IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

RASZELL REEDER,

                                                 Civil Action No.
                         Plaintiff,       9:09-CV-0977 (GTS/DEP)

       v.

MICHAEL HOGAN, OMH Commissioner;
JOANNE WALDRON, Unit Chief; MAUREEN
BOSCO, Forensic Program Administrator;
GREGORY SAVAGE, Mental Health
Counselor; JAMES MORGAN, Associate
Director of Quality  Management; TARA
BROUSSEAU, I.G.P.  Supervisor; THOMAS
LaVALLEY,[1] First Deputy Superintendent; DALE
ARTUS, Superintendent; and STEVEN RACETTE,
Deputy Superintendent of Security,

                                 Defendants.

_____

APPEARANCES:

<u>FOR PLAINTIFF</u>:               <u>OF COUNSEL</u>:

RASZELL REEDER, *Pro Se*
94-A-6388
Clinton Correctional Facility
PO Box 2002
Dannemora, NY 12929

_____

      [1]      Both plaintiff's complaint and the court's records list this defendant's name as "Lavalle".   On his return of service form, however, that defendant has signed his name as "LaValley".  The clerk will therefore be directed to amend the docket sheet to reflect the correct spelling of his name as "LaValley".

<u>FOR DEFENDANTS</u>:

HON. ERIC SCHNEIDERMAN                JUSTIN C. LEVIN, ESQ.
Office of the Attorney General              Assistant Attorney General
State of New York
Department of Law
The Capitol
Albany, New York 12224

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT, RECOMMENDATION, AND ORDER</u>

*Pro se* plaintiff Raszell Reeder, a New York State prison inmate, has

commenced this action pursuant to 42 U.S.C. § 1983 against various

employees of the New York State Office of Mental Health ("OMH") and

Department of Correctional Services ("DOCS"), alleging deprivation of his

civil rights.  Though difficult to decipher, plaintiff's complaint appears to

center upon the refusal of OMH and prison officials to allow his

participation in group therapy at the facility in which he is incarcerated and

to provide other mental health treatment not available to him at his mental

health level designation, with which he disagrees.  Plaintiff also attributes

various other actions taken against him by prison officials, including

alleged harassment, use of excessive force, and deprivation of food and

showers, to defendants' refusal to provide him with requested mental

health services.  Plaintiff's complaint requests injunctive, declaratory, and monetary relief.

In response to plaintiff's complaint defendants have moved seeking its dismissal for failure to state a claim upon which relief may be granted, additionally asserting their entitlement to qualified immunity and requesting a stay of discovery pending the determination of the motion. For the reasons set forth below, I recommend that the motion be granted, but that plaintiff be permitted leave to amend his complaint to assert Eighth Amendment claims of medical indifference claim based upon defendants' alleged failure to provide the requested mental health treatment, excessive use of force, and the conditions of his confinement, as well as a First Amendment mail tampering claim.  In addition, I will order that discovery in the action be stayed pending a final determination on the pending motion and, if the recommendation is accepted, the submission of an amended complaint that is accepted by the court for filing.

I.      BACKGROUND[2]

_____

[2]      In light of the procedural posture of this case, the following recitation is drawn principally from plaintiff's amended complaint, the contents of which have been accepted as true for purposes of the pending motion.  *See Erickson v. Pardus,* 551

(continued...)

3

Plaintiff is a prison inmate entrusted to the custody of the DOCS. *See generally* Complaint (Dkt. No. 1).  At the times relevant to his claims, plaintiff was designated to the Clinton Correctional Facility ("Clinton"), located in Dannemora, New York, where he remains confined.  *Id.*

The circumstances giving rise to plaintiff's claim appear to stem from a determination in February or March of 2009 to assign the plaintiff a mental health Level Six designation.[3]  Complaint (Dkt. No. 1) ¶¶ 1, 2. According to the plaintiff, as a Level Six inmate he is not eligible to receive mental health treatment, including participation in the group therapy program ("GTP") at Clinton.  *Id.* at ¶¶ 1-3.  Plaintiff attributes the apparent change in designation to retaliation in response to his having thrown "a huge bucket of feces" at a mental health nurse and a corrections officer.

_____

[2](...continued)
U.S. 89, 94, 127 S. Ct. 2197, 2200 (2007) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56, 127 S. Ct. 1955, 1965 (2007)); *see also Cooper v. Pate*, 378 U.S. 546, 546, 84 S. Ct. 1733, 1734 (1964).  The court has also considered plaintiff's submission in opposition to the defendants' motion, Dkt. No. 22, to the extent it is consistent with the allegations set forth in his complaint.  *See Donhauser v. Goord*, 314 F. Supp. 2d 119, 121 (N.D.N.Y. 2004) (Hurd, J.).

[3]       According to the court's research, it appears that inmates are classified based upon their medical and mental health needs by levels that correspond to facility levels, which define the services that are available at the facility.  *See* N.Y. Correct. Law § 137 and 9 N.Y.C.R.R. § 7013.8; *see also* DOCS Directive No. 4301, Mental Health Satellite Services and Commitments to CNYPC.  Apparently, these classifications are made pursuant to the DOCS Health Services Policy Manual, a policy that is published by the DOCS Division of Health Services, *see* DOCS Directive No. 4300, and is not publicly available.

*Id.* at ¶ 2.

On or about July 16, 2009, plaintiff filed a grievance, designated as no. CL-59217-09, challenging his Level Six designation.  Complaint (Dkt. No. 1) ¶ 3.  The grievance was denied by defendant Thomas LaValley, the First Deputy Superintendent at Clinton, allegedly based upon LaValley's hatred of the plaintiff, which he attributes to racism.[4]  *Id.*

Although plaintiff's complaint does not provide elaboration, it appears that he also registered concerns over the Level Six designation with defendant James Morgan, Associate Director of Quality Management, who in or about March of 2009 forwarded those concerns "to appropriate DOCS leadership", including defendant Joanne Waldron, the Unit Chief, and Maureen Bosco, a Forensic Program Administrator. Complaint (Dkt. No. 1) ¶ 4.  Those defendants, however, did nothing to address plaintiff's concerns.  *Id.*

Plaintiff maintains that defendant Gregory Savage, a mental health counselor, should not have been removed from his case, and the Level Six designation should never have been issued.  Complaint (Dkt. No. 1) ¶

---

[4]      Plaintiff claims that the grievance process at Clinton is inadequate.  *Id.* at ¶ 7.

5

5.  Plaintiff contends that as a result of the change in designation his life has been placed in danger, he is constantly attacked, denied meals, receives food that had been tampered with, experiences interference with his mail, and suffers from "mental imbalance."  *Id.* at ¶ 5.

Plaintiff has apparently sent letters concerning his circumstances to defendants Michael Hogan, Commissioner of the OMH, Joanne Waldron, Maureen Bosco, Gregory Savage, James Morgan, Inmate Grievance Program ("IGP") Supervisor Tara Brousseau, Superintendent Dale Artus, First Deputy Superintendent LaValley, and Deputy Superintendent of Security Steven Racette; despite those communications there has been no change in his designation or the mental health treatment provided to him at Clinton.  Complaint (Dkt. No. 1) ¶ 6.  Plaintiff theorizes that the friendship of various prison officials with the nurse and corrections officer that were the targets of his bucket of feces has resulted in an organized conspiracy to retaliate against him, including in connection with his treatment at Clinton.  *Id.*

II.   PROCEDURAL HISTORY

Plaintiff commenced this action on August 28, 2009.[5]  Dkt. No. 1.

---

[5]    This is the third of four civil rights actions filed by the plaintiff in this
(continued...)

6

As defendants, plaintiff's complaint names OMH Commissioner Michael

Hogan; Joanne Waldron, identified as a Unit Chief; Maureen Bosco, a

Forensic Program Administrator; Mental Health Counselor Gregory

Savage; James Morgan, an Associate Director of Quality  Management;

IGP Supervisor Tara Brousseau; Thomas LaValley, First Deputy

Superintendent; Dale Artus, the Superintendent at Clinton; and Steven

Racette, the Deputy Superintendent of Security at the facility.  *Id.*

Plaintiff's complaint asserts claims under the First, Eighth, and Fourteenth

Amendments to the United States Constitution.

        In lieu of answering, on March 5, 2010 the defendants moved

pursuant to Rule 12(b)(6) of the Federal Rules of Civil to dismiss plaintiff's

complaint for failure to state a claim upon which relief may be granted.  In

their motion defendants challenge the merits of plaintiff's claims and the

adequacy of his showing of personal involvement on the part of certain of

the defendants, additionally seeking a finding that they are entitled to

qualified immunity from suit.  Dkt. No. 21.  Plaintiff has since responded in

opposition to defendants' motion.  Dkt. No. 22.

---

[5](...continued)
district since the beginning of 2009.  *See Reeder v. Hogan*, Civil Action No. 9:09-CV-
520 (NAM/AJB); *Reeder v. Artus,* 9:09-CV-0575 (DNH/DRH); and *Reeder v. Allan*,
Civil Action. No. 9:10-CV-959 (TJM/GHL).

The pending motion, which is now fully briefed and ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).  *See* Fed. R. Civ. P. 72(b).[6]

## III.   DISCUSSION

### A.   Dismissal Motion Standard

A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny.  *Ashcroft v. Iqbal*, ___ U.S. ___, ___, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 555, 127 S. Ct. 1955, (2007)).  Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  *Id.*  While modest in its requirement, that rule

---

[6]     This action was stayed on October 8, 2010 based upon efforts by Magistrate Judge Victor Bianchini to mediate the case.  *See* Dkt. No. 25.  The stay was lifted on January 31, 2011.  Dkt. No. 27.

commands that a complaint contain more than mere legal conclusions; "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."  *Iqbal,* 129 S. Ct. at 1950.

To withstand a motion to dismiss, a complaint must plead sufficient facts which, when accepted as true, state a claim which is plausible on its face.  *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (citing *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974).  As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974).

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party.  *Cooper v. Pate*, 378 U.S. 546, 546, 84 S. Ct. 1723, 1734 (1964); *Miller v. Wolpoff & Abramson, LLP*, 321 F.3d 292, 300 (2d Cir. 2003), *cert. denied*, 540 U.S. 823, 124 S. Ct. 153 (2003); *Burke v. Gregory*, 356 F. Supp. 2d 179, 182 (N.D.N.Y. 2005) (Kahn, J.). However, the tenet that a court must accept as true all of the allegations

9

contained in a complaint is inapplicable to legal conclusions. *Iqbal*, 129 S.

Ct. at 1949.  In the wake of *Twombly* and *Iqbal*, the burden undertaken by

a party requesting dismissal of a complaint under Rule 12(b)(6) remains

substantial; the question presented by such a motion is not whether the

plaintiff is likely ultimately to prevail, "'but whether the claimant is entitled

to offer evidence to support the claims.'"  *Log On America, Inc. v.*

*Promethean Asset Mgmt. L.L.C.*, 223 F. Supp.2d 435, 441 (S.D.N.Y.

2001) (quoting *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir.

1995)) (citations and quotations omitted).

> B.   <u>Personal Involvement</u>

In their motion defendants assert that plaintiff's complaint fails to

allege the requisite personal involvement in the constitutional deprivations

alleged on the part of defendants Hogan, Morgan, Brousseau, Artus, and

Racette to support a finding of liability against them.

As the Supreme Court underscored in its recent decision in *Iqbal*,

personal involvement of defendants in alleged constitutional deprivations

is a prerequisite to an award of damages in a civil rights suit such as this.

129 S. Ct. at 1948; *see also Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.

1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.

1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S. Ct. 1282 (1978)).  In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant.  *See Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

Certain of the defendants identified in plaintiff's complaint appear to be named based solely upon their supervisory positions.  It is well-established, however, that a supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor; there is no *respondeat superior* liability under section 1983.  *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501. Culpability on the part of a supervisory official for a civil rights violation can, however, be established in one of several ways, including when that individual 1) has directly participated in the challenged conduct; 2) after learning of the violation through a report or appeal, has failed to remedy the wrong; 3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) was grossly negligent in managing the subordinates who caused the unlawful event; or 5) failed to act on

information indicating that unconstitutional acts were occurring.[7]  *Colon v. Coughlin*, 58 F.3D 865, 873 (2d Cir. 1995); *Wright*, 21 F.3d at 501; *see also Richardson*, 347 F.3d at 435.

Plaintiff's claims against OMH Commissioner Hogan, Associate Director Morgan, Superintendent Artus, and Deputy Superintendent Racette are limited to his contention that they are liable for constitutional deprivations based upon their failure to abate the violations after having been placed on notice of the offending conditions by letter.  *See, e.g.,* Complaint (Dkt. No. 1) ¶¶ 2, 6.  Standing alone, however, such allegations are insufficient to establish the requisite personal involvement on the part of those defendants in the constitutional violations alleged.  *Greenwaldt v.*

---

[7]      The Second Circuit has yet to address the impact of *Iqbal* upon the categories of supervisory liability under *Colon*.  Lower courts have struggled with this issue, and specifically whether *Iqbal* effectively calls into question certain prongs of the *Colon* five-part test for supervisory liability.  *See Sash*, 674 F. Supp. 2d at 542-544; *see also Stewart v. Howard*, No. 9:09-CV-0069 (GLS/GHL), 2010 WL 3907227, at *12 n.10 (N.D.N.Y. Apr. 26, 2010) ("The Supreme Court's decision in [*Iqbal*] arguably casts in doubt the continued vitality of some of the categories set forth in *Colon*.") (citations omitted), *report and recommendation adopted*, 2010 WL 3907137 (Sept. 30, 2010) .  While some courts have taken the position that only the first and third of the five *Colon* categories remain viable and can support a finding of supervisory liability, *see, e.g., Bellamy v. Mount Vernon Hosp.*, No.07 CIV. 1801, 2009 WL1835939, at *6 (S.D.N.Y. June 26, 2009), *aff'd*, 387 Fed. App'x 55 (2d Cir. 2010), others disagree and conclude that whether any of the five categories apply in any particular case depends upon the particular violations alleged and the supervisor's participatory role, *see, e.g., D'Olimpio v. Crisafi*, Nos. 09 Civ. 7283 (JSR), 09 Civ. 9952 (JSR), 2010 WL 2428128, at *5 (S.D.N.Y. Jun. 15, 2010); *Qasem v. Toro*, No. 09 Civ. 8361 (SHS), 2010 WL 3156031, at *4 (S.D.N.Y. Aug. 10, 2010).  Copies of these and all unreported decisions referred to herein are attached for the convenience of the *pro se* plaintiff.

*Coughlin,* No. 93 Civ. 6551, 1995 WL 232736, at *4 (S.D.N.Y. Apr.19,

1995) ("[I]t is well-established that an allegation that an official ignored a

prisoner's letter of protest and request for an investigation of allegations

made therein is insufficient to hold that official liable for the alleged

violations.") (citing, *inter alia, Garrido v. Coughlin*, 716 F.Supp. 98, 100

(S.D.N.Y.1989) (dismissing claim against superintendent of prison where

only allegation was that he ignored inmate's request for an investigation)).

　　Since plaintiff's allegations against defendants Hogan, Morgan,

Artus and Racette appear to be predicated solely upon their failure to act

in response to his various letters, they are entitled to dismissal of plaintiff's

claims against them based upon lack of personal involvement.

　　The fifth defendant seeking dismissal on the basis of lack of

personal involvement, Tara Brousseau, stands on different footing.  While

the allegations against defendant Brousseau, identified as an IGP

Supervisor at Clinton, also depend in part upon plaintiff's allegations that

she failed to respond to communications regarding his mental health

treatment, they go beyond that mere allegation to also rest upon her

alleged failure to process grievances, and are thus sufficient to

demonstrate defendant Brousseau's personal involvement in the

deprivations alleged, and specifically that failure.[8]  I therefore recommend against dismissal of plaintiff's claims against defendant Brousseau on the basis of lack of personal involvement.

C.    Retaliation

Scattered throughout plaintiff's complaint are isolated, conclusory allegations of retaliation.  Plaintiff appears to attribute both his Level Six designation and the corresponding denial of GTP participation, as well as actions taken by the various unidentified corrections personnel, to retaliatory animus.  In their motion defendants challenge the sufficiency of those allegations.

When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies.  *See Franco v. Kelly*, 854 F.2d 584, 588-90 (2d Cir. 1988).  As the Second Circuit has repeatedly cautioned, however, such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach

---

[8]        As will be seen, those claims, which arise under the First Amendment, nonetheless lack merit.  *See* pp. 19-21, *post*.

such claims "with skepticism and particular care." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001) (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002); *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (same).

In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action – in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S. Ct. 568, 576 (1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007); *Dawes*, 239 F.3d at 492 (2d Cir. 2001).  If the plaintiff carries this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy*, 429 U.S. at 287, 97 S. Ct. at 576.  If taken for both proper and

improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone.  *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (citations omitted).  When a claim of retaliation is alleged in only conclusory fashion unsupported by facts tending to establish the requisite nexus between protected activity and the adverse action complained of, dismissal for failure to state a cognizable claim is warranted.  *Crenshaw v. Hartman*, 681 F. Supp. 2d 412, 416 (W.D.N.Y. 2010);  *McQuilkin v. Central New York Psychiatric Center*, No. 9:08-CV-00975, 2010 WL 3765847, at * 15 (N.D.N.Y. Aug 27, 2010) (Peebles, M.J.), *Report and Recommendation Adopted*, 2010 WL 3765715 (N.D.N.Y. Sep 20, 2010) (McAvoy, S.J.).

Here, plaintiff's complaint is uninformative when addressing the protected conduct that serves as the lynchpin for his First Amendment retaliation claim.  Plaintiff's complaint seems to reflect his belief that the Level Six designation was attributable to his having thrown feces on a mental health nurse and a corrections officer.  Complaint (Dkt No. 1) ¶ 2.  Such conduct, however, is obviously not entitled to protection under the First Amendment.  *Ferrell v. Beard*, No. 3:CV-01-0924, 2006 WL 2828862, at *7-8 (M.D.Pa. Sept. 29, 2006).

16

It is true that plaintiff's complaint makes reference to the filing of a grievance in July of 2009.  Complaint (Dkt. No. 1) ¶ 3.  The filing of a grievance can constitute protected activity for purposes of the First Amendment.  *Graham*, 89 F.3d at 80.  In this instance, however, the allegedly adverse action – the Level Six designation and corresponding denial of mental health treatment associated with that level – pre-dated the filing of the grievance, and thus logically cannot serve as a predicate for supporting a retaliation claim.

In sum, careful review of plaintiff's complaint fails to disclose allegations of fact sufficient to support a plausible claim of retaliation, including that plaintiff engaged in protected activity, that he suffered adverse action, and that the two are related.  Accordingly, I recommend dismissal of plaintiff's retaliation claim.

D.    Conspiracy

Throughout his complaint plaintiff also makes reference to a conspiracy among prison and mental health officials to retaliate against him, and to harass and assault him.  *See, e.g.,* Complaint (Dkt. No. 1) ¶ 2 (alleging constant use of "retaliation conspiracy methods against [the plaintiff] . . ."); ¶ 4 (alleging assault "in a conspiracy attack" by a cell

17

extraction team); ¶ 6 (alleging that mental health personnel at Clinton engaged in "conspiracy retaliation against [the plaintiff] in denying him participation in GTP and placing him at a Level Six designation] and additionally alleging that corrections officers at the facility "organized retaliation conspiracies against [the plaintiff]); ¶ 8 (alleging the existence of "constant conspiracy cover-ups").  Defendants maintain that these allegations are insufficient to demonstrate the existence of a plausible claim of conspiracy, and that in any event such a claim would be barred by the intra-agency conspiracy doctrine.

To sustain a conspiracy claim under § 42 U.S.C. 1983, a plaintiff must demonstrate that a defendant "acted in a wilful manner, culminating in an agreement, understanding or meeting of the minds, that violated the plaintiff's rights . . . secured by the Constitution or the federal courts." *Malsh v. Austin*, 901 F. Supp. 757, 763 (S.D.N.Y. 1995) (citations and internal quotation marks omitted).  Conclusory, vague or general allegations of a conspiracy to deprive a person of constitutional rights do not state a claim for relief under section 1983.  *See Sommer v. Dixon*, 709 F.2d 173, 175 (2d Cir.), *cert. denied*, 464 U.S. 857, 104 S. Ct. 177 (1983).

In this instance, plaintiff's complaint fails to identify the participants

18

in the alleged conspiracy, and to allege facts demonstrating the existence

of a plausible conspiracy claim to include a meeting of the minds and an

agreement among the parties to abridge plaintiff's constitutional rights.

Accordingly, I recommend dismissal of plaintiff's claims of conspiracy.[9]

*Webb v. Goord*, 340 F.3d 105, 110-11 (2d Cir. 2003), *cert. denied*, 540

U.S. 1110, 124 S. Ct. 1077 (2004).

E.    Interference With The Grievance Process

In his complaint plaintiff appears to assert that certain of the

defendants, including principally IGP Supervisor Tara Brousseau, failed to

process grievances he filed.  *See, e.g.,* Complaint (Dkt. No. 1) ¶ 11.  In

their motion defendants request dismissal of plaintiff's grievance

interference claim for failing to state a cause of action upon which relief

───────────────────

[9]    Although it appears that the question of whether two state agencies can conspire together has not been directly addressed by the courts in this circuit, in general the intra-corporate conspiracy doctrine provides that with exceptions not now presented, an entity cannot conspire with one or more of its employees, acting within the scope of employment, and thus a conspiracy claim conceptually will not lie in such circumstances.  *See, e.g.*, *Everson v. New York City Transit Auth.*, 216 F.Supp.2d 71, 75-76 (E.D.N.Y.2002); *Griffin-Nolan v. Providence Washington Ins. Co.*, No. 5:04CV1453, 2005 WL 1460424, at *10-11 (N.D.N.Y. June 20, 2005) (Scullin, C.J.). Thus, as defendants argues, it seems that in any event plaintiff's conspiracy claims could well be precluded under the intra-agency conspiracy doctrine.  *See Murray v. Pataki,* No. 9:03-CV-1263, 2009 WL 981217, at * 4 n. 11 (N.D.N.Y. Apr. 9, 2009) (Suddaby, J.) (citing cases), *rev'd on other grounds*, 378 Fed. App'x 50 (2d Cir. 2010); *see also Little v. City of New York,* 487 F. Supp. 2d 426, 441-42 (S.D.N.Y. 2007) (citations omitted).

may be granted.

While the First Amendment affords a right to petition the government for redress, thus guarantying meaningful access to the courts, that right does not extend to require prison officials provide inmate grievance mechanisms and to constitutionally entitle inmates to access to such procedures. *Burgess v. Champagne*, No. 08-CV-725, 2011 WL 382203, at *8 (N.D.N.Y. Jan. 12, 2011) (Homer, M.J.) (citing *Shell v. Brzesniak*, 365 F. Supp. 2d 362, 370 (W.D.N.Y. 2005)), *Robinson v. New York State Dep't of Corr. Serv.*, No. 9:08-CV-0911, 2009 WL 3246818, at * 17 (N.D.N.Y. Sept. 30 2009) (McAvoy, S.J. and DiBianco, M.J.); *Cancel v. Goord*, No. 00 CIV 2042 LMN, 2001 WL 303713, *3 (S.D.N.Y. March 29, 2001). It therefore follows, and courts have consistently held, that an inmate does not possess a cognizable claim for denial of or interference with access to established grievance procedures such as those provided by the DOCS in New York. *See, e.g., Burgess,* 2011 WL 382203, at * 9*; Reeder v. Hogan*, 2010 WL 3909050, at *6 (N.D.N.Y. Sept. 30, 2010) (Mordue, C.J. and Baxter, M.J.); *DeJesus v. Tierney*, No. 9:04-CV-298, 2006 WL 839541, *10 (N.D.N.Y. March 28, 2006). Accordingly, I recommend that dismissal of plaintiff's claims alleging the failure of prison

officials to process grievances filed by him with the DOCS.

    F.    Mail Tampering

    In his complaint plaintiff intimates in passing that prison officials at

Clinton have tampered with his mail.  Complaint (Dkt. No. 1) ¶¶ 5, 11.

Plaintiff's complaint does not provide any details regarding the alleged

tampering, nor does it identify which prison officials are alleged to have

been involved.  While defendants also challenge the sufficiency of this

claim,unfortunately plaintiff's papers in opposition fail to address this

aspect of defendants' motion and provide no elaboration on the mail

tampering allegations contained within his complaint.

    Among the protections enjoyed by prison inmates, though not

unfettered, is the right "to the free flow of incoming and outgoing mail"

guaranteed by the First Amendment.  *LeBron v. Swaitek*, No. 05-CV-172,

2007 WL 3254373, at *6 (N.D.N.Y. 2007) (Sharpe, J.) (quoting *Davis v.

Goord*, 320 F.3d 346, 351 (2d Cir. 2003)).  That right, however, gives way

to the legitimate penological interests of prison officials when mail is

monitored for the purpose of ensuring order in the prison by preventing

illegal activities, in which case no constitutional violation has occurred.

*U.S. v. Workman*, 80 F.3d 688, 699 (2d Cir. 1996), *cert. denied*, 519 U.S.

21

938, 117 S. Ct. 319 (1996).  Actions taken by prison administrators directed toward inmate mail are subject to the overarching consideration that a prison regulation infringing on an inmate's constitutional rights is valid so long as the regulation is "reasonably related to the legitimate penological interests."  *Turner v. Safely*, 482 U.S. 78, 89, 107 S. Ct. 2254, 2261 (1987).

Plaintiff's complaint in this case fails to plead facts demonstrating the existence of a plausible mail tampering claim.  Neither the alleged facts surrounding the tampering, nor the identity of those to whom it is attributed are disclosed in plaintiff's complaint.  According, I recommend dismissal of plaintiff's First Amendment mail tampering claim as failing to state a plausible cause of action.  *See Islam v. Goord*, No. 05 Civ. 7502, 2006 WL 2819651, at *7 (S.D.N.Y.  Sept. 29, 2006)

G.    Eighth Amendment

In his complaint plaintiff raises several concerns regarding the conditions of his confinement and treatment he has received, alleging that he has been subjected to cruel and unusual punishment in violation of the Eighth Amendment.

The Eighth Amendment to the United States Constitution provides

22

that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. CONST. AMEND. VIII. The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society."  *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S. Ct. 285, 290, 291 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S. Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle*).  While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny.  *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S. Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman*, 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

<div align="center">

1.   <u>Excessive Force</u>

</div>

Plaintiff's complaint is replete with references to the use of excessive force against him by corrections officers and alleges claims under both the Eighth and Fourteenth Amendments.[10]  *See, e.g.,*

---

[10]   Plaintiff's opposition motion papers provide some illumination with regard
(continued...)

Complaint (Dkt. No. 1) ¶¶ 2, 4-5, 7.  In general, excessive force claims

involving convicted inmates implicate the Eighth Amendment, whereas

those involving pretrial detainees implicate the Fourteenth Amendment.

*Brown v. Outhouse*, No. 9:07-CV-1169, 2010 WL 3862082, at * 8

(N.D.N.Y. Jul. 9, 2010) (Lowe, M.J.), *Report and Recommendation*

*Adopted*, 2010 WL 3862080 (N.D.N.Y. Sep. 27, 2010) (Sharpe, J.).  This

is a distinction without a difference, however, since both types of claims

are analyzed under the framework of *Hudson v. McMillian*, 503 U.S. 1,

112 S. Ct. 995 (1992). *United States v. Walsh*, 194 F.3d 37, 48 (2d

Cir.1999). Under that framework, when prison officials are "accused of

---

[10](...continued)
to his Eighth Amendment claims.  Plaintiff's Opposition (Dkt. No. 22) at pp. 5-6.  His
Eighth Amendment claim appears to include allegations of that he has been denied
food and subjected loud noises, including banging caused by loose water pipes and
beating on the plexiglass shield to his cell, as well as alleged physical assaults
experienced when he complained to facility administrators regarding his
circumstances.  *Id.*  Plaintiff also identifies several corrections officers allegedly
involved in causing noise and preventing him from sleeping, conditions which could
potentially rise to a level sufficient to state a cognizable constitutional claim.  *Wilson v.*
*Seiter*, 501 U.S. 294, 303-05, 111 S. Ct. 2321, 2327-28 (1991) (overcrowding,
excessive noise, insufficient locker storage space, inadequate heating and cooling,
improper ventilation, unclean and inadequate restrooms, unsanitary dining facilities
and food preparation, and housing with mentally and physically ill inmates can
establish an Eighth Amendment violation when such conditions have the effect of
producing the deprivation of a single, identifiable human need).  Unfortunately, with
regard to his claim of excessive force and unsafe conditions to which he has been
allegedly exposed, neither plaintiff's complaint nor his opposition papers identify which
corrections personnel have engaged in the unconstitutional conduct directed against
him.

using excessive physical force ... the core judicial inquiry is ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 6-7.

In this instance, plaintiff has not identified any of the defendants named in his complaint as having participated in the assaults referenced. Accordingly, plaintiff's excessive force claims are subject to dismissal. *See Wright,* 21 F.3d at 501.

### 2. Food Denial/Food Tampering

Included within the ambit of the guarantees afforded to prison inmates under the Eighth Amendment is entitlement to "'the minimal civilized measure of life's necessities,' such as adequate food, clothing, shelter, sanitation, medical care, and personal safety." *May v. DeJesus,* No. 3:06-CV-1888, 2010 WL 1286800, at *4 (D. Conn. Mar. 30, 2010) (*quoting Alvarez v. County of Cumberland,* Civil Action No. 07-346 (RBK), 2009 WL 750200, at *2 (D.N.J. Mar. 18, 2009) (*citation omitted)).*  The Second Circuit has recognized that the Eighth Amendment requires that prisoners be provided with "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v.*

25

*Couglin*, 725 F.2d 12, 15 (2d Cir. 1983) (citation omitted); *Brown v. Eagen*, No. 9:08-CV-0009, 2009 WL 815724, at *10 (N.D.N.Y. Mar. 26, 2009) (McAvoy, S.J.) (citations omitted); *Midalgo v. Bass*, No. 9:03-CV-1128, 2006 WL 2795332, at * 11 (N.D.N.Y. Sept. 26 2006) (Mordue, C.J.) (citations omitted).

In this case, plaintiff's complaint is devoid of any specifics regarding his alleged food tampering claim, as well as an identification of which of the defendants, if any, are responsible for the tampering.  Accordingly, being unable to discern a plausible Eighth Amendment claim from the four corners of plaintiff's complaint, I also recommend dismissal of this portion of plaintiff's Eighth Amendment cause of action.

### 3.   Denial of Mental Health Treatment

Serving as the focal point of plaintiff's Eighth Amendment claim is the allegation that the defendants have failed to provide him with adequate mental health treatment.

Claims that prison officials have intentionally disregarded an inmate's medical needs also fall under the umbrella of protection from the imposition of cruel and unusual punishment afforded by the Eighth Amendment.  *Estelle,* 429 U.S. at 102, 104, 97 S.Ct. at 290, 291.  A claim

alleging that prison officials have violated the Eighth Amendment by

inflicting cruel and unusual punishment must satisfy both objective and

subjective requirements.   *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir.

2009); *Price v. Reilly*, No. 07-CV-2634 (JFB/ARL), 2010 WL 889787, at

*7-8 (E.D.N.Y. Mar. 8, 2010).  Addressing the objective element, to prevail

a plaintiff must demonstrate a violation sufficiently serious by objective

terms, "in the sense that a condition of urgency, one that may produce

death, degeneration, or extreme pain exists."  *Hathaway v. Coughlin*, 99

F.3d 550, 553 (2d Cir. 1996).  With respect to the subjective element, a

plaintiff must also demonstrate that the defendant had "the necessary

level of culpability, shown by actions characterized by 'wantonness.'"

*Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999).  Claims of medical

indifference are subject to analysis utilizing this Eighth Amendment

paradigm.  *See Salahuddin v. Goord,* 467 F.3d 263, 279-81 (2d Cir.

2006).

<div align="center">1.    Objective Requirement</div>

Analysis of the objective, "sufficiently serious," requirement of an

Eighth Amendment medical indifference claim begins with an inquiry into

"whether the prisoner was actually deprived of adequate medical care . .

<div align="center">27</div>

.", and centers upon whether prison officials acted reasonably in treating the plaintiff. *Salahuddin*, 467 F.3d at 279.  A second prong of the objective test addresses whether the inadequacy in medical treatment was sufficiently serious.  *Id*. at 280.  If there is a complete failure to provide treatment, the court must look to the seriousness of the inmate's medical condition.  *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003).  If, on the other hand, the complaint alleges that treatment was provided but was inadequate, the seriousness inquiry is more narrowly confined to that alleged inadequacy, rather than focusing upon the seriousness of the prisoner's medical condition.  *Salahuddin*, 467 F.3d at 280.  "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in treatment. . . [the focus of] the inquiry is on the challenged delay or interruption, rather that the prisoner's underlying medical condition alone."  *Id.* (quoting *Smith*, 316 F.3d at 185) (internal quotations omitted).  In other words, at the heart of the relevant inquiry is the seriousness of the medical need, and whether from an objective viewpoint the temporary deprivation was sufficiently harmful to establish a constitutional violation.  *Smith*, 316 F.3d at 186.  Of course, "when medical treatment is denied for a prolonged period of time,

or when a degenerative medical condition is neglected over sufficient time, the alleged deprivation of care can no longer be characterized as 'delayed treatment', but may properly be viewed as a 'refusal' to provide medical treatment." *Id.* at 186, n.10 (quoting *Harrison v. Barkley*, 219 F.3d 132, 137 (2d Cir. 2000)).

Since medical conditions vary in severity, a decision to leave a condition untreated may or may not raise constitutional concerns, depending on the circumstances. *Harrison,* 219 F.3d at 136-37 (quoting, *inter alia, Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir. 1998)). Relevant factors informing this determination include whether the plaintiff suffers from an injury or condition that a "'reasonable doctor or patient would find important and worthy of comment or treatment'", a condition that "'significantly affects'" a prisoner's daily activities, or "'the existence of chronic and substantial pain.'" *Chance,* 143 F.3d at 702 (citation omitted); *Lafave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at *3 (N.D.N.Y. Apr. 3, 2002) (Sharpe, M.J.) (citation omitted).

2.    Subjective Element

The second, subjective, requirement for establishing an Eighth Amendment medical indifference claim mandates a showing of a

29

sufficiently culpable state of mind, or deliberate indifference, on the part of one or more of the defendants.  *Salahuddin*, 467 F.3d at 280 (citing *Wilson*, 501 U.S. at 300, 111 S.Ct. at 2325).  Deliberate indifference, in a constitutional sense, exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach v. Dufrain,* 103 F. Supp.2d 542, 546 (N.D.N.Y. 2000) (Kahn, J.) (citing *Farmer*); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.) (same).  Deliberate indifference is a mental state equivalent to subjective recklessness as the term is used in criminal law.  *Salahuddin*, 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839-40, 114 S. Ct. 1970).

Here, plaintiff alleges that he has been denied needed mental health treatment as a result of his Level Six designation.  Prior to the Supreme Court's decisions in *Twombly* and *Iqbal,* this could potentially have sufficed to establish a cognizable Eighth Amendment medical indifference claim.  In the wake of those decisions, however, it seems clear that more

facts must be alleged in order to support a plausible deliberate indifference claim.  *Iqbal*, 129 S. Ct. at 1949-50; *Kalwansinski v. Maxymillian*, No. 9:09-CV-0214, 2010 WL 5620908, at * 2 (N.D.N.Y. Dec. 23, 2010) (Lowe, M.J.); *Snyder v. Law*, 2010 WL 5572768, at * 2 (N.D.N.Y. 2010) (Treece, M.J.); *Excell v. Woods*, No. 9:07-CV-0305, 2009 WL 3123323, at *16 n.26 (N.D.N.Y. Sept. 29, 2009) (Suddaby, J. and Lowe, M.J.).

Plaintiff's complaint does not provide information concerning the extent of his mental health condition, nor does it provide insight into the effects of the failure of prison and OMH personnel to provide him with GTP or other undisclosed treatment mental health treatment, other than to allege in conclusory terms that the failure has led to a parade of horribles, including assaults.  Similarly, plaintiff's complaint fails to identify those responsible for the Level Six designation, and does not contain facts sufficient to satisfy the subjective element of the Eighth Amendment test on the part of those who made the designation.   I therefore recommend dismissal of plaintiff's deliberate indifference claim, though with leave to replead in order to permit him to flesh out the facts associated with his claims sufficiently to demonstrate the existence of a plausible Eighth

Amendment cause of action.

    H.    <u>Plaintiff's Claim For Recovery of Compensatory Damages</u>

    In their motion defendants also challenge plaintiff's request for an

award of compensatory damages based upon his failure to allege that he

suffered physical injury as a result of the defendants' alleged

constitutional conduct.

    Among the measures added in 1996 by the Prison Litigation Reform

Act ("PLRA") was one which provides, in relevant part, that

> [n]o Federal civil action may be brought by a
> prisoner confined in a jail, prison, or other
> correctional facility, for mental or emotional injury
> suffered while in custody without a prior showing of
> physical injury.

42 U.S.C. § 1997e(e).  Section 1997e(e) includes within its purview

alleged constitutional violations brought pursuant to 42 U.S.C. § 1983.

*Thompson v. Carter,* 284 F.3d 411, 417-18 (2d Cir. 2002); *Petty v. Goord,*

No. 00 Civ.803, 2002 WL 31458240, at *8-9 (S.D.N.Y. Nov. 4, 2002).

Under section 1997e(e), claims brought by inmates for emotional

damages unrelated to any physical injury in civil rights actions are subject

to dismissal.  *Shariff v. Coombe*, No. 96 Civ. 3001, 2002 WL 1392164, at

*4 (S.D.N.Y. June 26, 2002).  The absence of physical injury does not

totally bar civil rights claims by inmates, however, since section 1997e(e) does not preclude claims for nominal damages, punitive damages, or declaratory or injunctive relief.  *Id.* at *5 (citation omitted).

Plaintiff's complaint does not directly state that he experienced physical injury as a result of defendants' conduct. Moreover, in response to defendants' motion, which asserts the lack of physical injury, plaintiff has chosen not to respond and controvert that assertion.  Under these circumstances I recommend dismissal of plaintiff's claim for recovery of compensatory damages on this independent basis.  *Iqbal v. Hasty,* 490 F.3d 143, 152-53 (2d Cir. 2007), *rev'd on other grounds,* 129 S. Ct. 1937 (2009); *see also Richardson v. Goord*, 347 F.3d at 435; *Colon v. Coughlin,* 58 F.3d at 873; *Wright v. Smith*, 21 F.3d at 501.

H.   New York Correction Law § 24

Although this is less than clear, in the closing portions of his complaint plaintiff references "tort claims and negligence."  *See* Complaint (Dkt. No. 1) at p. 13.  Defendants assert that pursuit of such tort claims, including negligence, in this action is statutorily precluded based upon N.Y. Corrections Law § 24. [11]

---

[11]    Claims of negligence are not cognizable under section 1983, *Arroyo v.*
(continued...)

By statute, New York invests state employees, including correctional workers, with immunity from suits requiring them to personally answer state law claims for damages based on activities falling within the scope of the statute, providing that

1.  [n]o civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of [the Department of Correctional Services], in his personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

2.  Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties of any officer or employee of [the Department of Correctional Services] shall be brought and maintained in the court of claims as a claim against the state.

N.Y. Correct. Law § 24; *see also Ierardi v. Sysco,* 119 F.3d 183, 186-87 (2d Cir. 1997).[12]   Section 24 thus precludes claims against corrections

---

[11](...continued)
*City of New York*, No. 99 Civ. 1458, 2003 WL 22211500, at * 2 (S.D.N.Y. 2003) (citing *Estelle*, 429 U.S. at 105-06, 97 S. Ct. at 292), although the court could choose to exercise supplemental jurisdiction over such a pendent state law cause of action pursuant to 28 U.S.C. § 1367.   *Stephenson v. Albany County Policymakers*, Civ. No. 6:09-CV-326, 2009 WL 2922805, at *2 (N.D.N.Y. Aug. 14, 2009) (Kahn, J. & Treece, M.J.) (citing 28 U.S.C. § 1367(c)(3)).

[12]   To be sure, the immunity afforded under section 24 is by no means absolute; actions taken by corrections workers occurring during the course of their

(continued...)

officers brought against them in any court in their personal capacities arising out of the discharge of their duties.  *Baker v. Couglin*, 77 F.3d 12, 14-15 (2d Cir. 1996).

In *Haywood v. Drown*, ___ U.S. ___, 129 S. Ct. 2108 (2009), the Supreme Court recently held this provision unconstitutional to the extent it precludes inmates from pursuing § 1983 actions.  In the wake of *Haywood*, "the courts of this district have unanimously held that the *Haywood* decision does not affect the question of the district court's jurisdiction to hear pendent state-law claims against DOCS officials."  *Joy v. New York*, No. 5:09-CV-841, 2010 WL 3909694, at * 4 (N.D.N.Y. Sept. 30, 2010) (Scullin, S.J.) (citing *Crump v. Ekpe*, No. 9:07-CV-1331, 2010 WL 502762, *18 (N.D.N.Y. Feb. 8, 2010) (Kahn, J. and Peebles, M.J.) (quoting *May v. Donneli*, 9:06-cv-437, 2009 WL 3049613, at *5 (N.D.N.Y. Sept.18, 2009) (Sharpe, J. & Treece, M.J.);*Tafari v. McCarthy*, 714 F.Supp.2d 317, 384 (N.D.N.Y. 2010) (citations omitted)).  In those cases,

_____

[12](...continued)
employment but wholly outside of their scope of employment, for example, lack the protection of that section.  The circumstances presented in *Ierardi,* for example, involving a claim of sexual harassment made by a special education teacher employed by the DOCS against a corrections officer assigned to the same facility, serves aptly to illustrate the type of situation in which section 24 would not afford protection.  *Ierardi*, 119 F.3d at 188-89.

however, where the acts of the corrections officers alleged fell within the scope of their employment, the courts found that section 24 remained intact and precluded the exercise of jurisdiction to hear such pendent state law claims. *See, e.g., Joy,* 2010 WL 3909694, at * 4.

In this case, plaintiff's pendent state law claims, alleging negligence and other torts of an unspecified nature, indisputably arise from actions taken by the DOCS personnel in their roles as corrections employees.[13] Although the precise nature of the conduct giving rise to plaintiff's claims of negligence is unclear from his complaint, it almost certainly stems from defendants' alleged failure to properly label his mental health condition and to provide appropriate treatment. Because those claims may entail constitutional deprivations and actions exceeding the scope of a corrections officer's authority, such claims have consistently been treated as giving rise to immunity from suit for pendent state law claims against corrections officers in their individual capacities, whether in state or federal court. *See, e.g. Baker*, 77 F.3d at 15-16; *Parker v. Fogg*, No. 85-CV-177, 1994 WL 49696, at *9 (N.D.N.Y. Feb. 17, 1994) (McCurn, S.J.).

---

[13] Section 24 does not shield non-DOCS personnel, including employees of the OMH, from liability. *See Lumpkin v. Albany Truck Rental Services, Inc.*, 70 A.D.2d 441, 444, 421 N.Y.S.2d 714 (3d Dep't 1979). Accordingly, this argument applies only to those of the defendants who are employees of the DOCS. *See id.*

*Cepeda v. Coughlin,* 128 A.D.2d 995, 996-97, 513 N.Y.S.2d 528, 530 (3d

Dep't 1987) (holding Correction Law section 24 applicable to actions

against corrections officers for allegedly using excessive force when

returning inmates to their cells during a disturbance), *lv. denied*, 70 N.Y.2d

602, 512 N.E.2d 550 (1987).  For this reason, I find that plaintiff's state

law claims are precluded by section 24, to the extent they are asserted

against DOCS employees, and recommend that they be dismissed.[14]

I.      Stay of Discovery

Defendants also move for the entry of a protective order pursuant to

Federal Rule of Civil Procedure Rule 26(c)(1) staying discovery pending

the resolution of defendants' motion to dismiss.  That rule provides, in

relevant part, that

> [a] party or any person from whom discovery is sought may
> move for a protective order in the court where the action is
> pending . . . The Court may, for good cause, issue an order to
> protect a party or person from annoyance, embarrassment,
> oppression, or undue burden or expense, including one or
> more of the following: (A) forbidding the disclosure or
> discovery.

---

[14]      In any event, even if I were to conclude that those state law claims were
not precluded, I would recommend that the court not exercise pendent jurisdiction of
such claims, "pursuant to 28 U.S.C. § 1367, which authorizes a federal court to decline
supplemental jurisdiction over a state claim if all of the claims over which the court had
original jurisdiction were dismissed."  *Stephenson*, 2009 WL 2922805, at *2.

Fed. R. Civ. P. 26(c)(1); *see Spencer Trask Software and Information Services, LLC v. RPost Intern. Ltd.*, 206 F.R.D. 367, 368 (S.D.N.Y. 2002) (granting stay of discovery pending determination of motion to dismiss where court found defendants presented "substantial arguments" for dismissal of many if not all of the claims in the lawsuit); *United States v. County of Nassau*, 188 F.R.D. 187, 188-89 (E.D.N.Y. 1999) (granting stay of discovery during the pendency of a motion to dismiss where the "interests of fairness, economy and efficiency . . . favor[ed] the issuance of a stay of discovery,"  and where the plaintiff failed to claim prejudice in the event of a stay.).

In light of my recommendation that the court dismiss plaintiff's complaint, though with leave to amend, I find the existence of good cause to issue an order protecting the defendants against the burden of engaging in discovery until after the plaintiff files an amended complaint, if any, and issue is properly joined by the defendants' filing of an answer.

IV.    SUMMARY AND RECOMMENDATION

Plaintiff's complaint in this action, which is rambling, repetitive, and lacking in specificity as to the actions complained of and the defendants to whom those actions are attributable, weaves a tapestry of alleged

38

constitutional claims, none of which are supported by facts demonstrating

the existence of any plausible cause of action.  Based upon the minimal

facts alleged in plaintiff's complaint, it seems clear that plaintiff cannot

state claims for retaliation or conspiracy and that any amendment as to

those claims would therefore be futile.[15]  On the other hand, plaintiff's

complaint does suggest the possibility that he could assert a plausible

claim of medical indifference based upon defendants' actions in

designating him as a Level Six mental health inmate and the

corresponding denial of mental health treatment associated with that

apparently more serious level designation, and, though doubtful, perhaps

Eighth Amendment claims for excessive use of force and relating to the

conditions of his confinement, as well as a cause of action for mail

_____

[15]     Ordinarily, a court should not dismiss a complaint filed by a  *pro se*
litigant without granting leave to amend at least once if there is any indication that a
valid claim might be stated.  *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir.1991)
(emphasis added); see also Fed. R. Civ. P. 15(a) (leave to amend "shall be freely
given when justice so requires"); *see also Mathon v. Marine Midland Bank, N.A.*, 875
F.Supp. 986, 1003 (E.D.N.Y.1995) (leave to replead granted where court could not say
that under no circumstances would proposed claims provide a basis for relief).
However, an opportunity to amend is not required where "the problem with [plaintiff's]
causes of action is substantive" such that "[b]etter pleading will not cure it."  *Cuoco v.
Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (finding that repleading would be futile)
(citation omitted); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d
Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support
its claim, a complaint should be dismissed with prejudice.")  (affirming, in part,
dismissal of claim with prejudice) (citation omitted).

tampering.  The complaint as currently constituted, however, falls short,

failing to allege sufficient facts to support cognizable claims, and also

failing to identify with specificity the defendants associated with the

alleged unconstitutional acts.[16]  Based upon the foregoing it is hereby

RECOMMENDED, that defendants' motion to dismiss (Dkt. No. 21)

be GRANTED and that plaintiff's complaint be DISMISSED, with leave to

file an amended complaint in accordance with the terms of the foregoing

recommendation within thirty days from the date of an order acting upon

such recommendation; and it is further

ORDERED, that pending a final determination in connection with the

instant motion and the submission of an amended complaint accepted for

filing with the court, and the filing of an answer to that amended complaint,

discovery in this action is STAYED; and it is further

ORDERED, that the clerk amend the court's records to correctly list

defendant Lavalle as "Thomas LaValley".

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge

written objections to the foregoing report.  Such objections must be filed

---

[16]     In light of my recommendation that plaintiff's complaint be dismissed, I
have not addressed defendants' assertion of qualified immunity as presenting a further
ground for dismissal.

40

with the clerk of the court within FOURTEEN days of service of this report.

 FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE

APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d),

72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

      It is hereby ORDERED that the clerk of the court serve a copy of this

report and recommendation upon the parties in accordance with this

court's local rules.

Dated:      March 1, 2011
            Syracuse, NY

David E. Peebles
U.S. Magistrate Judge

41



Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))



Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Jesse L. STEWART, Jr., Plaintiff,

v.

Gary HOWARD, D. Monell, N. Marsh, D. Spangenburg, D. Swarts, E. Hollenbeck, J. Edwards, D. Russell, Defendants.

No. 9:09-CV-0069 (GLS/GHL).

April 26, 2010.

Jesse L. Stewart, Jr., Marienville, PA, pro se.

Office of Frank W. Miller, Frank W. Miller, Esq., Michael J. Livolsi, Esq., of Counsel, East Syracuse, NY, for Defendants.

### *REPORT-RECOMMENDATION*

GEORGE H. LOWE, United States Magistrate Judge.

**\*1** This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Gary L. Sharpe, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Jesse L. Stewart alleges that Defendants, all employees of the Tioga County Jail, violated his constitutional rights by limiting his ability to send legal mail, depriving him of his mattress and bedding during daytime hours, subjecting him to excessive force, denying him medical care after the alleged use of excessive force, and conducting biased disciplinary hearings. Currently pending before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 30.) Plaintiff has opposed the motion. (Dkt. No. 32.) For the reasons that follow, I recommend that Defendants' motion be granted.

### I. FACTUAL AND PROCEDURAL SUMMARY

This action involves Plaintiff's experiences at Tioga County Jail, where he was incarcerated from August 19, 2008, to January 13, 2009. (Dkt. No. 30-4 at 14:2-11.) The complaint consists almost entirely of copies of grievances and letters that Plaintiff submitted to other individuals and organizations. The "facts" section of the civil complaint form merely directs the reader to "see attached." As such, the precise contours of Plaintiff's claims are difficult to discern. The documents attached to the complaint show that:

On September 22, 2008, Plaintiff requested a grievance form so that he could complain about the facility's legal mail procedures. (Dkt. No. 1 at 41.) A grievance form was issued. *Id.*

On October 27, 2008, Plaintiff requested a grievance form so that he could complain about being denied access to the courts. (Dkt. No. 1 at 44.) Sgt. William "spoke with

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

[Plaintiff] but he refuses to sign off. He states he needs these letters to go out to these courts because he's fighting extradition." *Id.*

On October 30, 2008, Defendant Officer Earl Hollenbeck issued an Inmate Rule Infraction Notice to Plaintiff accusing him of sending mail using another inmate's account. (Dkt. No. 1 at 31.)

In a "notice of intention" dated November 30 2008, Plaintiff alleged that, pending disciplinary action against him, staff at the Tioga County Jail deprived him of his mattress, sheets, and blanket when temperatures were as low as fifteen degrees at night and forced him to sit directly on his steel bed for periods up to seventeen hours. (Dkt. No. 1 at 8.) In support of Defendants' summary judgment motion, Defendant Lt. David Monell declares that when inmates are accused of violating a disciplinary rule, they are placed in administrative segregation pending a hearing. During that time, the inmate's bedding is removed during the day. If this was not done, "inmates may intentionally violate rules in order to be assigned to administrative segregation so they could sleep in the cell all day instead of having to adhere to the normal inmate routine." (Dkt. No. 30-11 at 6 ¶ 12.) The parties agree that inmates' mattresses and bedding are returned at night. (Dkt. No. 1 at 10; Dkt. No. 30-11 at 6 ¶¶ 13-15.)

**\*2** In his "notice of intention," Plaintiff alleged that on November 3, 2008, he asked for a grievance form. (Dkt. No. 1 at 8.) Defendant Officer Douglas Swarts told him "if you don't shut the fuck up I'll have a few people shut you up." *Id.* Two or three minutes later, several other officers, including Defendant Sergeant Dennis Spangenburg, arrived and stood in front of Plaintiff's locked cell. *Id.* Plaintiff asked Defendant Spangenburg why he was denying Plaintiff the right to file a grievance. *Id.* at 8-9. Defendant Spangenburg replied "I can deny you anything I want." *Id.* at 9. Defendant Officers Jonathan Edwards and David Russell then entered Plaintiff's cell

and handcuffed Plaintiff so tightly that the handcuffs "stopp[ed] the flow of blood to [Plaintiff's] hands." *Id.* Defendants Edwards and Russell then escorted Plaintiff to the intake area of the facility. Along the way, they used Plaintiff's "head and body as a ram to open the electronically control[l]ed doors," which cut Plaintiff's lip and caused his nose to bleed. *Id.* Attached to Plaintiff's complaint are affidavits from inmates who state that they witnessed this incident. *Id.* at 14-15.

Plaintiff alleged in his "notice of intention" that upon arrival at the intake area, he was placed in a strip isolation cell. (Dkt. No. 1 at 9.) Several officers "entered in behind me, at what time I was hit with closed fist[s] and what felt like kicks from all directions to my head, back, ribs, and groin area several times." *Id.* Plaintiff was punched in the right eye. *Id.* After that, Plaintiff's handcuffs were removed and Defendant Sergeant Nathaniel Marsh entered the cell, grasped Plaintiff around the neck with one hand, held his mace an arm's length away from Plaintiff's face, and repeated "get the fuck up you little asshole" over and over. *Id.*

Defendants Marsh, Spangenburg, Swarts, Edwards, and Russell have submitted notarized affidavits in support of Defendants' motion for summary judgment stating that they did not assault Plaintiff. (Dkt. No. 30-11 at 10, 12, 18, 22, 24.)

At 10:50 a.m., Defendant Swarts issued two Inmate Rule Infraction Notices. The first stated that Plaintiff "refused to lock in his cell after numerous orders to do so. Duress alarm was activated." (Dkt. No. 1 at 32.) The second stated that Plaintiff "disrupted the pod by yelling threats to jail personnel." *Id.* at 33.

In his "notice of intention," Plaintiff alleged that he needed medical attention but was locked in the cell alone

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

without such attention for approximately fourteen hours. (Dkt. No. 1 at 9.) At 11:30 p.m., Plaintiff was escorted back to his usual cell. *Id.* All of his personal property had been removed and he was given only a mattress and a blanket. *Id.* The next morning, officers removed the mattress. *Id.* Plaintiff was told that he could only shower if he remained handcuffed and shackled. *Id.* He was given only two sheets of toilet paper. *Id.* at 9-10. This pattern of being given a mattress at night and having it removed in the morning continued for ten days. *Id.* at 10.

**\*3** On November 6, 2008, Plaintiff submitted an Inmate Request Form asking to "be released from ... restraint and receive my property back today." (Dkt. No. 1 at 45.) His request was denied. *Id.*

In his "notice of intention," Plaintiff alleged that when his property was finally returned to him, he "became submissive" and "did not file any more grievances as I was told not to or the next time it may be worse." *Id.* at 10.

In his "notice of intention," Plaintiff alleged that Defendant Marsh conducted a biased disciplinary hearing and found him guilty "on all of the infractions." (Dkt. No. 1 at 10.) Another attachment to the complaint shows that on November 12, 2008, Defendant Marsh found Plaintiff guilty and sentenced him to twenty-eight days of keeplock with no programs, no commissary, twenty minute hygiene, and legal phone calls only. *Id.* at 34.

In his "notice of intention," Plaintiff alleged that there is no "inhouse mail, or legal outgoing mail system" at Tioga County Jail and that Defendants refused to mail any item that would cost more than eighty-four cents. (Dkt. No. 1 at 10.)

On December 1, 2008, Officer Sean Shollenberger issued an Inmate Rule Infraction Notice stating that Plaintiff used stamps from another inmate to send personal mail. (Dkt. No. 1 at 35.) A hearing was scheduled for December 17, 2008. Plaintiff filed a written request stating that he had been informed of the hearing and requesting "that any decision to be determined may be done so without my participation or presence ... I do not wish to participate in such hearing." (Dkt. No. 1 at 36.) Plaintiff's request was approved. *Id.* At the hearing, Defendant Marsh found Plaintiff guilty and sentenced him to fourteen days of keeplock, no programs, no commissary, twenty minute hygiene, and legal calls only. *Id.* at 37. Defendant Marsh noted that "this is not the first infraction hearing due to [Plaintiff's] abusing the U.S. Postal Service." *Id.* On December 18, 2008, Plaintiff appealed the decision. *Id.* at 38. Plaintiff stated that he had refused to attend the hearing because of Defendant Marsh's previous use of force against him and because the hearing was not recorded. *Id.* at 39. The Chief Administrative Officer denied the appeal on December 23, 2008, because the "sanctions imposed are appropriate." *Id.* at 38.

On December 17, 2008, Plaintiff requested two grievance forms so that he could complain about the lack of bedding and facility disciplinary and hearing procedures. Grievance forms were issued. (Dkt. No. 1 at 46-47.)

On December 18, 2008, Plaintiff submitted a grievance complaining about the lack of bedding, visits, food, medical care, access to courts, and water. (Dkt. No. 1 at 20.) The grievance coordinator denied the grievance because "[d]iscipline is not grievable. There is an appeal process which the inmate can follow." *Id.* at 22. Plaintiff appealed to the Chief Administrative Officer. *Id.*

**\*4** On December 18, 2008, Plaintiff submitted a grievance complaining about Defendant Marsh's conduct during the disciplinary hearing [FN1] and requesting that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

disciplinary hearings be recorded or monitored by another hearing officer. (Dkt. No. 1 at 23-24.) The Grievance Coordinator denied the grievance because "NYS Minimum Standards requires that records be kept of infraction hearings. Records are kept of the infraction hearing. The TCJ does not have more than one officer available to do infraction hearings." *Id.* at 25. Plaintiff appealed to the Chief Administrative Officer. *Id* . On December 22, 2008, Defendant Marsh completed a Grievance Investigation Form stating that he interviewed Plaintiff. Defendant Marsh found that "this facility keeps all hearing records as well as provide a copy of the hearing record to the inmate. This facility has more than one hearing officer available." *Id.* at 26.

> FN1. Although it is not clear, Plaintiff was presumably referring to the November 12, 2008, hearing, which he attended, rather than the December 17, 2008, hearing that he refused to attend.

On December 18, 2008, Plaintiff submitted an Inmate Request Form asking to speak with the Undersheriff or Captain. (Dkt. No. 1 at 48 .)

On December 22, 2008, Plaintiff wrote a letter to the Chairman of the New York Commission of Corrections; the Hon. Thomas J. McAvoy, Senior United States District Judge, and the New York State Attorney General regarding conditions at Tioga County Jail. (Dkt. No. 1 at 16-17.) Specifically, Plaintiff complained about the bedding issue, the grievance and appeal system, and the legal mail system. *Id.*

On December 28, 2008, Plaintiff submitted a grievance complaining about the facility's legal mail procedure. (Dkt. No. 1 at 27.) The Grievance Coordinator denied the grievance because "[t]his facility is not denying

you access to the courts. Minimum standards ha[ve] been and will be controlled by the State of NY, therefore this issue is not grievable. NYSCOC was contacted regarding your reference to a 'new' state directive regarding legal mail. No such directive exists." *Id.* at 28. Plaintiff checked the box indicating that he wanted to appeal to the Chief Administrative Officer and wrote a note that he "was told that Lt. D. Monell is the Chief Officer and that I could not appeal this decision any higher." *Id.*

In his "notice of intention," Plaintiff alleged that on December 31, 2008, he was summoned to the front of the jail for an interview with Defendant Lt. D. Monell. (Dkt. No. 1 at 11.) Defendant Monell questioned Plaintiff about his December 22, 2008, letter to the Commission of Corrections. *Id.* Defendant Monell said that he did not give a damn about federal standards regarding bedding. *Id.* Defendant Monell told Plaintiff he should save his weekly postage allowance until he had enough to send a large document and did not respond when Plaintiff informed him that he was not allowed to do. *Id.* Regarding Plaintiff's complaint that he had received only two sheets of toilet paper, Defendant Monell replied that this was facility policy. (Dkt. No. 1 at 12.) Defendant Monell stated that he had reviewed the videotape of the alleged excessive force incident and did not see anything. *Id.* Defendant Monell asked "in a sarcastic manner" whether Plaintiff wanted protective custody because he felt threatened by the facility's officers. Plaintiff said no. *Id.*

**\*5** On January 1, 2009, Plaintiff filed an Inmate Request Form stating that he had not received responses to his appeals regarding disciplinary hearings. (Dkt. No. 1 at 49.) Defendant Russell responded that "Grievance # 36 was upheld so there is no appeal. Grievance # 35 was not a grievable issue because it regarded disciplinary sanctions." (Dkt. No. 1 at 50.)

On January 1, 2009, Plaintiff wrote to the Commission of Corrections informing them of his

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

conversation with Defendant Monell and requesting an outside investigation. (Dkt. No. 1 at 18.)

On January 5, 2009, Plaintiff filed an Inmate Request Form asking for a grievance form. He stated that "the taking of bedding is not a disciplinary sanction but in fact an illegal practice." (Dkt. No. 1 at 42.) Defendant Monell replied that "removal of bedding is a disciplinary sanction and as such is not a grievable issue. Do not put in any more requests on this matter." *Id.*

On January 5, 2009, Plaintiff filed an Inmate Request Form stating that "the grievant has the right to appeal any decision by the grievance committee to the highest level for confirmation of such determination." (Dkt. No. 1 at 43.) Defendant Monell replied that Plaintiff should "read minimum standards-once the action requested has been met-there is no grounds for appeal. Request for grievance is denied. Do not put in any more requests on this matter ." *Id.*

On January 5, 2009, Plaintiff wrote to the Commission of Corrections again. He stated that he was being illegally denied the right to file grievances and that Defendant Monell "attempted to intimidate me." (Dkt. No. 1 at 19.) In a separate letter, he stated that his "grievance is not in regards to any disciplinary sanctions, but in fact an illegal local procedural practice at Tioga County Jail." (Dkt. No. 1 at 29.) He stated that he had been deprived of bedding, food, medical care, visits, and mail without due process. *Id.* at 29-30.

On January 8, 2009, Plaintiff filed an Inmate Request Form stating that he wanted to file a grievance about "the issue of periodicals and the donation/reading of them." (Dkt. No. 1 at 51.) A sergeant (signature illegible) responded that "this is not a grievable issue-this is a requestable issue which will be denied due to security

problems encountered in the D-pod housing unit involving the newspaper. Donations of books and magazines are allowed-you also are allowed to release property to persons outside of the jail." *Id.* at 52.

Plaintiff filed this action on January 21, 2009. (Dkt. No. 1.) Defendants now move for summary judgment. (Dkt. No. 30.) Plaintiff has opposed the motion. (Dkt. No. 32.) Defendants have filed a reply. (Dkt. No. 36.)

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. Only after the moving party has met this burden is the non-moving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord,* 467 F.3d 263, 272-73 (2d Cir.2006). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material [FN2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

*Baseball Props., Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008).

> FN2. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson,* 477 U.S. at 248.

**B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim**

**\*6** To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnise General Transatlantique,* 405 F.2d 270, 273-74 (2d Cir.1968) [citations omitted]; *accord, Katz v. Molic,* 128 F.R.D. 35, 37-38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Accordingly, it is appropriate to summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U .S. 544, 570 (2007)) (emphasis added).

"Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense ... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not shown-that the pleader is entitled to relief." *Id.* at 1950 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). However, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

**III. ANALYSIS**

Defendants argue that they are entitled to summary judgment because (A) Plaintiff refused to cooperate with his deposition; (B) Plaintiff failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA") regarding the November 3 excessive force incident "and other claims such as lack of toilet paper"; (C) Plaintiff has failed to state an Eighth Amendment conditions of confinement claim; (D) Plaintiff's allegations regarding the lack of bedding do not state a due process claim; (E) Plaintiff has failed to state a claim that he was denied access to the courts; and (F) Plaintiff has not alleged that Defendants Howard or Hollenbeck were personally involved in any alleged constitutional violation.

**A. Deposition**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

**\*7** Defendants move, pursuant to Federal Rule of Civil Procedure 37, to dismiss this action because Plaintiff unilaterally ended his deposition before answering any substantive questions. (Dkt. No. 30-12 at 10-11.) In the alternative, Defendants request an order precluding Plaintiff from offering sworn testimony in opposition to any motion brought by Defendants or at trial. *Id.* at 11. I find that Defendants' motion is untimely.

This Court's Mandatory Pretrial Discovery and Scheduling Order, issued on March 31, 2009, granted Defendants permission to depose Plaintiff. The order stated that "[t]he failure of the plaintiff to attend, be sworn, and answer appropriate questions may result in sanctions, including dismissal of the action pursuant to [Rule] 37." (Dkt. No. 21 at 3 ¶ D.) The order also noted that "any motion to compel discovery in the case must be filed not later than ten (10) days after the deadline for completing discovery." [FN3] *Id.* at 4 n. 5. The order set July 29, 2009, as the deadline for completing discovery. *Id.* at 4 ¶ A.

> FN3. Effective January 1, 2010, the deadlines in the local rules were amended. The local rule now requires that discovery motions be filed no later than fourteen days after the discovery cut-off date. Local Rule 7.1(d)(8).

On July 2, 2009, Defendants requested permission to depose Plaintiff. (Dkt. No. 22.) The Court denied the motion as moot, noting that permission had already been granted. (Dkt. No. 23.) On July 31, 2009, Defendants requested an extension of the discovery cut-off date to allow them time to take Plaintiff's deposition. (Dkt. No. 24.) The Court granted Defendants' request and extended the discovery deadline to September 19, 2009. (Dkt. No. 27.)

On September 14, 2009, Defendants conducted Plaintiff's deposition. (Dkt. No. 30-4 at 9-17.) When defense counsel began asking Plaintiff about his criminal history, Plaintiff stated "[y]ou're browbeating me here, and I'll write to the judge and tell him why I didn't cooperate." *Id.* at 15:14-15. Plaintiff then ended the deposition. *Id.* at 15:20-22. No questions were asked or answered about the events at issue in this action.

Discovery in this case closed on September 19, 2009. Defendants did not file a motion to compel Plaintiff's deposition or for sanctions until they filed the pending motion on October 27, 2009. Because Defendants did not file their motion within ten days of the discovery cut-off date or request an extension of time in which to file a discovery motion, I recommend that their motion to dismiss the case as a sanction for Plaintiff's refusal to cooperate with his deposition be denied.

**B. Exhaustion of Administrative Remedies**

Defendants argue that Plaintiff's claims regarding the November 3, 2008, alleged use of excessive force and the alleged failure to provide medical care after the incident must be dismissed because Plaintiff failed to exhaust his administrative remedies. (Dkt. No. 30-12 at 2-3.) Defendants are correct.

Under the PLRA, "[n]o action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002). In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

institution to which they are confined. *Jones v. Bock,* 549 U.S. 199, 218 (2007).

**\*8** Tioga County Jail has an inmate grievance procedure. (Dkt. No. 30-10 at 8-11.) Under the procedure, the Corrections Officer assigned to the inmate's housing unit initially receives complaints either verbally or in writing and attempts to resolve the complaint informally. *Id.* at ¶ 1.2(A)(1-2). If the complaint cannot be resolved informally, the inmate files a written complaint form, which is forwarded to the Shift Supervisor. *Id.* at ¶ 1.2(A) (3-4). If the Shift Supervisor cannot resolve the complaint, the complaint is forwarded to the Grievance Coordinator, who provides the inmate with a grievance form. *Id.* at ¶ 1.2(A)(5-8). The Grievance Coordinator is responsible for investigating and making a determination on the grievance and must give a written copy of his or her decision to the inmate. *Id.* at ¶ 1.2(A)(9). This written decision must be issued within five business days of receipt of the grievance. *Id.* at 1.3(C). If the inmate does not accept the Grievance Coordinator's determination, "an appeal will be forwarded to the Jail Chief Administrative Officer." *Id.* at ¶ 1.2(A)(11). The inmate must appeal within two business days of receipt of the Grievance Coordinator's determination. *Id.* at ¶ 1.3(D). At the request of the inmate, a copy of the appeal will be mailed by the Jail Administrator to the Commission of Corrections. *Id.* at ¶ 1.2(A)(13). The Jail Administrator must make a determination within two working days. *Id.* at ¶ 1.3(E). The inmate may appeal within three business days of receipt of the decision to the Commission of Corrections. *Id.* at ¶ 1.3(F).

Here, Plaintiff did not file a grievance regarding the alleged use of excessive force on November 3, 2008. (Dkt. No. 30-11 ¶ 6.) Therefore, he did not exhaust his administrative remedies.

Plaintiff's failure to exhaust, however, does not end the inquiry. The Second Circuit has held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his available administrative remedies. *Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004).[FN4]

> **FN4.** The Second Circuit has not yet decided whether the *Hemphill* rule has survived the Supreme Court's decision in *Woodford v. Ngo,* 548 U.S. 81 (2006), in which the Supreme Court held that each step of an available grievance procedure must be "properly" completed before a plaintiff may proceed in federal court. *Chavis v. Goord,* No. 07-4787-pr, 2009 U.S.App. LEXIS 13681, at \*4, 2009 WL 1803454, at \*1 (2d Cir. June 25, 2009).

First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

**\*9** Here, as discussed above, administrative remedies were available to Plaintiff. Defendants preserved the exhaustion defense by raising it in their answer. (Dkt. No. 19 at ¶¶ 8-10.) Plaintiff appears to argue that Defendants are estopped from asserting the defense or that special

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

circumstances exist justifying the failure to exhaust. Specifically, Plaintiff states that exhausting his administrative remedies would have been futile and "may have caused more harm to the plaintiff" because the officers who allegedly assaulted him "are the persons that operate and give the decisions" regarding grievances. (Dkt. No. 32 at 1.)

Plaintiff's explanation is belied by his actual conduct. Plaintiff alleges that Defendant Marsh was involved in the use of excessive force. (Dkt. No. 1 at 9.) Despite this fact, Plaintiff filed a grievance three weeks after the incident complaining about Defendant Marsh's conduct during a disciplinary hearing. (Dkt. No. 1 at 23-24.) This indicates that Plaintiff was not, in fact, afraid to file grievances against the Defendants who allegedly assaulted him and denied him medical care. Thus, Plaintiff has not plausibly alleged that special circumstances prevented him from exhausting his administrative remedies. Therefore, I find that Plaintiff failed to exhaust his administrative remedies regarding the alleged use of excessive force and I recommend that the Court dismiss that claim.

**C. Eighth Amendment Conditions of Confinement**

Plaintiff alleges that Defendants violated his Eighth Amendment rights by removing his personal property, taking away his bedding and mattress during the day, allowing him to shower only if he remained handcuffed and shackled, and providing him with only two sheets of toilet paper. (Dkt. No. 1 at 9-10.) Defendants move for summary judgment of this claim. (Dkt. No. 30-12 at 5.)

The Eighth Amendment to the United States Constitution imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). In fulfilling this duty, prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " *Farmer,* 511 U.S. at 832 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526-27 (1984)).

A viable Eighth Amendment claim must contain both an objective and a subjective component. *Farmer,* 511 U.S. at 834. To prove the objective component of an Eighth Amendment conditions of confinement claim, a prisoner must show that the defendant's "act or omission ... result[ed] in the denial of the minimal civilized measure of life's necessities." *Farmer,* 511 U.S. at 834. Therefore, "extreme deprivations are required to make out a conditions-of-confinement claim." *Hudson v. McMillian,* 503 U.S. 1, 9 (1992). Specifically, an inmate must show that he was deprived of a "single, identifiable human need such as food, warmth, or exercise." *Wilson v. Seiter,* 501 U.S. 294, 304 (1991). Here, Plaintiff does not allege that he was deprived of any human need. He was provided with a mattress and blankets at night, had the opportunity to shower, and received toilet paper. Although his conditions may not have been pleasant, the Eighth Amendment "does not mandate comfortable prisons." *Farmer,* 511 U.S. at 932 (citing *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981)). Therefore, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's conditions of confinement claim.

**D. Due Process**

*1. Bedding*

**\*10** Defendants construe Plaintiff's complaint as asserting a claim that the removal of his bedding during the day violated his right to due process. Defendants argue that this claim should be dismissed. (Dkt. No. 30-12 at 5-6.) Defendants are correct.

An individual claiming that he was deprived of an

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

interest in property "must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents v. Roth,* 408 U.S. 564, 577 (1972). Plaintiff had not legitimate claim of entitlement to possessing bedding during the day. Therefore, I recommend that the Court dismiss this claim.

2. *Disciplinary Hearing*

Plaintiff appears to allege that Defendant Marsh deprived him of due process by conducting a biased disciplinary hearing. (Dkt. No. 1 at 10.) Defendants have not addressed this claim. I find that it is subject to *sua sponte* dismissal.

In order to state a claim for violation of his procedural due process rights, a plaintiff must allege facts plausibly suggesting that he was deprived of a liberty interest without due process of law. *Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir.2000).

An inmate has a liberty interest in remaining free from a confinement or restraint where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular confinement or restraint; and (2) the confinement or restraint imposes "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484 (1995); *Tellier,* 280 F.3d at 80; *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

Assuming *arguendo* that the state has granted inmates in county jails an interest in remaining free from keeplock confinement, the issue is whether Plaintiff's confinement imposed an "atypical and significant hardship" on him in relation to the ordinary incidents of prison life. Courts in the Second Circuit have routinely declined to find a liberty interest where an inmate's keeplock confinement is an "exceedingly short" period, less than thirty days, and there is no indication that the inmate suffered any "unusual conditions" during the confinement. *Anderson v. Banks,* No. 06-Cv-0625, 2008 U.S. Dist. LEXIS 60932, 2008 WL 3285917 (N.D.N.Y. Aug. 7, 2008) ("Confinements in ... keeplock of less than thirty days will not suffice to demonstrate a protected liberty interest absent other extraordinary circumstances of the confinement demonstrating that it was atypical or significant for other reasons.") (Sharpe, J.) (Homer, M.J.).[FN5]

FN5. The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

Here, Defendant Marsh sentenced Plaintiff to twenty-eight days of keeplock after the November 12, 2008, hearing that followed the alleged excessive force incident. (Dkt. No. 1 at 34.) Defendant Marsh sentenced Plaintiff to fourteen days of keeplock after the December 17, 2008, hearing regarding Plaintiff's alleged use of another inmate's stamps. (Dkt. No. 1 at 37.) There is no indication that Plaintiff suffered any unusual conditions during these keeplock confinements. Notably, Plaintiff's allegations regarding the removal of his bedding occurred not during these keeplock sentences, but rather during earlier administrative segregation periods in October and November. (Dkt. No. 1 at 8-10.) Thus, Plaintiff has not alleged facts plausibly suggesting, or raised a triable issue of fact, that he was deprived of a liberty interest. Therefore, I recommend that the Court dismiss Plaintiff's due process claim against Defendant Marsh *sua sponte.*

**E. Access to the Courts**

**\*11** Defendants argue that Plaintiff's claims regarding Tioga County Jail's legal mail procedures must be dismissed because (1) Plaintiff has not alleged the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

personal involvement of any Defendant; and (2) Plaintiff has not alleged any actual harm resulting from the procedures. (Dkt. No. 36-3 at 1.) Defendants did not raise this argument in their moving papers. Normally, due process would thus require that I disregard the argument or give Plaintiff an opportunity to file a sur-reply. Here, however, Plaintiff addressed this issue in his opposition despite Defendants' failure to raise it initially. (Dkt. No. 32 at 1.) Moreover, even if he had not, I would recommend that the Court dismiss the claim *sua sponte.*

"Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). "A prisoner has a constitutional right of access to the courts for the purpose of presenting his claims, a right that prison officials cannot unreasonably obstruct and that states have affirmative obligations to assure." *Washington v. James,* 782 F.2d 1134, 1138 (2d Cir.1986) (citing *Bounds v. Smith,* 430 U.S. 817, 821-23 (1977)). This right of access, however, guarantees a prisoner "no more than reasonable access to the courts." *Herrera v. Scully,* 815 F.Supp. 713, 725 (S.D.N.Y.1993) (citing *Pickett v. Schaefer,* 503 F.Supp. 27, 28 (S.D.N.Y.1980)). A claim for reasonable access to the courts under § 1983 requires that an inmate demonstrate that the alleged act of deprivation "actually interfered with his access to the courts or prejudiced an existing action." *Id.* (citations omitted). Courts have not found an inmate's rights to be violated when the deprivation merely delays work on his legal action or communication with the court. *Id.* To state a claim for denial of access to the courts, a plaintiff must assert non-conclusory allegations demonstrating both (1) that the defendant acted deliberately and maliciously, and (2) that the plaintiff suffered an actual injury. *Lewis v. Casey,* 518 U.S. 343, 353 (1996); *Howard v. Leonardo,* 845 F.Supp. 943, 946 (N.D.N.Y.1994) (Hurd, M.J.).

Here, Plaintiff has not raised a triable issue of fact that he suffered any actual injury. In his "notice of intention," he stated that the facility's mail policies "*could*

cause a great effect" and "*could* cause irreparable harm" to two pending *habeas corpus* cases. (Dkt. No. 1 at 10, emphasis added.) In his opposition to the motion for summary judgment, Plaintiff states that he "suffered the loss of one of the court actions" because he could not mail a brief. (Dkt. No. 32 at 1.) However, I note that this statement is not "evidence" because Plaintiff's opposition was not signed under penalty of perjury and does not contain any other language bringing it into substantial compliance with 28 U.S.C. § 1746. *See, LeBoeuf, Lamb, Greene & MacCrae, L.L.P. v. Worsham,* 185 F.3d 61, 65-66 (2d Cir.1999). Therefore, I recommend that Plaintiff's claim regarding legal mail be dismissed.

**F. Personal Involvement**

**\*12** Defendants argue that Plaintiff has failed to allege personal involvement by Defendants Howard or Hollenbeck. (Dkt. No. 30-12 at 11-12.) Defendants are correct.

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)).[FN6] In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the unlawful conduct and the defendant.[FN7] If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct.[FN8] In other words, supervisory officials may not be held liable merely because they held a position of authority.[FN9] Rather, supervisory personnel may be considered "personally involved" if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). FN10

FN6. *Accord, McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087 (1978); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

FN7. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

FN8. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

FN9. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

FN10. The Supreme Court's decision in *Ashcroft v. Iqbal,* ---U.S. ----, 129 S.Ct. 1937 (2009) arguably casts in doubt the continued viability of some of the categories set forth in *Colon. See Sash v. United States,* --- F.Supp.2d ----, No. 08-CV-116580, 2009 U.S. Dist. LEXIS 116580, at *32-39, 2009 WL 4824669, at*10-11 (S.D.N.Y. Dec. 15, 2009). Here, the Court will assume *arguendo* that all of the *Colon* categories apply.

The only allegation in the complaint regarding Defendant Hollenbeck is that he issued an Inmate Rule Infraction Notice to Plaintiff on October 30, 2008. (Dkt. No. 1 at 31.) Plaintiff has not alleged any facts plausibly suggesting, or raised a triable issue of fact, that Defendant Hollenbeck's conduct violated Plaintiff's constitutional rights. Therefore, I recommend that any claims against Defendant Hollenbeck be dismissed.

The complaint's only reference to Defendant Howard is in the caption of the "notice of intention." (Dkt. No. 1 at 7.) Plaintiff could, perhaps, have argued that, as Sheriff, Defendant Howard was responsible for creating or allowing to continue unconstitutional policies. However, Plaintiff did not allege any facts plausibly suggesting, or raise a triable issue of fact, that Defendant Howard was responsible for the policies about which Plaintiff complains. Even if he had, as discussed above, Plaintiff has not provided sufficient evidence for any of his claims regarding those policies to survive summary judgment. Therefore, I recommend that any claims against Defendant Howard be dismissed.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 30) be ***GRANTED;*** and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of *Anderson v. Banks,* No. 06-Cv-0625, 2008 U.S. Dist. LEXIS 60932, 2008 WL 3285917 (N.D.N.Y. Aug. 7, 2008) in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

**\*13** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.* *Roldan v. Racette, 984 F.2d 85 (2d Cir.1993)* (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

N.D.N.Y.,2010.

Stewart v. Howard

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

▷

Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.

Jerome BELLAMY, Plaintiff,

v.

MOUNT VERNON HOSPITAL, in its official and
individual capacity, Dr. Marc Janis, in his official and
individual capacity, New York State Department Of
Correctional Services, Dr. Lester Wright, in his official
and individual capacity, and Dr. J. Pereli, in his official
and individual capacity, Defendants.

No. 07 Civ. 1801(SAS).

June 26, 2009.

West KeySummary**Civil Rights 78**  ⬦  **1358**

**78** Civil Rights

   **78III** Federal Remedies in General

      **78k1353** Liability of Public Officials

         **78k1358** k. Criminal law enforcement; prisons.
Most Cited Cases

**Prisons 310**  ⬦  **203**

**310** Prisons

   **310II** Prisoners and Inmates

      **310II(D)** Health and Medical Care

         **310k203** k. Reproductive issues. Most Cited
Cases

**Sentencing and Punishment 350H**  ⬦  **1546**

**350H** Sentencing and Punishment

   **350HVII** Cruel and Unusual Punishment in General

      **350HVII(H)** Conditions of Confinement

         **350Hk1546** k. Medical care and treatment. Most
Cited Cases

   A correctional services doctor was not deliberately
indifferent to a prisoner's serious medical needs under the
Eighth Amendment in connection with the alleged denial
of testosterone treatments. The prisoner brought a § 1983
action which alleged that he was denied the treatments
which he needed after he developed hypogonadism after
an epididymectomy. The doctor not liable for the alleged
harm because he was not involved with any denials of the
prisoner's treatment and did not create a policy that
contributed to the prisoner's alleged harm. U.S.C.A.
Const.Amend. 8; 42 U.S.C.A. § 1983.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

Jerome Bellamy, Alden, NY, pro se.

Julinda Dawkins, Assistant Attorney General, New York, NY, for Defendants.

### *OPINION AND ORDER*

SHIRA A. SCHEINDLIN, District Judge.

## I. INTRODUCTION

   **\*1** Jerome Bellamy, presently incarcerated and proceeding pro se, alleges that the New York State Department of Correctional Services ("DOCS") and Dr. Lester Wright, the remaining defendants in this case,[FN1] violated Bellamy's constitutional rights. His claims surround denials of requested testosterone treatment by Wright, a doctor and supervisory official for the DOCS. Wright and the DOCS now move for summary judgment. For the reasons stated below, their motion for summary judgment is granted in its entirety.

> FN1. The original and amended complaints were also filed against Mount Vernon Hospital, Dr. Mark Janis, Dr. J. Pereli, in their individual and official capacities. The claims against Mount Vernon Hospital and Dr. Mark Janis were dismissed in *Bellamy I* and the claim against Dr. J. Pereli was dismissed in a subsequent order issued by this Court on January 15, 2009. Wright and the DOCS are the only remaining defendants.

## II. BACKGROUND[FN2]

> FN2. For more detailed background, see *Bellamy v. Mount Vernon Hosp.,* No. 07 Civ. 1801, 2008

WL 3152963 (S.D.N.Y. Aug. 5, 2008) (*"Bellamy I"*). Some of the facts recounted here are drawn from the prior opinion.

### A. Facts

### 1. Parties

   Bellamy is presently in the custody of the DOCS at the Wende Correctional Facility in Alden, New York.[FN3] The DOCS is a state agency responsible for the care, custody and control of inmates convicted of crimes under New York State laws.[FN4] Wright is both a New York-licensed medical doctor and the Deputy Commissioner and Chief Medical Officer ("CMO") of the DOCS.[FN5] As CMO, he is responsible for the development and operation of a system to provide necessary medical care for inmates in the custody of the DOCS.[FN6]

> FN3. *See* Defendants' Rule 56.1 Statement of Facts ¶ 1.

> FN4. *See id.* ¶ 2.

> FN5. *See id.* ¶ 3.

> FN6. *See id.*

### 2. Bellamy's Surgery

   In August 2004, while in DOCS custody at Sing Sing

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

Correctional Facility in Ossining, New York, Bellamy underwent an epididymectomy.[FN7] Bellamy was HIV positive at the time of his surgery.[FN8] Around that time, Bellamy developed hypogonadism (a deficiency in the hormone testosterone) as well as a deficiency in the hormone Cortisol.[FN9] As a result of these conditions, Bellamy was prescribed various medications, including a testosterone patch called "Androderm." [FN10] Bellamy contends that without testosterone treatment, he suffers from mood swings, fatigue, nausea, headaches, and lack of appetite.[FN11] However, he also experiences similar symptoms even with medication.[FN12]

FN7. See Bellamy I, 2008 WL 3152963, at *1. An epididymectomy is defined as the surgical removal of the epididymis (the cord-like structure along the posterior border of the testicle). The epididymis is essential to the male reproductive system. See Dorland's Illustrated Medical Dictionary 639, 1342, 1770 (31st ed.2007).

FN8. See 3/6/08 Deposition Testimony of Jerome Bellamy ("Bellamy Dep. I") at 139:15-17 (where Bellamy says that, prior to the surgery, he was on HIV medication).

FN9. See Bellamy I, 2008 WL 3152963, at *2. These conditions had many side effects, including sexual maladies and dramatic weight loss. See id. While Bellamy contends that the surgery caused the hypogonadism, his treating doctor claims "with a reasonable degree of medical certainty" that the hypogonadism preceded the surgery. See 4/22/08 Affidavit of Dr. Harish Moorjani ("Moorjani Aff."), Ex. J to 6/5/09 Supplemental Declaration of Julinda Dawkins, counsel to defendants, ¶ 4.

FN10. See, e.g., Amended Complaint ("Am.Compl."), Statement of Facts ¶¶ 5, 7. Androgel is a similar medication. The Amended Complaint is divided into various parts with overlapping paragraph and page numbers. As a result, references to the Amended Complaint are made by noting first the relevant topic header and then the cited or quoted paragraph number.

FN11. See 1/12/09 Deposition Testimony of Jerome Bellamy ("Bellamy Dep. II") at 35:23-24. Bellamy's hypogonadism may have been caused by his HIV. Bellamy complained of similar symptoms before the surgery and, therefore, before any alleged denial of Androgel or similar medications. See Moorjani Aff. ¶¶ 4-5.

FN12. See Bellamy Dep. II at 43:21-24 (where Bellamy admits that some of his symptoms resumed even after using the testosterone patch). See also Am. Compl., Statement of Facts ¶ 7 ("[T]his treatment [, Androderm,] still has not proven to be effective in keeping my hormone levels elevated, even after the dosages were increased, and my levels rise high at times then suddenly drops real low.").

**3. Bellamy's Letters to Wright**

Following the surgery, Bellamy wrote to Wright on three pertinent occasions. In the first letter, Bellamy provided background into his ailments and asked Wright to provide him with a hormone treatment (Androgel) which had been provided at a previous facility.[FN13] The second letter asked Wright to force Dr. Gennovese at the Shawangunk facility to provide him with Ensure-a nutritional supplement which had been provided at a previous facility. [FN14] Bellamy's third letter to Wright concerned several matters. [FN15] In particular, Bellamy claimed, *first,* that a female officer entered his cell and retrieved his HIV medication, *second,* that an officer

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

eavesdropped on a medical consultation with his doctor, and, *third,* that he went four days without HIV medication, five days without Cortisol treatment, and six days without testosterone treatment, all while undergoing a mental health evaluation.[FN16]

>    **FN13.** *See* Defendants' Rule 56.1 Statement of Facts ¶ 9. *See also* 7/5/05 Grievance Letter from Bellamy to Wright, Ex. D to 3/30/09 Declaration of Julinda Dawkins, counsel to defendants ("Dawkins Decl.").

>    **FN14.** *See* Defendants' Rule 56.1 Statement of Facts ¶ 10. *See also* 1/22/07 Grievance Letter from Bellamy to Wright, Ex. E to Dawkins Decl.

>    **FN15.** *See* Defendants' Rule 56.1 Statement of Facts ¶ 11. *See also* 6/5/07 Grievance Letter from Bellamy to Wright, Ex. F to Dawkins Deck

>    **FN16.** *See* 6/5/07 Grievance Letter from Bellamy to Wright, Ex. F to Dawkins Decl.

Wright's office routinely receives hundreds of letters each year, addressed to him personally from inmates throughout the DOCS system and from individuals writing on behalf of inmates.[FN17] These letters are screened by staff, who then forward them to the appropriate division or bureau within the DOCS with an instruction to respond or with a notation indicating the appropriate action.[FN18] Wright never sees the actual letters or their responses.[FN19] Inmate letters concerning medical care-such as Bellamy's-are forwarded to the Regional Health Services Administrator or the Regional Medical Director, as appropriate, that oversees the facility housing the inmate.[FN20] The concerns are then investigated and addressed by

the regional staff.[FN21]

>    **FN17.** *See* Defendants' Rule 56.1 Statement of Facts ¶ 12.

>    **FN18.** *See id.*

>    **FN19.** *See id.* ¶ 13.

>    **FN20.** *See id.* ¶ 14.

>    **FN21.** *See id.*

**\*2** All three of Bellamy's letters received responses. Holly A. Collet, the Facility Health Services Administrator at Elmira Correctional Facility, responded to Bellamy's July 5, 2005 letter.[FN22] Pedro Diaz, the Regional Health Services Administrator at Shawangunk Correctional Facility, responded to Bellamy's January 22, 2007 letter.[FN23] Pedro Diaz, also the Regional Health Services Administrator at Sing Sing Correctional Facility, responded to Bellamy's June 5, 2007 letter.[FN24] Wright and Bellamy have never met each other, nor have they had any other personal contact.[FN25] Bellamy admits that he has no evidence that Wright was involved in the responses to any of the three letters.[FN26]

>    **FN22.** *See id.* ¶ 15.

>    **FN23.** *See id.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

FN24. *See id.*

FN25. *See id.* ¶ 16. *See also* 3/27/09 Affidavit of Dr. Lester N. Wright ("Wright Aff."), Ex. G to Dawkins Decl., ¶ 9; Bellamy Dep. II at 20:23-25.

FN26. *See* Bellamy Dep. II at 26:17-20.

**4. Bellamy's Claims**FN27

FN27. In addition to the claims listed here, Bellamy originally charged both the DOCS and Wright with violations of the Americans with Disabilities Act of 1990 (the "ADA") and the Rehabilitation Act of 1973 (the "RHA"). *See* Am. Compl., Legal Claims ¶ 15. However, Bellamy later conceded that "Plaintiff['s] Americans With Disabilities Act and Rehabilitation [Act] fails because those statutes are not applicable here at this junction." Plaintiff's Reply to Defendants' Summary Judgment ("Bellamy's Reply") at 7. This Court interprets Bellamy's Reply as a withdrawal of his ADA and RHA claims against the remaining defendants.

Bellamy admits that he has no evidence that Wright denied him testosterone replacement treatment.FN28 Nonetheless, Bellamy claims that Wright "was responsible for denying plaintiff's testosterone treatment on different occasions" and "was also made aware of plaintiff's complaints, but failed to abate further injury to the plaintiff."FN29 Bellamy charges the DOCS because he was in its custody when his claims arose.FN30 Bellamy

specifically alleges that Wright-acting under color of state law-displayed "deliberate indifference to plaintiff's serious medical needs and violated plaintiff's rights and constituted cruel and unusual punishment under the Eight [h] Amendment of the United States Constitution."FN31 A similar claim is lodged against the DOCS.FN32 Bellamy also seeks a preliminary and permanent injunction against the DOCS to provide the medical treatment he requests and to comply with various New York State laws.FN33 Finally, Bellamy seeks compensatory and punitive damages.FN34

FN28. *See* Bellamy Dep. II at 33:14 to 34:15 (Question: "Do you have any kind of evidence that Dr. Wright denied you testosterone treatment?" Answer: "Directly, no.").

FN29. *See* Am. Compl., Defendants ¶ 6.

FN30. *See id.* Many of the claims that allegedly occurred under DOCS supervision have since been dismissed.

FN31. *See id.,* Legal Claims ¶ 13. Bellamy brings his claims pursuant to section 1983 of Title 42 of the United States Code ("section 1983").

FN32. *See id.,* Legal Claims ¶ 14 (repeating the same claim but omitting the phrase that the DOCS "violate[d] plaintiff's rights").

FN33. *See id.,* Legal Claims ¶ 18. Bellamy's original Complaint only requested injunctive

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

relief against the DOCS. However, he later asked for injunctive relief against Wright. *See* Bellamy's Reply at 1. Because Bellamy is proceeding pro se, the *factual* allegations in his Reply Memoranda are treated as if they were raised in his Complaints. *See Gill v. Mooney,* 824 F.2d 192, 195 (2d Cir.1987) (considering a pro se plaintiff's affidavit in opposition to defendant's motion to dismiss in reviewing district court's dismissal of claim). However, it would be improper to allow a plaintiff, even one proceeding pro se, to add a defendant to a claim he had raised more than a year earlier. Thus, Bellamy's claim for injunctive relief against Wright is dismissed. *See Polanco v. City of New York Dep't of Corr.,* No. 01 Civ. 759, 2002 WL 272401, at *3 (S.D.N.Y. Feb. 26, 2002) ("It is well established that a plaintiff may not amend his pleading through papers offered in opposition to a motion to dismiss ... Plaintiff is bound by the allegations of his Amended Complaint.") (citations omitted).

FN34. *See* Am. Compl., Legal Claims ¶¶ 19-21.

**B. Procedural History**

Bellamy's first Complaint was filed on March 2, 2007, and an Amended Complaint followed on July 16, 2007. On August 5, 2008, this Court granted summary judgment to defendants Dr. Janis and Mount Vernon. The DOCS had not been properly served at that point, but it was subsequently served on August 7, 2008. Dr. J. Pereli was dismissed as a defendant on January 15, 2009, for lack of timely service of process.

**III. LEGAL STANDARD**

**A. Summary Judgment**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FN35 An issue of fact is genuine " 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " FN36 A fact is material when it " 'might affect the outcome of the suit under the governing law.' " FN37 "It is the movant's burden to show that no genuine factual dispute exists." FN38

FN35. Fed.R.Civ.P. 56(c).

FN36. *Roe v. City of Waterbury,* 542 F.3d 31, 34 (2d Cir.2008) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

FN37. *Ricci v. DeStefano,* 530 F.3d 88, 109 (2d Cir.2008) (quoting *Anderson,* 477 U.S. at 248).

FN38. *Vermont Teddy Bear Co. v. 1-800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)).

In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. FN39 "Summary judgment is properly granted when the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

party's case, and on which that party will bear the burden of proof at trial.' " [FN40] To do so, the non-moving party must do more than show that there is " 'some metaphysical doubt as to the material facts,' " [FN41] and it " 'may not rely on conclusory allegations or unsubstantiated speculation.' " [FN42] However, " 'all that is required [from a non-moving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.' " [FN43]

FN39. Fed.R.Civ.P. 56(c).

FN40. *Abramson v. Pataki,* 278 F.3d 93, 101 (2d Cir.2002) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). *Accord In re September 11 Litig.,* No. 21 MC 97, 2007 WL 2332514, at *4 (S.D.N.Y. Aug.15, 2007) ("Where the nonmoving party bears the burden of proof at trial, the burden on the moving party may be discharged by showing-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case.") (quotation omitted).

FN41. *Higazy v. Templeton,* 505 F.3d 161, 169 (2d Cir.2007) (quoting *Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

FN42. *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) (quoting *Fujitsu Ltd. v. Federal Express Corp.,* 247 F.3d 423, 428 (2d Cir.2001)).

FN43. *Kessler v. Westchester County Dep't of Soc. Servs.,* 461 F.3d 199, 206 (2d Cir.2006) (quoting *Anderson,* 477 U.S. at 248-49).

**\*3** In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor.[FN44] However, "[i]t is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.' " [FN45] Summary judgment is therefore "only appropriate when there is no genuine issue as to any material fact, making judgment appropriate as a matter of law." [FN46]

FN44. See *Mathirampuzha v. Potter,* 548 F.3d 70, 74 (2d Cir.2008) (quoting *Allianz Ins. Co. v. Lerner,* 416 F.3d 109, 113 (2d Cir.2005)).

FN45. *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir.2006) (quoting *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997)). *Accord Anderson,* 477 U.S. at 249.

FN46. *Karpova v. Snow,* 497 F.3d 262, 270 (2d Cir.2007) (citing *Tocker v. Philip Morris Cos.,* 470 F.3d 481, 486-87 (2d Cir.2006)).

Further, where the plaintiff is proceeding pro se, his or her pleadings must be considered under a more lenient standard than that accorded to "formal pleadings drafted by lawyers," [FN47] and his or her pleadings must be "interpret[ed] ... to raise the strongest arguments they suggest." [FN48] However, a pro se plaintiff must still meet the usual requirements of summary judgment .[FN49] Thus, a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

pro se plaintiff's "failure to allege either specific facts or particular laws that have been violated renders [his or her] attempt to oppose defendants' motion [for summary judgment] ineffectual." [FN50]

> **FN47.** *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (per curiam). *Accord* *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) ("Because [plaintiff] is a pro se litigant, we read his supporting papers liberally.").

> **FN48.** *Burgos,* 14 F.3d at 790.

> **FN49.** *See* *Maalouf v. Salomon Smith Barney, Inc.,* No. 02 Civ. 4470, 2004 WL 2008848, at *4 (S.D.N.Y. Sept.8, 2004). (" 'Proceeding pro se does not otherwise relieve a litigant from the usual requirements of summary judgment, and a pro se party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment.' ") (quoting *Cole v. Artuz,* No. 93 Civ. 5981, 1999 WL 983876, at *3 (S.D.N.Y. Oct.28, 1999)).

> **FN50.** *Kadosh v. TRW,* No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994).

## B. Exhaustion of Administrative Remedies

The Prison Litigation Reform Act (the "PLRA") mandates that a prisoner exhaust all administrative remedies before bringing an action regarding prison conditions. [FN51] Failure to exhaust is an absolute bar to an inmate's action in federal court: "[section] 1997e(a) requires exhaustion of available administrative remedies *before* inmate-plaintiffs may bring their federal claims to

court at all." [FN52] Because the plain language of section 1997e(a) states "no action shall be brought," an inmate must have exhausted his claims at the time of the initial filing, given that "[s]ubsequent exhaustion after suit is filed ... is insufficient." [FN53] Moreover, the exhaustion of administrative remedies must be proper-that is, in compliance with a prison grievance program's deadlines and other critical procedural rules-in order to suffice. [FN54] The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." [FN55]

> **FN51.** *See* 42 U.S.C. § 1997e(a) (providing that: "No action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.") ("section 1997"). *See also Porter v. Nussle,* 534 U.S. 516, 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *Booth v. Churner,* 532 U.S. 732, 739 (2001).

> **FN52.** *Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001) (quotation marks and citation omitted, emphasis in original).

> **FN53.** *Id.*

> **FN54.** *See Woodford v. Ngo,* 548 U.S. 81, 90-92, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006).

> **FN55.** *Porter,* 534 U.S. at 532.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

FN58. *Id.* (quoting *Woodford,* 548 U.S. at 95).

While the Second Circuit has recognized that the PLRA's exhaustion requirement is mandatory, it has also recognized three exceptions to the exhaustion requirement:

when (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as reasonable misunderstanding of the grievance procedure, justify the prisoner's failure to comply with the exhaustion requirement. FN56

FN56. *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006).

The Second Circuit has held that " '[a]lert[ing] the prison officials as to the nature of the wrong for which redress is sought,' ... does not constitute proper exhaustion." FN57 "[N]otice alone is insufficient because '[t]he benefits of exhaustion can be realized only if the prison grievance system is given fair opportunity to consider the grievance' and '[t]he ... system will not have such an opportunity unless the grievance complies with the system's critical procedural rules.' " FN58

FN57. *Marias v. Zenk,* 495 F.3d 37, 44 (2d Cir.2007) (quoting *Braham v. Clancy,* 425 F.3d 177, 184 (2d Cir.2005) and citing *Woodford,* 548 U.S. at 94-95) (finding plaintiff "cannot satisfy the PLRA's exhaustion requirement solely by filing two administrative tort claims, or by making informal complaints to the MDC's staff").

## C. Eleventh Amendment Immunity

**\*4** The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State ..." FN59 "A state's Eleventh Amendment protection from suit extends to its agencies and departments." FN60 "This [Eleventh Amendment] bar remains in effect when State officials are sued for damages in their official capacity." FN61 To determine whether the action is an official or individual capacity suit, this Court must look behind the designation and determine whether "the State is the real, substantial party in interest." FN62 State agencies are not immune from suits asking for injunctive relief under the Eleventh Amendment. FN63

FN59. U.S. Const. amend. XI.

FN60. *Morningside Supermarket Corp. v. New York State Dep't of Health,* 432 F.Supp.2d 334, 338 (S.D.N.Y.2006) (citing *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)). *Accord Bryant v. New York State Dep't of Corr. Servs. Albany,* 146 F.Supp.2d 422 (S.D.N.Y.2001) (affirming the dismissal of a section 1983 claim against the DOCS and a correctional facility because Eleventh Amendment immunity abrogated the court's subject matter jurisdiction to hear the claim).

FN61. *Kentucky v. Graham,* 473 U.S. 159, 169, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (citation omitted).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

FN62. *Ford Motor Co. v. Department of Treasury of Ind.,* 323 U.S. 459, 464, 65 S.Ct. 347, 89 L.Ed. 389 (1945), *overruled in part by Lapides v. Board of Regents of the Univ. Sys. of Ga.,* 535 U.S. 613, 122 S.Ct. 1640, 152 L.Ed.2d 806 (2002).

FN63. *See, e.g., Perez v. Westchester County Dep't of Corr.,* No. 05 Civ. 8120, 2007 WL 1288579, at *6-8 (S.D.N.Y. Apr. 30, 2007) (considering, but then denying, injunctive relief against a county's department of corrections).

**D. Section 1983**

Section 1983 "does not create a federal right or benefit; it simply provides a mechanism for enforcing a right or benefit established elsewhere." [FN64] In order to state a claim under section 1983, a plaintiff must show that the conduct complained of was committed by a person or entity acting under color of state law, and that the conduct deprived a person of rights, privileges, or immunities secured by the Constitution.[FN65] "[N]either a State nor its officials acting in their official capacities are 'persons' under [section] 1983." [FN66] Thus, section 1983 "does not provide a federal forum for litigants who seek a remedy against a state for alleged deprivation of rights secured by the United States Constitution." [FN67]

FN64. *Morris-Hayes v. Board of Educ. of Chester Union Free Sch. Dist.,* 423 F.3d 153, 159 (2d Cir.2005) (citing *Oklahoma City v. Tuttle,* 471 U.S. 808, 816, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)).

FN65. *See Palmieri v. Lynch,* 392 F.3d 73, 78 (2d Cir.2004) (citation omitted).

FN66. *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). *Accord Huminski v. Corsones,* 396 F.3d 53, 70 (2d Cir.2005).

FN67. *Bryant,* 146 F.Supp.2d at 425.

Furthermore, "[i]t is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983.' " [FN68] Thus, "[a] supervisory official cannot be liable solely on account of the acts or omissions of his or her subordinates." [FN69] In 1995, the Second Circuit held that a supervisory official is personally involved only when that official: (1) participates directly in the alleged constitutional violation; (2) fails to remedy the violation after being informed of the violation through a report or appeal; (3) creates or allows the continuation of a policy or custom under which unconstitutional practices occurred; (4) acts with gross negligence in supervising subordinates who commit the wrongful acts; or (5) exhibits deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.[FN70] However, in 2009, the Supreme Court held, "[b]ecause vicarious liability is inapplicable to ... [section] 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's *own individual actions,* has violated the Constitution." [FN71] The Supreme Court explicitly rejected the argument that, "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." [FN72] Thus, "[a]bsent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." [FN73] For example, "[t]he allegation that plaintiff sent defendant[ ] letters complaining of prison conditions is not enough to allege personal involvement." [FN74]

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

FN68. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)).

FN69. *Ford v. Conway,* No. 03 Civ. 0927S, 2004 WL 1071171, at *4 (W.D.N.Y. Mar.16, 2004).

FN70. See *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citation omitted).

FN71. *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1948, 173 L.Ed.2d 868 (2009) (emphasis added).

FN72. *Id.* at 1949.

FN73. *Id.*

FN74. *Laureano v. Pataki,* No. 99 Civ. 10667, 2000 WL 1458807, at *4 (S.D.N.Y. Sept.29, 2000) (granting a motion to dismiss on similar facts). See also *Farid v. Goord,* 200 F.Supp.2d 220, 235 (W.D.N.Y.2002) (dismissing claims of personal involvement against supervisory official who merely sent grievances "down the chain of command for investigation").

**E. Eighth Amendment Right to be Free from Deliberate Indifference to Serious Medical Needs**

**\*5** The Eighth Amendment prohibits the infliction of cruel and unusual punishment on prisoners.[FN75] The Supreme Court has held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' ... proscribed by the Eighth Amendment." [FN76] Because the inadvertent or negligent failure to provide adequate medical care does not rise to the level of deliberate indifference, allegations of medical malpractice or negligent treatment are insufficient to state a claim under section 1983.[FN77] "Prison officials have a duty to provide prisoners with the 'reasonably necessary medical care which would be available to him or her ... if not incarcerated.' " [FN78] However, a prison cannot be required to meet the same standard of medical care found in outside hospitals.[FN79]

FN75. U.S. Const. amend. XIII.

FN76. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (quoting *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). *Accord Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("To violate the Cruel and Unusual Punishments Clause, a prison official must have a sufficiently culpable state of mind .... In prison-conditions cases that state of mind is one of 'deliberate indifference' to inmate health or safety ....") (quotations and citations omitted).

FN77. See *Estelle,* 429 U.S. at 105-06.

FN78. *Candeleria v. Coughlin,* No. 91 Civ. 2978, 1996 WL 88555, at *7 (S.D.N.Y. Mar.1, 1996) (quoting *Langley v. Coughlin,* 888 F.2d 252, 254 (2d Cir.1989)). *Accord Edmonds v. Greiner,* No. 99 Civ. 1681, 2002 WL 368446, at

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

*8 (S.D.N.Y. Mar. 7, 2002) ("A person who is incarcerated is entitled to receive adequate medical care.").

FN79. *See Archer v. Dutcher,* 733 F.2d 14, 17 (2d Cir.1984) ("We have no doubt that the same standards of medical care cannot be imposed upon a prison as are presumed to be realized at a hospital.").

" 'The deliberate indifference standard embodies both an objective and a subjective prong.' " FN80 "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." FN81 "Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation." FN82 "[W]hen a prisoner asserts that delay in his treatment constitutes deliberate indifference on the part of a healthcare provider, the Court looks to the severity of the consequences brought about by the alleged delay." FN83

FN80. *Morrison v. Mamis,* No. 08 Civ. 4302, 2008 WL 5451639, at *5 (S.D.N.Y. Dec.18, 2008) (quoting *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994)).

FN81. *Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d Cir.2003) (quoting *Estelle,* 429 U.S. at 104)).

FN82. *Id.* (citing *Estelle,* 429 U.S. 105-06).

FN83. *Pabon v. Goord,* No. 99 Civ. 5869, 2003 WL 1787268, at *11 (S.D.N.Y. Mar.28, 2003) (citation omitted).

**F. Preliminary and Permanent Injunction**

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." FN84 "A preliminary injunction is an extraordinary remedy never awarded as of right." FN85 "When the movant seeks a 'mandatory' injunction-that is, as in this case, an injunction that will alter rather than maintain the status quo-[he or] she must meet the more rigorous standard of demonstrating a 'clear' or 'substantial' likelihood of success on the merits." FN86 The standard for a permanent injunction is essentially the same as for a preliminary injunction, except that a plaintiff seeking a permanent injunction must show actual success on the merits rather than a likelihood of success on the merits. FN87

FN84. *Winter v. Natural Res. Def. Council, Inc.,* --- U.S. ----, 129 S.Ct. 365, 374, 172 L.Ed.2d 249 (2008). *Accord Citigroup Global Markets Inc. v. VCG Special Opportunities Master Fund,* No. 08 Civ. 5520, 2009 WL 1528513, at *1-2 (S.D.N.Y. June 1, 2009) (discussing *Winter* approvingly). *But see Almontaser v. New York City Dep't of Educ.,* 5 19 F.3d 505, 508 (2d Cir.2008) ("A party seeking a preliminary injunction 'must show irreparable harm absent injunctive relief, and either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in plaintiff's favor.' ") (citation omitted).

FN85. *Winter,* 129 S.Ct. at 376 (citation omitted).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

FN86. *Mitchell v. New York State Dep't of Corr. Servs.,* No. 06 Civ. 6278, 2009 WL 185757, at *2 (W.D.N.Y. Jan. 26, 2009) (quoting *Doninger v. Niehoff,* 527 F.3d 41, 47 (2d Cir.2008)).

FN87. *See Winter,* 129 S.Ct. at 381.

## IV. DISCUSSION

Bellamy asserts an Eighth Amendment deliberate indifference claim against Wright and the DOCS. Defendants respond, first, by asserting Eleventh Amendment immunity with respect to all claims against the DOCS and any claims against Wright in his official capacity. As for the claim against Wright in his individual capacity, defendants argue that he was not personally involved in the alleged harm, nor did he create a policy that contributed to that harm. Bellamy also seeks a preliminary and permanent injunction against the DOCS to provide the medical treatment he requests and to comply with several New York State laws. Defendants argue that Bellamy will not win on the merits, nor will he suffer irreparable harm. Defendants urge this Court to decline to exercise supplemental jurisdiction over any remaining New York State law claims. Finally, Bellamy seeks compensatory and punitive damages.

## A. Exhaustion of Administrative Remedies

**\*6** This Court determined in a previous opinion that "Bellamy did not fail to exhaust his administrative remedies because he was justified in his belief that no administrative remedy was available to him." [FN88] Thus, Bellamy's claims are not barred by the PLRA.

FN88. *Bellamy I,* 2008 WL 3152963, at *5

(citing *Giano v. Goord,* 380 F.3d 670, 678 (2d Cir.2004)).

## B. Eleventh Amendment Immunity

The Eleventh Amendment immunizes state agencies and state officials acting in their official capacity from suit under section 1983. Accordingly, Bellamy's deliberate indifference claims against both the DOCS and Wright, in his official capacity, are dismissed.

## C. Section 1983 Claim of Deliberate Indifference Against Wright in His Individual Capacity

The Supreme Court's decision in *Iqbal v. Ashcroft* abrogates several of the categories of supervisory liability enumerated in *Colon v. Coughlin. Iqbal'* s "active conduct" standard only imposes liability on a supervisor through section 1983 if that supervisor actively had a hand in the alleged constitutional violation. Only the first and part of the third *Colon* categories pass *Iqbal'* s muster-a supervisor is only held liable if that supervisor participates directly in the alleged constitutional violation or if that supervisor creates a policy or custom under which unconstitutional practices occurred. The other *Colon* categories impose the exact types of supervisory liability that *Iqbal* eliminated-situations where the supervisor knew of and acquiesced to a constitutional violation committed by a subordinate.

Bellamy's remaining claim alleges that Wright, in his individual capacity, was deliberately indifferent to Bellamy's medical needs. However, Bellamy offers no evidence that any of Wright's actions fall into any of the remaining exceptions that would permit supervisory liability. *First,* Bellamy admits that Wright was not personally involved in the letter responses. Both parties agree that they have never had any form of contact. *Second,* Bellamy offers no evidence that Wright created or contributed to a policy or custom of unconstitutional practices. Bellamy also admitted that he can provide no

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

evidence that Wright was responsible for making any decisions regarding his testosterone medications.[FN89] Bellamy's conclusory allegations that Wright must have known about Bellamy's plight is not enough to impute section 1983 liability.[FN90]

FN89. *See, e.g.,* Bellamy Dep. II at 32:19-21 (Question: "Did Dr. Moorjani say anything that Dr. Wright was involved in the April of 2005 denial?" Answer: "No, he did not.")

FN90. *See Reid v. Artuz,* 984 F.Supp. 191, 195 (S.D.N.Y.1997) (dismissing an asthmatic prisoner's section 1983 claim against a supervisory official when the pleadings "fail[ed] to allege, let alone establish, any factual basis upon which a fact finder could reasonably conclude personal involvement by the supervisory official defendant ... that [defendant] created or continued a policy or custom which allowed the violation to occur, or that [defendant] was grossly negligent in managing the subordinates who caused the unlawful condition").

Finally, Bellamy offers no evidence that Wright demonstrated deliberate indifference to Bellamy's serious medical needs. Bellamy does not contend that Wright unnecessarily and wantonly inflicted any pain-indeed Bellamy conceded that Wright was not involved in the alleged denials of treatment. Accordingly, Bellamy's deliberate indifference claim against Wright in his individual capacity is dismissed.

**D. Preliminary and Permanent Injunction**

Bellamy asks this Court to order the DOCS-through an injunction-to provide him with adequate medical care and to comply with New York State laws. This request is denied.

**\*7** *First,* Bellamy has not alleged that he is suffering irreparable harm. Instead, he has alleged a number of unrelated and sporadic problems that can be expected in the normal course of incarceration, especially when transferring from facility to facility. It cannot be inferred from his pleadings, his testimony or his letters to Wright that he has consistently been denied any form of treatment. Indeed, each of his three letters address completely different topics without re-addressing prior issues. Bellamy concedes that the disruption of his medication only occurred on a very limited or isolated basis.[FN91]

FN91. *See* Bellamy Dep. II at 56-57, 75-76 (demonstrating that, over the course of three-years, Bellamy was denied treatment for one three-week period, for one allegedly three-month period-while he was transferring facilities-and a few alleged short-term periods, although those dates are unspecified).

*Second,* Bellamy cannot show a clear or substantial likelihood of success on the merits. Bellamy does not offer evidence that either defendant was deliberately indifferent to his serious medical needs.[FN92] For the objective prong, Bellamy offers no evidence that any deprivation of medication was sufficiently serious. Headaches and fatigue do not rise to the level of seriousness necessary to warrant a preliminary injunction-especially when Bellamy admits that he still suffers similar side-effects while receiving the requested treatment.[FN93] For the subjective prong, Bellamy does not offer any evidence that any DOCS employee acted with the requisite state of mind to be deliberately indifferent to his serious medical needs.

FN92. While the DOCS itself is immune from section 1983 liability, the following analysis

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

surrounds the DOCS and its employees generally.

FN93. Further, the defendants' affidavits question many of Bellamy's medical propositions. *See, e.g.,* Moorjani Aff. ¶ 4 (claiming that Bellamy exhibited signs of hypogonadism and many of its symptoms, including weight loss, headaches, and fatigue, prior to the surgery).

This Court need not address the balance of equities nor the public interest factors because Bellamy has not shown irreparable harm or a substantial likelihood of success on the merits. Accordingly, Bellamy's request for both a preliminary and permanent injunction is denied.

**E. Supplemental Jurisdiction**

Bellamy asks this Court to compel the DOCS-through an injunction-to comply with New York State Public Health Laws.[FN94] To the extent that there are any remaining state law claims, this Court declines to exercise supplemental jurisdiction over those claims.[FN95]

FN94. *See* Am. Compl., Prayer for Relief ¶ 18.

FN95. *See Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims."). *See also Kshel Realty Corp. v. City of New York,* No. 01 Civ.

9039, 2006 WL 2506389, at *13 (S.D.N.Y. Aug.30 2006) ("[T]he Second Circuit instructs that 'absent exceptional circumstances,' where federal claims can be disposed of on 12(b)(6) or summary judgment grounds, courts should 'abstain from exercising pendent jurisdiction.' ") (quoting *Walker v. Time Life Films, Inc.,* 784 F.2d 44, 53 (2d Cir.1986)).

**V. CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment is granted. The Clerk of the Court is directed to close this motion (Docket # 64) and this case.

SO ORDERED:

S.D.N.Y.,2009.

Bellamy v. Mount Vernon Hosp.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

H

United States District Court,

S.D. New York.

Matthew D'OLIMPIO and Michael Kaplan, Plaintiffs,

v.

Louis CRISAFI, in his individual capacity, Brendan Vallely, in his individual capacity, Thomas D'Amicantonio, in his individual capacity, James Giglio, in his individual capacity, Michael Moffett, in his individual capacity, Paul Nadel, in his individual capacity, Jennifer Treacy, in her individual capacity, Kenneth Post, in his individual capacity, and Timothy Dewey, in his individual capacity, Defendants.

Louis Crisafi, Counterclaim-Plaintiff,

v.

Michael Kaplan, Counterclaim-Defendant.

Nos. 09 Civ. 7283(JSR), 09 Civ. 9952(JSR).

June 15, 2010.

**Background:** Arrestee and former narcotics enforcement investigator brought action against another investigator and other narcotics enforcement officials, alleging malicious prosecution, false arrest, unlawful detention, and other constitutional violations against arrestee, and First Amendment retaliation against investigator. Defendant investigator counterclaimed, alleging defamation by plaintiff investigator. Defendants moved to dismiss for failure to state a claim.

**Holdings:** The District Court, Jed S. Rakoff, J., held that:

(1) allegations were sufficient to state a claim of supervisory liability against officials;

(2) law enforcement officers lacked even arguable probable cause to make arrest;

(3) investigator's statements were not protected by First Amendment; and

(4) plaintiff investigator was not liable for defamation.

Motions denied in part and granted in part.

West Headnotes

**[1] Civil Rights 78 ☞ 1358**

78 Civil Rights

    78III Federal Remedies in General

        78k1353 Liability of Public Officials

           78k1358 k. Criminal law enforcement; prisons. Most Cited Cases

    Arrestee was not required to show discriminatory

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

purpose on the part of law enforcement officers in order to establish the personal involvement needed to support the officers' liability on his § 1983 claim alleging that his search, arrest, and prosecution violated the Fourth Amendment. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[2] Civil Rights 78 ⌘    1395(6)**

78 Civil Rights

   78III Federal Remedies in General

      78k1392 Pleading

      78k1395 Particular Causes of Action

         78k1395(4) Criminal Law Enforcement; Police and Prosecutors

            78k1395(6) k. Arrest, search, and detention. Most Cited Cases

   Allegations against law enforcement officials were sufficient to state a claim under § 1983 that officials failed to supervise narcotics enforcement investigators; complaint incorporated by reference an investigatory report that described various acts of misconduct by investigator that took place prior to arrestee's arrest, and concluded that there was a lack of appropriate supervision by officials, and arrestee alleged that another investigator complained to official in writing regarding investigator's misconduct prior to arrestee's arrest. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[3] Arrest 35 ⌘    63.4(2)**

35 Arrest

   35II On Criminal Charges

      35k63 Officers and Assistants, Arrest Without Warrant

         35k63.4 Probable or Reasonable Cause

            35k63.4(2) k. What constitutes such cause in general. Most Cited Cases

   In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime. U.S.C.A. Const.Amend. 4.

**[4] Civil Rights 78 ⌘    1376(6)**

78 Civil Rights

   78III Federal Remedies in General

      78k1372 Privilege or Immunity; Good Faith and Probable Cause

         78k1376 Government Agencies and Officers

            78k1376(6) k. Sheriffs, police, and other peace officers. Most Cited Cases

   In the context of a qualified immunity defense to an allegation of false arrest, the defending officer need only show arguable probable cause. U.S.C.A. Const.Amend. 4.

**[5] Civil Rights 78 ⌘    1358**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

78 Civil Rights

    78III Federal Remedies in General

        78k1353 Liability of Public Officials

            78k1358 k. Criminal law enforcement; prisons. Most Cited Cases

    Arrestee's allegations were sufficient to state a § 1983 supervisory liability claim against law enforcement officials, arising out of officials' creation of policy allowing narcotics enforcement investigators to initiate criminal charges based on a phone conversation or faxed affidavit, where arrestee alleged that his arrest for possession of a narcotic and criminal impersonation to obtain prescriptions was predicated on nothing more than his pharmacy's report that it had failed to receive a hard copy of a prescription within a week, which prompted a narcotics enforcement official to call arrestee's doctor's office and speak with an unknown person there, who either stated that he was not aware of any such prescription or effectuated the fax transmission of an affidavit bearing an unverified signature of arrestee's doctor. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

[6] Arrest 35 ⛌ 63.4(8)

35 Arrest

    35II On Criminal Charges

        35k63 Officers and Assistants, Arrest Without Warrant

            35k63.4 Probable or Reasonable Cause

                35k63.4(7) Information from Others

                    35k63.4(8) k. Reliability of informer. Most Cited Cases

    Law enforcement officers lacked even arguable probable cause to arrest arrestee for possession of a narcotic and impersonation of a physician based solely on unauthenticated report by physician's staff denying knowledge of arrestee's prescription. U.S.C.A. Const.Amend. 4.

[7] Constitutional Law 92 ⛌ 1941

92 Constitutional Law

    92XVIII Freedom of Speech, Expression, and Press

        92XVIII(P) Public Employees and Officials

            92k1941 k. Discipline or reprimand. Most Cited Cases

    A public employee's cause of action for his employer's discipline based on his speech can proceed only if the employee spoke as a citizen on a matter of public concern; otherwise, the employee's speech is outside the scope of the First Amendment. U.S.C.A. Const.Amend. 1.

[8] Constitutional Law 92 ⛌ 1955

92 Constitutional Law

    92XVIII Freedom of Speech, Expression, and Press

        92XVIII(P) Public Employees and Officials

            92k1955 k. Police and other public safety officials. Most Cited Cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

**Municipal Corporations 268 ☞ 185(1)**

268 Municipal Corporations

    268V Officers, Agents, and Employees

        268V(B) Municipal Departments and Officers Thereof

            268k179 Police

                268k185 Suspension and Removal of Policemen

                    268k185(1) k. Grounds for removal or suspension. Most Cited Cases

Law enforcement officer's complaints to supervisor about fellow officer's behavior, his workplace incident reports, and his complaint to the inspector general, was speech falling within officer's official duties, and thus was not protected under the First Amendment, as required to support employee's retaliation claim; statements were made privately though channels available through officer's employment and were made in a manner that would not be available to a non-public employee citizen, and subject of statements was that other officer was not performing his job properly. U.S.C.A. Const.Amend. 1.

[9] Libel and Slander 237 ☞ 28

237 Libel and Slander

    237I Words and Acts Actionable, and Liability Therefor

        237k26 Repetition

            237k28 k. By others in general. Most Cited Cases

It was simply implausible that narcotics investigator in any legally relevant sense caused the republication of his statements in an investigatory report or newspaper article regarding actions of a fellow investigator, as required to state a claim of defamation under New York law.

[10] Libel and Slander 237 ☞ 28

237 Libel and Slander

    237I Words and Acts Actionable, and Liability Therefor

        237k26 Repetition

            237k28 k. By others in general. Most Cited Cases

Under New York law, a plaintiff may not recover damages from the original author for slander arising from the republication of defamatory statements by a third party absent a showing that the original author was responsible for or ratified the republication.

*342 James Brian Lebow, Sr., New York, NY, for Plaintiffs.

Christine Alexandria Rodriguez, Christine A. Rodriguez, Law Office, Ivan B. Rubin, Peter Sangjin Hyun, New York State Office of the Attorney General, New York, NY, for Defendants.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

*MEMORANDUM ORDER*

JED S. RAKOFF, District Judge.

On August 18, 2009, Plaintiff Matthew D'Olimpio brought this action (docket-numbered 09 Civ. 7283) against defendants Louis Crisafi, Brendan Vallely, Thomas D'Amicantonio, James Giglio, Michael Moffett, and Paul Nadel for malicious prosecution, false arrest, unlawful detention, and various other violations of the Constitution and 42 U.S.C. §§ 1983 and 1988. An amended complaint filed on October 29, 2009 joined Michael Kaplan as a plaintiff and added a claim against defendants Nadel, Jennifer Treacy, Kenneth Post, and Timothy Dewey for unconstitutionally retaliating against Kaplan based on his reports of misconduct committed by defendant Crisafi, a fellow investigator employed by the New York State Department of Health's Bureau of Narcotics Enforcement, Metropolitan Area Regional Office ("BNE-MARO"), in violation of the First and Fourteenth Amendments and § 1983.

On December 18, 2009, defendants Giglio, Moffett, and Nadel moved to dismiss all of D'Olimpio's claims against them, and defendants Crisafi, Vallely, and D'Amicantonio moved to dismiss D'Olimpio's malicious prosecution claim. That same day, defendants Nadel, Treacy, Post, and Dewey moved to dismiss Kaplan's claims against them. Meanwhile, on December 3, 2009, Crisafi had filed what was styled as a complaint against Kaplan (docket-numbered 09 Civ. 9952) alleging that Kaplan defamed him through publication of the reports of Crisafi's misconduct discussed in Kaplan's complaint. On the parties' consent, the Court converted Crisafi's complaint into a compulsory counterclaim in the action docket-numbered 09 Civ. 7283 and consolidated the two cases. *See* Transcript, 1/14/10, *Crisafi v. Kaplan,* No. 09 **\*343** Civ. 9952. On January 22, 2010, Kaplan moved to dismiss that counterclaim.

By Order dated March 1, 2010 (the "March 1 Order"), the Court granted the motion of Nadel, Treacy, Post, and Dewey to dismiss Kaplan's retaliation claim; granted Kaplan's motion to dismiss Crisafi's defamation counterclaim; and denied all other motions to dismiss.[FN1] The Order also promised that a Memorandum would issue in due course stating the reasons for these rulings. With apologies to counsel for the extended delay, the Court here provides that Memorandum.

> FN1. Although the Order did not explicitly so state, all the dismissals were with prejudice (which, as it happens, is also the default position when an order does not state whether a dismissal is or is not with prejudice).

The Court turns first to the motions of defendants Crisafi, Vallely, and D'Amicantonio to dismiss D'Olimpio's malicious prosecution claim, as set forth in the First Amended Complaint ("FAC") filed on October 29, 2009.[FN2] The relevant allegations are as follows:

> FN2. The first five causes of action in the FAC are D'Olimpio's claims. The sixth cause of action is Kaplan's claim.

Sometime before November 16, 2007, D'Olimpio, a resident of Brooklyn, was prescribed Vicodin by his doctor. FAC ¶ 17. He called that prescription into his pharmacy and obtained the Vicodin. *Id.* ¶ 18. D'Olimpio's pharmacy contacted the BNE-MARO after it had not received a hard copy of the prescription from D'Olimpio's doctor within seven days. *Id.* ¶ 19. A MARO official called D'Olimpio's doctor's office and spoke to an unknown individual there, who either stated by phone that he was not aware of D'Olimpio's Vicodin prescription or provided a faxed affidavit purportedly signed by the doctor to that effect. *Id.* ¶ 20. Based on these occurrences, and without any further investigation, MARO investigator Crisafi began planning Crisafi's arrest. *Id.* ¶ 21.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

On or about November 16, 2007, D'Olimpio was exiting his doctor's office in Brooklyn and walking toward his car when Crisafi and defendants Vallely and D'Amicantonio, also MARO investigators, showed D'Olimpio their badges and asked to speak with him. *Id.* ¶¶ 4, 27-28. They asked D'Olimpio his name, where he was coming from, what he was doing at the doctor's office, and whether the car was his. *Id.* ¶ 29. D'Olimpio replied it was his wife's car. *Id.* ¶ 30. Crisafi asked D'Olimpio if they could search him for weapons; D'Olimpio consented to be frisked, but not to a full search. *Id.* ¶¶ 31-32. Crisafi then frisked D'Olimpio, reached into his pockets, and took out his car keys. *Id.* ¶ 33. Crisafi asked D'Olimpio whether he would consent to a search of the car; D'Olimpio refused, but Crisafi nonetheless carried out the search. *Id.* ¶¶ 34-36. During the search, Crisafi found a bag containing a bottle marked for Klonopin but containing both Vicodin and Klonopin pills, all of which were lawfully prescribed to Crisafi and which he carried in one bottle for convenience. *Id.* ¶¶ 37-38. Upon finding the bottle and discovering that there were two types of pills inside, Crisafi handcuffed D'Olimpio and moved him into the police car, without making any effort to find out whether the drugs were legally prescribed. *Id.* ¶¶ 39-40.

While D'Olimpio was being driven to the police precinct and again when he was being escorted to a bathroom prior to questioning, D'Olimpio requested an attorney, but these requests were denied. *Id.* ¶¶ 41-44. Before questioning began, D'Olimpio asked Crisafi to call an ambulance so that he could take the Klonopin that he needed; Crisafi told D'Olimpio to call his wife and ask her to come to the precinct with his medication. *Id.* ¶¶ 46-47. When **\*344** D'Olimpio's wife arrived, D'Olimpio was brought into a different room, and his wife was given his possessions. *Id.* ¶ 48. Crisafi then offered D'Olimpio a blue pill, which he took, but D'Olimpio now believes that pill was not a Klonopin pill, as he experienced side effects of confusion and drowsiness after taking it, which he had never felt previously when taking Klonopin. *Id.* ¶ 50. Crisafi began to interrogate D'Olimpio, and at one point

threatened to rescind his father's physician license. *Id.* ¶ 51. D'Olimpio at that point again requested an attorney, and Crisafi again denied his request. *Id.* ¶¶ 52-53.

During the interrogation, Crisafi asked D'Olimpio to confess to charges of criminal possession of a controlled substance for possessing the Vicodin and to charges of criminal impersonation for allegedly calling pharmacies and using false information to obtain prescriptions. D'Olimpio, under the influence of the pill, signed a one-page confession presented to him by Crisafi. *Id.* ¶ 54. At Crisafi's request, Vallely signed a form falsely indicating that he had seen Crisafi inform D'Olimpio of his *Miranda* rights. *Id.* ¶ 55. D'Olimpio's forged signature was also added to this "*Miranda* sheet." *Id.* ¶ 56. Crisafi, perhaps with the assistance of Vallely or D'Amicantonio, also wrote a four-page confession and forged D'Olimpio's signature and initials on it. *Id.* ¶ 57. Furthermore, Crisafi, possibly with the assistance of Vallely and D'Amicantonio, drafted an affidavit falsely attesting that D'Olimpio illegally possessed Vicodin and that he impersonated a doctor to obtain his prescriptions. *Id.* ¶ 58.

D'Olimpio was then taken to the Manhattan Detention Center, where he was held for 24 hours prior to being arraigned. *Id.* ¶¶ 59-60. Based on the four-page confession and the affidavit, he was arraigned on the criminal possession and impersonation charges and then released on his own recognizance. *Id.* ¶¶ 61-62. According to the Complaint, D'Olimpio appeared in court about seven times before the charges against him were finally dropped on September 4, 2008. *Id.* ¶ 76.

On the basis of these allegations, D'Olimpio's third cause of action claims that Crisafi, Vallely, and D'Amicantonio maliciously prosecuted D'Olimpio by initiating the criminal charges.[FN3] These defendants moved to dismiss this malicious prosecution claim, primarily on the basis that the charges against D'Olimpio remained pending against him as of the time of their motion, as

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

demonstrated by a Court Action Sheet of the Criminal Court, New York County. Decl. of Ivan Rubin, 12/22/09, Ex. 1. Because the favorable termination of the prosecution is a necessary element of a malicious prosecution claim under § 1983, *Green v. Mattingly,* 585 F.3d 97, 103 (2d Cir.2009), the pendency of criminal charges would be fatal to this cause of action.

> FN3. In the first, fourth, and fifth causes of action in the FAC, D'Olimpio respectively alleges that Crisafi, Vallely, and D'Amicantonio violated various constitutional rights, falsely arrested him, and unlawfully detained him. No motions to dismiss were filed with respect to these claims.

In his opposition to the motions to dismiss, D'Olimpio asserted that the Assistant District Attorney prosecuting D'Olimpio's criminal case had committed to move orally to dismiss that case at the next court hearing, which was scheduled for February 2, 2010. Based on that representation, this Court granted leave for D'Olimpio to file a Second Amended Complaint ("SAC") following that hearing. The Second Amended Complaint, filed on February 18, 2010, did indeed include the representation that the criminal charges were dismissed on February 2, 2010. SAC **\*345** ¶ 110. Since D'Olimpio had now sufficiently alleged the favorable termination of the criminal charges against him, the March 1 Order therefore denied the motions to dismiss D'Olimpio's malicious prosecution claim.[FN4]

> FN4. Defendants also asserted that the malicious prosecution claim should be dismissed because D'Olimpio's allegations failed to demonstrate the element of malice-*i.e.,* that there was "some deliberate act punctuated with awareness of 'conscious falsity' " with respect to the institution of criminal proceedings. *Bradley v. Vill. of Greenwood Lake,* 376 F.Supp.2d 528,

534-35 (S.D.N.Y.2005). But D'Olimpio's allegations regarding the false affidavits and confessions were clearly more than sufficient to plead malice.

Defendants Giglio, Moffett, and Nadel moved to dismiss D'Olimpio's second cause of action, which charged them with various constitutional violations based on their supervisory authority over Crisafi and their involvement with an alleged policy leading to D'Olimpio's false arrest. In this regard, the FAC contains the following allegations with respect to these defendants: At the time of the events alleged, James Giglio was the director of the BNE, and worked in the BNE's office in Troy, New York. *Id.* ¶ 5. Michael Moffett was the BNE's Section Chief with responsibility over BNE investigators, and also worked in the Troy office. *Id.* ¶ 6. Paul Nadel was the BNE's Program Director for the MARO, and worked in the same Manhattan office as Crisafi, Vallely, and D'Amicantonio. *Id.* ¶ 7. All three of these defendants had supervisory authority over Crisafi, Vallely, D'Amicantonio, and Kaplan. *Id.* ¶¶ 5-7.

The FAC further alleges that at the time of Crisafi's arrest, MARO followed the following protocol in order to determine whether a narcotics prescription was legitimate: First, when a patient called in a prescription to a pharmacy, the pharmacy would expect to receive a hard copy of the prescription from the patient's doctor within a week. Second, pharmacies were instructed to contact the MARO if they failed to receive a hard copy by the end of the seven-day period. Third, when the MARO was contacted by a pharmacy because the pharmacy did not receive a hard copy, a MARO officer would call the doctor's office and would either speak with the doctor to inquire whether the prescription was legitimate or would ask the doctor to fax an affidavit stating that the prescription was legitimate. *Id.* ¶ 11. With respect to this last step, MARO had a practice of confirming complaints from doctors by telephone and fax without taking any other steps to verify the doctors' identities. *Id.* ¶ 12.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

The FAC also includes the following allegations regarding the failure of Giglio, Moffett, and Nadel to supervise Crisafi: On March 22, 2007, the *New York Times* published an article detailing the abuse of parking placards by government officials. This article included a photograph of a car belonging to Crisafi. *Id.* ¶ 13. Shortly after the publication of that article, the New York State Inspector General's Office began an investigation of Crisafi, which unearthed evidence of other misconduct. *Id.* ¶ 14. Sometime before November 16, 2007, plaintiff Kaplan, a MARO investigator, sent Nadel a written complaint informing him that Crisafi was violating suspects' Fifth Amendment rights. *Id.* ¶ 15. Nadel took no action in response to this complaint. *Id.* ¶ 16. Kaplan followed up with a series of other complaints, including a report to the Inspector General, which are discussed more fully below in the context of Kaplan's retaliation claim. The Inspector General's investigation culminated in a report issued on December 8, 2008, written by Inspector General Joseph Fisch (the "Fisch Report"), which found that Crisafi committed numerous abuses, including many of those alleged by Kaplan, some of **\*346** which were assisted by Vallely and D'Amicantonio. The Fisch Report also found that Giglio and Moffett failed to supervise Crisafi and the MARO office, and noted the fact that Nadel, who was responsible for approving law enforcement operations, was a licensed pharmacist with no previous law enforcement experience. *Id.* ¶¶ 78-79.

Based on the above allegations, Crisafi in his second cause of action asserted § 1983 claims against Giglio, Moffett, and Nadel arising from (1) their creation of a policy allowing MARO personnel to initiate criminal charges based on a phone conversation or faxed affidavit without confirmation of the doctor's identity or that the alleged signature on the affidavit was authentic (the "Policy"); (2) their failure to supervise Crisafi and the MARO; (3) their allowing Nadel, a pharmacist with no prior law enforcement experience, to be the MARO Program Director; and (4) their deliberate indifference to D'Olimpio's rights. *Id.* ¶¶ 122-25.

Defendants attack these claims on several grounds. First, they assert that these claims are based on a broad theory of "supervisory liability" that has been discredited by the Supreme Court in *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Prior to *Iqbal,* well-established Second Circuit law provided five bases for showing that a supervisory defendant had sufficient personal involvement with the alleged violation to maintain a § 1983 claim. A plaintiff could plead personal involvement by showing any of the following:

(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). Defendants argue that *Iqbal's* discussion of supervisory liability took a narrower approach than did *Colon,* therefore rendering D'Olimpio's reliance on some of the *Colon* categories unwarranted.

By way of background, the plaintiff in *Iqbal* brought a " *Bivens* " action against several high-ranking federal officials, including the Attorney General and the Director of the Federal Bureau of Investigation, based on allegations that following the September 11 attacks, the FBI "arrested and detained thousands of Arab and Muslim men" substantially on the basis of their race, religion, or national origin, and that as a result plaintiff was unlawfully

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

subjected to harsh confinement conditions substantially on these discriminatory bases. *129 S.Ct. at 1951.* The Supreme Court, however, held, *inter alia,* that the complaint failed to state a claim for intentional discrimination with respect to the Attorney General or FBI Director, and, as part of that discussion, observed that neither *Bivens* itself (*i.e., Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971)) nor § 1983 imposes supervisory liability simply on the basis of *respondeat superior;* rather, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* at 1948; *see also id.* at 1949 ("[T]he term 'supervisory liability' is a misnomer.... [E]ach Government official ... is only liable for his or her own misconduct."). The Court went on to note that the required showing of personal involvement "will vary with the **\*347** constitutional provision at issue"; as the plaintiff's claim in *Iqbal* was for "invidious discrimination" in violation of the First Amendment and Equal Protection Clause, "the plaintiff must plead and prove that the defendant acted with discriminatory purpose." *Id.* at 1948. Accordingly, the Court rejected the plaintiff's theory that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." *Id.* at 1949.

[1] The defendants here note that certain courts in this District have read these passages of *Iqbal* to mean that "[o]nly the first and part of the third *Colon* categories pass *Iqbal's* muster ... [t]he other *Colon* categories impose the exact types of supervisory liability that *Iqbal* eliminated." *Bellamy v. Mount Vernon Hosp.,* 2009 WL 1835939, at *6 (S.D.N.Y. June 26, 2009); *see also Newton v. City of N.Y.,* 640 F.Supp.2d 426, 448 (S.D.N.Y.2009) ("[P]assive failure to train claims have not survived the Supreme Court's recent decision in *Ashcroft v. Iqbal.*"); *Joseph v. Fischer,* 2009 WL 3321011, at *15 (S.D.N.Y. Oct. 8, 2009) ("Plaintiff's claim, based on [defendant's] 'failure to take corrective measures,' is precisely the type of claim Iqbal eliminated."). This Court respectfully disagrees. As *Iqbal* noted, the degree of personal involvement varies depending on the

constitutional provision at issue; whereas invidious discrimination claims require a showing of discriminatory purpose, there is no analogous requirement applicable to D'Olimpio's allegations regarding his search, arrest, and prosecution. *See, e.g., Wren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."). *Colon's* bases for liability are not founded on a theory of *respondeat superior,* but rather on a recognition that "personal involvement of defendants in alleged constitutional deprivations" can be shown by nonfeasance as well as misfeasance. 58 F.3d at 873 (internal quotation marks omitted). Thus, the five *Colon* categories for personal liability of supervisors may still apply as long as they are consistent with the requirements applicable to the particular constitutional provision alleged to have been violated. *See, e.g., Sash v. United States,* 674 F.Supp.2d 531, 544 (S.D.N.Y.2009) ("It was with intent-based constitutional claims in mind, specifically racial discrimination, that the Supreme Court rejected the argument that 'a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution.' Where the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth and Eighth Amendments, the personal involvement analysis set forth in *Colon v. Coughlin* may still apply." (citation omitted)).

[2] Apart from this argument based on *Iqbal,* Giglio and Moffett assert that D'Olimpio's claims against them should be dismissed insofar as they allege a failure to supervise the MARO investigators. They maintain that D'Olimpio's allegations in this regard are too conclusory to state a claim. The Court disagrees. The FAC incorporates by reference the Fisch Report, which summarizes an investigation beginning in March 2007, describes various acts of misconduct by Crisafi that took place prior to D'Olimpio's arrest, contains a section headed "Lack of Supervision of Crisafi and MARO," and indeed concludes that there was a "lack of appropriate supervision by [Crisafi's] supervisors at MARO and at

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

BNE's headquarters in Troy," where Giglio and Moffett were in charge. Fisch Report, 12/8/08, at 4, 16-17, *available at http:// www. ig. state. ny. us/ *348 pd fs/Investigationöf% 20Employee% 20Misconduct% 20at% 20the% 20DOH% 20Bureau% 20of% 20Narcotics% 20Enforcement.pdf* (cited in FAC ¶ 78). These findings by the Inspector General strongly suggest that defendants Giglio and Moffett "fail[ed] to act on information indicating unconstitutional acts were occurring," or were "gross[ly] negligen[t] in failing to supervise ... subordinates who commit ... wrongful acts," or were otherwise deliberately indifferent to suspects' rights, and also demonstrate "an affirmative causal link between the supervisor's inaction and [plaintiff's] injury." *Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir.2002). For the foregoing reasons, the March 1 Order held that the claims against Giglio and Moffett in this respect cannot be dismissed.

Nadel also argued that the claims against him for his failure to supervise Crisafi must be dismissed because there were no specific allegations of Nadel's personal involvement. The FAC does allege, however, that Kaplan complained to Nadel in writing of Crisafi's misconduct prior to D'Olimpio's arrest. FAC ¶ 15. The Fisch Report, although it does not dwell on Nadel's actions, cites Nadel's lack of prior law enforcement experience and describes complaints by MARO investigators that the lack of a Program Director with law enforcement experience allowed Crisafi "to attain an inappropriate degree of power within the office." Fisch Report at 1, 16. Because the Court, in ruling on a motion to dismiss, must "take all facts and draw all inferences in the light most favorable" to the plaintiff, *Gross v. Rell,* 585 F.3d 72, 75 n. 1 (2d Cir.2009), and because, as noted, the FAC incorporates by reference the allegations of the Fisch Report, the Fisch Report's conclusion that there was a general failure to supervise Crisafi must be taken for these purposes to apply to Nadel, Crisafi's immediate supervisor.[FN5] Thus, the March 1 Order denied the motion to dismiss the claim alleging Nadel's failure to supervise.

FN5. Defendants' reply memorandum asserted that contrary to what was pleaded in the FAC, Crisafi was a Senior Investigator at the time of D'Olimpio's arrest and thus did not report to Nadel at that time. In support of this, it cited to the Fisch Report, which mentions that Crisafi was temporarily promoted between 2006 and March 2008. Fisch Report at 16. The Report does not, however, state that Crisafi ceased reporting to Nadel during this period. The FAC alleges that Nadel, as MARO Program Director, had supervisory authority over all MARO investigators. FAC ¶ 7. In light of the allegations in the FAC, and taking all inferences in favor of D'Olimpio, the Court cannot conclude that Nadel lacked supervisory authority over Crisafi during this period. In any event, it is undisputed that Nadel supervised Vallely and D'Amicantonio, who are also alleged to have violated D'Olimpio's constitutional rights.

With respect to those aspects of plaintiff D'Olimpio's second cause of action that relate to the alleged "Policy," that Policy allegedly permitted BNE investigators to rely on unverified telephone communications with, or faxed affidavits from, doctors' offices to satisfy the requirement of probable cause to arrest suspects or initiate criminal charges. While defendants appear to concede that Giglio, Moffett, and Nadel were sufficiently involved with the formation and operation of this Policy to satisfy the personal involvement requirement of § 1983, they argue that the alleged Policy is not unconstitutional, or at the very least, that the doctrine of qualified immunity should bar further proceedings with respect to these allegations.

[3][4] "In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is **349 committing a crime." *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996). The probable cause determination is

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

based on the "totality of the circumstances," and does not readily lend itself to being reduced to a "neat set of legal rules." *Caldarola v. Calabrese,* 298 F.3d 156, 162 (2d Cir.2002) (internal quotation marks omitted). Furthermore, "in the context of a qualified immunity defense to an allegation of false arrest, the defending officer need only show 'arguable' probable cause." *Id.* (internal quotation mark omitted). The Supreme Court has held that tips from informants can provide probable cause to arrest, but only if either the informant or the information in his/her tips has been shown to be reliable or has been sufficiently corroborated. *See Illinois v. Gates,* 462 U.S. 213, 242, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) ("[E]ven in making a warrantless arrest[,] an officer 'may rely upon information received through an informant, rather than upon his direct observations, *so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge.'* " (emphasis added)); *Florida v. J.L.,* 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) (anonymous call to police reporting that person was carrying a gun lacked indicia of reliability sufficient to satisfy "reasonable suspicion" standard with respect to a police officer's stop-and-frisk search, even though that standard requires a lesser showing than probable cause to arrest); *see also United States v. Elmore,* 482 F.3d 172, 179 (2d Cir.2007) ("Even a tip from a completely anonymous informant-though it will seldom demonstrate basis of knowledge and the veracity of an anonymous informant is largely unknowable-can form the basis of reasonable suspicion or probable cause *if it is sufficiently corroborated.*" (emphasis added) (citation omitted)); *Oliveira v. Mayer,* 23 F.3d 642, 647 (2d Cir.1994) ("Information about criminal activity provided by a single complainant can establish probable cause *when that information is sufficiently reliable and corroborated.*" (emphasis added)).

[5] Defendants argue that the Policy provides BNE officers with probable cause (either on the merits or sufficient to entitle them to qualified immunity) because the information provided by the doctors' offices is sufficiently reliable to support a reasonable belief that a crime has been committed. For this proposition, the defendants rely primarily on two out-of-circuit cases,

*United States v. Fooladi,* 703 F.2d 180 (5th Cir.1983), and *Edwards v. Cabrera,* 58 F.3d 290 (7th Cir.1995). While these cases do support the proposition that it may be error to discount information provided by disinterested informants absent reason to doubt these informants' veracity, even when their names are not known to the law enforcement officer, these cases do not stand for the proposition that such information alone suffices to establish probable cause. Rather, in *Fooladi,* the probable cause determination was not based solely on information provided by a representative of a glass manufacturer, which the Fifth Circuit held that the trial court had erroneously disregarded. Instead, the arrest was based not only on the employee's tip that the manufacturer had shipped glassware to a purported business address that was in fact the arrestee's personal address, but also on, among other things, the law enforcement agent's personal observation that the arrestee's residence emanated an odor characteristic of methamphetamine manufacturing and that the arrestee left the premises "holding his gloved hands away from his body as if a chemical were on them." 703 F.2d at 181-84. Similarly, in *Edwards,* the Seventh Circuit found that probable cause existed not just because of a tip from a bus **\*350** driver, relayed through a dispatcher, that the driver thought he saw several men participate in a drug transaction in a bus station, but also based on the police officer's own personal observations of several men, including the arrestee and his brother, who matched the driver's description standing together outside the bus station; the officer's personal observation that the arrestee's brother was so nervous that he appeared to have urinated on himself; and the officer's subsequent consent search of the brother's garment bag, which yielded a plastic bag appearing to contain marijuana. 58 F.3d at 292.

These cases are thus consistent with the law in this Circuit, as articulated in *Caldarola v. Calabrese,* 298 F.3d 156 (2d Cir.2002). The plaintiff in *Caldarola,* a New York corrections officer challenged his arrest on charges that he was unlawfully collecting job injury benefits even though he was no longer a New York resident and thus was not qualified to receive such benefits. The arresting officer determined there was probable cause to believe the plaintiff had moved from New York to Connecticut based

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 12

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

on an investigative file containing reports from two private investigation firms that had been hired by the officer's supervisors. The reports themselves contained, among other things, summaries of investigators' personal interviews with the plaintiff's New York neighbors, surveillance tapes showing the plaintiff emerging from a home in Connecticut and dropping his children off at school, a deed and mortgage for a Connecticut home in the plaintiff's name indicating that it was his primary residence, and work attendance records indicating that the plaintiff had a Connecticut telephone number. The Second Circuit held that it was reasonable for the arresting officer to conclude that these private investigative firms hired by his supervisors were reliable and that the investigators' reports provided information corroborating their conclusions. *Id.* at 163-68. Thus, accepting *arguendo* defendants' assertion that *Caldarola* stands for the proposition that information gathered by private investigators can support probable cause even in the absence of personal knowledge by the arresting officer, the decision certainly does not suggest that an unadorned, unverified phone call or fax can, by itself, without further meaningful corroboration, satisfy probable cause or support qualified immunity.

[6] Returning to the allegations in the FAC, D'Olimpio has asserted that, consistent with the Policy, his arrest was predicated on nothing more than his pharmacy's report that it had failed to receive a hard copy of the prescription within a week, which prompted a MARO official to call D'Olimpio's doctor's office and speak with an unknown person there, who either stated that he was not aware of any such prescription or effectuated the fax transmission of an affidavit bearing an unverified signature of the doctor. None of the above-cited cases suggests that this information originating from an unidentifiable person in a doctor's office can even come close to satisfying probable cause to arrest, absent corroboration or other indicia of reliability. Unlike *Caldarola,* here there is no underlying data providing support for the informant's conclusion. There is no indication that the identity of the informant here could ever be determined. *Cf. J.L.,* 529 U.S. at 270, 120 S.Ct. 1375 ("Unlike a tip from a known informant whose

reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, 'an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity.' " (citation omitted)). There is no suggestion that the MARO investigators had any reason to rely on this particular doctor's office; to the contrary, there are numerous **\*351** reasons why a doctor or her staff might inadvertently provide inaccurate information, especially given that the relevant information is not affirmatively provided by a tipper, but rather can be elicited by the investigator from whoever happens to pick up the phone in the doctor's office. Moreover, if the doctor herself were involved in wrongdoing with respect to the prescription of narcotics, she would have an incentive to affirmatively mislead the investigators. In sum, while a report from a doctor or her staff denying knowledge of the prescription might be a reasonable basis for further investigation, it is patently deficient as the sole ground for an arrest.

For the foregoing reasons, under the facts alleged and the clearly established law cited herein, defendants lacked even arguable probable cause to arrest D'Olimpio. Because the circumstances of this arrest were consistent with the Policy (as alleged), and because defendants do not dispute that Giglio, Moffett, and Nadel had personal involvement with the establishment and enforcement of this Policy, the March 1 Order declined to dismiss the second cause of action with respect to these allegations.

The Court turns next to those portions of the FAC that assert claims by plaintiff Kaplan, all of which the defendants moved to dismiss. Kaplan's claim of retaliation for expressing his First Amendment rights (the sixth cause of action in the FAC) is based on the following allegations: Kaplan (as noted) is a MARO investigator. FAC ¶ 3. During at least some of the times covered by the FAC, Crisafi was Kaplan's supervisor. *Id.* ¶ 64. As described above, Kaplan complained to Nadel about Crisafi prior to November 16, 2007, but Nadel took no action. *Id.* ¶¶ 15-16. On or about November 17, 2007, Kaplan again went to Nadel and raised concerns about

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

Crisafi: in particular, he stated that Crisafi took prescription narcotics while on duty; that Crisafi would experience facial tics and "zone out"; that Crisafi accidentally discharged his weapon while on duty; that Crisafi lied about his previous job experience; that Crisafi had investigators perform "ill-conceived" and dangerous arrests and searches; that Crisafi was violating suspects' *Miranda* rights; that Crisafi, without authorization, put sirens and lights on his car; and that Crisafi was working outside jobs during work hours. *Id.* ¶ 63. Despite the fact that Kaplan told Nadel that he was afraid of Crisafi and Nadel assured Kaplan that the conversation would be kept confidential, Nadel reported this conversation to Crisafi. *Id.* ¶¶ 63-64. Thereafter, on or about November 20, 2007, Crisafi threatened Kaplan by walking up behind him and saying, "Bang bang, you're dead." *Id.* ¶ 65. At around that same time, Kaplan filed a Workplace Incident Report with the Department of Health's Bureau of Employee Relations detailing these threats and reporting Crisafi's other misconduct, of which he had previously complained to Nadel. *Id.* ¶ 66. In response, Crisafi sabotaged Kaplan's work product on several occasions and began to spread rumors about him, including rumors that Kaplan appeared tired and slept while at the office. *Id.* ¶¶ 67-68. Kaplan then called the Inspector General to report these concerns about Crisafi, and the Inspector General then widened his ongoing investigation of Crisafi to address these issues. *Id.* ¶¶ 69-70. Because, however, the Inspector General's investigation led to interviews with all the MARO inspectors except for Kaplan, Crisafi and Nadel were able to infer that Kaplan was the whistleblower. *Id.* ¶ 71.

Kaplan, after spraining his ankle while on duty, went on workers' compensation leave on or about February 27, 2008. *Id.* ¶ 72. A bullet was shot at Kaplan's house on April 17, 2008, and on April 25, 2008, his house was vandalized. *Id.* ¶¶ 73-74. **352** On August 12, 2008, after Kaplan was notified that Employee Relations never received his first Workplace Incident Report, Kaplan resubmitted it. *Id.* ¶ 75.

After publication of the Fisch Report, Giglio resigned

as the director of the BNE. *Id.* ¶ 81. In December 2008, defendant Jennifer Treacy was appointed Deputy Director of the New York State Department of Health, with supervisory authority over the BNE and the MARO. *Id.* ¶ 82. The Inspector General attempted to persuade Kaplan to return to work, as Crisafi was on leave and would face discipline for his conduct. *Id.* ¶ 83. Kaplan agreed to return to work and received a physician's evaluation that he was fit to return. *Id.* ¶¶ 84-86. Nonetheless, Kaplan was required to undergo three additional physical examinations; after reviewing these, the relevant administrator concluded that Kaplan was fit to return, provided the he be closely monitored, specifically for falling asleep at work. *Id.* ¶¶ 87-90. He was scheduled to return to work on April 10, 2009. *Id.* ¶ 91. The FAC alleges that Treacy, who was romantically involved with Giglio, was upset about Giglio's resignation and blamed Kaplan for causing it; therefore, she ordered the acting director of the BNE not to allow Kaplan to return. *Id.* ¶¶ 92-93. On April 9, 2009, Kaplan was told not to return because of a lack of staff, and on April 23, the Department of Health sent him a letter informing him that he was terminated for failing to complete a study to confirm he did not have a sleep disorder. *Id.* ¶¶ 94-95. Kaplan filed a grievance and, after a hearing, was allowed to return to work. *Id.* ¶ 96.

In May 2009, defendant Kenneth Post was appointed as director of the BNE, and defendant Timothy Dewey was appointed as BNE Section Chief. *Id.* ¶¶ 97-98. In June 2009, Kaplan returned to work, and was informed that he would only be given a temporary assignment and would not perform fieldwork. *Id.* ¶ 99. After his reinstatement, Kaplan was denied access to a state car and was not given a badge, gun, or firearms training; he was confined to desk duties and menial document review. *Id.* ¶¶ 100-101. On July 14, 2009, Kaplan met with Dewey to complain about his treatment. *Id.* ¶ 102. D'Olimpio filed his original complaint in the instant action on August 18, 2009. In September 2009, Stephanie Jubic of Employee Relations confiscated the computers of Crisafi, Vallely, D'Amicantonio, and Kaplan-Kaplan believes Jubic downloaded his emails to find grounds to terminate him. *Id.* ¶ 105. On October 8, 2009, Kaplan was placed on

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

administrative leave and told not to contact anyone at the BNE. *Id.* ¶ 108. On October 16, Jubic mailed Kaplan a letter stating that he would be interrogated on October 27 and would possibly face discipline. *Id.* ¶ 109. Also on October 16, Kaplan had a grievance hearing to discuss being denied his proper job responsibilities. At this hearing, Post stated that as BNE director, it was in his discretion to decide what duties Kaplan should have. *Id.* ¶ 110.

Based on these facts, Kaplan alleges in that defendants Treacy, Post, Dewey, and Nadel retaliated against him with respect to speech that was protected by the First Amendment. These defendants have moved to dismiss Kaplan's claim on several grounds, including that Kaplan's speech was made pursuant to his official duties and hence is not protected by the First Amendment.

[7] A public employee's cause of action for his employer's discipline based on his speech can proceed only if the employee "spoke as a citizen on a matter of public concern"; otherwise, the employee's speech is outside the scope of the First Amendment. *Sousa v. Roque,* 578 F.3d 164, 170 (2d Cir.2009) (internal quotation *353 mark omitted). In *Garcetti v. Ceballos,* 547 U.S. 410, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006), the Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421, 126 S.Ct. 1951. Though not without reluctance, the Court concludes that this "official duties" exception, as recently elaborated on by the Second Circuit in *Weintraub v. Board of Education,* 593 F.3d 196 (2d Cir.2010), is fatal to Kaplan's retaliation claim.

*Weintraub* made clear that for purposes of determining whether a public employee's speech is protected, a public employee's "official duties" are to be

construed broadly. The plaintiff in *Weintraub* was a public school teacher, and the allegedly protected speech consisted of a grievance he filed with his union challenging a school administrator's decision not to discipline a disruptive student. Quoting *Garcetti,* the Court of Appeals stated that the inquiry into whether a public employee speaks pursuant his official duties is "a practical one," and that the employee's duties should not be interpreted narrowly. 593 F.3d at 202 (internal quotation marks omitted). Thus, *Weintraub* held:

[U]nder the First Amendment, speech can be "pursuant to" a public employee's official job duties even though it is not required by, or included in, the employee's job description, or in response to a request by the employer. In particular, we conclude that Weintraub's grievance was "pursuant to" his official duties because it was "part-and-parcel of his concerns" about his ability to "properly execute his duties," as a public school teacher-namely, to maintain classroom discipline, which is an indispensable prerequisite to effective teaching and classroom learning.... Weintraub's speech challenging the school administration's decision to not discipline a student in his class was a "means to fulfill," and "undertaken in the course of performing," his primary employment responsibility of teaching.

*Id.* at 203 (citations omitted). The court went on to note that its conclusion was supported "by the fact that [Weintraub's] speech ultimately took the form of an employee grievance, for which there is no relevant citizen analogue." *Id.* Whereas actions like writing a letter to a newspaper or informally discussing politics with co-workers are equally available to government employees and ordinary citizens, "[t]he lodging of a union grievance is not a form or channel of discourse available to non-employee citizens." *Id.* at 203-04.

[8] Here, the speech that Kaplan claims is protected falls within Kaplan's official duties as defined by

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

*Weintraub.* In the FAC, Kaplan alleges that the retaliation he allegedly suffered was in response to the following statements: (1) his complaints to Nadel about Crisafi's behavior; (2) his Workplace Incident Reports; and (3) his complaint to the Inspector General. With the possible exception of the latter, each of these statements, as Kaplan concedes, was "made privately though channels available through his employment, and was "made in a manner that would not be available to a non-public employee citizen." Kaplan Supp. Mem., 2/5/10, at 5. Moreover, the common theme of all these statements was that Crisafi was violating suspects' rights and was not performing his job properly, and by implication that Crisafi was interfering with Kaplan's ability to perform his own duties. It is clear that Kaplan's duties as a MARO officer included ensuring that investigations and arrests of narcotics abuses are lawfully conducted. *See, e.g.,* Fisch Report at 2-3 (describing policies and training manuals **354** applicable to BNE investigators). All of Kaplan's relevant speech was therefore, either directly or indirectly, " 'part-and-parcel of his concerns' about his ability to 'properly execute his duties' " as a BNE investigator. *Weintraub,* 593 F.3d at 203. Just as the speech in *Weintraub* was in furtherance of the teacher's duty to maintain classroom discipline, Kaplan's speech here, which related to ensuring the "safety of citizens" and the "constitutional rights of suspects," Kaplan Supp. Mem. at 5, was made in furtherance of his law enforcement duties as an investigator endowed with the power to arrest. *Cf. Carter v. Inc. Vill. of Ocean Beach,* 693 F.Supp.2d 203, 211 (E.D.N.Y.2010) ( "All of plaintiffs' complaints to their superiors ... related to their concerns about their ability to properly execute their duties as police officers, as they expressed concern [that various acts] affected their ability to perform their job assignments safely and that they were told not to issue summonses to certain individuals and businesses.... Plaintiffs' speech in challenging ... defendants' alleged cover-ups of officer misconduct ... was undertaken in the course of performing one of their core employment responsibilities of enforcing the law and, thus, was speech made pursuant to their official duties."). Accordingly, Kaplan's allegations cannot support a First Amendment retaliation claim.

In addition, the speech contained in Kaplan's Workplace Incident Reports and his complaint to the Inspector General were unprotected by the First Amendment because these statements were required by law. *See* N.Y. Labor Law § 27-b(6)(a) ("Any employee ... who believes that a serious violation of a workplace violence protection program exists or that an imminent danger exists shall bring such matter to the attention of a supervisor in the form of a written notice."); N.Y. Exec. Law § 55(1) ("Every state officer or employee in a covered agency shall report promptly to the state inspector general any information concerning corruption, fraud, criminal activity, conflicts of interest or abuse by another state officer or employee relating to his or her office or employment .... The knowing failure of any officer or employee to so report shall be cause for removal from office or employment or other appropriate penalty.").[FN6] Speech made pursuant to a public employee's legal obligations is not made "as a citizen."[FN7]

FN6. It is these statutory obligations, as well as *Weintraub's* broad definition of speech made in the course of official duties, that distinguish Kaplan's speech from that of the plaintiff in *Freitag v. Ayers,* 468 F.3d 528 (9th Cir.2006). The plaintiff in *Freitag,* a California correctional officer, claimed she was retaliated against after reporting to the California Inspector General that she and other prison guards were being sexually harassed. Although the Ninth Circuit held that the plaintiff "acted as a citizen" in complaining to the Inspector General and in writing letters to a state senator regarding this harassment, the court's holding was based on the fact that "[i]t was certainly not part of [plaintiff's] official tasks to complain to the Senator or the IG about the state's failure to perform its duties properly." *Id.* at 545. Under New York law, however, such complaints *are* within the official duties of BNE investigators.

FN7. Because Kaplan's speech was made

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

pursuant to his official duties and thus is not constitutionally protected, the Court need not reach other required elements of a First Amendment retaliation claim, including whether his speech addressed matters of "public concern," *see Sousa, 578 F.3d at 170,* and whether the complaint sufficiently alleges a causal connection between the protected speech and the retaliatory acts, *see Gorman-Bakos v. Cornell Coop. Extension of Schenectady County, 252 F.3d 545, 554 (2d Cir.2001).*

For the foregoing reasons, the March 1 Order denied the sixth cause of action in the FAC, and, as the Court now clarifies, the dismissal was with prejudice because it rests on a legal ground that cannot be **\*355** cured by repleading. *Cf. Oliver Schs., Inc. v. Foley,* 930 F.2d 248, 252-53 (2d Cir.1991). The Court notes, however, that the dismissal of Kaplan's First Amendment claim brought pursuant to § 1983 does not alter Kaplan's opportunity under applicable New York law to seek protection from the retaliatory acts he alleges. *See* N.Y. Labor Law § 27-b(6)(e) (prohibiting retaliation based on an employee's filing of a report of workplace violence); N.Y. Exec. Law. § 55(1) (providing that employees who report "improper governmental action" to the Inspector General "shall not be subject to dismissal, discipline or other adverse personnel action").

[9] The Court comes finally to Crisafi's counterclaim for defamation, which insinuates that the aforementioned Workplace Incident Reports filed by Kaplan, Kaplan's complaint to the Inspector General, and even Kaplan's allegations in the FAC are defamatory. Crisafi subsequently conceded, however, that the only potentially actionable statements not protected by privilege or barred by the statute of limitations are those that were allegedly republished on December 8, 2008 by the Inspector General and the *New York Times.* Crisafi Mem. Opp. Kaplan's Mot. to Dismiss, 2/5/10, at 4-5. In this respect, the counterclaim, which was filed on December 3, 2009, alleges the following: Kaplan filed Workplace Incident Reports on or about November 20, 2007 and August 12,

2008 reporting various misconduct by Crisafi, and made a complaint to the Inspector General to the same effect on or about November 20, 2007. Crisafi Compl. ¶¶ 15, 17, 20, Exs. C-E. Crisafi alleges, based on information and belief, that Kaplan's report to the Inspector General "prompted an investigation" focused on Crisafi and relating to Kaplan's complaints. *Id.* ¶ 19. Also upon information and belief, Crisafi alleges that a copy of the Fisch Report was provided to Kaplan in advance of its public release. *Id.* ¶ 35. This report was also provided to the *New York Times,* which described this report in an article published on December 8, 2008. *Id.* ¶ 36 & Ex. F. Upon information and belief, Crisafi alleges that Kaplan gave the Fisch Report to the *New York Times. Id.* ¶ 37. The Fisch Report was published on the *New York Times's* and Inspector General's websites, where it remains accessible. *Id.* ¶¶ 39-40. Crisafi alleges that the contents of the *New York Times* article and the Fisch Report reflect false and defamatory statements made by Kaplan, and have caused Crisafi to be vilified and his reputation to suffer. *Id.* ¶¶ 16, 18, 21, 23-33, 41-43. Accordingly, Crisafi asserted two causes of action alleging that Kaplan defamed him. Kaplan then moved to dismiss these counterclaims on the basis that Kaplan is not responsible for the republication of his allegedly defamatory statements by the *New York Times* or the Inspector General.

[10] Under New York law, a plaintiff "may not recover damages from the original author for ... slander arising from the republication of defamatory statements by a third party absent a showing that the original author was responsible for or ratified the republication." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.,* 314 F.3d 48, 59 (2d Cir.2002). Crisafi argues that a more lenient standard applies, permitting liability based on Kaplan's mere knowledge or reasonable expectation that his allegedly defamatory statements would be republished. *See, e.g., Campo v. Paar,* 18 A.D.2d 364, 368, 239 N.Y.S.2d 494 (1st Dept.1963). The Court need not resolve which standard applies: Crisafi's counterclaim is deficient under either test because it fails to "state a claim to relief that is plausible on its face." *Iqbal,* 129 S.Ct. at 1949 (internal quotation marks omitted).

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

Even accepting as true Crisafi's non-conclusory factual allegations, including **356** those made only on information and belief, it is simply implausible that Kaplan in any legally relevant sense caused the republication of his statements in the Fisch Report or *New York Times* article. Crisafi alleges that Kaplan's complaint prompted the Inspector General investigation, but this allegation is contradicted by the Fisch Report itself, which indicates that the investigation began after the *New York Times* published an article in March 22, 2007 describing abuses of government-issued parking placards. Fisch Report at 3-4. In any event, even if Kaplan's complaint served to expand the scope the investigation, and included allegations consistent with what the Fisch Report eventually concluded, the Report clearly did more than merely parrot Kaplan's charges. The Report, in a section headed "Methodology," states that the investigation was based on, among other things, interviews with Crisafi himself, other BNE employees, Giglio, and Moffett, as well as other police officers and district attorneys who had interacted with Crisafi. *Id.* at 4. Indeed, the Inspector General is required by statute to "investigate," not merely repeat, allegations of malfeasance. N.Y. Exec. Law § 53. And even if, as alleged, Kaplan acted to bring the Report to the attention of the *New York Times*, the *New York Times* article, which consists entirely of a summary of the Fisch Report, reflects Kaplan's allegations only to the extent that such charges were ratified by the Report itself. *See* Crisafi Compl., Ex. F.

For these reasons, the Court concluded that there is no basis for holding Kaplan liable for the republication of his allegedly defamatory statements, even if he intended that his allegations be republished in this manner and gave the *New York Times* a copy of the Fisch Report. "The rationale for making the originator of a defamatory statement liable for its foreseeable republication is the strong causal link between the actions of the originator and the damage caused by the republication." *Van-Go Transp. Co. v. N.Y. City Bd. of Educ.,* 971 F.Supp. 90, 102 (E.D.N.Y.1997) (internal quotation marks omitted). Here,

the duty of the Inspector General to investigate complaints prior to publishing a written report, the fact that the Fisch Report was based on numerous sources beyond Kaplan's allegations, and the fact that the *New York Times* article merely summarized the Fisch Report together sever any causal link that might exist between Kaplan's actions and the December 8, 2008 republications. Thus, the March 1 Order dismissed Crisafi's counterclaim with prejudice.[FN8]

FN8. This result is not inconsistent with *Campo v. Paar,* 18 A.D.2d 364, 368, 239 N.Y.S.2d 494 (1st Dept.1963), which declared that "[a]nyone giving a statement to a representative of a newspaper authorizing or intending its publication is responsible for any damage caused by the publication." This broad pronouncement was made in the context of a narrower holding that the defendant, Jack Paar, could be held responsible for the *New York Post's* publication of his statement, made by him to a reporter during an interview, that the plaintiff "lacked certain qualities which would fit him to be a performer desirable to [Paar's] program." *Id.* at 365, 239 N.Y.S.2d 494. The causal link between Kaplan's statements and the findings of the Fisch Report, which were subsequently summarized by the *New York Times,* is obviously much more attenuated than the relationship in *Campo* between Paar's statement to the newspaper reporter during an interview and the reporter's publication of that statement.

For the foregoing reasons, the Court hereby confirms its decisions to dismiss the sixth cause of action (*i.e.,* all of Kaplan's claims) and to dismiss both of Crisafi's counterclaims, all with prejudice, and to otherwise deny the motions to dismiss. The Clerk of the Court is directed to close **357** the entries numbered 33, 34, 35, 42, and 47 on the docket of case number 09 Civ. 7283 and to close case number 09 Civ. 9952.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

S.D.N.Y.,2010.

D'Olimpio v. Crisafi

718 F.Supp.2d 340

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

C

Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.

Gultela QASEM, Plaintiff,

v.

Luis A. TORO; Superintendent of Taconic Correctional
Facility Delores Thornton; Deputy Superintendent for
Security William Rogers; John Does 1-10, Defendants.

No. 09 Civ. 8361(SHS).

Aug. 10, 2010.

**Background:** Inmate brought a § 1983 suit against
corrections officials regarding injuries suffered by the
inmate at the hands of a corrections officer alleged to have
sexually assaulted the inmate. Superintendent and deputy
superintendent for security moved to dismiss claims that
they were deliberately indifferent to the inmate's personal
safety.

**Holdings:** The District Court, Sidney H. Stein, J., held
that:

(1) inmate stated a claim against the movants for Eighth
and Fourteenth Amendment violations, and

(2) movants were not entitled to qualified immunity.

Motion denied.

West Headnotes

[1] Civil Rights 78 ⊂⊃ 1358

78 Civil Rights

78III Federal Remedies in General

78k1353 Liability of Public Officials

78k1358 k. Criminal Law Enforcement; Prisons.
Most Cited Cases

Constitutional Law 92 ⊂⊃ 4825

92 Constitutional Law

92XXVII Due Process

92XXVII(H) Criminal Law

92XXVII(H)11 Imprisonment and Incidents
Thereof

92k4825 k. Use of Force; Protection from
Violence. Most Cited Cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

**Prisons 310** &#128273;      **234**

310 Prisons

   310II Prisoners and Inmates

      310II(E) Place or Mode of Confinement

         310k234 k. Duty to Protect; Protective Confinement. Most Cited Cases

**Sentencing and Punishment 350H** &#128273;      **1537**

350H Sentencing and Punishment

   350HVII Cruel and Unusual Punishment in General

      350HVII(H) Conditions of Confinement

         350Hk1537 k. Protection from Violence. Most Cited Cases

Inmate's allegations against superintendent and deputy superintendent for security in a § 1983 suit, claiming that they were deliberately indifferent to her rights and were responsible for creating or maintaining policies or practices that failed to prevent her from being repeatedly raped and assaulted by a corrections officer, stated a claim for Eighth and Fourteenth Amendment violations; complaint alleged that the officials were responsible for determining where inmates were to be housed and the assignment of guards, and in conjunction with another official, the investigation and response to complaints of staff misconduct. U.S.C.A. Const.Amends. 8, 14; 42 U.S.C.A. § 1983.

**[2] Civil Rights 78** &#128273;      **1335**

78 Civil Rights

   78III Federal Remedies in General

      78k1334 Persons Liable in General

         78k1335 k. In General. Most Cited Cases

Degree of personal involvement required to overcome a motion to dismiss a § 1983 claim for failure to state a claim varies depending on the constitutional provision alleged to have been violated. 42 U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[3] Civil Rights 78** &#128273;      **1355**

78 Civil Rights

   78III Federal Remedies in General

      78k1353 Liability of Public Officials

         78k1355 k. Vicarious Liability and Respondeat Superior in General; Supervisory Liability in General. Most Cited Cases

Categories set forth in case law as supporting personal liability of supervisors under § 1983 apply as long as they are consistent the requirements applicable to the particular constitutional provision alleged to have been violated. 42 U.S.C.A. § 1983.

**[4] Sentencing and Punishment 350H** &#128273;      **1532**

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

350H Sentencing and Punishment

   350HVII Cruel and Unusual Punishment in General

      350HVII(H) Conditions of Confinement

         350Hk1532 k. In General. Most Cited Cases

Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody. U.S.C.A. Const.Amend. 8.

**[5] Sentencing and Punishment 350H  ☞  1533**

350H Sentencing and Punishment

   350HVII Cruel and Unusual Punishment in General

      350HVII(H) Conditions of Confinement

         350Hk1533 k. Deliberate Indifference in General. Most Cited Cases

Official acts with the requisite deliberate indifference for an Eighth Amendment violation when that official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. U.S.C.A. Const.Amend. 8.

**[6] Civil Rights 78  ☞  1376(7)**

78 Civil Rights

   78III Federal Remedies in General

      78k1372 Privilege or Immunity; Good Faith and Probable Cause

         78k1376 Government Agencies and Officers

            78k1376(7) k. Prisons, Jails, and Their Officers; Parole and Probation Officers. Most Cited Cases

Superintendent and deputy superintendent for security were not entitled to qualified immunity in an inmate's § 1983 suit claiming that they were deliberately indifferent to her rights and were responsible for creating or maintaining policies or practices that failed to prevent her from being repeatedly raped and assaulted by a corrections officer, given the extent of the alleged sexual abuse, the numerous warning signs alleged, and the number of questionable, if not unintelligible, decisions made with respect to the inmate during the course of an investigation. 42 U.S.C.A. § 1983.

**[7] Civil Rights 78  ☞  1376(2)**

78 Civil Rights

   78III Federal Remedies in General

      78k1372 Privilege or Immunity; Good Faith and Probable Cause

         78k1376 Government Agencies and Officers

            78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases

Individual defendants are shielded from liability for civil damages under § 1983 if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. 42 U.S.C.A. § 1983.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

Karen K. Won, Cooley Godward Kronish LLP, William O'Brien, Kronish, Lieb, Weiner & Hellman L.L.P., New York, NY, for Plaintiff.

Thomas Patrick McCloskey, Aliazzo, McCloskey & Gonzalez, LLP, Ozone Park, NY, Julia Hyun-Joo Lee, New York State Department of Law, New York, NY, for Defendants.

*OPINION & ORDER*

SIDNEY H. STEIN, District Judge.

*1 Plaintiff Gultela Qasem brings this action pursuant to 42 U.S.C. § 1983 against defendants Luis Toro, Delores Thornton, William Rogers, and John Does 1-10 in their individual capacities. The lawsuit arises from injuries allegedly suffered by Qasem at the hands of Corrections Officer Luis Toro while Qasem was an inmate under the custody of the New York State Department of Correctional Services ("DOCS") at Taconic Correctional Facility. The complaint alleges that defendants deprived Qasem of her constitutional rights through (1) direct and repeated acts of sexual assault by Toro; (2) Thornton and Rogers's deliberate indifference to her personal safety; and (3) Thornton and Rogers's maintenance of, or failure to remedy, policies and practices that created an unreasonable risk of sexual assault by Toro. Defendants Thornton and Rogers have now moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim for relief.

**I. BACKGROUND**

The following facts are taken from the complaint and presumed to be true for the purposes of this motion.

A. *Parties*

Plaintiff Gultela Qasem is currently an inmate at the Bedford Hills Correctional Facility. At the time of the acts alleged in the complaint, plaintiff was an inmate at the Taconic Correctional Facility. (Compl. ¶¶ 5, 21.) Defendant Toro-not a party to the present motion-is a DOCS Corrections Officer. At the time of the acts alleged in the complaint, defendant Delores Thornton was the Superintendent of Taconic and defendant Rogers was the Deputy Superintendent for Security of Taconic. (*Id.* ¶¶ 1, 8-9.)

B. *This Action*

Qasem alleges defendants violated her Eighth and Fourteenth Amendment rights under the United States Constitution as they arise out of a repeated pattern of sexual assault and rape committed against her by Toro.

While an inmate at Taconic, Qasem was assigned to work in Building 93 from approximately February 2007 to November 2007, and for most of that time, she also lived there. (*Id.* ¶¶ 21-22.) Qasem alleges that, on or around March 27, 2007, Toro entered her cell during the afternoon "count time" [FN1] and sexually assaulted her by fondling her breasts, vaginal area, and buttocks while also exposing his penis and forcing Qasem to perform oral sex on him. (*Id.* ¶ 23.) Plaintiff alleges that later that evening Toro ordered her to the officers' station where he raped her. (*Id.* ¶ 24.) Toro then told Qasem that he would write up a disciplinary action against her if she told anyone what he had done to her. (*Id.* ¶ 24.)

Qasem alleges that a pattern of sexual assault emerged over the next eight months. Toro allegedly assaulted and raped Qasem in her cell on numerous occasions during the night count time, in the officers' station, in the shower area, and in the recreation room. (*Id.* ¶¶ 25-26.) Throughout these eight months, Qasem alleges that Toro

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

repeatedly threatened to kill her and her family if she reported his actions. As a result, she did not report Toro's conduct. (*Id.* ¶ 27.) Plaintiff alleges, however, that other corrections staff facilitated Toro's repeated sexual abuse by condoning Toro or plaintiff being in unauthorized areas and allowing Toro into plaintiff's housing area when he was not assigned there. (*Id.* ¶ 28.)

**\*2** Although Qasem did not file a report against Toro based on his conduct, others did, and on July 2, 2007, the DOCS Officer of Inspector General ("IG") commenced an investigation into Toro's actions. (*Id.* ¶¶ 31-33.) When interviewed by an IG representative, Qasem denied the allegations because of the prior threats that Toro had made; despite her denials, plaintiff was reassigned to a different building the day after her interview. (*Id.* ¶¶ 33-34.) As the IG continued its investigation, in August 2007 Qasem was transferred back to building 93, which was the building where Toro worked at that time. Plaintiff contends that by causing her to be transferred back to Toro's building, defendants Thornton and Rogers were deliberately indifferent to her safety and allowed Toro to have continued unfettered access to her, which enabled him to continue raping and sexually abusing her. (*Id.* ¶ 38.) Plaintiff alleges that once she returned to building 93 in August 2007, Toro resumed his sexual assaults, including but not limited to raping and sodomizing her. (*Id.* ¶ 40.)

During this same time period, plaintiff was transferred in and out of the "keeplock" area in building 93. (*Id.* ¶¶ 39-47.) While she was in keeplock, at least one corrections officer delivered a message from Toro to her, while other corrections staff condoned and disregarded the alleged continuing assaults by Toro. (*Id.* ¶¶ 47-48.) In addition to physical, mental, and emotional injuries she suffered from the repeated rapes and sexual abuse, Qasem alleges that in October 2007 she was diagnosed with genital herpes, a sexually transmitted disease, which she believes was transmitted to her by Toro. (*Id.* ¶¶ 61-63.)

Plaintiff alleges that sometime in November 2007, Toro became aware of the IG investigation and started harassing her by asking her what questions the IG representative had asked her and what her responses were. (*Id.* ¶ 45.) Qasem contends that on November 26, 2007, after she was once again raped by Toro, she told him that she was going to report his conduct, and Toro became violent with her-twisting her arm and wrist. (*Id.* ¶ 50.) The next day, plaintiff was transferred out of Taconic and into Bedford. (*Id.* ¶ 51.)

Plaintiff alleges that Thornton and Rogers were deliberately indifferent to her safety and well-being and that despite ample evidence of the assaults, they permitted Toro to have repeated access to her instead of removing either her or Toro from building 93. (*Id.* ¶¶ 55-60.) Plaintiff maintains that Thornton and Rogers were responsible for the inadequate polices and practices that allowed her to be repeatedly raped and assaulted over a number of months, despite the fact that other corrections officers were aware of Toro's misconduct. (*Id.*)

**II. DISCUSSION**

A. *Rule 12(b)(6) Standard*

On a motion to dismiss a claim for relief pursuant to Rule 12(b)(6) a court accepts the truth of the facts alleged in the complaint and draws all reasonable inferences in the plaintiff's favor. *Ashcroft v. Iqbal,* ---U.S. ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009); *Global Network Commc'ns, Inc. v. City of New York,* 458 F.3d 150, 154 (2d Cir.2006). A complaint will be dismissed if it fails to set forth "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 129 S.Ct. at 1949 (quoting *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955).

B. *Supervisory Liability Post-Iqbal*

*3 [1] The complaint alleges that defendants deprived Qasem of her constitutional rights through (1) the direct and repeated acts of sexual assault by Toro; (2) defendant Thornton and Rogers's deliberate indifference to her personal safety; and (3) Thornton and Rogers's maintenance of, or failure to remedy, policies and practices that created an unreasonable risk of sexual assault by Toro. Thornton and Rogers respond to the claims against them on several grounds.

First, they assert that Qasem's claims are based on a broad theory of "supervisory liability" that has been discredited by the U.S. Supreme Court in *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Prior to *Iqbal,* well-established Second Circuit law provided five bases for alleging that a supervisory defendant had sufficient personal involvement with the alleged violation to maintain a section 1983 claim. A plaintiff could plead personal involvement by showing any of the following five courses of conduct:

(1) the defendant participated directly in the alleged constitutional violation, the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were

occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Sanders v. N.Y. City Dep't of Corr.,* 07 Civ. 3390, 2009 WL 222161, at *5, 2009 U.S. Dist. LEXIS 7709, at *17-18 (S.D.N.Y. Jan. 30, 2009). Defendants contend that *Iqbal's* discussion of supervisory liability took a narrower approach than did *Colon,* thereby rendering Qasem's reliance on *Colon* categories unwarranted.

The Second Circuit has not yet addressed how *Iqbal* affects the five categories of conduct that give rise to supervisory liability under *Colon.* As explained in detail in *D'Olimpio v. Crisafi,* No. 09 Civ. 7283, ---F.Supp.2d ----, ---- - ----, 2010 WL 2428128, at *4-6, 2010 U.S. Dist. LEXIS 59563, at *14-18 (S.D.N.Y. June 15, 2010), in the wake of *Iqbal,* certain courts in this district have found that "[o]nly the first and part of the third *Colon* categories pass *Iqbal's* muster," and that "[t]he other *Colon* categories impose the exact types of supervisory liability that *Iqbal* eliminated," because only the first and third categories allege personal involvement sufficiently to permit supervisory liability to be imposed after *Iqbal. Bellamy v. Mount Vernon Hosp.,* No. 07 Civ. 1801, 2009 WL 1835939, at *1-2, 2009 U.S. Dist. LEXIS 54141, at *6 (S.D.N.Y. June 26, 2009); *see also Newton v. City of N.Y.,* 640 F.Supp.2d 426, 448 (S.D.N.Y.2009) ("[P]assive failure to train claims pursuant to section 1983 have not survived the Supreme Court's recent decision in *Ashcroft v. Iqbal.*"); *Joseph v. Fischer,* No. 08 Civ. 2824, 2009 WL 3321011, at *15, 2009 U.S. Dist. LEXIS 96952, at *42-43 (S.D.N.Y. Oct. 8, 2009) ("Plaintiff's claim, based on [defendant's] 'failure to take corrective measures,' is precisely the type of claim *Iqbal* eliminated."). This Court, as did the Court in *D'Olimpio,* disagrees with this narrow interpretation of *Iqbal.*

*4 [2] As *Iqbal* noted, the degree of personal involvement required to overcome a Rule 12(b)(6) motion varies depending on the constitutional provision alleged to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

have been violated. Invidious discrimination claims require a showing of discriminatory purpose, but there is no analogous requirement applicable to Qasem's allegations of repeated sexual assaults. *See Sash v. United States,* 674 F.Supp.2d 531, 544 (S.D.N.Y.2009) (citing *Chao v. Ballista,* 630 F.Supp.2d 170, 178 n. 2 (D.Mass.2009)); *see also D'Olimpio,* --- F.Supp.2d at ----, 2010 WL 2428128, at *5, 2010 U.S. Dist. LEXIS 59563, at *16. *Colon's* bases for liability are not founded on a theory of respondeat superior, but rather on a recognition that "personal involvement of defendants in alleged constitutional deprivations" can be shown by nonfeasance as well as misfeasance. *Id.* at ----, *5, 2010 U.S. Dist. LEXIS 59563 at *17 (quoting *Colon,* 58 F.3d at 873).

[3] Thus, the five *Colon* categories supporting personal liability of supervisors still apply as long as they are consistent with the requirements applicable to the particular constitutional provision alleged to have been violated. *Id.;* *see also Sash v. United States,* 674 F.Supp.2d 531, 544 (S.D.N.Y.2009) ("It was with intent-based constitutional claims in mind, specifically racial discrimination, that the Supreme Court rejected the argument that 'a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution.' Where the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth and Eighth Amendments, the personal involvement analysis set forth in *Colon v. Coughlin* may still apply." (citation omitted)).

Plaintiff's allegations and inferences, if proven, would entitle her to relief under the Fourteenth Amendment and Eighth Amendments. *See Breithaupt v. Abram,* 352 U.S. 432, 435, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957) (sustaining substantive due process claims where state action shocks the conscience); *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.") (quoting *Helling v. McKinney,* 509 U.S. 25, 31, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)).

C. *Colon Categories*

Second and apart from their argument based on *Iqbal,* Thornton and Rogers assert that plaintiff has adequately alleged neither (1) that they were deliberately indifferent to her rights by failing to act on information that unconstitutional acts were occurring nor (2) that they were responsible for creating or maintaining policies or practices that failed to prevent Qasem from being repeatedly raped and assaulted.

[4][5] The Court finds that plaintiff has alleged sufficient facts that Thornton-the Superintendent of the DOCS facility where plaintiff resided-and Rogers-the Deputy Superintendent for Security at that same facility-were deliberately indifferent to her health and safety and that they were responsible for creating or maintaining policies and practices that failed to prevent plaintiff from being raped and assaulted. The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody. *Hayes v. New York City Dep't of Corrections,* 84 F.3d 614, 620 (2d Cir.1996). "An official acts with the requisite deliberate indifference when that official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

*5 Specifically, the complaint alleges that defendants were responsible for determining where inmates were to be housed and the assignment of guards, and in conjunction with the IG, the investigation and response to complaints of staff misconduct. Despite an investigation and what plaintiff alleges as substantial evidence of Toro's misconduct known to a variety of individuals (*id.* ¶ 56),

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

defendants Thornton and Rogers allowed plaintiff to be housed in the building where Toro worked (*id.* ¶ 58); they failed to remove him from guarding Qasem (*id.* ¶ 57); they failed to reassign Qasem to another building (*id.*); they allowed Qasem to be transferred back to the building where Toro worked (*id.* ¶ 58); and they did not increase supervision of Toro despite their knowledge of allegations of Toro's assaults and the IG's investigation of him (*id.* ¶ 59). The complaint also alleges that a number of acts occurred under defendants' supervision that were violations of DOCS rules and regulations (*id.* ¶¶ 28, 47), and that defendants Thornton and Rogers allowed those practices to take place.

Although discovery may ultimately reveal that defendants Thornton and Rogers made every reasonable effort to prevent the alleged sexual abuse, Qasem has alleged sufficient facts to allow the Court "to draw the reasonable inference" that the defendants "are liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949.

D. *Qualified Immunity*

[6] Third, Thornton and Rogers claim that qualified immunity requires dismissal of this litigation as to them. So far as the Court can ascertain, defendants contend that they are entitled to immunity principally because Qasem herself initially denied the sexual relationship when asked about it by prison security officers. In their view, her denials by themselves operate as a "reasonable" basis for the decision to place plaintiff back into the building where Toro had unfettered access to her.

[7] Individual defendants are " 'shielded from liability for civil damages' " under 42 U.S.C. § 1983 if " 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d

396 (1982)); *accord Gilles v. Repicky,* 511 F.3d 239, 243 (2d Cir.2007). "A right is clearly established if (1) the law is defined with Supreme Court or the Second Circuit has recognized the right, and (3) 'a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful.' " *Anderson v. Recore,* 317 F.3d 194, 197 (2d Cir.2003) (quoting *Young v. County of Fulton,* 160 F.3d 899, 903 (2d Cir.1998)).

This Court cannot find the defendants immune from suit on this record. It is well established that the sexual exploitation of prisoners by prison guards amounts to a constitutional violation. *See Schwenk v. Hartford,* 204 F.3d 1187, 1197 (9th Cir.2000) ("In the simplest and most absolute terms, the Eighth Amendment right of prisoners to be free from sexual abuse was unquestionably clearly established ... and no reasonable prison guard could possibly have believed otherwise."); *Daskalea v. District of Columbia,* 227 F.3d 433, 440, 343 U.S.App.D.C. 261 (D.C.Cir.2000) (affirming prisoner's Eighth Amendment claim after prison guards sexually assaulted her); *Berryhill v. Schriro,* 137 F.3d 1073, 1076 (8th Cir.1998); *Barney v. Pulsipher,* 143 F.3d 1299, 1310 (10th Cir.1998) ("Clearly plaintiffs' deprivations resulting from the sexual assaults are sufficiently serious to constitute a violation under the Eighth Amendment."). *Cf. Farmer v. Brennan,* 511 U.S. 825, 833-34, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.' ") (quoting *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). Given the extent of the alleged sexual abuse, the numerous warning signs alleged, and the number of questionable-if not unintelligible-decisions made with respect to plaintiff during the course of the IG's investigation, the Court cannot say at this stage of the litigation that Thornton and Rogers are entitled to qualified immunity for their alleged actions.

**III. CONCLUSION**

*6 Because plaintiff has alleged enough facts to raise

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

a plausible claim to relief against the supervisory officials Thornton and Rogers and they are not entitled to qualified immunity on the basis of the record at this stage of the litigation, the motion by Thornton and Rogers to dismiss the complaint is denied.

> FN1. Count time is time during which all activity stops and essentially all inmates are locked into their cells, and corrections staff verify that no inmates are missing. (Compl. ¶ 23 n. 1.)

S.D.N.Y.,2010.

Qasem v. Toro

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)
(Cite as: 1995 WL 232736 (S.D.N.Y.))

**C**
Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.

GREENWALDT, Plaintiff,
v.
COUGHLIN, et al., Defendants.
**93 Civ. 6551 (LAP).**

April 19, 1995.

*MEMORANDUM AND ORDER*

PRESKA, District Judge:

**\*1** Plaintiff Paul P. Greenwaldt ("Greenwaldt") brings this prisoner pro se suit under 42 U.S.C. § 1983, claiming that the defendants, employees of the New York State Department of Correctional Services ("NYSDOCS"), violated his constitutional rights. Defendants Thomas A. Coughlin, III ("Coughlin"), Commissioner of NYSDOCS; Anthony J. Annucci ("Annucci"), Deputy Commissioner and Counsel; Susan E. Butler ("Butler"), Deputy Commissioner; Philip Coombe, Jr. ("Coombe"), First Deputy Commissioner; James Recore ("Recore"), Director of the Bureau of Temporary Release and Robert Hanslmaier ("Hanslmaier"), Acting Superintendent of Woodbourne Correctional Facility ("Woodbourne"), have moved to dismiss. Defendant T. J. Miller ("Miller"), Deputy Superintendent of Woodbourne, has not joined in the motion to dismiss. For the reasons given below, the motion is granted.

*BACKGROUND*

Greenwaldt makes numerous allegations against the defendants. On May 21, 1993, Greenwaldt was transferred to Woodbourne, a medium security facility under the jurisdiction of NYSDOCS. (Am. Compl. ¶¶ 1-2.)[FN1] Upon his arrival at Woodbourne, a sergeant allegedly informed Greenwaldt that at Woodbourne visits were permitted only on alternate Saturdays and Sundays, depending on the first letter of the inmate's last name.[FN2] Greenwaldt asked if there were any exceptions possible, and the sergeant told him to write the Deputy Superintendent to request an exception. (Am. Compl. ¶¶ 3-6.) Greenwaldt, an avid letter writer, proceeded to write to various state public officials concerning what he perceived to be discriminatory visitation rules. (Am. Compl. ¶¶ 8-11.)

Greenwaldt also complains that on June 3, 1993, he was placed in keeplock without a good reason. (Am. Compl. ¶¶ 15-16.) Greenwaldt claims that, at about that time, he was fined five dollars, without explanation or notice. (Am. Compl. ¶ 20.) On June 5, 1993, Greenwaldt claims to have received notice that he had been found guilty of "refusing a direct order...; interfering with an officer; and, [sic] creating a disturbance." (Am. Compl. ¶ 22.) Greenwaldt then wrote to defendants Coughlin, Coombe, Annucci, and Hanslmaier complaining of perceived procedural violations in connection with his disciplinary proceeding. (Am. Compl. ¶¶ 23-25.) On June 8, 1993, Greenwaldt attended a Tier II disciplinary hearing and was found "not guilty of one charge, and guilty of the other charges." (Am. Compl. ¶¶ 26-28.) Greenwaldt appealed this finding. (Am. Compl. ¶ 30.) He also persisted in his complaints regarding the five dollar fine. (Am. Compl. ¶ 33.)

Greenwaldt also claims that a Sargeant Keesler ("Keesler") threatened him. Greenwaldt alleges Keesler told him, "if you continue to complain, I will personally have my officers write you up for every little thing and it will cost you much more than the five dollars ($5.00) we already got." (Am. Compl. ¶ 34.) Greenwaldt claims he immediately wrote to Coughlin, Coombe and Hanslmaier informing them of Keesler's threats. Hanslmaier responded to Greenwaldt in a letter which, according to Greenwaldt "totally disregarded the written complaint." (Am. Compl. ¶ 36.)

**\*2** Greenwaldt also claims that Recore denied his appeal

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)
(Cite as: 1995 WL 232736 (S.D.N.Y.))

of the disciplinary hearing judgment. (Am. Compl. ¶¶ 37-41.) Displeased, Greenwaldt wrote to Recore, complaining that he did not receive a copy of the decision and alleging the decision was inaccurate. (Am. Compl. ¶ 42.) Greenwaldt also complained to Recore of alleged violations of New York correctional facility regulations and of allegedly improper administration of the temporary release program. (Am. Com pl. ¶ 44-48.) In fact, Greenwaldt claims Coughlin, Coombe, Butler, Annucci, Recore, and possibly even then-Governor Mario Cuomo, the Attorney General, and members of the New York State Senate and Assembly were together "engaged in an active conspiracy to circumvent and violate the very laws that they swore to uphold" with respect to the administration of the temporary release program. (Am. Compl. ¶ 49.) Greenwaldt also claims he requested Recore to:

take the necessary steps as the DIRECTOR of the TEMPORARY RELEASE PROGRAMS, to rectify the egregious violations of the law and, [sic] the total disregard of the mandates of 7 N.Y.C.C.R. Part 1900 et seq. by the Temporary Release Committees in the various correctional facilities.

(Compl. ¶ 49.)

Greenwaldt alleges that on September 10, 1993, Keesler conducted a search of Greenwaldt's cell and told him that he was "in real trouble because [he] wrote legal papers for other inmates." (Am. Compl. ¶ 52.) Keesler allegedly took legal papers and forms from Greenwaldt's cell. (Am. Compl. at ¶¶ 53-54.) Greenwaldt was served with a Notice of Charges, taken to a Tier III Disciplinary Hearing and "found guilty and sentenced." Though his legal papers were eventually returned to him, he was fined another five dollars. (Am. Compl. ¶¶ 59, 61.)

Greenwaldt alleges that he was subjected to new threats after this incident. According to Greenwaldt, Keesler and Miller "attempted to intimidate [[[Greenwaldt] by questioning [him] about the lawsuit presently pending." (Am. Compl. ¶ 62.) Greenwaldt claims that Keesler then said of Greenwaldt to Miller, in Greenwaldt's presence, "this one... you can lock up anytime, he deserves it." (Am. Compl. ¶ 62-63.)

Turning to the procedural background of the instant action, Greenwaldt filed his original complaint on September 16, 1993. Defendants Coughlin, Annucci, Butler and Coombe moved to dismiss on November 18, 1993. On December 13, 1993, Greenwaldt filed his memorandum in opposition. Defendants, including Recore, filed an amended memorandum on January 31, 1994. Greenwaldt filed an amended complaint on March 2, 1994. Defendants filed a second amended memorandum on July 15, 1994, Hanslmaier by then having joined the motion as well.

Greenwaldt brings this suit under 42 U.S.C. § 1983, and alleges violations of his rights under the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments. (Am. Compl. ¶¶ 70-74.) He asks that I enjoin the defendants "from further penalizing [Greenwaldt] for exercising his constitutional rights and from confining him to his cell," (Am. Compl. at 22, ¶ 1), and from implementing what Greenwaldt claims is a discriminatory policy on visiting times. (Am. Compl. at 22, ¶ 2). Greenwaldt also seeks declaratory relief declaring unconstitutional the administration of the temporary release program. Finally, he seeks compensatory damages, punitive damages, and costs. Defendants argue, *inter alia,* that there is no basis for holding defendants liable for the alleged violations, and that Greenwaldt has no protected interest, in either the temporary release program or the visitation policy, upon which to base his claims. Defendants' motion to dismiss is granted for the reasons stated below.

## DISCUSSION

*3 Defendants have moved to dismiss the claims pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. A complaint should not be dismissed unless "it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim[s] which would entitle him to relief.'" *Elliott v. Bronson,* 872 F.2d 20, 22 (2d Cir. 1989) (quoting *Haines v. Kerner,* 404 U.S. 519, 520-21 (1972)); *Massop v. Coughlin,* 770 F.2d 299, 301 (2d Cir. 1985). In addition, the courts "must construe pro se complaints liberally, applying less stringent standards than when a plaintiff is represented by counsel." *Elliott,* 872 F.2d at 21; *Gill v. Mooney,* 824 F.2d 192, 195 (2d Cir. 1987); *Williams v. Vincent,* 508 F.2d 541, 543 (2d Cir. 1974). Where a plaintiff acts pro se, a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)
(Cite as: 1995 WL 232736 (S.D.N.Y.))

court must "read his supporting papers liberally, and... interpret them to raise the strongest arguments that they suggest." *Soto v. Walker,* 44 F.3d 169, 173 (S.D.N.Y. 1995). However, I also note that the Court of Appeals has stated that:

As we have repeatedly held, complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning.

*Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir. 1987). *See, e.g., Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir. 1988); *Ruderman v. Police Dep't of New York,* 857 F. Supp. 326, 330 (S.D.N.Y. 1994); *Saunders v. Coughlin,* No. 92 Civ. 4289 (SCH), 1994 WL 88108 at *3 (S.D.N.Y. Mar. 15, 1994).

I. Plaintiff's Failure to Allege that the Defendants *Are Personally Responsible for any Violations*

Greenwaldt has failed to allege how the defendants are personally responsible for the injustices he perceives. It is well-settled that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991)); *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied,* 434 U.S. 1087 (1978). A plaintiff must "allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir. 1986). The doctrine of *respondeat superior* is not applicable to § 1983 actions brought against corrections officers. *Monell v. Department of Social Serv. of New York,* 436 U.S. 658, 692 (1978); *Bass,* 790 F.2d at 263; *Candelaria v. Coughlin,* No. 93 Civ. 3212 (RWS), 1994 WL 119146 at *4 (S.D.N.Y. Apr. 4, 1994). Similarly, the fact that a defendant may have been in a "high position of authority is an insufficient basis for the imposition of personal liability" under § 1983. *McKinnon,* 568 F.2d at 934; *see also Wright,* 21 F.3d at 501. There are a number of ways in which a defendant in a supervisory position may be found personally involved in, and therefore liable for, constitutional violations, including: (1) direct

participation, (2) failure to remedy a wrong after learning of it, (3) creation or tolerance of a policy under which unconstitutional practices occurred or were allowed to continue, or (4) gross negligence in managing subordinates who committed the violations. *Wright,* 21 F.3d at 501 (citations omitted).

**\*4** Greenwaldt's complaint and memorandum of law ("Pl.'s Mem." or "Memorandum in Opposition") are difficult to follow. He sets forth the facts at length, but mentions his various legal theories only briefly and without connecting those theories to his factual allegations. Thus, it is difficult to assess the merits of his case. However, construing the complaint liberally as I am constrained to do, I take it that Greenwaldt is displeased with various problems he claims to have faced at Woodbourne, including a misbehavior report, a disbursement and surcharge removed from Greenwaldt's account, and threats by a correctional officer to write up Greenwaldt. Greenwaldt also claims that the defendants failed to respond to his numerous letters. The defendants argue they cannot be said to have been personally involved in these alleged constitutional violations and, therefore, cannot be held liable.

In examining the complaint, it is apparent that the only connection between the defendants moving herein and the facts Greenwaldt recites are the numerous letters Greenwaldt claims to have sent the defendants. However, the defendants cannot be held liable on this basis. It is true that "supervisory liability may be imposed where an official demonstrates 'gross negligence' or 'deliberate indifference' to the constitutional rights of inmates by failing to act on information indicating that unconstitutional practices are taking place." *Wright,* 21 F.3d at 501. However, it is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations. *E.g., id.; Murray v. Coughlin,* No. 91-CV-0476E(H), 1995 WL 128968 at *6 (W.D.N.Y. Mar. 15, 1995); *Cepeda v. Coughlin,* No. 91 Civ. 2469 (RWS), 1995 WL 23566 at *3 (S.D.N.Y. Jan. 19, 1995); *Clark v. Coughlin,* No. 92 Civ. 0920 (RWS), 1993 WL 205111 at *6 n.2 (S.D.N.Y. June 10, 1993), *aff'd,* 17 F.3d 391 (2d Cir. 1993); *Garrido v. Coughlin,* 716 F. Supp. 98, 100 (S.D.N.Y. 1989) (dismissing that portion of complaint against NYSDOCS Commissioner where his only alleged connection to the case was that "he ignored [plaintiff's]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)
(Cite as: 1995 WL 232736 (S.D.N.Y.))

letter of protest and request for an investigation of the allegations made in [the] action"). To the extent that Greenwaldt relies upon his allegations that he sent letters to the defendants, his complaint must be dismissed.

In his Memorandum in Opposition, Greenwaldt contends that he does not rely solely on his letter-writing campaign to allege the personal involvement of the prison officials. Instead, he claims that he joined these defendants because (i) Coughlin directed an investigation by Keesler into Greenwaldt; (ii) the defendants implemented various policies that are not to Greenwaldt's liking; and (iii) Annucci failed to maintain the law library.[FN3] The second of these assertions is addressed *infra.* The first and third claims are too vague to withstand defendants' motion to dismiss. Greenwaldt has not made any "specific allegations of fact." *Barr v. Abrams,* 810 F.2d 358, 364 (2d Cir. 1987). In particular, I note that Greenwaldt has not explained how Annucci's alleged failure to maintain the law library has anything to do with the other defendants. Nonetheless, if Greenwaldt elects to do so, he may attempt to replead these allegations within thirty days of the date of this Memorandum and Order.[FN4]

II. *The Temporary Release Program*

A. *Conspiracy Claims*

*5 As stated *supra,* Greenwaldt claims that the defendants and numerous political figures, possibly including former Governor Cuomo, the Attorney General, and members of the New York State Senate and Assembly, were engaged in a conspiracy with respect to the temporary release program. (Am. Compl. ¶ 49.) In order to state a claim under § 1983 for conspiracy:

[T]he complaint must contain more than mere conclusory allegations. And while a plaintiff should not plead mere evidence, he should make an effort to provide some "details of time and place and the alleged effect of the conspiracy." Thus, complaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; "[d]iffuse and expansive allegations are insufficient, unless amplified by

specific instances of misconduct."

*Dwares v. City of New York,* 985 F.2d 94, 99-100 (2d Cir. 1993) (citations omitted). *See also Leon v. Murphy,* 988 F.2d 303, 311 (2d Cir. 1993); *Polur v. Raffe,* 912 F.2d 52, 56 (2d Cir. 1990) (dismissing plaintiff's claims that defendants conspired to deprive plaintiff of his constitutional rights where plaintiff made only "conclusory allegations" and "diffuse averments" without stating a factual basis for his claim or pleading overt acts indicating the existence of a conspiracy), *cert. denied,* 449 U.S. 937 (1991); *Zemsky v. City of New York,* 821 F.2d 148, 151 (2d Cir.), *cert. denied,* 484 U.S. 965 (1987). In the instant case, Greenwaldt's claim of conspiracy is insufficient to survive a motion to dismiss. It is entirely conclusory; Greenwaldt has failed to plead any factual basis indicating the existence of a conspiracy. Greenwaldt will not, however, be permitted to replead his conspiracy claim because, as explained *infra,* he has no protectible interest in the temporary release program.

B. *No Protected Interest*

Greenwaldt may not replead his conspiracy claim because he does not have a federally protected right to participate in New York's temporary release program. In order to state a claim under the due process clause, Greenwaldt must first allege that he was deprived of a property or liberty interest. Only if he claims such a protected interest is it necessary to go on to determine whether the deprivation of that interest occurred without the process that was due under the circumstances. *See generally Goss v. Lopez,* 419 U.S. 565 (1975); *Board of Regents v. Roth,* 408 U.S. 564 (1972); *White Plains Towing Corp. v. Patterson,* 991 F.2d 1049, 1061-62 (2d Cir.) (stating that "[i]n order to succeed on a claim of deprivation of procedural due process, a plaintiff must establish that state action deprived him of a protected property or liberty interest"), *cert. denied,* 114 S. Ct. 185 (1993). In the instant case, Greenwaldt's claim fails because there is no protected right to participate in New York's temporary release program.

*6 It is well-settled that the Constitution itself does not confer a right for an inmate to be conditionally released before serving his full sentence. *Connecticut Bd. of*

Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)
(Cite as: 1995 WL 232736 (S.D.N.Y.))

*Pardons v. Dumschat,* 452 U.S. 458, 464 (1981); *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex,* 442 U.S. 1, 7 (1979) (stating that "[t]here is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence"). The question thus becomes whether New York conferred an enforceable liberty interest in its temporary release program.

In general, a state may create a protected liberty interest through the use of mandatory language and placement of substantive limits on the authority and discretion of state officials. *See Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 461-63 (1989); *Olim v. Wakinekona,* 461 U.S. 238, 249-51 (1983); *Klos v. Haskell,* No. 684, 93-2666, 1995 WL 64776 at *6 (2d Cir. Feb. 10, 1995). In order for the state to confer such a liberty interest:

(1) the state must have articulated specified "substantive predicates" which limit the discretion of state officials; and (2) it must have employed "explicitly mandatory language," requiring state officials to follow those substantive predicates.

*Klos,* 1995 WL 64776 at *6.

Turning to New York's temporary release program, it is clear that prisoners do not have a protected interest in being admitted to this program. Neither the governing statute, *Correction Law § 851 et seq.,* nor the regulations, 7 N.Y.C.R.R. § 1900 et seq., contain any assurance of admission into the program. In fact, it is stated explicitly that there are no guarantees of admission:

Participation in the temporary release program shall be a privilege. Nothing contained in this article may be construed to confer upon any inmate the right to participate, or to continue to participate, in a temporary release program.

*Correction Law § 855(9).* Nothing in the regulations concerning the temporary release program confers a protected entitlement. *See* 7 N.Y.C.R.R. § 1900 et seq. In addition, courts that have considered whether inmates in

New York have a protected interest in the temporary release program have consistently held that they do not. *See, e.g., Dugar v. Coughlin,* 613 F. Supp. 849, 854-57 (S.D.N.Y. 1985); *Martino v. Gard,* 526 F. Supp. 958, 960 (E.D.N.Y. 1981); *McCormack v. Posillico,* No. 71654, 1995 WL 122170 at *1 (3d Dep't Mar. 23, 1995); *Grant v. Temporary Release Committee,* 619 N.Y.S.2d 106, 106 (2d Dep't 1994); *Szucs v. Recore,* 618 N.Y.S.2d 473, 473 (3d Dep't 1994); *Walker v. Le Fevre,* 598 N.Y.S.2d 345, 345 (3d Dep't 1993). Consequently, Greenwaldt's claim that he was denied due process in connection with the temporary release program is dismissed without leave to replead.

III. *Visitation Policy*

Greenwaldt is disgruntled with the NYSDOCS visitation policy. (Am. Compl. ¶ ¶ 4-6, 8-10.) It appears that Greenwaldt is most displeased about the fact that visits are permitted daily at maximum security facilities but only on weekends and holidays at medium and minimum security facilities. The Supreme Court unambiguously has rejected the argument that "an inmate's interest in unfettered visitation is guaranteed directly by the Due Process Clause." *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 460 (1989). The question thus becomes whether New York has created a protected interest in visitation. *Klos v. Haskell,* No. 684, 93-2666, 1995 WL 64776 at *6 (2d Cir. Feb. 10, 1995). It appears that New York has done so. *See Kozlowksi v. Coughlin,* 871 F.2d 241, 242 (2d Cir. 1989) (explaining that the District Court had ruled that a "state-created liberty interest in prison visitation rights existed, and that proper process was due prior to curtailment of these rights"); *Ricco v. Coughlin,* No. 92-CV-0632E(H), 1995 WL 128959 at *1 (W.D.N.Y. Mar. 15, 1995); *Daniels v. Walker,* No. 93-CV-570, 1995 WL 88186 at *5 (N.D.N.Y. Mar. 1, 1995).

*7 However, to recognize that inmates have a protected interest in visitation is not to say that the NYSDOCS policy infringe upon that interest. The District Court has considered and rejected a virtually identical claim to Greenwaldt's in an earlier decision, *Windley v. Cuomo,* No. 91 Civ. 3774 (TPG), 1992 WL 123172 at *2 (S.D.N.Y. May 27, 1992). In that case, a prisoner at a New York state facility complained that the facility's elimination of weekday visitation violated his rights under

Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)
(Cite as: 1995 WL 232736 (S.D.N.Y.))

the First Amendment, the Eighth Amendment, and the Due Process Clause of the Fourteenth Amendment. *Id.* at *1. Visitation was, however, permitted on weekends and state holidays. *Id.* The District Court dismissed plaintiff's due process claim, explaining that:

Plaintiff's Fourteenth Amendment claim is also without substance. It is true that "[t]he State of New York, by judicial decision, administrative regulation and departmental directive, has granted its prisoners a protected liberty interest in receiving visits from persons of their choice." *Kozlowski v. Coughlin,* 539 F. Supp. 852, 856-57 (S.D.N.Y. 1982). Neither the *Kozlowski* decision nor any provision of state or federal law, however, forbids reasonable regulation of visiting hours by prison officials. There is no showing that the regulation here exceeds the bounds of reasonableness.

*Id.* This reasoning is equally applicable to the instant case, where the policy is the same, *i.e.,* visitation is permitted on the weekends and holidays. Thus, Greenwaldt's claims regarding visitation policy are dismissed with prejudice.

IV. *Equal Protection Claims*

Greenwaldt argues in his Memorandum in Opposition that his complaint should not be dismissed because, he claims, the defendants have violated the Equal Protection Clause of the Fourteenth Amendment with respect to visitation policy and the temporary release program. (Pl.'s Mem. at 7). Greenwaldt claims in his Memorandum in Opposition that:

Plaintiff can *decisively* demonstrate, if permitted to proceed with discovery, that discrimination exists under the rules, regulations, practices and policies of the defendants in relation to visits, temporary release, disciplinary programs, etc.

(Pl.'s Mem. at 7-8 (emphasis in original).)

Greenwaldt's claims that he will be able to establish discrimination by the defendants if he is permitted to

engage in discovery does not preclude dismissal of his equal protection claims at this time. Greenwaldt's equal protection claims are properly dismissed at this time because they are vague and inconclusive. *See Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir. 1987). If Greenwaldt seeks to do so, he may replead his equal protection claims within thirty days.

*CONCLUSION*

With respect to the defendants moving herein, *i.e.,* Coughlin, Annucci, Butler, Coombe, Recore, and Hanslmaier, Greenwaldt's complaint is dismissed with prejudice in its entirety, with the limited exception of those particular claims that Greenwaldt has been granted leave to replead within thirty days. That is, within thirty days of the date of this Memorandum and Order, Greenwaldt may replead his allegations that Coughlin directed an investigation by Keesler into Greenwaldt, that Annucci failed to maintain the law library, and that the defendants violated his right to equal protection with respect to visitation policy and the temporary release program.

FN1. Reference is made to the Amended Complaint dated February 25, 1994.

FN2. Inmates whose names begin with letters A-L would have visitations on Saturday, and those whose names begin with letters M-Z on Sunday. On the following weekend, the order would be reversed. (Am. Compl. ¶4.)

FN3. As Greenwaldt puts it in his memorandum:

In the present case, COMMISSIONER COUGHLIN not only learned of the deprivations through letters from the plaintiff; but went so far as to direct an investigation by the defendant KEESLER. Exactly what more plaintiff must do to show that the Commissioner has direct knowledge and is condoning his subordinates [sic] actions or lack of actions, as the case may be, is beyond

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)
(Cite as: 1995 WL 232736 (S.D.N.Y.))

the comprehension of the plaintiff.... Plaintiff does not join the Commissioner of Correctional Services and three Deputy Commissioners by virtue of their failure to respond to plaintiff's complaints in letters addressed to them respectively. He (plaintiff) joins the Commissioner and the three Deputy Commissioners by virtue of the investigation ordered by COMMISSIONER COUGHLIN and the implementation of various policy Directives signed and ordered by the Deputy Commissioners and condoned by the Commissioner.... Counsel either fails to understand the responsibilities of either the Commissioner or the three Deputy Commissioners or, while understanding their respective responsibilities would rather distort the factual position of the plaintiff. The perfect example of the above is Deputy Commissioner Annucci's total disregard of his responsibility to maintain the law libraries with the proper materials.

(Pl.'s Mem. at 3-4.) I note that Greenwaldt's allegations regarding the investigation and the law library are glaringly absent from the complaint.

FN4. I note that it may be that, if pleaded properly, Greenwaldt's claim that Annucci failed to maintain the law library might state a claim. For example, it has been held that:

Prisoners have a constitutional right of access of the courts. Thus prison authorities must assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law. The right of access to the courts must ensure that prisoners have a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts. Courts have held that prisoners do not have a right to access law books per se, but must be provided with any of several methods designed to provide meaningful access to the courts

including the use of trained legal assistants.

*Bellamy v. McMickens,* 692 F. Supp. 205, 214 (S.D.N.Y. 1988). *See Morello v. James,* 810 F.2d 344, 347 (2d Cir. 1987) (stating that "[w]here a prisoner chooses to proceed pro se with his appeal, the state is required to provide affirmative assistance in the form of adequate law libraries or trained legal assistance"). However, Greenwaldt's allegations are, again, too conclusory to assess, and must be dismissed.

S.D.N.Y. 1995
Greenwaldt v. Coughlin
Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3765847 (N.D.N.Y.)

(Cite as: 2010 WL 3765847 (N.D.N.Y.))

H

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Rudolph McQUILKIN, Plaintiff,
v.
CENTRAL NEW YORK PSYCHIATRIC CENTER, J.
Taylor, J. Berggren, V. Komareth, K. Sangani, Dr.
Hernandez, D. Sawyer, S. Hanna, and G. Bodrog,
Defendants.
Civil Action No. 9:08-CV-00975 (TJM/DEP).

Aug. 27, 2010.
Rudolph McQuilkin, New York, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of
New York, Krista A. Rock, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants
CNYPC, J. Taylor, J. Berggren, V. Komareth, Dr.,
Hernandez, D. Sawyer, S. Hanna, and G. Bodrog.

O'Connor, O'Connor Law Firm, Law Firm-Albany Office,
Peter Joslin, Jr., Esq., of Counsel, Albany, NY, for
Defendant K. Sangani.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

   *1 Plaintiff Rudolph McQuilkin, a former New York
State prison **inmate** who is proceeding *pro se* and *in
forma pauperis,* has commenced this action pursuant to 42
U.S.C. § 1983 against the Central New York Psychiatric
Center ("CNYPC" or "Center") and several Center
employees as well as the superintendent of one of the
correctional facilities in which he was previously housed,
claiming that his civil rights were violated during the
course of his confinement. In his complaint, as amended,
plaintiff alleges that he was civilly committed to CNYPC
against his will and forcibly medicated with various
psychiatric drugs in retaliation for having served a "notice
of summons" on the superintendent of the Gouverneur
Correctional Facility ("Gouverneur"), without his consent
and in violation of his religious beliefs. Plaintiff further
complains of the seizure and destruction of certain of his
personal property. Plaintiff's complaint seeks injunctive

relief, elimination of any reference of being a mental
health patient from his institutional record, and an award
of both compensatory and punitive damages.

   In response to plaintiff's complaint one of the
defendants, Dr. Kishor R. Sangani, a psychiatrist, has
moved for dismissal alleging that plaintiff's complaint fails
to assert an actionable claim against him. Those remaining
defendants who have been served and appeared in the
action have moved for summary judgment on a variety of
grounds, both procedural and substantive including, *inter
alia,* on the basis of qualified immunity.

   Having carefully considered defendants' motions,
which McQuilkin has not opposed, I recommend that they
be granted and that the second amended complaint be
dismissed in its entirety.

I. *BACKGROUND*[FN1]

   FN1. In light of the procedural posture of the
   case the following recitation is derived from the
   record now before the court with all inferences
   drawn and ambiguities resolved in favor of the
   plaintiff.  *Terry v. Ashcroft,* 336 F.3d 128, 137
   (2d Cir.2003).

   At the times relevant to the claims set forth in his
second amended complaint, plaintiff was a prison **inmate**
entrusted to the care and custody of the New York State
Department of Correctional Services ("DOCS"), and
designated to various DOCS prisons as well as the
CNYPC, a facility located in Marcy, New York and
operated under the authority of the New York State Office
of Mental Health ("OMH"). *See generally* Second
Amended Complaint. Plaintiff was released from DOCS
custody on October 27, 2009. Waldron Aff. (Dkt. No. 66)
¶ 35 and Exh. A.[FN2]

   FN2. Because defendants' summary judgment
   moving papers were filed traditionally, they do
   not appear on the docket but collectively have
   been assigned docket number 66.

   Plaintiff was admitted into the CNYPC from the
nearby Mid-State Correctional Facility ("Mid-State"), on
September 17, 2007, and was diagnosed with

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3765847 (N.D.N.Y.)

(Cite as: 2010 WL 3765847 (N.D.N.Y.))

schizophrenia, paranoid type.[FN3] *Id.* at ¶ 6, Exh. B. at P2; Defendants' Rule 7.1(a)(3) Statement ¶ 2. Paranoid schizophrenia can cause a variety of symptoms, the most prevalent of which are delusions, auditory hallucinations and disorganized thinking. Waldron Aff. (Dkt. No. 66) ¶ 7. Individuals who suffer from this type of schizophrenia frequently suffer from feelings of being persecuted or plotted against and may have grandiose delusions that are associated with protecting themselves from the perceived plot. Waldron Aff. (Dkt. No. 66) ¶ 7. According to his referral from Mid-State, on or about September 17, 2007, plaintiff "started to become irritable and paranoid. He displayed a thought disorder and believed that there was a plan by the mental health staff to murder him. He was refusing medication and mental health treatment." Waldron Aff. (Dkt. No. 66) Exh. B at P289.

> FN3. The 2007 admission to the Center was plaintiff's second, the first having occurred in 1998. Waldron Aff. (Dkt. No. 66) ¶¶ 8-9. During the first admission, which lasted twenty-seven days, plaintiff was diagnosed with schizophrenia paranoid type. *Id.* The notes of that admission reflect that while at Mid-State plaintiff refused to take psychotropic medications. *Id.* at ¶¶ 8-9 and Exh. B at P289.

**\*2** Upon his arrival at the CNYPC, plaintiff consistently refused his medications. *Id.* at P291. Plaintiff explained the basis for that refusal by stating to CNYPC personnel "these are heterogeneous medications, work as isotopes, you know, like small nuclear bombs[,]", adding "I am a different organism, therefore under no circumstances I would take them." *Id.*

On or about October 1, 2007, Donald Sawyer, Ph. D., the Executive Director of the Center, petitioned the New York State Supreme Court, Oneida County, for an order committing plaintiff to the CNYPC for a period not to exceed six months. *Id.* at P271-272. Following a hearing regarding the petition held on October 11, 2007, Supreme Court Justice Anthony F. Shaheen issued a ruling, over plaintiff's objection, in which he determined that McQuilkin was mentally ill and a proper subject for custody and continued treatment in the CNYPC within the meaning of New York Mental Hygiene Law ("MHL") §

9.27, and therefore approved the requested retention period.[FN4] Waldron Aff. (Dkt. No. 66) Exh. B. at P263.

> FN4. Pursuant to the MHL, the director of a hospital may receive and retain therein as a patient any person alleged to be mentally ill and in need of involuntary care and treatment upon the certificates of two examining physicians, accompanied by an application for the admission of such a person. N.Y. MENTAL HYG. § 9.27(a). The examination may be conducted jointly but each examining physician must execute a separate certificate. *Id.*

Based on plaintiff's refusal to consent to the administration of medication while at the Center, and following an evaluation of his condition by CNYPC staff, on or about November 1, 2007, Sawyer once again petitioned the state courts, this time for an order authorizing OMH employees to forcibly administer psychiatric medication to McQuilkin. Waldron Aff. (Dkt. No. 66) ¶ 17 and Exh. B at P276-96. That involuntary treatment petition was granted on November 21, 2007, following a hearing and despite McQuilkin's objection, based upon a finding that plaintiff lacked the capacity to make a reasoned decision regarding his own treatment and that the administration of medication to the plaintiff was in his best interest. *Id.* at ¶¶ 19-20 and Exh. B at P318-19. The order granting the petition authorized the administration of psychiatric drugs "during the concurrent retention of Rudolph McQuilkin, and any extension thereof at [CNYPC] as well as for a period not to exceed twelve (12) months after the patient is discharged from the [CNYPC] to a psychiatric satellite unit operated by [OMH] at a New York State Correctional facility ..." *Id.* at Exh. B and P319.

Plaintiff was discharged from the CNYPC and transferred into the Clinton Correctional Facility ("Clinton") on January 4, 2008, commencing the twelve-month period of court-authorized forced medication. Waldron Aff. (Dkt. No. 66) ¶ 21. During that time, plaintiff was injected with fifty milligrams of Haldol, an antipsychotic medication, once a month. *Id.* at ¶¶ 21-22 and Exh. B. at P320-23.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3765847 (N.D.N.Y.)

(Cite as: 2010 WL 3765847 (N.D.N.Y.))

From the expiration of the court-ordered psychiatric treatment period on January 4, 2009 until April of 2009, plaintiff refused to be medicated, which caused him to become symptomatic. Waldron Aff. (Dkt. No. 66) ¶ 23 and Exh. B. at P327-30. On April 8, 2009, Dr. Sohail Gillani, a psychiatrist, requested that McQuilkin be taken to the Clinton Mental Health Satellite Unit ("Satellite Unit") for evaluation as to whether an involuntary psychiatric hospitalization in the CNYPC, based upon the recommendation of two physicians, should be sought and with the intent of seeking another court order permitting involuntary psychiatric medication. Waldron Aff. (Dkt. No. 66) ¶ 24 and Exh. B at P331-32. This request was based on plaintiff's ongoing refusal to take psychiatric medication and his repeated history of subsequent psychiatric decompensation, as well as his refusal to attend therapy sessions during which his mental status could be clinically monitored. *Id.*

*3 As a result of Dr. Gillani's request, plaintiff was escorted from his cell to the Mental Health Satellite unit at Clinton, where he was assigned to a residential crisis treatment program cell. *Id.* at ¶ 26. Once there, McQuilkin showed poor insight and judgment, continued to display symptoms of paranoia, and persisted in his denial of any mental health issues. *Id.* at ¶ 27. Plaintiff remained in the satellite unit for less than twenty-four hours, however, based upon his agreement to take his prescribed psychiatric medication (Haldol 50 mg). *Id.* at ¶ 28.

During the period that Haldol was administered, plaintiff complained of side effects including a rash.[FN5] Waldron Aff. (Dkt. No. 66) ¶ 32. The use of Haldol to address plaintiff's condition was ultimately discontinued, and Risperal was added to his prescription drug regimen on or about July 17, 2009. *Id.* at ¶ 33 and Exh. B at P336. Since then, plaintiff has not registered any further medical complaints, and reports that he "like[s] the Risperdal better." *Id.* at ¶ 34.

FN5. According to defendants' submissions, this is not a side effect ordinarily associated with Haldol. Waldron Aff. (Dkt. No. 66) ¶ 32.

II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on September 22, 2008, and has since twice amended his complaint. Dkt. Nos. 1, 8, and 35. As defendants, plaintiff's second amended complaint names the CNYPC; J. Taylor, the Superintendent of the Gouverneur Correctional Facility; CNYPC psychiatrists J. Berggren, V. Komareth, K. Sangani, S. Hanna, and Dr. Hernandez; D. Sawyer, the Director of the CNYPC; and G. Bodrog, whose position is not disclosed in plaintiff's complaint but who appears to be a physician involved in the October, 2007 petition to have him involuntarily committed. Dkt. No. 35; *see* Waldron Aff. (Dkt. No. 66) Exh. B at P287-88. Plaintiff's second amended complaint contains three designated causes of action requesting various forms of relief, including 1) an order prohibiting defendants from forcing McQuilkin to take psychiatric medications against his free will; 2) total expungement of any reference of being a mental health patient from plaintiff's institutional record; and 3) damages for wanton disregard of his Eighth Amendment rights as well as directing that defendants not retaliate against him for filing this proceeding. Dkt. No. 35.

In response all of the defendants, with the exception of Dr. Sangani, have answered generally denying the allegations of plaintiff's complaint and asserting eighteen separate affirmative defenses. Dkt. No. 38. For his part, Dr. Sangani has moved pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure seeking the dismissal of plaintiff's claims against him for failure to state a claim upon which relief may be granted. Dkt. No. 56.

On January 28, 2010, following the completion of discovery, the defendants other than Dr. Sangani moved for summary judgment dismissing plaintiff's complaint upon a variety of grounds. Dkt. No. 66. In their motion, those defendants argue that 1) all claims against the CNYPC and against the other defendants in their official capacities should be dismissed as barred by the Eleventh Amendment; 2) plaintiff's first cause of action, seeking injunctive relief, should be dismissed as moot in light of his release from DOCS custody; 3) plaintiff's claims are procedurally barred based upon his failure to exhaust administrative remedies with respect to the majority of his claims; 4) plaintiff's claims surrounding his interfacility transfer lack merit since **inmates** do not have a constitutional right to be incarcerated at a correctional

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3765847 (N.D.N.Y.)

(Cite as: 2010 WL 3765847 (N.D.N.Y.))

facility of their choice; 5) plaintiff's due process claim concerning the alleged seizure and destruction of his personal property is not constitutionally cognizable; 6) plaintiff is not entitled to expungement of his psychiatric records; 7) plaintiff's allegations of wrongdoing are unduly conclusory and therefore subject to dismissal; 8) plaintiff's challenges to his OMH confinement are barred by *Heck v. Humphrey* and the *Rooker-Feldman* doctrine [FN6]; 9) defendants are entitled to qualified immunity; and 10) plaintiff's claims surrounding disagreement with his medical care are not actionable under the Eighth Amendment.

> FN6. *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994); *District of Columbia v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983); *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923).

**\*4** Despite expiration of the time for responding, plaintiff has failed to offer any submissions in opposition to either of the pending motions, which are now ripe for determination and have been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

III. *DISCUSSION*

A. *Standards of Review*

1. *Motion to Dismiss*

A motion to dismiss a complaint, brought pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal,* --- U.S. ----, ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 554, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929, ----, (2007)). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short

and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). *Id.* While modest in its requirement, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft,* 129 S.Ct. at 1950.

To withstand a motion to dismiss, a complaint must plead sufficient facts which, when accepted as true, state a claim which is plausible on its face. *Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (citing *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.' " *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974).

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1723, 1734 (1964); *Miller v. Wolpoff & Abramson, LLP,* 321 F.3d 292, 300 (2d Cir.2003), *cert. denied,* 540 U.S. 823, 124 S.Ct. 153, 157 L.Ed.2d 44 (2003); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005) (Kahn, J.). The burden undertaken by a party requesting dismissal of a complaint under Rule 12(b)(6) is substantial; the question presented by such a motion is not whether the plaintiff is likely ultimately to prevail, " 'but whether the claimant is entitled to offer evidence to support the claims.' " *Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.,* 223 F.Supp.2d 435, 441 (S.D.N.Y.2001) (quoting *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995)) (citations and quotations omitted).

2. *Summary Judgment Motions*

**\*5** Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3765847 (N.D.N.Y.)

(Cite as: 2010 WL 3765847 (N.D.N.Y.))

judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing Anderson). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though pro se plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether pro se plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Assn. v. McGowan,* 311 F.3d 501, 507-08 (2d Cir.2002) (citation omitted); see also Anderson, 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only

when "there can be but one reasonable conclusion as to the verdict").

B. *Plaintiff's Failure to Oppose Defendants' Summary Judgment Motion*

**\*6** Before turning to the merits of plaintiff's claims, a threshold issue to be addressed is the legal significance, if any, of his failure to oppose defendants' motions, and specifically whether that failure automatically entitles defendants to the relief sought.

This court's rules provide that

[w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.

N.D.N.Y.L.R. 7.1(b)(3). Undeniably, *pro se* plaintiffs are entitled to some measure of forbearance when defending against dismissal or summary judgment motions. *See Jemzura v. Public Serv. Comm'n,* 961 F.Supp. 406, 415 (N.D.N.Y.1997) (McAvoy, C.J.). The deference owed to *pro se* litigants, however, does not extend to relieving them of the consequences of Local Rule 7.1(b) (3). *Robinson v. Delgado,* No. 96-CV-169, 1998 WL 278264, at \*2 (N.D.N.Y. May 22, 1998) (Pooler, J. & Hurd, M.J.) [FN7]; *Cotto v. Senkowski,* No. 95-CV-1733, 1997 WL 665551, at \*1 (N.D.N.Y. Oct. 23, 1997) (Pooler, J. & Hurd, M.J.); *Wilmer v. Torian,* 980 F.Supp. 106, 106-07 (N.D.N.Y.1997) (Pooler, J. & Hurd, M.J.). Accordingly, absent a showing of good cause defendants' unopposed motions should be granted, if determined to be facially meritorious. *See Allen v. Comprehensive Analytical Group, Inc.,* 140 F.Supp.2d 229, 231-32 (N.D.N.Y.2000) (Scullin, C.J.); *Leach v. Dufrain,* 103 F.Supp.2d 542, 545-46 (N.D.N.Y.2000) (Kahn, J.).

FN7. Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies

Slip Copy, 2010 WL 3765847 (N.D.N.Y.)

(Cite as: 2010 WL 3765847 (N.D.N.Y.))

deleted for online display.]

It should also be noted that the plaintiff's failure to properly oppose the pending summary judgment motion is not without further consequences. By failing to submit papers in opposition to their motion, plaintiff has left the facts set forth in defendants' Local Rule 7.1(a)(3) Statement unchallenged, thus permitting the court to deem facts set forth in the defendants' statement of material facts not in dispute to have been admitted based upon his failure to properly respond to that statement. *See Elgamil v. Syracuse Univ.,* No. 99-CV-611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dept. of Corrs.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)).

Based upon plaintiff's failure to oppose defendants' summary judgment motion, I recommend that the court review the motion for facial sufficiency, accepting defendants' assertions of facts as set forth in their Local Rule 7.1(a)(3) Statement as uncontroverted, and that the motion be granted if determined to be facially meritorious.[FN8]

> FN8. I note that defendants' notice of motion contains the required notice to plaintiff of the consequences of his failure to respond to the summary judgment motion. Dkt. No. 66; *see* N.D.N.Y.L.R. 56.2.

**C. *Eleventh Amendment Immunity***

At the outset, defendants' summary judgment motion seeks dismissal of plaintiff's claims against the CNYPC as well as the individual defendants, to the extent that they are sued in their official capacities, asserting their entitlement to Eleventh Amendment immunity.

**\*7** As defendants correctly argue, "it is beyond dispute that the State of New York and its agencies have never consented to be sued in federal court." *Dube v. State Univ. of N.Y.,* 900 F.2d 587, 594-95 (2d Cir.1990), *cert. denied,* 501 U.S. 1211, 111 S.Ct. 2814, 115 L.Ed.2d 986 (1991).[FN9] "The law is clear that the state, and state agencies ..., are immune from **prisoner § 1983** suits because of their Eleventh Amendment sovereign

immunity." *Jackson v. Johnson,* 985 F.Supp. 422, 426 (S.D.N.Y.1997).

> FN9. "On the other hand, a state official acting in his [or her] official capacity may be sued in a federal forum to enjoin conduct that violates the federal Constitution, notwithstanding the Eleventh Amendment bar. *Id.* at 595 (citing *Papasan v. Allain,* 478 U.S. 265, 276-77, 105 S.Ct. 2932, 2939-40 (1986)). Insofar as plaintiff seeks injunctive relief, his claims against the CNYPC and the individual defendants in their official capacities are not barred by the Eleventh Amendment. As will be seen, however, plaintiff's request for injunctive relief is nonetheless moot in light of his release from prison. *See* pp. 21-23, *post.*

The Eleventh Amendment protects a state against suits brought in federal court by citizens of that state, regardless of the nature of the relief sought. *Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 3057-58, 57 L.Ed.2d 1114 (1978). This absolute immunity which states enjoy under the Eleventh Amendment extends to both state agencies and state officials sued in their official capacities, when the essence of the claim involved is one against a state as the real party in interest.[FN10] *Richards v. State of New York Appellate Division, Second Dep't,* 597 F.Supp. 689, 691 (E.D.N.Y.1984), (citing *Pugh* and *Cory v. White,* 457 U.S. 85, 89-91 102 S.Ct. 2325, 2328-2329 (1982)). To the extent that a state official is sued for damages in his or her official capacity the official is entitled to invoke the Eleventh Amendment immunity belonging to the state.[FN11] *Kentucky v. Graham,* 473 U.S. 159, 166-67, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985); *Hafer,* 502 U.S. at 25, 112 S.Ct. at 361.

> FN10. In a broader sense, this portion of defendants' motion implicates the sovereign immunity enjoyed by the State. As the Supreme Court has reaffirmed relatively recently, the sovereign immunity enjoyed by the states is deeply rooted, having been recognized in this country even prior to ratification of the Constitution, and is neither dependent upon nor defined by the Eleventh Amendment. *Northern*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3765847 (N.D.N.Y.)

(Cite as: 2010 WL 3765847 (N.D.N.Y.))

*Ins. Co. of New York v. Chatham County,* 547 U.S. 189, 193, 126 S.Ct. 1689, 1693, 164 L.Ed.2d 367 (2006).

FN11. By contrast, the Eleventh Amendment does not establish a barrier against suits seeking to impose individual or personal liability on state officials under **section 1983**. *See Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 361, 116 L.Ed.2d 301 (1991).

Because plaintiff's **section 1983** claims against the CNYPC are in reality claims against the State of New York, they typify those against which the Eleventh Amendment protects, and are therefore subject to dismissal. *Daisernia v. State of New York,* 582 F.Supp. 792, 798-99 (N.D.N.Y.1984) (McCurn, J.). Additionally, to the extent that plaintiff asserts claims for damages against the defendants in their official capacities, those claims are properly regarded as claims against the state, and are likewise barred by the Eleventh Amendment. *Kentucky v. Graham,* 473 U.S. 159, 169, 105 S.Ct. 3099, 3107, 87 L.Ed.2d 114 (1985); *Ying Jing Gan v. City of N.Y.,* 996 F.2d 522, 529 (2d Cir.1993). Accordingly, I recommend the entry of summary judgment dismissing plaintiff's claims for damages against the CNYPC and the individual defendants in their official capacities.

D. *Mootness*

In their motion, defendants next seek summary judgment with respect to plaintiff's first cause of action, in which he seeks "[a]n order prohibiting defendants from forcing plaintiff to take psychiatric medications against his free will." Second Amended Complaint (Dkt. No. 35) p. 9. In support of their request, defendant argues that because the plaintiff is no longer in state custody, that claim is moot.

"The mootness doctrine is derived from Article III of the Constitution, which provides that federal courts may decide only live cases or controversies. 'This case-or-controversy requirement subsists through all stages of federal judicial proceedings, trial and appellate.' " *Van Wie v. Pataki,* 267 F.3d 109, 113 (2d Cir.2001) (citations omitted). A federal court has no authority to decide an issue when the relief sought can no longer be

given, or is no longer needed. *Martin-Trigona v. Shiff,* 702 F.2d 380, 386 (2d Cir.1983). The courts have recognized a narrow exception to this rule for repetitive conduct, although only in exceptional circumstances. *City of Los Angeles v. Lyons,* 461 U.S. 95, 109, 103 S.Ct. 1660, 1669, 75 L.Ed.2d 675 (1983). The capable of repetition doctrine applies when the conduct at issue is of insufficient duration to permit it to be fully litigated and is reasonably likely to reoccur. *Spencer v. Kemna,* 523 U.S. 1, 17, 118 S.Ct. 978, 988, 140 L.Ed.2d 43 (1998) (citing and quoting *Lyons* ). This limited exception does not appear to be potentially applicable in this instance.

**\*8** The record now before the court reflects that plaintiff is no longer in state custody. *See* Dkt. No. 57; Waldron Aff. (Dkt. No. 66) Exh. A. To the extent McQuilkin seeks injunctive relief preventing the defendants from forcing him to be medicated against his will, they are no longer involved with him, and the claim is now moot. I therefore recommend dismissal of plaintiff's first cause of action on this basis.

E. *Exhaustion*

In their motion defendants seek dismissal of certain of plaintiff's claims on the basis of his failure to exhaust available administrative remedies before commencing suit.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of **prisoners** to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under **section 1983** of this title, or any other Federal law, by a **prisoner** confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S.Ct. 2378, 2382, 165 L.Ed.2d 368 (2006); *Hargrove v. Riley,* No. CV-04-4587, 2007 WL 389003, at \*5-6 (E.D.N.Y. Jan.31, 2007). "[T]he PLRA's exhaustion requirement applies to all **inmate** suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 992, 152 L.Ed.2d 12 (2002) (citation omitted).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3765847 (N.D.N.Y.)

(Cite as: 2010 WL 3765847 (N.D.N.Y.))

The failure of a **prisoner** to satisfy the PLRA's exhaustion requirement, though not jurisdictional, gives rise to a defense which may affirmatively be raised by a defendant in response to an **inmate** suit. *Jones v. Block,* 549 U.S. 199, 212, 127 S.Ct. 910, 919, 166 L.Ed.2d 798 (2007). In the event a defendant named in such an action establishes that the **inmate** plaintiff failed properly to exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal. *See Pettus v. McCoy,* No. 04-CV-0471, 2006 WL 2639305, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 548 U.S. at 94-95, 126 S.Ct. at 2387-88 (holding that the PLRA requires "proper exhaustion" of available remedies). "Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95, 126 S.Ct. at 2388; *see also Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007) (citing *Woodford* ). [FN12]

> FN12. While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "in a substantive sense", an **inmate** plaintiff nonetheless must meet the procedural requirement of exhausting his or her available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias,* 495 F.3d at 43 (quoting *Johnson v. Testman,* 380 F.3d 691, 697-98 (2d Cir.2004) (emphasis omitted).

New York prison **inmates** are subject to an **Inmate** Grievance Program ("IGP") established by the DOCS and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* No. 96 CV 5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb.20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2d Cir.2003) and *Snider v. Melindez,* 199 F.3d 108, 112-13 (2d Cir.1999)). The IGP consists of a three-step review process. First, a written grievance is submitted to the IGRC within twenty-one days of the incident. 7 N.Y.C.R.R. § 701.5(a). The IGRC, which is comprised of **inmates** and facility employees, then issues a determination regarding the grievance. *Id.* §§ 701.4(b), 701.5(b). If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision. *Id.* § 701.5(c). The third level of the

process affords the **inmate** the right to appeal the superintendent's ruling to the CORC which makes the final administrative decision. *Id.* § 701.5(d). Ordinarily, absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a **prisoner** seek relief pursuant to **section 1983** in a federal court. *Reyes v. Punzal,* 206 F.Supp.2d 431, 432 (W.D.N.Y.2002) (citing, *inter alia, Sulton v. Greiner,* No. 00 Civ. 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec.11, 2000)).

**\*9** In support of their exhaustion argument, defendants submit a declaration given by Karen Bellamy, the Director of the IGP, reflecting that from a review of records maintained by the CORC it appears that only one grievance filed by the plaintiff, grievance number CL 57139-08, relating to missing personal property, was processed through to completion under the IGP. *See* Bellamy Aff. (Dkt. No. 66) ¶ 10. This, they assert, requires dismissal of all of plaintiff's remaining claim as unexhausted.

While McQuilkin does not appear to have filed grievances related to the other matters at issue in this case, including principally his treatment while at the CNYPC, and to have processed those grievances through to completion under the IGP, he did take certain measures to complain of the treatment received while there. At the suggestion of personnel employed at the Mental Hygiene Legal Services, with whom plaintiff communicated in writing concerning his plight on multiple occasions including in February of 2008, plaintiff McQuilkin sent letters on March 28, 2008, and again on June 27, 2008, to Dr. Jonathan Kaplan, the Clinical Director of the Mental Hygiene Psychiatric Center at Marcy, New York, to whom he had been referred. [FN13] *See* Second Amendment Complaint (Dkt. No. 35) pp. 12-23, 26. In those letters, plaintiff requested that Dr. Kaplan review his treatment plan in light of adverse effects from which he claimed to suffer as a result of the medication being administered. *Id.* at pp. 12-13, 26. In addition, McQuilkin forwarded a letter dated February 21, 2008, to "the psychiatrist" at Clinton, again complaining of being compelled to take the drugs and of their side effects, and also that he was not being properly monitored "due to insincere motives on the original action for the court order." *See* Attachments to

Slip Copy, 2010 WL 3765847 (N.D.N.Y.)

(Cite as: 2010 WL 3765847 (N.D.N.Y.))

Second Amended Complaint (Dkt. No. 35) p. 31.

> FN13. The attachments to plaintiff's Second Amended Complaint (Dkt. No. 35) are not separately marked as exhibits, nor are the pages numbered. The page numbers referred to herein as are reflected in the court's docket.

While confined at Clinton, plaintiff also filed an **inmate** grievance, dated April 1, 2008 and assigned grievance number CL-56924-08, complaining that he was being ordered to take psychiatric medication against his will, that he was experiencing adverse side effects from the medication, and requesting that the medication be discontinued. Attachments to Second Amended Complaint (Dkt. No. 15) p. 10. In response to plaintiff's grievance, the IGRC advised McQuilkin that pursuant to DOCS Directive No. 4040,[FN14] the OMH, together with its employees, policies and procedures, are not within the jurisdiction of the DOCS **inmate** grievance program, and he was therefore directed to address the issue of psychiatric medication with Joanne Waldron, Satellite Unit Chief. *Id.* at p. 11. Thus, in accordance with the DOCS Directive No. 4040, the matter was deemed closed, and there is no record of plaintiff having appealed this determination. *Id.*

> FN14. DOCS Directive No. 4040 provides, in relevant part, that "[t]he IGRC may dismiss and close a grievance after a hearing if it determines, by majority vote (3 of 4), that ... the grievant is seeking action with respect to any policy, regulation, rule or action of any agency not under the supervision of the Commissioner of Correctional Services (see section 701.3[f] of this Part)." 7 N .Y.C.R.R. § 701.5(b)(4)(i)(d).

On June 27, 2008, plaintiff wrote letters to Drs. Gillani and Berggren complaining of the administration of psychiatric drugs, claiming that he was being discriminated against and harassed by certain corrections officers and nurses who administered his oral medication, and requesting a meeting to discuss the possibility of receiving all of his medication once a month by injection. *See* Second Amended Complaint (Dkt. No. 15) at pp. 24-25. Plaintiff wrote a second letter to Dr. Gillani on July

16, 2008, voicing the same complaint and again requesting that he be given all his court-ordered drugs at the same time each month. *Id.* at pp. 27-28.

**\*10** Although the plaintiff was at all relevant times an **inmate** in the primary care and custody of the DOCS, the conduct giving rise to his claims occurred at the CNYPC, a facility operated by the OMH. Based upon that circumstance, it is arguable that plaintiff's claims are not subject to the PLRA because they do not involve "prison life." While the court's research has not identified a case in this circuit squarely addressing the issue, it appears that even though confined to the CNYPC at the time in question, plaintiff would still qualify as a **prisoner** subject to the requirements of the PLRA. *See, e.g., Page v. Torrey,* 201 F.3d 1136, 1140 (9th Cir.2000) ("[W]e hold that only individuals who, at the time they seek to file their civil actions, are detained as a result of being accused of, convicted of, or sentenced for criminal offense are ' **prisoners'** within the definition of 42 U.S.C. § 1997e...."); *Kalinowski v. Bond,* 358 F.3d 978, 979 (7th Cir.) ("As used in this section, the term ' **prisoner'** means any person incarcerated or detained at any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, [or] probation ....") (quoting 28 U.S.C. § 1915(h)), *cert. denied,* 542 U.S. 907, 124 S.Ct. 2843, 159 L.Ed.2d 273 (2004). It would therefore appear that plaintiff's complaint includes a combination of claims relating to lost property, which were properly exhausted, and claims for which he failed to exhaust his administrative remedies, including those relating to his confinement to CNYPC and the forced administration of psychiatric drugs, as well as that relating to retaliation.[FN15]

> FN15. Because defendants have not raised failure to exhaust administrative remedies with regard to plaintiff's claims that he was denied access to the courts and the right to practice his religion, I have not addressed exhaustion of these claims.

In a series of decisions rendered since enactment of the PLRA, the Second Circuit has crafted a three-part test for determining whether dismissal of an **inmate's** complaint is warranted for failure to satisfy the PLRA's

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3765847 (N.D.N.Y.)

(Cite as: 2010 WL 3765847 (N.D.N.Y.))

exhaustion requirement. *Macias,* 495 F.3d 37 at 41; *see Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004). The test for determining whether a claim has not been properly exhausted should nonetheless be considered under the Second Circuit's prescribed exhaustion rubric focuses upon whether special circumstances have been plausibly alleged which, if demonstrated, would justify excusing a plaintiff's failure to exhaust administrative remedies. *Hemphill,* 380 F.3d at 689; *see also Giano v. Goord,* 380 F.3d at 676-77; *Hargrove,* 2007 WL 389003, at *10. The circumstances potentially qualifying as "special" under this prong of the test can include where a plaintiff's reasonable interpretation of applicable regulations regarding the grievance process differs from that of prison officials and leads him or her to conclude that the dispute is not grievable. *Giano,* 380 F.3d at 676-77; *see also Hargrove,* 2007 WL 389003, at *10 (quoting and citing *Giano* ).

Undeniably, plaintiff appears not to have pursued to completion a grievance regarding his treatment at the CNYPC. It should be noted, however, that "DOCS Directive 4040 states, *inter alia,* that '[t]he individual decisions or dispositions of any current or subsequent program or procedure having a written appeal mechanism which extends review to outside the facility shall be considered non-grievable.' " *Giano,* 380 F.3d at 678. Indeed, as previously noted, the IGRC response to plaintiff's grievance number CL 56924-08 requesting discontinuance of his medication specifically stated, "OMH, it's [sic] employees and policies and procedures are not with in [sic] the jurisdiction of the DOCS **Inmate** grievance program." *See* Attachments to Second Amended Compl. (Dkt. No. 35) p. 11. Given this response, it seems somewhat disingenuous for defendants to now contend that plaintiff failed to fully exhaust his administrative remedies as to the claims relating to his psychiatric treatment. It is true that, strictly construed, plaintiff's grievance number CL 56924-08 does not specifically complain of his CNYPC confinement; nonetheless, after having received the foregoing response from the IGRC, and being specifically advised that his grievance complaining of being forced to take the drugs was being "closed and dismissed", it certainly would have been reasonable for plaintiff to conclude that he could not grieve either claim, and likewise that an appeal of the

denial of the medication grievance would be rejected.

**\*11** It is also worth noting that the IGRC directed the plaintiff to the OMH, and that both before and after he was notified that his grievance was closed and dismissed, he sent numerous letters to the Clinical Director of CNYPC, both the Director and Deputy Director of Mental Hygiene Legal Services, and Drs. Gillani and Berggren complaining of his psychiatric treatment. In each instance, Mental Hygiene Legal Services referred plaintiff to the physicians and ultimately advised that they could provide no further assistance; McQuilkin's letters to the doctors received no responses at all.

In view of the foregoing, it appears that, at a minimum, issues of fact exist as to whether sufficient special circumstances are present to excuse plaintiff's failure to exhaust claims relating to his psychiatric treatment. For the going reasons, I conclude that the defendants' motion for summary judgment dismissing the plaintiff's unexhausted claims regarding his confinement in the CNYPC and involuntarily administration of psychiatric drugs against the plaintiff's wishes will be denied.

### F. *Confinement At Clinton*

Although not identified as a discrete cause of action, plaintiff's complaint alleges that he was "transported to the Clinton Correctional Facility against his free will and adamant refusal." Second Amended Compl. (Dkt. No. 35) ¶ 3. To the extent that plaintiff attempts to premise his **section 1983** claim in part upon this prison transfer, defendants seek dismissal of that claim as failing to allege a constitutional violation.

It is well-established that convicted **prisoners** have no right to choose the prison they are housed in. *Montanye v. Haymes,* 427 U.S. 236, 243, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976). Prison authorities are entrusted with unfettered discretion to transfer **prisoners** from one institution to another. *Pugliese v. Nelson,* 617 F.2d 916, 922-23 (2d Cir.1980).

In view of the foregoing, summary judgment in favor of the defendants on plaintiff's apparent claim of violation of his constitutional rights based upon his alleged

Slip Copy, 2010 WL 3765847 (N.D.N.Y.)

(Cite as: 2010 WL 3765847 (N.D.N.Y.))

involuntarily transfer to Clinton is appropriate.

G. *Due Process Claim Based on Destruction of Personal Property*

Although not alleged as a distinct cause of action, in his second amended complaint plaintiff appears to claim that all of his legal work and documentation-five draft bags altogether-were seized and allegedly destroyed by employees at the Gouverneur Correctional Facility ("Gouverneur"). Second Amended Compl. (Dkt. No. 35) ¶ 2. Defendants contend that this claim also should be dismissed as failing to state a constitutionally cognizable cause of action.

Addressing **inmate** claims relating to stolen or lost property, the Supreme Court has held that even intentional destruction of **prisoner's** property may not be the basis for constitutional claims if sufficient post deprivation remedies are available to address the claim. *Hudson v. Palmer,* 468 U.S. 517, 531, 104 S.Ct. 3194, 3202, 82 L.Ed.2d 393 (1984) (citing *Parratt v. Taylor,* 451 U.S. 527, 541, 101 S.Ct. 1908, 1916, 68 L.Ed.2d 420 (1981)). As long as a meaningful post deprivation remedy is provided, the due process requirement is met and the Fourteenth Amendment is satisfied. *Howard v. Leonardo,* 845 F.Supp. 943, 947 (N.D.N.Y.1994) (citing *Paratt,* 451 U.S. at 540, 101 S.Ct. at 1916). With regard to claims of lost or stolen property, the Second Circuit has recognized that New York provides, "an adequate post deprivation remedy in the form of, *inter alia,* a Court of Claims action. *Jackson v. Burke,* 256 F.3d 93, 96 (2d Cir.2001) (citing *Love v. Coughlin,* 714 F.2d 207, 208-09 (2d Cir.1983)).

**\*12** In this instance plaintiff had available to him, and indeed apparently pursued, an internal DOCS process for making a claim for his lost property. Additionally, under the New York Court of Claims Act, the State provides **inmates** like the plaintiff with a post deprivation remedy by way of an action asserted in the New York Court of Claims for appropriation of personal property. *See* N.Y. CT. OF CLAIMS ACT §§ 8, 9(2). Thus, as a matter of law, McQuilkin was afforded adequate procedural protections and any procedural due process claim premised upon the alleged destruction of his property at Gouverneur is subject to dismissal.[FN16]

FN16. The availability of a post-deprivation remedy does not foreclose plaintiff's claim that he was effectively denied meaningful access to the courts as a result of the loss of his legal documents. *See Lewis v. Casey,* 518 U.S. 343, 350, 116 S.Ct. 2174, 2179, 135 L.Ed.2d 606 (1996). As will be seen, however, that claim also lacks merit. *See* pp. 41-43, *post.*

H. *Expungement of Psychiatric Records*

Plaintiff's second cause of action seeks "total expungement from [sic] any reference of mental health patient from Plaintiff's institutional record." Second Amended Compl. (Dkt. No. 35) Second Cause of Action. In their motion, defendants request dismissal of this cause of action as not presenting a constitutional claim, and additionally because the relief sought is not available under New York law.

To state a valid claim under **section 1983**, a plaintiff must allege that he or she was deprived of a right guaranteed under the Constitution of the United States." *Snider v. Dylag,* 188 F.3d 51, 53 (2d Cir.1999) (citing *Dwares v. City of New York,* 985 F.2d 94, 98 (2d Cir.1993)). Plaintiff has identified no cognizable constitutional right at stake with regard to his mental health records. While plaintiff complains of his involuntary commitment at the Center, it appears from the record now before the court that the commitment occurred, at least in part, based upon state court proceedings conducted pursuant to New York Correction Law § 402.[FN17] *See generally* Waldron Aff. (Dkt. No. 66). As such, plaintiff cannot plausibly allege the denial of procedural due process associated with that commitment.

FN17. Under that provision, upon receiving a report from a physician that an **inmate** is, in his or her opinion, mentally ill the superintendent of a correctional facility must apply to the court for designation of two examining physicians who, conducting a personal examination, may certify that the **inmate** is mentally ill and in need of care and treatment, if deemed appropriate. N.Y. Correction Law § 402. In the event that certification is made by the two examining physicians, the superintendent must then apply to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3765847 (N.D.N.Y.)

(Cite as: 2010 WL 3765847 (N.D.N.Y.))

an appropriate state court judge for an order of commitment, with notice to the affected **inmate** as well as any known relative. *Id.* § 402(3). The **inmate** thereafter may request a hearing, and the court additionally may request one of its own initiative. *Id.* § 402(5). In the event the court determines that the person is mentally ill and in need of care and treatment, the court may order him or her committed for a period not to exceed six months in order that the **inmate** may be transferred into an OMH facility. *Id.*

Nor has McQuilkin stated a claim under New York law, even assuming such a claim would be actionable under **section 1983**. Generally, expungement of psychiatric records is not an available form of relief in New York. *Wade v. Dep't of Mental Hygiene of New York, 49 N.Y.2d 947, 428 N.Y.S.2d 945, 406 N.E.2d 800 (1980).* MHL section 33.14 does allow for the sealing of psychiatric records when

> the petitioner has demonstrated by competent medical evidence that he is not currently suffering from a mental illness, has not for a period of three years received inpatient services for the treatment of a mental illness, and the interests of the petitioner and society would best be served by sealing the petitioner's records.

N.Y. MENTAL HYG. LAW § 33.14(a)(1)(b). Plaintiff cannot avail himself of the sealing provision in this instance, however. At the outset, plaintiff cannot establish that he has not "received inpatient services for a period of three years." *Id.* Plaintiff was discharged from services on October 27, 2009 and has therefore received inpatient services within the last three years. Waldron Aff. (Dkt. No. 66) Exh A. Additionally, plaintiff has not established, by competent medical evidence, that he is not currently suffering from a mental illness, nor has he demonstrated that both his interests and those of society would be best served by sealing his records of mental health treatment.

**\*13** For these reasons, the defendants' motion should be granted with respect to plaintiff's second cause of action.

*I. Religious Discrimination and Access to Court*

Plaintiff's complaint makes passing reference to abridgement of his right to "access the court of law" and his "religious rights." Second Amended Complaint (Dkt. No. 35) ¶¶ 2, 8. As defendants assert in support of their motion, plaintiff's complaint is devoid of any factual allegations to support these claims, and there is nothing in the record that would suggest that these rights are implicated.

*1. Religious Discrimination*

While **inmates** confined within prison facilities are by no means entitled to the full panoply of rights guaranteed under the United States Constitution, including its First Amendment, the free exercise clause of that amendment does afford them at least some measure of constitutional protection, including their right to participate in congregate religious services. *See Pell v. Procunier, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974)* ("In the First Amendment context ... a prison **inmate** retains those First Amendment rights that are not inconsistent with his [or her] status as a **prisoner** or with the legitimate penological objectives of the corrections system."); *see also Salahuddin v. Coughlin, 993 F.2d 306, 308 (2d Cir.1993)* ("It is well established that **prisoners** have a constitutional right to participate in congregate religious services.") (citing cases). The task of defining the contours of that right in a prison setting requires careful balance of the rights of prison **inmates** against the legitimate interests of prison officials tasked with maintaining prison security. *O'Lone v. Estate of Shabazz, 482 U.S. 342, 348, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987); Ford v. McGinnis, 352 F.3d 582, 588 (2d Cir.2003); Salahuddin, 993 F.2d at 308.* When determining whether an action taken by prison officials impinges upon that individual's First Amendment free exercise right, the inquiry is "one of reasonableness, taking into account whether the particular [act] affecting [the] right ... is 'reasonably related to legitimate penological interests.' " *Benjamin v. Coughlin, 905 F.2d 571, 574 (2d Cir.), cert. denied, 498 U.S. 951, 111 S.Ct. 372, 112 L.Ed.2d 335 (1990)* (quoting *Turner v. Safley, 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987)); Ford, 352 F.3d at 588; see also Farid v. Smith, 850 F.2d 917, 925 (2d Cir.1988)* (citing, *inter alia,*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3765847 (N.D.N.Y.)

(Cite as: 2010 WL 3765847 (N.D.N.Y.))

O'Lone, 482 U.S. at 348, 107 S.Ct. at 2404).

In this instance, neither plaintiff's complaint nor the record before the court discloses any facts demonstrating religious discrimination or establishing that plaintiff's religious beliefs were somehow burdened by his confinement to CNYPC or the administration of psychiatric drugs against his will. Plaintiff's complaint does not identify his religion, nor does it explain how the forced administration of psychiatric medications infringes upon his sincerely held religious beliefs. Since plaintiff's religious deprivation claim is stated in wholly conclusory terms without the articulation of facts demonstrating the existence of a plausible claim, and in light of his failure to come forward with the evidence to support that claim in the face of defendants' summary judgment motion, I recommend that any cause of action deemed to assert a First Amendment freedom of religion violation be dismissed.

2. *Access to Courts*

**\*14** Turning to plaintiff's reference to his deprivation of access to the courts, I note that undeniably "[ **p]risoners** have a constitutional right of access to the courts, which is infringed when prison officials interfere with a **prisoner's** preparation of legal documents." *Thomas v. Egan,* 1 Fed. App'x 52, 54 (2d Cir.2001) (citing *Lewis,* 518 U.S. at 350, 116 S.Ct. at 2179) (cited in accordance with Fed. R.App. Proc. 32.1). "To state a claim of denial of access to the courts, an **inmate** must allege an actual injury." *Id.* (citing *Lewis,* 518 U.S. at 349, 116 S.Ct. at 2179). Conclusory allegations are insufficient. *Id.* (citing *Lewis,* 518 U.S. at 349, 116 S.Ct. at 2179).

In this instance, plaintiff's complaint alleges that among his property confiscated and destroyed by unnamed prison workers at Gouverneur were legal documents. Second Amended Complaint (Dkt. No. 35) ¶ 2. Neither his complaint nor anything within the record now before court suggests, however, that plaintiff suffered any harm as a result of the alleged destruction of his legal documents. Plaintiff's complaint therefore fails to allege the existence of prejudice, an essential element of such a claim. *See Davidson v. Murray,* 371 F.Supp.2d 361, 366 (W.D.N.Y.2005) (citing cases) (requiring proof on access to courts claim that "a nonfrivolous legal claim had been frustrated or was being impeded due to the action or

inaction" of defendants). Based upon this lack of supporting facts, I recommend that plaintiff's court access claim be dismissed.

J. *Retaliation*

The claims set forth in plaintiff's complaint appear to be centered upon his involuntary commitment into the CNYPC and the forced administering of anti-psychotic medication, allegedly in retaliation for his filing a "notice of summons" against the DOCS. In their motion, defendants assert that plaintiff has failed to state a cognizable claim of retaliation. When adverse action is taken by prison officials against an **inmate**, motivated by the **inmate's** exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies. *See Franco v. Kelly,* 854 F.2d 584, 588-90 (2d Cir.1988). As the Second Circuit has repeatedly cautioned, however, such claims are easily incanted and **inmates** often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach such claims "with skepticism and particular care." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)), *overruled on other grounds sub nom., Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (same).

In order to state a prima facie claim under § 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Dawes,* 239 F.3d at 492 (2d Cir.2001). If the plaintiff carries this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy,* 429 U.S. at 287,

Slip Copy, 2010 WL 3765847 (N.D.N.Y.)

(Cite as: 2010 WL 3765847 (N.D.N.Y.))

97 S.Ct. at 576. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

**\*15** Analysis of retaliation claims thus requires careful consideration of the protected activity in which the **inmate** plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two. When such claims, which are exceedingly case specific, are alleged in only **conclusory** fashion, and are not supported by evidence establishing the requisite **nexus** between any protected activity and the adverse action complained of, a defendant is entitled to summary judgment **dismissing** plaintiff's **retaliation** claims. *Flaherty,* 713 F.2d at 13.

Plaintiff alleges that he was administered antipsychotic medication "in a continuing retaliation against him for filing a claim in the International Trade Court several years ago which was against the State of New York and the Quango New York State Brokerage Mortmain Collection Department of Correctional Services." Second Amended Compl. (Dkt. No. 35) ¶ 2. Plaintiff also alleges that in retaliation for his service of a "notice of summons upon [Defendant Taylor] on July 2, 2007 and July 3, 2007 ...", defendants seized and destroyed five bags containing his property on July 18, 2007, and "wrongfully referred" him to the psychiatric department at Clinton. *Id.*

Plaintiff's complaint clearly satisfies the first element of the retaliation claim. Both the filing of a claim with the International Trade Court and service of a notice of summons appear to qualify as constituting protected activity. *See Joseph's House and Shelter, Inc. v. City of Troy,* 641 F.Supp.2d 154, 159 n. 5 (N.D.N.Y.2009) (Scullin, S.D.J.) (citing *Dougherty v. Town of N. Hempstead,* 282 F.3d 83, 91 (2d Cir.2002) (finding lawsuit constitutionally protected activity under the First Amendment)). In addition I have assumed, solely for purposes of the instant motion, that the forced administering of drugs and the destruction of plaintiff's property could qualify as sufficiently adverse to trigger the protections of the First Amendment. *See Jones v. Harris,*

665 F.Supp.2d 384, 399 (S.D.N.Y.2009). The evidence of a connection between the two, however, is lacking in this case.

The portion of plaintiff's retaliation claim stemming from his filing of the claim in the International Trade Court is easily dispensed with. By plaintiff's own admission that claim was filed "several years ago" and does not appear to have involved any of the named defendants in this action. The bare allegation that the filing of that claim is somehow linked to the defendants' actions in forcing him to take medications, without further support, is woefully insufficient to establish the required connection between that protected activity and the adverse consequences claimed in his retaliation cause of action. *Flaherty,* 344 F.3d at 13.

Plaintiff's retaliation claim against defendant Taylor based upon service of a summons, followed by in short order by the seizure of his property, presents a closer question given the close proximity in time between the two events. In the face of a summary judgment motion, however, calling for plaintiff to lay bare his claims and the proof which supports them, however, this alone is insufficient to establish a basis upon which a reasonable factfinder could conclude that unlawful retaliation has occurred. *Vega v. Lareau,* No. 9:04-CV-0750, 2010 WL 2682307, at \*10 (N.D.N.Y.2010) (Baxter, M .J.). I note, in that regard, that the record fails to support plaintiff's claim that defendant Taylor, against whom this portion of the retaliation claim is asserted, was involved in any way in the decision to admit the plaintiff into the CNYPC. Instead, the record reflects the decision was made by OMH care providers following an evaluation of plaintiff's mental status, and was authorized by a state court order.

**\*16** Because the record fails to support plaintiff's retaliation cause of action, I recommend that it be dismissed.

K. *OMH Confinement and Involuntary Treatment*

Also embedded in plaintiff's complaint is a claim for violation of his Eighth and Fourteenth Amendment rights arising from his commitment to the CNYPC as well as the drugs he was forcibly administered while there. In support

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3765847 (N.D.N.Y.)

(Cite as: 2010 WL 3765847 (N.D.N.Y.))

of their motion, defendants argue that these claims should be dismissed as impermissibly conclusory, and further that because they are precluded under *Heck v. Humphrey* and the *Rooker-Feldman* doctrine.

1. *Eighth Amendment*

The claims alleged in plaintiff's complaint relating to his involuntary commitment to the CNYPC and the forced administration of drugs are predicated upon alleged violation of the Eighth and Fourteenth Amendments and, in essence, are directed to the medical treatment that he received for his schizophrenia.

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291, 50 L.Ed.2d 251 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an **inmate's** confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)). A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement-the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference". *See Leach,* 103 F.Supp.2d at 546 (citing *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.); *see also, generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271. Deliberate indifference exists if an official "knows of and disregards an excessive risk to **inmate** health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at

546 (citing *Farmer); Waldo,* 1998 WL 713809, at *2 (same).

To satisfy the objective prong of an Eighth Amendment conditions of confinement claim, a plaintiff must demonstrate a deprivation of " 'the minimal civilized measure of life's necessities,' such as adequate food, clothing shelter, sanitation, medical care, and personal safety." *May v. DeJesus,* No.3:06CV1888, 2010 WL 1286800, at *4 (D.Conn. Mar.30, 2010) (quoting *Alvarez v. County of Cumberland,* Civil No. 07-346(RBK), 2009 WL 750200, at *2 (D.N.J. Mar.18, 2009) (citation omitted)). Conditions that are merely restrictive or harsh, however, do not implicate the Eighth Amendment; "they are merely part of the penalty that criminal offenders pay for their offense against society." *May,* 2010 WL 1286800, at *4 (quoting *Alvarez,* 1009 WL 750200, at *2).

**\*17** Plaintiff does not claim that he was deprived of any of basic need or that his personal safety was put at risk during his confinement in the CNYPC or at Clinton. Instead, his complaint is directed to the facts that he was confined to a mental health facility and forced to undergo mental health treatment. Broadly construed, at best, plaintiff's Eighth Amendment claim can be interpreted as a challenge to his medical treatment.

Claims that prison officials have intentionally disregarded an **inmate's** medical needs are encompassed within the Eighth Amendment's prohibition of cruel and unusual punishment. *Estelle,* 429 U.S. at 104, 97 S.Ct. at 291. Here, however, even liberally construing plaintiff's allegations there is no claim, and indeed no evidence in the record to suggest that plaintiff's medical needs were disregarded. In fact, at the heart of plaintiff's claim is his contention that he did not need mental health treatment at all. It is well established, however, that "[c]harges that amount only to allegations of malpractice, and mere disagreements with respect to quality of medical care do not state an Eighth Amendment claim." *Arroyo v. City of New York,* 2003 WL 22211500, at *2 (S.D.N.Y. Sept.25, 2003) (citing *Estelle,* 429 U.S. at 105-06, 97 S.Ct. at 292). As a result, defendants are correct in their assertion that plaintiff's Eighth Amendment challenge to his CNYPC confinement and mental health treatment must fail as a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3765847 (N.D.N.Y.)

(Cite as: 2010 WL 3765847 (N.D.N.Y.))

matter of law.

2. *Heck v. Humphrey*

Defendants also assert that any claim by plaintiff that he should not have been placed in the CNYPC or in an OMH Satellite Unit is barred by the rule enunciated in *Heck v. Humphrey.* In *Heck,* the United States Supreme Court addressed the types of claims for which state **prisoners** may seek redress in **section 1983** actions. *Heck,* 512 U.S. at 480-82, 114 S.Ct. at 2369-70. The Supreme Court specifically held that a state **prisoner's** claim for damages is not cognizable under 42 U.S.C. § 1983 if a judgment in his or her favor "would necessarily imply the invalidity of his conviction or sentence." *Heck,* 512 U.S. at 487, 114 S.Ct. at 2372. For a plaintiff to recover damages for actions

> whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus.

*Id.* at 486-87, 2372. "But if the district court determines that the plaintiff's action, even if successful, will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit." *Id.* The Second Circuit has observed, however, that a **section 1983** suit by a **prisoner,** "challenging the validity of a disciplinary or administrative sanction that does not affect the overall length of the **prisoner's** confinement is not barred by *[Heck]." Jenkins v. Haubert,* 179 F.3d 19, 27 (2d Cir.1999).

**\*18** In this case, plaintiff is not disputing either his conviction or his confinement to prison; rather, McQuilkin is challenging his confinement to a mental health facility, which occurred in accordance with a state court order. Plaintiff additionally challenges the forced administration of psychotropic drugs, which also was court-authorized. It does not appear that these state court determinations had any effect on the length of the plaintiff's prison term. Waldron Aff. (Dkt. No. 66) Exh. B P263, P318-319.

Additionally, these state court proceedings clearly were not criminal in nature, but rather were civil state mental health proceedings. As a result, it cannot be said that the instant action would affect the invalidity of a criminal judgment against the plaintiff.[FN18]

> FN18. The fact that plaintiff has been released from custody does not alter this conclusion because "[t]his favorable termination requirement applies to plaintiffs who are incarcerated at the time that they file their **section 1983** actions, regardless of whether they are later released." *Hamm v. Hatcher,* No. 05-CV-503, 2009 WL 1322357, at \*8 n. 6 (S.D.N.Y. May 5, 2009).

For these reasons, it therefore does not appear that plaintiff's claims are precluded by the doctrine enunciated in *Heck v. Humphrey.*

3. *Rooker-Feldman*

Defendants further assert that plaintiff's OMH retention and involuntary treatment claims are subject to dismissal under the *Rooker-Feldman* doctrine because the plaintiff was accorded due process in the state court mental health proceedings, and the claim presents a pure question of state law that is not properly raised in a **section 1983** action.

"Where a federal suit follows a state suit, the former may be prohibited by the so-called *Rooker-Feldman* doctrine in certain circumstances." *Hoblock v. Albany County Board of Elections,* 422 F.3d 77, 83 (2d Cir.2005). A federal district court "has no authority to review final judgments of state court judicial proceedings." *District of Columbia v. Feldman,* 460 U.S. 462, 482, 103 S.Ct. 1303, 1315, 75 L.Ed.2d 206 (1983). "To do so would be an exercise of appellate jurisdiction which only the Supreme Court possesses over state court judgments." *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 416, 44 S.Ct. 149, 150, 68 L.Ed. 362 (1923).

The Supreme Court of the United States reviewed and redefined the limits of the *Rooker-Feldman* doctrine in *Exxon Mobile Corp. v. Saudi Basic Indus. Corp.,* 544 U.S. 280, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005). The Court

Slip Copy, 2010 WL 3765847 (N.D.N.Y.)

(Cite as: 2010 WL 3765847 (N.D.N.Y.))

limited application of the doctrine to "cases brought by state court losers complaining of injuries caused by state court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobile Corp., 544 U.S. at 284, 125 S.Ct. at 1521-22.* In *Hoblock,* the Second Circuit established four elements that must be met before the *Rooker-Feldman* doctrine applies:

First, the federal court plaintiff must have lost in state court. Second the plaintiff must 'complain[ ] of injuries caused by [a] state court judgment [.]' Third, the plaintiff must 'invite district court review and rejection of [that] judgment[ ].' Fourth, the state court judgment must have been 'rendered before the district court proceedings commenced.'

*Hoblock,* 422 F.3d at 85.

*\*19* Here, the first and fourth elements of this test are clearly satisfied. First, the plaintiff lost in the New York Supreme Court proceedings which resulted in the retention and involuntary treatment described in plaintiff's complaint. *See* Waldron Aff. (Dkt. No. 66) Exh. B at P263, P318-319. Additionally, the state court decisions at issue, dated October 11, 2007 and November 21, 2007, respectively, *see id.,* were rendered prior to the commencement of this action on September 15, 2008. *See* Dkt. No. 1.

The second and third elements of the prevailing *Rooker-Feldman* test also appear to have been established in this instance. Plaintiff's complaint is directly addressed to the injuries suffered as a result of those court determinations. Moreover, plaintiff's complaint, as amended, appears to challenge the correctness of those rulings, seeking both an order prohibiting his forced medication, despite the fact that it was accomplished pursuant to a state court order, as well as expungement of records of his treatment at the Center, also accomplished by court order. This, then, appears to present a classic case of a claim precluded under the *Rooker-Feldman* doctrine. I therefore recommend dismissal of plaintiff's confinement and administration of psychiatric drug claims on this basis.

L. *Due Process Claims*

In their motion defendants further attack plaintiff's procedural due process claim asserted under the Fourteenth Amendment.

To successfully state a claim under 42 U.S.C. § 1983 for denial of procedural due process, a plaintiff must show that he or she 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields, 280 F.3d 69, 79-80 (2d Cir.2000)* (citations omitted); *Hynes v. Squillace, 143 F.3d 653, 658 (2d Cir.1998); Bedoya v. Coughlin, 91 F.3d 349, 351-52 (2d Cir.1996).* It is undeniable that [i]nvoluntary confinement, including civil commitment, constitutes a significant deprivation of liberty, requiring due process." *Abdul-Matiyn v. Pataki, 9:06-CV-1503, 2008 WL 974409, at \*10 (N.D.N.Y. April. 8, 2008)* (Hurd, J. and Homer, M.J.) (quoting *Fisk v. Letterman, 401 F.Supp.2d 362, 374 (S.D.N.Y.2005)* (citations omitted). "When a person's liberty interests are implicated, due process requires at a minimum notice and an opportunity to be heard." *Mental Hygiene Legal Service v. Spitzer, 2007 WL 4115936, at \*5 (S.D.N.Y. Nov.16, 2006)* (citing *Hamdi v. Rumsfeld, 542 U.S. 507, 533, 124 S.Ct. 2633, 2648, 159 L.Ed.2d 578 (2004)* (plurality opinion)). The Supreme Court has approved the use of involuntary confinement where there has been a determination that the person in question currently suffers from a "mental abnormality" and is likely to pose a future danger to the public. *Abdul,* 2008 WL 974409, at \*10 (citing *Kansas v. Hendricks,* 521 U.S. 346, 371, 117 S.Ct. 2072, 2086, 138 L.Ed.2d 501 (1997)).

The primary focus of plaintiff's due process claim and defendants' motion seeking its dismissal, then, is upon the sufficiency of the procedural safeguards associated with that deprivation.[FN19] In this instance, plaintiff was committed to the CNYPC by way of the procedures set out in the New York Corrections Law § 402.

FN19. The record does not address, and I am therefore unable to determine, whether as a result of his involuntary commitment to the CNYPC and forced medication, plaintiff suffered deprivation of a cognizable liberty interest beyond that already associated with this criminal conviction and sentence. I have nonetheless

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3765847 (N.D.N.Y.)

(Cite as: 2010 WL 3765847 (N.D.N.Y.))

assumed, for purposes of the pending motion, that the plaintiff can demonstrate the deprivation of a cognizable liberty interest associated with those acts.

**\*20** It is clear from the record before the court that plaintiff was retained at the CNYPC under the authority of that statute, and his retention and involuntary treatment with the antipsychotic medication were court-ordered. Section 402 provides procedures and safeguards similar to the provisions of MHL section 33.03, the general provision governing involuntary commitment, and one which "has withstood challenges that it was facially unconstitutional." *United States v. Waters*, 23 F.3d 29, 32 (2d Cir.1994) (citing *Project Release v. Prevost,* 722 F.2d 960, 971-981 (2d Cir.1983)).

Plaintiff's claims regarding involuntary medication are similarly destined to fail. The Second Circuit has held that "due process requires an opportunity for hearing and review of a decision to administer antipsychotic medication-but such a hearing need not be judicial in nature." *Project Release,* 722 F.2d at 981. Moreover, due process does not require a guarantee that a physician's assessments in their commitment evaluation be correct. *Rodriguez City of New York,* 72 F.3d 1051, 1062 (2d Cir.1995).

Plaintiff was transferred from Mid-State to the CNYPC on September 17, 2007, after he refused medication and mental health treatment, and once admitted continued to refuse medication without any rational basis for doing so. As a result, the Executive Director of the CNYPC petitioned the court, based upon the certifications of two examining physicians, for an order committing McQuilkin for six months. McQuilkin objected to the retention petition, and a hearing was held in Oneida County Supreme Court to determine whether the plaintiff was mentally ill and a proper subject for involuntary commitment. Following the hearing, on October 11, 2007, the court ordered plaintiff's commitment to CNYPC for six months.

After the commitment order was issued, McQuilkin persisted in his refusal to consent to the administration of medication. As a result, following a similar procedure as

he did for commitment, based upon the certification of two examining physicians, defendant Sawyer petitioned the court for an order authorizing the administration of the medication against McQuilkin's will. McQuilkin opposed the petition, and, after a hearing, the court determined that he lacked capacity to make a reasoned decision regarding his own treatment and granted the petition. *United States v. Waters,* 23 F.3d at 32.

Because the evidence in the record establishes that defendants followed the procedures outlined in New York Corrections Law § 402 in obtaining authorization for plaintiff's involuntary commitment, and plaintiff was afforded the constitutionally required process to which he was entitled in connection with both that determination and the court ordered forced mediation, his procedural process claim lacks merit.[FN20]

> FN20. To the extent that plaintiff may be suggesting that defendants failed to follow the procedures outlined in the MHL, his claim would still fail. Section 1983 imposes liability for violations of rights protected by the Constitution and laws of the United States, and not for violations arising solely out of state or common law principles. *Fluent v. Salamanca Indian Lease Auth.,* 847 F.Supp. 1046, 1056 (W.D.N.Y.1994). "A violation of a state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. § 1983." *Cusamano v. Sobek,* 604 F.Supp.2d 416, 482 (N.D.N.Y.2009) (Suddaby, J.) (collecting cases). For this reason, even if defendants had failed to follow the letter of the New York MHL provisions with regard to his confinement and treatment, that failure would not provide the basis a cognizable section 1983 claim.

For the foregoing reasons, I recommend summary judgment granting dismissal of plaintiff's due process claim arising out of his mental health confinement and treatment with psychiatric medication.

M. *Defendant Sangani's Motion to Dismiss*

**\*21** In his motion Dr. K. Sangani, who has yet to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3765847 (N.D.N.Y.)

(Cite as: 2010 WL 3765847 (N.D.N.Y.))

answer plaintiff's complaint, seeks its dismissal for failure to state a claim against him upon which relief may be granted. The focus of defendant Sangani's motion is upon plaintiff's failure to allege in his complaint facts showing Sangani's involvement in the constitutional deprivations alleged.

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farid v. Ellen,* 593 F.3d 233, 249 (2d Cir.2010) (quoting *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006)). It should also be noted that personal involvement of a named defendant in any alleged constitutional deprivation is a prerequisite to an award of damages against that individual under **section 1983**. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cri.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978)). In order to prevail on a **section 1983** cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

The only mention of Dr. Sangani in plaintiff's second amended complaint is in that portion wherein it is alleged, "[t]he next day plaintiff was transferred to Marcy Psychiatric Center and petition before the court upon the application of K. Perlman and the certificates of Doctors K. Sangani and V. Komareth on 10/11/07 ..." Amended Complaint. (Dkt. No. 35) ¶ 5. It is doubtful that the mere provision of a certificate in support of an involuntary commitment petition would suffice to establish a physician's personal involvement in a claim that the involuntary commitment was either retaliatory or accomplished through lack of procedural due process. As such, it seems doubtful that plaintiff's claim against Dr. Sangani is legally plausible, given his failure to sufficiently allege that defendant's personal involvement in a constitutional deprivation. Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend *at least* once if there is any indication that a valid claim might be stated. *Branum v. Clark,* 927 F.2d 698, 704-05 (2d Cir.1991) (emphasis added); *see also* Fed. R. Civ. Proc. 15(a) (leave to amend

"shall be freely given when justice so requires"); *see also Mathon v. Marine Midland Bank, N.A.,* 875 F.Supp. 986, 1003 (E.D.N.Y.1995) (leave to replead granted where court could not say that under no circumstances would proposed claims provide a basis for relief). I note, however, that I have already recommended dismissal of plaintiff's claims growing out of that commitment as legally insufficient. I therefore similarly recommend that an order be entered dismissing plaintiff's claims against Dr. Sangani on this basis, without leave to replead.

N. *Defendants Komareth and Bodrog*

**\*22** Although defendants' motion does not explicitly request this relief, I have of my own initiative determined to raise the question of whether plaintiff's claims should proceed against the defendants Komareth and Bodrog, two defendants who were never served with the summons and complaint, and who, if this report and recommendation is adopted, would be the sole remaining defendants in the case.

Rule 4(m) of the Federal Rules of Civil Procedure requires that service of a summons and complaint be made within 120 days of issuance of the summons. [FN21] "[W]here good cause is shown, the court has no choice but to extend the time for service, and the inquiry is ended." *Panaras v. Liquid Carbonic Indus. Corp.,* 94 F.3d 338, 340 (7th Cir.1996). "If, however, good cause does not exist, the court may, in its discretion, either dismiss the action without prejudice or direct that service be effected within a specified time." *Id.* (citing Fed.R.Civ.P. 4(m)); *Zapata v. City of New York,* 502 F.3d 192, 196 (2d Cir.2007) ("[D]istrict courts have discretion to grant extensions even in the absence of good cause."); *Romandette v. Weetabix Co., Inc.,* 807 F.2d 309, 311 (2d Cir.1986). When examining whether to extend the specified 120 day period for service, a district court is afforded ample discretion to weigh the "overlapping equitable considerations" involved in determining whether good cause exists and whether an extension may be granted in the absence of good cause. *See Zapata,* 502 F.3d at 197.

FN21. That rule provides that

[i]f a defendant is not served within 120 days after the complaint is filed, the court-on

Slip Copy, 2010 WL 3765847 (N.D.N.Y.)

(Cite as: 2010 WL 3765847 (N.D.N.Y.))

motion or on its own after notice to the plaintiff-must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

Fed.R.Civ.P. 4(m). This court's local rules shorten the time for service from the 120 day period under Rule 4(m) to sixty days. *See* N.D.N.Y.L.R. 4.1(b).

A plaintiff's *pro se* status entitles him or her to a certain degree of leniency insofar as service of process is concerned; courts generally favor resolution of such a case on its merits, rather than on the basis of a procedural technicality. *Poulakis v. Amtrak,* 139 F.R.D. 107, 109 (N.D.Ill.1991). When a plaintiff proceeds *in forma pauperis,* such as is the case here, the court is obligated to issue the plaintiff's process to the United States Marshal, who must in turn effect service upon the defendants, "thereby relieving [the] plaintiff of the burden to serve process once reasonable steps have been taken to identify for the court the defendants named in the complaint." *Byrd v. Stone,* 94 F.3d 217, 219 (6th Cir.1996).

I am mindful of the Second Circuit's recent decision in *Murray v. Pataki,* in which the court cautioned that

[a] *pro se* **prisoner** proceeding *in forma pauperis* is only required to provide the information necessary to identify the defendant, *see, e.g. Sellers,* 902 F.2d at 602, and it is "unreasonable to expect incarcerated and unrepresented **prisoner**-litigants to provide the current business addresses of prison-guard defendants who no longer work at the prison," *Richardson v. Johnson,* 598 F.3d 734, 739-40 (11th Cir.2010).

*Murray v. Pataki,* No. 09-1657, 2010 WL 2025613, at *2 (2d Cir. May 24, 2010) (summary order) (cited in accordance with Fed. R.App. Proc. 32.1). In this instance, however, plaintiff has failed to demonstrate the requisite vigilance in insuring service upon these defendants and, to the extent necessary, eliciting the court's assistance. Plaintiff's original complaint in this action was filed on

September 15, 2008. Summonses issued for defendants Komareth and Bodrog were initially returned unexecuted on January 16, 2009. See Dkt. Nos. 18, 19. The summonses were thereafter reissued and again forwarded to the Marshals for service on April 29, 2009, Dkt. No. 30, and yet again on May 14, 2009, Dkt. No. 36, but were, once again, returned as unexecuted on July 23, 2007 (defendant Komareth), Dkt. No. 44, and August 3, 2009 (defendant Bodrog) Dkt. No. 46. Despite the passage of more than one year, and at least one court intervention at plaintiff's request seeking an order compelling discovery, *see* Dkt. Minute Entry Dated 8/5/09, plaintiff has failed to request assistance from the court in locating and serving these defendants. On that basis I recommend dismissal of plaintiff's claims against defendants Komareth and Bodrog, without prejudice.[FN22]

FN22. In his complaint plaintiff alleges that defendants Komareth and Bodrog are physicians who submitted certifications in support of the applications to confine McQuilkin to the CNYPC and to require that he submit to the administration of psychiatric medication. Since I have already determined that as to the defendants Hanna and Hernandez, who also submitted certifications in support of these applications, plaintiff has failed to establish that his constitutional rights have been violated, for the same reasons I could recommend dismissal of plaintiff's against these two defendants on the merits as well.

IV. *SUMMARY AND RECOMMENDATION*

**\*23** Although defendants have asserted that certain of plaintiff's claims should be dismissed for failure to exhaust his administrative remedies, the record shows that special circumstances potentially exist that could justify excusing the plaintiff from the exhaustion requirement in this instance. I therefore recommend against dismissal of plaintiff's claims on this procedural basis.

Turning to the merits of plaintiff's claims, I note first that his claim for injunctive relief must be dismissed as moot, based upon his release from custody. I also recommend dismissal of all claims against the CNYPC, and plaintiff's damages claims against the defendants in

Slip Copy, 2010 WL 3765847 (N.D.N.Y.)

(Cite as: 2010 WL 3765847 (N.D.N.Y.))

their official capacities, on the basis of the immunity afforded under the Eleventh Amendment. I further find that the balance of plaintiff's claims are not supported by the record now before the court, and no reasonable factfinder could conclude that those claims are meritorious. Finally, I recommend dismissal of plaintiff's involuntary commitment and forced medication claims on the basis of the *Rooker-Feldman* doctrine, and find it unnecessary, in light of these determinations, to address the additional, alternative basis for dismissal of qualified immunity.

Based upon the foregoing it is hereby respectfully,

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 66) be GRANTED, and that plaintiff's claims against the Central New York Psychiatric Center, Berggren, Hernandez, Sawyer, Hanna and Taylor be DISMISSED in all respects, with prejudice; and it is further

RECOMMENDED that defendant Sangani's motion to dismiss the complaint (Dkt. No. 56) be GRANTED and that all claims against that defendant be DISMISSED for failure to state a plausible civil rights claim; it is further

RECOMMENDED that plaintiff's claims against defendants Komareth and Bodrog be DISMISSED, *sua sponte,* without prejudice.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette, 984 F.2d 85 (2d Cir.1993).*

It is hereby ORDERED that the clerk of the court amend the court's records to reflect the correct spelling of defendant Berggen's name; and it is further

ORDERED THAT the clerk serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

N.D.N.Y.,2010.

McQuilkin v. Central New York Psychiatric Center
Slip Copy, 2010 WL 3765847 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 3765715 (N.D.N.Y.)

(Cite as: 2010 WL 3765715 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,

N.D. New York.
Rudolph McQUILKIN, Plaintiff,
v.
CENTRAL NEW YORK PSYCHIATRIC CENTER, J. Taylor, J. Berggren, V. Komareth, K. Sangani, Dr. Hernandez, D. Sawyer, S. Hanna, and G. Bodrog, Defendants.
Civil Action No. 9:08-CV-00975 (TJM/DEP).

Sept. 20, 2010.
Rudolph McQuilkin, New York, NY, pro se.

Krista A. Rock, New York State Attorney General, Peter B. Joslin, Jr., O'Connor, O'Connor Law Firm, Albany, NY, for Defendants.

### DECISION & ORDER

THOMAS J. McAVOY, Senior District Judge.

**\*1** This *pro se* action brought pursuant to 42 U.S.C. § 1983 was referred to the Hon. David E. Peebles, United States Magistrate Judge, for a Report and Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). No objections to the Report-Recommendation and Order dated August 27, 2010 have been filed, and the time to do so has expired. Furthermore, after examining the record, this Court has determined that the Report-Recommendation and Order is not subject to attack for plain error or manifest injustice. Accordingly, the Court adopts the Report-Recommendation and Order for the reasons stated therein.

It is therefore,

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 66) is **GRANTED,** and Plaintiff's claims against the Central New York Psychiatric Center, Berggren, Hernandez, Sawyer, Hanna and Taylor are **DISMISSED** in all respects, with prejudice; and it is further

**ORDERED** that Defendant Sangani's motion to dismiss the complaint (Dkt. No. 56) is **GRANTED** and all claims against Sangani are **DISMISSED** with prejudice; and it is further

**ORDERED** that Plaintiff's claims against Defendants Komareth and Bodrog are **DISMISSED,** *sua sponte,* without prejudice.

The Office of the Clerk of the Court is instructed to close the file in this matter.

**IT IS SO ORDERED.**

N.D.N.Y.,2010.

McQuilkin v. Central New York Psychiatric Center
Slip Copy, 2010 WL 3765715 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 2828862 (M.D.Pa.)

(Cite as: 2006 WL 2828862 (M.D.Pa.))

---

**C**

Only the Westlaw citation is currently available.
United States District Court,

M.D. Pennsylvania.
Bruce FERRELL, Plaintiff
v.
Jeffrey BEARD, et al., Defendants.
Civil No. 3:CV-01-0924.

Sept. 29, 2006.
Bruce Ferrell, Frackville, PA, pro se.

Gwendolyn T. Mosley, Office Of Attorney General, Harrisburg, PA, for Defendants.

### *MEMORANDUM*

EDWIN M. KOSIK, District Judge.

**I. *Introduction***

**\*1** This consolidated civil rights action pursuant to 42 U.S.C. § 1983 was filed by Bruce Ferrell, an **inmate** currently confined at the State Correctional Institution at Fayette, Pennsylvania, on May 24, 2001.[FN1] Named as Defendants are Jeffrey Beard, Secretary of the Department of Corrections ("DOC"), and the following former employees at the State Correctional Institution at Camp Hill ("SCI-Camp Hill"), Pennsylvania, Plaintiff's former place of confinement: Martin Dragovich, Superintendent; John Palakovich, Deputy Superintendent for Facility Management; Robert Novotney, Superintendent for Facility Management; Blaine Steigerwalt, Unit Manager in the Special Management Unit ("SMU")[FN2]; and David Maeyer, Business Manager. On March 22, 2002, Plaintiff's motion to add Sarah B. Vanderbrook Meart, former Chief Counsel of the DOC, as a defendant in this action was granted. (Doc. 34.) In the complaint Plaintiff contends that he was subjected to retaliation and denied access to the courts in conjunction with his transfer from the State Correctional Institution at Greene, Pennsylvania ("SCI-Greene") to the SMU at SCI-Camp Hill, and then subsequently to the Long Term Segregation Unit

("LTSU") at the State Correctional Institution at Pittsburgh (SCI-Pittsburgh). The case has a tortured procedural history which is fully set forth in the detailed opinions previously issued by this Court, and will not be reiterated herein. Numerous discovery and other miscellaneous motions have been filed and resolved. Defendants have filed a motion for summary judgment (Doc. 111) which is ripe for consideration. For the reasons that follow, the motion will be granted.

> FN1. A second complaint filed on June 25, 2001 was consolidated into the above-captioned action on July 6, 2001. (*See* Doc. 8, Civil Action No. 3:CV-01-1135.)

> FN2. Steigerwalt is currently still employed at SCI-Camp Hill, but now serves as Unit Manager of Blocks F and H.

**II. *Factual Background***

Plaintiff is serving a five (5) to ten (10) year sentence for robbery. The effective date of his sentence was March 27, 1999, with minimum and maximum sentence expiration dates of March 27, 2004, and March 27, 2009. (Doc. 130, Southers Declar. ¶ 6; Doc. 164, Ex. A, Sentence Status Summary.) Plaintiff's sentence was a "continuation sentence" resulting from a re-entry detainer that took effect after he finished serving back-time for a parole violation.[FN3] On November 22, 1999, Plaintiff was transferred from SCI-Greene to the SMU at SCI-Camp Hill. (Doc. 130, Southers Declar. ¶ 7.) The SMU is a specialized area within SCI-Camp Hill where **inmates** from various DOC institutions are assigned when they exhibit dangerous or unduly aggressive behavior over an extended period of time during their incarceration. This unit offers a prescriptive program designed to encourage cooperation and compliance with prison rules through positive reinforcement. When an **inmate** is first confined in the SMU, he is extremely limited in his privileges. As he progresses through the program, he earns greater privileges. The goal is release back into the general population which has the greatest degree of privileges. (Doc. 164, Ex. G.) Plaintiff was transferred to the SMU

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2828862 (M.D.Pa.)

(Cite as: 2006 WL 2828862 (M.D.Pa.))

because he consistently exhibited dangerous and uncooperative behavior at SCI-Greene. In the calendar year 1999 alone, Plaintiff's actions included lying to an employee, destroying/ damaging property, and repeated instances of assault, threatening an employee, refusing to obey orders, possession of contraband and using abusive or obscene language.[FN4] He was transferred as a Phase 5 Disciplinary custody status **inmate**. Phase 5 is the category reserved for **inmates** who pose the most serious threats to the prison. (Doc. 130, Southers Declar. ¶ 8.)

> FN3. At the time Plaintiff was sentenced on the robbery charge, he was on active parole from a previous conviction. He was recommitted by the Pennsylvania Board of Probation and Parole to complete all back-time before he would begin his new sentence. Plaintiff completed his back-time on January 3, 2000, at which point he began to serve the robbery sentence. (Doc. 164, Ex. A, Hale Declar. ¶ 7 and Sentence Status Summary; Ex. B, 2/11/00 Letter.)

> FN4. Plaintiff's behavior while confined at SCI-Greene is well documented by both Plaintiff's own submissions as well as Defendants' submissions. (Doc. 130, Southers Declar. ¶ 9; Doc. 164, Plaintiff's Ex. G, Ward Aff. ¶¶ 6-8; Plaintiff's Ex. B.)

**\*2** Following his arrival in the SMU Plaintiff admits that he refused to cooperate with staff there. Plaintiff contested his confinement in the SMU, and made repeated complaints about the denial of access to personal property. **Inmates** in the SMU are not permitted to possess unlimited amounts of personal material in their cells, including legal property. Upon his transfer to the SMU from SCI-Greene, Plaintiff was permitted to bring two (2) boxes of legal property and a television. While Plaintiff had eleven (11) more boxes of personal property, these were not shipped to SCI-Camp Hill until one month later. Plaintiff was advised that he had to select the property he would keep at SCI-Camp Hill, and the property he wished to have shipped elsewhere outside of the prison. (Doc. 130, Southers Declar. ¶ 20.) Although Plaintiff was always permitted access to his property by submitting request slips, he would often interfere with the staff's efforts to accommodate him and overall did not adjust in a positive

way to the SMU. (Doc. 130, Steigerwalt Declar. ¶¶ 4, 5.) After arriving at the SMU, Plaintiff received eight (8) misconducts, accumulating 750 days of disciplinary custody to be added to the number he received while at SCI-Greene. This brought his disciplinary maximum date to August 22, 2004. (*Id.,* Southers Declar. ¶ 25.) Plaintiff began to spread feces all over himself, his cell walls and the floor. He disputes that he ever threw waste at the officers. He does not dispute threatening to throw waste upon the SMU staff, urinating in his cell to wash the feces out onto the tier, and refusing to flush his toilet in an attempt to clog the pipes to spew his wastes onto the tier. Plaintiff also refused to attend Program Review Committee meetings which were scheduled once a month. (*Id.,* ¶¶ 27-33.) Despite complaints about possessing as much personal property as he wished, Plaintiff would interfere with efforts to provide him with materials by threatening to throw waste at staff attempting to approach his cell. On several occasions Plaintiff was placed in a psychiatric observation cell in the prison's infirmary due to this conduct in addition to engaging in a hunger strike.

Plaintiff was ultimately considered to be an SMU program failure because of his refusal to progress from Phase 5 or participate in any way with the SMU programming. (Doc. 130, Southers Declar. ¶ 28; Doc. 164, Ex. B, 2/2/00 Continuation Psychological Eval.; 12/11/00 Misconduct Report; Doc. 130, Dragovich Declar. ¶¶ 11, 12.) SMU staff thereafter detailed all the events which had occurred and recommended to Superintendent Dragovich that he seek Plaintiff's transfer to the Long Term Segregation Unit (LTSU). After submitting a petition to the Central Office and obtaining DOC Secretary Beard's approval, Plaintiff was transferred on February 12, 2001, to the LTSU at SCI-Pittsburgh. (Doc. 130, Southers Declar. ¶ 31; Beard Declar. ¶¶ 13-14; Brandt Declar. ¶ 14.)

**\*3** Plaintiff's property exceeded the amount he was permitted to take to SCI-Pittsburgh. The policy at that time was that a **prisoner** could take with him at prison expense two record boxes and a television box for shipment on the bus or van which transported him. A standard size footlocker could be substituted for the two boxes. (*Id.,* Southers Declar. ¶ 17.) Plaintiff was informed by Defendant Steigerwalt that the excess would be shipped

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2828862 (M.D.Pa.)

(Cite as: 2006 WL 2828862 (M.D.Pa.))

by the least expensive common carrier available at Plaintiff's own expense. (Doc. 130, Steigerwalt Declar. ¶ 18.) Plaintiff took two record boxes and a television box with him. In August of 2001, Defendant Maeyer, the Business Manager at SCI-Camp Hill, was asked by Dragovich to respond to a request from Plaintiff as to the amount it would cost him to have his remaining boxes of property at SCI-Camp Hill shipped to him at SCI-Pittsburgh. (Doc. 130, Maeyer Declar. ¶ 3; Doc. 164 .) Maeyer responded on August 21, 2001 by informing Plaintiff that he had ten (10) boxes of property which would cost $78.90 to ship. He was further informed that he had a negative $1,445.40 balance on his institution account (Doc. 164, Plaintiff's Ex. D.) In October of 2001, Plaintiff submitted requests to the Business Office at SCI-Camp Hill seeking to have his property shipped to SCI-Pittsburgh. He was again informed by Maeyer of his negative balance, and told that to have the property shipped, he would either need to have the funds available in his account or authority from the courts or the DOC permitting the Business Office to "anticipate" funds on his account to pay for the costs of shipping. Nothing was ever received by Maeyer authorizing him to anticipate funds on Plaintiff's account. In 2002, Plaintiff submitted request slips, letters and three (3) grievances with regard to this issue. Plaintiff disputes the negative balance claiming that it arose under his prior sentence and, therefore, was extinguished when service of that sentence was completed. In April of 2002, in response to Plaintiff's grievances, Ian Taggart, Assistant to the Superintendent at SCI-Camp Hill, contacted the DOC Central Office regarding Plaintiff's requests that his personal property be shipped for free. (Doc. 130, Taggart Declar. ¶ 21.) After discussions, it was decided that the prison would ship the 10 boxes of property on the DOC's buses scheduled to travel to SCI-Pittsburgh when space was available. Plaintiff was informed of this decision on April 2, 2002. (*Id.,* Ex. 2.) The property was ultimately shipped some time prior to April 16, 2002. (*Id.,* Taggart Declar. ¶ 23.)

### III. *Standard of Review*

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter

of law." Fed.R.Civ.P. 56(c). "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986). Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment. The substantive law determines which facts are material. *Id*, at 248. A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id* . at 250. If the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'." *Matsushita Elec. Industrial Co. v. Zenith Radio,* 475 U.S. 574, 587 (1986) (citing *First Nat. Bank of Ariz. v. Cities Service Co.,* 391 U.S. 253, 289 (1968)). All inferences, however, " 'should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true'." *Pastore v. Bell Tel. Co. of Pennsylvania,* 24 F.3 d 508, 512 (3d Cir.1994)(citing *Big Apple BMW, Inc. v. BMW of N. America, Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992);* Wicker v. Consol. Rail Corp.,* 142 F.3d 690, 696 (3d Cir.1998).

*\*4 The moving party bears the initial responsibility of stating the basis for its motion, identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). As a general rule, unsubstantiated arguments made in briefs are not considered evidence of asserted facts. *Versarge v. Township of Clinton,* 984 F.2d 1359, 1370 (3d Cir.1993). The moving party must present competent evidence to support his version of events. Likewise, the nonmoving party "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Williams v. Borough of West Chester,* 891 F.2d 458, 460 (3d Cir.1989)(citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 257 (1986)). The nonmoving party cannot "simply reassert factually unsupported allegations contained in [the] pleadings." *Williams,* 891 F.2d at 460 (citing *Celotex,* 477 U.S. at 325). "Once the moving party has carried the initial burden of showing that no genuine issue of material fact exists, the nonmoving party ... 'must make a showing sufficient to establish the existence of every element

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2828862 (M.D.Pa.)

(Cite as: 2006 WL 2828862 (M.D.Pa.))

essential to his case, based on the affidavits or by the depositions and admissions on file'." *Pastore,* 24 F.3d at 511 (citing *Harter v. GAF Corp.,* 967 F.2d 846, 852 (3d Cir.1992)). If the evidence in favor of the nonmoving party is merely colorable or not significantly probative, summary judgment should be granted. *Boyle v. County of Allegheny,* 139 F.3d 386, 393 (3d Cir.1998)(citing *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)).

**IV.** *Discussion*

**A. Exhaustion of Administrative Remedies**

In moving for summary judgment Defendants argue they are entitled to summary judgment because Plaintiff has failed to exhaust his administrative remedies with respect to his claims. Under the Prison Litigation Reform Act ("PLRA"), exhaustion of administrative remedies is required for all actions concerning prison conditions brought under federal law. *See* 42 U.S.C. § 1997e(a); *Woodford v. Ngo,* 126 S.Ct. 2378 (2006). The "exhaustion requirement applies to all **inmate** suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516 (2002). "The PLRA attempts to eliminate unwarranted federal-court interference with the administration of prisons, and thus seeks to afford corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Woodford,* 126 S.Ct. at 2387 (internal quotation and citation omitted). "The benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance." *Id.* at 2388.

The PLRA mandates that **inmates** "properly" exhaust administrative remedies before filing suit in federal court. *Id.* at 2387. "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Id.* at 2386. Failure to substantially comply with procedural requirements of the applicable prison's grievance system will result in a procedural default of the claim. *Spruill v. Gillis,* 372 F.3d 218,

227-32 (3d Cir.2004). The PLRA "completely precludes a futility exception to its mandatory exhaustion requirement." *Nyhuis v. Reno,* 204 F.3d 65, 71 (3d Cir.2000).

**\*5** A **prisoner** does not have to allege in his compliant that he has exhausted administrative remedies. *Ray v. Kertes,* 285 F.3d 287 (3d Cir.2002). Failure to exhaust available administrative remedies is an affirmative defense. (Id.) As such, it must be pleaded and proven by the Defendants. *Brown v. Croak,* 312 F.3d 109, 111 (3d Cir.2002).

At the relevant time, the Pennsylvania Department of Corrections had and continues to have a Consolidated **Inmate** Grievance Review System. (Doc. 130, Taggart Declar., Ex. 1.) Pursuant to the existing procedure, an **inmate** is first required to make every effort to resolve an issue informally. Failure to attempt informal resolution will be considered in any appeal. (*See* DC-ADM 804 VI. A(5)). If an **inmate** is dissatisfied following attempts at informal resolution, he can file a grievance with the Facility Grievance Coordinator. Any appeal from the decision of the Grievance Coordinator is filed with the Facility Manager/Superintendent. An **inmate** can then pursue a final written appeal to the Secretary's Office of **Inmate** Grievances and Appeals. The Consolidated **Inmate** Grievance Review System sets forth specific mandates to which an **inmate** must adhere including time limitations and appeal requirements. [FN5]

FN5. Plaintiff challenges the copy of DC-ADM 804 submitted by Defendants as an exhibit to Ian Taggart's declaration in that the effective date of said policy statement is listed as January 3, 2005. He appears to raise this challenge because his claims arose, and he filed this action, well before the effective date of the particular version of DC-ADM 804 submitted. Plaintiff's challenge to the application of DC-ADM is not well taken in that, while this is the most recent version of DC-ADM 804, all of the prior versions set forth a three-tiered review procedure requiring initial review, appeal from initial review and then final review. While some change has occurred over the years, for example, with respect to where

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2828862 (M.D.Pa.)

(Cite as: 2006 WL 2828862 (M.D.Pa.))

appeals were to be filed, *i.e., Central Office Review Committee v. Chief Hearing Examiner v. Secretary's Office of **Inmate** Grievance and Appeals,* the underlying system has always been the same.

Defendants maintain that none of Plaintiff's claims are exhausted. In support of their argument, they offer the declaration of Ian Taggart, Assistant to the Superintendent at the State Correctional Institution at Camp Hill. As part of Taggart's duties, he serves in the position as Grievance Coordinator for the DOC. (Doc. 130, Taggart Declar. ¶¶ 1,2.) According to Taggart, the DOC **inmate** tracking system reveals that Plaintiff submitted the following 5 grievances in the year 2000 while at SCI-Camp Hill wherein he complained about legal matters: CAM-0210-2000; CAM0292-2000; CAM-0296-2000; CAM-0324-2000; and CAM-0439-2000. (*Id.* at ¶ 9.) In the year 2001, Plaintiff submitted 2 grievances wherein he complained about his property being withheld: CAM-0031-2001 and CAM-0130-2001. (*Id.* at ¶ 10.) Taggart states that none of the grievances submitted in 2000 set forth any claims against Defendants named in this action. Rather, they contest actions taken by William Ward, former SMU Manager at SCI-Camp Hill, and Robert Gimble, an SCI-Camp Hill Business Office employee. Plaintiff does, however, submit evidence that CAM-210-2000 is exhausted through the final appeal level. (Doc. 164, Plaintiff's Ex. D.) This fact has no relevance for purposes of this action in that the only individual named in said grievance and addressed in the responses thereto is William Ward, who is not a defendant in this action. Nothing else contained in the voluminous record submitted by Plaintiff in opposition to Defendants' motion disputes the fact that the remaining 4 grievances filed in 2000 are unexhausted.

There is no question that the 2 grievances filed by Plaintiff in 2001 set forth claims against Defendant Steigerwalt and relate to claims in this action-the withholding of legal property/failure to ship property to SCI-Pittsburgh. Defendants maintain from Taggart's declaration that neither grievance was exhausted through the final level of available appeal, and that CAM-130-2001 fails to identify any Defendant. (*Id.* at ¶ 19.) Plaintiff, however, submits documentation which

establishes that CAM-0130-2001 sets forth complaints against Defendant Steigerwalt, and was pursued through the final level of appeal. As such, this grievance is exhausted for purposes of review by this Court. (Doc. 164, Plaintiff's Ex. D.)

**\*6** While Defendants state that numerous additional request slips and letters complaining about various issues were submitted, Plaintiff only filed 3 other grievances (on or about March 25, 2002), and they pertained to the shipment of his 10 boxes of property from SCI-Camp Hill to SCI-Pittsburgh. Both Defendants and Plaintiff submit evidentiary materials which establish that Taggart contacted the Central Office in response to these grievances, and it was decided that these boxes would be shipped for free on the DOC's buses scheduled to travel to SCI-Pittsburgh. The record further establishes that the boxes were, in fact, shipped for free some time before April 16, 2002. (Doc. 130, Taggart Declar. ¶ 23 and Ex. 2; Doc. 164, Plaintiff's Ex. D.)

In attempting to further contest Defendants' exhaustion argument, Plaintiff claims that other grievances he did file were either never entered into or deleted by Defendants from the grievance tracking system. He submits evidence that he filed the following grievances not set forth by Defendants: CAM-855-1999; CAM-869-1999; CAM-889-1999; CAM-890-1999; CAM-0015-2000; CAM-673-2000; CAM-0022-2000; CAM-6776-2001; and CAM-4743-2001.[FN6] Many of these grievances were either not exhausted to the final level of appeal or dismissed without consideration because Plaintiff failed to attempt informal resolution or follow the appropriate steps in the **inmate** grievance procedure. (Doc. 164, Plaintiff's Ex. E, G.) The remaining grievances which do appear to be exhausted involve non-Defendants or issues not set forth in this action. (*Id.,* Ex. B, D, E and G.)

FN6. Plaintiff further references several grievances filed during the year 1998 while he was confined at SCI-Greene which clearly pre-date the claims set forth in the instant action. (Doc. 164, Plaintiff Ex. G.) He also includes a grievance filed after the commencement of this lawsuit (April 23, 2002) against two non-Defendants regarding issues not part of this

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2828862 (M.D.Pa.)

(Cite as: 2006 WL 2828862 (M.D.Pa.))

action.

The only other argument advanced by Plaintiff in opposition to Defendant's exhaustion argument is that Defendants failed to process some of his grievances/enter them into the system. The evidentiary materials submitted in this case are many. In reviewing the entire record, there is no question of material fact that there were occasions that Defendants did not process grievances submitted by Plaintiff. However, the record is also replete with support for the basis in not processing certain grievances. These reasons, supported by evidence submitted by both Defendants and Plaintiff himself, include repetitive grievances, failure to first attempt informal resolution and failure to follow the necessary grievance channels as set forth in the Consolidated **Inmate** Grievance Review System. (*See* Doc. 164, Plaintiff's Exs. C, E and H.) Based on the foregoing, with the exception of the claims raised in grievance CAM-130-2001 against Defendant Steigerwalt, all other claims appear to be unexhausted, thereby warranting the entry of summary judgment in favor of all other Defendants on the basis of exhaustion.

**B. Claims in Grievance CAM-130-2001**

Plaintiff filed grievance CAM-130-2001 on January 19, 2001, while confined at SCI-Camp Hill. In the grievance he asserts that he is filing the grievance against Blaine Steigerwalt who has denied him his legal property since January 9, 2001, thereby depriving him of access to the courts to file lawsuits and criminal appeals. He admits in the grievance that the reason for the alleged deprivation of property is due to the fact that Plaintiff refused to stop smearing feces and urine in his cell. Plaintiff argues that Defendant cannot use the deprivation of his property as a tool to get him to stop his behavior. (Doc. 164, Plaintiff's Ex. D, 1/19/01 Grievance.) From the submissions in the record, it appears that shortly after filing this grievance, Plaintiff was transferred to the LTSU at SCI-Pittsburgh on February 12, 2001. Through the appeals of this grievance, Plaintiff continued to seek the return of his legal property which apparently was still being held at SCI-Camp Hill. According to a copy of the decision on final review with regard to this grievance issued May 30, 2001, it was decided that Plaintiff was not entitled to have his legal property remaining at SCI-Camp Hill shipped to him

because he showed a negative balance in his **inmate** account of $1,394.85 at that point.

**\*7** Nowhere in this entire voluminous record does Plaintiff dispute the fact that he was a behavior problem during his confinement in the DOC. This is well documented throughout the submissions. Further, there are numerous places in the record where Plaintiff admits that he engaged in throwing feces and urine all over his cell in the SMU at Camp Hill, as well as engaged in other activities in an effort to spew his excretions out of the cell and into the tier. Defendants submit declarations and there are many documents establishing Defendants attempts to control Plaintiff's behavior and maintain control and sanitation at the prison. While there is evidence establishing that property was withheld from Plaintiff so that it would not be among the mess created by him, there is also evidence substantiating Defendants' declarations that Plaintiff was never deprived of access to his legal materials, and could always request access if needed. The record contains ample support that during his confinement on the occasions Defendants did attempt to provide Plaintiff with access to file his legal materials, Plaintiff failed to cooperate and, at times, would refuse the property. (Doc. 130, Southers Declar. ¶¶ 16, 18, 33 and Ex. 2 Responses to **Inmate** Requests and Grievances; Steigerwalt Declar. ¶ 5; Plaintiff's Ex. D, Response to 2/1/01 Grievance; Ex. G, Responses to **Inmate** Requests; Ward Memo/Affidavit.) Thus, while Plaintiff attempts to set forth an access to the courts claim in his grievance, he is unable to support such a claim. Although actual injury is a necessary requirement in stating an access to the courts claim, *see Lewis v. Casey,* 518 U.S. 343, 351-54 (1996), and Plaintiff does come forth with exhibits demonstrating that appeals to the Pennsylvania Supreme Court were dismissed during the relevant time period for failure to perfect or file briefs, the undisputed record establishes that Plaintiff was a proponent of his own demise. While Plaintiff unquestionably was denied possession of his legal materials from time to time, such deprivation was a result of his own admitted conduct. During these periods, Plaintiff was afforded the opportunity of access, however he chose not to cooperate with Defendants' efforts to accommodate him. Further, the many evidentiary materials submitted by Plaintiff in opposition to Defendants' motion certainly support the conclusion that during the relevant time period he was a

Not Reported in F.Supp.2d, 2006 WL 2828862 (M.D.Pa.)

(Cite as: 2006 WL 2828862 (M.D.Pa.))

prolific filer of documents including **inmate** request slips, correspondence and grievances.

While Plaintiff attempts to convince this Court that Defendant retaliated against him by withholding his legal materials because of his behavior in throwing **feces** and urine all over his cell, any claim of **retaliation** is clearly unsupported by the undisputed facts in the record. Actions taken in **retaliation** for the exercise of a constitutional right can form the basis of a § 1983 complaint, even when the act, taken for a different reason, might have been legitimate. *See White v. Napoleon, 897 F.2d 103, 111-12 (3d Cir .1990).* A plaintiff alleging **retaliation** bears the initial burden of showing that (1) he was engaged in a constitutionally **protected activity**; (2) that he suffered an "adverse action" at the hands of prison officials; and (3) that this constitutionally **protected activity** was the substantial or motivating factor in the prison officials' decision to discipline the plaintiff. *Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir.2003)*(citing *Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir.2000).* The burden then shifts to the defendant to show by a preponderance of the evidence that the plaintiff would have received the same punishment, or alternatively stated, that defendant would have taken the same action, absent the retaliatory motive for reasons reasonably related to a legitimate penological interest. *Rauser v. Horn, 241 F.3d 330, 333-34 (3d Cir.2001).*

**\*8** Grievance CAM-130-2001 can fairly be read to assert that Defendant Steigerwalt retaliated against Plaintiff by depriving him of legal property due to his smearing **feces** and urinating all over his cell.[FN7] Even taking Plaintiff's assertion as true, Defendants are still entitled to summary judgment on the **retaliation** claim. Plaintiff is clearly unable to establish that engaging in such conduct is constitutionally **protected activity**. Further, even if Plaintiff could demonstrate constitutionally **protected activity**, he has not demonstrated in the record before the Court that Defendants' actions failed to further legitimate state interests. In fact, the record supports the contrary conclusion. (*See* Doc. 130 Southers Declar. ¶¶ 16, 17-18, 26, 30; Beard Declar. ¶¶ 13-15; Steigerwalt Declar. ¶¶ 3-4, 7.) Thus, even if Plaintiff's claim of **retaliation** were viable, Defendants are still entitled to summary judgment.

FN7. In fact, throughout his consolidated complaint Plaintiff asserts that Defendants retaliated against him by confining him in a psychiatric observation cell, transferring him to the LTSU at SCI-Pittsburgh, restricting his access to his legal and religious property, etc.-all because he refused to stop smearing his feces and urine in his cell. (*See* Doc. 1, Compl. ¶ 27.)

Plaintiff also contends throughout not only grievance CAM-130-2001, but the entire record that the debt referred to by Defendants as the basis for not shipping his excess property from SCI-Camp Hill arose under his "old commitment," and therefore no longer existed when he was transferred. His claim is without merit. The record is undisputed that at the time Plaintiff was transferred from SCI-Greene, he had incurred a substantial debt in his **inmate** account. (Doc. 130, Maeyer Declar., Ex. 2.) Despite Plaintiff's unfounded belief that this debt was magically "extinguished" when he was transferred to the SMU at SCI-Camp Hill, the debt continued on with him through his Department of Corrections transfers. Finally, Defendants argument that any claim regarding the shipment of the 10 boxes from SCI-Camp Hill to SCI-Pittsburgh is moot is well-taken. The grievance submitted challenging the shipment of this property was March 25, 2002. By mid April 2002, the property had been shipped for free via prison buses to SCI-Pittsburgh. Thus, the matter was resolved within the prison grievance system, precisely the purpose behind administrative review. Based on the foregoing, the Court finds that Defendant Steigerwalt in entitled to summary judgment with regard to all claims raised against him.

## V. *Conclusion*

For the reasons set forth above, Defendants' motion for summary judgment (Doc. 111) will be granted. An appropriate Order is attached.

### *ORDER*

**NOW,** this 28th day of **SEPTEMBER, 2006,** for the reasons set forth in the foregoing Memorandum, **IT IS HEREBY ORDERED THAT:**

1. Defendants' Motion for Summary Judgment (Doc.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2828862 (M.D.Pa.)

(Cite as: 2006 WL 2828862 (M.D.Pa.))

111) is **GRANTED.**

2. The Clerk of Court is directed to enter judgment in favor of all Defendants and to mark this matter **CLOSED.**

M.D.Pa.,2006.

Ferrell v. Beard
Not Reported in F.Supp.2d, 2006 WL 2828862 (M.D.Pa.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2005 WL 1460424 (N.D.N.Y.)
(Cite as: 2005 WL 1460424 (N.D.N.Y.))

H

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Edward P. GRIFFIN-NOLAN, Plaintiff,
v.
PROVIDENCE WASHINGTON INSURANCE
COMPANY and Howard Blute, in his Individual
Capacity as Manager for the Business Development
Executives at Washington Insurance Company,
Defendants.
**No. 504CV1453FJSGJD.**

June 20, 2005.

Chamberlain, D'Amanda, Oppenheimer & Greenfield
LLP, The Galleries of Syracuse, Syracuse, New York, for
Plaintiff, Mairead E. Connor, of counsel.

City of Syracuse Corporation Counsel, Syracuse, New
York, for Defendants, David H. Walsh, IV, of counsel.

MEMORANDUM-DECISION AND ORDER

SCULLIN, Chief J.

I. INTRODUCTION

**\*1** Plaintiff's complaint asserts (1) a 42 U.S.C. § 1983
cause of action for false arrest and denial of First
Amendment rights against Defendants City of Syracuse
("City"), Mullen, and Hennessey, alleging that Defendants
arrested him for speaking to Defendant officers about their
conduct in arresting a third-party; (2) a § 1983 cause of
action for false arrest and denial of First Amendment
rights against all Defendants, alleging that they arrested
him because they believed he might file a complaint of

police misconduct; (3) a § 1983 cause of action for failure
to train against Defendant City, alleging that Defendant
City acted with deliberate indifference in failing to train its
officers with respect to what constitutes the crime of
obstruction of justice and how to handle the public; (4) a
§ 1985(3) cause of action against all Defendants for
conspiracy to deprive him of the equal protection of the
law and of his equal privileges and immunities, alleging
that Defendants conspired to so deprive him out of animus
for his attempt to prevent them from injuring a
third-person on the basis of that third-person's race or
color; (5) a common law false arrest claim against all
Defendants; (6) a common law false imprisonment claim
against Defendants Mullen, Cecile, and City; (7) a
common law malicious prosecution claim against all
Defendants; (8) a common law libel claim against
Defendant Hennessey, alleging that he made false
statements in his Complaint Information; and (9) a claim
for attorney's fees pursuant to 42 U.S.C. § 1988.

Based upon these claims, Plaintiff seeks (1) declaratory
relief with respect to all causes of action, (2) injunctive
relief with respect to all causes of action other than those
made pursuant to § 1983, (3) compensatory damages, (4)
exemplary or punitive damages, and (5) costs,
disbursements, and legal fees.

Currently before the Court is Defendants' motion to
dismiss Plaintiff's complaint pursuant to Rules 12(b)(5)
and 12(b)(6) of the Federal Rules of Civil Procedure.[FN1]

> FN1. Defendants' motion to dismiss does not
> address Plaintiff's claim for attorney's fees
> pursuant to 42 U.S.C. § 1988.

II. BACKGROUND [FN2]

> FN2. Given the procedural posture of this case,
> the Court assumes the truth of the allegations in
> Plaintiff's complaint.

On the evening of December 16, 2003, Plaintiff was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1460424 (N.D.N.Y.)
(Cite as: 2005 WL 1460424 (N.D.N.Y.))

working as a licensed massage therapist at his booth in the Carousel Center mall. *See* Dkt. No. 1 at ¶ 10. Around 8:00 p.m. of that evening, he saw a "Hispanic man of color" ("Paredes") walking toward him and noticed a mall security officer pointing Paredes out to Defendants Hennessey and Mullen. *See id.* at ¶ 11. When Defendant Hennessey tried to stop Paredes by placing his hand on Paredes' chest, Paredes spat on the floor and continued shouting that he was going to kill someone. *See id.* at ¶ 12. Defendant Hennessey then took Paredes behind Plaintiff's booth, told him to show some respect, and smashed his back and head against a concrete pillar. *See id.* at ¶¶ 13-14. Paredes then either pushed or kicked at Defendant Hennessey, at which point they both tumbled and knocked over Plaintiff's booth. *See id.* at ¶¶ 15-16. With Paredes face-down on the floor, Defendant Hennessey placed his knee in Paredes' back and began punching him in the back. *See id.* at ¶¶ 18-19. Defendant Mullen then also placed his knee in Paredes' back and began punching him in the back and sides. *See id.* at ¶ 21. Defendant officers each hit Paredes six or more times after they had subdued him. *See id.* at ¶ 22.

**\*2** Plaintiff crouched by Defendant officers and told them that they had gone over the top and were out of control. *See id.* at ¶ 24. Defendant Mullen told Plaintiff to get back, and Plaintiff complied. *See id.* at ¶¶ 26-27. After Defendant officers continued to punch Paredes in the back, Plaintiff again told them that they were over the top. *See id.* at ¶¶ 28-29. Defendant Mullen told Plaintiff that, if he did not stop, he would be arrested for Obstructing Governmental Administration. *See id.* at ¶ 30. Plaintiff stopped speaking to Defendant officers, and they pulled Paredes up and led him away. *See id.* at ¶¶ 31-32.

At approximately 9:00 p.m., Defendant Mullen returned to Plaintiff's booth with Defendant Cecile and a mall security guard. *See id.* at ¶ 33. Defendant Cecile told Plaintiff that he understood that Plaintiff had been involved in an incident earlier in the evening and asked Plaintiff to explain what happened. *See id.* at ¶ 34. As soon as Plaintiff began to explain, Defendant Cecile stopped him and asked him whether he understood that he could be arrested. *See id.* at ¶ 35. Defendant Cecile told Plaintiff that, at the time of the incident, it was Defendants Hennessey's and Mullen's call whether to arrest Plaintiff but that, if Plaintiff made a complaint, it would be his call whether to arrest Plaintiff. *See id.* at ¶ 37. After Plaintiff

said that he was not sure how the complaint procedure worked, Defendant Cecile showed Plaintiff the patch on his shoulder and said, " 'It's right here with me, right now." ' *See id.* at ¶¶ 38-39. Plaintiff told Defendant Cecile that he did not think that this was the only way to file a complaint. *See id.* at ¶ 40. Defendant Cecile then told Plaintiff that, if he filed a complaint, Defendant Cecile would take him down. *See id.* at ¶ 41. Next, Defendant Cecile told Defendant Mullen, " 'He's not happy. We're going to get a complaint. Take him in,' or words to that effect." *See id.* at ¶ 42. When Plaintiff said that he had things at his booth that he could not leave unsecured, Defendant Cecile told him that he should have thought of that before. *See id.* at ¶ 44. Upon Defendant Cecile's direction, Defendant Mullen arrested Plaintiff for Obstructing Governmental Administration by giving him an appearance ticket. *See id.* at ¶¶ 45-46.

That same night, Defendant Hennessey submitted a complaint information affidavit in support of Plaintiff's arrest. *See id.* at ¶ 47. The affidavit contained a number of statements that were false and that Defendant Hennessey knew to be false when he made them. *See id.* at ¶¶ 48-49. Plaintiff's counsel filed a motion to dismiss the information for insufficiency. *See id.* at ¶ 51. On January 10, 2004, the Syracuse City Court dismissed the information in its entirety. *See id.* at ¶ 52.[FN3] In or about November 2004, Carousel Center management informed Plaintiff that he could not set up his booth during the holiday season because it was concerned about potential negative publicity arising from these incidents. *See id.* at ¶ 53.

FN3. It appears to the Court that this dismissal actually occurred on January 14, 2004, and was made pursuant to New York Criminal Practice Law § 170.40. *See* Dkt. No. 9 at Pt. 5.

**\*3** Plaintiff filed the instant action on December 15, 2004. *See* Dkt. No. 1.

III. DISCUSSION

A. Defendants' motion to dismiss for insufficient service of process pursuant to Rule 12(b)(5) of the Federal Rules

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1460424 (N.D.N.Y.)
(Cite as: 2005 WL 1460424 (N.D.N.Y.))

of Civil Procedure

Defendants argue that the Court lacks personal jurisdiction over them because Plaintiff failed to serve them with summonses. The docket sheet contains four affidavits of service that indicate that each Defendant was served with the summons and the complaint sometime between January 12, 2005, and January 26, 2005. *See* Dkt. Nos. 5-8. Perhaps these affidavits are mistaken; Plaintiff's counsel has filed an affidavit stating that Plaintiff personally served summonses and complaints for all Defendants upon Defendants' counsel on February 8, 2005, one day after Defendants filed their motion to dismiss. *See* Dkt. Nos. 9, 14 at ¶ 4. Since Defendants do not address insufficiency of service of process in their reply memorandum of law, the Court presumes that they were served summonses and are abandoning their motion to dismiss pursuant to Rule 12(b)(5) of the Federal Rules of Civil Procedure. Regardless, both Local Rule 7.1(a)(2) and common sense dictate that a motion to dismiss for a failure to serve summonses requires a supporting affidavit, which Defendants have not provided. *See* L.R. 7.1(a)(2). Accordingly, the Court denies Defendants' motion to dismiss Plaintiff's complaint pursuant to Rule 12(b)(5) of the Federal Rules of Civil Procedure.

B. Defendants' motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure

*1. Standard of review*

In considering a motion to dismiss for failure to state a claim, the court must accept the allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party. *See Burnette v. Carothers, 192 F.3d 52, 56 (2d Cir.1999).* Hence, dismissal is appropriate only if " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." ' *Sheppard v. Beerman, 18 F.3d 147, 150 (2d Cir.1994)* (quotation omitted).

*2. Defendant City's liability for Plaintiff's § 1983 claims*

A municipality may only be held liable under § 1983 when its policies or customs result in a plaintiff's constitutional injury. *See Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 694 (1978).* The existence of a policy or custom may be inferred when a plaintiff presents evidence that a " 'municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction...." ' *DeCarlo v. Fry, 141 F.3d 56, 61 (2d Cir.1998)* (quotation and footnote omitted). Contrary to some earlier Second Circuit cases, there is no heightened pleading requirement for claims of municipal liability. *See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 167-68 (1993)* (rejecting contention that "plaintiff must do more than plead a single instance of misconduct" to state a claim for municipal liability); *contra Dwares v. City of N.Y., 985 F.2d 94, 100 (2d Cir.1993)* (citation omitted). As the Supreme Court noted, "federal courts and litigants must rely on summary judgment and control of discovery to weed out unmeritorious claims sooner rather than later." *Leatherman, 507 U.S. at 168-69.*

**4** Plaintiff's complaint alleges that Defendant City has a policy or custom of threatening those who verbally challenge, or indicate the desire to file a complaint about, police misconduct with Obstructing Governmental Administration and that Defendant City has shown deliberate indifference in failing to train its police officers in how to handle the public while making arrests and failing to train its officers about what constitutes the crime of Obstructing Governmental Administration. *See* Dkt. No. 1 at ¶¶ 55, 64, 71-73. Plaintiff's allegations of municipal liability are directly related to his allegation of personal injury and, if shown to be true according to the evidence, might support a determination of municipal liability. Accordingly, the Court denies Defendants' motion to dismiss Plaintiff's § 1983 claims against Defendant City for failure to adequately plead municipal liability.

*3. Plaintiff's § 1983 and common law false arrest and false imprisonment claims*

*a. elements of false arrest and false imprisonment*

"The elements of false arrest ... under § 1983 are

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1460424 (N.D.N.Y.)
(Cite as: 2005 WL 1460424 (N.D.N.Y.))

'substantially the same' as the elements under New York law." *Boyd v. City of N.Y.,* 336 F.3d 72, 75 (2d Cir.2003) (quotation omitted). The elements of false arrest and false imprisonment claims are identical: " '(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." ' *See Curry v. City of Syracuse,* 316 F.3d 324, 335 (2d Cir.2003) (quotation omitted).

The central dispute between the parties is whether the issuance of an appearance ticket constitutes the requisite confinement.

*b. common law false arrest and false imprisonment*

Every New York case of which the Court is aware that has considered whether the issuance of an appearance ticket constitutes confinement has held that the issuance of an appearance ticket, in and of itself, does not constitute confinement for purposes of a common law false arrest or false imprisonment claim. *See Du Chateau v. Metro–North Commuter R.R. Co.,* 253 A.D.2d 128, 129, 132 (1st Dep't 1999) (citations omitted) (police officer escorted plaintiff from train, talked to him, and issued an appearance ticket); *Kramer v. Herrera,* 176 A.D.2d 1241, 1241 (4th Dep't 1991) (citations omitted); *Pozzanghera v. Anderson,* 136 A.D.2d 912, 913 (4th Dep't 1988) ("Plaintiff's sole contention is that he was detained by the service of an appearance ticket. This did not restrict plaintiff's freedom and, therefore, does not form a basis for his wrongful arrest claim." (citation omitted)); *Pritchett v. State,* 61 A.D.2d 1110, 1110 (3d Dep't 1978); *cf. Reinhart v. Jakubowski,* 239 A.D.2d 765, 766 (3d Dep't 1997) (issuance of criminal summons requiring court appearance insufficient to support false arrest claim); *Vill. of Ellenville v. Searles,* 235 A.D.2d 692, 693 (3d Dep't 1997) (brief traffic stop in order to serve process did not constitute requisite confinement) (citations omitted).

**\*5** Plaintiff contends, however, that his complaint alleges more than the mere issuance of an appearance ticket. Conduct that accompanies the issuance of an appearance ticket certainly can constitute confinement for purposes of a false arrest or false imprisonment claim. *See Wiggins v. Metro–North Commuter R.R. Co.,* 228 A.D.2d 198, 198 (1st Dep't 1996) (police escorted plaintiff off train, questioned him in a railroad police facility, and issued an appearance ticket). Unfortunately, Plaintiff does not specify which of his allegations he believes show that Defendants confined him. The relevant allegations are:

33. Approximately one hour later, at about 9:00 p.m., Officer Mullen returned to Plaintiff's booth with [Sergeant Cecile] and a mall security guard.

34. Sergeant Cecile told Plaintiff that he understood he had been involved in an incident earlier and asked the Plaintiff what happened.

35. As the Plaintiff began to tell him, Sergeant Cecile interrupted Plaintiff and asked if Plaintiff understood that he could be arrested.

36. Plaintiff was quite surprised at this statement as he had complied with Officer Mullen's directive and had not interfered with Paredes' arrest or done anything unlawful.

37. Sergeant Cecile said that right then it was the officer's call, but if they were going to receive a complaint from the Plaintiff, it would be his call whether to arrest Plaintiff.

38. Plaintiff said that he was not sure how the complaint procedure worked.

39. Sergeant Cecile showed Plaintiff the patch on his shoulder and said, "It's right here with me, right now."

40. Plaintiff said that he did not think that was the only way to file a complaint.

41. Sergeant Cecile then told Plaintiff, "I'll tell you right now if you're filing a complaint, I'm taking you down," or words to that effect.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1460424 (N.D.N.Y.)
(Cite as: 2005 WL 1460424 (N.D.N.Y.))

42. Sergeant Cecile told Officer Mullen, "He's not happy. We're going to get a complaint. Take him in," or words to that effect.

43. Plaintiff explained that he had expensive things in his booth that he could not leave unsecured.

44. Sergeant Cecile told Plaintiff that he should have thought of that before.

45. Sergeant Cecile told Officer Mullen to give Plaintiff an appearance ticket, which Officer Mullen did.

*See* Dkt. No. 1 at ¶¶ 33-45. Although Plaintiff alleges that Defendant Cecile threatened to arrest him, the mere threat to arrest does not constitute confinement. *See Blumenfield v. Harris,* 3 A.D.2d 219, 220 (1st Dep't 1957) (citations omitted), *aff'd* 3 N.Y.2d 905 (1957).[FN4]

> FN4. In articulating his first cause of action, Plaintiff alleges that "[i]n the course of arresting Plaintiff, plaintiff was not free to leave and was confined against his will at the Carousel Center." *See* Dkt. No. 1 at ¶ 58. However, in light of the more specific allegations that Plaintiff made in his statement of facts, this allegation is too vague and conclusory to support a reasonable inference that Defendants confined him.

Accepting all of Plaintiff's allegations as true and drawing every reasonable inference from them, the Court does not find that he has alleged that Defendants took any actions that would constitute confinement for purposes of a common law false arrest or false imprisonment claim. Accordingly, the Court grants Defendants' motion to dismiss Plaintiff's common law false arrest and false imprisonment claims for failure to state a claim.

*c. § 1983 false arrest*

*6 The question of whether the issuance of an appearance ticket constitutes confinement for purposes of § 1983 is not so clear. Defendants rely upon *Angel v. Kasson,* 581 F.Supp. 170, 177-78 (N.D.N.Y.1983) ("[I]t [is] well settled that the issuance of such tickets under the provisions of N.Y.Crim. Proc. Law § 150.10 does not constitute an arrest." (citation and footnote omitted)). Plaintiff, on the other hand, relies upon *Dorman v. Castro,* 214 F.Supp.2d 299 (E.D.N.Y.2002), which states that,

> [a]lthough this is a close case, the Court finds that Plaintiffs were subject to a "seizure" under the Fourth Amendment. Plaintiffs claim that their liberty was restrained because "at the point when the Plaintiffs were informed that they were being issued a Summons" they "were not free to leave until the Plaintiffs had the Summons in hand."

*Id.* at 308 (quotation omitted). *Dorman* goes on to note that "district courts in this circuit that have analyzed *Murphy [v. Lynn,* 118 F.3d 938 (2d Cir.1997) ], however, have held that the mere issuance of an appearance ticket, without any restraint on travel, is a sufficient restraint of liberty to constitute a 'seizure' under the Fourth Amendment." *Id.* (citing *Kirk v. Metropolitan Trans. Auth.,* No. 99 CV 3787, 2001 WL 258605, *15 (S.D.N.Y. Mar. 14, 2001); *Kirton v. Hassel,* No. 96 CV 1371, 1998 WL 146701, *6 (E.D.N.Y. Mar. 25, 1998); *Sassower v. City of White Plains,* 992 F.Supp. 652, 656 (S.D.N.Y.1998)) (other citation omitted).[FN5]

> FN5. Contrary to *Dorman's* statement, two of the supporting cases it cites do not involve appearance tickets and the third, *Kirk,* involves a desk appearance ticket that the defendant issued after the plaintiff had been arrested and detained. *Kirk,* 2001 WL 258605, *2-*4.

*Dorman* and all the supporting cases that it cites rely upon *Murphy. Murphy,* applying *Albright v. Oliver,* 510 U.S. 266 (1994), held that, in order for a plaintiff to establish a § 1983 malicious prosecution claim, he "must show ... that the initiation or pendency of judicial proceedings" resulted in a Fourth Amendment "seizure." *Murphy,* 118 F.3d at 944. The court went on to hold that "[t]he liberty deprivations regulated by the Fourth Amendment are not limited to physical detention." *Id.* at 945. Finally, the

Not Reported in F.Supp.2d, 2005 WL 1460424 (N.D.N.Y.)
(Cite as: 2005 WL 1460424 (N.D.N.Y.))

court, relying upon Justice Ginsburg's solitary concurrence in *Albright,* held that

> while a state has the undoubted authority, in connection with a criminal proceeding, to restrict a properly accused citizen's constitutional right to travel outside of the state as a condition of his pretrial release, and *may order him to make periodic appearances,* such conditions are appropriately viewed as seizures within the meaning of the Fourth Amendment.

*Id.* at 946 (emphasis added).

Like *Murphy,* all three of the supporting cases that *Dorman* cites concern malicious prosecution claims. There is certainly considerable similarity between the analysis of a § 1983 malicious prosecution claim and a § 1983 false arrest claim; both arise out of the Fourth Amendment's protection against unreasonable seizures. However, *Murphy* does not expressly address false arrest claims. Furthermore, there is reason to constrain the application of *Murphy* to the precise issues it addresses. Judge Jacobs, dissenting in *Murphy,* after noting the majority's reliance upon Justice Ginsburg's solitary concurrence, pointed out that "'[a] probable cause determination is required only for 'those suspects who suffer restraints on liberty *other* than the condition that they appear for trial." ' *Id.* at 953, 955 (quoting *Gerstein [v. Pugh],* 420 U.S. [103,] 125 n. 26, 95 S.Ct. [854,] 869 n. 26 [ (1975) ] (Judge Jacobs' emphasis)) (footnote omitted). In *Sassower,* Judge Lowe noted the novelty of the *Murphy* holding and quoted Judge Jacobs' statement that " 'strange is the majority's holding that [plaintiff] was seized within the meaning of the Fourth Amendment because he was required to appear in court." ' *Sassower,* 992 F.Supp. at 655, 656 (quotation omitted).

**\*7** Although in the context of a malicious prosecution claim *Murphy* would be controlling, given the tenuousness of its reasoning, the Court holds that the issuance of an appearance ticket does not, in and of itself, constitute confinement for purposes of a § 1983 false arrest or false imprisonment claim. Furthermore, since the circumstances surrounding the issuance of the appearance ticket in this case do not present any alternative forms of the restraint of Plaintiff's liberty, the Court grants Defendants' motion to dismiss Plaintiff's § 1983 false arrest claims for failure to state a claim.

**4. Plaintiff's § 1983 First Amendment claims**

Second Circuit First Amendment retaliation case law is, to put it mildly, confusing. There are at least three formulations of the elements of a First Amendment retaliation claim. *See Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) ((1) protected speech or conduct, (2) the defendant's adverse action against the plaintiff, and (3) " 'a causal connection between the protected speech and the adverse action" ' (quotation omitted)); *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals,* 282 F.3d 83, 91 (2d Cir.2002) ((1) conduct that the First Amendment protects that (2) prompts or substantially causes the defendant's action (citations omitted)); *Curley v. Vill. of Suffern,* 268 F.3d 65, 73 (2d Cir.2001) ((1) protected speech or conduct that (2) motivates or substantially causes the defendant's action, which action (3) effectively chills the plaintiff's exercise of his First Amendment right (citation omitted)).

In an attempt to make sense of this case law, one approach is to distinguish cases according to broad types. The great majority of First Amendment retaliation cases arise in the prisoner and public employee contexts. Less typical are those cases, like the one currently before the Court, in which a private citizen alleges that state actors took some action against him in retaliation for his exercise of his First Amendment rights. Unfortunately, even in this subset of cases, there is disagreement about the elements of the claim. The most recent case in this subset to set forth the elements of a First Amendment retaliation claim is *Dougherty.* In that case, the plaintiff alleged that the defendants had revoked a previously issued building permit in retaliation for his exercise of his First Amendment rights. Although the court indicated that there may have been additional protected speech, it specifically noted the plaintiff's allegation that the permit revocation occurred soon after the defendants' receipt of his opposition papers to their motion to dismiss an action that he had filed in relation to an earlier denial of a permit. *See Dougherty,* 282 F.3d at 91-92. The court held that the circumstances that the plaintiff alleged gave rise to a sufficient inference of a causal relationship between his protected conduct and the defendants' action to withstand a motion to dismiss. *See id.* at 92.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1460424 (N.D.N.Y.)
(Cite as: 2005 WL 1460424 (N.D.N.Y.))

**\*8** The next most recent case in the subset of private citizen plaintiffs is *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn,* 280 F.3d 98 (2d Cir.2001). *Garcia* involved a student who claimed that the defendants dismissed him from medical school in retaliation for his exercise of his First Amendment rights. The court followed the same formulation of the elements of a First Amendment retaliation claim as did *Gill* but concluded that the plaintiff's assertions did not satisfy the third element of that formulation. *See id.* at 106-07 (quotation and other citation omitted).

After *Garcia,* the next most recent case in this subset is *Curley.* The facts of that case are more analogous to those of the instant action than are those of either *Dougherty* or *Garcia.* The plaintiff in *Curley* alleged that the defendants arrested him in retaliation for comments that he had made while campaigning for municipal office about a police cover-up and failure to discipline. *See Curley,* 268 F.3d at 72-73. The court found that the defendants were entitled to summary judgment on the plaintiff's First Amendment retaliation claim because the existence of probable cause to arrest him negated the second element of such a claim and because the fact that the plaintiff continued his campaign and later campaigned for another municipal office negated the third, "chilling," element of the claim. *See id.* at 73.

*Curley* is distinguishable from *Dougherty* and *Garcia.* All the Second Circuit cases that the Court has found involving a private citizen plaintiff who alleges that the defendant arrested him in retaliation for his exercise of his First Amendment rights have articulated the same formulation of the elements of a First Amendment retaliation claim as did *Curley. See Kerman v. City of N.Y.,* 261 F.3d 229, 241-42 (2d Cir.2001) (citation omitted); *Connell v. Signoracci,* 153 F.3d 74, 79 (2d Cir.1998) (citations omitted). Although it might be difficult to explain the distinction between private citizen arrestee plaintiff cases and the other private citizen plaintiff cases, the distinction is present in the case law. Therefore, the Court will follow the *Curley* formulation of the elements of a First Amendment retaliation claim.[FN6]

FN6. The only Second Circuit case that Plaintiff

cites in support of his First Amendment retaliation claims is *Gagliardi v. Vill. of Pawling,* 18 F.3d 188, 194 (2d Cir.1994). *Gagliardi* applies the same formulation of the elements of the claim as does *Dougherty. See id.* at 194 (quotation and other citations omitted). However, *Gagliardi,* like *Dougherty,* is a private citizen zoning dispute case rather than a private citizen arrestee case.

The only challenge [FN7] that Defendants currently make to Plaintiff's First Amendment retaliation claims is that he fails to allege that they prevented him from filing a compliant, i.e., he fails to allege that Defendants' actions effectively chilled him from exercising his First Amendment rights. However, this challenge reads Plaintiff's claims too narrowly. Two distinct forms of speech are at issue in Plaintiff's first two causes of action. Plaintiff's first cause of action alleges that he verbally complained about Defendants' actions during the course of their arrest of Paredes. From Plaintiff's second cause of action, it may be reasonably inferred that he also desired to file a formal complaint about Defendants' actions after the arrest incident. With respect to the second cause of action, Plaintiff has not alleged that Defendants' actions effectively chilled him from filing a complaint. Therefore, Plaintiff's second cause of action fails to state a First Amendment claim. Accordingly, the Court grants Defendants' motion to dismiss the First Amendment claims in Plaintiff's second cause of action for failure to state a claim.

FN7. It is possible that Plaintiff's conduct in criticizing Defendants' actions during the course of their arrest of Paredes may not be protected activity. If the allegations in Defendant Hennessey's affidavit in support of the complaint information are true, Defendants likely had probable cause to arrest Plaintiff for Obstructing Governmental Administration and, thus, their threat to arrest him on that charge was privileged. *See* Dkt. No. 1 at ¶ 48. However, since Defendants have not raised the issue of whether Plaintiff's conduct was privileged, and the Court must accept the allegations in Plaintiff's complaint as true, the Court cannot address this issue at this time.

Not Reported in F.Supp.2d, 2005 WL 1460424 (N.D.N.Y.)
(Cite as: 2005 WL 1460424 (N.D.N.Y.))

**\*9** However, with respect to Plaintiff's first cause of action, the Court finds that it may reasonably infer from the complaint that Defendants' conduct effectively chilled Plaintiff's speech. The relevant allegations are:

   24. Plaintiff then crouched down and told the officers that they were "over the top" and that they were "out of control" or words to that effect.

   25. Plaintiff did this because the police officers were brutalizing Paredes.

   26. Officer Mullen told Claimant to get back.

   27. Claimant complied by stepping back.

   28. Officers Mullen and Hennessey then continued to punch Paredes on the back after Paredes was subdued.

   29. Plaintiff told the officers again that they were "over the top" or words to that effect.

   30. Officer Mullen then told the Plaintiff that if he didn't stop, he would be arrested for Obstructing Governmental Administration.

   31. Plaintiff stopped speaking to the officers.

*See* Dkt. No. 1 at ¶¶ 24-31. Accordingly, since Plaintiff has sufficiently alleged that Defendants' (or at least Defendant Mullen's) actions effectively chilled his exercise of his First Amendment rights, the Court denies Defendants' motion to dismiss Plaintiff's § 1983 First Amendment claims in his first cause of action for failure to state a claim.

*5. Plaintiff's § 1985(3) claims*

Defendants have asserted three bases for the dismissal of

Plaintiff's § 1985(3) claims. First, they argue that Plaintiff, as a white person, lacks standing to assert a § 1985(3) claim. Second, they contend that Defendants, as agents or employees of a corporate entity, by definition, may not conspire with one another. Finally, they assert that Plaintiff's factual allegations are insufficient to state a conspiracy claim.

*i. standing*

Despite the age and extensive use of § 1985(3), case law contains little discussion of the question of who has standing to assert a claim under that statute.[FN8] However, the Court finds that the case law provides sufficient guidance to answer the question currently before it: whether a non-minority person who alleges that he was injured by a conspiracy that aimed to deprive minority persons of the equal protection of the law has standing to assert a § 1985(3) claim.

   FN8. The parties have cited conflicting precedents, none of which are binding on this Court. Defendants cite two cases for the proposition that a plaintiff asserting a § 1985(3) claim must himself be a member of a class that the statute protects: *Puglisi v. Underhill Park Taxpayer Ass'n,* 947 F.Supp. 673, 692 (S.D.N.Y.1996) (citations omitted); *McLoughlin v. Altman,* No. 92 Civ. 8106, 1993 WL 362407, *6 (S.D.N.Y. Sept. 13, 1993)* (citation omitted). Although *McLoughlin* cites *Griffin v. Breckinridge,* [403 U.S. 88, 102,] 91 S.Ct. 1790, 1798 (1971), for the proposition that "a claimant must show, among other things, that she belonged to the type of class that is protected by that statute," *McLoughlin,* 1993 WL 362407, at *6,* it does not appear that *Griffin* stands for such a proposition. Likewise, although *Puglisi* discusses several other cases, when it holds "that plaintiff cannot bring this § 1985(3) claim because ... plaintiff is not a member of the class protected by the statute nor a member of the race triggering the alleged racial discrimination[,]" *McLoughlin* is the only case that the court cited that supports this holding. *Puglisi,* 947 F.Supp. at 692.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1460424 (N.D.N.Y.)
(Cite as: 2005 WL 1460424 (N.D.N.Y.))

The cases upon which Plaintiff relies are also suspect. He contends that a white person who has sought to vindicate the rights of members of a racial minority and against whom the defendants conspire has standing to assert a § 1985(3) claim. He cites three primary cases to support this proposition: *Maynard v. City of San Jose,* 37 F.3d 1396, 1403-04 (9th Cir.1994) (citations and footnote omitted); *Pisello v. Town of Brookhaven,* 933 F.Supp. 202, 216 (E.D.N.Y.1996) (citing *Maynard* ); *Bryant v. Polston,* No. IP 00-1064-C-T/G, 2000 WL 1670938, *7 (S.D.Ind. Nov. 2, 2000)* (citing *Maynard* ). In *Maynard,* the Ninth Circuit sought to apply the law of that circuit which provided that "[p]laintiffs have standing under Section 1985 only if they can show they are members of a class that the government has determined 'require[s] and warrant[s] special federal assistance in protecting their civil rights." ' *Maynard,* 37 F.3d at 1403 (quotations and other citation omitted). The court reasoned that, because Title VII "grants special protection to whites who are denied association with members of other groups because of an employer's discriminatory practices" and "to all employees-regardless of race-who are subjected to retaliation for assisting in the investigation of discriminatory employment practices," such persons may have standing to assert a § 1985(3) claim. *Id.* (citation omitted). The plaintiff in *Maynard* had alleged that his employer and other defendants had retaliated against him for complaining about discriminatory hiring practices. *See id.* at 1399-1400. Since it does not appear that the Second Circuit has articulated a general statement of the requirement for standing under § 1985(3), the Court does not find *Maynard* persuasive.

The Supreme Court has discussed the statute's purpose: "[t]he predominant purpose of § 1985(3) was to combat the prevalent animus against Negroes and their supporters. The latter included Republicans generally, as well as others, such as Northerners who came South with sympathetic views towards the Negro." *United Bhd. of Carpenters & Joiners of Am., Local 610, AFL-CIO v.*

*Scott,* 463 U .S. 825, 836 (1983). This statutory purpose implies that, if a white person who sought to vindicate the rights of members of a racial minority were injured by a conspiracy that aimed to deny members of that racial minority of the equal protection of the laws, he would have standing to assert a § 1985(3) claim.

**\*10** At least two Courts of Appeals have expressly held that a plaintiff asserting a § 1985(3) claim need not himself be a member of a class that the statute protects. *See Cutting v. Muzzey,* 724 F.2d 259, 260 (1st Cir.1984) (holding that a non-Italian had standing to assert a § 1985(3) claim against members of a town planning board who allegedly conspired to deprive Italians of access to housing); *Novotny v. Great Am. Fed. Sav. & Loan Ass'n,* 584 F.2d 1235, 1244 (3d Cir.1978) (*en banc* ) ("[M]embers of a conspiracy to deprive women of equal rights are liable under § 1985(3) to persons who are injured in furtherance of the object of the conspiracy, whether male or female."), *vacated on other grounds,* 442 U.S. 366 (1979).[FN9] Although the Second Circuit has not addressed whether a white person may have standing to assert a § 1985(3), the Court finds that, in light of the discussion in *Scott,* the holdings of *Cutting* and *Novotny* are persuasive. Therefore, the Court concludes that the fact that Plaintiff is white does not, in and of itself, bar him from asserting a § 1985(3) claim. Consequently, since Plaintiff has alleged that a conspiracy whose object was to deprive the constitutional rights of a member of a racial minority injured Plaintiff while he was seeking to vindicate those rights, the Court finds that he has adequately alleged standing for his 42 U.S.C. § 1985(3) claim.

FN9. The Supreme Court vacated *Novotny* because the plaintiff in that case alleged that the conspiracy that injured him had the goal of depriving women of their Title VII rights. The Court held that, because allowing a plaintiff to base a § 1985(3) cause of action upon rights that Title VII created would circumvent the procedural requirement that Congress had built into Title VII, "deprivation of a right created by Title VII cannot be the basis for a cause of action under § 1985(3)." *Novotny,* 442 U.S. at 378. Since the Fourth Amendment creates the rights of Paredes of which Plaintiff alleges Defendants conspired to deprive him, the Court's holding

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1460424 (N.D.N.Y.)
(Cite as: 2005 WL 1460424 (N.D.N.Y.))

does not bar Plaintiff's action.

*ii. intra-corporate conspiracy doctrine*

" 'Under the intracorporate conspiracy doctrine, officers, agents and employees of a single corporate entity are legally incapable of conspiring together[ ]' " while acting within the scope of their employment. *Nassau County Employee "L" v. County of Nassau,* 345 F.Supp.2d 293, 304 (E.D.N.Y.2004) (quotations and other citations omitted); *see Crudele v. City of N.Y. Police Dep't,* No. 97 Civ. 6687, 2004 WL 1161174, *5 (S.D.N.Y. May 24, 2004) (citations omitted). Although courts first applied this doctrine to cases involving public corporations, they have subsequently held that the doctrine is applicable to municipal entities and their officers, agents, and employees. *See County of Nassau,* 345 F.Supp.2d at 304 (citation omitted); *Cameron v. Church,* 253 F.Supp.2d 611, 623 (S.D.N.Y.2003) (quotation omitted). "However, '[a]n exception to the intracorporate conspiracy doctrine applies to individuals within a single entity when they are pursuing personal interests wholly separate and apart from the entity.' " *County of Nassau,* 345 F.Supp.2d at 304-05 (quotation omitted); *see Stoner v. N.Y. City Ballet Co.,* No. 99 Civ. 0196, 2002 WL 523270, *9 (S.D.N.Y. Apr. 8, 2002) (quotation and other citation omitted).

Individual Defendants are officers of Defendant City. *See* Dkt. No. 1 at ¶¶ 7-9. Plaintiff's allegation that at the time that individual Defendants "conspired to violate Plaintiff's civil rights and committed acts in furtherance of such conspiracy, they were acting as police officers for the City of Syracuse[ ]" is presumably an admission that individual Defendants were acting within the scope of their employment. *See* Dkt. No. 1 at ¶ 79.

**11** Nonetheless, Plaintiff contends that the personal interest exception applies. "[T]hat exception applies where 'a plaintiff adequately alleges that each defendant possessed an independent, personal conspiratorial purpose.' " *Everson v. N.Y. City Transit Auth.,* 216 F.Supp.2d 71, 76 (E.D.N.Y.2002) (quotation and other citation omitted); *see Salgado v. City of N.Y.,* No. 00 Civ. 3667, 2001 WL 290051, *9 (S.D.N.Y. Mar. 26, 2001). Plaintiff has not alleged that individual Defendants had a personal interest in their alleged conspiracy. *See* Dkt. No.

1 at ¶¶ 77-83. In his motion papers, Plaintiff concedes that he "does not allege Defendants' personal stake in their bias against Plaintiff or Paredes...." *See* Dkt. No. 15 at 14. However, he contends that he has "allege[d] sufficient facts to infer that the Defendants were motivated by personal gain in silencing Plaintiff about what he witnessed concerning their brutality and/or misconduct in subduing and arresting Paredes and preventing Plaintiff from filing a complaint about such misconduct." *See id.* at 14-15 (citations omitted). He further argues that "the complaint alleges sufficient facts to infer that Defendants' employment opportunities and interest in not answering a complaint about their misconduct was Defendants' personal stake or interest in participating in the conspiracy." *See id.* at 15. However, since Defendant City arguably has the same general interest, Plaintiff's allegations do not give rise to a reasonable inference that individual Defendants' interests in the alleged conspiracy were distinct from those of Defendant City.

Accordingly, since the intra-corporate conspiracy doctrine applies, the Court grants Defendants' motion to dismiss Plaintiff's § 1985(3) claims for failure to state a claim.[FN10]

> [FN10.] Since the Court concludes that the intra-corporate conspiracy doctrine applies, it will not address Defendants' alternative argument that Plaintiff's factual allegations are insufficient to state a conspiracy claim.

*6. Plaintiff's common law malicious prosecution claims*

In order to recover for malicious prosecution, a plaintiff must establish four elements: that a criminal proceeding was commenced; that it was terminated in favor of the accused; that it lacked probable cause; and that the proceeding was brought out of actual malice. *Cantalino v. Danner,* 96 N.Y.2d 391, 394-95 (2001) (citations omitted). Defendants argue that a dismissal in the interest of justice of an accusatory instrument pursuant to New York Criminal Practice Law § 170.40 cannot constitute a favorable termination. However, Defendants only cite pre-*Cantalino* case law to support their argument. *Cantalino* directly addressed "whether the dismissal of criminal charges against plaintiff in the interest of justice constituted a termination in her

Not Reported in F.Supp.2d, 2005 WL 1460424 (N.D.N.Y.)
(Cite as: 2005 WL 1460424 (N.D.N.Y.))

favor." *Id.* at 395. It expressly rejected "a per se rule that a dismissal in the interest of justice can never constitute a favorable termination," and held that

the question is whether, under the circumstances of each case, the disposition was inconsistent with the innocence of the accused. A case-specific rule is particularly appropriate for dismissals in the interest of justice, since the trial court is required to state on the record its reasons for dismissing the criminal charges....

**\*12** *Id.* at 396 (internal citation omitted). Unfortunately, in this case, the state court did not state on the record its reasons for dismissing the charges. *See* Dkt. No. 9 at 2. Furthermore, even if the state court had stated its reasons on the record, that record is not part of Plaintiff's pleadings. Accordingly, the Court denies Defendants' motion to dismiss Plaintiff's common law malicious prosecution claims for failure to state a claim.

*7. Plaintiff's common law libel claim*

Defendants argue (1) that Plaintiff has failed to comply with New York Civil Practice Law and Rules § 3016(a)'s requirement that a complaint asserting a claim for libel or slander set forth the particular words complained of and (2) that, if the Court dismisses all of Plaintiff's federal claims, it should decline to exercise jurisdiction over his state claims.

Since federal law governs the procedural issues in this case, " 'the mode of pleading defamation is governed by Rule 8, Fed.R.Civ.P." ' *Kelly v. Schmidberger,* 806 F.2d 44, 46 (2d Cir.1986) (quotation omitted). Therefore, the heightened pleading requirement of New York Civil Practice Law and Rules § 3016(a) does not apply to this action. *See Silverman v. City of N.Y.,* No. 98-CV-6277, 2001 WL 218943, \*8 (E.D.N.Y. Feb. 2, 2001) (quotation and other citation omitted). The allegations of libel in Plaintiff's complaint satisfy Rule 8's requirements of "a short and plain statement of the claim" and "simple, concise, and direct" allegations. Fed.R.Civ.P. 8(a), (e)(1); *see* Dkt. No. 1 at ¶¶ 47-49, 94-96. Furthermore, the Court has not dismissed all of Plaintiff's federal claims. Accordingly, the Court denies Defendants' motion to

dismiss Plaintiff's libel claim for failure to state a claim.

IV. CONCLUSION

After carefully considering the file in this matter, the parties' submissions, and the applicable law, and for the reasons stated herein, the Court hereby

ORDERS that Defendants' motion to dismiss Plaintiff's complaint for insufficient service of process is DENIED; and the Court further

ORDERS that Defendants' motion to dismiss Plaintiff's § 1983 claims against Defendant City of Syracuse for failure to sufficiently allege municipal liability is DENIED; and the Court further

ORDERS that Defendants' motion to dismiss Plaintiff's common law false arrest and false imprisonment claims for failure to state a claim is GRANTED; and the Court further

ORDERS that Defendants' motion to dismiss Plaintiff's § 1983 false arrest claims for failure to state a claim is GRANTED; and the Court further

ORDERS that Defendants' motion to dismiss Plaintiff's § 1983 First Amendment claims in his second cause of action is GRANTED; and the Court further

ORDERS that Defendants' motion to dismiss Plaintiff's § 1983 First Amendment claims in his first cause of action for failure to state a claim is DENIED; and the Court further

ORDERS that Defendants' motion to dismiss Plaintiff's § 1985(3) claims for failure to state a claim is GRANTED; and the Court further

**\*13** ORDERS that Defendants' motion to dismiss

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1460424 (N.D.N.Y.)
(Cite as: 2005 WL 1460424 (N.D.N.Y.))

Plaintiff's common law malicious prosecution claims for
failure to state a claim is DENIED; and the Court further

ORDERS that Defendants' motion to dismiss Plaintiff's
common libel claim for failure to state a claim is
DENIED.

IT IS SO ORDERED.[FN11]

> FN11. The following claims of Plaintiff remain
> in this action: (1) § 1983 claims for denial of
> First Amendment rights against Defendants City,
> Mullen, and Hennessey, alleging that these
> Defendants arrested him for speaking to
> Defendant officers about their conduct in
> arresting a third-party; (2) § 1983 claims for
> failure to train against Defendant City; (3)
> common law malicious prosecution claims
> against all Defendants; (4) a common law libel
> claim against Defendant Hennessey; and (5) a
> claim for attorney's fees pursuant to 42 U.S.C. §
> 1988.

N.D.N.Y.,2005.
Griffin-Nolan v. Providence Wash. Ins. Co.
Not Reported in F.Supp.2d, 2005 WL 1460424
(N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 2025613 (C.A.2 (N.Y.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 2010 WL 2025613 (C.A.2 (N.Y.)))

**H**
Only the Westlaw citation is currently available.This
case was not selected for publication in the Federal
Reporter.

United States Court of Appeals,
Second Circuit.
Joel MURRAY, Plaintiff-Appellant,
v.
George E. PATAKI, Governor of New York State,
Kang Yeon Lee, M.D., Daniel Senkowski,
Superintendent of Clinton Correctional Facility, Dr.
Melendez, R. Leduc, Corrections Officer, N. Irwin, J.
Travers, J. Forth, Corrections Officer, R. Girdich,
Superintendent at Franklin Correctional Facility, Glenn
S. Goord, Commissioner of N.Y.S. D.O.C.S., Richard
Roy, Inspector General, T. Reif, Corrections Officer,
CNY Psychiatric Center, S. Jones,
Defendants-Appellees.FN*
No. 09-1657-pr.

May 24, 2010.

**Background:** Pro se prisoner brought civil rights action
against various government defendants. The United States
District Court for the Northern District of New York,
dismissed certain § 1983 claims, Lawrence E. Kahn, J.,
2007 WL 956941, and granted summary judgment in
favor of defendants on his remaining § 1983 and § 1985
claims, and dismissed his claim against prison employee
defendant, Suddaby, J., 2009 WL 981217. Prisoner
appealed.

**Holding:** The Court of Appeals held that United States
Marshals' failure to effect service automatically
constituted "good cause" for extension of time in which to
serve prison employee defendant.
Affirmed in part, and vacated and remanded in part.

West Headnotes

Federal Civil Procedure 170A  417

170A Federal Civil Procedure
   170AIII Process
      170AIII(B) Service
         170AIII(B)1 In General
            170Ak417 k. Time for Making. Most Cited
Cases
Pro se prisoner provided information sufficient to identify
prison employee defendant, and therefore United States
Marshals' failure to effect service automatically
constituted "good cause" for an extension of time in which
to serve. Fed.Rules Civ.Proc.Rule 4(m), 28 U.S.C.A.

Appeal from a judgment of the United States District
Court for the Northern District of New York (Suddaby, J.,
Treece, M.J.).Joel Murray, pro se, Romulus, NY.

Andrew M. Cuomo, Attorney General of the State of New
York; Barbara D. Underwood, Solicitor General;
Benjamin N. Gutman, Deputy Solicitor General
(Sudarsana Srinivasan, Assistant Solicitor General; Kate
H. Nepyeu, of Counsel), New York, NY, for
Defendants-Appellees.

Present BARRINGTON D. PARKER, DEBRA ANN
LIVINGSTON, and DENNY CHIN, Circuit Judges.

**SUMMARY ORDER**

**\*1 UPON DUE CONSIDERATION, IT IS HEREBY
ORDERED, ADJUDGED, AND DECREED** that the
judgment of the district court is **AFFIRMED IN PART**
and **VACATED AND REMANDED IN PART.**

Plaintiff-Appellant Joel Murray appeals *pro se* from an
order of the United States District Court for the Northern
District of New York (Suddaby, *J.*), entered March 29,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2025613 (C.A.2 (N.Y.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 2010 WL 2025613 (C.A.2 (N.Y.)))

2007, dismissing certain of his 42 U.S.C. § 1983 claims against various of the Defendants-Appellees, and from a second order, entered on April 9, 2009, granting summary judgment in favor of Defendants-Appellees on Murray's remaining claims under 42 U.S.C. §§ 1983 and 1985, and dismissing his claim against Defendant-Appellee Dr. Melendez for failure to timely effect service of process upon her pursuant to Federal Rule of Civil Procedure 4(m). We assume the parties' familiarity with the underlying facts and procedural history of the case, and with the issues presented on appeal.

We review de novo a district court's dismissal of claims pursuant to Fed.R.Civ.P. 12(b)(6), "construing the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor ." Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir.2002). A complaint must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A claim will have facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, --- U.S. ----, ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). We also review a district court's grant of summary judgment de novo, and determine whether there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. See Miller v. Wolpoff & Abramson, L.L.P., 321 F.3d 292, 300 (2d Cir.2003). While we construe the evidence in the light most favorable to the non-moving party, id., "conclusory statements or mere allegations [are] not sufficient to defeat a summary judgment motion," Davis v. New York, 316 F.3d 93, 100 (2d Cir.2002).

We have undertaken a de novo review of the record and relevant cases and, except as noted below, we affirm the dismissal of Murray's claims against all defendants for substantially the same reasons set forth in Magistrate Judge Treece's thorough reports and recommendations of March 5, 2007, and March 3, 2009; these reports were adopted by the district court in their entirety.

We vacate the district court's dismissal of Murray's claim against Dr. Melendez for failure to serve process. We review a district court's dismissal pursuant to Federal Rule of Civil Procedure 4(m) for abuse of discretion. Zapata v. City of New York, 502 F.3d 192, 195 (2d Cir.2007). A district court abuses its discretion if it bases its ruling on an erroneous view of the law or clearly erroneous findings of fact, or its decision "cannot be located within the range of permissible decisions." Lynch v. City of New York, 589 F.3d 94, 99 (2d Cir.2009) (quoting Sims v. Blot, 534 F.3d 117, 132 (2d Cir.2008)).

**\*2** Rule 4(m) provides that "[i]f a defendant is not served within 120 days after the complaint is filed, the court-on motion or on its own after notice to the plaintiff-must dismiss the action without prejudice against that defendant or order that service be made within a specified time." Fed.R.Civ.P. 4(m). If the plaintiff shows "good cause for the failure" to serve, the district court is required to grant an "appropriate" extension of time in which to serve. Id. District courts also have discretion to enlarge the 120-day period even in the absence of good cause. See Zapata, 502 F.3d at 196. A pro se prisoner proceeding in forma pauperis, such as Murray, is "entitled to rely on service by the U.S. Marshals." Romandette v. Weetabix Co. ., 807 F.2d 309, 311 (2d Cir.1986). As long as the pro se prisoner provides the information necessary to identify the defendant, the Marshals' failure to effect service automatically constitutes "good cause" for an extension of time within the meaning of Rule 4(m). See, e.g., id.; see also Moore v. Jackson, 123 F.3d 1082, 1085-86 (8th Cir.1997); Byrd v. Stone, 94 F.3d 217, 220 (6th Cir.1996); Dumaguin v. Sec'y of Health & Human Servs., 28 F.3d 1218, 1221 (D.C.Cir.1994); Sellers v. United States, 902 F.2d 598, 602 (7th Cir.1990); Puett v. Blandford, 912 F.2d 270, 275 (9th Cir.1990). A pro se prisoner proceeding in forma pauperis is only required to provide the information necessary to identify the defendant, see, e.g., Sellers, 902 F.2d at 602, and it is "unreasonable to expect incarcerated and unrepresented prisoner-litigants to provide the current addresses of prison-guard defendants who no longer work at the prison," Richardson v. Johnson, 598 F.3d 734, 739-40 (11th Cir.2010).

Here, albeit after receiving a number of extensions of time within which to serve Melendez, Murray provided information that was sufficient to identify Dr. Melendez by full name and as an employee formerly assigned to Clinton Correctional Facility. See Doc. 103, Murray v.

Slip Copy, 2010 WL 2025613 (C.A.2 (N.Y.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 2010 WL 2025613 (C.A.2 (N.Y.)))

*Pataki,* 9:03-CV-1263 (N.D.N.Y. Apr. 13, 2007) (letter from Murray to the district court styled "Notification of Defendant"). This was sufficient to satisfy Murray's burden to provide sufficient information for the Marshals to identify the defendant. Although the Marshals subsequently failed to serve Dr. Melendez at the Clinton facility on March 11, 2008, *id.* Doc. 134, they were clearly able to identify her from the information proffered by Murray, and service was unsuccessful merely because Dr. Melendez apparently no longer worked at Clinton. *See id.* As Murray had satisfied his burden, it was an abuse of discretion for the district court to require him to provide additional information regarding Dr. Melendez, and to dismiss Murray's claims against her pursuant to Rule 4(m) for failure to serve process upon her. District courts have a responsibility to assist *pro se* plaintiffs in their efforts to serve process on defendants. *See Valentin v. Dinkins,* 121 F.3d 72, 75-76 (2d Cir.1997) (recognizing district court's obligation to allow *pro se* plaintiff limited discovery to identify defendant for service of process). With the information that Murray provided, the district court here could have ordered the other defendants to contact Dr. Melendez to see if she would accept service or to provide the Marshals with Dr. Melendez's last known address.

**\*3** For the foregoing reasons, the judgment of the district court dismissing the claims against Dr. Melendez for failure to serve process is **VACATED,** and we **REMAND** to the district court for further proceedings in accordance with this decision. The judgment is **AFFIRMED** in all other respects.

> FN* The Clerk of the Court is respectfully directed to amend the official caption as it appears above.

C.A.2 (N.Y.),2010.
Murray v. Pataki
Slip Copy, 2010 WL 2025613 (C.A.2 (N.Y.))

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2011 WL 382203 (N.D.N.Y.)

(Cite as: 2011 WL 382203 (N.D.N.Y.))

H

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Edward BURGESS, Plaintiff,
v.
Glenn CHAMPAGNE, Facility Health Service Director;
Dr. Cahill, Facility Director; Louise Tichenor, Dr.; and
Mr. Boyea, Inmate Grievance Program Supervisor,
Defendants.
No. 08-CV-725 (GLS/DRH).

Jan. 12, 2011.
Edward Burgess, Pittsburgh, PA, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State
of New York, Megan M. Brown, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

**REPORT-RECOMMENDATION AND ORDER**[FN1]

> FN1. This matter was referred to the undersigned
> for report and recommendation pursuant to 28
> U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, United States Magistrate Judge.

*1 Plaintiff pro se Edward Burgess ("Burgess"),
formerly an inmate in the custody of the New York State
Department of Correctional Services ("DOCS"), brings
this action pursuant to 42 U.S.C. § 1983 alleging that
defendants, four DOCS employees, violated his
constitutional rights under the Eighth and Fourteenth
Amendments. Am. Compl. (Docket No. 23). Presently
pending is defendants' motion for summary judgment
pursuant to Fed.R.Civ.P. 56. Dkt Nos. 41, 42. Burgess
opposes the motion. Dkt. No. 47. For the following
reasons, it is recommended that defendants' motion be
granted.

**I. Background**

The facts are related herein in the light most favorable
to Burgess as the non-moving party. *See* subsection II(A)
*infra.*

At all relevant times, Burgess was incarcerated at
Franklin ("Franklin") and Upstate ("Upstate")
Correctional Facilities. Am. Compl. ¶¶ 2, 8. The only
remaining contentions are Burgess' Eighth Amendment
claim regarding his right to medical treatment related to
his back and neck and his Fourteenth Amendment claim
alleging that defendant Boyea failed to determine a
grievance filed by Burgess.[FN2] Dkt. No. 31.

> FN2. DOCS maintains a grievance program for
> inmate, known as the Inmate Grievance Program
> (IGP), through which inmates may seek remedies
> for mistreatment or misconduct by prison staff.
> The IGP is a three-step process that requires an
> inmate to: (1) file a grievance with the IGRC
> [Inmate Grievance Resolution Committee]; (2)
> appeal to the Superintendent within four working
> days of receiving the IGRC's written response,
> and (3) appeal to the CORC [Central Office
> Review Committee] ... within four working days
> of receipt of the superintendent's written
> response." *Abney v. McGinnis,* 380 F.3d 663,
> 668 (2d Cir.2004) (internal citations omitted).

**A. Neck and Back Pain**

Burgess underwent a fusion surgery on his neck in
2002. Dkt. No. 23 at 80. Burgess was incarcerated at
Upstate from June 29, 2006 until September 24, 2007.
Tichenor Decl. (Dkt. No. 41-4) ¶ 6. During this time,
Burgess was under the care of defendant Tichenor, a
Physician's Assistant ("PA") who "diagnosed, treated and
wrote prescriptions under the supervision of a physician ...
[and] assess[ed] the physical and psychological status of
patients through interviews, health history, physical
examination and diagnostic tests." Tichenor Decl. ¶¶ 1, 3.
When Burgess arrived at Upstate in June 2006, he was
undergoing a number of treatments for multiple conditions
including diabetes and injuries to both his hands and his
knee, though he did not express any complaints of neck

Slip Copy, 2011 WL 382203 (N.D.N.Y.)

(Cite as: 2011 WL 382203 (N.D.N.Y.))

pain. *Id.* ¶¶ 7, 9. Burgess had made no complaints of neck pain during his previous incarceration at Franklin. *Id.* ¶ 8.

On July 26, 2006, Burgess complained of pain in his neck and feet. Dkt. No. 41-6, Ex. A, p. 165.[FN3] Tichenor issued Burgess a three-month prescription for Tylenol, to be taken twice a day. *Id .; see also* Tichenor Decl. ¶ 12. Tichenor prescribed Tylenol, instead of the Naprosyn which Burgess had previously been receiving at Franklin, because "given [Burgess'] status as a diabetic and the potential for it causing renal failure, it was not a proper pain reliever for ... Burgess." *Id.* ¶ 13. "The Tylenol prescription was renewed as soon as it expired and from reviewing the records it appears that [Burgess] was given a pain reliever prescription the whole time he was at Upstate." *Id.* ¶ 14; *see also* Dkt. No. 41-6, Ex. A, pp. 26-28, 32, 83, 87, 90, 139, 143-44, 146, 148, 151, 154, 162, 170-72, 361-65, 370, 372, 374, 379, 382, 384-86, 389, 393-94, 401, 415, 422. Burgess was also being treated for neuropathy as a result of his diabetes, though the prescription that he was given, Neurotin, also acted as a pain reliever. Tichenor Decl. ¶ 15. This prescription was also provided for the duration of Burgess' incarceration at Upstate. Dkt. No. 41-6, Ex. A, pp. 34, 36, 41-44, 46, 50-51. Tichenor also prescribed another medication for neurogenic pain, but after taking it for a few days Burgess decided he did not like its side effects, so the medication was discontinued. Tichenor Decl. ¶¶ 15-16; Dkt. No. 41-6, Ex. A, pp. 63, 126.

FN3. Burgess' complete medical records were filed traditionally with the Court. *See* Dkt. No. 41-6, Ex. A.

**\*2** Burgess next began complaining of back and neck pain in January 2007. Tichenor Decl. ¶ 18; Dkt. No. 41-6, Ex. A, p. 363. Burgess was given Extra Strength Tylenol, scheduled for examination, and, despite his complaints of pain, stood in his cell in no obvious or apparent distress. Tichenor Decl. ¶ 18; Dkt. No. 41-6, Ex. A, p. 363. On February 20, 2007, Burgess was seen by a nurse and sought stronger pain medication for his back, feet, hands, and knee. Tichenor Decl. ¶ 21; Dkt. No. 41-6, Ex. A, p. 370. Burgess was bearing his full weight, in no visible distress, and moving all his extremities without any difficulty. Tichenor Decl. ¶ 21; Dkt. No. 41-6, Ex. A, p.

370. When Burgess was offered pain medication, he became upset, refused to discuss the situation further, and walked away from his cell door. Tichenor Decl. ¶ 21; Dkt. No. 41-6, Ex. A, p. 370. A few days later Burgess wrote Tichenor seeking additional pain medication and an x-ray for his neck. Tichenor Decl. ¶ 22; Dkt. No. 41-6, Ex. A, p. 372. Tichenor ordered the x-ray and continued the Tylenol prescription as Naprosyn and Ibuprofen were contraindicated for Burgess based on his diabetes. Tichenor Decl. ¶ 22; Dkt. No. 41-6, Ex. A, p. 372.

The first week in March, Burgess received an x-ray performed on his cervical spine which showed a "fracture of one of the top most screws in the C3 vertebral body [as] compared to the 2003 examination ... [additionally there were a]dvanced degenerative change[s] ... seen from C3-C4." Dkt. No. 41-6, Ex. A, p. 358; *see also* Tichenor Decl. ¶ 23. On March 13, 2007, Tichenor responded to Burgess' claims that the screws used in the operation were fractured, seeking information as to the details surrounding the surgery. Tichenor Decl. ¶ 24; Dkt. No. 41-6, Ex. A, p. 355; Am. Compl. ¶ 26; Dkt. No. 23 at 79. Within a week, they determined that Burgess' surgery occurred in August 2002, the x-rays showed the possible fracture of two screws, and a neurosurgery consultation was required. Tichenor Decl. ¶ 25; Dkt. No. 41-6, Ex. A, p. 309. The neurosurgery consultation was approved on April 5, 2007. Tichenor Decl. ¶ 26.[FN4]

FN4. Once Tichenor requested the neurology consultation, she was no longer involved with the decision-making process. Tichenor Decl. ¶ 27. Instead, the consultation required approval from DOCS headquarters in Albany and then needed to be scheduled by the Central Office Medical Unit. *Id.* "It was not unusual for a neurosurgery consultation appoint[ment] to take three months to schedule." *Id.* ¶ 28.

On March 27, 2007, Burgess complained of pain in his neck, but medical records indicate that his range of motion was good and there was no swelling noted. Dkt. No. 41-6, Ex. A, p. 380. Burgess was given Tylenol and a warm compress to place on his neck. *Id.* On March 29, 2007, a nurse visited Burgess to advise that taking too much Tylenol was harmful to his health, as Burgess was

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 382203 (N.D.N.Y.)

(Cite as: 2011 WL 382203 (N.D.N.Y.))

running out of his prescription medication and requesting refills prior to the appropriate date. *Id.,* pp. 90, 380; *see also* Tichenor Decl. ¶ 17 (explaining that Burgess "was not always compliant with his treatment...."). On April 9 and 30, 2007, Burgess was informed that his neurosurgery consultation was pending scheduling by the Central Office Medical Unit. Dkt. No. 41-6, Ex. A, pp. 95, 378, 383; Dkt. No. 23 at 83.

**\*3** On May 14, 2007, a DOCS supervisor advised Burgess that he had relayed Burgess' complaints of pain and leaned that Burgess was scheduled to meet with a neurosurgeon concerning the pain in relation to the surgery. Dkt. No. 23 at 38, 77. Additionally, the letter informed Burgess that such scheduling was done by CORC and should be forthcoming soon. On May 31, 2007, a memorandum was sent from an Upstate corrections official to an official at the Coxsackie Regional Medical Unit ("RMU") explaining that Burgess was scheduled to report to Coxsackie on June 11th for a June 14th neurosurgery consultation and also provided the RMU staff with a list of medications Burgess would require upon his arrival and temporary stay at the RMU. Dkt. No. 41-6, Ex. A, p. 97. The date of the consultation was apparently changed, and a similar memorandum was again sent on June 15th, indicating that Burgess would arrive at the RMU on July 11th for a neurosurgery consultation the following day. *Id.,* p. 101. The memorandum again included a list of medications Burgess would require, including his pain medication. *Id.*

On July 9, 2007, medical records indicate that Burgess refused to go on the neurology consultation at the RMU because he was not provided with enough self-carry medication to sustain him through his absence from Upstate. Dkt. No. 41-6, Ex. A, p. 403; *see also Id.,* p. 109; Tichenor Decl. ¶ 29. Burgess was informed that the receiving facility, the RMU, would be apprised of the medication that he required upon his arrival, but Burgess still refused to go. Dkt. No. 41-6, Ex. A, pp. 109, 403; Tichenor Decl. ¶ 29. On June 11, 2007, Burgess asserted in a grievance appeal that his appointment with a neurologist was cancelled after he suffered through a seven-hour bus ride without pain or diabetes medication. Dkt. No. 23 at 91.

On July 24, 2007, Tichenor received a letter from Burgess accusing her of stopping Burgess' pain medication and causing him increased suffering. Tichenor Decl. ¶ 30; Dkt. No. 41-6, Ex. A, p. 400. Tichenor responded by referring Burgess to his medical records which indicated that a prescription for Tylenol renewal was written on July 13. Tichenor Decl. ¶ 30; Dkt. No. 41-6, Ex. A, pp. 110, 400, 402. A few days later, Burgess again sought different pain medication, stating that he did not want to speak to a PA but only to a physician, and again appearing in no acute distress since he was successfully moving his head, neck and upper extremities without any difficulty or pain. Dkt. No. 41-6, Ex. A, p. 413. Burgess was informed that he was required to discuss his treatment with a PA and was offered pain medication. *Id.* Burgess responded that he was being denied medical care and then walked away from his cell door, refusing the pain medication which had previously been offered. *Id.*

On August 1, 2007, Burgess again consulted with Tichenor, stating that he still wished to attend a neurology consultation but he was worried about the amount of self-carry medication he received. Tichenor Decl. ¶ 31; Dkt. No. 23 at 80; Dkt. No. 41-6, Ex. A, p 320, 333. Tichenor submitted another consultation request on Burgess' behalf. Tichenor Decl. ¶ 32; Dkt. No. 23 at 80; Dkt. No. 41-6, Ex. A, p 312, 320, 333. Another memorandum was sent to the RMU identifying the medication which Burgess would require during his consultation stay and Burgess was seen for the consultation on September 13, 2007. Tichenor Decl. ¶¶ 33-34; Dkt. No. 41-6, Ex. A, p. 115; Dkt. No. 23 at 80. The physician increased Burgess' Neurotin prescription and advised him to reschedule with his surgeon if the additional medication did not help. Tichenor Decl. ¶ 34; Dkt. No. 23 at 80. Burgess left Upstate on September 24, 2007 and eventually arrived at Clinton Correctional Facility where the physician's orders increasing his Neurotin were received and implemented on September 28, 2007. Tichenor Decl. ¶ 35; Dkt. No. 41-6, Ex. A, pp. 426-27.

**\*4** Subsequently, Burgess continued to receive treatment for chronic pain and the fractured screws in his neck. On January 28, 2008, CT scan results showed a disruption of a screw and spinal stenosis in three

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 382203 (N.D.N.Y.)

(Cite as: 2011 WL 382203 (N.D.N.Y.))

vertebrae. Dkt No. 23 at 81; Dkt. No. 41-6, Ex. A, p. 334. Burgess continued to complain of pain despite the multiple prescriptions and was advised to see Dr. DiRisio, who had performed the original surgery. Dkt No. 23 at 81; Dkt. No. 41-6, Ex. A, p. 334. On April 10, 2008, Burgess returned for another consultation for his persistent neck pain. Dkt No. 23 at 81; Dkt. No. 41-6, Ex. A, p. 334. Burgess was still not responding to the pain medication and no neurological findings were noted. Dkt No. 23 at 81; Dkt. No. 41-6, Ex. A, p. 334. Burgess was again instructed to return to Dr. DiRisio to see if screw removal was necessary or if the pain was unrelated to the screw breakage. Dkt No. 23 at 81; Dkt. No. 41-6, Ex. A, p. 334; Tichenor Decl. ¶ 36. Additional radiology tests were suggested. Dkt No. 23 at 81; Dkt. No. 41-6, Ex. A, p. 334.

**B. Grievances**

Prior to Burgess' incarceration at Upstate, he filed a grievance concerning events at Franklin. Am. Compl. ¶ 17. The grievance was denied and appealed. *Id.* After August 4, 2006, defendant Boyea, the IGP Supervisor, wrote to Burgess regarding the previously filed grievance at Franklin, explaining that a CORC decision had not yet been rendered. Docket No. 23 at 70; Am. Compl. ¶ 18. On September 18, 2006, DOCS employee Eagen wrote to Burgess stating that Burgess' grievance was received by CORC on August 7 and was being processed. Dkt. No. 23 at 71. Burgess wrote Eagen on December 10, 2006, inquiring whether CORC had responded to his appeal yet. Am. Compl. ¶ 20. Burgess received a response that CORC had issued is decision on September 27, 2006 and that if he had not received a copy, he should contact the IGP Supervisor at Franklin. *Id.*

**II. Discussion**

In his amended complaint, Burgess claims that defendants violated his Eighth Amendment rights by being deliberately indifferent to his serious medical needs and his Fourteenth Amendment rights by failing to send him the September 27, 2006 CORC decision. Defendants move for summary judgment asserting that (1) Burgess has failed to establish that defendants Champagne, Cahill, and Boyea were personally involved in his Eighth Amendment claims; (2) Burgess' constitutional claims are meritless; and (3) defendants are entitled to qualified immunity.

**A. Legal Standard**

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

**\*5** The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.* 22 F.3d 1219, 1223-24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

When, as here, a party seeks dismissal or summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191 (2d Cir.2008)* ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247-48.

**B. Personal Involvement**

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 382203 (N.D.N.Y.)

(Cite as: 2011 WL 382203 (N.D.N.Y.))

damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

(1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)).

### 1. Champagne and Cahill

Defendants Champagne and Cahill were directly involved with the diagnosis and treatment of Burgess' broken finger while he was incarcerated at Franklin. Am. Compl. ¶¶ 3-6. The medical evidence presented regarding the treatment of Burgess' neck and back pain occurred after his transfer from Franklin and during his incarceration at Upstate. Champagne and Cahill were never mentioned in the treatment of this particular ailment. As Burgess' prior Eighth Amendment claims related to his broken finger were dismissed pursuant to the prior Decision and Order (Dkt. No. 31 at 15-17), the only involvement relevant to the progression of the case is that regarding the treatment of Burgess' neck pain. As defendants Champagne and Cahill were not involved with this portion of Burgess' treatment, they were not personally involved in his care. Moreover, there is nothing in the amended complaint to indicate that Champagne and

Cahill failed to train any of the defendants, were grossly negligent, or were privy to a continuing pattern of constitution violations.

**\*6** Accordingly, defendants' motion should be granted on this ground as to Champagne and Cahill.

### 2. Boyea

Defendant Boyea allegedly failed to respond to Burgess' request for a previously filed grievance at Franklin. Because Boyea was not involved with any of the remaining Eighth Amendment claims, his lack of personal involvement with respect to the medical claims is clear. However, Burgess has offered evidence that Boyea was directly involved in the alleged depravation of Burgess' due process rights as discussed in subsection II(D) *infra.* Accordingly, a question of fact exists whether Boyea was personally involved in the deprivation of Buregess' due process rights and defendants' motion on this ground should be denied as to that claim against Boyea.

### C. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. This prohibition extends to the provision of medical care. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). The test for a § 1983 claim is twofold. First, the prisoner must show that the condition to which he was exposed was sufficiently serious. *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

" 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson v. McMillian,* 503 U.S. 1, 9 (1992)). Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or

Slip Copy, 2011 WL 382203 (N.D.N.Y.)

(Cite as: 2011 WL 382203 (N.D.N.Y.))

treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright*, 315 F.3d 158, 162-63 (2d Cir.2003) (*citing Chance,* 143 F.3d 698, 702 (2d Cir.1998)). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. *Smith,* 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance,* 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate. *Chance,* 143 F.3d at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists ... are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001).

**\*7** Defendants assume, though do not admit, that Burgess' neck and back condition were sufficient to constitute a serious medical need but argue that there was no deliberate indifference to Burgess' medical treatment as required for a constitutional violation. Defs. Mem. of Law (Dkt. No. 42) at 6. Even construing the facts in the light most favorable to Burgess, Burgess has failed to establish a question of material fact sufficient to indicate that Tichenor was deliberately indifferent to his care.

Upon arrival at Upstate, Tichenor reviewed Burgess' medical records and began treating his myriad of physical conditions. Tichenor Decl. ¶¶ 7, 9. It was not until July 2006 that Burgess began complaining about chronic pain in his neck, but when that occurred, Tichenor immediately prescribed pain medication to attempt to alleviate Burgess' symptoms. *Id.* ¶¶ 12, 14. Moreover, Tichenor modified the type of pain medication, prescribing one that was less harmful to Burgess' continued health given his various other conditions.[FN5] *Id.* ¶ 13. This medication was also consistently refilled and provided to Burgess throughout his incarceration at Upstate. Id ¶ 14; *see also* Dkt. No.

41-6, Ex. A, pp. 26-28, 32, 34, 36, 41-44, 46, 50-51, 83, 87, 90, 139, 143-44, 146, 148, 151, 154, 162, 170-72, 361-65, 370, 372, 374, 379, 382, 384-86, 389, 393-94, 401, 415, 422. These actions refute any allegations of delay or indifference to treatment of Burgess' symptoms.

> FN5. The prior Decision and Order determined that, to the extent a claim was proffered, any disagreement over the pain medication prescribed to Burgess was insufficient to establish an Eighth Amendment violation. Dkt. No. 31-1 at 17 n. 10.

Additionally, any delay in receiving pain medication or treatment was attributable to Burgess' own actions. On several occasions, Burgess complained of pain, being seen by medical staff rather than a physician, and offered a plan or medication with which he did not agree. On those occasions, Burgess responded by walking away from medical staff effectively terminating the appointment. Dkt. No. 41-6, Ex. A, pp. 363, 370, 380, 413; Tichenor Decl. ¶ 17. Burgess' voluntary actions in walking away were the direct and proximate cause of him not receiving further medication or treatment. Such actions cannot be attributed to the medical staff or Tichenor.

Furthermore, Tichenor was not responsible for any alleged delay in Burgess attending his neurosurgery consultation. As soon as Tichenor was notified, Tichenor complied with Burgess' requests for radiology tests and a specialty consultation. Tichenor Decl. ¶¶ 22, 25. There is no evidence the delay at DOCS headquarters in approving and then scheduling that consultation was due to any indifference or delay on Tichenor's part. *See* note 5 *supra.* Furthermore, any alleged delay in the three months it took to schedule the delay is incredible as that is a reasonable time frame for any individual patient seeking specialty medical services. Also, Tichenor and the medical staff provided all the necessary information regarding Burgess' required medications to the medical staff at the RMU. *Id.* ¶¶ 33-34; Dkt. No. 41-6, Ex. A, pp. 97, 101, 115.

**\*8** Burgess was apprised of this fact when he expressed concern over his lack of self-carry medication and still chose not to attend the consultation trip. Tichenor Decl. ¶ 29; Dkt. No. 41-6, Ex. A, pp. 109, 403. Burgess'

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 382203 (N.D.N.Y.)

(Cite as: 2011 WL 382203 (N.D.N.Y.))

inability to physically possess the medications during transport does not indicate that the respective facilities would not provide him with the appropriate doseage prior to, and upon arrival at, the RMU. Furthermore, any failure on the part of the RMU staff to provide such medication would not have been attributable to either Upstate or Tichenor, as Upstate had provided all the relevant information to the RMU as evidenced by the memorandum which the RMU received and were incorporated into Burgess' medical records. While it was initially unclear whether Burgess attended the consultation, based on his statement of appeal on his grievance (Dkt. No. 23 at 91), the medical records make it clear that Burgess did not ride in a car for seven hours without pain medication and instead chose to forego participating in the trip altogether. Burgess' ultimate decision to refuse the trip was his choice and there is no evidence that ir resulted from any delay by the medical staff.

Lastly, the ultimate result appears to be that Burgess still suffers from chronic pain in his neck and that this pain may not be responding to any medication. Dkt. No. 23 at 81; Dkt. No. 41-6, Ex. A, p. 334. This amounts to an unfortunate bad result. While unfortunate, this is insufficient by itself to state a claim for deliberate indifference as it does not indicate a failure or denial of treatment. The record indicates without question that Burgess received at least adequate care. *See Dean,* 804 F.2d at 215 (citations omitted). Accordingly, defendants motion as to this claim should be granted.

### D. Due Process

An action commenced pursuant to § 1983 requires proof of the "deprivation of any right[ ], privilege[ ], or immunit[y] secured by the Constitution" or laws of the federal government. 42 U.S.C. § 1983. Thus, no action lies under § 1983 unless a plaintiff has asserted the violation of a federal right. *See Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n,* 453 U.S. 1, 19 (1981).

"Prisoners, including pretrial detainees, have a constitutional right of access to the courts ...." *Bourden v. Loughren,* 386 F.3d 88, 92 (2d Cir.2004) (internal quotation marks omitted) (citing *Bounds v. Smith,* 430 U.S. 817, 821-22 (1977) (citations omitted) (holding that all prisoners have a well-established Constitutional right

to "adequate, effective, and meaningful" access to courts). "[I]nmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim." *Shell v. Brzezniak,* 365 F.Supp. 2d 362, 370 ( W.D.N.Y. 2005) (citations omitted). However, "[i]f prison officials ignore a grievance that raises constitutional claims, an inmate can directly petition the government for redress of that claim." *Shell,* 365 F.Supp. 2d at 370 (citations omitted).

*\*9 In this case, Burgess claims that his due process rights were violated when he did not receive a response from Boyea. This appears to be nothing more than a complaint about Boyea's failure to follow established DOCS policies and provisions, which is not actionable in federal court. *See Bolden v. Alston,* 810 F.2d 353, 358 (2d Cir.1987) ("State procedural requirements do not establish federal constitutional rights. At most, any violation of state procedural requirements would create liability under state law ...."). Thus Burgess has failed to establish that he had a liberty interest which required constitutional protection. Moreover, it is unclear to what this particular grievance was even in reference. Assuming that the underlying facts of the grievance concerned deprivations under other constitutional provisions, such as delay of and indifference to medical care, the substance of Burgess' grievance is addressed *supra* or has already been dismissed by the prior Decision and Order.

Accordingly, defendants' motion as to this claim should also be granted.

### E. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229-30 (N.D.N.Y.2002) (McAvoy, J.), *aff'd,* 80 Fed .Appx. 146 (2d Cir. Nov. 10, 2003). However, even if the constitutional privileges "are clearly established, a government actor may still be shielded by qualified

Slip Copy, 2011 WL 382203 (N.D.N.Y.)

(Cite as: 2011 WL 382203 (N.D.N.Y.))

immunity if it was objectively reasonable for the ... official to believe that his [or her] acts did not violate those rights." *Smith v. City of Albany,* No. 03-CV-1157, 2006 WL 839525 *16 (N.D.N.Y. Mar. 27, 2006) (quoting *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991); *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990) (internal citations omitted)).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights, of which a reasonable person would have known, were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. For the reasons discussed above, Burgess has failed to demonstrate any constitutional violation. Accordingly, it is recommended in the alternative that defendants' motion on this ground also be granted.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for summary judgment (Docket No.41) be **GRANTED** in all respects as to all remaining claims and defendants.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2011.

Burgess v. Champagne
Slip Copy, 2011 WL 382203 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 3246818 (N.D.N.Y.)

(Cite as: 2009 WL 3246818 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
David ROBINSON, Plaintiff,
v.
NEW YORK STATE DEPARTMENT OF CORRECTION
SERVICES, et al., Defendants.
No. 9:08-CV-0911.

Sept. 30, 2009.

David Robinson, pro se.

KRista A. Rock, Assistant Attorney General, for Defendants.

### DECISION & ORDER

THOMAS J. McAVOY, Senior District Judge.

**\*1** This *pro se* civil rights action pursuant to 42 U.S.C. § 1983 was referred to the Hon. Gustave J. Di Bianco, United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

The Report-Recommendation dated September 8, 2009 recommended that the Defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12 be granted. Plaintiff filed objections to the Report-Recommendation arguing only that he did not consent to have his complaint adjudicated by a Magistrate Judge, the Magistrate Judge misconstrued the facts in litigation and the law governing its conduct, and it was the fault of the United States Marshal's service that service was not properly effectuated.

When objections to a magistrate judge's Report-Recommendation are lodged, the Court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1). After such a review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." *Id.*

Having reviewed the record *de novo* and having considered the issues raised in the Plaintiff's objections, this Court has determined to accept and adopt the recommendation of the Magistrate Judge for the reasons stated in the Report-Recommendation.

It is therefore **ORDERED** that Defendants' motion to dismiss is **GRANTED** and the Complaint is **DISMISSED IN ITS ENTIRETY.**

**IT IS SO ORDERED.**

### REPORT-RECOMMENDATION

GUSTAVE J. DiBIANCO, United States Magistrate Judge.

This matter has been referred to the undersigned for Report and Recommendation by the Honorable Thomas J. McAvoy, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

In this civil rights complaint, plaintiff, a former inmate, alleges that defendants delayed plaintiff's access to the United States Mail; assigned him to be double-bunked; subjected him to excessive searches; limited his use of a "warming stove"; harassed him; and refused to address plaintiff's grievances. (Dkt. No. 1 ("Compl.")). Plaintiff claims that defendants' actions violated the First, Fifth, Sixth, Eighth, Ninth, Tenth, and Fourteenth Amendments. Plaintiff cites 42 U.S.C. §§ 1983, 1985, 1986, 1987, and 1988. Plaintiff also claims that defendants have violated 18 U.S.C. §§ 241, 242.[FN1] Plaintiff seeks injunctive [FN2] as well as substantial monetary relief.

> FN1. These statutes are criminal in nature, and there is no private right of action to enforce federal criminal laws. *See Dugar v. Coughlin,* 613 F.Supp. 849, 852 n. 1 (S.D.N.Y.1985).

> FN2. Because plaintiff is no longer incarcerated, any claims for injunctive relief may be dismissed as moot. *See Pugh v. Goord,* 571 F.Supp.2d 477, 489-90 (S.D.N.Y.2008) (where an inmate has been released from prison, his claims for injunctive relief based on the conditions of his incarceration must be dismissed

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3246818 (N.D.N.Y.)

(Cite as: 2009 WL 3246818 (N.D.N.Y.))

as moot).

Presently before the court is defendants' motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6). (Dkt. No. 41). Plaintiff has filed a response in opposition to the motion. (Dkt. No. 46). For the following reasons, this court recommends that defendants' motion to dismiss be **GRANTED** and the complaint be dismissed in its entirety.

### DISCUSSION

**1.** *Motion to Dismiss*

**\*2** To survive a motion to dismiss, the plaintiff must provide "the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' " *Camarillo v. Carrols Corp.,* 518 F.3d 153, 156 (2d Cir.2008) (quoting *inter alia ATSI Communications, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007)). *See Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1965 (2007). Plaintiff's factual allegations must be sufficient to give the defendant "fair notice of what the claim is and the grounds upon which it rests." *Id.* (citing *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.,* 507 F.3d 117, 121 (2d Cir.2007)). *See Ashcroft v. Iqbal,* --- U .S. ----, 129 S.Ct. 1937, 1949 (May 18, 2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."). When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint. *Erickson v. Pardus,* 551 U.S. 89, 93-94 (2007) (citations omitted).

The court must heed its particular obligation to treat *pro se* pleadings with liberality. *Phillips v. Girdich,* 408 F.3d 124, 128 (2d Cir.2005); *Tapia-Ortiz v. Doe,* 171 F.3d 150, 152 (2d Cir.1999) (per curiam). In deciding a motion to dismiss, the court may review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any documents attached to the complaint as exhibits and any statements or documents incorporated into the complaint by reference. *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000) (citing *Cosmas v. Hassett,* 886 F.2d 8, 13 (2d Cir.1989)).

**2.** *Facts*

Plaintiff states that he has nine claims in this action. (Compl. at ¶¶ 112-29). The complaint is comprised of three parts. In the first part, plaintiff gives a generally chronological recounting of the events that are the bases of the alleged

constitutional violations. (Compl. at ¶¶ 24-111). In the second part, plaintiff summarizes his nine causes of action. (Compl. at ¶¶ 112-29). The third part of the complaint consists of 52 pages that include copies of his "grievances," legal arguments, and supporting documents for some of his claims. (Dkt. No. 1, *Exhibits*FN3). The court will attempt to discuss the facts separately as to each claim.

> FN3. When filing the complaint on the court's electronic filing system, the Clerk divided the Complaint into two parts. On the docket, the first part is entitled "Main Document" and includes the first two sections of plaintiff's Complaint as described above. These sections are consecutive numbered paragraphs 1-159. On the docket, the second part is entitled "Statement of Facts" and includes the third 52-page section of plaintiff's Complaint as described above. While the first page is titled "Statement of Facts," the document appears to be a grievance. Plaintiff also includes a variety of other documents. For ease, the court will refer to this as the Exhibits. The court has numbered the pages consecutively for citation purposes.

*A. Interference with Mail*

Plaintiff's first two claims (Compl. at ¶¶ 112-13, 114-15) relate to the handling of his mail. Plaintiff asserts that the New York State Department of Correctional Services ("NYSDOCS"), the Central Office Review Committee ("CORC"), and individual defendants Rivera, Glover, and Jessen FN4 violated plaintiff's rights under the First, Fifth and Fourteenth Amendments. (Compl. at ¶¶ 113, 115).

> FN4. George Jessen is listed in the caption of the Complaint, and is mentioned several times in the Complaint. However, it appears that Mr. Jessen was not listed on the docket in the list of defendants. Furthermore, no attempt was made to serve defendant Jessen.

Plaintiff discusses in detail three instances of problems with his mail, March 16, April 8, and June 5, 2008. (Compl. at ¶¶ 24, 26, 34). Plaintiff alleges that on March 16, 2008, he submitted two items to be mailed, one was legal correspondence, and the other personal correspondence. (Compl. at ¶ 24). Plaintiff alleges that the legal correspondence "was issued to the Postal Service by defendant Glover, the Senior Mail Clerk, on or about March 19, 2008," but that the

Slip Copy, 2009 WL 3246818 (N.D.N.Y.)

(Cite as: 2009 WL 3246818 (N.D.N.Y.))

personal correspondence was returned to plaintiff on March 28, 2008. *Id.* Plaintiff argues that defendant Glover, "unlawfully obstructed/delayed/tampered with plaintiff's correspondence." *Id.* Plaintiff alleges that this conduct interfered with his right to correspond and access to the court. *Id.* Plaintiff states that he submitted a written inquiry, and that defendant Glover responded in writing

> **\*3** admitting that she unlawfully obstructed/delayed/tampered with plaintiff's afore-stated correspondence. Attributing her actions upon DOCS policy of prohibiting prisoner's access to their accounts the day before and the day of prisoner's scheduled commissary date, the busy volume of mail due to the approaching holiday and unintended negligence on her part.

(Compl. at ¶ 25).

Plaintiff states that the second incident occurred on April 8, 2008. (Compl. at ¶ 26). Plaintiff states that he submitted legal correspondence, together with a disbursement form to pay the cost of postage. *Id.* Plaintiff states that this piece of mail was not given to the Postal Service for mailing until April 14, 2008. *Id.* Plaintiff alleges that defendant Glover was responsible for this delay. *Id.* The third occasion was on June 5, 2008. (Compl. at ¶ 34). Plaintiff states that he submitted legal correspondence on June 5, 2008, and on June 6, 2008, the correspondence "was rejected by defendant Glover, per directions of defendant Jessen." *Id.* Plaintiff argues that this was an unlawful rejection of his correspondence. *Id.* at ¶ 35.

In addition to the three incidents detailed above, plaintiff also lists approximately eight other occasions where submission of his mail to the United States Postal Service was delayed [FN5]. (Compl. at ¶ 32).

> FN5. Plaintiff did not include information about what day of the week he submitted his mail to the Mail Clerk. The court was able to reconstruct that information based on a calendar.

*Date Submitted by Plaintiff/Day*          *Type of Correspondence*          *Date Submitted to U.S.P.S./Day*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3246818 (N.D.N.Y.)

(Cite as: 2009 WL 3246818 (N.D.N.Y.))

| April 28, 2008/Mon. | Legal | May 2, 2008/Fri. |
| May 29, 2008/Thurs. | Legal | June 2, 2008/Mon. |
| June 5, 2008/Thurs. | Legal | June 9, 2008/Mon. |
| June 8, 2008/Sun. | Legal | June 12, 2008/Thurs. |
| June 19, 2008/Thurs. | Legal | June 23, 2008/Mon. |
| July 3, 2008/Thurs. | Legal | July 7, 2008/Mon. |
| July 3, 2008/Thurs. | Legal | July 10, 2008/Thurs. |
| July 15, 2008/Tues. | Legal | July 18, 2008/Fri. |

*Id.* Plaintiff submits a number of completed forms titled "Disbursement or Refund Request," which appear to be the forms used by inmates to draw on their available funds to pay for postage. (Dkt. No. 1, *Exhibits* at 4, 6, 8, 11-15) (IAS-**2706** Forms). The forms are largely illegible, but generally seem to confirm that plaintiff submitted these forms with his correspondence to pay for the postage. *Id.*

Plaintiff basically alleges that defendant Glover violated NYSDOCS policy requiring all mail to be processed and delivered to the United States Postal Service "the next day." (Compl. at ¶ 33). Plaintiff claims that defendants were "practicing" a policy, requiring the approval of his disbursement form prior to issuing the inmate any required postage for mail. This policy prevented an inmate who was attempting to purchase postage from accessing his account for three days if he had purchased something from the commissary. (*Id.* at ¶ 30). Plaintiff claims that, as a result of this "practice," his mail was delayed until the IAS-*2708* advance form was approved.

**B. "Double-Bunking"**

**\*4** Plaintiff states that his third cause of action is against defendants State Commission on Corrections ("SCOC"), NYSDOCS, Rivera, and Neuwirth. (Compl. at ¶ 116). Plaintiff states that on March 26, 2008, he submitted a request to defendant Supt. Rivera to be moved to a "single" cell. (Compl. at ¶ 37). Plaintiff claims that his assignment to double-bunked cell was unlawful and discriminatory. *Id.*

Plaintiff states that on April 1, 2008, he met with defendant Neuwirth to discuss the double-bunking. (Compl. at ¶ 38). During the conversation, defendant Neuwirth asked plaintiff "for specific statutes prohibiting double-bunking." *Id.* Plaintiff gave a general answer that it was the obligation of the employees of the correctional facility to understand the statutes that govern the policies at the facility. *Id.* Plaintiff states that defendant Neuwirth threatened to give plaintiff a ticket for refusing a direct order. *Id.* Plaintiff claims that he was not refusing a direct order, but needed time research the issue. *Id.* Plaintiff states that defendant Neuwirth then threatened to issue a Misbehavior Report. *Id.*

Plaintiff filed a grievance on May 16, 2008 to complain about defendant Neuwirth's conduct, and about plaintiff's housing situation. (Compl. at ¶ 42). Plaintiff states that his "grievance has not been disposed, unlawfully suppressed." *Id.* at ¶ 50. Plaintiff argues that

SCOC issued a variance in accordance with the relevant statute of NYCRR, (Double occupancy housing units *originally designated for double occupancy* ), which unlawfully allowed Wallkill to convert 72 units to house two inmates. Wallkill;s [sic] units are not double occupancy units originally designated and constructed for double occupancy, rendering SCOC's variance, void and unlawful on its face.

*Id.* at ¶ 43 (emphasis in original). Plaintiff further argues that these conditions subject "all Wallkill prisoners" to standards that are "below the minimum standards governing

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3246818 (N.D.N.Y.)

(Cite as: 2009 WL 3246818 (N.D.N.Y.))

other state prisoners." *Id.* at ¶ 48.

### C. Cell Searches

Plaintiff's fourth cause of action is against defendants Rivera, Amado, Jessen, Calender [FN6], and Scott. (Compl. at ¶ 118). However, in plaintiff's statement of this claim, he includes allegations against defendant Neuwirth.

> FN6. Defendant Calender was not served with process. A summons in his name was issued in November 2008 (Dkt. No. 12), but was returned unexecuted in March 2009 (Dkt. No. 42). The docket indicates that service was not attempted a second time.

Plaintiff states that his "living quarters and property" were searched by defendant Scott on March 20 and March 26, 2008. (Compl. at ¶ 52). On March 26, 2008, he asked defendant Amado to provide plaintiff with "copies of the documents that authorized these searches." *Id.* Plaintiff states that on March 29, 2008, he met with defendant Calender, and plaintiff was informed that random searches were selected by computer program. *Id.* Plaintiff stated that he informed defendant Calender that the searches were too frequent, and the policy authorizing them was unlawful. *Id.*

Plaintiff states that his "living quarters and property" were searched again by defendant Scott on May 7, 2008, allegedly authorized by defendant Calender. (Compl. at ¶ 53). Plaintiff states that he filed a grievance, and that the grievance "has not been disposed, unlawfully suppressed." *Id.* Plaintiff states that he witnessed frequent searches of other inmates, and that this issue of "perpetual, harassing searches" was brought up at the Inmate Liaison Committee, which took the issue up with defendants Rivera, Amado, Jessen, and Neuwirth, during the May 29, 2008 meeting. *Id.* at ¶ 54. Plaintiff states that his quarters were also searched on May 20, June 18, June 22, July 24, August 6, August 7, and August 13, 2008. (Compl. at ¶ 55).

### D. Warming Stove Privileges

**\*5** Plaintiff's fifth and sixth claims are about three separate revocations of the privilege to use warming stoves. (Compl. at ¶¶ 120-23). The fifth cause of action names defendants Rivera, Amado, Scott, and Calender. *Id.* at 120-21. The sixth cause of action names only defendant Marrero.[FN7] *Id.* at 122-23. Plaintiff states that Wallkill Correctional Facility allows the use

of warming stoves. He argues that "[r]evocation of this privilege, must be in accordance to a constitutionally sound policy, and never be arbitrary or caprious [sic], or administered for the purpose of retaliation or revenge." (Compl. at ¶ 59). Plaintiff challenges the method by which the warming stove privileges were revoked, claiming that defendants' actions did not comply with due process.

> FN7. This defendant was also not served with process.

Plaintiff states that he first lost his warming stove privileges during January, when the facility revoked the warming stove privilege "of the entire AB Wing 1, 2, 3, arbitrarily depriving 300 prisoners of secured privileges .... " (Compl. at ¶ 65). Plaintiff argues that because defendant Amado "has the overall charge of the security of the facility," his approval of the revocation of privileges "was mandatory." *Id.* at ¶ 66.

Plaintiff states that on June 23, 2008, defendant Calender informed the population of "AB 1" that "use of the stoves would be restricted for at least a week, due to defendant Scott's report that someone put a substance on the supply room door knob ...." (Compl. at ¶ 60). Plaintiff states that he explained to defendant Calender that there was a long "list of suspects" who could have put the substance on the door knob. *Id.* at ¶ 61. Defendant Calender "replied that it is *his practice,* when he cannot identify the individual guilty of misconduct, he punishes the population, as to pressure the population to find and address the 'guilty' individual." [FN8] *Id.* at ¶ 61-62 (emphasis in original).

> FN8. Plaintiff also states that on June 25, 2008, he complained about the warming stove privileges to Lieutenant Baker, who is not named as a defendant in this action. (Compl. at ¶ 63). Plaintiff claims that Lieutenant Baker confirmed that it was also his practice to punish the entire population when the guilty individual could not be identified. *Id.* at ¶ 64.

Plaintiff states that on the same day that the substance was found on the door knob, an "AB 1 porter, admitted to defendant Scott that, he was the individual who inadvertently put cleaning substance from his glove on the supply room door knob, when he entered the closet to get a mop head." (Compl. at ¶ 67). Plaintiff states that notwithstanding the porter's

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3246818 (N.D.N.Y.)

(Cite as: 2009 WL 3246818 (N.D.N.Y.))

admission, the Wallkill staff, "with vindictiveness and no justification" still deprived plaintiff and 100 other prisoners of their stove privilege for (7) days." *Id.*

Plaintiff states that he filed a grievance about the loss of warming stove privileges with defendant Supt. Rivera on June 25, 2008. (Compl. at ¶ 70). Plaintiff alleges that the grievance "was not disposed, unlawfully suppressed." *Id.*

Plaintiff states that the third occasion that he lost his privilege to use a warming stove was between July 29 and August 2, 2008. (Compl. at ¶ 71). Plaintiff alleges that defendant Marrero revoked the use of the stoves because they were not clean. *Id.* Plaintiff states that it is the duty of the "assigned porter" to clean the stoves, and that when the stoves are not cleaned, the policy is to issue a Misbehavior Report. *Id.* Plaintiff argues that instead of issuing a Misbehavior Report to the porter, defendant Marrero unlawfully revoked the privilege to use the stoves. *Id.*

### E. Harassment

**\*6** Plaintiff's seventh cause of action alleges harassment of plaintiff, and names defendants Rivera, Roy, Amado, Holmes, Valuc [FN9], Marrero, Curfman, Galbally, Heal, Dunham, and Chenneham [FN10]. (Compl. at ¶ 124).

> FN9. This defendant was not served with process. The docket does not indicate when a summons was issued, but the docket shows that as to Mr. Valuc, the summons was returned unexecuted in December 2008 (Dkt. No. 18). The Clerk's Office wrote to plaintiff, and explained that there was no Lt. Valuc employed by Wallkill Correctional Facility. The clerk suggested another possible name of this particular defendant. (Dkt. No. 40). Plaintiff was also provided with an additional USM-285 form in order to effect service on the potential defendant. *Id.* Plaintiff did not respond to the court's letter.

> FN10. This defendant was not served with process. A summons was issued for this defendant in November 2008. (Dkt. No. 12). The summons was returned unexecuted in December 2008 (Dkt. No. 19). The Clerk's Office wrote to plaintiff, and explained that there was no employee with a last name of "Chenneham" employed at Wallkill Correctional

Facility. (Dkt. No. 40). The clerk asked plaintiff if he had any other identifying information about this defendant. *Id* . Plaintiff was also provided with an additional USM-285 form in order to effect service on the potential defendant. *Id.* Plaintiff did not respond to the court's letter.

Plaintiff alleges that on May 5, 2008, defendant Heal approached plaintiff and instructed him to step outside of the mess hall. (Compl. at ¶ 73). Plaintiff alleges that defendant Heal stated that he suspected plaintiff was carrying a weapon on the string of plaintiff's pants. *Id.* Plaintiff showed defendant Heal the string which held a key to plaintiff's room. *Id.* Plaintiff states that defendant Heal conducted a search of plaintiff "before the view of at least (20) prisoners waiting to enter the messhall and the messhall duty Sgt, Burns [sic]." *Id.* Plaintiff argues that once defendant Heal saw that the string on plaintiff's pants held only a key, defendant Heal had no reason to search plaintiff. *Id.* at ¶ 74. Plaintiff states that the reason for the search was "to abuse [defendant Heal's] Official Capacity to quench his individual desire to harass/intimidate and retaliate against plaintiff for filing grievances/complaints against his co-workers." *Id.* Plaintiff states that he filed a grievance with defendant Supt. Rivera, but that the "grievance was never disposed, unlawfully suppressed." *Id.*

Plaintiff states that after he filed the grievance regarding the May 5, 2008 search, defendant Heal

in retaliation conspired with other officers (who are soon to be charged), by lambasting him with a barrage of threatening, reckless eyeballing and hostile/profane language/jester. Previous documented complaints/grievances lodged by other prisoners against defendant Heal, in addition to the fact that Heal, reported to work for (3) weeks. With blackened eyes, which were the obvious result of an off duty fight. Clearly exhibits that defendant Heal, lacks a disposition which is conducive to the discharge of his duties of Correction Officer.

(Compl. at ¶ 75). Plaintiff states that he filed an additional grievance complaint on May 16, 2008 with defendants Amado and Roy as to defendant Heal's "conspiracy" with other officers "to harass/intimidate plaintiff in retaliation to grievance submitted by plaintiff." *Id.* at ¶ 78. Plaintiff argues that defendants Amado and Roy "neglected to Prevent these and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3246818 (N.D.N.Y.)

(Cite as: 2009 WL 3246818 (N.D.N.Y.))

future acts of retaliation." *Id.* at ¶ 77.

Plaintiff states one instance of retaliation occurred on May 21, 2008 during the 9:30 p.m. count of the inmates. (Compl. at ¶ 79). Defendant Heal conducted the count, and "stopped in front of plaintiff's room, stood there for 30 seconds looking into the room, while writing on a clipboard. Then defendant Dunham, on her "swing" of the count, stopped and stood in front of plaintiff's room, looking in the room for 30 seconds while writing on a clipboard." *Id.* Plaintiff states that he attempted to ask defendant Heal if they could speak, but that defendant Heal "replied in a hostile/ profane manner, get the [expletive] out of here, stop harassing me, before I give you ticket." *Id.* at ¶ 80. Plaintiff then states that he approached defendant Dunham, and asked if there was a problem with his room during the count. *Id.* "Dunham replied are you harassing me. Plaintiff said no more and returned to his room." *Id.* Plaintiff states that he filed a grievance on this issue, but that it was "never disposed, unlawfully suppressed." *Id.* at ¶ 81.

**\*7** Plaintiff states that defendant Heal issued a Misbehavior Report on May 21, 2008 to retaliate against plaintiff for filing the grievance and the May 16, 2008 complaint to defendants Amado and Roy. (Compl. at ¶ 82). Plaintiff states that defendant Dunham signed the Misbehavior Report as a witness. *Id.* Plaintiff argues that defendants Dunham and Heal committed "perjury by falsely, fabricating charges in order to retaliate against plaintiff for filing grievances, and May 16, 2008 complaint." *Id.* Plaintiff alleges that defendant Holmes "approved" the retaliatory Misbehavior Report. *Id.*

Plaintiff states that he was called to defendant Galbally's office on May 23, 2008 to discuss the Misbehavior Report filed by defendant Heal. (Compl. at ¶ 84). Plaintiff stated that the Misbehavior Report should be dismissed as retaliatory. *Id.* Plaintiff argues that defendant Galbally neglected his official duty when he failed to dismiss the Misbehavior Report and commenced a hearing on the Report. *Id.* at ¶ 86 [FN11]. Plaintiff states that he requested the opportunity to present witnesses, but that defendant Galbally stated that the rules for a Tier I hearing did not afford plaintiff the opportunity to present witnesses, or for the hearing to be recorded. *Id.*

FN11. There is no Paragraph 85.

Plaintiff alleges that defendants Heal and Dunham harassed plaintiff while conducting the inmate count, "then conspired to fabricate a fraudulent report to cover-up their improprieties and retaliate." *Id.* Plaintiff argues that defendant Galbally's "affirmation of the fraudulent report affirms his part of the conspiracy by officers." *Id.* at ¶ 87. Plaintiff further argues that since defendants Rivera and Amado were "properly appraised [sic] of the improprieties of their subordinates, [and they] neglected to curtail this unlawfulness affirms that they condone the conspiracy to retaliate." *Id.*

Plaintiff states that he filed a grievance with defendant Rivera on May 24, 2008 regarding the Tier I Disposition, but he received no relief. (Compl. at ¶ 88). Plaintiff argues that defendants Rivera, Amado, Holmes, Galbally, Heal, and Dunham "conspired to harass/intimidate, issue/affirm fraudulent retaliatory misbehavior report, defraud plaintiff's rights to substantive/procedural due process to grieve/ appeal, present evidence in his favor, equal protection, subjecting cruel [sic] and unusual punishment." *Id.*

Plaintiff alleges another instance of harassment that occurred on July 5, 2008, when defendants Heal and Curfman "directed Threatening stares/Gestures upon plaintiff." (Compl. at ¶ 89). Plaintiff states that as he was leaving the mess hall, defendant Curfman "accosted plaintiff, threateningly, screaming with hostility, pull your pants up." *Id.* Plaintiff states that six other Corrections Officers laughed at plaintiff, and that defendant Heal's laughter was the loudest. *Id.* Plaintiff argues that defendant Curfman's behavior on the morning of July 5, 2008 "confirms that he conspired" with defendant Heal. *Id.* Plaintiff argues that defendants Roy and Amado violated plaintiff's civil rights "by their willful Neglect to Prevent, the perpetual campaign to threaten, harass, intimidate plaintiff in retaliation, as substantiated in numerous afore-mentioned grievances, by plaintiff all of which have been WHITE WASHED." *Id.* at ¶ 90.

**\*8** Plaintiff next alleges that defendant Curfman harassed plaintiff by implementing *"his own unlawful policy/custom* of arbitrarily prohibiting plaintiff/ Wallkill prisoners from taking rolls, buns, biscuits. i.e. bread [sic] from the messhall." (Compl. at ¶ 91) (emphasis in original). Plaintiff asserts that the Wallkill Facility Guide states that bread may be taken out of the mess hall at the noon and evening meals. *Id.* It is unclear when defendant Curfman allegedly engaged in the enforcement

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3246818 (N.D.N.Y.)

(Cite as: 2009 WL 3246818 (N.D.N.Y.))

of his policy about the bread.

In the next paragraph, plaintiff states that on July 10, 2008, plaintiff was summoned to defendant Marrero's office for a hearing regarding a grievance about the bread. (Compl. at ¶ 92). Much of this section of plaintiff's complaint references the Ku Klux Klan, and refers to some defendants as "Grand Wizard", "Regional Grand Wizard", or other combinations of defendants' title and Ku Klux Klan references. Plaintiff states, in essence, that the grievance was never resolved. *Id.*

Plaintiff also states that defendant Marrero conducted the grievance hearing, and that in Marrero's opinion, "the fact that no one made any racist remarks, shows that grievance is an unsubstantiated, anger fueled, written document that no court would believe." *Id.* Plaintiff states that another instance of harassment occurred on July 7, 2008 at around 8:00 a.m., while plaintiff walked toward the "P.C. window" in the basement. (Compl. at ¶ 94). Plaintiff states that defendant Chenneham "physically bumped" into plaintiff. *Id.*

Plaintiff states that the next instance of harassment occurred on July 12, 2008 around 12:30 p.m., when he was on the telephone. (Compl. at ¶ 94). Plaintiff states the defendant Valuc "fraudulently stat[ed]" to defendant Scott that plaintiff had his feet on the wall, and that plaintiff should have to paint the wall. *Id.* Plaintiff argues that defendant Valuc has become "the latest Nazi, to abuse his Official Capacity, by cracking the whip of Unlawful Slave Labor, in order to degrade, harasss, and intimidate plaintiff in retaliation." *Id.* Plaintiff argues that the defendants act with "impunity, which fuels their recklessness, to the inevitable point of assaulting plaintiff." *Id.* at ¶ 96. Plaintiff argues that his personal safety is threatened by "the escalating campaign of harassment, intimidation, threats, physical abuse, MUST BE CURTAILED." *Id.* at ¶ 97.

### F. Grievances

Plaintiff's eighth cause of action is against defendants CORC, Rivera, Henn, and Scott. This claim includes several allegations about how defendants handled plaintiff's grievances. Plaintiff alleges that defendant Rivera "willfully pervert[ed] state statute [sic] governing Inmate Grievance Program, by unlawfully suppressing all grievances submitted to him by plaintiff." (Compl. at ¶ 98).

Plaintiff states that on June 17, 2008, he submitted to CORC all of the grievances that plaintiff had submitted up until

that date (May 5, May 8, May 16, May 16 (complaint), May 21, May 24 (grievance and complaint), and June 8, 2008). (Compl. at ¶ 98). Plaintiff states that defendant CORC rejected the group of documents and returned them to plaintiff. *Id.*

**\*9** Plaintiff states that his copies of correspondence from the CORC and his grievances were stolen by defendant Scott on May [FN12] 13, 2008. (Compl. at ¶ 100). Plaintiff states that this theft occurred "under the guise of a 'random search' ". *Id.* Plaintiff alleges that Defendants Rivera, Henn, CORC, conspired to willfully deprive plaintiff of his constitutional rights by unlawfully suppressing his grievances. *Id.* at ¶ 101.

> [FN12.] Plaintiff wrote "May," but this may have been a typographical error. Plaintiff alleges that the theft took place after August 10, 2008, when plaintiff submitted certain documents to Wallkill's business office that indicated that plaintiff had begun this civil action.

### G. NYSDOCS

Plaintiff's ninth cause of action names only NYSDOCS. (Compl. at ¶ 128). Plaintiff argues that the policy of electronic monitoring of prisoners' telephone conversations violates plaintiff's federal constitutional and state statutory rights. (Compl. at ¶ 103). Plaintiff also alleges that he was the subject of an investigation, involving electronic surveillance of his telephone conversations. *Id.* at ¶ 104. Plaintiff also makes some claims that there were undercover "agents" and inmate "agents" conspiring to fabricate charges against plaintiff. *Id.* Plaintiff states that, as a result, his spiritual, mental, and physical well-being were in "clear and present danger." *Id.* Plaintiff requested that the court initiate an investigation into the matter. [FN13] *Id.* at ¶ 105.

> [FN13.] As stated above, plaintiff has been released from custody, and therefore, any requests for injunctive relief may be dismissed as moot. *Pugh, 571 F.Supp.2d at 489-90.*

### 3. Eleventh Amendment Immunity

It is well-settled that the state itself cannot be sued under section 1983. *Komlosi v. New York State OMRDD, 64 F.3d 810, 815 (2d Cir.1995)* (citing *Will v. Michigan Department of Police, 491 U.S. 58, 71 (1989)*). This is true whether the court is considering Eleventh Amendment immunity or a statutory

Slip Copy, 2009 WL 3246818 (N.D.N.Y.)

(Cite as: 2009 WL 3246818 (N.D.N.Y.))

interpretation of section 1983. *Id.* at 815 n. 3. This immunity also applies to suits against state agencies. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100 (1984) (holding that "in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."); *Burnette v. Carothers,* 193 F.3d 52, 57 (2d Cir.1999), *cert. denied,* 531 U.S. 1052 (2000).

However, a state official acting in his official capacity may be sued in a federal forum **to enjoin conduct** that violates the federal Constitution, notwithstanding the Eleventh Amendment bar. *Papasan v. Allain,* 478 U.S. 265, 276-77 (1986); *Pennhurst,* 465 U.S. at 102; *Hutto v. Finney,* 437 U.S. 678, 692 (1978). Under *Edelman v. Jordan,* "a federal court's remedial power, consistent with the Eleventh Amendment, is necessarily limited to prospective injunctive relief ... and may not include a retroactive award which requires the payment of funds from the state treasury." *Edelman v. Jordan,* 415 U.S. 651, 677 (1974).

NYSDOCS and SCOC are both state agencies.[FN14] These agencies are entitled to Eleventh Amendment immunity, and, thus, the claims against the New York State Department of Correctional Services and the State Commission of Corrections should be dismissed. Additionally, the claims against the remaining defendants in their "official" capacities, should be dismissed to the extent that plaintiff sues them for money damages.

> [FN14.] It appears that the court issued a summons for the DOCS Central Office Review Committee ("CORC"). (Dkt. No. 12). The CORC is a Committee within DOCS, it is neither an agency of the state, nor is it a "branch" of an agency. Thus, the CORC is not an entity that can be served. The court agrees with defendants that even if service on CORC had been somehow effected, plaintiff's claims against CORC would be barred by the Eleventh Amendment.

**\*10** This court recommends dismissal of plaintiff's ninth claim, and all other claims against NYSDOCS and SCOC, and the court also recommends dismissal of the claims against the remaining defendants in their official capacities, to the extent that plaintiff seeks money damages. Although the plaintiff's claims for injunctive relief would not necessarily have been barred by the Eleventh Amendment, plaintiff has been released

from incarceration, thus, as stated above, any claims for injunctive relief must be dismissed as moot. *Pugh,* 571 F.Supp.2d at 489-90.

**4. *Service of Process***

The Federal Rules require that a defendant be served within 120 days of filing the complaint. FED. R. CIV. P. 4(m). The failure to serve a defendant within 120 days of filing the complaint may be a ground for dismissal of the complaint unless good cause is shown for an extension of that time. *Id.* A dismissal may be initiated by motion or *sua sponte* by the court after notice to plaintiff. *Id.* Generally, if the court chooses to dismiss the action against the unserved defendants, the dismissal must be without prejudice. *Id.*

In this case, defendants C.O. Chenneham; Sgt. Calender; Lt. Valuc; Lt. Marrero; and the CORC have not been served with process. As stated above, the CORC may not be named as a defendant in any event, thus, the court will recommend dismissal with prejudice as against the CORC. On December 22, 2008 and February 12, 2009, the Clerk wrote to plaintiff explaining that defendants Marerro, Valuc, and Chenneham had not been served and explaining potential reasons for the failure of service. (Dkt. Nos. 39-Def. Marerro, 40-Defs. Valuc & Chenneham). On March 6, 2009, the summons was returned "unexecuted" as to defendant Calender, and plaintiff was informed that he must notify the Marshal's Service if plaintiff wished any further attempt to serve this defendant. (Dkt. No. 42 at 2).

Plaintiff has taken no further steps to serve these defendants, notwithstanding the court's letters and the Marshal's notice. Thus, this court will recommend dismissal as to defendants Calender, Valuc, Marerro, and Chenneham for failure to serve.[FN15]

> [FN15.] Understandably, the moving defendants did not include the unserved defendants in their motion. However, the arguments made by the moving defendants also justify dismissal as to the unserved defendants. Thus, although the court recommends dismissal against these defendants for failure to serve, the court also finds that it would have recommended dismissal as against these defendants in any event.

**5. *Interference with the Mail***

Slip Copy, 2009 WL 3246818 (N.D.N.Y.)

(Cite as: 2009 WL 3246818 (N.D.N.Y.))

Plaintiff alleges that delays in processing his mail have violated his constitutional rights under the First, Fifth, and Fourteenth Amendments. Under the First Amendment, prisoners have a right "to the free flow of incoming and outgoing mail." *Johnson v. Goord,* 445 F.3d 532, 534 (2d Cir.2006) (citing *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003)). A prisoner's right to receive and send mail may, however, be regulated. *Davidson v. Mann,* 129 F.3d 700, 702 (2d Cir.1997). A regulation affecting an inmate's attempt to send or receive mail "is valid if it is reasonably related to legitimate penological interests." *Rodriguez v. James,* 823 F.2d 8, 12 (2d Cir.1987) (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)).

**11** "In balancing the competing interests implicated in restrictions on prison mail, courts have consistently afforded greater protection to legal mail than to non-legal mail, as well as greater protection to outgoing mail than to incoming mail." [FN16] *Davis,* 320 F.3d at 351 (citing *Thornburgh v. Abbott,* 490 U.S. 401, 413 (1989); *Washington v. James,* 782 F.2d 1134, 1138-39 (2d Cir.1986); *Davidson v. Scully,* 694 F.2d 50, 53 (2d Cir.1982)). Interference with *legal* mail may implicate a prisoner's right to access to the courts as guaranteed by the First and Fourteenth Amendments. *Davis,* 320 F.3d at 351. A denial of access to courts, however, requires an additional finding of "actual injury." *Lewis v. Casey,* 518 U.S. 343 (1996). Plaintiff must show that a non-frivolous legal claim was frustrated or impeded due to the actions of prison officials. *Warburton v. Underwood,* 2 F.Supp.2d 306, 312 (W.D.N.Y.1998) (quoting *Lewis v. Casey,* 518 U.S. at 353).

FN16. Generally, when the issue involves only censorship or tampering with legal mail as opposed to an alleged denial of access to courts, the inmate alleges that the defendants either read his mail, censored his mail, or otherwise interfered with the mail. *Davis, supra.* Outgoing mail, whether legal or personal is entitled to greater protection from review or censorship because of the lesser security concerns presented. *Id.* at 532 (citing *Thornburgh,* 490 U.S. at 413).

**A. Correspondence Regulations**

In this case, plaintiff alleges only that his mail was delayed pursuant to a practice whereby an inmate is denied "access to his account" for three days while a commissary purchase is processed. Although plaintiff alleges one delay regarding non-legal mail, most of his complaints involve a delay in processing his legal mail. Plaintiff claims that this "practice" violates the DOCS policy requiring all mail to be processed to the postal service "the next day."

The DOCS Directives governing both "general" and "privileged" correspondence outline the procedures required to obtain postage for outgoing mail. DOCS Directive Nos. 4421, § 721.3(a)(3) [FN17] (privileged), 4422(III)(D) [FN18] (general). If an inmate has sufficient funds in his inmate account, he may purchase postage for both personal and legal (privileged) correspondence through the sale of stamps in the commissary. DOCS Directive No. 4422(III)(D)(1) (c). In certain circumstances, an inmate may purchase stamps by attaching an IAS-2706 Form to a letter. *Id.* 4422(III)(D)(1) (d). The IAS-*2706* is a form that requests disbursement from an inmate's existing account *if there are sufficient funds.*

FN17. Directive 4421 is a copy of the New York State Regulations governing correctional services. N.Y. CODE RULES & REGS. (N.Y.CRR), tit. 7 §§ 721.1-.3.

FN18. The information contained in Directive 4422 is also contained in 7 NYCRR §§ 720.2-720.8.

An inmate is entitled to a weekly free postage allowance for privileged correspondence. DOCS Directive No. 4421 § 721.3(a)(3) (ii). If an inmate does not have sufficient funds for the purchase of postage, [FN19] he is entitled to obtain an advance from the facility for a certain amount of postage for *privileged* correspondence, including legal mail by submitting an IAS-*2708* Form with his request. DOCS Directive No. 4421 § 721.3(a)(3)(iv)(a)-(c). Another Directive governs the procedure for obtaining funds when the inmate is in need of photocopying services. DOCS Directive No. 4483(III)(I). This Directive provides that photocopying requests must be accompanied by either an IAS-2706 Form (for disbursements) or an IAS-2708 Form (for advances). [FN20] *Id.* The Directive warns that the inmate must receive the requested photocopies within five business days, however "[t]wo day commissary holds, where applicable, might increase the delivery deadline to seven days." *Id.*

FN19. The court would note that in order to utilize the IAS-2708 Form to obtain an advance of funds, the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3246818 (N.D.N.Y.)

(Cite as: 2009 WL 3246818 (N.D.N.Y.))

inmate must meet additional conditions that are specified in the Directive. DOCS Directive No. 4421 § 721.3(a)(3)(iv)(a)-(c).

FN20. Directive No. 2788 provides the procedure for collection and repayment of money due from inmates as the result of advances or other obligations. Directive No. 2788(III). This Directive has specific sections that relate to postage. *Id.* Directive No. 2788(III)(A)(1)-(3).

**\*12** It appears that, as plaintiff claims, an inmate's request for funds for postage or other disbursements may be delayed when there has been a commissary purchase. Plaintiff submits a completed form dated March 26, 2008 titled "Inmate Accounts," stating that his money was "held for Commissary for 2 days." (Dkt. No. 1, *Exhibits* at 5). The form also states that as soon as plaintiff's money was "released," his postage and disbursement requests were processed immediately. *Id.* Another of plaintiff's exhibits is a letter from defendant Glover, dated March 25, 2008, stating that when she received plaintiff's mailings, he had insufficient funds to cover the postage, and that she was unable to contact plaintiff for him to complete the "advance form for [his] Legal mailing". (Dkt. No. 1, *Exhibits* at 7). The court notes that defendant Glover's letter states that she sent out plaintiff's legal mail in any event, but that there was an error regarding a personal mailing. *Id.* In response to plaintiff's grievance, the Superintendent stated that "[t]he state accounting system that is currently in place prevents an inmate from overspending his account before a commissary buy." (*Id. Exhibits* at 9).

To the extent that plaintiff challenges the Directives regulating how the facility processes mail and the policy of holding an inmate's request for disbursement until his account can be cleared, these regulations are not unreasonable. Holding an inmate's request for funds for a short period of time to make sure that he has sufficient funds to cover the disbursement is reasonably related to legitimate penological interests and the administration of the inmate account system.FN21 The delays cited by plaintiff are not excessive, and in themselves do not rise to the level of First Amendment violations.

FN21. The court would simply point out that non-prisoners must often wait for accounts to clear prior to banks disbursing funds.

Plaintiff also alleges that his account was ***improperly*** labeled as having insufficient funds for postage, when, in fact, he did possess sufficient funds. (Dkt. No. 1, *Memo.* at 2). Plaintiff claims that Defendant Glover "willful[ly] violat[ed]" his rights. However, during the investigation of plaintiff's grievance, defendant Rivera found that "[a]ny delay in the grievant's personal outgoing mail being processed is attributed to human error and no malice by staff can be substantiated." (Dkt. No. 1, *Memo.* at 9). Similarly, the CORC stated that any delay was "inadvertent." *Id.* at 10. An inadvertent or negligent delay in processing plaintiff's mail would not rise to the level of a constitutional violation.FN22 *See Daniels v. Williams,* 474 U.S. 327, 332 (1986) (negligence not actionable under Section 1983).

FN22. Plaintiff alleges that DOCS had a policy whereby all mail was to be processed by "the next day," however, he cites no statutory or regulatory basis for this requirement. Even if DOCS had a policy that encouraged the immediate processing of an inmate's mail, the violation of a DOCS policy would not necessarily violate plaintiff's constitutional rights. *See Salahuddin v. Coughlin,* 781 F.2d 24, 27 n. 4 (2d Cir.1986) ( "[e]very violation of state law is not necessarily a denial of constitutional right").

**B. Access to Courts**

Because plaintiff claims that his legal mail was delayed, he also alleges that defendants violated his right to access the courts. (Compl. at ¶¶ 24, 26, 32, 34). Though plaintiff alleges delays,FN23 and perhaps inconvenience, he has not alleged *any actual harm* to any legal action, resulting from the alleged delays. Plaintiff has not argued that defendants' conduct resulted in the dismissal of an otherwise meritorious legal claim. Without an actual injury, plaintiff has not stated a claim that can survive this motion to dismiss. *Lewis v. Casey, supra.* Mere "delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995) (citing *Jones v. Smith,* 784 F.2d 149, 151-52 (2d Cir.1986)).

FN23. The longest delay alleged by plaintiff was seven days. Compl. ¶ 32. Most of the delays were four days, one was three days, and one was six days.

Slip Copy, 2009 WL 3246818 (N.D.N.Y.)

(Cite as: 2009 WL 3246818 (N.D.N.Y.))

*Id.*

**\*13** Plaintiff does claim that one piece of legal mail "was rejected by defendant Glover", and that the mail was returned to plaintiff. (Compl. at ¶ 35). However, plaintiff does not state that he was ultimately unable to mail that one piece of legal correspondence, and he does ***not*** allege any harm to a pending action as the result of this alleged "rejection."

Based upon the complaint and the documents attached, plaintiff fails to state a constitutional violation associated with either his right to send and receive mail or his access to courts. Thus, plaintiff's claims relating to the processing of his mail should be dismissed.

### 6. *Double-Bunking*

Plaintiff claims that his assignment to "double-bunked quarters is unlawful/ discriminatory." (Compl. at ¶ 37). Plaintiff is challenging a "variance" [FN24] issued to Wallkill, allowing the facility to convert single occupancy cells to double occupancy. Plaintiff claims that this variance was unconstitutional, subjecting "all Wallkill prisoners" to standards "below the minimum standards governing other state prisoners." *Id.* at ¶ 48.

> FN24. It is unclear what plaintiff means when he states that Wallkill was issued a "variance," however, because this is a motion to dismiss, the court assumes the truth of plaintiff's statement for purposes of this report.

The Supreme Court has held that "double celling" [FN25] is generally permissible under the Eighth and Fourteenth Amendments. *Rhodes v. Chapman,* 452 U.S. 337, 352 (1981). There is no "one man, one cell" principle embodied in the Constitution. *Bell v. Wolfish,* 441 U.S. 520, 542 (1979). However, combined with other adverse conditions, double-celling may amount to an Eighth Amendment violation. *Bolton v. Goord,* 992 F.Supp. 604, 626 (S.D.N.Y.1998). In order to violate the constitutional prohibition against cruel and unusual punishment, the conditions of confinement must result in an "unquestioned and serious deprivation of basic human needs," and the defendants must have imposed those conditions with "deliberate indifference." *Jolly v. Coughlin,* 76 F.3d 468, 480 (2d Cir.1996) (citing *Wilson v. Seiter,* 475 U.S. 312, 319-20 (1986); *Anderson v. Coughlin,* 757 F.2d 33, 35 (2d Cir.1985)).

> FN25. Double-celling involves housing two inmates in a cell that was originally designed for one person. *Jones v. Goord,* 435 F.Supp.2d 221, 227 (S.D.N.Y.2006).

In *Jones v. Goord,* the court analyzed the double-celling issue at length. *Jones v. Goord,* 435 F.Supp.2d 221 (S.D.N.Y.2006). *Jones* was a class action case in which plaintiffs challenged a double-celling program that was instituted in New York State due to a large increase in prison population. *Jones,* 435 F.Supp.2d at 228. Plaintiffs argued that the practice deprived inmates of the "minimal civilized measure of life's necessities." *Id.* Plaintiffs claimed that New York's double-celling policy violated the Eighth Amendment because of "the general conditions of confinement in double cells, the risk of inmate against inmate violence, injury and disease, and secondhand smoke." *Id.* at 236. The court found that none of the conditions alleged by plaintiffs resulted in constitutional violations, and dismissed the claims. *Id.* at 236-53.

Under DOCS regulations, inmates must consent to being housed in a double cell for more than sixty days, and there exists a screening process, which prevents certain kinds of inmates from being housed together in a double cell. *Jones,* 435 F.Supp.2d at 230-31, 247-49. In this case, plaintiff appears to challenge the policy as a whole, rather than alleging that ***he*** suffered some hardship or adverse condition. He merely alleges that this "variance" [FN26] subjected all Wallkill inmates to constitutionally inadequate conditions and cites numbers of bathrooms, toilets, urinals, and showers. (Compl.¶ 48). This conclusory allegation, without any specific claim that plaintiff suffered any deprivation, does not rise to the level of an Eighth Amendment violation. Any claim that defendants violated state law or regulations, without more, does not state a constitutional claim. *Salahuddin v. Coughlin,* 781 F.2d 24, 27 n. 4 (2d Cir.1986). Plaintiff's claim about "double-bunking" does not rise to the level of a constitutional violation and may be dismissed.

> FN26. The court must also note that plaintiff cites the incorrect section of the NYCRR. Plaintiff cites the text of a section governing double occupancy housing units originally designated for "double occupancy"

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3246818 (N.D.N.Y.)

(Cite as: 2009 WL 3246818 (N.D.N.Y.))

and argues that by converting single occupancy cells to double occupancy, Wallkill violated this regulation. *See* 9 NYCRR § 7621.6-b. The regulations do, however, also provide for "Double occupancy housing units originally designed for *individual occupancy.*" *Id.* § 7621.6-a. The regulations contain a formula for maximum facility capacity and provide for an application to the SCOC if a change in maximum facility capacity becomes necessary. 9 NYCRR §§ 7621.10, 7621.11. Thus, the conversion of which plaintiff complains is authorized by the regulations, and the variance is not "void" on its face.

## 7. *Cell Searches and Privacy*

**\*14** Plaintiff claims that his "quarters and property" were subject to an excessive number of searches. Plaintiff claims that defendant Scott searched plaintiff's cell on March 20, March 26, and May 7, 2008. (Compl. at ¶¶ 52-53). Plaintiff alleges that some of these searches were authorized by defendant Calender. *Id.* at ¶ 53. Plaintiff alleges that his cell was searched an additional seven times: May 20, June 18, June 22, July 24, August 6, 7, and 13, 2008. *Id.* at ¶ 55. Plaintiff states that other inmates were similarly searched, and that defendants Rivera, Amado, Jessen, and Neuwirth were advised of the issue at the May 29, 2008 meeting of the Inmate Liaison Committee. *Id.* at ¶ 54. As proof of the excessive nature of these searches, plaintiff argues that while incarcerated at Franklin Correctional Facility for three years, he was subjected to only one random search. *Id.* at ¶ 55.

It is well-settled that the prohibition against unreasonable searches and seizures does not apply to a prison cell. *Hudson v. Palmer,* 468 U.S. 517, 526 (1984. Inmates have no reasonable expectation of privacy in their cells. *Willis v. Artuz,* 301 F.2d 65, 67-69 (2d Cir.2002); *Rodriguez v. McClenning,* 399 F.Supp.2d 228, 239 (S.D.N.Y.2005). In *Rodriguez,* the court held that an inmate has no right to be free from searches of any kind, including those alleged to be "retaliatory." *Id.* (citing cases).

Plaintiff cites all the occasions when his cell was searched and mentions that other inmates suffered from excessive searches. (Compl.¶¶ 53-55). He then states that his claim is substantiated "res ipsa loquitur" because he was subjected only to one "random" search in the three years that he was

incarcerated at Franklin Correctional Facility. *Id.* ¶ 55. The fact that Wallkill officials choose to search inmates' cells more frequently, even if true, does not change this court's finding. There is no protection from unreasonable searches of one's prison cell. Thus, any cell search claims must be dismissed.

## 8. *Warming Stove and Other Privileges*

Plaintiff's fifth and sixth causes of action are related to three separate occasions when plaintiff's *housing block* lost the privilege to use "warming stoves" in their cells. (Compl. at ¶¶ 59-72). Plaintiff also complains about his loss of the privilege to remove bread products from the mess hall. *Id.* at ¶ 91. Plaintiff argues that the defendants' policy of punishing the entire housing block when defendants are unable to identify who committed some particular misbehavior is unconstitutional. Plaintiff argues that the deprivation of these privileges must be in accordance with a "constitutionally sound policy," and must not be "arbitrary and capricious" or retaliatory. Plaintiff is clearly attempting to make a due process argument regarding the denial of these privileges.

Plaintiff cannot make claims on behalf of his "housing block." *See Singleton v. Wulff,* 428 U.S. 106, 114 (1976) (plaintiff cannot assert claims on behalf of other individuals). However, to the extent that plaintiff is making his own due process claim, the claim must also fail. In *Sandin v. Conner,* the Supreme Court held that although states may still create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 483-84 (1995).

**\*15** In this case, plaintiff is complaining *only* about the loss of privileges. Plaintiff has *not* alleged that any atypical and significant hardship was imposed upon him. *Sandin,* 515 U.S. at 483-84. Plaintiff does *not* claim that the loss of the warming stove privilege or that the inability to take bread out of the mess hall was harmful to his health.[FN27] There is simply nothing "atypical" or "significant" that would create the right to any particular process prior to losing these privileges.

FN27. Plaintiff also does not state a separate Eighth Amendment claim with respect to this denial of

Slip Copy, 2009 WL 3246818 (N.D.N.Y.)

(Cite as: 2009 WL 3246818 (N.D.N.Y.))

privileges. He does not claim that the conditions of confinement due to the deprivation of these privileges resulted in an "unquestioned and serious deprivation of basic human needs." *See Jolly v. Coughlin,* 76 F.3d at 480. Plaintiff does claim that by punishing the entire block, defendants were "endangering the security of the facility." (Compl.¶¶ 64-65). Plaintiff appears to claim that defendants were endangering the security of the facility because defendants' actions would pressure the inmates to determine who was the guilty party, fostering unrest among the inmates. *Id.* ¶ 61. However, plaintiff is speculating about this claimed result of defendants' actions. Nowhere does he claim that there was ever an incident of inmate unrest due to defendants' actions.

To the extent that plaintiff uses the word "retaliation," he does not state a constitutional claim. In order to state a constitutional claim, plaintiff must allege that the defendants retaliated against plaintiff for the exercise of a constitutional right. In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for adverse action taken against him by defendants. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002); *Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997)). The court must keep in mind that claims of retaliation are "easily fabricated" and thus, plaintiff must set forth non-conclusory allegations. *Id.* (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506 (2002)).

In this case, plaintiff claims that the privileges were initially revoked "in retaliation" for someone leaving a substance on the doorknob. (Compl.¶ 60). Defendants' alleged "retaliation" had nothing to do with plaintiff exercising a constitutional right. Thus, plaintiff's claim of denial of privileges must be dismissed.

**9. *Harassment***

Plaintiff alleges that he has been subject to several different kinds of harassment by a number of corrections officers, and that some of the defendants have engaged in a conspiracy to harass plaintiff. These behaviors include the following allegations:

1. Defendant Neuwirth told plaintiff that he was "going to have a hard time [at Wallkill]," and wrote a false misbehavior report against plaintiff in conjunction with plaintiff's complaint about being assigned to a double cell. (Compl. at ¶¶ 40-41).

2. Defendant Heal illegally escorted plaintiff from the mess hall, and searched plaintiff in front of at least twenty other prisoners, in retaliation for plaintiff's filing of grievances against defendant Heal's co-workers. (Compl. at ¶¶ 73-74).

3. On May 21, 2008, while performing the "evening count," Defendants Heal and Dunham, "stopped in front of plaintiff's room, stood there for 30 seconds looking into the room, while writing on a clipboard." (Compl. at ¶ 79). Defendant Dunham then accused plaintiff of harassment, and defendant Heal wrote an allegedly false misbehavior report regarding the incident that was "affirmed" after a disciplinary hearing conducted by defendant Galbally. (*Id* . at ¶¶ 82, 86-87).

**\*16** 4. Defendant Curfman told plaintiff to pull his pants up, causing defendant Heal and other officers to laugh at plaintiff. (Compl. at ¶ 89).

5. Defendants Roy and Amado failed to prevent the harassment. (Compl. at ¶ 90).

6. Defendant Curfman instituted a policy prohibiting inmates from taking bread out of the mess hall. (Compl. at ¶ 91).

7. Defendant Chenneham bumped into plaintiff. (Compl. at ¶ 94).

8. Defendant Valuc told defendant Scott that plaintiff had his feet on the wall during a telephone conversation, and suggested that defendant Scott should have plaintiff paint the wall as punishment. (Compl. at ¶ 95).

**A. *Verbal Harassment***

To the extent that plaintiff alleges that defendants verbally harassed him, whether by threatening to file a Misbehavior Report or suggesting that plaintiff should paint the walls, the claims should be dismissed. Verbal harassment and name-calling, absent "appreciable injury," simply are not constitutional violations cognizable under Section 1983.

Slip Copy, 2009 WL 3246818 (N.D.N.Y.)

(Cite as: 2009 WL 3246818 (N.D.N.Y.))

*Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986); *Vega v. Artus,* 610 F.Supp.2d 185, 209 (N.D.N.Y., Mar. 26, 2009).

In his response to defendants' motion to dismiss, plaintiff claims that defendants violated various New York State statutes; regulations; and the DOCS Employee Manual. (Dkt. No. 46). Even if defendants had violated New York law or the DOCS Employee Manual prohibiting verbal harassment, the violation of state law, absent a constitutional violation, is not actionable under section 1983.[FN28] *Salahuddin v. Coughlin,* 781 F.2d 24, 27 n. 4 (2d Cir.1986).

> FN28. The court also notes that where the plaintiff lacks a valid federal claim, a district court has the discretion to decline to exercise supplemental jurisdiction over any pendent state law claims. *Matican v. City of New York,* 524 F.3d 151, 154-55 (2d Cir.1008).

**B. Retaliation**

Plaintiff alleges throughout his complaint that defendants retaliated against him for filing grievances. As stated above, in order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for adverse action taken against him by defendants. *Bennett v. Goord,* 343 F.3d at 137.

The court in *Dawes* stated that in order to survive summary dismissal, the plaintiff's "non-conclusory" allegations must establish

(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech [or conduct] and the adverse action.

239 F.3d at 492 (citations omitted). Subsequent Second Circuit cases have held that, in a prison context, all that is required is that the adverse conduct by defendant would have deterred a similarly situated individual of ordinary firmness from exercising his First Amendment rights. *See Gill v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir.2004). In *Gill,* the court held that this objective test applied, even where a particular plaintiff was *not subjectively deterred* and continued to file grievances and lawsuits. *Id.*

*17 The filing of grievances is constitutionally protected conduct. *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996). Thus, the court will assume that plaintiff engaged in "constitutionally protected conduct." As to the second element of retaliation, plaintiff has not alleged a single instance of the kind of "adverse action" that would deter a similarly situated inmate from exercising his constitutional rights. Most of the "retaliation" that plaintiff alleges is verbal harassment. Plaintiff described the harassment as being "lambast[ed] ... with a barrage of threatening, reckless eyeballing and hostile/profane language/jester [sic]." Plaintiff generally alleges that defendants were "mean" to him, that they "eyeball[ed]" him, and even that these conducts constituted "terrorizing conduct." These are not the kinds of unconstitutional "adverse actions" that would make up a retaliation claim.

Contrary to plaintiff's claim that the allegedly "false" misbehavior report written by defendants Heal and Dunham was "affirmed" by defendant Galbally, it is clear from plaintiff's own exhibits that defendant Galbally found plaintiff "not guilty" of two of the charges and only sentenced plaintiff to a seven day work detail. (Compl. *Exhibits* at 42-43). This is not the type of "adverse action" that would deter a similarly situated individual from asserting his rights. Plaintiff makes passing reference to one instance where defendant Chenneham "physically bumped into" plaintiff. (Compl. at ¶ 94). Plaintiff alleges no injury or any adverse consequences whatsoever from the incident. It is unclear how plaintiff claims that this "bump" would have deterred him from asserting his rights. Thus, plaintiff's "retaliation" claims may be dismissed.

**10. *Grievances***

Plaintiff's eighth claim is that defendants, defendant Superintendent Rivera in particular, "willfully pervert[ed] state statute [sic] governing Inmate Grievance Program, by unlawfully suppressing all grievances submitted to him by plaintiff." (Compl. at ¶ 98). Plaintiff alleges that defendants Rivera, Henn, and CORC were engaged in a conspiracy to deprive him of his right to grieve his complaints. *Id.* at ¶ 101.

The law is clear that plaintiff has no constitutional right to have his grievances processed at all, or if processed, to have the procedure done properly. *Torres v. Mazzuca,* 246 F.Supp.2d 334, 342 (S.D.N.Y.2003). A violation of the inmate grievance procedures does *not* give rise to a claim under

Slip Copy, 2009 WL 3246818 (N.D.N.Y.)

(Cite as: 2009 WL 3246818 (N.D.N.Y.))

section 1983. *Cancel v. Goord,* No. 00-Civ.2042, 2001 U.S. Dist. LEXIS 3440 (S.D.N.Y. Mar. 29, 2001). A claim that defendants improperly or inadequately investigated plaintiff's grievance is not actionable. *See Davis v. Buffardi,* No. 0:01-CV-0285, 2005 U.S. Dist. LEXIS 45487, 2005 WL 1174088, at *3 (N.D.N.Y. May 4, 2005) (Magnuson, J.) ("[p]articipation in an inmate grievance process is not a constitutionally protected right") (citations omitted); *Shell v. Brzezniak,* 365 F.Supp.2d 362, 369-70 (W.D.N.Y.2005) ( "[i]nmate grievance programs created by state law are not required by the Constitution") (citations omitted); *Cancel v. Goord,* No. 00. CIV.2042, 2001 U.S. Dist. LEXIS 3440, 2001 WL 303713, at *3 (S.D.N.Y. Mar. 29, 2001) ("inmate grievance procedures are not required by the Constitution and therefore a violation of such procedures does not give rise to a claim under § 1983") (citations omitted).

**\*18** Because there is no constitutional right to the Inmate Grievance Program, there can be no constitutional violation for officials' alleged failure to abide by the proper procedures. Plaintiff alleges that because of defendants' alleged "suppression" of his grievances, he submitted all of his "grievances" to the CORC. (Compl.¶ 98). Plaintiff then complains that the CORC rejected these grievances and returning them to plaintiff and to defendants Rivera and Henn. *Id.* Rejection of plaintiff's attempt at sending all of his grievances directly to the CORC is perfectly reasonable. The CORC is the final appeal for grievances that have been denied at the Superintendent's level. N.Y. COMP.CODES R. & REGS., tit. 7 § 701.5(d).

The court also notes that a review of plaintiff's exhibits shows that plaintiff's letters and "grievances" were not all "suppressed." Plaintiff received a response to his mail claims and his double bunking claims. (*Exhibits* at 7, 9-10 (mail), 20-25 (double bunking)). Of the letters that plaintiff labels "GRIEVANCE," many appear to have been sent directly to defendant Rivera or Deputy Superintendent Amado. (*Exhibits* at 20-25; 32-33; 34; 35-37; 40; 44-46; 48-49). The grievance regulations in New York require that "grievances" be submitted first to the Inmate Grievance Resolution Committee (IGRC). N.Y. COMP.CODES R. & REGS., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC is then appealed to the Superintendent. *Id.* § 701.5(c).

By submitting claims directly to the Superintendent, the

Deputy Superintendent or the CORC, plaintiff was not using the grievance procedure properly and appears to have been attempting to bypass the required steps. Thus, plaintiff cannot claim that defendants were "suppressing" his grievances. Thus, his claims that his grievances were somehow "suppressed," or that defendants engaged in a conspiracy [FN29] to prevent plaintiff from availing himself of the Inmate Grievance Program should be dismissed.

FN29. Plaintiff sprinkles the entire complaint with allegations of "conspiracy." He alleges conspiracy under both section 1983 and 1985. The relevant part of section 1985 provides a narrower protection than section 1983. Section 1985(3) prohibits conspiracies to deprive persons of equal protection of the law. *Davila v. Secure Pharm. Plus,* 329 F.Supp.2d 311, 316 (D.Conn.2004) (citing 28 U.S.C. § 1985(3). Section 1986 provides that every person who is aware of a conspiracy under section 1985, but does not prevent or aid in preventing the injury, while having the power to do so will be liable in damages. 28 U.S.C. § 1986. A claim under section 1986 is contingent to a valid claim under section 1985 and must be commenced within one year after the cause of action accrued. *Id.*

The protection afforded by section 1985 is "narrower" than that afforded by section 1983 because section 1985 requires the conspiracy to be motivated by a racial or other class-based animus. *Davila,* 329 F.Supp.2d at 317. In order to state a claim under section 1985(3), Plaintiff must allege a conspiracy for the purpose of depriving him of equal protection; an overt act in furtherance of that conspiracy; and an injury to plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States. *Id.* (citing *Thomas v. Roach,* 165 F.3d 137, 146 (2d Cir.1999)). Mere conclusory allegations of conspiracy are also insufficient to state a claim under either section 1983 or 1985. *Id. See also Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987) ( section 1983). Plaintiff's claims of conspiracy in this case are completely conclusory and cannot survive the motion to dismiss.

Slip Copy, 2009 WL 3246818 (N.D.N.Y.)

(Cite as: 2009 WL 3246818 (N.D.N.Y.))

**WHEREFORE** it is hereby

**RECOMMENDED,** that defendant's motion to dismiss (Dkt. No. 41) be **GRANTED,** and the complaint dismissed in its entirety.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2009.

Robinson v. New York State Dept. of Correction Services
Slip Copy, 2009 WL 3246818 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2001 WL 303713 (S.D.N.Y.)

(Cite as: 2001 WL 303713 (S.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Frankie CANCEL and Melvin Owens, Plaintiffs,
v.
Glenn S. GOORD, Commissioner of New York State
Department of Correctional Services, et al. Defendants.
No. 00 CIV 2042 LMM.

March 29, 2001.
*MEMORANDUM AND ORDER*

MCKENNA, J.

*1 Frankie Cancel and Melvin Owens (collectively "Plaintiffs"), inmates at Fishkill Correctional Facility ("Fishkill"), bring this pro se civil rights action pursuant to 42 U.S.C. § 1983 against Defendants Glenn S. Goord, Commissioner of the New York State Department of Correctional Services ("DOCS"); Anthony Annucci, Deputy Commissioner of DOCS; Jennifer Jones, Staff Attorney at DOCS; William Mazzuca, Fishkill Superintendent; Robert Ercole, Fishkill Deputy Superintendent; Robert Erbert, Fishkill Deputy Superintendent, Administration; Ada Perez, Fishkill Deputy Superintendent, Programs; Stephan Lowry, Fishkill Captain; Lewis Goidel, Fishkill Inmate Grievance Program ("I.G.P.") Supervisor; Christine O'Dell, Fishkill Senior Mail Clerk; Sandie Breen, Fishkill Mail Clerk; and John/Jane Doe[s], unknown Members of the Fishkill Mail Room Staff (collectively "Defendants") for unconstitutionally implementing the inmate grievance program and for deliberately tampering and interfering with their regular and legal mail. The Plaintiffs seek injunctive relief as well as compensatory and punitive damages from each Defendant individually and in their official capacities. The Defendants filed a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed.R.Civ.P. 12(b)(6). For the reasons set forth below the Defendants' motion is granted in part and denied in part.[FN1]

FN1. Plaintiffs' independently move pursuant to

Fed.R.Civ.P. 37(d) for an order compelling defendants to comply with Plaintiffs' interrogatories. As Defendants do not oppose this motion, and because the court has partially denied Defendants' motion to dismiss, Plaintiffs' motion is granted. Defendants are hereby required to respond to Plaintiffs' interrogatories, except those regarding the Inmate Grievance Program, within sixty days of the date hereof.

Statement of Facts [FN2]

FN2. The facts set forth herein are adduced from a liberal reading of Plaintiffs' complaint. *See Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1998).

On Friday August 28, 1998 Plaintiff Cancel received a piece of legal mail marked as such from the Criminal Term Clerk's Office of the Supreme Court in the State of New York which had been opened outside his presence. (Am.Compl.¶ 22.) The letter had been opened by Defendants O'Dell, Breen, and unknown members of Fishkill mail room staff even though it was clearly marked as privileged legal mail. (*Id.* ¶¶ 22-24.)

On August 31, 1998 Cancel filed a grievance with the Fishkill I.G .P. Supervisor, Defendant Goidel, regarding the August 28 legal mail incident. (*Id.* ¶¶ 25-26.) Goidel failed to process Cancel's grievance. (*Id.*) Subsequently, on October 5, 1998 Cancel filed a second grievance, this time against Goidel for refusing to process Cancel's original grievance. (*Id.* ¶¶ 27-28.) This second grievance was not processed. (*Id.*) On October 19, 1998 Cancel wrote a letter to the I.G.P. Director informing him of Goidel's refusal to process the two grievances. (*Id.*) Subsequently, on November 2, 1998 both grievances were processed (*Id.* ¶ 29) and on November 19, 1998 Cancel received a grievance decision by Defendant O'Dell who wrote that "such mistakes should not occur in the future." (*Id.* ¶ 36.) Despite this statement both Cancel's legal mail and regular mail were continually interfered with. (*Id.* ¶ 37.)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 303713 (S.D.N.Y.)

(Cite as: 2001 WL 303713 (S.D.N.Y.))

On December 4, 1998 Cancel put together a complaint pursuant to New York State Civil Service Law § 75 seeking a hearing, disciplinary action and the removal of Goidel for his improper actions and unlawful manner of running the I.G.P.[FN3] (*Id.* ¶ 33.) On December 9, 1998 the complaint was mailed to Defendants Goord and Goidel. (*Id.* ¶¶ 33-35.) The complaint was ignored by both of these Defendants. (*Id.*) On December 14, 1998 Cancel sent a letter with a copy of the complaint to Defendant Annucci who also did not respond. (*Id.* at 35.)

> FN3. New York Civil Service Law § 75 provides a cause of action for civil service employees unlawfully removed. Although neither party addressed this claim in their motion papers, the Court notes that § 75 specifically delineates five categories of persons who may maintain a cause of action for removal. Because Cancel does not fall into one of these five categories he has no standing to bring suit under this provision.

**\*2** On June 28, 1999 Cancel filed another grievance stating that both his regular and legal mail were being withheld. (*Id.* ¶ 38.) Subsequent to the filing of this grievance, but on the same day, Cancel received sixteen pieces of regular mail that had been withheld for several weeks by Defendants Mazzuca, O'Dell, Breen and unknown members of the Fishkill mail room staff. (*Id.*) Cancel filed a grievance about this interference with his regular mail recommending there be an investigation; however, his recommendation was denied. (*Id.* ¶ 39.)

On December 21, 1999 Cancel received another piece of legal mail which had not been processed or handled as legal mail because it was opened outside his presence. (*Id.* ¶ 40.) Cancel filed a complaint regarding this incident and attached photocopies of the legal mail that had been opened outside his presence. (*Id.* ¶ 41.)

On April 17, 2000 Cancel notarized two documents for a personal Family Court matter concerning his son, placed the legal documents in an envelope, sealed it, placed stamps on it and placed it in the outgoing mail addressed to "the other party in the matter." (*Id.* ¶ 49.) The envelope was intercepted, opened and photocopied by

Mazzuca, O'Dell, Breen and unknown members of the Fishkill mail room staff and the photocopies were placed in Cancel's file. (*Id.* ¶¶ 49-51.) On July 12, 2000 Cancel met with a member of the Parole board who had Cancel's file which contained a memo from Mazzuca with the Family Court documents attached. (*Id.* ¶ 51.) Defendants continue to withhold Cancel's legal and regular mail. (*Id.*)

On November 5, 1999 Plaintiff Owens picked up a piece of legal mail that had been opened and photocopied outside his presence and had been withheld for about a week. (*Id.* ¶ 45.) As a result, Owens was unable to "research and file a timely Criminal motion for which he received an adverse decision." (*Id.*) The Defendants responsible for withholding this piece of legal mail were Mazzuca, Ercole, Erbert, Perez, O'Dell, Breen and unknown members of the Fishkill mail room staff. (*Id.*) Owens filed a grievance for the opening and photocopying of his legal mail denying him access to the courts, but it was denied. (*Id.* ¶ 47.)

Legal Standard

On a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6), the court must accept as true all well pleaded factual allegations set forth in the complaint and must draw all positive inferences in favor of the pleader. *Hudson v. Greiner,* No. 99 Civ. 12339, 2000 U.S. Dist. LEXIS 17913, at \*4 (S.D.N.Y. Dec. 12, 2000). A case should only be dismissed when "it appears beyond a reasonable doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir.1994) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). A plaintiff must do more than plead mere "conclusory allegations or legal conclusions masquerading as factual conclusions" to survive a motion to dismiss. *Gebhardt v. Allspect, Inc.,* 96 F.Supp.2d 331, 333 (S.D.N.Y.2000).

**\*3** Furthermore, since the Plaintiffs are proceeding *pro se* their submissions should be judged on a more lenient standard than that accorded to formal pleadings drafted by lawyers. *McNeil v. United States,* 508 U.S. 106, 113 (1993). The court must make some reasonable allowances so that a *pro se* plaintiff does not forfeit his rights by virtue of a lack of legal training. *Hudson,* 2000

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 303713 (S.D.N.Y.)

(Cite as: 2001 WL 303713 (S.D.N.Y.))

U .S. Dist. LEXIS 17913, at *3. However, proceeding pro se does not altogether relieve a plaintiff from the usual pleading requirements. *Id.* at *4.

Plaintiffs' Civil Rights Claims

A plaintiff has a civil cause of action under § 1983 against:

Every person who, under the color of any statute, ordinance, regulation, custom, or usage, of any State or Territory of the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceedings for redress.

42 U.S.C. § 1983.

Plaintiffs bring this action under § 1983 alleging that Defendants violated their rights under the First, Fourth, Sixth and Fourteenth Amendments by unconstitutionally implementing the inmate grievance programs and by deliberately tampering and interfering with their regular and legal mail thereby denying them access to the courts and impinging on their rights to free speech.

Discussion

1. Denial of Access to Grievances and the Unlawful Operation of the Inmate Grievance Program

The amended complaint alleges that Defendant Goidel failed to process Cancel's grievance complaints and that the improper and unlawful running of the I.G.P. violated Cancel's First Amendment right to petition the government for redress and right of access to the courts. (Am.Compl.¶ 52.) Cancel also claims that Defendants Goord, Annucci, Mazzuca, Ercole, Perez, Erbert and Lowry failed to take action to "curb the unlawful practices of Defendant Goidel" even though they were aware that his unlawful conduct proximately caused the above constitutional violation. (*Id.* ¶ 53.)

While there is a First Amendment right of meaningful

access to the courts and a right to petition the government for redress, *e.g .,* Bill Johnson's Rest., Inc. v. NLRB, 461 U.S. 731, 741 (1983) (finding that "the right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances"), inmate grievance procedures are not required by the Constitution and therefore a violation of such procedures does not give rise to a claim under § 1983. *Justice v. Coughlin, III,* No. 94-CV-1287, 1996 U.S. Dist. LEXIS 15341, at *11 (N.D.N.Y. July 1, 1996). When an inmate sets forth a constitutional claim in a grievance to prison officials and the grievance is ignored, the inmate has the right to directly petition the government for redress of that claim. Flick v. Alba, 932 F.2d 728, 729 (8th Cir.1991). Therefore, the refusal to process an inmate's grievance or failure to see to it that grievances are properly processed does not create a claim under § 1983. *Id.*

**\*4** Thus, Cancel's claim that the Defendants violated his First Amendment right of access to the courts and right to petition the government for redress by failing to process his grievances lacks merit and is dismissed with prejudice.

Cancel also claims that Goidel's failure to process his grievances and his unlawful and unfair running of the inmate grievance program violates New York State Correction Law § 139 which sets forth prison grievance procedures. (Am.Compl.¶ 52.) First, the failure to process a grievance in a timely manner only entitles an inmate to review at the next appeal level in the grievance process. *See* Cliff v. Goodman, 710 N.Y.S.2d 718 (App.Div.2000) (citing 7 NYCRR § 701.8 (2001)). Second, under New York law a claim generally challenging the constitutionality of the inmate grievance program does not constitute an actual controversy reviewable in an Article 78 proceeding or otherwise. Matter of Hall v. State of N.Y. Dept. of Corr., 453 N.Y.S.2d 58 (App.Div.1992). When Cancel's grievances were ignored by Goidel, Cancel sought review at the next level and his grievances were subsequently processed. Further, Cancel's general dissatisfaction with the inmate grievance program does not constitute an actual controversy reviewable by the Court. *Id.* Therefore, Cancel's claim that Goidel's actions violated New York State Corrections Law § 139 is dismissed with prejudice.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 303713 (S.D.N.Y.)

(Cite as: 2001 WL 303713 (S.D.N.Y.))

2. Denial of Access to the Courts as a Result of Legal Mail Tampering

Prisoners have a First Amendment right of access to the courts, and where there is a deliberate and malicious interference with that right they may seek redress from the court. *Washington v. James,* 782 F.2d 1134, 1138 (2d Cir.1986). To state a valid § 1983 claim for denial of access to the courts due to interference with an inmate's legal mail, an inmate must allege that a defendant's deliberate and malicious interference actually impeded his access to the court or prejudiced an existing action. *Lewis v. Casey,* 518 U.S. 343, 349 (1996). Therefore, in order to survive a motion to dismiss a plaintiff must allege not only that the defendant's alleged conduct was deliberate and malicious, but also that the defendant's actions resulted in actual injury to the plaintiff such as the dismissal of an otherwise meritorious legal claim. *Id.* at 351. In other words "the plaintiff must show that a 'non-frivolous legal claim had been frustrated or was being impeded' due to the actions of prison officials." *Warburton v. Underwood,* 2 F. Supp .2d 306, 312 (W.D.N.Y.1998) (quoting *Lewis,* 518 U.S. at 353); *see also Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir.1997).

Plaintiff Cancel does not state a cognizable § 1983 claim for denial of access to the courts because he has not alleged any actual injury resulting from Defendants' actions. Cancel alleges three instances where his legal mail was handled inappropriately.[FN4] Cancel must show that because Defendants opened his outgoing and incoming legal mail he was prejudiced in a legal action he sought to pursue. Because Cancel has not alleged such an injury, his claim under the First Amendment for denial of access to the courts is dismissed with leave to amend the complaint with allegations, if true, that (1) Defendants' interference with Cancel's legal mail injured him by prejudicing him in a legal action; and (2) that the outgoing envelope containing the Family Court documents mailed on April 17, 2000 was clearly identifiable as legal mail. [FN5]

FN4. Liberally construing Plaintiffs' complaint, the Court assumes that the Family Court documents Cancel mailed on April 17, 2000 were in an envelope addressed to a person or entity that would clearly identify the letter as legal mail or that the envelope was marked as

"legal mail." Plaintiff only alleges that he sent these Family Court documents to "the other party in the matter" (Am.Compl.¶ 49) and the Court assumes for the purpose of this motion only that the envelope in question was clearly identified as legal mail.

FN5. "[T]he court should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Gomez v. USAA Fed. Sav. Bank,* 171 F.3d 794, 795 (2d Cir.1999) (quoting *Branum v. Clark,* 927 F.2d 698, 705 (2d Cir.1991)).

*5 As to Plaintiff Owens' claim with respect to legal mail, the amended complaint alleges that because Owens' mail was opened and withheld for about a week he was "unable to research and file a timely response to a Criminal motion for which he received an adverse decision." (Am.Compl.¶ 45.) A delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation. *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995) (citing *Jones v. Smith,* 784 F.2d 149, 151-52 (2d Cir.1986)). However, if Owens' adverse judgment to his otherwise meritorious Criminal motion was the result of the named Defendants' opening and withholding of his legal mail then he has stated a claim under § 1983 for denial of access to the courts. For purposes of this motion, the Court accepts all allegations as true and draws all positive inferences in favor of Plaintiff. *See Hudson,* 2000 U.S. Dist LEXIS 17913, at *3. Therefore, Defendants' motion is denied as to Plaintiff Owens' claim under the First Amendment for denial of access to the courts.

3. Violation of the First Amendment Right to Free Speech for Interference with Cancel's Mail

Cancel alleges that Defendants' continuous actions of opening and reading his incoming legal mail, the temporary withholding of his regular mail and the opening and photocopying of his outgoing legal mail impinges on his constitutional right to free speech. (Am.Compl.¶¶ 54, 60, 63.) Inmates unquestionably have a First Amendment

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 303713 (S.D.N.Y.)

(Cite as: 2001 WL 303713 (S.D.N.Y.))

right of free speech to send and receive mail, *Wolfish v. Levi,* 573 F.2d 118, 130 (2d Cir.1978), *rev'd in part on other grounds sub nom., Bell v. Wolfish,* 441 U.S. 520 (1979), and a prison official's interference with an inmate's mail may violate his First Amendment right to free speech, which includes the "right to be free from unjustified governmental interference with communication." *Brewer v. Wilkinson,* 3 F.3d 816, 820 (5th Cir.1993).

The boundary between an inmate's First Amendment right to free speech and the ability of prison officials to open or otherwise interfere with an inmate's mail is not precise. However, when analyzing such claims courts have consistently made distinctions between outgoing and incoming mail and legal and non-legal mail based on the various rights and interests at stake. *See Taylor v. Sterrett,* 532 F.2d 462, 475 (5th Cir.1976) (holding that the governmental interest in monitoring incoming mail is more substantial than its interest regarding outgoing mail); *see also Lewis,* 518 U.S. at 353 (holding that prison regulations or practices that affect a prisoner's legal mail are of particular concern because of the potential for interference with a prisoner's right of access to the courts).

With respect to the first distinction, the Supreme Court has recognized that "the implications of outgoing correspondence for prison security are of a categorically lesser magnitude than the implications of incoming materials." *Thornburgh v. Abbott,* 490 U.S. 401, 413 (1989). Therefore, the penological interests for interference with outgoing mail must be more than just the general security interest which justifies most interference with incoming mail. *Davidson v. Scully,* 694 F.2d 50, 53 (2d Cir.1982).

**\*6** As to the second distinction, many courts have held that a prisoner's legal mail is entitled to a higher degree of protection than his regular mail. *See Morgan v. Montanye,* 516 F.2d 1367, 1368 (2d Cir.1975) (holding that although prison officials can inspect an inmate's general correspondence, different procedures apply to an inmate's legal mail which should be treated as confidential material); *see also Taylor,* 532 F.2d at 475. Therefore, prison polices or practices which interfere with legal mail on a regular basis whether incoming or outgoing must be supported by a legitimate penological interest other than mere general security concerns which permit interference

with regular mail. *Washington,* 782 F.2d at 1139 (citing New York State Department of Corrections Directive 4421).

A. Incoming Mail

1. Withholding of Incoming Non-Legal Mail

Cancel alleges that Defendants withheld his incoming non-legal mail and relies on a single instance when he received sixteen pieces of regular mail on the same day he filed a grievance about the opening of his legal mail. (Am.Compl.¶ 38.) These sixteen pieces of regular mail had been withheld for several weeks. (*Id.*) Prison regulations or practices affecting a prisoner's receipt of non-legal mail must be "reasonably related to legitimate penological interests," *Abbott,* 490 U.S. at 409 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)), and "prison security is a sufficiently important governmental interest to justify limitations on a prisoner's [F]irst [A]mendment rights." *Gaines v.. Lane,* 790 F.2d 1299, 1304 (7th Cir.1986). However, this general security interest will not justify a regular pattern and practice of such interference absent other prison concerns with regards to a particular inmate. *Rowe v. Shake,* 196 F.3d 778, 782 (7th Cir.1999).

This Court agrees with the reasoning of the Seventh Circuit in *Rowe* that in order for an inmate to state a claim for interference with incoming non-legal mail he must show a pattern and practice of interference that is not justified by any legitimate penological concern. *Id.* Because Cancel only alleges that prison officials withheld his regular mail on one occasion, rather than showing a pattern and practice of such behavior, his First Amendment free speech claim for the withholding of his regular incoming mail is dismissed with leave to amend the complaint to include specific allegations, if true, establishing such a pattern and practice.

2. Opening and Withholding of Incoming Legal Mail

Cancel alleges two occasions upon which the Defendants opened his incoming legal mail outside his presence. (Am.Compl.¶¶ 22, 40.) Although legal mail is "privileged" and is afforded a higher degree of protection, there still must be a showing that prison officials regularly

Not Reported in F.Supp.2d, 2001 WL 303713 (S.D.N.Y.)

(Cite as: 2001 WL 303713 (S.D.N.Y.))

and unjustifiably interfered with the incoming legal mail rather than merely showing an isolated incident. *Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986).

**\*7** In *Washington,* the Second Circuit held that more than one incident of interference with legal mail could give rise to a constitutional claim if it indicated ongoing activity. 782 F.2d at 1139; *see also Bieregu v. Berman,* 59 F.3d 1445, 1452 (3d Cir.1995) (finding that an allegation that prison officials had opened an inmate's incoming legal mail on fifteen occasions was sufficient to show a pattern and practice of deliberate interference). However, in the present case Plaintiff proffers only two instances of opening incoming legal mail with no indication that such practices are ongoing. Without alleging additional facts to establish a pattern and practice that rises to the level of constitutionally impermissible censorship, Plaintiff's complaint is deficient. Therefore, Cancel's claim that Defendants violated his First Amendment right to free speech for interference with his incoming legal mail is dismissed with leave to amend the complaint to include specific allegations, if true, that establish the requisite pattern and practice of interference.[FN6]

> **FN6.** Plaintiffs' also allege that in October 1999 Defendant Lowery ordered mail sent to any inmate by the Legal Aid Society regarding contemplated litigation against the New York State Parole Board to be confiscated if seen. (Am.Compl.¶ 42.) In addition, Defendant Ercole also instructed the Fishkill mail room staff to confiscate all mail envelopes larger than regular size, to transfer the contents to a facility envelope and then forward it to the inmate to whom it is addressed. (*Id.* ¶ 43.) Plaintiffs make these allegations in their complaint without stating that they personally were to receive this letter from the Legal Aid Society or that Ercole's policy affected their mail in any way. Because there is no allegation that Plaintiffs' mail was affected by either policy they have no standing to bring a suit for these allegations and they are not addressed by the Court. Plaintiffs' are given leave to amend the complaint to allege, if that be the case, that these polices affected their personal legal mail. If such allegations are made they will be considered in establishing a pattern and

practice of interference with legal mail.

**B. Outgoing Legal Mail**

Cancel's claim that prison officials interfered with his outgoing legal mail poses a different question. As previously stated, the Supreme Court has explicitly recognized that there are "differing penological concerns with respect to outgoing and incoming mail." *Brewer v. Wilkinson,* 3 F.3d 816, 825 (5th Cir.1993) (citing *Thornburgh v. Abbott,* 490 U.S. 401, 413 (1989)). The Second Circuit has held that prison officials can only open an inmate's outgoing legal mail if there is a "rational justification" for doing so. *Davidson,* 694 F.2d at 54 (citing *Wolfish,* 573 F.2d at 130.). The Fifth Circuit has applied the same standard to an instance where an inmate's outgoing legal mail was opened and censored without a "legitimate penological interest" and found the practice to violate the inmate's First Amendment right to free speech. *Brewer,* 3 F.3d at 825.

In the present case, Defendants have failed to state any rational justification for opening and photocopying Cancel's outgoing legal mail. Because interference with outgoing legal mail cannot be based on a general prison security interest, Defendants must provide additional justification for their actions. Therefore, because Defendants have interfered with Cancel's outgoing legal mail without providing any legitimate penological interest, Cancel has stated a valid claim under the First Amendment right to free speech.[FN7] Defendants' motion to dismiss Cancel's claim for violation of his First Amendment right to free speech is denied with respect to his outgoing legal mail.

> **FN7.** As originally stated in footnote 4, the Court again presumes that the Family Court documents were placed in an envelope marked or addressed in such a way that it could be identified as legal mail. If in fact this document was not privileged legal mail, this First Amendment free speech claim may require a different analysis.

**4. Money Damages Barred by** 42 U.S.C. § 1997e(e) of the Prison Litigation Reform Act

Defendants argue that the money damages Plaintiffs

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 303713 (S.D.N.Y.)

(Cite as: 2001 WL 303713 (S.D.N.Y.))

seek are barred by 42 U.S.C. § 1997e(e) of the Prison Litigation Reform Act because the complaint does not allege any physical injury. (Defs.' Mem. at 8-9.) Section 1997e(e) states, "[n]o federal civil action may be brought by a prisoner confined in jail, prison, or other correctional facility, for mental or emotional injury suffered while in the custody without a prior showing of physical injury." Id.

**\*8** The plain language of the statute does not prohibit a plaintiff's First Amendment claim. Section 1997e(e) specifically prohibits federal civil action[s] for mental or emotional injury without a showing of physical injury. In this case Plaintiffs do not allege any claim of mental or emotional distress for which they are seeking redress. Furthermore, the few courts that have addressed this issue have held that:

the deprivation of First Amendment rights entitles a plaintiff to judicial relief wholly aside from any physical injury he can show, or any mental or emotional injury he may have incurred. Therefore, § 1997e(e) does not apply to First Amendment claims regardless of the form of relief sought.

Reynolds v. Goord, No. 98 Civ. 6722, 2000 U.S. Dist LEXIS 2140, at \*23 (S.D.N.Y. Mar. 1, 2000) (quoting Canell v. Lightner, 143 F.3d 1210, 1213 (9th Cir.1998)). Therefore, § 1997e(e) is not applicable to the present case and does not bar Plaintiffs from seeking recovery for First Amendment claims of denial of access to the courts and violation of free speech.

5. Lack of Personal Involvement of Defendants

The personal involvement of defendants in an alleged constitutional violation is a prerequisite under § 1983. Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir.1995). A plaintiff must allege that each defendant was directly and personally responsible for the purported conduct and establish fault and causation on the part of each defendant. Alfaro Motors, Inc. v. Ward, 814 F.2d 883 (2d Cir.1987). Defendants move to dismiss all claims against Defendants Goord, Annucci, Jones, Mazzuca, Ercole, Perez and Erbert for lack of personal involvement. Plaintiffs' amended complaint as to Owens' legal mail claim alleges that Defendants Mazzuca, Ercole, Perez, and

Erbert were personally involved in the opening and withholding of his legal mail. Additionally, Mazzuca is implicated in Cancel's claim for violating his First Amendment right to free speech. Accepting these allegations as true, the Defendants' motion to dismiss for lack of personal involvement against Mazzuca, Ercole, Perez, and Erbert is denied.

As to Defendants Goord, Annucci and Jones, in a § 1983 action supervisors cannot be held liable under the theory of respondeat superior for the acts of their subordinates. Id. at \*7. A supervisor can only be found to be personally involved if there is evidence that there was: (1) direct participation in the alleged constitutional violation, (2) failure to remedy a wrong after learning of it, (3) creation or maintenance of a policy under which unconstitutional violations occurred, (4) gross negligence in managing subordinates who committed the unconstitutional acts, or (5) deliberate indifference by failing to act on information indicating that constitutional violations were occurring. Id.; see also Colon, 58 F.3d at 873. Allegations that a supervisor ignored an inmate's grievance letter of protest and request for an investigation is insufficient to find that a supervisor is personally involved in the alleged constitutional violations. Kinch v. Artuz, No. 97 Civ. 2419, 1997 U.S. Dist. LEXIS 13998, at \*8 (S.D.N.Y. Sept. 15, 1997).

**\*9** Plaintiffs' amended complaint contains no allegations relating to the personal involvement of Defendants Goord, Annucci and Jones either through direct participation, maintenance of a policy or deliberate disregard for Plaintiffs' rights. Plaintiffs' sole claim against these three Defendants is that they were sent grievances and complaints by Cancel which were ignored. Plaintiffs' claims as to these three Defendants are dismissed with prejudice.

Conclusion

For the above stated reasons the Defendants' motion is granted in part and denied in part as follows:

(1) Cancel's claims against Goidel under the First Amendment right to petition the government for redress and right of access to the courts for failure to process grievances and for the unlawful running of the I.G.P. are

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 303713 (S.D.N.Y.)

(Cite as: 2001 WL 303713 (S.D.N.Y.))

dismissed with prejudice.

(2) Cancel's claims against Defendants Goord, Annucci, Mazzuca, Ercole, Perez, Erbert and Lowry for failure to curb the unlawful practices of Goidel in his unlawful running of the I.G.P. are dismissed with prejudice.

(3) Cancel's claim that Goidel's actions violated New York State Corrections Law § 139 is dismissed with prejudice.

(4) Cancel's claim under the First Amendment for denial of access to the courts is dismissed with leave to amend the complaint with allegations that (a) Defendants' interference with Cancel's legal mail injured him by prejudicing him in a legal action; and (b) that the outgoing envelope containing the Family Court documents mailed on April 17, 2000 was clearly identifiable as legal mail.

(5) Defendants' motion is denied as to Owens' claim under the First Amendment for denial of access to the courts against Mazzca, Ercole, Perez, Erbert, O'Dell, Breen and unknown members of the Fishkill mail room staff.

(6) Cancel's claim under the First Amendment right to free speech for the withholding of his regular incoming mail is dismissed with leave to amend the complaint with specific allegations that establish a pattern and practice of interference.

(7) Cancel's claim that Defendants violated his First Amendment right to free speech for interference with his incoming legal mail is dismissed with leave to amend the complaint with specific allegations that establish a pattern and practice of interference with Cancel's incoming legal mail.

(8) Defendants' motion is denied as to Cancel's claim under the First Amendment for a violation of free speech for interference with his outgoing legal mail against Mazzuca, O'Dell, Breen and unknown members of the Fishkill mail room staff.

(9) Defendants' motion to dismiss the claims against

Mazzuca, Ercole, Perez, and Erbert for lack of personal involvement is denied.

(10) Defendants' motion to dismiss the claims against Goord, Annucci and Jones for lack of personal involvement is granted with prejudice.

(11) The Court also considered Plaintiffs' claim that Defendants' actions violated Article 14 and 17 of the International Covenant on Civil and Political Rights ("ICCPR"). (Am.Compl.¶ 54, 55, 58, 60.) However, courts have uniformly held that the ICCPR is not self-executing and does not give rise to a private right of action. *See Beazley v. Johnson,* No. 99-41383, 2001 WL 118393, at *18- *19 (5th Cir.2001) (citing additional cases). Therefore, the Court sua sponte dismisses Plaintiffs' claims under the ICCPR.

S.D.N.Y.,2001.

Cancel v. Goord
Not Reported in F.Supp.2d, 2001 WL 303713 (S.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3909050 (N.D.N.Y.)

(Cite as: 2010 WL 3909050 (N.D.N.Y.))

599355,*2-* 3 (N.D.N.Y.), *aff'd without op.,* 175 F.3d 1007 (2d Cir.1999). Failure to object to any portion of a report and recommendation waives further judicial review of the matters therein. *See* Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993).

## AMENDED COMPLAINT

There is no objection to the recitation of facts in the Report and Recommendation, which states as follows:
Plaintiff was at Upstate Correctional Facility ("Upstate") in 2007 and then transferred to Elmira Correctional Facility ("Elmira") in 2008, where he participated in a group therapy program. (Am.Compl.¶¶ 13-15). After about four weeks, plaintiff was transferred from Elmira to Great Meadow Correctional Facility ("Great Meadow") to participate in a different mental health program. (Am.Compl.¶¶ 15-16). Plaintiff alleges that upon his arrival at Great Meadow, he was "[i]mmediately harrassed [sic] and retaliated against because of [his] facility history." (Am.Compl.¶ 16, 39). Plaintiff claims that he has been "deprived [of his] mental health treatment because of constant movement to different facility programs." (Am.Compl.¶ 18).

**\*2** While plaintiff was at Great Meadow, defendant Howard allegedly "got [plaintiff] relocated" to the "last cell and with feces in it" and told other correctional officers that when plaintiff was at Upstate, plaintiff had attacked defendant Howard's friend. (Am.Compl.¶¶ 16, 36, 39, 52). Plaintiff had interacted with defendant Howard at Upstate and Downstate Correctional Facilities. (Am.Compl.¶ 52). Plaintiff indicates that while he was a part of the Great Meadow B.H.U. program, plaintiff was "given a new criminal charge," but gives no explanation as to the surrounding facts or its relevance. (Am.Compl.¶ 16).

Plaintiff complained to defendant Hicks at Great Meadow that he was "never suppose[d] to be transfer[r]ed out of Elmira," but "she still did nothing except sent me to Clinton Correctional Facility [group therapy] program" later in 2008. (Am.Compl.¶ 17). At Clinton, plaintiff "experienced constant assaults [and] wasn't fed for two daily meals[, and w]hile at O.B.S. [plaintiff] was extremely cold and in strong pain."

(Am.Compl.¶ 28). Plaintiff also complains of roaches and mice. (Am.Compl.¶ 29). Overall, plaintiff asserts that the "threat at Clinton was very threatening it forced [plaintiff] to not want to file any grievances ." (Am.Compl.¶ 29).

Plaintiff alleges that on two occasions he asked for an Imam, and defendant Allen instead sent for a deacon, and plaintiff was also "denied my religious practive [sic] to eat ramadan meals" for the entire month when ramadan is celebrated. (Am.Compl.¶ 29, 46). Plaintiff "had to wait patiently and stop writting [sic] grievance[s] until the harrassment, [sic] and constant banging doors, gates and loud noises finally stop." (Am.Compl.¶ 37).

On July 10, 2008, plaintiff "committed a[n] aggr[a]vated assault charge," and was placed in "full restraints and assaulted in the back of [his] cell" at Clinton by unnamed defendants. (Am.Compl.¶¶ 20, 40). After the incident, defendant nurse Fitzgerald evaluated plaintiff, but from behind the plexiglass shield in front of plaintiff's cell, which plaintiff alleges was "unclean" and "gives unclear vision." (Am.Compl.¶ 26). Plaintiff allegedly received no treatment for his bruises, swelling, or the "excruciating pain [he] was constantly feeling." (Am.Compl.¶¶ 26-27).

The next day, plaintiff alleges that he was sleeping, and "correction officials entered my cell and placed a green state towel around my head and begin [sic] punching me in my face, my body and they kneed me and kicked me ... [for] about three minutes. I couldn't see who did it. They told me if I snitch[ed] they [were] going to murder me." (Am.Compl.¶ 21, 40). An unnamed sergeant and two corrections officers returned a few minutes later and began "punching [plaintiff], kicking [plaintiff], and kneeing [plaintiff]." (Am.Compl.¶ 22, 40). A third officer stood at the door, holding it open. *Id.* After assaulting plaintiff for another three minutes, they "ran out the cell door." *Id.* Plaintiff alleges that the unidentified corrections officer who held the door also refused to feed plaintiff breakfast and lunch. *Id.*

**\*3** While plaintiff was still housed in the same cell, he alleges that defendants Uhler, Allen, Marcil, and other

Slip Copy, 2010 WL 3909050 (N.D.N.Y.)

(Cite as: 2010 WL 3909050 (N.D.N.Y.))

corrections officers wanted plaintiff to come out of his cell, but he "disagreed with coming out," because "they did not come with [a] camera." (Am.Compl.¶ 24, 41). A "distraction unit" was called, bringing a camera, so plaintiff "agreed to come out," but defendants Uhler, Allen, Marcil and others still used mace "repeatedly." *Id.* Plaintiff was placed in full restraints, but the officers failed to lock the cuffs, which caused plaintiff "excruciating pain," and a corrections officer held plaintiff's "arm in an unproffessional [sic] way only intended to cause [plaintiff] extra excruciating pain and he used a[n] untrained hold to apply pressure on my arms and wrist." (Am.Compl.¶ 24, 42). Plaintiff received an eye examination by defendant nurse Larnan in the SHU "holding pen," but plaintiff received nothing for his bruises, "excruciating pain [he] was constantly feeling," or "swollenness [sic] from my head, face, chest, stomach, left leg, right leg and testicles." (Am. Compl. ¶ 27, 43; Pl.'s Resp. to Defs.' Mem. of Law in Supp. of Mot. to Dismiss the Am. Compl. as to Defs. Farnan and Fitzgerald ¶ 1).

On January 5, 2009, plaintiff states that he was "forced to retaliate against a Sgt. and two correction officers for constant harrassment [sic] and constant retaliation ... and because the administration at Clinton refuse[s] to professionally [sic] protect me." (Am.Compl.¶ 28). The officers then submitted allegedly false reports stating that plaintiff's personal property inside his cell was also contaminated and needed to be destroyed. (Am.Compl.¶ 51). Plaintiff's property was placed in a bag and destroyed due to a report indicating that it was "contaminated." (Am.Compl.¶ 35). Plaintiff claims that only "one pair of state pants and short sleeve shirt, one pair of state sox, [sic] one pair of state undershirt and undershorts was contaminated and that was outside my cell at the back of the cell outside cell entrance." (Am.Compl.¶ 51).

The state property that was destroyed was valued at $152.64, and plaintiff's property, "five Vibe magazines, 1 bible, 7 personal letters, [and] 1 pair of slippers" were valued at $36.25. (Am.Compl.¶ 35). The loss of his slippers prevented plaintiff from showering. (Am.Compl.¶ 35). After plaintiff attempted to assault the officers on January 5, 2009, he claims he was placed

"back in S.H.U. 2 cell" that only had a mattress with "huge holes and it was torn in many places." (Am.Compl.¶ 30). Plaintiff alleges he was deprived of writing utensils, paper, grievances, envelopes, sheets, blankets, washcloths, soap, a pillow or pillowcase, towels, toilet paper, a toothbrush, toothpaste, and a sweatshirt. (Am.Compl.¶ 30). Plaintiff claims that it took until January 23, 2009, for him "to receive most items back." (Am.Compl.¶ 30).

**\*4** For ten days following the January 5, 2009 incident, plaintiff claims he went without food and then only received one meal a day for four more days. (Am.Compl.¶ 34, 50). Plaintiff refused to eat during the final four days because "they spit in it or put dirt in it." (Am.Compl.¶ 34). Plaintiff was "denied toilet paper for six days while they offer[ed] to feed me." (Am.Compl.¶ 47). Plaintiff also felt cold because of a broken window that was not fixed until January 28, 2009. (Am.Compl.¶ 30, 47). Plaintiff spoke to defendants Artus and Lavalley, but "neither did nothing," telling plaintiff that "it's a security concern." (Am.Compl.¶ 34, 38, 47). Plaintiff claims that "grievance investigations are not done proffessionally [sic]" or not investigated at all, and defendant Brosseau "neglects her responsibility" as I.G.P. Supervisor by "not using her powers ... to enforce her authority against Clinton Correctional Facility Administration." (Am. Compl. ¶ 3 8).

Plaintiff was not included in the group therapy program at Clinton in 2009, which plaintiff alleges is because "the grievance system never conduct proffessional [sic] investigations it has constant incomp[e]tents." (Am.Compl.¶ 19). Plaintiff asserts that his exclusion from the Clinton group therapy program "has nothing to do with the criminal charge at Great Meadow." *Id.* Plaintiff also claims his mail has been tampered with, because he "never heard from grievance about the grievance [complaining of being denied ramadan meals] and correction officers began stealing my Vibe magazine subscription and it stop coming to me." (Am.Compl.¶ 37, 53).

Plaintiff also complains of the "loudness of the very loose pipes banging against each other and against the wall," which causes plaintiff an "extreme amount of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3909050 (N.D.N.Y.)

(Cite as: 2010 WL 3909050 (N.D.N.Y.))

uneasiness," loss of concentration, and gives him migraine headaches. (Am.Compl.¶ 31, 48). Plaintiff alleges that his "mental health is constantly worst [sic] and noone [sic] is helping me I have no other choice but to keep throwing feces and looking a[t] the people that walk bye [sic] that's [sic] responsible for not fixing these constant attacks when they were warned repeatedly. My brain be [sic] getting angry." (Pl.'s Resp. to Defs.' Mot. to Dismiss Compl. p. 11).

Additionally, corrections officers allegedly "bang at the back of [plaintiff's] cell [on the] plexiglass that is called a bus stop[,] it's put there for disciplinary reasons." (Am.Compl.¶ 32, 49). Plaintiff claims these "attacks" are retaliation for the July 10, 2008, July 11, 2008, and the January 5, 2009, incidents. (Am.Compl.¶ 32). These incidents allegedly disturb plaintiff, make it difficult for him to sleep, constitute an invasion of his privacy, anger him, and were a contributing factor that "caused plaintiff to attack on 1/5/09 forcing Clinton administration to take notice to the abuse they pretend doesn't exist." (Am.Compl.¶ 32). Plaintiff lists six occasions on February 6, 2009, and nine occasions on February 8, 2009, to February 16, 2009, when corrections officers were "banging" on the plexiglass at the end of his cell. (Am.Compl.¶ 32). Plaintiff claims these types of activities "took place for ... close to six months." (Am.Compl.¶ 45).

**\*5** Plaintiff seeks a judgment in his favor, including substantial compensatory and punitive damages. Plaintiff included three main headings in his fact section followed by a largely repetitive section entitled "claims for relief." (Am.Compl. p. 15).

**DISCUSSION**

**Standard**

To survive a dismissal motion, "a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.' " *Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). The plaintiff "must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' " *ATSI Commc'n, Inc. v.*

*Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) (quoting *Bell,* 550 U.S. at 555). The Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See ATSI,* 493 F.3d at 98. A complaint should be "especially liberally construed when it is submitted *pro se* and alleges civil rights violations." *See Jacobs v. Mostow,* 271 Fed.Appx. 85, 87 (2d Cir.2008) (citing *Fernandez v. Chertoff,* 471 F.3d 45, 51 (2d Cir.2006)). The submissions of a *pro se* litigant should be interpreted "to raise the strongest arguments that they suggest." *Triestman v. Federal Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006) (citations omitted).

**First Amendment**

*Retaliation*

To state a First Amendment retaliation claim under 42 U.S.C. § 1983, the plaintiff must allege that: (1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated by or substantially caused by the plaintiff's exercise of that right; and (3) the defendant's actions effectively chilled the plaintiff's exercise of his rights. *See Connell v. Signoracci,* 153 F.3d 74, 79 (2d Cir.1998). Additionally, a prisoner has a substantive due process right, actionable under § 1983, not to be subjected to false misconduct charges as retaliation for his exercise of a constitutional right such as petitioning the government for redress of his grievances. *See Jones v. Coughlin,* 45 F.3d 677, 679-680 (2d Cir.1995). However, "a complaint of retaliation that is wholly conclusory can be dismissed on the pleadings alone." *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996).

In this case, although plaintiff states that he submitted numerous grievances to prison officials, to which he received no response, even construing his complaint liberally, plaintiff claims that defendants retaliated against him, not because of his grievances, but rather, because he attempted to assault several correctional officers on January 5, 2009.[FN2] (¶ 35). As Magistrate Judge Baxter explained, because attempting to assault correctional officers is not protected conduct under the First Amendment, plaintiff fails to state a claim of retaliation. Accordingly, the Court accepts Magistrate Judge Baxter's recommendation that plaintiff's claim of retaliation be

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3909050 (N.D.N.Y.)

(Cite as: 2010 WL 3909050 (N.D.N.Y.))

dismissed.

> **FN2.** As Magistrate Judge Baxter indicates, in the amended complaint, plaintiff also alleges that defendant Howard told "officers" that plaintiff had previously attacked defendant Howard's friend and that, as a result, plaintiff was attacked. Plaintiff also references "retaliation" elsewhere in the amended complaint. These references, like the allegation regarding defendant Howard, are vague and indecipherable. Thus, without more specific allegations, the references to "retaliation" do not state a claim on which relief can be granted.

### Free Exercise

**\*6** Here, the magistrate judge found that even assuming plaintiff's allegations that he did not receive proper meals during Ramadan were sufficient to implicate the free exercise clause of the First Amendment, plaintiff failed to indicate which defendants were responsible for the alleged deprivation. Plaintiff objects. In the amended complaint, plaintiff states that he wrote a grievance "about me not receiving ramadan meals that caused me to speak verbally to grievance Sgt. Archambault he said they have my grievance but I never heard from grievance about the grievance." Am. Complaint ¶ 37. This allegations sufficiently alleges that defendant Archambault was aware of both plaintiff's complaint that he was not receiving proper meals during Ramadan and plaintiff's grievances to that effect, but failed to act. Accordingly, the Court finds that the amended complaint states a claim that plaintiff's First Amendment right to the free exercise of religion was violated.

### Grievances

Magistrate Judge Baxter recommends the dismissal of plaintiff's claim that defendants repeatedly violated the grievance process at Clinton Correctional Facility by ignoring his grievances and failing to conduct proper investigations. Plaintiff objects. "[ **I]nmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim.**" *Shell v. Brzezniak,* **365**

**F.Supp. 2d 362, 370 ( W.D.N.Y. 2005)**. Accordingly, the Court accepts the Report and Recommendation and plaintiff's general claim regarding grievances at Clinton is dismissed.

**Eighth Amendment**

### Denial of Medical Care

Magistrate Judge Baxter recommends denial of defendants' motion to dismiss plaintiff's claim that he was denied medical care by defendants Fitzgerald and Larnan, nurses at Clinton Correctional Facility on July 10, 2009 and July 11, 2009. With respect to plaintiff's allegation that defendants deprived him of mental health treatment at Clinton, however, Magistrate Judge Baxter recommends dismissal on the ground "plaintiff was getting mental health treatment in the different facilities in which he is housed." Thus, the magistrate judge concluded, plaintiff's allegation of deprivation was "conclusory" and "disingenuous". Plaintiff objects to dismissal of this claim.

Plaintiff specifically states in the amended complaint that although he was transferred to Clinton to participate in the mental health treatment program in 2008, as of the time of filing of this case in 2009, he had not been included in this program. In connection with this allegation, plaintiff "accuse[s] Michael Hogan, Brian Fischer, Maureen Boscu and Joanne Waldron. They [sic] responsible for the G.T.P. program at Clinton". Am. Complaint ¶ 19. Plaintiff also identifies defendants Roy, Artus, Lavalle, Racette in connection with this claim. The Court finds that these allegations sufficiently state a claim for denial of medical treatment and identify the defendants allegedly involved.

### Excessive Force

**\*7** According to the amended complaint, there are three separate incidents for which plaintiff seeks relief. First, plaintiff alleges that on July 10, 2008, "I was placed in full restraints and assaulted in the back of my cell at Clinton Correctional Facility." Plaintiff further states that Hogan, Boscu, and Waldron "is [sic] responsible" (Am.Compl.¶ 20) and that one "John Doe" S.H.U. Sergeant and two "John Doe" S.H.U. Correction Officers (A.Compl.¶ 40). Second, plaintiff alleges that on July 11, 2008, he was sleeping in his cell when "correction

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3909050 (N.D.N.Y.)

(Cite as: 2010 WL 3909050 (N.D.N.Y.))

officials entered my cell and placed a green state towel around my head and bing[sic] punching me in my face, my body and they kneed me and kicked me" for "about three minutes." Plaintiff states that he "couldn't see who did it ." Third, plaintiff alleges that later on July 11, 2008, officers Uhler, Allen, Marcil, and O.B.S. Sergeant "John Doe" used mace against him to harm him. The magistrate judge recommends denying defendants' motion to dismiss the third claim, finding that it successfully states a claim and identifies the defendants allegedly involved. The magistrate judge, however, recommends dismissal of the first and second claims of excessive force on July 10, 2008, and July 11, 2008 on the ground that amended complaint fails to identify the defendants' involved. Plaintiff objects to dismissal of these claims and requests permission to amend the complaint following discovery, through which he expects to learn the names of the individuals directly involved as well as those whom he believes failed to protect him. In light of plaintiff's request, and because no discovery has been conducted, defendant's motion to dismiss plaintiff's excessive force claims is denied without prejudice. If, however, after discovery, plaintiff fails to identify the John Doe defendants who allegedly subjected him to excessive force, these claims will be dismissed.

### Conditions of Confinement

Plaintiff objects to the finding in the Report and Recommendation that the amended complaint fails to state a valid "conditions of confinement" claim FN3 with respect to the denial of toiletries, including toilet paper, writing utensils, paper, grievance forms, envelopes, and placement in a cell with a broken window and no heat, blanket, or warm clothing from January 5, 2009 through January 28, 2009. According to the amended complaint, plaintiff complained to defendants Ludwig, Artus, Lavalle and Savage about these conditions, but "they disagreed". The Court finds the amended complaint sufficiently alleges a "conditions of confinement" claim. Deprivation of toiletries, "especially toilet paper, can rise to the level of unconstitutional conditions of confinement." *Trammell v. Keane,* 338 F.3d 155, 165 (2d Cir.2003). Deprivation of the basic human need of warmth can also constitute an Eighth Amendment violation. *See, e.g., Benitez v. Straley,* 2006 WL 5400078, *13 (S.D.N.Y. Feb. 16, 2006); *Moore v. Gardner,* 199 F.Supp.2d 17, 36-38 (W.D.N.Y.2002). Accordingly, defendants' motion to dismiss the

"conditions of confinement" claim is denied.

> FN3. There is no objection to the finding in the Report and Recommendation that the amended complaint sufficiently alleged a "conditions of confinement" claim with respect to the deprivation of food during the same time period.

**\*8** Plaintiff objects to the dismissal of the portion of the amended complaint which alleges that he is subject to unconstitutional "conditions of confinement" because of the loudness of the pipes banging against each other in the facility. Plaintiff alleges that "[g]rievance said it will be monitored closely" but states that "defendants are still taking to [o] long to respond to it being fixed." Paragraph 31 of the amended complaint, however, does not identify the defendants involved. Accordingly, this claim is dismissed without prejudice to filing an amended complaint identifying the defendants allegedly responsible.

### Other Claims

Plaintiff objects to the dismissal of the claim in the amended complaint that defendants unconstitutionally deprived him of his personal property. However, as the magistrate judge correctly noted, " 'New York in fact affords an adequate post-deprivation remedy in the form of, *inter alia,* a Court of Claims action' pursuant to N .Y. Comp.Codes R. & Regs. tit. 7, § 1700.3(b)(4)." *Davis v. New York,* 311 Fed.Appx. 397, 400, 2009 WL 424151, *2 (2d Cir.2009) (quoting *Jackson v. Burke,* 256 F.3d 93, 96 (2d Cir.2001)). This "adequate post-deprivation state remedy would thus preclude [the plaintiff's] due process claim under § 1983 even if he had exhausted his administrative remedies." *Id.* Accordingly, defendants' motion to dismiss plaintiff's claim that defendants unconstitutionally deprived him of his personal property, is granted.

### Qualified Immunity

There is no objection to the magistrate judge's finding that qualified immunity does not apply to plaintiff's Eighth Amendment claims at this point. Further, it is well established that a prisoner has a First Amendment right to keep a diet consistent with his religious beliefs. *See Ford v. McGinnis,* 352 F.3d 582, 597 (2d Cir.2003) ("We ... have clearly established that a prisoner has a right to a diet

Slip Copy, 2010 WL 3909050 (N.D.N.Y.)

(Cite as: 2010 WL 3909050 (N.D.N.Y.))

consistent with his or her religious scruples") (citing *Kahane v. Carlson,* 527 F.2d 492 (2d Cir.1975); *Bass v. Coughlin,* 976 F.2d 98, 99 (2d Cir.1992)). Accordingly, defendants' motion to dismiss on grounds of qualified immunity is denied.

**CONCLUSION**

For the foregoing reasons, it is hereby

**ORDERED** that the Report and Recommendation is Accepted with regard to the recommendation that defendants motion to dismiss the First Amendment retaliation claim, grievance claim, deprivation of personal property claim be Granted, and it is further

**ORDERED** that the Report and Recommendation is Accepted with regard to the recommendation that defendants' motion for dismissal on grounds of qualified immunity be Denied; and it is further

**ORDERED** that defendants' motion to dismiss the First Amendment retaliation claim, grievance claim, and deprivation of personal property claim is Granted; and it is further

**ORDERED** that the Report and Recommendation is otherwise Rejected; and it is further

**\*9 ORDERED** that defendants' motion to dismiss is otherwise Denied.

**IT IS SO ORDERED.**

N.D.N.Y.,2010.

Reeder v. Hogan
Slip Copy, 2010 WL 3909050 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 839541 (N.D.N.Y.)

(Cite as: 2006 WL 839541 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Felix DEJESUS, Plaintiff,
v.
Officer R. TIERNEY; Brantly; Officer Gransbury;
Manharm Julie Suarez; Fielder; Mercis; E. Roth;
Thomas Eagen; Officer M. Schuer; Mayforths; Officer,
F. Pambiachi; Broke; John Doe; Officer K. Sweet;
Perez; Dirie; Gary Filion; and Donald Selsky,
Defendants.
No. 9:04-CV-298.

March 28, 2006.
Felix DeJesus, Plaintiff pro se.

Hon. Eliot Spitzer, Attorney General of the State of New
York, Stephen Kerwin, Assistant Attorney General, The
Capitol, Albany, New York, for DOCS Defendants.

Thuillez, Ford, Gold, Johnson & Butler, LLP, Debra J.
Young, Albany, New York, for Medical Personnel
Defendants, of counsel.

MEMORANDUM-DECISION AND ORDER

MORDUE, Chief J.

**\*1** Plaintiff, an inmate in the custody of the New York
State Department of Correctional Services ("DOCS"),
brought this action for monetary relief under 42 U.S.C. §
1983, alleging that he was denied due process in
connection with a disciplinary hearing held against him,
that he was denied proper medical care, and that one of the
defendants used excessive force against him.

Presently before the court are two motions to dismiss
this action pursuant to Fed.R.Civ.P. 12(b)(6), one on
behalf the corrections personnel (Dkt. No. 63) and one on
behalf of the medical personnel (Dkt. No. 66). The
motions were referred to United States Magistrate Judge
Gustave J. DiBianco for a Report and Recommendation

pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule
72.3(c). Magistrate Judge DiBianco has submitted a
Report and Recommendation (Dkt. No. 89) recommending
that both motions be granted and the action dismissed in
its entirety.

Plaintiff has submitted objections to the Report and
Recommendation (Dkt. Nos.90, 92). Pursuant to 28 U.S.C.
§ 636(b)(1)(C), this Court conducts a *de novo* review of
those parts of a magistrate judge's Report and
Recommendation to which a party specifically objects.
Where only general objections are filed, the Court reviews
for clear error. *See Brown v. Peters*, 1997 WL 599355,
*2-*3 (N.D.N.Y.), aff'd without op., 175 F.3d 1007 (2d
Cir.1999). Failure to object to any portion of a Report and
Recommendation waives further judicial review of the
matters therein. *See Roldan v. Racette*, 984 F.2d 85, 89
(2d Cir.1993). Defendants have interposed no objections
to the Report and Recommendation, nor do they submit
papers in response to plaintiff's objections (Dkt.Nos.91,
93).

Plaintiff's objections are best characterized as general
objections; he interposes no specific objection to any
portion of the Report and Recommendation. Thus, the
proper standard of review is clear error. The Court finds
no clear error. Even on *de novo* review, the Court
determines that the Report and Recommendation of
Magistrate Judge DiBianco is correct in all respects. In the
objections plaintiff appears to be raising a discovery issue;
however, it is not clear what information plaintiff is
seeking, nor does it appear that the discovery to which he
refers concerns any incident which is the subject of this
action. Nor does a search of the docket sheet and the
documents submitted by plaintiff on these motions
indicate that plaintiff previously sought such information.
The objections do not make a showing on this issue
sufficient to warrant reopening the briefing or rejecting the
Report and Recommendation. It is therefore

ORDERED that the Report and Recommendation is
accepted and adopted; and it is further

Not Reported in F.Supp.2d, 2006 WL 839541 (N.D.N.Y.)

(Cite as: 2006 WL 839541 (N.D.N.Y.))

ORDERED that the motion to dismiss this action pursuant to Fed.R.Civ.P. 12(b)(6) on behalf the corrections personnel (Dkt. No. 63) is granted; and it is further

ORDERED that the motion to dismiss this action pursuant to Fed.R.Civ.P. 12(b)(6) on behalf the medical personnel (Dkt. No. 66) is granted; and it is further

**\*2** ORDERED that the action is dismissed in its entirety.

IT IS SO ORDERED.

REPORT-RECOMMENDATION

DIBIANCO, Magistrate J.

This matter has been referred to me for Report and Recommendation by the Honorable Norman A. Mordue, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

In this civil rights action, plaintiff alleges that he was denied due process in conjunction with a disciplinary hearing held against him, and he was denied proper medical care. Plaintiff also alleges that one of the defendants used excessive force against him. Plaintiff seeks substantial monetary relief.

Presently before the court are two motions to dismiss this action pursuant to FED. R. CIV. P. 12(b)(6). (Dkt.Nos.63, 66). One motion has been submitted on behalf of the corrections personnel defendants, represented by the New York State Attorney General's Office. (Dkt. No. 63). The second motion has been submitted on behalf of the medical personnel defendants, represented by private counsel (Dkt. No. 66). For the following reasons, this court agrees with defendants in part and will recommend dismissing almost all of the complaint.

DISCUSSION

1. *Motion to Dismiss*

A court may not dismiss an action pursuant to Rule 12(b)(6) unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which

would entitle him to relief." *Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir.1994)(citing *inter alia Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). The court must accept the material facts alleged in the complaint as true. *Id.* (citing *Cooper v. Pate*, 378 U.S. 546 (1964)(per curiam)). In determining whether a complaint states a cause of action, *great liberality* is afforded to *pro se* litigants. *Platsky v. Central Intelligence Agency*, 953 F.2d 26, 28 (2d Cir.1991) (citation omitted). When considering a motion to dismiss for failure to state a claim, the court may consider the complaint, together with any documents attached as exhibits or incorporated by reference. *See Dangler v. New York City Off Track Betting Corp.*, 193 F.3d 130, 138 (2d Cir.1998).

The court may also consider documents that, although not mentioned in the complaint or specifically incorporated by reference, are "integral" to the complaint. *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir.2004)(citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir.2002)). In *Chambers,* the Second Circuit noted that the harm from considering material outside the complaint is the lack of notice that the material may be considered. *Id.* However, where there is actual notice by the opposing party of all the information in the movant's papers, such as where the plaintiff has relied upon the documents in question in framing the complaint, the necessity to convert a motion to dismiss to one for summary judgment is dissipated. *Id.* Thus, when the plaintiff has relied upon the terms and effect of the document in framing the complaint, the document will be considered "integral" to the complaint and may be considered in a motion directed to the face of the complaint.

2. *Facts*

**\*3** During the time covered by the facts in this amended complaint, plaintiff was housed in the Infirmary of Coxsackie Correctional Facility, referred to as the Regional Medical Unit (RMU), due to his multiple medical conditions. The amended complaint is a rambling discussion relating many instances of alleged misconduct by defendants over many months. Plaintiff has named eighteen defendants in his amended complaint. (Dkt. No. 26). Ten of the defendants are employees of the Department of Correctional Services (DOCS), assigned to Coxsackie Correctional Facility. The DOCS defendants

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 839541 (N.D.N.Y.)

(Cite as: 2006 WL 839541 (N.D.N.Y.))

are: Corrections Officer (CO) R. Tierney; CO Gransbury; CO Schauer; CO Pambianchi;[FN1] CO Schauer;[FN2] Thomas Eagen, Director of the Inmate Grievance Program; CO Sweet; Lieutenant Perez; Captain Dirie (hearing officer); Gary Filion, Superintendent of Coxsackie; and Donald Selsky,[FN3] Director of Special Housing/Inmate Disciplinary Programs.

> FN1. Plaintiff spelled this defendant's name "Schuer" in the caption of the amended complaint. The proper spelling is "Schauer", and the court will refer to this defendant with the proper spelling of his name.

> FN2. Plaintiff spelled this defendant's name "Pambiachi".

> FN3. Plaintiff spelled this defendant's name "Selskie".

The other eight named[FN4] defendants are employees of Correctional Medical Services, an independent contractor providing medical services to inmates at Coxsackie.[FN5] These medical defendants are: Theresa Brantley;[FN6] Valerie M. Memhard;[FN7] Julie[FN8] Suarez; Elizabeth J. Fielder; Nurse S. Mercer;[FN9] Grace M. Mayforth;[FN10] Emma Roth; and Peggy Broke.[FN11]

> FN4. Plaintiff has named a "John Doe" defendant. Plaintiff has not identified this defendant, and therefore, he is not a part of this action at this time.

> FN5. The court notes that defense counsel has not properly spelled her clients' names, and has not properly identified what positions they hold at Coxsackie. In fact, some of the individuals are listed as physicians on the title page of the memorandum of law, but are apparently nurses (defendant Mercer). The court, however, by examining the acknowledgments of service has determined the correct spelling of the defendants' names, and in cases where the defendant herself indicated what position she held, the court has been able to determine whether the individual is a nurse or a physician. For the defendants who did not identify themselves specifically as

holding a certain position, this court cannot make any determination. Although plaintiff has attempted to identify the defendants by their positions in the amended complaint, it appears that he has made some errors in identification, and thus, the court will not rely exclusively on plaintiff's recitation.

> FN6. Plaintiff spelled this defendant's name Brantly. The court would point out that defendant Brantley was never served in this action. The summons was returned unexecuted with a notation that Theresa Brantley was no longer employed by Correctional Medical Services at Coxsackie. (Dkt. No. 46). However, it appears that defense counsel has responded on defendant Brantley's behalf, and based on this court's findings with respect to the merits of plaintiff's medical care, the court will not discuss the lack of service.

> FN7. Plaintiff spelled this defendant's name "Manharm."

> FN8. Plaintiff spelled this defendant's first name "July."

> FN9. Plaintiff spelled this defendant's name "Mercis."

> FN10. Plaintiff spelled this defendant's name "Mayforths."

> FN11. Defendant Broke has not been served for the same reason as defendant Brantley. (Dkt. No. 46).

Plaintiff states that he resides in the RMU because of his multiple medical impairments, including some paralysis resulting from a stroke; reflux disease; prostatic disease; anemia; and diabetes. AC ¶ 25. Plaintiff also alleges various other ailments in his "medical history." *Id.* Throughout the rest of the amended complaint, plaintiff relates instances in which he had contact with defendants and in some instances claims that defendants harassed him or falsely accused plaintiff of some misbehavior. Plaintiff

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 839541 (N.D.N.Y.)

(Cite as: 2006 WL 839541 (N.D.N.Y.))

also alleges that when he was charged with misbehavior on June 22, 2003, defendant Dirie found plaintiff guilty notwithstanding insufficient evidence. Plaintiff may also be attempting to allege deliberate indifference to his serious medical needs and one instance of excessive force. Plaintiff also alleges that he was denied access to courts and that defendants retaliated against plaintiff for filing grievances and a lawsuit.

The amended complaint is difficult to understand. In their motions to dismiss, defense counsel have listed each defendant and stated the facts alleged against each. For clarity, the court will do the same.

1. Defendant CO Tierney (DOCS)

This defendant is mentioned in paragraphs 26-30 of the amended complaint. Plaintiff alleges that on June 13, 2003, plaintiff was going to the yard in his wheelchair and moved a chair that was blocking a doorway. AC ¶ 26. Plaintiff claims that defendant Tierney approached plaintiff and asked him "in a stressful conditions [sic]" why he moved the chair. Plaintiff states that defendant Tierney told plaintiff to go back to his room, but that when plaintiff kept going toward the yard, Tierney came after plaintiff and began kicking his wheelchair and threatening to kill plaintiff. AC ¶ 27. Plaintiff states that other defendants (Brantley, Sweet, Memhard) witnessed this conduct. AC ¶¶ 27-28.

*4 Plaintiff states that the next day he was issued a misbehavior report for refusing a direct order. AC ¶ 28. Plaintiff states that he filed a grievance against defendant Tierney based upon his conduct, and that almost immediately thereafter, defendant Tierney harassed plaintiff by telling him to "get out of his face" on August 28, 2003. AC ¶ 29. Plaintiff alleges additional harassment by defendant Tierney on September 1, 2003. AC ¶ 30. Plaintiff claims that he gave defendant Tierney two envelopes to mail, but that plaintiff observed defendant Tierney smiling before he put the mail in the "box." Id. Plaintiff states that he never received a response from those two grievances. Id.

2. Defendant Theresa Brantley (Medical)

Defendant Brantley is mentioned in paragraphs 27,

30, 31, 33, and 34. Plaintiff alleges that defendant Brantley was one of the other defendants who observed defendant Tierney kick plaintiff's wheelchair on June 13, 2003. AC ¶ 27. Plaintiff also alleges that defendants Brantley and Fielder were present when defendant Tierney took plaintiff's mail and smiled before placing it in the box. AC ¶ 30. Plaintiff also claims that on June 22, 2003, defendant Brantley was giving ice to other patients, but did not stop at plaintiff's room to give him ice. AC ¶ 31. Plaintiff states that hours later he began yelling for ice and asked defendant Brantley for ice again when she was making her rounds, but plaintiff alleges that defendant Brantley told plaintiff that she "don't gave [sic] fuck." Id.

As a result of this encounter with defendant Brantley, plaintiff claims that defendant Schauer wrote a false misbehavior report against plaintiff, claiming that he called defendant Brantley a "puta." AC ¶ 32. Plaintiff alleges that defendant Brantley testified at plaintiff's disciplinary hearing that he did not call her this name, but was still found guilty of the misbehavior. AC 33-34.

3. Defendant CO Schauer (DOCS)

In addition to plaintiff's claim that defendant Schauer wrote a false misbehavior report June 22, 2003, plaintiff alleges that on September 27, 2003, defendant Schauer and defendant Roth came to plaintiff's room, and defendant Schauer took two of plaintiff's pens. AC ¶ 36. Plaintiff claims that when he got out of bed to ask Schauer to return the pens, Schauer pushed plaintiff, and plaintiff fell to the floor. Id. Plaintiff states that when he continued to ask about the pens, defendant Schauer hit plaintiff on the right shoulder with a dictionary. Id. Plaintiff then alleges that defendant Roth took some of plaintiff's property out of his room, but it appears that both defendants brought the property back to plaintiff and put him back on the bed after a sergeant was notified of the incident. Id.

4. Defendant Captain Dirie (DOCS)

Defendant Dirie was the hearing officer, who held a disciplinary hearing against plaintiff on July 8, 2003, resulting from the June 22, 2003 incident. AC ¶¶ 33-34. Plaintiff alleges that defendant Dirie found plaintiff guilty and sentenced plaintiff to 40 days of keeplock and a loss of privileges based on insufficient evidence and a false

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 839541 (N.D.N.Y.)

(Cite as: 2006 WL 839541 (N.D.N.Y.))

misbehavior report by defendant Schauer. AC ¶ 34.

5. Defendant Selsky (DOCS)

**\*5** Plaintiff alleges that he appealed the result of the disciplinary hearing to defendant Selsky. AC ¶ 35. It appears that plaintiff's appeal requested a "time cut" or a shortening of the sentence because of plaintiff's "health and safety". *Id.* Plaintiff alleges that defendant Selsky denied plaintiff's appeal "without clarification." *Id.*

6. Defendant Emma Roth (Medical)

Plaintiff alleges that defendant Roth was present on September 27, 2003 when defendant Schauer took plaintiff's pens. AC ¶ 36. Defendant Roth was there to give plaintiff medications. *Id.* Plaintiff claims that defendant Roth also took some of plaintiff's property out of his room. AC ¶ 36. However, it appears that plaintiff also claims that she brought plaintiff's property back to him as soon as a sergeant was notified. *Id.* She also apparently helped put plaintiff back in bed after the incident. *Id.*

Plaintiff stated that on August 21, 2003, he fell in the shower when he was attempting to get back into his wheelchair, but he states that he managed to hit an alarm. AC ¶ 38. Plaintiff appears to state that because he was in keeplock at the time, no medical personnel could open the door without the officers present. AC ¶ 39. Plaintiff alleges that defendants Roth, Fielder, and Mercer arrived with an unnamed officer to put him back on his bed. *Id.* Defendant Mercer placed an ice bag on his forehead due to swelling from plaintiff's fall in the shower. *Id.*

7. Defendant Elizabeth J. Fielder (Medical)

Plaintiff alleges that defendant Fielder was present on September 1, 2003 when defendant Tierney mailed plaintiff's grievances. AC ¶ 30. Defendant Fielder also arrived with defendants Mercer and Roth after the shower incident on August 21, 2003 to help put plaintiff back in bed. AC ¶ 39.

8. Defendant S. Mercer, RN (Medical)

The only mention of defendant Mercer is that she arrived with defendants Fielder and Roth after the shower incident on August 21, 2003 to help put plaintiff back in bed. AC ¶ 39. Plaintiff also states that defendant Mercer placed ice on plaintiff's forehead. *Id.*

9. Defendant Pambianchi (DOCS)

Plaintiff alleges that on October 18, 2003, defendant Pambianchi and an unidentified nurse entered plaintiff's room to bring him his dinner. AC ¶ 41. Plaintiff claims that after they left the room, defendant Pambianchi came back and turned on and off plaintiff's lights, "disturbing his moment of silence." *Id.* Plaintiff alleges that on October 19, 2003, defendant Pambianchi came into plaintiff's room with defendant Peggy Broke to give plaintiff his dinner. AC ¶ 42. Plaintiff alleges that defendant Pambianchi called plaintiff "# 380," and when plaintiff told Pambianchi that this was not his name and to leave the room, defendant Pambianchi allegedly threatened to kick plaintiff in the face. *Id.*

Plaintiff claims that on October 29, 2003, defendant Pambianchi came into plaintiff's room with defendant Mayforth. AC ¶ 42. Plaintiff states after he told defendant Mayforth that she was late with his medication, defendant Mayforth told plaintiff "in a stressful condition" to take his medication, and defendant Pambianchi told plaintiff to take his "fucking meds." *Id.* Plaintiff then told the defendants to leave his room, and defendant Pambianchi took a container of "nitrition [sic]" and threw it over plaintiff's head and against the wall, making a mess. *Id.*

**\*6** Plaintiff states that he reported this alleged conduct to a sergeant, and the next day, plaintiff was served with a misbehavior report "in order to retaliate" against plaintiff for filing a lawsuit. AC ¶¶ 44-45. Plaintiff alleges that as a result of these incidents, he filed two grievances, one regarding the October 29, 2003 incident and one regarding the alleged retaliation. AC ¶ 45.

10. Defendant Grace M. Mayforth (Medical)

The only mention of defendant Mayforth is that she told plaintiff on October 29, 2003 to take his medications. AC ¶ 43. Plaintiff alleges, however, that this was done in a "stressful condition." *Id.*

11. Defendant Thomas G. Eagen (DOCS)

Defendant Eagen is identified by plaintiff as the Director of the Inmate Grievance Program. AC ¶ 12. Plaintiff alleges that defendant Eagen returned some grievances to plaintiff without responding to the merits.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 839541 (N.D.N.Y.)

(Cite as: 2006 WL 839541 (N.D.N.Y.))

AC ¶ 46.

**12. Defendant K. Sweet (DOCS)**

Plaintiff alleges that defendant Sweet was present to witness defendant Tierney kick plaintiff's wheelchair on June 13, 2003. AC ¶ 28. Plaintiff also claims that on November 12, 2003, defendant Sweet came to plaintiff's room and told him to go to a hearing with defendant Dirie. AC ¶ 47. Plaintiff stated that he told defendant Sweet that plaintiff was tired and in pain and that he could not walk because defendant Suarez had taken his wheelchair for no reason. *Id.* Plaintiff claims that defendant Sweet rushed plaintiff. *Id.*

Plaintiff states that even though he tried to explain the situation to defendant Sweet, he persisted in rushing him and forcing plaintiff into "stressful conditions" without concern for plaintiff's health. AC ¶ 48. Defendant Sweet also pointed his finger in plaintiff's face, harassed, and threatened plaintiff. *Id* .

**13. Defendant Peggy Broke**

Plaintiff alleges that defendant Broke was with defendant Pambianchi when he called plaintiff # 380 and later threatened to kick plaintiff in the face. AC ¶ 42. Plaintiff alleges that on January 25, 2004, defendant Broke came into plaintiff's room to bring him dinner, but only brought him one container of "resource nitriction [sic]", when he was supposed to have two containers. AC ¶ 52. Plaintiff claims that he later pushed the "alarm switch", and defendant Broke came back to plaintiff's room with an unidentified guard. *Id.* Plaintiff states that defendant Broke had the other container with her, but that she and the guard began to harass plaintiff, and defendant Broke ultimately opened the container and threw the contents in the toilet. AC ¶ 53.

Plaintiff states that he wrote a letter to defendant Broke, explaining that plaintiff was not an animal, but that he did not want to write a grievance against defendant Broke. AC ¶ 54. Plaintiff claims, however, that on January 26, 2004, defendant Broke only again brought one container of "resource" at 5:00 p.m. *Id.* Plaintiff states that he pushed the alarm, but there was no response. *Id.* Plaintiff claims that when the nurse came to give plaintiff his medications at 9:00 p.m., plaintiff asked for the resource, but the unidentified nurse told him that it was not

her job. *Id.* Plaintiff alleges that on February 13, 2004, he wrote a letter to the head nurse complaining about defendant Broke's actions, and that later on February 17, 2004, he filed a grievance against defendant Broke. AC ¶ 55.

**14. Defendant Julie Suarez (Medical)**

**\*7** Plaintiff alleges that defendant Gransbury took plaintiff to be examined by defendant Suarez on June 13, 2003 after defendant Tierney allegedly kicked plaintiff's wheelchair. AC ¶ 28. Plaintiff claims that he did not have his wheelchair on November 12, 2003 when defendant Sweet came to take plaintiff to a hearing because defendant Suarez took the wheelchair away for no reason. AC ¶ 47.

**15. Defendant Gransbury (DOCS)**

The only thing that plaintiff alleges about defendant Gransbury is that he took plaintiff to be examined by Julie Suarez on June 13, 2003 after defendant Tierney allegedly kicked plaintiff's wheelchair. AC ¶ 28.

**16. Defendant Valerie M. Memhard (Medical)**

Plaintiff alleges only that defendant Memhard was present in the corridor on June 13, 2003 when defendant Tierney kicked plaintiff's wheelchair. AC ¶ 28.

**17. Defendant Perez (DOCS)**

Defendant Perez is identified as a corrections lieutenant. Plaintiff mentions defendant Perez *only* in the caption of the amended complaint and in the section where plaintiff is simply identifying the defendants, but there are no factual claims against this defendant.

**18. Defendant Gary Filion (DOCS)**

Defendant Filion is identified as the Superintendent of Coxsackie. AC ¶ 22. However, plaintiff makes no factual allegations against this defendant. He is not mentioned in the textual portion of the complaint.

**19. Miscellaneous Claims with No Defendants Named**

The amended complaint contains some miscellaneous claims that do not appear to be directed at any of the named defendants. AC ¶¶ 49-51. Plaintiff claims that he filed a grievance on December 9, 2003, complaining about

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 839541 (N.D.N.Y.)

(Cite as: 2006 WL 839541 (N.D.N.Y.))

insects in his room. AC ¶ 49. Plaintiff claims that an individual named Mrs. Monillo (not named as a defendant) told plaintiff that he was not the first one to complain about this problem. *Id.* Plaintiff alleges that there was no response to his grievance. *Id.*

Plaintiff also alleges that on August 5, 2003, he received an order from the "courts", telling plaintiff to file an amended complaint, but plaintiff alleges that he could not get legal materials from an unidentified officer. AC ¶ 50. Plaintiff appears to allege that he obtained an extension of time from the court. AC ¶ 51 Plaintiff claims that he then had trouble writing his request for access to the law library. *Id.* Plaintiff states that he was told to add certain information to his next request, and plaintiff filed a grievance. *Id.* None of the named defendants are mentioned in these three paragraphs, although it appears that plaintiff is attempting to allege a denial of access to courts.

In the last three paragraphs of the amended complaint, plaintiff lists his constitutional claims. AC ¶¶ 56-58. Plaintiff raises claims of Due Process (14th Amendment); equal protection (14th Amendment); Deliberate Indifference/Cruel and Unusual Punishment (8th/14th Amendment); Access to Courts (6th/14th Amendments); and Freedom of Speech (1st/14th Amendments).

3. *Personal Involvement*

**\*8** It is well-settled that in order to be held liable for damages in a section 1983 action a defendant must have been personally involved in the alleged violation. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.), *cert. denied,* 434 U.S. 1087 (1978). ("[t]he doctrine of respondeat superior is inapplicable to section 1983 claims. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981); *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied,* 414 U.S. 1033 (1973).

In this case, plaintiff makes absolutely no claims against defendants Perez and Filion. These defendants are mentioned only in the caption of the complaint and in the section in which plaintiff identifies defendants. However, these two defendants appear to have had no contact with plaintiff at all in relation to the facts stated in the amended complaint. Thus, the complaint may be dismissed as against these two defendants for lack of personal

involvement.

4. *Due Process*

The court must first note that it is very difficult to determine what claims plaintiff is making against which defendant. As stated above, the complaint is a rambling recitation of events that happened on different days involving different people over a series of many months. At the end of this recitation, plaintiff lists several constitutional rights that he believes were violated based on the previous recitation without identifying which rights were violated by which defendant at which time. Thus, defendants and the court have attempted to match the possible violations with the recitation of the facts.

A. Disciplinary Hearing of July 8, 2003

In order to begin a due process analysis, the court must determine, *inter alia,* that plaintiff had a protected liberty interest in remaining free from the confinement that he challenges. *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). In *Sandin,* the Supreme Court held that although states may still create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 515 U.S. at 484.

The Second Circuit has *indicated* that whether a deprivation is atypical and significant involves fact finding. *See Frasier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996)("[t]he extensive fact-finding of the district court permits us to measure Frasier's SHU claim by the standard of *Sandin* ); *Samuels v. Mockry,* 77 F.3d 34, 38 (2d Cir.1996)(assessment as to whether inmate had a protected liberty interest may require fact finding). The Court in *Sandin* determined that the inmate's discipline in segregated confinement for *30 days* did *not* present the type of atypical, significant deprivation in which the state might create a liberty interest. *Id.*

**\*9** The Second Circuit has discussed the duration element of the *Sandin* analysis. *Colon v. Howard,* 215 F.3d 227 (2d Cir.2000). In *Colon,* the court discussed

Not Reported in F.Supp.2d, 2006 WL 839541 (N.D.N.Y.)

(Cite as: 2006 WL 839541 (N.D.N.Y.))

whether it was appropriate to have a "bright line" rule regarding the maximum length of confinement in the Special Housing Unit (SHU) before a liberty interest might be created. *Id.* The court concluded that 305 days in SHU would meet the standard. *Id.* at 231. Although Judge Newman believed that the court should articulate a bright line rule, holding that any SHU confinement less than 180 days would not create a liberty interest, the panel disagreed. *Id.* at 234. The court also noted that the longest confinement in SHU that did *not* meet the atypical requirement was *101 days. Id.* at 231 (citing *Sealey v. Giltner,* 197 F.3d 578, 589-90 (2d Cir.1999)).

In this case, plaintiff was issued a misbehavior report by defendant Schauer on June 22, 2003 after plaintiff refused to stop yelling at defendant Brantley and allegedly called her a prostitute in Spanish. AC ¶¶ 31, 33.[FN12] Plaintiff claims that defendant Dirie was the hearing officer and found plaintiff guilty of the misbehavior even though defendant Brantley testified that plaintiff did not call her a prostitute. Plaintiff received a penalty of 40 days of keeplock, together with a loss of privileges.

> **FN12.** Plaintiff has omitted a paragraph 32 in his amended complaint.

Based on the facts stated in plaintiff's complaint, this court finds that plaintiff did not have a liberty interest in remaining free of the confinement to which he was subjected. Keeplock involves confinement in one's own room or cell and does not involve a transfer to a more restrictive part of the institution. Additionally, plaintiff was already confined to a room in the medical unit,[FN13] and there is no indication that the additional deprivation caused by the guilty finding was either atypical or significant. Thus, plaintiff had no liberty interest and therefore, his due process rights were not violated.[FN14]

> **FN13.** In the amended complaint, plaintiff also states that he was already in keeplock and had been so since June 13, 2003. AC ¶ 31. Plaintiff does not explain why he was in keeplock, and it is unclear how much longer plaintiff would have been in keeplock if not for this incident.

> **FN14.** The DOCS defendants have submitted a

transcript of the disciplinary hearing. Kerwin Aff. Ex. B. Although this is a motion to dismiss, as defendants point out, the testimony of defendant Brantley at the disciplinary hearing was "integral" to plaintiff's claim that the evidence was insufficient to convict him of the misbehavior. Thus, the transcript of the disciplinary hearing can be said to have been "incorporated" into the complaint, and the court would have been able to consider it without converting the motion to one for summary judgment. In any event, a review of the transcript of the disciplinary hearing shows that plaintiff's recitation of the facts is incorrect. Plaintiff was charged with three violations: an unhygienic act of spitting, creating a disturbance, and threats to staff. Kerwin Aff. Ex. B. Defendant Brantley testified that she could not remember what names plaintiff had called her. *Id.* at 7. In fact, plaintiff was only found *not guilty of the threats,* but only found guilty of spitting (a charge that he admitted) and creating a disturbance (plaintiff admits in the amended complaint that he began "yelling" for ice). Thus, there was sufficient evidence to find plaintiff guilty of the charged for which he was ultimately held responsible. *See Superintendent v. Hill,* 472 U.S. 445, 455 (1985)(the hearing disposition must be supported by "some" or "a modicum" of evidence). Plaintiff's admissions and the testimony of Nurse Brantley are sufficient to find plaintiff guilty. Thus, regardless of the lack of a liberty interest, plaintiff suffered no due process violation.

Plaintiff does allege that defendant Schauer filed a false misbehavior report that accused plaintiff of calling defendant Brantley a prostitute. Plaintiff claims he did not do this. The law is clear that there is *no constitutional violation* caused by the issuance of a false misbehavior report alone. *Freeman v. Rideout,* 808 F.2d 949, 953 (2d Cir.1986), *cert. denied,* 485 U .S. 982 (1988). Thus, any due process claims may be dismissed as against defendants Dirie, Schauer, and Brantley. Since this is the only claim against defendant Dirie, the entire amended complaint may be dismissed as against this defendant. Any due process claims may be dismissed as against

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 839541 (N.D.N.Y.)

(Cite as: 2006 WL 839541 (N.D.N.Y.))

defendants Schauer and Brantley in connection with the events leading up to and including the July 8, 2003 disciplinary hearing.

Plaintiff's only claim against defendant Selsky is that he refused to reduce plaintiff's sentence on appeal. Since there was no due process violation at the hearing, any due process claims relating to the appeal may also be dismissed. Thus, the entire complaint may be dismissed as against defendant Selsky. To the extent that plaintiff states that defendant Selsky ignored plaintiff's health and safety in refusing to reduce the sentence, this court finds the claim to be completely conclusory. The court would point out that plaintiff was keeplocked in the medical unit. Thus, it is completely unclear, and plaintiff does not specify why his health or safety would have been jeopardized by defendant Selsky's refusal to shorten the sentence.

B. Grievance Procedure

**\*10** Plaintiff seems to claim that many of his grievances were not answered and that defendant Eagen sent two grievances back to plaintiff for some unknown reason. AC ¶ 46. To the extent that plaintiff challenges the grievance procedure or defendant Eagen's alleged rejection of plaintiff's grievances, plaintiff states no constitutional claim. Courts have consistently held that because grievances procedures are undertaken voluntarily by New York and other states, they are *not constitutionally required. See Ramos v. Hanslmaier,* 96 Civ. 744, 1997 U.S. Dist. LEXIS 6082, \*6-7 (S.D.N.Y. Feb. 19, 1997)(multiple citations omitted). *See also Bullock v. Horn,* CV-99-1402, 2000 U.S. Dist. LEXIS 21573, \*22-23 (M.D.Pa.2000)(plaintiff claimed improper refusal to process grievance); *Hoover v. Watson,* 886 F.Supp. 410, 418-19 (D.Del.), *aff'd,* 74 F.3d 1226 (3d Cir.1995); *Muhammad v. McMickens,* 86 Civ. 7376, 1988 U.S. Dist. LEXIS 552, \*8-9 (S.D.N.Y. Jan. 25, 1988). Because the grievance procedures are not constitutionally required, a state's violation of those procedures or its failure to enforce them does not give rise to a claim under section 1983. *Id.*

Thus, any due process claim may be dismissed as against defendant Eagen. Since this is the only mention of defendant Eagen in the amended complaint, the entire complaint may be dismissed as against this defendant.

C. Property Rights

Plaintiff also claims that on September 27, 2003, defendant Schauer took plaintiff's pens, before pushing him down and hitting him with a dictionary. AC ¶¶ 36-37. Plaintiff also claims that at the same time, defendant Roth took plaintiff's property out of the room, but apparently brought it back shortly thereafter. Plaintiff would not state a due process claim even if the defendants actually deprived plaintiff of some of his personal property.

Even if the defendants had intentionally caused the loss or destruction of plaintiff's property, the deprivation of property, whether intentional or unintentional, without more, is not actionable under section 1983 as long as the state has an adequate post deprivation procedure available. *Hudson v. Palmer,* 468 U.S. 517, 533 (1984). New York provides an adequate post-deprivation remedy in the Court of Claims with respect to property claims by prison inmates. *See Koehl v. Dalsheim,* 85 F.3d 86, 88 (2d Cir.1996); *Love v. Coughlin,* 714 F.2d 207, 209 (2d Cir.1983); *see also* N.Y. CT. CL. ACT § 10(6) (McKinney 1998).

Thus, even assuming that defendants Schauer and Roth did take some of plaintiff's property, there would be no due process violation as a result, and any due process claims relating to plaintiff's property may be dismissed as against these two defendants.

5. *Equal Protection*

Although plaintiff mentions equal protection in the last part of the amended complaint, plaintiff fails to allege how he was treated differently than any similarly situated individuals. There is no indication against which defendant he might be attempting to raise such a claim. Thus, any equal protection claims may be dismissed against all defendants.

6. *Cruel and Unusual Punishment/Medical Care (8th & 14th Amendments)*

A. Punishment

**\*11** The Eighth Amendment prohibits cruel and unusual punishments, including punishments that involve

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 839541 (N.D.N.Y.)

(Cite as: 2006 WL 839541 (N.D.N.Y.))

the unnecessary and wanton infliction of pain. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). When the use of excessive force is alleged, the court must determine whether the force "was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitely v. Albers,* 475 U.S. 312, 320-21 (1986)(quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied,* 414 U.S. 1033 (1973)). In order to meet the constitutional standard for excessive force, the defendants' conduct must be " 'inconsistent with the contemporary standards of decency' and 'repugnant to the conscience of mankind." ' *Whitely,* 475 U.S. at 327.

Minor uses of physical force do not reach the constitutional level as long as the force used is not "repugnant to the conscience of mankind." *Hudson v. McMillian,* 503 U.S. 1, 9-10 (1992). However, the court must determine the need for the force, the relationship between the need and the amount of force used, the extent of the injury suffered, the extent of the threat to the safety of staff and inmates, and any efforts made to temper the severity of a forceful response. *Whitely,* 475 U.S. at 321. The absence of serious injury may be relevant to the inquiry, but does not end it. *See Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003)(citing *Hudson,* 503 U.S. at 7).

However, it is also well settled that *verbal harassment* itself does not rise to the level of a constitutional violation. Verbal abuse, vulgarity, and even threats are insufficient to rise to the level of constitutional violations. *See Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986); *Ramirez v. Holmes,* 921 F.Supp. 204, 210 (S.D.N.Y.1996)(threats or verbal harassment without injury, "although indefensible and unprofessional," do not rise to the level of constitutional violations).

Most of what plaintiff alleges in this case amounts to verbal abuse and harassment. Plaintiff alleges that on June 13, 2003, defendant Tierney kicked plaintiff's wheelchair and threatened to "kill" plaintiff. Even assuming that these allegations are true, the kicking of plaintiff's wheelchair may have caused more pain to defendant Tierney than to plaintiff. Plaintiff does not allege any injury as the result of these actions. The court also notes that plaintiff alleges

that defendant Tierney filed a misbehavior report against plaintiff for disobeying a direct order, however, it is clear from plaintiff's own amended complaint that he did disobey defendant Tierney's order to return to plaintiff's room. Plaintiff specifically states that after Tierney told plaintiff to go back to his room, plaintiff kept going to the yard. *Id.* Thus, plaintiff admits that he engaged in the conduct for which he was given a misbehavior report, and this action by defendant Tierney did not amount to harassment of plaintiff.

**\*12** Plaintiff also alleges that plaintiff filed a grievance against defendant Tierney, and that on August 28, 2003 (more than two months after the wheelchair incident) defendant Tierney retaliated against plaintiff by telling him to "get out of Tierney's face." AC ¶ 29. Certainly telling someone to get out of one's face is not under any stretch of the imagination an Eighth Amendment violation. It is true, however, that any action taken by defendant in retaliation for the exercise of a constitutional right, even if not unconstitutional in itself, states a viable constitutional claim. *Franco v. Kelly,* 854 F.2d 584, 588-90 (2d Cir.1988).

In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for adverse action taken against him by defendants. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003)(citing *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002); *Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997)). The court must keep in mind that claims of retaliation are "easily fabricated" and thus, plaintiff must set forth non-conclusory allegations. *Id.* (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506 (2002)).[FN15]

> **FN15.** The court would note that *Dawes* did not create a "heightened pleading standard", and to the extent that it did create such a standard, the Second Circuit held that *Dawes* was inconsistent with *Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506 (2002). *See Phelps v. Capnolas,* 308 F.3d 180, 187 (2d Cir.2002).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 839541 (N.D.N.Y.)

(Cite as: 2006 WL 839541 (N.D.N.Y.))

There is absolutely no connection stated between the incident on June 13, 2003 and defendant telling plaintiff to get out of his face in August. Plaintiff begins paragraph 30 of the amended complaint by stating that he was harassed by defendants after he filed a grievance. Plaintiff does not specify to which grievance he is referring. Plaintiff claims that on September 1, 2003, when defendants Brantley, Fielder, and Tierney came into plaintiff's room to bring him breakfast, he gave two envelopes to defendant Tierney to mail. AC ¶ 30. The only fact that plaintiff states is that defendant Tierney smiled as he placed the envelopes in the mailbox, and that plaintiff thereafter did not receive a response to the grievances. Plaintiff claims that he watched defendant Tierney drop the envelopes in the box, so it is unclear how defendant Tierney would have been responsible for a failure of plaintiff to receive a response to his grievance. Thus, this statement does not rise to the level of a constitutional violation. Since these are the only claims made against defendant Tierney, the entire complaint may be dismissed as against this defendant.

The court must point out that although defendants Brantley and Fielder are mentioned in paragraph 30 of the complaint, plaintiff only alleges that they were present to bring him breakfast. It is unclear whether he is attempting to make any claim against them, but there is none stated.

Defendant Pambianchi is also alleged to have harassed plaintiff. AC ¶¶ 41-43. Plaintiff claims that on October 18, 2003, defendant Pambianchi turned plaintiff's lights on and off and disturbed his moment of silence. AC ¶ 41. On October 19, 2003, defendant Pambianchi called plaintiff a number (# 308) and threatened to kick him in the face. AC ¶ 42. On October 29, 2003, defendant Pambianchi allegedly told plaintiff to take his fucking medication and then threw a can of nutritional supplement against the wall. Even assuming the truth of all of these statements, these actions do not rise to the level of an Eighth Amendment claim. Thus, the complaint may be dismissed as against defendant Pambianchi.

**\*13** Defendant Sweet is alleged to have rushed plaintiff and pointed a finger in his face because plaintiff did not want to attend a disciplinary hearing on November

12, 2003. AC ¶ 47-48. Once again, verbal harassment and threats do not rise to the level of a constitutional violation.[FN16]

> [FN16.] The court will consider below whether plaintiff is attempting to state a deliberate indifference to his serious medical needs in this paragraph in addition to the verbal harassment claim.

Plaintiff does allege that in the presence of defendant Roth, defendant Schauer pushed plaintiff onto the floor and hit him with a dictionary on the right shoulder while he was on the floor. AC ¶¶ 36-37. However, plaintiff states that he was subsequently placed back on his bed and mentions no adverse effects from these alleged actions. He does not claim that any medical care was required or that he was injured in any way. Based only on the facts alleged by plaintiff, this court finds that he does not state a claim for an Eighth Amendment violation as against either defendant Schauer or Roth.

B. Medical Care

In order to state a claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). A plaintiff must allege that his access to physicians for necessary medical care was unreasonably delayed or denied, or that prescribed medical treatment was not administered. *Tomarkin v. Ward,* 534 F.Supp. 1224, 1240 (S.D.N.Y.1982) (citing *Todaro v. Ward,* 431 F.Supp. 1129, 1133 (S.D.N.Y.)), *aff'd,* 565 F.2d 48 (2d Cir.1977).

The court would point out that disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.1992). Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Id.* (citations omitted). An inmate does not have the right to treatment of his choice. *Id.* (citing *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986)); *Jackson v. Fair,* 846 F.2d 811, 817-18 (1st Cir.1988) Additionally, negligence by physicians, even amounting to malpractice does not become a constitutional

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 839541 (N.D.N.Y.)

(Cite as: 2006 WL 839541 (N.D.N.Y.))

violation because the plaintiff is an inmate. *Estelle,* 429 U.S. at 107. *See also Daniels v. Williams,* 474 U.S. 327, 332 (1986)(negligence not actionable under section 1983). Thus, any claims of malpractice, or disagreement with treatment are not actionable under section 1983.

It is unclear why many of the medical defendants have been named in this action. It appears from the amended complaint that because plaintiff was in keeplock during the relevant time periods of which he complains, a corrections officer was required to accompany medical personnel when visiting or examining the plaintiff. Thus, many of the medical defendants appear to be mentioned only because they happened to be present taking care of plaintiff when one of the corrections officers allegedly violated plaintiff's rights. Nonetheless, the court will consider all the claims that could possibly be made against these defendants and any DOCS defendants who are accused of interfering with plaintiff's medical care.

**\*14** In paragraph 28, plaintiff states that defendant Suarez examined him after defendant Tierney kicked plaintiff's wheelchair. There is no violation of any kind mentioned in this paragraph. The only other mention of defendant Suarez is in paragraph 47 where plaintiff alleges that defendant Sweet wanted plaintiff to attend a disciplinary hearing, but he refused to go because defendant Suarez had taken away his wheelchair for no reason. Although plaintiff alleges in the same paragraph that defendant Sweet continued to insist that plaintiff attend the hearing, there is no further mention of defendant Suarez, and no indication that plaintiff suffered any injury as the result of defendant Suarez's alleged actions.

With respect to defendant Sweet, a DOCS defendant, plaintiff alleges in paragraph 47 that Sweet continued to insist that plaintiff attend the hearing, and plaintiff simply states that defendant Sweet was rushing plaintiff and pointing fingers in plaintiff's face, notwithstanding his medical condition. AC ¶¶ 47-48. Once again, this is neither cruel and unusual punishment or a denial of proper medical care. There is no indication that plaintiff was forced to do anything or that he was injured in any way due to this defendant's actions.

Defendants Brantley and Fielder are accused of

watching defendant Tierney mail some envelopes for plaintiff. AC ¶ 30. Defendant Brantley is accused of failing to stop at plaintiff's room and give him ice on one occasion and then telling him that she did not give a "fuck." AC ¶ 31. No constitutional denial of medical care has been stated by these actions.

Plaintiff also alleges that on August 21, 2003, he fell out of his wheelchair and hit his head after he had taken a shower. AC ¶ 38. Plaintiff alleges that defendants Fielder, Roth, and Mercer helped put plaintiff back on his bed, and defendant Mercer placed an ice pack on plaintiff's forehead for the swelling. AC ¶ 39. It is unclear to this court how any part of this paragraph states a denial of proper medical care or any other violation. Plaintiff states that after he fell, no one could hear him until he hit the alarm bell, but does not state that anyone delayed in coming to his rescue after that. He simply states that because he was keeplocked, the nurses were required to have someone accompany them when entering plaintiff's room.

Plaintiff alleges that defendant Mayforth was "late" bringing plaintiff his medications on one occasion, but that when he questioned her, she told him just to take the medications "in a stressful condition." AC ¶ 43. No constitutional violation is stated by these allegations. Plaintiff appears to be unhappy when anyone raises their voice to him, but also appears to admit that he frequently ignores orders and requests made of him, even when it comes to taking his medications.

Finally, plaintiff alleges that defendant Broke threw a bottle of nutritional supplement in the toilet when plaintiff was challenging her on whether he was entitled to one bottle of the supplement or two bottles. AC ¶¶ 52-55. Plaintiff states that defendant Broke arrived at 5:00 p.m. to bring plaintiff dinner, and she had only one bottle of the supplement. AC ¶ 52. Plaintiff implies that she should have brought two bottles because he was supposed to have "one at supper and one at bed time." *Id.* Plaintiff claims that hours later, he rang the bell, and defendant Broke returned with the second bottle of supplement, but then started to harass plaintiff and ended up throwing the contents of the bottle in the toilet. AC ¶ 53.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 839541 (N.D.N.Y.)

(Cite as: 2006 WL 839541 (N.D.N.Y.))

**\*15** Plaintiff alleges that on January 26, 2003, defendant Broke again brought only one bottle of the nutritional supplement at dinner time, and when plaintiff pushed the bell to get her to come back into the room, there was no answer. AC ¶ 54. Later when he asked the night nurse who came at 9:00 p.m. to give plaintiff his medications, she told him it was not her job to bring him the supplement. AC ¶ 54.

It appears that plaintiff was having a disagreement over how many bottles of nutritional supplement he should have at the same time. Plaintiff states himself that he was supposed to have one at dinner and one later. It would not be unusual that defendant Broke was only supposed to bring plaintiff the bottle that he was prescribed at dinner, and then another nurse would be responsible for bringing him the bottle that he was supposed to drink at bed time. As the amended complaint is written, there is no Eighth Amendment claims stated against defendant Broke, regardless of the fact that on one occasion she may have gotten upset with plaintiff and thrown the contents of the bottle into the toilet.[FN17]

    [FN17.](#) This court is in no way finding that this action occurred. It is only being assumed for purposes of the motions to dismiss.

Thus, this court finds that plaintiff has stated no claim for denial of or delay of medical care by any of the medical defendants. As stated above, plaintiff states no other claims as against these defendants even if they were present at a time when plaintiff was making allegations of misconduct as against the DOCS defendants that were accompanying the medical personnel. This court also finds no claims for due process, equal protection, or any other constitutional violations stated against either the DOCS defendants or the medical personnel.

WHEREFORE, based on the findings above, it is

RECOMMENDED, that the DOCS defendants' motion to dismiss (Dkt. No. 63) be GRANTED, and the complaint DISMISSED IN ITS ENTIRETY AS AGAINST THE DOCS DEFENDANTS, and it is further

RECOMMENDED, that the motion to dismiss filed

on behalf of the medical defendants (Dkt. No. 66) be GRANTED, and the complaint DISMISSED IN ITS ENTIRETY AS TO ALL DEFENDANTS.

Pursuant to [28 U.S.C. § 636(b)(1)](#) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *[Roldan v. Racette,](#)* 984 F.2d 85, 89 (2d Cir.1993)(citing *[Small v. Secretary of Health and Human Services,](#)* 892 F.2d 15 (2d Cir.1989)); [28 U.S.C. § 636(b)(1);](#) [Fed.R.Civ.P. 6(a),](#) [6(e),](#) [72.](#)

N.D.N.Y.,2006.

DeJesus v. Tierney
Not Reported in F.Supp.2d, 2006 WL 839541 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 3254373 (N.D.N.Y.)

(Cite as: 2007 WL 3254373 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Elvin LeBRON, Plaintiff,
v.
D. SWAITEK, et al., Defendants.
No. 9:05-CV-172 (GLS/DRH).

Nov. 2, 2007.
Elvin LeBron, Dannemora, NY, pro se.

Hon. Andrew M. Cuomo, New York Attorney General, Stephen M. Kerwin, Assistant Attorney General, of Counsel, Albany, NY, for the Defendants.

### *MEMORANDUM-DECISION AND ORDER*

GARY L. SHARPE, U.S. District Judge.

#### I. *Introduction*

**\*1** Plaintiff Elvin LeBron brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, ninety-two employees of the New York State Department of Correctional Services ("DOCS"), violated his constitutional rights under the First and Fourteenth Amendments. LeBron's amended complaint was referred to Magistrate Judge David R. Homer pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c) of the Northern District of New York. Upon the motion of sixty-nine of the defendants, Judge Homer issued a Report-Recommendation and Order recommending dismissal of all claims against the moving defendants. *See Report-Recommendation and Order; Dkt. 127.*[FN1] Additionally, Judge Homer recommended that the amended complaint be dismissed without prejudice as to the non-moving defendants, for failure to serve. *Id.* Now pending before the court is LeBron's timely objection to the Report-Recommendation. *See Dkt. 130.*

> FN1. The Clerk is directed to append Judge Homer's Report-Recommendation to this decision, and familiarity is presumed. *See Dkt.*

*127.*

Upon careful consideration of the arguments, the record, and the applicable law, the court concludes that five of LeBron's seven claims should be dismissed in their entirety. However, the claim denominated "Claim Four" in LeBron's amended complaint survives, but only to the extent that it states a due process claim against certain defendants, and to the extent that it states a First Amendment retaliation claim against certain defendants. Additionally, the claim denominated "Claim Seven" survives, but only to the extent that it states a First Amendment claim of interference with mail. Thus, for the reasons stated below, the Report-Recommendation is adopted in part and rejected in part.

#### II. *Standard of Review*

Before entering final judgment, this court routinely reviews all report-recommendations in cases it has referred to a Magistrate Judge. If a party has objected to specific elements of the Magistrate Judge's findings and recommendations, this court reviews those findings and recommendations *de novo. See Almonte v. N.Y. State Div. of Parole, No. 9:04-CV-484, 2006 WL 149049, \*6-7 (N.D.N.Y. Jan. 18, 2006).* Even in those cases where no party has filed an objection, this court reviews the findings and recommendations of a Magistrate Judge under a clearly erroneous standard. *Id.*

LeBron has filed several specific objections to Judge Homer's Report-Recommendation. *See generally Dkt. 130.* First, LeBron objects to Judge Homer's recommendation that Claims One and Two be dismissed as untimely.[FN2] Second, LeBron objects to Judge Homer's determination that LeBron was not subjected to the type of atypical and significant confinement that is required to establish a due process claim. Third, LeBron argues that Judge Homer erroneously concluded that the named defendants lacked the authority to expunge his disciplinary record. Finally, LeBron asserts that Judge Homer failed to consider his First Amendment claims, and that the Report-Recommendation erroneously recommended dismissal of Claim Four in spite of Judge Homer's

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3254373 (N.D.N.Y.)

(Cite as: 2007 WL 3254373 (N.D.N.Y.))

determination that said claim was not barred by the statute of limitations. In light of LeBron's specific objections, the court has reviewed the foregoing determinations *de novo*. The court has reviewed the remainder of Judge Homer's Report-Recommendation for clear error.

> FN2. LeBron also argues that Claim Five is not barred by the statute of limitations. However, Judge Homer did not hold that Claim Five was time-barred.

### III. *Discussion*

#### A. *Equal Protection and Fourth Amendment Claims*

**\*2** LeBron asserts seven claims in his amended complaint, each alleging "First Amendment, due process, and equal protection violations." *See Dkt. 6 at ¶¶ 38, 84, 112, 200, 251, 291, 352* . Judge Homer determined that LeBron's amended complaint is devoid of any allegations that would support an equal protection claim. LeBron has not challenged this determination, and this court agrees with Judge Homer's conclusion. Accordingly, LeBron's equal protection claims are dismissed.

On its face, LeBron's amended complaint asserts no Fourth Amendment claims. However, reading the amended complaint liberally, Judge Homer recognized that LeBron may have alleged a deprivation of his Fourth Amendment protection against unreasonable searches and seizures. Even assuming that LeBron had alleged a Fourth Amendment violation, Judge Homer concluded that LeBron had no viable claim on that ground. *See Dkt. 127, p. 15, n. 14.* LeBron has not objected to this conclusion, and the court is in full agreement with Judge Homer. Accordingly, LeBron's Fourth Amendment claims, if any, are dismissed.

#### B. *Due Process Claims*

Judge Homer has recommended that the due process claims asserted in Claims One, Two, Five, Six, and Seven be dismissed in their entirety. The Report-Recommendation may also be construed as recommending dismissal of the due process claim asserted in Claim Four, although it mentions this claim only in passing. *See Dkt. 127, p. 12, n. 11.*[FN3]

> FN3. As to Claim Three, Judge Homer construed this claim as asserting only a violation of

LeBron's right of access to the courts. Thus, neither Judge Homer's Report-Recommendation, nor this opinion, should be read as ignoring the purported "due process" claim asserted in Claim Three. Rather, as discussed below, Claim Three is dismissed in its entirety, because LeBron has failed to state a claim for denial of access to the courts.

Upon *de novo* review, the court agrees with and adopts Judge Homer's recommendation that the due process claims asserted in Claims One, Two, Five, Six and Seven should be dismissed. With respect to Claim Four, the court concludes that the due process claim asserted therein should survive dismissal only with respect to those defendants whose personal involvement is alleged.

#### 1. Claims One and Two are Barred by the Statute of Limitations

Judge Homer recommended dismissal of Claims One and Two on statute of limitations grounds. In his objections to the Report-Recommendation, LeBron asserts that a prisoner must exhaust his state remedies as well as his administrative remedies before bringing a § 1983 claim. Thus, with respect to Claim Two, he argues that his state action tolled the running of the statute of limitations until January 14, 2002, the date that the results of the subject disciplinary proceedings were administratively reversed. *See Dkt. 130, p. 1.*[FN4]

> FN4. LeBron also argues that Claims Five, Six, and Seven are not time-barred. *See Dkt. 130, p. 1.* However, Judge Homer did not base his dismissal of these claims on the statute of limitations. LeBron also argues that Claim One constituted an ongoing violation for which the statute of limitations did not accrue until July 2, 2000. *Id.* Even accepting this as true, the complaint, deemed filed on January 13, 2005, was still untimely with respect to Claim One.

LeBron's contention that pursuit of state remedies tolls the statute of limitations in a § 1983 action is an incorrect statement of law. *See Abbas v. Dixon, 480 F.3d 636, 641 (2d Cir.2007)* ("We have held ... that a plaintiff's pursuit of a state remedy, such as an Article 78 proceeding, does not toll the statute of limitations for

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3254373 (N.D.N.Y.)

(Cite as: 2007 WL 3254373 (N.D.N.Y.))

filing a claim pursuant to section 1983."). Thus, under the three year statute of limitations applicable to LeBron's § 1983 claims,[FN5] Claims One and Two are time-barred. As Judge Homer noted, the statute of limitations began to run on these claims when LeBron knew his rights were violated. *See Singleton v.. City of New York,* 632 F.2d 185, 191 (2d Cir.1980). As such, LeBron's first and second causes of action accrued, at the latest, on June 19, 2000 and August 24, 2000, respectively, the dates that his administrative appeals were denied. Therefore, LeBron's objections based on tolling of the statute of limitations are without merit.

> FN5. *See Veal v. Geraci,* 23 F.3d 722, 724 (2d Cir.1994).

**\*3** Accordingly, defendants' motion to dismiss is granted as to the due process claims asserted in Claims One and Two. Moreover, to the extent that Claims One and Two assert equal protection and First Amendment claims, such claims are dismissed as untimely as well.

**2. Claims One, Two, Five, Six and Seven Fail to State a Due Process Claim**

In Claims One, Two, Five, Six and Seven, LeBron asserts due process violations arising out of procedurally improper disciplinary hearings. As a threshold matter, in order to establish a due process violation, a prisoner must demonstrate that a liberty interest has been infringed. *See Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004). "A prisoner's liberty interest is implicated by prison discipline, such as SHU confinement, only if the discipline 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Id.* (quoting *Sandin v. Conner,* 515 U.S. 472, 484 (1995)).

With respect to Claims One, Two, Five, and Seven, Judge Homer determined that LeBron could not establish, as a matter of law, that the confinement to which he was subjected was "atypical and significant," because in each case LeBron was sentenced to keeplock of 30 days or less. *See Dkt. 127, pp. 11-12.* The court concurs with Judge Homer's conclusion-which LeBron does not contest-that, absent additional allegations of atypicality, keeplock of 30 days or less is not alone "atypical and significant" confinement. *See Smart v. Goord,* 441 F.Supp.2d 631, 640

(S.D.N.Y.2006); *Davidson v. Murray,* 371 F.Supp.2d 361, 368-69 (W.D.N.Y.2005).[FN6] Therefore, LeBron has not established that a liberty interest has been infringed. Accordingly, the due process claims asserted in Claims One, Two, Five, and Seven are dismissed.

> FN6. LeBron's amended complaint contains no allegations that would indicate that the keeplock confinement to which he was sentenced was atypical and significant. In his objections to the Report-Recommendation, LeBron has attempted to supplement the allegations in his amended complaint by setting forth a laundry list of deprivations to which he was subjected. The court will not consider these belated allegations. *See Hynes v. Squillace,* 143 F.3d 653, 656 (2d Cir.1998) (noting that it is within the district court's discretion to refuse to allow supplementation of the record upon its review of a Report-Recommendation); *Bester v. Dixion,* No. 03-cv-1041, 2007 WL 951558, \*3 (N.D.N.Y. March 27, 2007) ("Allowing Plaintiff to raise in his objections legal and factual arguments not presented to the Magistrate Judge defeats the very purpose of the report and recommendation procedure ....").

With respect to Claim Six, LeBron has alleged that he was sentenced to 180 days in the special housing unit ("SHU"). The court need not decide whether a sentence of this length is "atypical and significant," because, as Judge Homer noted, LeBron's sentence was administratively reversed before he had served any portion of it. *See Dkt. 127, pp. 12-14.* LeBron has not contested Judge Homer's finding in this regard. The court agrees with Judge Homer that LeBron suffered no interference with a liberty interest with respect to Claim Six, and, accordingly, the due process claim asserted in Claim Six is dismissed.

**3. Claim Four States a Due Process Claim With Respect to Certain Defendants**

The court agrees with Judge Homer that Claim Four is not barred by the statute of limitations. *See Dkt. 127, pp. 10-11.* Since LeBron has alleged a loss of good time credit as a result of the subject disciplinary hearing, LeBron's cause of action did not accrue until October 23, 2002,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3254373 (N.D.N.Y.)

(Cite as: 2007 WL 3254373 (N.D.N.Y.))

when the disciplinary hearing was administratively reversed.[FN7] *See Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999).

> FN7. Moreover, it appears that the last event giving rise to Claim Four occurred on January 21, 2002, *see Dkt. 6, ¶ 164,* within three years of the deemed filing of LeBron's complaint on January 13, 2005.

Although Claim Four survives dismissal on statute of limitations grounds, it fails to adequately allege the personal involvement of many of the defendants. It is axiomatic that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986) (citation and quotation omitted).[FN8]

> FN8. In assessing whether Claim Four states a due process claim, the court has considered only the issue of personal involvement. The parties have not briefed the issue of whether the disciplinary hearing conducted on or about January 16, 2002, was, in fact, procedurally improper, and the court will not address that issue at this time.

*4 Under a liberal construction of LeBron's amended complaint, defendants Mehrmann, Faulkner, and McLaughton are the only defendants who are alleged to have conducted or participated in the allegedly procedurally defective disciplinary hearing conducted on or about January 16, 2002. *See Dkt. 6, ¶¶ 149-162.* Accordingly, LeBron has stated a due process claim with respect to these three defendants.[FN9]

> FN9. However, as discussed below, these defendants have not been served, and thus, the amended complaint is dismissed without prejudice as to them.

LeBron has also alleged that certain defendants failed to reverse his sentence upon being notified of the due process violations that occurred at his disciplinary hearing. *See Dkt. 6, ¶¶ 166-198.* The Second Circuit has held that an official has the requisite personal involvement for

liability under § 1983 when, *inter alia,* "the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong." *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). A number of district courts have held that the language in *Colon* should not be construed so broadly as to impose liability on any and all officials to whom a prisoner complains. *See, e.g., Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002) (collecting cases). This makes eminent sense; certain officials, even those in supervisory positions, simply may not have the authority to review and redress a prisoner's complaints. However, personal involvement will be found "where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint." *Id.* LeBron's amended complaint adequately alleges, for purposes of withstanding a motion to dismiss under Rule 12(b)(6), that the following defendants reviewed his appeals, and declined to rectify the alleged constitutional violations: L. Leclaire,[FN10] Sanders, Ricks, Roy, Burke, McNulty, Goord, Selsky, Donelli, Racette, LeFevre, Pasquil, Annucci, Murphy, and McCoy. *See Dkt. 6, ¶¶ 166-198.* Accordingly, LeBron has stated a due process claim with respect to these defendants.[FN11]

> FN10. LeBron's amended complaint does not specify which of the three "LeClaire" defendants is alleged to have denied his grievances; however, the defendants have indicated that it was "L. LeClaire." *See Dkt. 112, p. 14.*

> FN11. However, as discussed below, several of these defendants have not been served, and thus, the amended complaint is dismissed without prejudice as to them.

LeBron also alleges that certain defendants planted evidence and wrote misbehavior reports prior to the January 16, 2002, disciplinary hearing. *See Dkt. 6, ¶¶ 134-147.* However, the filing of a misbehavior report-even a false one-"does not, of itself, implicate the guard who filed it in constitutional violations which occur at a subsequent disciplinary hearing." *Williams,* 781 F.2d at 324. Similarly, the act of planting evidence does not, of itself, violate due process. Due process is implicated only at the point that a prisoner is denied the procedural

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3254373 (N.D.N.Y.)

(Cite as: 2007 WL 3254373 (N.D.N.Y.))

protections that would enable him to prove that the evidence against him has been fabricated. *See Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986) ("The prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest. The plaintiff, as all other prison inmates, has the right not to be deprived of a protected liberty interest without due process of law."). Accordingly, LeBron fails to state a due process claim with respect to those defendants who are only alleged to have engaged in conduct prior to the disciplinary hearing.

**\*5** In summary, Claim Four states a due process claim only with respect to the following 18 defendants: Mehrmann, Faulkner, McLaughton, L. LeClaire, Sanders, Ricks, Roy, Burke, McNulty, Goord, Selsky, Donelli, Racette, Lefevre, Pasquil, Annucci, Murphy, and McCoy. Accordingly, with the exception of these 18 defendants, the due process claims asserted in Claim Four are dismissed *with prejudice* as to all other defendants. Moreover, the due process claims asserted in Claim Four are dismissed *without prejudice* as to Mehrmann, Faulkner, McLaughton, Sanders, Ricks, Lefevre, and Pasquil, for failure to serve. [FN12]

> **FN12.** The docket indicates that John Mehrmann has been served. *See Dkt. 80.* However, the acknowledgment of service indicates that, in fact, a "James Meehan" was served. *Id.*

**C. First Amendment Claims**

In his objections to the Report-Recommendation, LeBron notes that Judge Homer failed to analyze his First Amendment claims. [FN13] This is only partly correct. Judge Homer did address LeBron's claim of denial of access to courts, which is a species of First Amendment claim. *See Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003); *Cancel v. Goord,* No. 00-cv-2042, 2001 WL 303713, *3 (S.D.N.Y. March 29, 2001).* Nevertheless, to the extent that LeBron's amended complaint may also be read as alleging First Amendment retaliation claims and claims of interference with outgoing mail, the court will address the merits of such claims in the first instance herein.

> **FN13.** Each of LeBron's seven claims may be

read as asserting some form of First Amendment claim. However, as noted above, Claims One and Two are barred by the statute of limitations. Thus, in this section, the court discusses only the First Amendment claims asserted in Claims Three through Seven.

**1. Retaliation Claims**

With respect to Claims Four, Five, and Six, LeBron's objections to the Report-Recommendation clarify that he believes that defendants retaliated against him after he had engaged in protected speech. *See Dkt. 130, p. 3.* To survive dismissal, a plaintiff asserting a First Amendment retaliation claim must advance non-conclusory allegations "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Davis,* 320 F.3d at 352 (quoting *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001)). In regards to causation, "the temporal proximity of an allegedly retaliatory misbehavior report to a grievance may serve as circumstantial evidence of retaliation." *Gayle v. Gonyea,* 313 F.3d 677, 683 (2d Cir.2002) (citation omitted).

In Claim Four, LeBron alleges that his complaints of harassment and his filing of a "facility claim" led to multiple acts of retaliation, including random searches of his cell, the planting of contraband in his cell, and the fabrication of misbehavior reports. *See Dkt. 6, ¶¶ 115-141.* With respect to the first prong of a retaliation claim, LeBron's complaints of harassment constituted protected speech. *See Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996). As to the second prong, LeBron has alleged that the defendants took adverse action against him, in the form of retaliatory misbehavior reports and the retaliatory planting of evidence. *See Gill v. Pidlypchak,* 389 F.3d 379, 384 (2d Cir.2004); *Rodriguez v. McClenning,* 399 F.Supp.2d 228, 239-240 (S.D.N.Y.2005).[FN14] Finally, LeBron has sufficiently alleged the causation element of a First Amendment retaliation claim by showing a temporal proximity between his protected speech and the adverse actions taken against him. *See Dkt. 6, ¶¶ 132-147.*

> **FN14.** By contrast, the alleged searches of LeBron's cell provide no support for a First

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3254373 (N.D.N.Y.)

(Cite as: 2007 WL 3254373 (N.D.N.Y.))

Amendment retaliation claim. Inmates have no reasonable expectation of privacy in their prison cells, and thus "no constitutional right to be free from cell searches of any kind, including retaliatory cell searches." *Rodriguez v. McClenning,* 399 F.Supp.2d 228, 239 (S.D.N.Y.2005) (collecting cases).

**\*6** Thus, Claim Four states a claim for First Amendment retaliation. Accordingly, the defendants' motion to dismiss the First Amendment retaliation claim asserted in Claim Four is denied with respect to all defendants, with the exception of defendants Woodroof, Olson, M. LeClaire, and Bushie. The First Amendment retaliation claim asserted in Claim Four is dismissed with respect to defendants Woodroof, Olson, M. LeClaire, and Bushie, because LeBron has not alleged that these defendants participated in any prohibited retaliatory conduct.[FN15]

> **FN15.** Additional defendants named in Claim Four have also moved for dismissal, arguing lack of personal involvement. *See Dkt. 112, pp. 13-15.* However, the court is unable to conclusively determine, at this stage, that these additional defendants were not involved in the alleged retaliatory conduct (or the failure to redress). Hence, the retaliation claim alleged in Claim Four is dismissed only with respect to Woodruff, Olson, M. LeClaire, and Bushie.

Turning now to Claims Five and Six, LeBron has failed to state a retaliation claim. There are, quite simply, no allegations of retaliation in Claim Five. LeBron asserts that he was issued a misbehavior report, *see Dkt. 6, ¶ 217,* but nowhere in the amended complaint does he state that this misbehavior report was issued in retaliation for his exercise of First Amendment rights.[FN16] The same is true of Claim Six; the claim does not allege, even in conclusory terms, that any retaliatory conduct occurred.

> **FN16.** In his opposition to the motion to dismiss, LeBron makes conclusory allegations of retaliation. *See Dkt. 121, p. 7.* However, unlike Claim Four, discussed above, the allegations in Claim Five of the amended complaint provide no

basis for believing that circumstantial evidence might exist that would support LeBron's bare allegations of retaliation. *See Boddie v. Schnieder,* 105 F .3d 857, 862 (2d Cir.1997) (dismissing, upon motion pursuant to Rule 12(b)(6), allegations of retaliation that were "unsupported, speculative, and conclusory").

**2. *Access to Courts Claims***

Construing LeBron's amended complaint broadly, Judge Homer interpreted Claims Three and Five as alleging a denial of access to courts. Judge Homer recommended that these claims be dismissed. LeBron has not objected to this recommendation. The court agrees with Judge Homer's conclusion that Claims Three and Five do not state a claim for denial of access to courts, because LeBron has failed to allege any actual injury. *See Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir.1997) ("In order to establish a violation of a right of access to courts, a plaintiff must demonstrate that a defendant caused 'actual injury,' *i.e.,* took or was responsible for actions that 'hindered [a plaintiff's] efforts to pursue a legal claim.' ") (citing *Lewis v. Casey,* 518 U.S. 343, 349-51 (1996)) (internal citations omitted). Accordingly, to the extent that Claims Three and Five allege a denial of access to courts, these claims are dismissed.[FN17] Moreover, to the extent that Claim Six may be read as alleging a denial of access to courts, this claim is dismissed as well, for the same reasons.

> **FN17.** The court declines to provide LeBron the opportunity to amend his complaint, yet again, to include allegations of injury. In a Conditional Order of Dismissal, dated March 7, 2005, the court explicitly advised LeBron that his allegations regarding denial of access to courts were inadequate, and that "[i]n order to establish standing for a claim for denial of access to courts, an inmate must show that he has suffered an actual injury traceable to the challenged conduct of prison officials." *See Dkt. 4, p. 5.* The court accepted LeBron's amended complaint because it cured many of the defects of the original complaint. *See Dkt. 7.* However, upon closer review, at least insofar as the denial of access to courts claims are concerned, LeBron's amended complaint suffers from the same

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3254373 (N.D.N.Y.)

(Cite as: 2007 WL 3254373 (N.D.N.Y.))

infirmities as his original complaint.

### 3. *Interference With Mail Claim*

In Claim Seven, LeBron alleges that two of his outgoing letters were confiscated. *See Dkt. 6, ¶¶ 296, 299.* LeBron does not assert that the confiscation of the two letters interfered with his access to the courts, and, indeed, does not even allege that the letters constituted legal mail. Thus, he has not stated a claim for denial of access to courts. Accordingly, to the extent that Claim Seven may be read as asserting a claim of denial of access to courts, such claim is dismissed.

However, apart from the right of access to courts, "a prisoner's right to the free flow of incoming and outgoing mail is protected by the First Amendment." *Davis,* 320 F.3d at 351; *see Moore v. Gardner,* 199 F.Supp.2d 17, 33 (W.D.N.Y.2002) ("Although prisoners' First Amendment mail claims are often intertwined with claims for denial of court access, they may exist separately."). Thus, the court will address whether LeBron has stated a claim for the violation of his First Amendment rights arising out of the confiscation of two pieces of outgoing mail.

*7 In short, for purposes of a Rule 12(b)(6) motion, he has. The Second Circuit has held that restrictions on a prisoner's mail are justified only if they further the substantial governmental interests of security, order, and rehabilitation. *Davis,* 320 F.3d at 351 (citation omitted). Moreover, "courts have consistently afforded greater protection ... to outgoing mail than to incoming mail." *Id.* (citations omitted). This is because "[t]he implications of outgoing correspondence for prison security are of a categorically lesser magnitude than the implications of incoming materials." *Thornburgh v. Abbott,* 490 U.S. 401, 413 (1989).

It may be the case that the confiscation of LeBron's outgoing mail was justified by legitimate governmental interests. However, the defendants have not proffered any reasons for the confiscation,[FN18] and thus, it would be inappropriate to dismiss LeBron's claim at this time. *See Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) (reversing the district court's dismissal of claims relating to interference with plaintiff's outgoing and incoming mail, and noting that even two instances of mail interference

may be sufficient to suggest a continuing activity); *Knight v. Keane,* 247 F.Supp.2d 379, 384 (S.D.N.Y.2002) (affirming magistrate judge's determination that dismissal was inappropriate where the record evidence was insufficient to establish that inspection of plaintiff's mail was based on good cause). Accordingly, Claim Seven survives to the extent that it alleges a violation of LeBron's First Amendment right to send mail.[FN19]

FN18. The defendants' brief in support of their motion to dismiss did not address the First Amendment claim asserted in Claim Seven. *See Dkt. 112, pp. 23-25.*

FN19. In holding that the First Amendment mail claim asserted in Claim Seven survives, the court rejects the defendants' argument that LeBron has failed to exhaust his administrative remedies with respect to Claim Seven. The parties dispute the issue of exhaustion, and the court is not able to resolve this dispute on the basis of the facts before it. Moreover, LeBron has suggested that even if he did not exhaust his administrative remedies, such failure to exhaust may be attributed to inhibitions imposed by the defendants. *See Abney v. McGinnis,* 380 F.3d 663, 667 (2d Cir.2004) ("Defendants may ... be estopped from raising non-exhaustion as an affirmative defense when prison officials inhibit an inmate's ability to utilize grievance procedures.").

Additionally, the court rejects the defendants' argument that venue for Claim Seven is improper. As defendants correctly note, venue is proper in "a judicial district where any defendant resides ." *28 U.S.C. § 1391(b).* In this case, at least one defendant named in Claim Seven resides in the Northern District of New York. *See Dkt. 11 (Acknowledgement of Service as to Anthony Annucci).* The defendants have not argued that Annucci was not personally involved in the First Amendment violations asserted in Claim Seven; indeed, as stated above, the defendants' brief does not address Claim Seven insofar as

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3254373 (N.D.N.Y.)

(Cite as: 2007 WL 3254373 (N.D.N.Y.))

it asserts a First Amendment claim. Moreover, for the reasons discussed above in connection with Claim Four, the court is unwilling to hold, at this stage of the proceedings, that LeBron's amended complaint does not state a claim with respect to defendants such as Annucci, who are alleged only to have failed to remedy a claimed constitutional violation.

**D. Injunctive Relief**

Judge Homer recommended that LeBron's request for injunctive relief be denied because LeBron has sued the defendants in their individual capacities only. LeBron has objected to this recommendation, arguing that "it is a given that the named defendants are in a position to expunge the disciplinary determinations made against plaintiff." *Dkt. 130, p. 3.* Notwithstanding LeBron's unsupported assertion to the contrary, the court agrees with Judge Homer that the injunctive relief LeBron seeks is unavailable because the defendants have been sued in their individual capacities. *See Ziemba v. Armstrong,* No. 3:02-cv-2216, 2004 WL 1737447, *2 (D.Conn. July 30, 2004)* ("Injunctive relief may only be recovered from parties in their official capacities.") (citations omitted). Accordingly, LeBron's claims for injunctive relief are dismissed.

**IV.** *Conclusion*

Having considered LeBron's objections and reviewed Judge Homer's findings of fact and conclusions of law, the court adopts Judge Homer's Report-Recommendation to the extent that it recommends dismissal of all of LeBron's equal protection and Fourth Amendment claims, as well as the due process claims asserted in Claims One, Two, Three, Five, Six, and Seven. The court rejects the Report-Recommendation to the extent that it recommends the complete dismissal of the due process claim asserted in Claim Four. The due process claim asserted in Claim Four is dismissed as to all defendants *except* L. LeClaire, Roy, Burke, McNulty, Goord, Selsky, Donelli, Racette, Annucci, Murphy, and McCoy.

**\*8** As to the First Amendment claims, the court adopts Judge Homer's Report-Recommendation to the extent that it recommends dismissal of the denial of access to courts claims asserted in Claims Three and Five. Additionally, all First Amendment claims asserted in

Claims One, Two, Three, Five, and Six are dismissed. The First Amendment retaliation claim asserted in Claim Four survives as to all defendants except Woodroof, Olson, M. LeClaire, and Bushie. The First Amendment claim of interference with mail asserted in Claim Seven survives as to all defendants.

Finally, the court adopts the Report-Recommendation to the extent that it recommends dismissal of LeBron's requests for injunctive relief.

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Judge Homer's September 25, 2006 Report-Recommendation (*Dkt. No. 127* ) is accepted in part and rejected in part; and it is further

**ORDERED** that Claims One, Two, Three, Five, and Six are dismissed in their entirety; and it is further

**ORDERED** that the equal protection claims asserted in Claims Four and Seven are dismissed; and it is further

**ORDERED** that the Fourth Amendment claims asserted in Claims Four and Seven, if any, are dismissed; and it is further

**ORDERED** that the due process claim asserted in Claim Seven is dismissed; and it is further

**ORDERED** that the due process claim asserted in Claim Four is dismissed as to all defendants *except* L. LeClaire, Roy, Burke, McNulty, Goord, Selsky, Donelli, Racette, Annucci, Murphy, and McCoy, and that such dismissal is *without prejudice* as to Mehrmann, Faulkner, McLaughton, Sanders, Ricks, LeFevre, and Pasquil, but is *with prejudice* as to all other defendants; and it is further

**ORDERED** that the defendants' motion to dismiss the First Amendment retaliation claim asserted in Claim Four is DENIED as to all defendants *except* that the motion to dismiss the First Amendment retaliation claim asserted in Claim Four is GRANTED as to defendants Woodroof, Olson, M. LeClaire, and Bushie; and it is further

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3254373 (N.D.N.Y.)

(Cite as: 2007 WL 3254373 (N.D.N.Y.))

**ORDERED** that the denial of access to courts claim asserted in Claim Seven is dismissed as to all defendants; and it is further

**ORDERED** that the defendants' motion to dismiss the First Amendment claim of interference with outgoing mail asserted in Claim Seven is DENIED; and it is further

**ORDERED** that the defendants' motion to dismiss LeBron's claims for injunctive relief is GRANTED; and it is further

**ORDERED** that the Clerk of the Court provide copies of this Order to the parties by mail.

**IT IS SO ORDERED.**

N.D.N.Y.,2007.

LeBron v. Swaitek
Not Reported in F.Supp.2d, 2007 WL 3254373 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 3862082 (N.D.N.Y.)

(Cite as: 2010 WL 3862082 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
KARO BROWN, Plaintiff,
v.
ROBERT OUTHOUSE, et al., Defendants.
No. 9:07-CV-1169 (GLS/GHL).

July 9, 2010.
Karo Brown, Canaan U.S. Penitentiary, Waymart, PA, pro
se.

Office of Frank W. Miller, Frank W. Miller, Esq., Michael
J. Livolsi, Esq., of Counsel, East Syracuse, NY, for
Defendants.

### *REPORT-RECOMMENDATION and ORDER*

GEORGE H. LOWE, United States Magistrate Judge.

   **\*1** This *pro se* prisoner civil rights action,
commenced pursuant to 42 U.S.C. § 1983, has been
referred to me for Report and Recommendation by the
Honorable Gary L. Sharpe, United States District Judge,
pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).
Plaintiff Karo Brown alleges that Defendants Robert
Outhouse (who at the time of the alleged incident was the
Sheriff of Cayuga County), Deputy Scott Walborn of the
Cayuga County Jail, and two or more unnamed officers
violated his rights under the United States Constitution
and New York state law by using excessive force on him,
denying him prompt medical care, and conducting a
procedurally flawed disciplinary hearing FN1 Currently
pending before the Court is Defendants' motion for
summary judgment. (Dkt. No. 39.) For the reasons that
follow, I recommend that Defendants' motion be granted.

>   FN1. Plaintiff also named former United States
>   Attorney General Alberto Gonzalez and Director
>   of the Bureau of Prisons Harley G. Lappin as
>   defendants. (Dkt. No. 1.) This Court *sua sponte*
>   dismissed those defendants upon initial review of

the complaint. (Dkt. No. 5.)

### I. FACTUAL AND PROCEDURAL HISTORY

   In 2004, Plaintiff was detained at Cayuga County Jail
pending trial on federal charges. FN2 (Dkt. No. 1 at ¶ 5.)
Cayuga County Jail has a rule prohibiting the harboring of
food. (Dkt. No. 39-5 ¶ 6.) This rule is set out in the inmate
handbook, which Plaintiff received prior to November 15,
2004. *Id.*

>   FN2. Defendants assert, without citation to
>   evidence, that Plaintiff was "a convicted inmate
>   at the time of the incident." (Dkt. No. 39-8 at 3.)

   On November 15, 2004, Defendant Custody Deputy
Scott Walborn was "made aware that [Plaintiff] had been
recorded by security cameras hiding objects under the
table at which he was eating lunch." (Dkt. No. 39-4 ¶ 4.)
Along with several other officers, he entered the lunch
room to investigate. *Id.* Defendant Walborn ordered
Plaintiff to pack up his lunch tray and prepare to be
removed from the area. (Dkt. No. 39-4 ¶ 5.) Defendant
Walborn then investigated the table where Plaintiff had
been sitting and discovered salt and pepper packets in the
cracks underneath the table. (Dkt. No. 39-4 ¶ 6.) FN3

>   FN3. Plaintiff admits that he was hiding salt
>   packets. At his deposition, Plaintiff was asked if
>   he knew why Defendant Walborn asked him to
>   leave the lunch room. Plaintiff testified that "I
>   guess it was putting salt packages under the
>   table, 'cause that's what I was doing." (Dkt. No.
>   39-2 at 19:3-6.) Plaintiff testified that at the time
>   of the incident he was not aware that there was a
>   policy against putting salt under the table. (Dkt.
>   No. 39-2 at 19:17-21.) He was aware of a rule
>   prohibiting inmates from taking food to their
>   cells, which was why he stuck the salt in the table
>   rather than taking it to his cell. (Dkt. No. 39-2 at
>   20:14-15.)

   Defendant Walborn declares that Plaintiff "became
verbally combative and turned toward me in a manner that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3862082 (N.D.N.Y.)

(Cite as: 2010 WL 3862082 (N.D.N.Y.))

I perceived as hostile." (Dkt. No. 39-4 ¶ 7.) According to Defendant Walborn, Plaintiff said "you don't mean shit to me ... you can't do nothing to me ... fuck you." (Dkt. No. 39-4 ¶ 8.) Defendant Walborn declares that Plaintiff was carrying a plastic food tray in his right hand and that he gripped and brandished an unidentified object in his left hand. (Dkt. No. 39-4 ¶ 9.) Defendant Walborn "decided that the situation called for restraining [Plaintiff] for his safety and the safety of the other officers." (Dkt. No. 39-4 ¶ 10.) Defendant Walborn declares that he "approached [Plaintiff] from behind and grabbed his left wrist. I then leaned him forward onto the lunch tray cart to apply handcuffs. However, the wheeled lunch tray cart rolled several feet [FN4] into the wall ahead. The cart approached the wall in a slow and steady manner, and at no point was [Plaintiff] thrown or shoved into the wall." (Dkt. No. 39-4 ¶ 11.) Defendant Walborn declares that "[a]fter the cart stopped rolling, using minimal force I put [Plaintiff] on the ground, rolled him onto his chest, and applied handcuffs." (Dkt. No. 39-4 ¶ 12.) As he was handcuffing Plaintiff, he determined that the object in Plaintiff's left hand was an eating utensil. (Dkt. No. 39-4 ¶ 14.) After Plaintiff was handcuffed, Plaintiff "rose to his feet" and was escorted away from the area. (Dkt. No. 39-4 ¶ 17.) As he was being moved, Plaintiff "continued to make verbal threats" against Defendant Walborn and the other officers, such as "I will get you all." (Dkt. No. 39-4 ¶ 18.)

> FN4. In a memorandum written on the day of the incident, Sgt. Morgan Radell estimated that the cart rolled ten or fifteen feet. (Dkt. No. 39-5 at 9.)

*2 Defendant Walborn declares that he never physically struck or kicked Plaintiff, pushed his face into the wall, or injured his lip. (Dkt. No. 39-4 ¶¶ 15, 19.) Lt. John Mack, who observed the incident contemporaneously on a security camera, declares that he did not "witness any injury or force used against [Plaintiff] other than that which was necessary to accomplish placing handcuffs on him. At no time did I witness any other corrections officer push [Plaintiff]'s face into the wall or injure him in any way." (Dkt. No. 39-5 ¶ 8.)

Plaintiff's version of the events is quite different. He denies confronting Defendant Walborn or showing any signs of aggression. (Dkt. No. 43 at 3.) He testified at his deposition that Defendant Walborn "slammed" him into the cart once, "slammed" him onto the floor once, and then placed him against the wall so hard that he banged his head and "busted" his lip. (Dkt. No. 39-2 at 30:7-23.)

Defendants have submitted security video of the incident. [FN5] This video, which does not have audio, does not fully support either party's description of the incident. The video shows that Plaintiff had packed up his tray before Defendant Walborn approached, placing his trash and remaining food on a bottom tray and then covering it with another tray. He did not, however, place his brightly colored eating utensil on the bottom tray. Rather, he placed it on the table to the right of his tray. He then stood up and drank some milk. He was walking away from the table with the tray in his left hand and the eating utensil on top of the tray when Defendant Walborn approached. Defendant Walborn pointed in the direction of the tray cart and then proceeded to check under the table where Plaintiff had been sitting. Plaintiff, meanwhile, continued in the direction of the tray cart. He looked over his shoulder in Defendant Walborn's direction three times, apparently saying something to Defendant Walborn each time. The second time he looked and spoke, he transferred the tray to his right hand and the eating utensil from the top of the tray to his left hand. Although Lt. Mack declares that this constituted "brandishing" the eating utensil (Dkt. No. 46-1 ¶ 4), a reasonable juror could conclude that this characterization is not apt. [FN6] Plaintiff did not at any point stop moving toward the tray cart or turn his body in Defendant Walborn's direction. Immediately after the third time Plaintiff turned his head to look at him, Defendant Walborn approached Plaintiff from behind and bent him forward onto the tray cart. The cart moved forward several feet into a wall, sending Plaintiff's head into the wall. When the cart moved, Plaintiff was leaning forward onto the cart with Defendant Walborn's right hand on his neck and Defendant Walborn's left hand on his left shoulder. Defendant Walborn took several stutter steps when the cart first moved rather than maintaining a smooth walking flow as one would expect if he intended to move the cart. [FN7] When the cart came to a rest, Defendant Walborn and several officers moved Plaintiff to the floor, restrained him, and then pulled him to his feet again. The entire incident, from Defendant Walborn's first physical contact

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3862082 (N.D.N.Y.)

(Cite as: 2010 WL 3862082 (N.D.N.Y.))

with Plaintiff to the time that Plaintiff was raised to his feet, lasted less than fifty seconds.

> FN5. On April 21, 2010, Defendants sought permission to file a copy of the video evidence. (Dkt. No. 44.) On April 26, 2010, I granted Defendants' request, noting that the Court would determine at a later date whether or not the proffered video constituted admissible evidence. (Dkt. No. 45.) On April 28, 2010, Defendants submitted the video, supported by a declaration from Lt. Mack, the custodian of records at Cayuga County Jail, regarding its admissibility as a business record. (Dkt. No. 46.) On June 1, 2010, Plaintiff filed objections to the Affidavit of John Mack. (Dkt. No. 49.) Plaintiff argues that Lt. Mack's affidavit is not based on personal knowledge. (Dkt. No. 49 at 1-2.) I recommend that the Court, for the purposes of this motion, overrule Plaintiff's objections and find the video evidence admissible pursuant to Federal Rule of Evidence 901.

> FN6. Indeed, it appears that no one present at the time of the incident believed at the time that Plaintiff was "brandishing" a utensil. As discussed further below, none of the reports written on the day of the incident mention that Plaintiff was holding, much less "brandishing," a utensil.

> FN7. According to a memorandum written by Lt. Mack, Defendant Walborn told Lt. Mack after the incident that he thought he may have pulled some muscles or injured his back. He received chiropractic care and was excused from work for at least two days to recuperate from strained back muscles. (Dkt. No. 43 at 31.) This fact also supports Defendant Walborn's contention that he did not intend to move the cart.

**\*3** Lt. Mack escorted Plaintiff to segregated housing ("the RHU"). (Dkt. No. 39-4 ¶ 20.) Lt. Mack declares that when he assumed custody of Plaintiff to escort him to the RHU, he "noticed no injury to his person" and did not "observe him to be in any pain or to be experiencing any

significant discomfort." (Dkt. No. 39-5 ¶ 9.)

Plaintiff alleges that he "did not eat any food while he was in solitary confinement because he had requested ... medical attention." (Dkt. No. 1 at ¶ 20.) Plaintiff alleges that he did not receive any medical attention until two or three days later. (Dkt. No. 1 at ¶ 20.) However, Jackie Chadwick, a registered nurse employed at the Cayuga County Jail, declares that she personally examined Plaintiff at sick call on the day after the incident. (Dkt. No. 39-3 ¶ 4.) Plaintiff's medical records from the Cayuga County Jail support Nurse Chadwick's assertion. Plaintiff told Nurse Chadwick that he had been in an altercation with corrections officers on the previous day and that he had injuries to his left shoulder, right jaw area, the right side of his neck, and the back of his neck. (Dkt. No. 39-3 ¶¶ 5-6.) Upon examination, Nurse Chadwick noted a "small abrasion" above Plaintiff's right eye, a "very small scratch" on Plaintiff's right wrist, a "small scratch" on Plaintiff's left upper inner arm, and a "small scratch" on the back of Plaintiff's neck. (Dkt. No. 39-3 ¶ 7.) There was "minimal swelling" to Plaintiff's left jaw, just below his ear. There were no cuts, scrapes, or bruises in that area. (Dkt. No. 39-3 ¶ 9.) There was no obvious trauma, injury, or deformity to Plaintiff's left shoulder and no evidence of swelling or bruising. (Dkt. No. 39-3 ¶ 8.) Nurse Chadwick did not report any injury to Plaintiff's lip. Nurse Chadwick concluded that Plaintiff required only observation, not treatment. (Dkt. No. 39-3 ¶ 11.)

On December 14, 2004, Plaintiff was brought to the infirmary complaining of a dislocated left shoulder. (Dkt. No. 39-3 ¶ 13.) He said this had occurred due to contact with a metal cart. *Id.* Upon examination, the doctor found that Plaintiff's left shoulder exhibited full range of movement. *Id.* The doctor prescribed Advil as needed for discomfort. *Id.* Based upon her review of Plaintiff's medical file, Nurse Chadwick declares that Plaintiff "had no further medical complaints between December 14, 2004, and his transfer out of [Cayuga County Jail] the following year." (Dkt. No. 39-3 ¶ 14.)

As a result of the incident, Defendant Walborn issued a misbehavior report charging Plaintiff with failing to follow orders, physically and verbally obstructing or interfering with staff, storing or hoarding food, and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3862082 (N.D.N.Y.)

(Cite as: 2010 WL 3862082 (N.D.N.Y.))

making threats to staff. (Dkt. No. 39-4 at 7.) As Plaintiff notes in his opposition (Dkt. No. 43 at 4), although the misbehavior report written on the day of the incident states that Plaintiff had "a lunch tray in his hand," it does not mention that Plaintiff was holding an eating utensil in his left hand. *Id.* It was not until he prepared an incident report two weeks later that Defendant Walborn mentioned the eating utensil. (Dkt. No. 39-4 at 9.) Indeed, no report prepared on the day of the incident mentions the utensil. (Dkt. No. 39-5 at 9 (Radell report); Dkt. No. 39-5 at 15 (Purcell report); Dkt. No. 39-5 at 11 (Campanello report).) However, several of the reports written two weeks later do mention the utensil. (Dkt. No. 39-5 at 12 (Babcock report); Dkt. No. 39-5 at 18 (Gleason report).)

**\*4** Sometime after Defendant Walborn filed the misbehavior report, Plaintiff was "required to appear at a disciplinary hearing without any prior notice of the disciplinary hearing." (Dkt. No. 1 at ¶ 14.) At the hearing, Plaintiff asked to call other prisoners to testify as eyewitnesses, but the hearing officer denied the request. (Dkt. No. 1 at ¶ 22-23.) Plaintiff was then "kept in solitary confinement status for a couple of months." (Dkt. No. 1 at ¶ 23.) In his opposition to the motion for summary judgment, Plaintiff states that he was in solitary confinement for sixty to ninety days. (Dkt. No. 43 at 8.) The record does not include any other information about Plaintiff's disciplinary hearing and subsequent disciplinary confinement.

Plaintiff filed his complaint in this action on November 2, 2007, claiming that Defendants violated his rights under the United States Constitution and New York state law. (Dkt. No. 1 at 1.) Plaintiff alleges that he still suffers great pain and stiffness and believes that he risks permanent disability in his left shoulder if he is not promptly provided with physical therapy. (Dkt. No. 1 at ¶¶ 27, 29.) He requests 10 million dollars in damages. (Dkt. No. 1 at 7.)

On January 15, 2009, I recommended that Plaintiff's state law claims be dismissed as barred by the statute of limitations and that Plaintiff's medical care claims against Defendants Walborn and Outhouse be dismissed for lack of personal involvement. (Dkt. No. 21.) On June 10, 2009, Judge Sharpe adopted my recommendation in part and ordered that Plaintiff's state law claims and the medical care claim against Defendant Walborn be dismissed. He found, however, that the complaint adequately alleged that Defendant Outhouse was personally involved in the alleged denial of medical care and therefore ordered that the claim survive Defendants' motion to dismiss. (Dkt. No. 27.)

Thus, the following claims proceeded to discovery: (1) an excessive force claim against Defendant Walborn; (2) a procedural due process claim against Defendant Walborn; and (3) a medical care claim against Defendant Outhouse. Discovery closed on November 12, 2009. (Dkt. No. 36.)

On January 11, 2010, Defendants moved for summary judgment of the remaining claims. (Dkt. No. 39.) On February 10, 2010, Plaintiff requested, and I granted, an extension of time in which to respond to the motion. Plaintiff's extension request did not mention a need for further discovery. (Dkt. No. 40.) On March 1, 2010, Plaintiff wrote to the Court seeking assistance with obtaining discovery from Defendants in order to oppose the motion for summary judgment. Specifically, Plaintiff requested an order directing the warden of U.S.P. Canaan to take pictures of his shoulder, an order directing the psychology department to release Plaintiff's records, and an order directing the medical department to give Plaintiff copies of his medical records. (Dkt. No. 42.) On March 12, 2010, I issued an order directing Plaintiff to respond to four portions of Defendants' motion for summary judgment without receiving further discovery: (1) the argument that Plaintiff failed to exhaust his administrative remedies; (2) the argument that there are no triable issues of fact regarding Plaintiff's procedural due process claim; (3) the argument that Defendant Outhouse was not personally involved in any alleged constitutional violation; and (4) the argument that Defendants are entitled to qualified immunity.

**\*5** On March 25, 2010, Plaintiff filed his opposition papers. (Dkt. No. 43.) Plaintiff's opposition responds to all of Defendants' arguments, not simply the four that I directed him to address. *Id* .

**II. APPLICABLE LEGAL STANDARDS**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3862082 (N.D.N.Y.)

(Cite as: 2010 WL 3862082 (N.D.N.Y.))

## A. Legal Standard Governing Motions for Summary Judgment1

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. Only after the moving party has met this burden is the non-moving party required to produce evidence demonstrating that genuine issues of material fact exist. Salahuddin v. Goord, 467 F.3d 263, 272-73 (2d Cir.2006). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-86 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material [FN8] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. Major League Baseball Props., Inc. v. Salvino, 542 F.3d 290, 309 (2d Cir.2008).

> FN8. A fact is "material" only if it would have some effect on the outcome of the suit. Anderson, 477 U.S. at 248.

## B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim

To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." Schwartz v. Compagnise General Transatlantique, 405 F.2d 270, 273-74 (2d Cir.1968) (citations omitted); accord, Katz v. Molic, 128 F.R.D. 35, 37-38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Accordingly, it is appropriate to summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U .S. 544, 570 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense ... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not shown-that the pleader is entitled to relief." Id. at 1950 (internal citation and punctuation omitted).

**\*6** "In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." Harris v. Mills, 572 F.3d 66, 72 (2d Cir.2009). However, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 129 S.Ct. at 1949.

## III. ANALYSIS

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3862082 (N.D.N.Y.)

(Cite as: 2010 WL 3862082 (N.D.N.Y.))

### A. Exhaustion of Administrative Remedies

Defendants argue that this action must be dismissed because Plaintiff failed to exhaust his administrative remedies. (Dkt. No. 39-8 at 2.) I find that Plaintiff has raised a triable issue of fact that Defendants are estopped from asserting this affirmative defense.

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002). In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution to which they are confined. Jones v. Bock, 549 U.S. 199, 218 (2007). If a prisoner fails to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative remedies. Woodford v. Ngo, 548 U.S. 81, 90-91 (2006).

Here, Plaintiff did not exhaust his administrative remedies regarding his medical care and due process claims. The current Sheriff of Cayuga County declares that although Plaintiff filed a grievance complaining of excessive force, he never filed a grievance complaining that he had been denied due process or medical treatment. (Dkt. No. 39-6 ¶¶ 11-14.) Although the copies of Plaintiff's grievance that have been submitted to the Court are not entirely legible, this assertion appears to be accurate. (Dkt. Nos. 39-5 at 22, 43 at 14.) In his opposition, Plaintiff admits that he did not fully exhaust his administrative remedies regarding due process and medical care. (Dkt. No. 43 at 2.)

Plaintiff's failure to exhaust does not end the inquiry. The Second Circuit has held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his available administrative remedies. Hemphill v. State of New York, 380 F.3d 680, 686, 691 (2d Cir.2004).[FN9]

FN9. The Second Circuit has not yet decided whether the *Hemphill* rule has survived the Supreme Court's decision in Woodford, 548 U.S. 81. Chavis v. Goord, No. 07-4787-pr, 2009 U.S.App. LEXIS 13681, at *4, 2009 WL 1803454, at *1 (2d Cir. June 25, 2009). I will assume for the purposes of this motion that *Hemphill* remains good law.

*7 First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." Hemphill, 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

A prison official's refusal to accept or forward a prisoner's grievance is conduct that hinders a plaintiff's ability to pursue administrative remedies, and thus estops prison officials from asserting an exhaustion defense. Sandlin v. Poole, 575 F.Supp.2d 484, 488 (W.D.N.Y.2008). Here, Plaintiff states that he submitted a grievance form regarding due process and medical care, but that he never received a response. He "questioned staff about this [g]rievance and was told he had to file another [g]rievance [and] that the only [g]rievance they had on file was the first [g]rievance." (Dkt. No. 43 at 2.) Plaintiff "then submitted a second [g]rievance form and this [g]rievance never made it to [its] destination." *Id.* Plaintiff "then decided that if he filed another [g]rievance it would be lost or destroyed." *Id.*[FN10] Although this bald assertion would be insufficient if he were represented by counsel, I must afford Plaintiff special solicitude as an unrepresented

Slip Copy, 2010 WL 3862082 (N.D.N.Y.)

(Cite as: 2010 WL 3862082 (N.D.N.Y.))

civil rights litigant. Therefore, I recommend that the Court find that Plaintiff has raised a triable issue of fact that Defendants are estopped from asserting an exhaustion defense.

> FN10. None of these statements were made under penalty of perjury. Rather, they are merely asserted in Plaintiff's opposition brief.

**B. Physical Injury Requirement**

The Prison Litigation Reform Act of 1995, 42 U.S.C. § 1997(e), provides that prisoners cannot bring federal civil actions "for mental or emotional injury suffered while in custody without a prior showing of physical injury." Defendants argue that Plaintiff has not made a prior showing of physical injury, and that therefore his claims should be dismissed. (Dkt. No. 39-8 at 2-3.) Defendants' argument is without merit. The undisputed facts show that Plaintiff suffered abrasions, cuts, and swelling as a result of the incident. (Dkt. No. 39-3 ¶¶ 7, 9.) Therefore, I find that Plaintiff's claims are not barred by the PLRA's physical injury requirement.

**C. Excessive Force**

Plaintiff claims that Defendant Walborn used excessive force in restraining him. (Dkt. No. 43 at 3-7.) Defendants argue that Plaintiff has failed to raise a triable issue of fact because the undisputed evidence shows that Plaintiff suffered only *de minimis* injuries and that Defendant Walborn applied force in a good-faith effort to maintain discipline. (Dkt. No. 39-8 at 3-8.) Defendants are correct.

**\*8** As noted above, the complaint alleges that Plaintiff was a pretrial detainee at the time of the incident (Dkt. No. 1 ¶ 5), while Defendants assert without citation to evidence that Plaintiff was "a convicted inmate" (Dkt. No. 39-8 at 3). Excessive force claims involving pretrial detainees implicate the Fourteenth Amendment, whereas excessive force claims involving convicted inmates implicate the Eighth Amendment. However, both types of claims are analyzed under the framework of *Hudson v. McMillian,* 503 U.S. 1 (1992). *United States v. Walsh,* 194 F.3d 37, 48 (2d Cir.1999). Under that framework, when prison officials are "accused of using excessive physical force ... the core judicial inquiry is ... whether force was applied in a good-faith effort to maintain or

restore discipline, or maliciously and sadistically to cause harm." *Hudson,* 503 U.S. at 6-7. The extent of any injury suffered by the inmate "is one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Id.* at 7 (citation and quotation marks omitted).

> In determining whether the use of force was wanton and unnecessary, it may also be proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by responsible officials, and any efforts made to temper the severity of a forceful response. The absence of serious injury is therefore relevant to the ... inquiry, but does not end it.

*Id.* (citation and quotation marks omitted). Force may be considered excessive, even where the prisoner does not suffer a serious or significant injury, if the force used is more than *de minimis* or is of a type that is "repugnant to the conscience of mankind." *Walsh,* 194 F.3d at 48 (quoting *Hudson,* 503 U.S. at 9-10).

Here, upon viewing the video of the incident, no reasonable juror could conclude that Defendant Walborn acted maliciously and sadistically to cause harm. It is true that the video does not precisely comport with Defendant Walborn's description of the incident. A reasonable juror might find it noteworthy that the first descriptions of the incident by Defendant Walborn and the other officers did not mention that Plaintiff was holding a utensil in his left hand. However, even when viewed in the light most favorable to Plaintiff, the evidence shows that Defendant Walborn used no more than *de minimis* force and that the force he used was not of a type repugnant to the conscience of mankind. The entire incident lasted less than a minute. Plaintiff admits that he was violating a facility rule. Defendant Walborn never struck or kicked Plaintiff. The force lasted only long enough to place handcuffs on Plaintiff and bring him to his feet. Therefore, I recommend that the Court grant Defendants' motion and dismiss the excessive force claim against Defendant Walborn.

**D. Procedural Due Process**

Slip Copy, 2010 WL 3862082 (N.D.N.Y.)

(Cite as: 2010 WL 3862082 (N.D.N.Y.))

**\*9** Plaintiff claims that his due process rights were violated when he received no prior notice of his disciplinary hearing and the hearing officer refused to allow him to call witnesses. (Dkt. No. 1 ¶¶ 14, 22-23; Dkt. No. 43 at 8.) Defendants argue that they are entitled to summary judgment in their favor on this claim because Plaintiff was not deprived of any liberty interest. (Dkt. No. 39-8 at 8-12.) Defendants are correct.

In order to succeed on a procedural due process claim, a plaintiff must prove that he was deprived of a liberty interest without due process of law. *Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir.2000). An inmate has a liberty interest in remaining free from a confinement or restraint where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular confinement or restraint; and (2) the confinement or restraint imposes "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484 (1995); *Tellier,* 280 F.3d at 80; *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). Regarding the first prong of this test, "[i]t is undisputed ... that New York state law creates a liberty interest in not being confined" in a segregated housing unit. *Palmer v. Richards,* 364 F.3d 60, 64 n. 2 (2d Cir.2004). The issue, then, is whether Plaintiff's confinement in the RHU imposed "an atypical and significant hardship on [him] in relation to the ordinary incidents of prison life."

In the Second Circuit, determining whether disciplinary confinement constituted an "atypical and significant hardship" requires examining "the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions and the duration of the disciplinary segregation compared to discretionary confinement." *Palmer,* 364 F.3d at 64 (quoting *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998)). Where, as here, a prisoner has served less than 101 days in disciplinary segregation, the confinement constitutes an "atypical and significant hardship" only if "the conditions were more severe than the normal SHU conditions [FN11]." *Palmer,* 364 F.3d at 65.

> FN11. "Normal" SHU conditions include being kept in solitary confinement for 23 hours per day, provided one hour of exercise in the prison yard

per day, and permitted two showers per week. *Ortiz v. McBride,* 380 F.3d 649, 655 (2d Cir.2004).

Here, the current Sheriff of Cayuga County and Lt. Mack each declare that conditions in the RHU are "not significantly different from those of the general population. Only three major differences exist in the RHU: inmates' cells are searched on a daily basis; inmates eat inside their cells; and cell doors are transparent rather than barred. All other RHU conditions are similar to the general population. For example, inmates confined to RHU receive the same opportunities for exercise (one hour per day), similar clothing and bedding, similar food, and similar opportunities to wash and bathe. Inmates in RHU are permitted to bathe three days per week. Additionally, cell size is comparable." (Dkt No. 39-5 ¶ 11; Dkt. No. 39-6 ¶ 10.) Plaintiff has not submitted any evidence that contradicts Defendants' version of conditions in the RHU. The conditions described in Defendants' papers are not more severe than normal SHU conditions. Therefore, Plaintiff was not deprived of a liberty interest. Accordingly, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's procedural due process claim.

**E. Medical Care**

**\*10** Plaintiff alleges that Defendant Outhouse violated his right to adequate medical care.[FN12] (Dkt. No. 1 ¶ 33.) Defendants argue that this claim should be dismissed because Plaintiff has not raised a triable issue of fact that his medical condition was sufficiently serious, Defendants were not deliberately indifferent, and there is no evidence that Defendant Outhouse was personally involved. (Dkt. No. 39-8 at 12-16.) Plaintiff concedes that Defendant Outhouse should "be removed from suit without prejudice." (Dkt. No. 43 at 12.) Even if Plaintiff had not made this concession, I would find that Plaintiff has failed to raise a triable issue of fact as to his medical care claim.

> FN12. Any claim that Defendant Walborn violated Plaintiff's right to adequate medical care was dismissed with leave to amend because Plaintiff failed to allege facts plausibly suggesting that Defendant Walborn was personally involved in the alleged violation.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3862082 (N.D.N.Y.)

(Cite as: 2010 WL 3862082 (N.D.N.Y.))

(Dkt. No. 27.) Plaintiff did not amend his complaint.

There are two elements to a prisoner's claim that prison officials violated his right to receive adequate medical care: "the plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009) (citation and punctuation omitted).[FN13] "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d Cir.2003).

> FN13. The same standard applies to pretrial detainees' claims under the Fourteenth Amendment and convicted inmates' claims under the Eighth Amendment. *Caiozzo,* 581 F.3d at 69-72.

A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) (citations omitted), *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154 (1995); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702-03.

Here, Plaintiff's medical records show that Plaintiff suffered a small abrasion over his right eye, a very small scratch on his right wrist, a small scratch on his left upper inner arm, a small scratch on the back of his neck, and minimal jaw swelling as a result of the incident. (Dkt. No. 39-3 ¶ 7-8.) Nurse Chadwick did not find these injuries worthy of treatment. (Dkt. No. 39-3 ¶ 11.) Even if one credits Plaintiff's assertion that his lip was "busted," he has

not established the existence of a serious medical condition. Courts considering similar injuries have found them to be insufficiently serious to satisfy the objective prong. *See Benitez v. Straley,* No. 01-CV-0181, 2006 U.S. Dist. LEXIS 6382, at *8, 10, 33, 2006 WL 5400078, at *3, 4, 12 (S.D.N.Y. Feb. 16, 2006) (cut on plaintiff's lips, cut on plaintiff's head, and "severe cuts" to plaintiff's wrists-none of which required stitches-did not constitute a medical condition that was sufficiently serious for purposes of Eighth Amendment, even if plaintiff's allegations were assumed to be true); *Hickey v. City of New York,* No. 01-CV-6506, 2004 U.S. Dist. LEXIS 23941, at *53-54, 2004 WL 2724079, at *16 (S.D .N.Y. Nov. 29, 2004) (cuts and bruises do not constitute sufficiently serious medical needs); *Decayette v. Goord,* No. 06-CV-0783, 2009 U.S. Dist. LEXIS 48127, at * 3-4, 2009 WL 1606753, at *1 (N.D.N.Y. June 8, 2009) (McAvoy, J.); *Rodriguez v. Mercado,* No. 00-CV-8588, 2002 U.S. Dist. LEXIS 16057, at *8, 24, 2002 WL 1997885, at *3, 8 (S.D.N.Y. Aug. 28, 2002) (bruises to plaintiff's head, back and wrists, accompanied by back pain and migraines but no loss of consciousness, did not constitute a medical condition that was sufficiently serious for purposes of Eighth Amendment).[FN14]

> FN14. The Court will provide Plaintiff with a copy of these unpublished decisions in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

**\*11** Even if Plaintiff had sustained a sufficiently serious injury as a result of the incident, I would recommend that his medical care claim be dismissed because he has not raised a triable issue of fact that his condition was met with deliberate indifference. Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance,* 143 F.3d, 698, 703 (quoting *Hathaway,* 99 F.3d at 553). Thus, to establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer v. Brennan,* 511 U .S. 825, 837 (1994); *Chance,* 143 F.3d at 702-703.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3862082 (N.D.N.Y.)

(Cite as: 2010 WL 3862082 (N.D.N.Y.))

The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer,* 511 U.S. 825, 835; *Ross v. Giambruno,* 112 F.3d 505 (2d Cir.1997). Here, there is no evidence that either Defendant Outhouse or any medical care provider was aware of any facts from which the inference could be drawn that Plaintiff had a serious medical need. Plaintiff was treated twice in the month after the incident. At that time, no serious injuries were noted. Plaintiff's scratches and swelling did not require treatment, and he had full range of motion in his shoulder. (Dkt. No. 39-3 ¶¶ 11, 13.) Plaintiff did not seek treatment again while he was confined at Cayuga County Jail.[FN15] (Dkt. No. 39-3 ¶ 14.) Therefore, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's medical care claim.

> FN15. It appears that Plaintiff may have sought treatment for his shoulder after he transferred out of the Cayuga County Jail. In a letter to this Court dated February 25, 2010, Plaintiff requested, *inter alia,* an order directing the medical department of his current facility to provide him with copies of his records. (Dkt. No. 42.) Plaintiff asserted that these documents were relevant to the summary judgment motion, but did not explain why. Discovery in this case closed on November 12, 2009. Although I might exercise discretion to allow Plaintiff, an unrepresented civil rights litigant, to pursue discovery after the discovery cut-off, I decline to do so here. Plaintiff has not asserted any reason why the records are relevant. He does not argue, for instance, that these later medical records would raise a triable issue of fact that he suffered injuries so severe that Defendants' failure to note or treat them constituted deliberate indifference. Defendants state that they have provided Plaintiff with all of the medical records in their possession. (Dkt. No. 50.) Therefore, I deny Plaintiff's request.

**F. Doe Defendants**

Plaintiff's complaint includes claims against Doe Defendants. These Does appear to be the officers who were in the mess hall at the time of the incident and the

officer who conducted Plaintiff's disciplinary hearing. Plaintiff has never amended his complaint to name these officers. Even if Plaintiff had named the officers, he has not raised a triable issue of fact as to any of his claims, as discussed above. Therefore, I recommend that the Court dismiss the Doe Defendants.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 39) be **GRANTED;** and it is further

**RECOMMENDED** that all claims against the Doe Defendants be dismissed; and it is further

**ORDERED** that the Clerk provide Plaintiff with copies of *Hickey v. City of New York,* No. 01-CV-6506, 2004 U.S. Dist. LEXIS 23941, 2004 WL 2724079 (S.D.N.Y. Nov. 29, 2004); *Decayette v. Goord,* No. 06-CV-0783, 2009 U.S. Dist. LEXIS 48127, 2009 WL 1606753 (N.D.N.Y. June 8, 2009); and *Rodriguez v. Mercado,* No. 00-CV-8588, 2002 U.S. Dist. LEXIS 16057, 2002 WL 1997885 (S.D.N.Y. Aug. 28, 2002) in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

**\*12** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

N.D.N.Y.,2010.

Brown v. Outhouse
Slip Copy, 2010 WL 3862082 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 3862080 (N.D.N.Y.)

(Cite as: 2010 WL 3862080 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Karo BROWN, Plaintiff,
v.
Robert OUTHOUSE, Sheriff, Cayuga County; C.O.
Walborn, Correctional Officer, Cayuga County Jail;
John Does, Correctional Officers, Cayuga County Jail,
Defendants.
No. 9:07-cv-1169 (GLS/GHL).

Sept. 27, 2010.
Karo Brown, Waymart, PA, pro se.

Office of Frank W. Miller, Frank W. Miller, Esq., of
Counsel, East Syracuse, NY, Mackenzie, Hughes Law
Firm, Michael J. Livolsi, Esq., of Counsel, Syracuse, NY,
for the Defendants.

*MEMORANDUM-DECISION AND ORDER*

GARY L. SHARPE, District Judge.

### I. *Introduction*

**\*1** Pro se plaintiff Karo Brown brings this action
under 42 U.S.C. § 1983 alleging violations of his rights
under the United States Constitution and New York State
law. (Dkt. No. 1.) In a Report-Recommendation and Order
(R & R) filed July 9, 2010, Magistrate Judge George H.
Lowe recommended that defendants' motion for summary
judgment be granted.FN1 (Dkt. No. 51.) Pending are
Brown's objections to the R & R. (Dkt. No. 52.) For the
following reasons, the R & R is adopted in its entirety.

> FN1. The Clerk is directed to append the R & R
> to this decision, and familiarity therewith is
> presumed.

### II. *Background*

#### A. *Factual History*

On November 15, 2004, while detained at Cayuga

County Jail, plaintiff Karo Brown was restrained and
handcuffed by defendant Scott Walborn after violating a
facility rule and allegedly acting in a verbally combative
and hostile manner. (*See* R & R at 2-6, Dkt. No. 51.)
Immediately following the incident, Brown was placed in
segregated housing (RHU), where he requested medical
attention. (*See id.* at 6.) The next day, Brown was
personally examined by Jackie Chadwick, a registered
nurse employed at the Cayuga County Jail. (*See id.*) Upon
examination, Nurse Chadwick observed that Brown "did
not complain of intense pain or discomfort," and
concluded that "Brown displayed only superficial
injuries[, which] needed no treatment ... other than
continued observation." FN2 (Defs. Mem. of Law,
Chadwick Aff. ¶¶ 10-11, Dkt. No. 39:3.) On December
14, 2004, Brown was again brought to the infirmary, this
time complaining of a dislocated shoulder that he claimed
was caused by the November altercation. (*See id.* at ¶ 13.)
Again, however, the examining physician found no serious
injury, observing that Brown's "left shoulder exhibited a
full range of movement," and "prescrib[ing] only Advil as
needed for discomfort." (*Id.*)

> FN2. More specifically, Nurse Chadwick noted
> that Brown suffered a small abrasion over his
> right eye, a very small scratch on his wrist, a
> small scratch on his left upper inner arm, a small
> scratch on the back of his neck, and minimal jaw
> swelling. (Defs. Mem. of Law, Chadwick Aff. ¶¶
> 7-9, Dkt. No. 39:3.)

As a result of the November 15 incident, Brown
received a misbehavior report and was required to appear
at a disciplinary hearing. (*See* R & R at 7-8, Dkt. No.
151.) However, Brown was given no prior notice of the
hearing and was not permitted to call other prisoners to
testify as eyewitnesses. (*Id.* at 8.) Following the hearing,
Brown was kept in RHU for sixty to ninety days. (*Id.*)

#### B. *Procedural History*

On November 2, 2009, Brown filed the present
action, alleging that defendants violated his rights under
the United States Constitution and New York State law by:

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3862080 (N.D.N.Y.)

(Cite as: 2010 WL 3862080 (N.D.N.Y.))

(1) using excessive force against him; (2) denying him adequate medical care; and (3) denying him due process during his disciplinary hearing. (*See* Compl., Dkt. No. 1.) On June 10, 2009, Brown's state law claims and his medical care claim against defendant Walborn were dismissed, leaving in tact Brown's claims for excessive force and denial of procedural due process against Walborn, and his medical care claim against defendant Robert Outhouse, then Sheriff of Cayuga County. (*See* Dkt. No. 27.) On January 11, 2010, defendants moved for summary judgment on Brown's remaining claims. (Dkt. No. 39.) On July 9, 2010, Judge Lowe recommended that defendants motion be granted and that Brown's complaint be dismissed. (Dkt. No. 51.) Pending are Brown's objections to the R & R. (Dkt. No. 52.)

### III. *Standard of Review*

**\*2** Before entering final judgment, this court routinely reviews all report and recommendation orders in cases it has referred to a magistrate judge. If a party has objected to specific elements of the magistrate judge's findings and recommendations, this court reviews those findings and recommendations de novo. *See Almonte v. N.Y. State Div. of Parole,* No. 04-cv-484, 2006 WL 149049, at *6-7 (N.D.N.Y. Jan. 18, 2006).* In those cases where no party has filed an objection, or only a vague or general objection has been filed, this court reviews the findings and recommendations of a magistrate judge for clear error. *See id.*

### IV. *Discussion*

### A. *Excessive Force*

Brown claims that defendant Walborn used excessive force against him during the November 15 incident. (*See* Pl. Objections at 1-3, Dkt. No. 52.) When prison officials are "accused of using excessive physical force ... the core judicial inquiry is ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm ." *Hudson v. McMillian,* 503 U.S. 1, 6-7 (U.S.1992).

In this case, based on his viewing of security video footage of the November 15 incident, Judge Lowe recommended the dismissal of Brown's excessive force claim, finding that "no reasonable juror could conclude that ... Walborn acted maliciously and sadistically to cause harm." (R & R at 16, Dkt. No. 51.) In drawing this conclusion, Judge Lowe highlighted that the entire

incident lasted less than a minute, that Brown admits that he was violating a facility rule, that Walborn never struck or kicked Brown, and that the force lasted only long enough to place handcuffs on Brown and bring him to his feet. (*Id.*) Based on these facts, Judge Lowe concluded that "Walborn used no more than *de minimis* force and that the force he used was not of a type repugnant to the conscience of mankind." (*Id.* at 16.)

Having reviewed this portion of the R & R de novo, and having viewed the security video footage, the court concurs with Judge Lowe's findings and conclusion and adopts the R & R's recommendation to dismiss Brown's claim for excessive force.

### B. *Procedural Due Process*

Brown claims that he was deprived of procedural due process because he received no prior notice of his disciplinary hearing and was not allowed to call witnesses at the hearing. (*See* Pl. Objections at 4-5, Dkt. No. 52.)

To succeed on a procedural due process claim, a plaintiff must show that he was deprived of a "property or liberty interest protected by the Constitution." *Narumanchi v. Bd. of Trs. of Conn. State Univ.,* 850 F.2d 70, 72 (2d Cir.1988). As explained in the R & R, "[a]n inmate has a liberty interest in remaining free from a confinement or restraint where ... [that] confinement or restraint 'imposes an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " (R & R at 17, Dkt. No. 51 (quoting *Sandin v. Conner,* 515 U.S. 472, 484 (1995)*).*) In the Second Circuit, where, as here, a prisoner has served fewer than 101 days in disciplinary segregation, the confinement amounts to "atypical and significant hardship" only if "the conditions were more severe than the normal SHU conditions." *Palmer v. Richards,* 364 F.3d 60, 65 (2d Cir.2004).

**\*3** Here, in recommending the dismissal of Brown's due process claim, Judge Lowe found the record to be devoid of any evidence or indication that the conditions in RHU were more severe than normal SHU conditions, and thus concluded that Brown was not deprived of any liberty interest. (*See* R & R at 18, Dkt. No. 51.) Brown's sole challenge to this finding is that "[his] confinement in

Slip Copy, 2010 WL 3862080 (N.D.N.Y.)

(Cite as: 2010 WL 3862080 (N.D.N.Y.))

R.H.U. was atypical and significant hardship [because he] was confined from November 2004 until March of 2005 in which was 120 days, over the 101 days in *Palmer."* (Pl. Objections at 5, Dkt. No. 52.) This argument is without merit.

Initially, the basis of Brown's assertion-that he was confined for 120 days-belies his prior, consistent contentions that his confinement lasted for a period of between sixty and ninety days. (*See* Compl. ¶ 23, Dkt. No. 1 (alleging segregation lasting "a couple of months"); Compl., Ex. A, Karo Dep. at 33 ("two or three months"); Pl. Response at 8, Dkt. No. 43 ("60 to 90 days").) Moreover, even if the court were to credit Brown's inconsistent allegation, his claim would nonetheless fail. The Second Circuit has "[made] clear that duration is not the only relevant factor" in assessing whether segregated confinement amounts to an "atypical and severe hardship." *See Palmer,* 364 F.3d at 64 (citation and internal quotation marks omitted). Rather, "[t]he conditions of confinement are a distinct and equally important consideration" in that assessment. *Ortiz v. McBride,* 323 F.3d 191, 195 (2d Cir.2003). And in that regard, Brown has failed to allege or offer any evidence that his living conditions in RHU were harsher than typical SHU conditions, or even dispute defendants' showing that the conditions of RHU were largely similar to those of the general prison population. (*See* R & R at 18, Dkt. No. 51.) Therefore, because Brown has failed to even allege unusual confinement conditions, his due process claim cannot survive. *See Barclay v. New York,* 477 F.Supp.2d 546, 556 (N.D.N.Y.2007) ("Where a plaintiff fails to 'demonstrate a significant deprivation of a liberty interest because he has not shown that the conditions of his confinement in the SHU were dramatically different from the 'basic conditions of his indeterminate sentence' his due process claim fails." (quoting *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996))).

Accordingly, upon de novo review, the court adopts Judge Lowe's recommendation to dismiss Brown's due process claim.

**C Denial of Medical Care**

Brown claims that he was deliberately denied medical treatment for more than twenty-four hours after the November 15 incident. (*See* Pl. Objections at 3-4, Dkt. No. 52.)

"To establish an unconstitutional denial of medical care, a prisoner must prove deliberate indifference to his serious medical needs." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citations and internal quotation marks omitted). Therefore, to succeed on his claim, Brown must show that he "had a serious medical condition and that it was met with deliberate indifference." *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009) (citation and internal quotation marks omitted). "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d Cir.2003) (citations omitted).

**\*4** In recommending the dismissal of Brown's deliberate indifference claim against Outhouse, Judge Lowe found that Brown failed to (1) establish the existence of a serious medical condition, or (2) raise a triable issue of fact that his condition was met with deliberate indifference. (R & R at 21, Dkt. No. 51.) Upon de novo review of these findings, the court concurs with Judge Lowe and adopts his recommendation to dismiss Brown's medical care claim.

A "serious medical condition" is " 'a condition of urgency ... that may produce death, degeneration, or extreme pain.' " *Hathaway,* 37 F.3d at 66 (quoting *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J., dissenting)). Factors relevant to the seriousness of a medical condition include: "the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; [and] the existence of chronic and substantial pain." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (citations and internal quotation marks omitted).

In this case, Brown's injuries were limited in nature and characterized by Nurse Chadwick as "superficial." Further, there is no evidence in the record, and Brown does not appear to allege, that his injuries caused him any chronic and substantial pain, or that they significantly

Slip Copy, 2010 WL 3862080 (N.D.N.Y.)

(Cite as: 2010 WL 3862080 (N.D.N.Y.))

affected his daily activities. Accordingly, discerning no error in Judge Lowe's application of the law to these and other relevant facts, the court concurs with Judge Lowe's conclusion that Brown's injuries were not sufficiently serious to satisfy the objective prong.

The court also agrees with Judge Lowe that, "[e]ven if [Brown] had sustained a sufficiently serious injury as a result of the incident," his claim would nonetheless fail on the subjective, deliberate indifference prong. (*See id.* at 21.) As Judge Lowe correctly explained, "[m]edical mistreatment rises to the level of deliberate indifference only when it 'involves culpable recklessness, i.e., an act or failure to act ... that evinces a conscious disregard of a substantial risk of serious harm.' " (*Id* . (quoting *Chance,* 143 F.3d at 703).) In other words, to satisfy the subjective prong, the plaintiff must show that the prison official "[knew] of and disregard[ed] an excessive risk to inmate health or safety." *Hathaway,* 37 F.3d at 66 (citation and internal quotation marks omitted).

In this case, because the court agrees with Judge Lowe that "there is no evidence that either ... Outhouse or any medical care provider was aware of any facts from which the inference could be drawn that [Brown] had a serious medical need," (R & R at 21, Dkt. No. 51), the court finds no error in the R & R's finding as to deliberate indifference, or in its ultimate recommendation to dismiss Brown's medical care claim. Accordingly, the court adopts the portion of the R & R dismissing Brown's medical care claim.

### V. *Conclusion*

**\*5** Having reviewed the remainder of the R & R for clear error, the court finds no error.
**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate George H. Lowe's Report-Recommendation and Order (Dkt. No. 51) is **ADOPTED** in its entirety; and it is further

**ORDERED** that defendants' motion for summary judgment is **GRANTED** and Brown's complaint is **DISMISSED;** and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

N.D.N.Y.,2010.

Brown v. Outhouse
Slip Copy, 2010 WL 3862080 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2010 WL 1286800 (D.Conn.)

(Cite as: 2010 WL 1286800 (D.Conn.))

**C**

Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,

D. Connecticut.
Thomas MAY, Plaintiff,
v.
Miguel DeJESUS, Correctional Officer, Defendant.
No. 3:06CV1888 (AWT).

March 30, 2010.
Thomas J. May, Machiasport, ME, pro se.

Matthew B. Beizer, Attorney General's Office, Hartford, CT, for Defendant.

### *RULING ON MOTION FOR SUMMARY JUDGEMENT*

ALVIN W. THOMPSON, District Judge.

**\*1** The plaintiff, Thomas May, who is currently incarcerated at Maine State Prison in Warren, Maine, commenced this civil rights action *pro se* and *in forma pauperis* against the defendant, Correctional Officer Miguel DeJesus. The plaintiff claims that the defendant deprived him of basic human needs in violation of the Eighth and Fourteenth Amendment, which resulted in physical injury and emotional distress. The defendant has moved for summary judgment on all claims. For the reasons set forth below, the motion for summary judgment is being granted.

**I. Facts**

In December 2004, the plaintiff underwent hemorrhoid surgery. Following the surgery, Dr. Ruiz, a prison physician, prescribed Ducosate Sodium, a laxative, to be taken by the plaintiff twice a day from December 9, 2004 until March 29, 2005.

In March 2005, the defendant was employed as a

Correctional Officer at Osborn Correctional Institution ("Osborn") in Somers, Connecticut where the plaintiff, a sentenced inmate, was incarcerated. On March 14, 2005, the plaintiff was scheduled to participate in a trial in a case filed in the United States Bankruptcy Court in New Haven, Connecticut. Department of Correction officials assigned the defendant to transport the plaintiff in a prison van from Osborn to the Bankruptcy Court in New Haven, a distance of approximately 65 miles. The plaintiff had taken his prescribed laxative medication prior to the trip to New Haven. The plaintiff and the defendant were the only occupants in the prison van. The plaintiff wore handcuffs and leg shackles during the trip to and from New Haven.

The plaintiff avers that, at the beginning of the trip to New Haven, the defendant did not ask him whether he had to use the bathroom and did not instruct him to use the bathroom. The plaintiff avers that "[i]f [the defendant] had asked or instructed me, I would have told [the defendant] that I did not need to use a bathroom, because at that time I had no urge to defecate or urinate." (Thomas J. May Affidavit (Doc. No. 27 Ex. 2) ("May Aff.") ¶ 9) Approximately 45 to 60 minutes into the trip to New Haven, the plaintiff informed the defendant that he needed to defecate and asked the defendant to stop the van at the Cheshire Correctional Institution so that he could use the bathroom. The defendant did not stop the van and the plaintiff defecated in his pants. The plaintiff was forced to sit in his soiled pants for 15 to 30 minutes until the van arrived at the courthouse in New Haven.

Upon his arrival at the courthouse, Deputy United States Marshals permitted the plaintiff to throw out his soiled pants, underwear and socks, take a shower and change into a new pair of pants. The United States Marshals' Service did not provide the plaintiff with a new pair of socks. The bankruptcy proceeding lasted approximately two hours. Thereafter, the plaintiff was placed in leg shackles and handcuffs for the return trip to Osborn.

The plaintiff avers that, at the beginning of the return

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1286800 (D.Conn.)

(Cite as: 2010 WL 1286800 (D.Conn.))

trip to Osborn, the defendant did not ask him whether he had to use the bathroom and did not instruct him to use the bathroom. The plaintiff avers that "[i]f [the defendant] had instructed or asked me, I would have told [the defendant] that I did not need to use a bathroom, because at that time I had no urge to urinate or defecate." (May Aff.¶ 29) Approximately 60 minutes into the return trip, the plaintiff informed the defendant that he had to urinate and asked the defendant to stop the van at the Hartford Correctional Center or MacDougall-Walker Correctional Institution in Suffield so that he could use a bathroom. The defendant did not stop the van and the plaintiff urinated in his pants. The plaintiff sat in his urine-soaked pants for 15 to 30 minutes, before the van arrived at Osborn. Upon his arrival at Osborn, the plaintiff was escorted back to his cell.

**\*2** The plaintiff suffered a small abrasion, approximately 1/4 inch by 1/8 inch in size on his left ankle where the leg shackle rubbed against his skin during the return trip to Osborn. On March 24, 2005, a nurse examined plaintiff's ankle and noted a small, well-healed scab on the front of the ankle, no sign of infection, redness or swelling and excellent range of motion. The nurse recommended follow-up as needed.

## II. Legal Standard

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. Fed.R.Civ.P. 56(c). *See* Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223 (2d Cir.1994). When ruling on a motion for summary judgment, the court may not try issues of fact, but must leave those issues to the jury. *See, e.g.,* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir.1987). Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined ... to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be resolved is *both* genuine and related to a material fact. Therefore, the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. An issue is "genuine ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248 (internal quotation marks omitted). A material fact is one that would "affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. Only those facts that *must* be decided in order to resolve a claim or defense will prevent summary judgment from being granted. Immaterial or minor facts will not prevent summary judgment. *See* Howard v. Gleason Corp., 901 F.2d 1154, 1159 (2d Cir.1990).

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and ... draw all reasonable inferences in its favor." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir.2000)(quoting Delaware & Hudson Ry. Co. v. Consolidated Rail Corp., 902 F.2d 174, 177 (2d Cir.1990)). However, the inferences drawn in favor of the nonmovant must be supported by the evidence. "[M]ere speculation and conjecture" is insufficient to defeat a motion for summary judgment. Stern v. Trustees of Columbia University, 131 F.3d 305, 315 (2d Cir.1997) (quoting Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d. Cir.1990)). Moreover, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position" will be insufficient; there must be evidence on which a jury could "reasonably find" for the nonmovant. Anderson, 477 U.S. at 252.

**\*3** Where one party is proceeding *pro se,* the court reads the *pro se* party's papers liberally and interprets them to raise the strongest arguments suggested therein. *See* Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir.1994). Despite this liberal interpretation, however, an unsupported assertion cannot overcome a properly supported motion for summary judgment. Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir.1991).

## III. Discussion

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1286800 (D.Conn.)

(Cite as: 2010 WL 1286800 (D.Conn.))

The plaintiff contends that the defendant's failure to stop the van on the way to and from the courthouse to permit him to use the bathroom, which also resulted in injury from the application of leg shackles to his bare ankles, constituted a violation of his right to be free from unconstitutional conditions of confinement. The plaintiff also contends that he suffered humiliation and emotional distress as a result of the violation.[FN1]

FN1. Deliberate indifference by prison officials to a prisoner's serious medical need constitutes cruel and unusual punishment in violation of the Eighth Amendment. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Although the plaintiff had undergone hemorrhoid surgery and was taking medication because of the surgery, he did not include a claim of deliberate indifference to medical needs in his complaint. The court does not construe the complaint as raising such a claim because even if the plaintiff could prove his medical condition was serious, he does not contend that the defendant was aware of this medical condition or of the fact that the plaintiff was taking medication. Thus, the plaintiff could not show that the defendant was deliberately indifferent to that condition.

The defendant moves for summary judgment on the ground that the plaintiff has failed to produce evidence that could show he was subjected to unconstitutional conditions of confinement during the trip to and from the courthouse.

**A. Constitutional Violation: Conditions of Confinement**

"It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney,* 509 U.S. 25, 31, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). "A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components-one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009). In *Gill v. Riddick,* No. Civ. 9:03-CV-1456, 2005 WL

755745 (March 31, 2005), the court stated:

A prisoner alleging that a certain prison condition constitutes cruel and unusual punishment must prove both an objective and subjective element, specifically, the inmate must show that the deprivation at issue is objectively sufficiently serious such that the plaintiff was denied the minimal civilized measure of life's necessities, and that the defendant possessed a sufficiently culpable state of mind associated with the unnecessary and wanton infliction of pain.... The objective component of an Eighth Amendment violation must be evaluated based on the severity of the deprivation imposed.... When considering whether a particular condition is so serious as to invoke the Eighth Amendment, a court should assess the duration of the condition and the potential for serious physical harm.... To prove the second, subjective component, a prisoner must establish that the person who inflicted the unconstitutional condition was deliberately indifferent to the severe deprivation.

*Id.,* at *16(internal quotation marks and citations omitted). "Because society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient" to state a claim of unconstitutional conditions of confinement. *Blyden v. Mancusi,* 186 F.3d 252, 263 (2d Cir.1999).

***4** The defendant contends that the plaintiff has not met either the objective or the subjective component of the Eighth Amendment test because, as to the objective component, he has not produced evidence that he suffered an unconstitutional deprivation during his trip to or from the courthouse in New Haven, and, as to the subjective component, he has not produced evidence that the defendant acted with the requisite state of mind. The court concludes that the plaintiff has failed to create a genuine issue of fact as to the objective component and, for that reason, the defendant is entitled to summary judgment.

"To satisfy the objective component of an Eighth Amendment conditions of confinement claim, Plaintiff must show that the conditions alleged, either alone or in combination, deprive him of 'the minimal civilized measure of life's necessities,' such as adequate food,

Not Reported in F.Supp.2d, 2010 WL 1286800 (D.Conn.)

(Cite as: 2010 WL 1286800 (D.Conn.))

clothing, shelter, sanitation, medical care, and personal safety." *Alvarez v. County of Cumberland,* Civil No. 07-346(RBK), 2009 WL 750200, *4 (D.N.J. March 18, 2009)* (citation omitted). "To the extent that certain conditions are only 'restrictive' or 'harsh,' they are merely part of the penalty that criminal offenders pay for their offenses against society." *Id.*

In addition, an important consideration in determining whether a particular condition deprived an inmate of a basic human need or life necessity is the duration of the condition. *See e.g., Smith v. Copeland,* 87 F.3d 265, 268 (8th Cir.1996) (holding that inmate's confinement in cell for four days with overflowed toilet, during which time he endured stench of his own feces and urine, did not rise to level of Eighth Amendment violation); *Davis v. Scott,* 157 F.3d 1003, 1006 (5th Cir.1998)(holding that inmate being placed in cell with blood on walls and excretion on floors for three days did not meet objective component of Eighth Amendment, especially in view of fact that cleaning supplies were made available to him); *Hutto v. Finney,* 437 U.S. 678, 687-88, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978)("A filthy overcrowded cell and a diet of 'grue' might be tolerable for a few days and intolerably cruel for weeks or months."); *Wright v. McMann,* 387 F.2d 519, 526 (2d Cir.1967) (" 'civilized standards of humane decency ... do not permit' " an inmate to be placed in a filthy, unheated strip cell and deprived of clothes and basic hygiene items such as soap and toilet paper for a substantial period of time, i.e., 33 days).

The defendant concedes that unsanitary conditions, including lack of access to toilet paper or a properly functioning toilet, may constitute a severe deprivation of a basic human need. *See e.g., LaReau v. MacDougall,* 473 F.2d 974, 978 (2d Cir.1972) (confinement for five days in strip cell with only a pit toilet and without light, a sink or other source of water violated minimum standards of human decency required by Eighth Amendment); *Wright,* 387 F.2d at 522, 526 (conditions of confinement in strip cell including denial of toilet paper for 33 days violated Eighth Amendment). The defendant contends, however, that depriving the plaintiff of the use of a bathroom for two short periods of time did not constitute an extreme deprivation of a basic human need.

**\*5** Courts in this and other circuits have consistently held that an occasional or temporary deprivation of toilet use, does not constitute an extreme deprivation of a basic human need or necessity of life. *See Jones v. Marshall,* No. 08 Civ. 0562, 2010 WL 234990, at *3 (S.D.N.Y. Jan.19, 2010)* (denial of right to use bathroom for 90 minutes did not "establish the existence of an objective injury for purposes of Eighth Amendment claim"); *Rogers v. Laird,* Civ. No. 9:07-CV-668 (LEK/RFT), 2008 WL 619167, at *3 (N.D.N.Y. Feb.8, 2008)* (denial of use of restroom during three hour trip to and from court causing inmate to urinate on himself did not "constitute an extreme deprivation of life's necessities"); *Simpson v. Wall,* 2004 WL 720276, at *3 (W.D.Wis. Mar.29, 2004)* ("Sitting in one's feces for sixty to eighty miles cannot be said to present a risk of serious harm."); *Bourdon v. Roney,* 2003 WL 21058177, at *10-11 (N.D.N.Y. Mar.6, 2003)* (three hours without bathroom privileges is not deprivation of minimal necessities of life); *Whitted v. Lazerson,* No. 96 Civ. 2746(AGS), 1998 WL 259929, at * 2 (S.D.N.Y. May 21, 1998)* (temporary deprivation of use of toilet for 90 minutes at most, in the absence of serious physical injury, did not constitute denial of necessities of life).

In reaching this conclusion, courts have considered whether the deprivation of toilet use resulted in unsanitary conditions that posed a significant risk to the inmate's health. *See Gill,* 2005 WL 755745, at *16* (inmate who urinated on himself as result of denial of use of bathroom during trip to prison failed to satisfy objective element of Eighth Amendment because denial was temporary-70 minutes-and he suffered no injury to his health); *Qawi v. Howard,* No. Civ. A. 98-220-GMS, 2000 WL 1010281, at *3-4 (D.Del. Jul.7, 2000)* (denial of use of bathroom for six hours during which inmate forced to urinate in drinking cup and bowl and defecate into a paper bag did not constitute sufficiently serious deprivation because duration of condition was brief and inmate suffered no significant health risk); *Odom v. Keane,* No. 95 Civ. 9941, 1997 WL 576088, at *4-5 (S.D.N.Y. Sept.17, 1997)* (lack of a working toilet in prison cell for approximately 10 hours, absent an allegation that the prisoner risked fecal contamination by contact with human waste, "does not rise to the level of cruel and unusual punishment").

Although the plaintiff was forced to sit in pants that

Not Reported in F.Supp.2d, 2010 WL 1286800 (D.Conn.)

(Cite as: 2010 WL 1286800 (D.Conn.))

were soiled with feces for up to 30 minutes on the way to court, he was permitted to clean himself and change his clothes when he arrived at the courthouse and before he was required to appear in court. Despite the fact that the plaintiff had to sit in urine-soaked pants for up to 30 minutes on the trip back to Osborn, there is no evidence to suggest that he was not able to wash himself and change his clothes after officers escorted him to his cell. Furthermore, other than a minor abrasion on his ankle, there is no evidence to suggest that the plaintiff suffered any contamination or risk to his health as a result of having to sit in pants soiled with feces and soaked with urine. There is no aspect of the conditions described by the plaintiff that could satisfy the objective element of the Eighth Amendment standard. The conditions were temporary and did not constitute an extreme deprivation of basic human need or the minimal civilized measure of life's necessities.

**\*6** The plaintiff fails to create a genuine issue of fact as to whether he can satisfy the objective component of the Eighth Amendment test, so it is not necessary to reach subjective component. Accordingly, the defendant's motion for summary judgment is being granted on this ground.

**B. Emotional Distress**

The plaintiff asserts that the defendant subjected him to emotional distress and humiliation because he was forced to walk into the courthouse in front of the Deputy United States Marshals in soiled pants and was escorted through a crowded prison gymnasium and housing unit on the way back to his cell at Osborn in urine-soaked pants. Having granted summary judgment on the plaintiff's sole federal claim, the court declines to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c) over the plaintiff's state law claims for negligent or intentional infliction of emotional distress. *See Valencia ex rel. Franco v. Lee, 316 F.3d 299, 305 (2d Cir.2003)*("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims.")(quoting *Carnegie-Mellon Univ. v.*

*Cohill,* 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988)).

**IV. Conclusion**

For the reasons set forth above, the defendants' Motion for Summary Judgment **(Doc. No. 24)** is hereby **GRANTED.** The Clerk is directed to enter judgment in favor of the defendant and close this case.

It is so ordered.

D.Conn.,2010.

May v. DeJesus
Not Reported in F.Supp.2d, 2010 WL 1286800 (D.Conn.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 750200 (D.N.J.)

(Cite as: 2009 WL 750200 (D.N.J.))



Only the Westlaw citation is currently available.NOT FOR PUBLICATION
United States District Court, D. New Jersey.

Julio ALVAREZ, Jr., Plaintiff,
v.
COUNTY OF CUMBERLAND, et al, Defendants.
Civil No. 07-346 (RBK).

March 18, 2009.

West KeySummary**Federal Civil Procedure 170A**
⚷    2491.5

170A Federal Civil Procedure

170AXVII Judgment
170AXVII(C) Summary Judgment
170AXVII(C)2 Particular Cases
170Ak2491.5 k. Civil Rights Cases in General. Most Cited Cases

Genuine issues of material fact existed as to the conditions of an inmate's confinement in an isolation unit at a county jail. Therefore, summary judgment was precluded in an action for an Eighth Amendment conditions of confinement claim. The inmate spent three days in his isolation cell without working plumbing and with a toilet overflowing with feces, urine, and other materials. The inmate also pointed to evidence that he contracted methicillin-resistant staphylococcus aureus (MRSA) while in isolation to show that he lived and slept exposed to feces in his cell. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

Richard A. Stoloff, Law Offices of Richard A. Stoloff, Linwood, NJ, for Plaintiff.

Steven L. Rothman, Lipman, Antonelli, Batt, Dunlap, Wodlinger & Gilson, Vineland, NJ, Nancy L. Siegel, White & Williams, LLP, Cherry Hill, NJ, for Defendants.

**OPINION**

ROBERT B. KUGLER, District Judge.

**\*1** This matter comes before the Court on a motion by Defendants County of Cumberland, Cumberland County Board of Chosen Freeholders, Cumberland County Department of Corrections, Cumberland County Sheriff's Department, Kenneth Lamcken, Michael Palau, Glenn Saunders, and Lewis Walker (collectively, "the County Defendants") for partial summary judgment on the Complaint of Plaintiff Julio Alvarez, Jr. ("Plaintiff") and on a motion by Defendant Prison Health Services, Inc. ("PHS") for summary judgment on Plaintiff's Complaint. Plaintiff's Complaint includes allegations that the County Defendants and PHS acted negligently and violated Plaintiff's civil rights pursuant to 42 U.S.C. §§ 1983, 1985(3). The County Defendants only move for summary judgment on Plaintiff's civil rights claims against them. For the reasons expressed below, the Court will grant in part and deny in part the County Defendants' motion and grant Prison Health Services' motion.

**I. BACKGROUND**

The allegations in Plaintiff's Complaint arise from events that occurred while he was an inmate at the Cumberland County Correctional Facility ("Cumberland County Jail"). Plaintiff was placed in an isolation unit at the Cumberland County Jail on or about January 28, 2005, and released from isolation on or about February 2, 2005. Plaintiff's isolation cell measured six feet by eight feet and was the middle cell in a group of three adjacent isolation cells in the unit. The cells on either side of Plaintiff's had working toilets and sinks. However, the parties agree that the toilet and sink in Plaintiff's original cell was in a state of disrepair at the time of his placement in isolation. Other inmates occupied the adjacent isolations cells, which contained working toilets and sinks. For the purposes of summary judgment, the parties agree that Plaintiff's toilet in isolation was not only non-functional, but also filled to the point of overflowing with urine, feces, and trash.

While in his original isolation cell, Plaintiff urinated in a Styrofoam cup which he then emptied into the broken sink so as not to cause the toilet to overflow onto the floor. Plaintiff defecated in the toilet, only after removing from it pieces of plastic and cardboard, which he placed on the

Slip Copy, 2009 WL 750200 (D.N.J.)

(Cite as: 2009 WL 750200 (D.N.J.))

floor of the cell. Plaintiff used the toilet by squatting over it, attempting to avoid touching the toilet seat.

Plaintiff was not provided with cleaning products with which to clean the isolation cell himself, nor was it cleaned by someone else while Plaintiff occupied it. Plaintiff was not provided equipment to use to empty the toilet or sink. At one time during his stay, a corrections officer did attempt to fix the toilet but was unsuccessful. Plaintiff did not ask to use a toilet outside his cell. Plaintiff alleges, and the County Defendants refute, that he did not ask because there was not a guard available to whom Plaintiff could have made such a request. Plaintiff was allowed to shower twice during his time in the original cell. The County Defendants argue that Plaintiff had frequent access to corrections officer, including at the time of his showers.

**2** Plaintiff contends that on February 1, 2005, one day before he was released from isolation, he transferred himself, with the permission of the guards, to an adjacent isolation cell with working plumbing. Plaintiff further contends that he could not have moved to an adjacent cell until February 1 because both adjacent cells were occupied from the time of Plaintiff's arrival in the isolation unit until that date. The County Defendants do not agree to the date of Plaintiff's self-transfer, but agree that he did so at some point during the time he was in isolation.

Plaintiff was released from isolation on February 2, 2005, at which time he was seen by a nurse to be treated for boils. He was seen by a doctor on February 4, 2005, at which time he had developed 10 lesions over his buttocks, legs, and penis. Plaintiff was placed in a medical isolation cell with other prisoners until February 9, 2005 when he was sent to the hospital to be treated for his lesions. Plaintiff stayed at the hospital eight days and underwent surgery. Plaintiff's medical expert reports that Plaintiff was infected with methicillin-resistant staphylococcus aureus ("MRSA") at least in part due to his exposure to waste matter in his isolation cell and his inability to wash after touching contaminated surfaces. (Pl.Opp.Ex. B.)

Plaintiff and the County Defendants agree that in 2005, the Cumberland County Jail was overcrowded. Further, Plaintiff presents the deposition testimony of

Defendant Kenneth Lamcken, who was responsible for maintenance at the Cumberland County Jail in 2005. Lamcken testified that there were times in 2005 when toilets in isolation units were broken, but that inmates were placed in cells with broken toilets. He further testified that those inmates often defecated on the floor of the cell. (Pl.Opp.Ex. C.) The County Defendants do not contest Lamcken's testimony in their reply brief.

## II. LEGAL STANDARD

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 330, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could find for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When the Court weighs the evidence presented by the parties, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her]favor." *Id.* at 255.

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment. Celotex, 477 U .S. at 330. The moving party may satisfy this burden by either (1) submitting affirmative evidence that negates an essential element of the nonmoving party's claim; or (2) demonstrating to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's case. *Id.* at 331.

**3** Once the moving party satisfies this initial burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). To do so, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 750200 (D.N.J.)

(Cite as: 2009 WL 750200 (D.N.J.))

## III. ANALYSIS

### A. The County Defendants' Motion

The County Defendants move for partial summary judgment on Plaintiff's constitutional claims against the County Defendants in Count IV of the Complaint.

### 1. Plaintiff's Fifth Amendment Claim

Plaintiff's Fifth Amendment claim does not present a genuine issue for trial and will be dismissed. The County Defendants move for summary judgment on Plaintiff's claim that they violated his constitutional rights guaranteed under the Fifth Amendment, contending that there is no genuine issue of material fact regarding a Fifth Amendment violation because Plaintiff has no evidence to support such a claim. Plaintiff has provided no argument to refute the motion on this point and thus presents no evidence to satisfy his burden. *See* Fed.R.Civ.P. 56(e). Finding no genuine issue of material fact, the Court will grant summary judgment for the County Defendants on Plaintiff's Fifth Amendment claim.

### 2. Plaintiff's Eighth Amendment Claim

The County Defendants move for summary judgment on Plaintiff's claim that they violated his Eighth Amendment rights. There are genuine issues of fact regarding the conditions of Plaintiff's confinement at the Cumberland County Jail, so Plaintiff's Eighth Amendment claims will survive summary judgment.

"To state a claim under [42 U.S.C.] § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). Prisoners have a protected right in being incarcerated at a place of confinement conforming to the standards set forth by the Eighth Amendment. The Constitution "does not mandate comfortable prisons," *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), but neither does it permit inhumane ones, and it is now settled that "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling v.*

*McKinney,* 509 U.S. 25, 31, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). In its prohibition of "cruel and unusual punishments, the Eighth Amendment ... imposes duties on [prison] officials, who must provide humane reasonable measures to guarantee the safety of the inmates." *Hudson v. Palmer,* 468 U.S. 517, 526-27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984); see *Helling,* 509 U.S. at 31-32; *Washington v. Harper,* 494 U.S. 210, 225, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990); *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The Eighth Amendment prohibits conditions which involve the unnecessary and wanton infliction of pain or are grossly disproportionate to the severity of the crime warranting imprisonment. *Rhodes,* 452 U.S. at 346, 347. The cruel and unusual punishment standard is not static, but is measured by "the evolving standards of decency that mark the progress of a maturing society." *Rhodes,* 452 U.S. at 346 (quoting *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958)).

**\*4** To state a claim under the Eighth Amendment, an inmate's allegation must include both an objective and a subjective component. See *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). The objective component mandates that "only those deprivations denying 'the minimal civilized measure of life's necessities" ... are sufficiently grave to form the basis of an Eighth Amendment violation." *Helling,* 509 U.S. at 32 (quoting *Rhodes,* 452 U .S. at 346). This component requires that the deprivation sustained by a prisoner be sufficiently serious, for only "extreme deprivations" are sufficient to make out an Eighth Amendment claim. *Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). The subjective component requires that the state actor have acted with "deliberate indifference," a state of mind equivalent to a reckless disregard of a known risk of harm. *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Wilson,* 501 U.S. at 303.

To satisfy the objective component of an Eighth Amendment conditions of confinement claim, Plaintiff must show that the conditions alleged, either alone or in combination, deprive him of "the minimal civilized measure of life's necessities," such as adequate food, clothing, shelter, sanitation, medical care, and personal

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 750200 (D.N.J.)

(Cite as: 2009 WL 750200 (D.N.J.))

safety. *See* Rhodes, 452 U.S. at 347-48; *Young v. Quinlan,* 960 F.2d 351, 364 (3d Cir.1992). To the extent that certain conditions are only "restrictive" or "harsh," they are merely part of the penalty that criminal offenders pay for their offenses against society. *See Rhodes,* 452 at 347. An inmate may fulfill the subjective element of such a claim by demonstrating that prison officials knew of such substandard conditions and "acted or failed to act with deliberate indifference to a substantial risk of harm to inmate health or safety." *Ingalls v. Florio,* 968 F.Supp. 193, 198 (D.N.J.1997). An official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837.

In *Young,* the Third Circuit reversed the district court, which granted summary judgment for the defendant on plaintiff's claims regarding the conditions of his confinement. *See Young,* 960 F.2d at 353. In that case, Young was a federal prisoner who allegedly suffered continuous physical and psychological abuse by his cellmates. *Id.* at 353-54. In response to threats from one cellmate, Young stopped up his cell toilet, consequently flooding the cell. *Id.* at 355. As punishment, Young was placed in a dry cell, one without a toilet or running water, for ninety-six hours. *Id.* In addition, Young was not provided with toilet paper. *Id.* During the first twenty-nine hours of his confinement in the dry cell, Young asked repeatedly for a urinal and for permission to leave his cell to defecate. *Id.* Not receiving same, Young relieved himself in his cell. *Id.* Young was finally provided with a urinal and allowed to leave his cell to defecate, only after having been confined in the dry cell for twenty-nine hours. *Id.* The following day, Young again requested permission to leave his cell to defecate, but his requests were ignored or rejected. *Id.*

**\*5** When the Third Circuit considered whether Young had raised a genuine question of fact regarding the constitutionality of his confinement, it applied the standard described *supra. Id.* at 360. Specifically, the court noted that "inhumane prison conditions, including prolonged isolation in dehumanizing conditions ... and unsanitary conditions have ... been found to be cruel and unusual under contemporary standards of decency." *Id.* at 363. Further, the court explained that "segregated detention is

not cruel and unusual punishment per se, as long as the conditions of confinement are not foul, inhuman or totally without penological justification." *Id.* at 364 (*citing* Smith v. Coughlin, 748 F.2d 783, 787 (2d Cir.1984); *Ford v. Board of Managers of New Jersey State Prison,* 407 F.2d 937, 940 (3d Cir.1969); *Mims v. Shapp,* 399 F.Supp. 818, 822 (W.D.Pa.1975)). Noting that "the touchstone [of the constitutional analysis] is the health of the inmate," the court determined that the conditions of Young's confinement worked a deprivation of the basic necessities of human existence and thus were sufficient to satisfy the objective prong of the analysis. *Young,* 960 F.2d at 364. Indeed, the court opined that "it would be an abomination of the Constitution to force a prisoner to live in his own excrement for four days." *Id.* at 365. Turning to the subjective prong of the Eighth Amendment analysis, the court found that among other questions, it was a genuine issue whether or not "prison officials were deliberately indifferent to Young's requests for a minimal amount of relief," and so summary judgment by the district court had been inappropriately granted. *Id.*

The facts of the instant case appear similar to Young's allegations regarding the toilet facilities in his dry cell.[FN1] As to the objective component of the analysis in Alvarez's case, the conditions of his confinement in isolation were similar to Young's. Plaintiff spent three days in his isolation cell without working plumbing and with a toilet overflowing with feces, urine, and other materials. Although the Plaintiff in this case does not claim, as Young did, that he explicitly was denied access to alternate toilet facilities, he does contend that the guards generally were unavailable to respond to his request for alternate facilities. In support of his contention, Plaintiff points to his own deposition testimony in response to the question, "Did you ever ask the guard to go someplace to use the bathroom?" Plaintiff's answer was, "They wouldn't come back there. What they are saying is all a lie." (Pl.Opp.Ex. A.) Plaintiff further points to evidence that he contracted MRSA, specifically boils in his groin area, while in isolation to show that he lived and slept exposed to feces in his cell.

FN1. To be sure, Young made numerous other allegations regarding his treatment in isolation, although for the purposes of this Court's analysis,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 750200 (D.N.J.)

(Cite as: 2009 WL 750200 (D.N.J.))

we will consider the parallels to Young's and Alvarez's claims regarding toilet facilities.

The County Defendants contest Plaintiff's version of events, alleging that Plaintiff never asked to use alternate toilet facilities and was allowed to shower at least twice (which Plaintiff admits, but the County Defendants contend provided Plaintiff an opportunity to ask for alternate toilet facilities). The Court finds the facts of this case sufficiently similar to those in *Young* to find that the objective prong of the Eighth Amendment analysis is satisfied. So too, are there genuine issues of material fact as to the knowledge and response of prison officials. Summary judgment would thus be inappropriate on the Eighth Amendment claims.

**3. Plaintiff's Fourteenth Amendment Claim**

*6 Plaintiff's Fourteenth Amendment claim, insofar as it supports Plaintiff's Eighth Amendment claim, will remain before the Court, although summary judgment is appropriate as to any other Fourteenth Amendment claim. The County Defendants move for summary judgment on Plaintiff's Fourteenth Amendment claim on two grounds: (1) that the County Defendants did not violate Plaintiff's due process rights and (2) that Plaintiff's Fourteenth Amendment claim cannot stand on its own without Plaintiff's Fifth and Eighth Amendment claims. In response, Plaintiff contends that because there are genuine issues of material fact regarding the alleged violation of his Eighth Amendment rights, his Fourteenth Amendment claim must remain.

The County Defendants motion must fail in part because Plaintiff has pointed out that there is a genuine issue as to whether or not his Fourteenth Amendment rights were violated so long as Plaintiff's claim rests on the Eighth Amendment's prohibition against cruel and unusual punishment. The Court will deny summary judgment as to Plaintiff's Fourteenth Amendment claim made pursuant to the Fourteenth Amendment, because Plaintiff's Eighth Amendment claim remains, *see supra,* and the Eighth Amendment is applicable to the states via the Due Process Clause of the Fourteenth Amendment. *Robinson v. California,* 370 U.S. 660, 666, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).

Plaintiff, having failed to provide any argument to refute the County Defendants' motion with respect to a Fourteenth Amendment due process claim in and of itself, does not meet his burden on that possible claim. *See* Fed.R.Civ.P. 56(e). Accordingly, the Court will grant summary judgment for the County Defendants on Plaintiff's Fourteenth Amendment claim as it stands alone.

**4. Plaintiff's § 1983 Claim**

The County Defendants move for summary judgment on all of Plaintiff's claims made pursuant to 42 U.S.C. § 1983. They contend that Plaintiff's constitutional rights have not been violated, nor is there evidence of a policy or custom of such violation.

"To state a claim under [42 U.S.C.] § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). As discussed *supra,* there is a genuine issue of fact as to the possible Eighth Amendment rights violations which may form the basis of a § 1983 claim against the County Defendants. The Court finds that prison officials employed by Cumberland County qualify as state actors, so Plaintiff's § 1983 claims against the individual County Defendants remain.

To hold the entity County Defendants liable under § 1983, Plaintiff must first demonstrate the underlying constitutional violation, about which there is a genuine issue of material fact, as discussed. Under § 1983, however, a local government entity such as a county "cannot be held liable solely because it employs a tortfeasor." *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts and acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694. To the extent that Plaintiff also makes allegations against those of the County Defendants which are entities, the Court undertakes a *Monell* analysis.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 750200 (D.N.J.)

(Cite as: 2009 WL 750200 (D.N.J.))

**\*7** The County Defendants contend that Plaintiff has no evidence of a policy of refusing working clean toilets to inmates in Cumberland County. So too, they contend that Plaintif has presented no evidence of similar incidents involving other inmates. Further, the County Defendants point to the undisputed material fact that the two isolation units next to Plaintiff's had working toilets to support its contention that no policy exists to satisfy the *Monell* standard. Plaintiff's responsive submission to the Court points to the deposition testimony of Kenneth Lamcken, who was responsible for maintenance at the Cumberland County Jail in 2005. Lamcken testified that there were times in 2005 when toilets in isolation units were broken and inmates were nonetheless placed in a cell with a broken toilet, where those inmates often defecated on the floor of the cell. (Pl.Opp.Ex. C.) The County Defendants do not contest Lamcken's testimony in their reply brief. Accordingly, the Court finds that there is a genuine issue of material fact with respect to whether there is a policy or custom in the Cumberland County Jail which deprives inmates' constitutional right to be free from cruel and unusual punishment. As Plaintiff's Eighth Amendment claims against the individual County Defendants remain, and there appears to be a genuine issue regarding a policy or custom of Eighth Amendment rights deprivations, the Court finds no reason to grant summary judgment for the County Defendants on Plaintiff's claims made pursuant to § 1983.

**5. Plaintiff's § 1985 Claim**

The County Defendants move for summary judgment on Plaintiff's claim made pursuant to 42 U.S.C. § 1985(3). They argue that Plaintiff has not shown evidence sufficient to make out such a claim, in particular providing no evidence of a conspiracy whatsoever, particularly not a conspiracy intended to inhibit Plaintiff's equal protection rights.[FN2] Plaintiff contends that there is a genuine issue as to whether or not a conspiracy existed that prevented him from enjoying his civil rights, as evidenced by his placement in the isolation cell without a functioning toilet. Plaintiff avers that the conspiratorial aspect of his treatment arises out of a policy of placing other inmates in the same or similar conditions.

FN2. Although the County Defendants also point out that there is no evidence of a conspiracy to

deprive Plaintiff of his voting rights, Plaintiff makes clear in his opposition brief that his right to vote is not the basis of this claim.

To state a claim under 42 U.S.C. § 1985(3), Plaintiff must allege, among other things, a conspiracy motivated by a racial or class based discriminatory animus designed to deprive him of equal protection of the laws. *Lake v. Arnold,* 112 F.3d 682, 685 (3d Cir.1997) (*citing Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971)). Plaintiff has provided no specific allegations of such discrimination, nor any evidence to support such a claim. He has simply not alleged any class or race-based motive which would support a § 1985(3) claim. Accordingly, the Court will grant summary judgment for the County Defendants on Plaintiff's claims made pursuant § 1985(3).

*B. Prison Health Services' Motion*[FN3]

FN3. Plaintiff previously agreed to dismiss Defendant Betty Gambrell from this matter; Gambrell was a health services administrator at Cumberland County Jail.

**\*8** PHS was contracted to provide health care management and staffing for the Cumberland County Jail at the time of the events alleged in Plaintiff's Complaint. PHS contends that it did not employ nurses to provide direct care to inmates, but rather that any nurses who did so were employed by Cumberland County. (PHS Br. at 1.) The Agreement between Cumberland County and the regional office of PHS reflects that PHS provided "physician and administrative personnel" at the Cumberland County Jail; there is no mention of PHS providing nurses. (PHS Exs. B, C.)

**1. Plaintiff's § 1983 Claim**

PHS moves for summary judgment on Plaintiff's Eighth Amendment claims against it filed pursuant to 42 U.S.C. § 1983.[FN4] PHS grounds its motion on Plaintiff's lack of evidence that PHS violated his constitutional rights and upon the legal argument that 42 U.S.C. § 1983 does not permit a claim based solely upon vicarious liability. Plaintiff did not oppose the instant motion.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 750200 (D.N.J.)

(Cite as: 2009 WL 750200 (D.N.J.))

FN4. The Court notes that PHS does not specify that its motion only seeks summary judgment on Plaintiff's Eighth Amendment claims. It appears to the Court, however, that PHS has not addressed Plaintiff's Fifth and Fourteenth Amendment claims, nor for that matter Plaintiff's § 1985 claims, in the instant motion. Accordingly, the Court only considers PHS's motion with respect to Plaintiff's Eighth Amendment claims made pursuant to § 1983.

"To state a claim under [42 U.S.C.] § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West, 487 U.S. at 48. Because a physician under contract with a state prison acts under the color of state law when he treats an inmate, the Court finds that PHS was also acting under the color of state law when it provided medical personnel to treat inmates at the Cumberland County Jail Id. Plaintiff may establish liability by showing that PHS had a policy or custom that caused the civil rights violations he alleges. Monell, 436 U.S. at 694. Thus, there can be no entity liability unless there is an underlying constitutional violation.

Where § 1983 claims are grounded on claims that medical treatment fell below constitutional standards, an inmate must show that the defendant was deliberately indifferent to his serious medical needs. See Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251; Rouse, 182 F.3d at 197. "Deliberate indifference" exists "where [a] prison official: (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." Rouse, 182 F.3d at 197. Further, claims of negligence or malpractice are not sufficient to establish "deliberate indifference." Id.

PHS contends that Plaintiff's only evidence regarding its treatment of Plaintiff comes in the form of an expert report by Dr. John Kirby. PHS notes that Dr. Kirby, Plaintiff's own expert, mentions PHS employees when it

says that, "Once detected, Mr. Alvarez's wounds were treated appropriately by his physicians," although "wound care was neglected by the prison nurses." (PHS Ex. E at 7.) FN5 The report further states that when Plaintiff discovered the boils on his abdomen and upper legs, "the prison physician lanced [the] boils." (PHS Ex. E at 3; PHS Ex. F at 3.) PHS also argues that there is no evidence that PHS was responsible for the cleaning and sanitation of the inmates' housing, a focus of both of Dr. Kirby's reports.

FN5. The Court has taken into consideration both versions of the Kirby report submitted by PHS in support of its motion.

*9 The Court finds that PHS has met its burden, that Plaintiff's own expert report shows that PHS' physicians did not act with deliberate indifference to Plaintiff's serious medical need and that there is no evidence that PHS is responsible for Cumberland County Jail's failure to adequately prevent infection. PHS' contract with Cumberland County reinforces the notion that cell cleaning and sanitation were not its responsibility. There is thus no evidence before the Court which shows a genuine issue of material fact as to PHS' alleged Eighth Amendment violations. Plaintiff, having not opposed the instant motion, has not met his burden to show that there is a genuine issue for trial. Accordingly, the Court will grant summary judgment for PHS on Plaintiff's Eighth Amendment claims made pursuant to § 1983.

**2. Plaintiff's Negligence Claim**

PHS also moves for summary judgment on Plaintiff's negligence claims FN6, arguing that Dr. Kirby's report concludes that the medical care provided to Plaintiff was appropriate. Plaintiff's medical malpractice claim fails and must be dismissed.

FN6. The Court notes that PHS does not specify that its motion only seeks summary judgment on Plaintiff's medical malpractice claims of negligence. It appears to the Court, however, that PHS has not addressed in the instant motion Plaintiff's claims that PHS was negligent in other respects. Accordingly, the Court only considers PHS's motion as to Plaintiff's medical malpractice claims.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 750200 (D.N.J.)

(Cite as: 2009 WL 750200 (D.N.J.))

Plaintiff's negligence claim against PHS is, in part, a medical malpractice claim requiring expert testimony establishing (1) the applicable standard of care; (2) a deviation from that standard of care; and (3) that the deviation caused the injury. *See Teilhaber v. Greene,* 320 N.J.Super. 453, 727 A.2d 518 (N.J.Super.Ct.App.Div.1999). The facts of this case, as presented to the Court, do not show that there is a genuine issue as to Plaintiff's treatment by PHS. The physicians who treated him at the Cumberland County Jail provided medical care that, according to Plaintiff's own expert, was appropriate. Because Plaintiff has not responded, and there are no facts currently before the Court to support the bare allegations of medical malpractice in the Complaint, PHS is entitled to summary judgment Plaintiff's medical malpractice claims against it.

## IV. CONCLUSION

Based upon the foregoing, the Court will GRANT summary judgment for the County Defendants on Plaintiff's Fifth Amendment claims, Plaintiff's claims made pursuant § 1985(3), and Plaintiff's Fourteenth Amendment claim to the extent that it alleges a violation of Plaintiff's Fourteenth Amendment right to due process. Further, the Court will DENY summary judgment for the County Defendants on Plaintiff's Eighth Amendment claims made pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983. The Court will GRANT summary judgment for PHS on Plaintiff's Eighth Amendment claims made pursuant to § 1983 and on Plaintiff's medical malpractice claims against PHS. The accompanying Order shall issue today. D.N.J.,2009.

Alvarez v. County of Cumberland
Slip Copy, 2009 WL 750200 (D.N.J.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 815724 (N.D.N.Y.)
(Cite as: 2009 WL 815724 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Frank BROWN, Plaintiff,
v.
Thomas G. EAGEN, et al., Defendants.
**No. 9:08-CV-0009 (TJM/DRH).**

March 26, 2009.

West KeySummary
**Civil Rights 78 ⚷ 1395(7)**

78 Civil Rights
    78III Federal Remedies in General
        78k1392 Pleading
            78k1395 Particular Causes of Action
                78k1395(7) k. Prisons and Jails; Probation
and Parole. Most Cited Cases
An inmate's § 1983 claims of deliberate indifference to his
serious medical needs were so fantastic or incredible that
they were dismissed as factually frivolous. The inmate
alleged that prison officials gave him a "medical resource
drink" that contained blood and feces, intentionally
infected him with Hepatitis A and H. Pylori and denied
testing and treatment. The inmate also alleged that the
prison officials were working with Spanish inmates to
contaminate his food tray with blood, urine, semen, and
chemicals. Further, the inmate failed to allege a tangible
connection between the acts of any of the prison officials
and any injuries he suffered. 42 U.S.C.A. § 1983.

Frank Brown, pro se.

Hon. Andrew M. Cuomo, New York State Attorney
General, Richard Lombardo, Esq., Assistant Attorney
General, of Counsel, for Represented Defendants.

**MEMORANDUM-DECISION and ORDER**

THOMAS J. McAVOY, Senior District Judge.

**I. Introduction**

**\*1** Plaintiff Frank Brown commenced this action *pro se*
pursuant to 42 U.S.C. § 1983 ("Section 1983") alleging
that Defendants violated his rights under the United States
Constitution. Dkt. No. 1 (Comp.). Plaintiff seeks
substantial monetary relief.

Reading Plaintiff's Complaint liberally, Plaintiff claims
that Defendants conspired and retaliated against him for
filing grievances; denied him access to the courts by
interfering with his legal mail; were deliberately
indifferent to his serious medical needs; failed to protect
him from known harm; subjected him to excessive force;
conspired against Plaintiff; and denied him due process,
all in violation of his rights under the First, Fifth, Eighth,
and Fourteenth Amendments to the United States
Constitution.

Presently before the Court is Defendants' Motion to
Dismiss the Complaint pursuant to FED. R. CIV. P.
12(b)(1) and (6). Dkt. No. 50. Plaintiff has responded in
opposition to the Motion. Dkt. No. 65. For the following
reasons, Defendants' Motion to Dismiss is granted.

**II. Standard of Review**

A motion to dismiss pursuant to Rule 12(b)(6) may not be
granted so long as plaintiff's complaint includes "enough
facts to state a claim to relief that is plausible on its face."
*Bell Atlantic Corp. v. Twombly,* 550 U.S. 544,550 U.S.
544, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007); [FN1]
*cf. Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007)
(recognizing that the Supreme Court "is not requiring a
universal standard of heightened fact pleading, but is
instead requiring a flexible 'plausibility standard,' which
obliges a pleader to amplify a claim with some factual

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 815724 (N.D.N.Y.)
(Cite as: 2009 WL 815724 (N.D.N.Y.))

allegations in those contexts where such amplification is needed to render the claim *plausible.*" ). The pleading of specific facts is not required; rather a complaint need only give the defendant "fair notice of what the ... claim is and the grounds upon which it rests." *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007). The court must accept the material facts alleged in the complaint as true. *Cooper v. Pate,* 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964) (per curiam)); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005). In determining whether a complaint states a cause of action, great liberality is afforded to pro se litigants. *Platsky v. Central Intelligence Agency,* 953 F.2d 26, 28 (2d Cir.1991) (citation omitted).

> FN1. The Supreme Court, in *Bell Atlantic Corp.,* rejected the standard of review previously applied-namely, that "it appears beyond a doubt that plaintiff can prove no set of facts in support of his claim that would entitle him to relief"-and replaced the "no set of facts" language with the requirement that a plaintiff plead sufficient facts "to state a claim for relief that is plausible on its face." *Id.* at 1974.

For purposes of a Rule 12(b)(6) motion, the "complaint" includes any written instrument attached to the complaint and any statements or documents incorporated into it by reference. *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002); *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 674 (2d Cir.1995) (citations omitted). "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Chambers,* 282 F.3d at 153 (citation omitted). The Court may also consider "matters of which judicial notice may be taken." *Kowalyshyn v. Sobieski,* 3:07-CV-687, 2008 WL 1924973, at *1 (D.Conn. Apr.30, 2008).

### III. Facts

*2 The facts are related as alleged by Plaintiff in his complaint. Dkt. No. 1 (Comp.).

### A. First Cause of Action

On November 4, 2004, Defendants Burge and Bellnier failed to protect Plaintiff when they did "nothing to stop" Spanish inmates from contaminating Plaintiff's food tray "by putting ketchup that was sealed and called LA-BINE-YA, which is sealed ketchup with blood inside" and by "paying black porters with drugs and money to let them violate [Plaintiff's] food trays with sperm and blood and chemicals." Comp. at 11. Plaintiff's mail was constantly tampered with at Auburn Correctional Facility by the spanish inmates and, as a result, his grievances and complaints, including a letter to the FBI which included a sample of the ketchup, were never delivered. Comp. at 11-12. Plaintiff's mail was tampered with "to prevent [Plaintiff] from contacting anyone [to] let them know that all the murders of [his] whole family was done by spanish inmates at Great Meadow from Oct, 2006, until Nov, 2007." Comp. at 12. Defendants Burge and Bellnier are "responsible for massive corruption at Auburn from 9/17/2004 until 3/8/2005, so they are responsible for all corrupt acts committed" against Plaintiff. Comp. at 13, 33.

### B. Second Cause of Action

On December 29, 2004, spanish officers gave out Plaintiff's personal information to "their spanish people." Comp. at 13. The sharing of Plaintiff's personal information began in 1999 when he was at Southport, and since then "all spanish inmates have been able to get all information at will." Comp. at 13. John Burge, Glenn Goord, and Lucien J. LeClaire were made aware of all of these "criminal acts by many spanish inmates and officers" but did nothing to protect Plaintiff's federal rights. Comp. at 13, 33-34.

### C. Third Cause of Action

On January 1, 2005 Defendants Nurse Smith [FN2] and Sergeant Nipper retaliated against Plaintiff because of the many grievances Plaintiff had filed against "medical and officers." Comp. at 13-14. Nurse Smith and Sergeant Nipper gave Plaintiff "an infected medical resource drink with feces and blood inside of it." Comp. at 14. Nurse Smith was very nervous when she came to Plaintiff's cell

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 815724 (N.D.N.Y.)
(Cite as: 2009 WL 815724 (N.D.N.Y.))

on that day "[b]ecause some one put her up to this ... [and it] was done in retaliation for the many grievances and complaints" that Plaintiff was writing. Comp. at 14, 34.

> FN2. Nurse Smith has not been served and has not appeared in this action.

**D. Fourth Cause of Action**

Nurse Smith and Sergeant Nipper gave Plaintiff an "infected medical resource drink with feces and blood inside of it." Comp. at 14. Defendants were deliberately indifferent to Plaintiff's serious medical needs and to his safety in violation of the Eighth Amendment. Comp. at 14, 35.

**E. Fifth Cause of Action**

On January 6, 2005, Defendant Burge was involved in a "massive conspiracy" with Southport Superintendent Michael McGinnis, who is **not a defendant** in this action, to keep Plaintiff "on mental health level one" and medicated so as to prevent Plaintiff from pursuing his legal actions in Federal Court and exposing the massive conspiracy. Comp. at 15. Burge and McGinnis knew each other because they had previously worked together at Southport. Comp. at 15. Plaintiff was put on mental health level one and transferred to Auburn "to be silenced at all costs." Comp. at 15. Plaintiff has "no mental health problems or issues at all." Comp. at 15. Burge's actions violated Plaintiff's right to due process in violation of the Fourteenth Amendment. Comp. at 35.

**F. Sixth Cause of Action**

**\*3** On January 12, 2005, Defendants Robinson, Laux, Wright, LeClaire, Goord, Burge, Bellnier, Meyers, Nurse Smith, Officer Smith, and Sergeant Nipper violated Plaintiff's "constitutional rights to be free from infections." [FN3] Comp. at 15. Plaintiff was infected with the hepatitis A virus and then denied medical treatment. Comp. at 16. All of the staff prevented Plaintiff from being tested for hepatitis to prevent the ongoing conspiracy from being

exposed. Comp. at 16. Plaintiff advised "all staff at Central Office" of this problem but they did nothing at all. Comp. at 16. Defendants were deliberately indifferent to Plaintiff's serious medical needs and to his safety in violation of the Eighth Amendment. Comp. at 36.

> FN3. Defendants Robinson and Correctional Officer Smith have not been served and have not appeared in this action.

**G. Seventh Cause of Action**

On January 18, 2005, Defendants Eagan, Bellamy, and Burge denied Plaintiff "access to the open tank cells." Comp. at 16. All Defendants are to blame for this discrimination because they "all had the opportunity to correct this policy that discriminated against [Plaintiff]." Comp. at 16. Defendants' actions were retaliatory in violation of Plaintiff's First Amendment rights. Comp. at 37.

**H. Eighth Cause of Action**

On January 23, 2005, Defendants Meyers and Toomey denied Plaintiff his right to "medical help" by destroying a paper instructing Plaintiff not to eat any food in preparation for a blood test. Comp. at 17. LeClaire, Goord, Eagen, and Bellamy "are all responsible also because they did nothing and knew of all crimes being done to [Plaintiff] many times." Comp. at 17. Defendant Wright is also responsible because it was "his duty to stop crimes against [Plaintiff] for massive infections." Comp. at 17. Defendants were deliberately indifferent to Plaintiff's serious medical needs and safety in violation of the Eighth Amendment. Comp. 38.

**I. Ninth Cause of Action**

On January 26, 2006, Defendant Nurse Vega, who is spanish, destroyed the test results from Plaintiff's stool sample to cover up the conspiracy by spanish inmates and corrupt officers. Comp. at 18. Defendant was deliberately indifferent to Plaintiff's serious medical needs in violation

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 815724 (N.D.N.Y.)
(Cite as: 2009 WL 815724 (N.D.N.Y.))

of the Eighth Amendment. Comp. at 38.

**J. Tenth Cause of Action**

On January 27, 2005, in retaliation for Plaintiff's filing grievances, Defendant Rizzo gave Plaintiff tuna fish with "sperm in it." Comp. at 18-19. Plaintiff wrote many grievances against Defendant Rizzo. Comp. at 19. Defendant retaliated against Plaintiff in violation of his First Amendment rights. Comp. at 39.

**K. Eleventh Cause of Action**

On January 30, 2005, Defendant Meyers denied Plaintiff access to the courts "by destroying [Plaintiff's] free legal postage mail," including his Article 78 motions. Comp. at 19-20. Defendant Meyers also destroyed many of Plaintiff's grievances. Comp. at 20. Meyers is the officer "who almost always picks up the mail." Comp. at 20. Defendant Meyers denied Plaintiff access to the Courts in violation of his First Amendment rights. Comp. at 39.

**L. Thirteenth Cause of Action**[FN4]

> **FN4.** Plaintiff's Complaint does not include a Twelfth Cause of Action. *See* Comp. at 39-40.

**\*4** On February 1, 2005, Defendants Rizzo, Correctional Officer Smith, Portney, Nurse Smith, Sergeant Nipper, and D. Meyers infected Plaintiff with "a life time virus called Hepatitis A" because Plaintiff filed many grievances against them and other correctional staff. Comp. at 21. Defendants subjected Plaintiff to cruel and unusual punishment and were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. Comp. at 40.

**M. Fourteenth Cause of Action**

On February 2, 2005, Plaintiff was infected with H. Pylori from the drinking water. Comp. at 21. Defendant Burge,

"being the chief person at Auburn in 2004 and 2005 is responsible for [Plaintiff's] well-being." Comp. at 22. Defendant Laux refused to have Plaintiff's blood tested. Comp. at 22. Both Defendants Burge and Laux knew that Plaintiff was "bleeding inside from the drinking water" but did nothing. Comp. at 22. Defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. Comp. at 40-41.

**N. Fifteenth Cause of Action**

On February 10, 2005, Defendants Eagen, Bellamy, and Burge denied Plaintiff the right to petition the government without retaliation or reprisals "because the grievance program is not fair and effective." Comp. at 22. Plaintiff has been "infected in every prison ... most likely by chemicals, sperm, blood by officers, sergeants, medical staff and spanish inmate agents. [He] has been given three (3) life time viruses of Hepatitis A, Herpes and H pyloria. Plus massive infections in [his] stomach, throat and head for only using the grievance programs." Comp. at 23. "The whole corrupt Great Meadow murdered [Plaintiff's] whole family for only using the grievance program." Comp. at 24. Plaintiff was denied due process under the Fourteenth Amendment. Comp. at 42.

**O. Sixteenth Cause of Action**

On February 23, 2005, Defendants Burge, Bellnier, Nurse Smith, Officer Smith, Portney, Rizzo, Putman, Toomey, LeClaire, Wright, Eagen, Bellany, Laux, Robinson, Vega, Nipper, Meyers, and Goord all conspired with each other to infect Plaintiff with chemicals and to retaliate against him. Comp. at 25. Goord, Wright, LeClaire, Eagen, and Bellamy were all from the Central Office and therefore "in a position to stop all crimes being committed against [Plaintiff] but did nothing." Comp. at 25. Plaintiff claims that no white prisoners would be treated like this, only black prisoners, because there is "class-based discriminatory animus behind this massive conspiracy." Comp. at 25. Plaintiff states that

[t]his massive conspiracy is from prison to prison with massive criminal acts of food tampering, mail tampering, property destruction, assaults, conspiracy to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 815724 (N.D.N.Y.)
(Cite as: 2009 WL 815724 (N.D.N.Y.))

murder, attempted murders, massive infections, retaliation and murders of [Plaintiff's] whole family also. This is the biggest conspiracy in the history of United States. Plus using mental health to help [them] cover-up massive federal crimes.

**\*5** Comp. at 26. Plaintiff claims that Defendants conspired against him in violation of 42 U.S.C. § 1985(3).

### P. Seventeenth and Eighteenth Causes of Action

On February 27, 2005, Defendants Portney and Correctional Officer Smith assaulted Plaintiff "by putting the black strap on [him] at sick call because nurse Androsko told the officers" to get Plaintiff out of there. Comp. at 27. When Plaintiff returned to his cell, Plaintiff put his hands out of the food slot and "all officers which [he] didn't put on this lawsuit because [he] is extremely indigent ... pulled [Plaintiff's] hands and arms very hard trying to break them and [Plaintiff's] wrists also plus [his] back was in extreme pain." Comp. at 27-28. Plaintiff alleges that he was subjected to excessive force in violation of the Eighth Amendment. Comp. at 44-46.

### Q. Nineteenth Cause of Action

On February 28, 2005, Defendant Putnam told Plaintiff that he will remember Plaintiff till the day Plaintiff died and then threatened to give Plaintiff food and water infected with feces, urine, and sperm. Comp. at 28-29. Putnam's actions were in retaliation for Plaintiff filing grievances in violation of the First Amendment. Comp. at 29, 47.

### R. Twentieth Cause of Action

On February 28, 2005, Officer Toomey tampered with Plaintiff's food tray by pouring some sort of liquid all over everything. Comp. at 29-30. Toomey planned this with Defendant Putnam. Comp. at 30. Plaintiff alleges that Defendants actions were retaliatory in violation of the First Amendment. Comp. at 48-49.

### S. Twenty-first Cause of Action

On March 1, 2005, Defendant Rizzo contaminated Plaintiff's water with chemicals "that put pain in [Plaintiff's] side." Comp. at 30. Many times Defendant Officer Smith put feces and sperm in Plaintiff's hot water. Comp. at 31.

### T. Twenty-second Cause of Action

Plaintiff was in the Auburn Special Housing Unit (SHU) from October 30, 2004 until March 7, 2005 under conditions that were an "atypical and significant hardship [and] a deprivation of a liberty interest." Comp. at 31. During this period of SHU incarceration, he was infected with two or maybe three "life time viruses." [FN5] Comp. at 31. Plaintiff alleges that he "was entitled to be free from all infections, crimes against [him] in SHU at Auburn." Comp. at 50. Plaintiff claims that he was deprived of due process. Comp. at 50.

> **FN5.** Plaintiff was placed in SHU after he "stabbed spanish inmate Rodriguez on October 30, 2005. Comp. at 32. Plaintiff says that he stabbed Rodriguez because Defendants had failed to stop the "corruption and breaches of security" that Plaintiff had been subjected to. Comp. at 32.

### IV. Defendants' motion to dismiss

Defendants argue that Plaintiff's Complaint should be dismissed because: (1) the Complaint fails to state a claim pursuant to 42 U.S.C. § 1983; (2) Defendants are entitled to qualified immunity; and (3) the First, Second, Third and Fourth causes of action are barred by the applicable statute of limitations. Dkt. No. 50.

### V. Discussion

### A. Statute of limitations

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 815724 (N.D.N.Y.)
(Cite as: 2009 WL 815724 (N.D.N.Y.))

The applicable statute of limitations for Section 1983 actions arising in New York requires claims to be brought within three years. *Pinaud v. County of Suffolk,* 52 F.3d 1139, 1156 (2d Cir.1995) (citing *Owens v. Okure,* 488 U.S. 235, 250-51, 109 S.Ct. 573, 582, 102 L.Ed.2d 594 (1989); *Eagleston v. Guido,* 41 F.3d 865, 871 (2d Cir.1994)).

*6 Defendants assert that Plaintiff's action was filed with the Court on January 4, 2008, and that therefore Plaintiff's first, second, third, and fourth causes of action should be dismissed as time-barred. Dkt. No. 50-2, Memorandum of Law at 26. However, because Plaintiff is an inmate, his pleading is deemed "filed" when it is delivered to prison officials. *Dory v. Ryan,* 999 F.2d 679, 682 (2d Cir.1993); *Pritchard v. Kelly,* 9:98-CV-0349, 2000 WL 33743378, at *2 n. 2 (N.D.N.Y. Oct.3, 2000) (Sharpe, M.J.). The date the plaintiff signed the complaint is presumed to be the date the plaintiff gave the complaint to prison officials to be mailed. *Mingues v. Nelson,* 96-CV-5397, 2004 WL 324898, at *3 (S.D.N.Y. Feb.20, 2004). In this case, Plaintiff signed his Complaint on December 25, 2007. Comp. at 52. Accordingly Plaintiff may not prevail on any claims asserted in his Complaint which occurred prior to December 25, 2004.

Plaintiff's first cause of action asserts allegations against Defendants Burge and Bellnier concerning wrongdoing that occurred on November 4, 2004, **but also alleges** that Burge and Bellnier were "responsible for massive corruption at Auburn from September 17, 2004 continuing **until March 8, 2005.** Comp. at 11-13. The alleged wrongdoing in Plaintiff's second, third, and fourth causes of action occurred, if at all, on December 29, 2004 and January 4, 2008. Accepting Plaintiff's allegations as true, the Court cannot conclude at this juncture that the allegations set forth in the first through fourth causes of action are time-barred.[FN6] Defendants' Motion to Dismiss portions of Plaintiff's Complaint as untimely is denied **without prejudice.**

FN6. The sufficiency of Plaintiff's allegations will be discussed below.

**B. Personal Involvement**

To state a viable claim under Section 1983, a plaintiff must allege that the defendant, while acting under color of state law, deprived him of a right, privilege or immunity secured by the Constitution or by the laws of the United States. *See* 42 U.S.C. § 1983. The personal involvement of a defendant is a prerequisite for the assessment of damages in a Section 1983 action, *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), and the doctrine of respondeat superior is inapplicable to Section 1983 claims. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 453, 70 L.Ed.2d 509 (1981); *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973). "Further, a Section 1983 plaintiff must 'allege a tangible connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas,* No. 04-CV7263, 2008 WL 857528, at *2 (S.D.N.Y. Mar.31, 2008) (citing *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986) (other citation omitted). Any complaint that fails to allege personal involvement is "fatally defective on its face." *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 886 (2d Cir.1987) (internal quotations and citations omitted).

A defendant is "personally involved" if he or she "directly participated in the infraction." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Also, a defendant in a supervisory capacity may be "personally involved" within the meaning of Section 1983 if the state actor (1) failed to remedy the wrong after learning of the violation through a report or appeal; (2) created or continued a custom or policy under which unconstitutional practices ensued; or (3) was grossly negligent in managing subordinates who caused the unlawful condition or event. *Id.*

*7 Plaintiff has named supervisory personnel as Defendants and attempts to hold them liable for alleged violations of his rights by Department of Corrections employees. Plaintiff alleges, among other things, that Burge and Bellnier failed to stop "breaches of security" including spanish inmates from giving Plaintiff ketchup contaminated with blood (Comp. at 11-12); Burge, Goord, and LeClaire did nothing to stop "the spanish inmates" from tampering with Plaintiff's food and mail and disseminating Plaintiff's personal information (Comp. at 13); Burge was involved in a "massive conspiracy" to keep Plaintiff on mental health status and medicated (Comp. at 15); Wright, LeClaire, Goord, Burge, and Bellnier and "all staff at Central Office were made aware

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 815724 (N.D.N.Y.)
(Cite as: 2009 WL 815724 (N.D.N.Y.))

of all infections and did nothing at all" (Comp. at 15-16); LeClaire, Goord, Eagan, Bellamy, and Wright are responsible for Plaintiff's injuries because "they did nothing and knew of all crimes being done to [Plaintiff]" and did not stop the crimes or the "massive infections" (Comp. at 17). Plaintiff's vague allegations that he let the supervisory Defendants and all Central Office staff know about the conspiracy and crimes against him is insufficient to provide the type of notice that would have required these Defendants to act. Moreover, none of these Defendants can be held personally liable merely because they were in a high position of authority. *See Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985) ("[P]laintiff's claim for monetary damages against [the Commissioner] requires a showing of more than linkage in the prison chain of command.").

The Court has reviewed the Complaint in its entirety and afforded it great liberality but is unable to find any allegations to suggest that any of the supervisory Defendants-Burge, Goord, LeClaire, Bellnier, Wright, Eagan, or Bellamy-were personally involved or directly participated in any violation of Plaintiff's civil or constitutional rights. *See Johnson,* 481 F.2d at 1034 (when monetary damages are sought under Section 1983, the general doctrine of respondeat superior does not suffice and a showing of personal responsibility is required). Defendants Burge, Goord, LeClaire, Bellnier, Wright, Eagan, and Bellamy are **dismissed without prejudice.**[FN7]

FN7. As discussed below, even if Plaintiff could sufficiently allege personal involvement by these Defendants, Plaintiff has failed to state any claim which would entitle him to relief under Section 1983.

**C. Failure to State a Claim**

A court may dismiss an *in forma pauperis* complaint if it determines that the complaint is frivolous. *Neitzke v. Williams,* 490 U.S. 319, 325, 109 S.Ct. 1827, 1833, 104 L.Ed.2d 338 (1989). "An action is frivolous when either: (1) the factual contentions are clearly baseless, such as when allegations are the product of delusion or fantasy; or (2) the claim is based on an indisputably meritless legal theory." *Livingston v. Adirondack Beverage Co.,* 141 F.3d

434, 437 (2d Cir.1998) (internal quotations omitted) (citing *Nance v. Kelly,* 912 F.2d 605, 606 (2d Cir.1990) (per curiam) (quoting *Neitzke,* 490 U.S. at 327, 109 S.Ct. at 1833)).

*8 A complaint is factually frivolous if the facts alleged are clearly baseless, a category that includes allegations that are fanciful, fantastic, and delusional. *Denton v. Hernandez,* 504 U.S. 25, 32-33, 112 S.Ct. 1728, 1733, 118 L.Ed.2d 340 (1992) (citing *Neitzke,* 490 U .S. at 325-28, 109 S.Ct. at 1833). "[A] finding of factual frivolousness is appropriate when the facts alleged rise to the level of the irrational or the wholly incredible, whether or not there are judicially noticeable facts available to contradict them." *Denton,* 504 U.S. at 33, 112 S.Ct. at 1733. A complaint is based on an "indisputably meritless" legal theory when either the claim lacks an arguable basis in law, *Benitez v. Wolff,* 907 F.2d 1293, 1295 (2d Cir.1990) (per curiam), or a dispositive defense clearly exists on the face of the complaint. *See Pino v. Ryan,* 49 F.3d 51, 53 (2d Cir.1995). Although the Court must accept the truth of Plaintiff's allegations on a motion to dismiss, the federal *in forma pauperis* statute grants the Court "the unusual power to pierce the veil of the complaint's factual allegations and dismiss those claims whose factual allegations are clearly baseless." *Neitzke,* 490 U.S. at 327, 109 S.Ct. at 1833.

Moreover, the law in this Circuit clearly provides that "complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Hunt v. Budd,* 895 F.Supp. 35, 38 (N.D.N.Y.1995) (McAvoy, C.J.) (citing *Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987) (other citations omitted)); *Pourzandvakil v. Humphry,* 94-CV-1594, 1995 WL 316935, at *7 (N.D.N.Y. May 22, 1995) (Pooler, J.) (citation omitted).

**1. Eighth Amendment**

The Eighth Amendment prohibits cruel and unusual punishment which encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 815724 (N.D.N.Y.)
(Cite as: 2009 WL 815724 (N.D.N.Y.))

*Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290-91, 50 L.Ed.2d 251 (1976) (citations and quotations omitted). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement-the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference." *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (quoting *Wilson v. Seiter,* 501 U.S. 294, 297-98, 111 S.Ct. 2321, 2323-24, 115 L.Ed.2d 271 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.). Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979.

*9 Plaintiff alleges multiple violations of his Eighth Amendment rights. Plaintiff claims that Defendants were deliberately indifferent to his health and safety because they purposely infected him with and then denied him treatment for three "life-time" viruses, served him contaminated food, and subjected him to excessive force.

**a. Medical claims**

Generally, to prevail on a claim of inadequate medical care under the Eighth Amendment, a plaintiff must show two things: (1) that the plaintiff had a *sufficiently serious* medical need; and (2) that the defendant was *deliberately indifferent* to that serious medical need. *Estelle,* 429 U.S. at 104, 97 S.Ct. at 290-91. Mere disagreement with prison officials about what constitutes appropriate medical care does not state a cognizable claim under the Eighth

Amendment. *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.1992). Prison officials have broad discretion in determining the nature and the character of medical treatment afforded to inmates. *Id.* (citations omitted). An inmate does not have the right to treatment of his choice. *Id.* at 45 (citing *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986); *Jackson v. Fair,* 846 F.2d 811, 817-18 (1st Cir.1988)). "Further, a delay in treatment does not violate the constitution unless it involves an act or failure to act that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Thomas v. Nassau County Correctional Center,* 288 F.Supp.2d 333, 339 (E.D.N.Y.2003) (citation omitted). "The Second Circuit has 'reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment, ignored a life threatening and fast-degenerating condition for three days, or delayed major surgery for over two years.' " *Thomas,* 288 F.Supp.2d at 339 (citing *Espinal v. Coughlin,* 98 Civ. 2579, 2002 WL 10450, at *3 (S.D.N.Y. Jan.3, 2002)). Even if a prisoner is able to establish delay, in order to establish deliberate indifference, he must also show that his condition became worse or deteriorated as a result of the delay. *Thomas,* 288 F.Supp.2d at 339.

Plaintiff alleges that Defendants were deliberately indifferent to his serious medical needs when they gave him a "medical resource drink" containing blood and feces (fourth cause of action); intentionally infected him with Hepatitis A and then denied testing and medical treatment for the disease (sixth and thirteenth causes of action); infected him with H. Pylori (fourteenth cause of action); and served Plaintiff water intentionally contaminated with chemicals (twenty-first cause of action). Plaintiff also alleges that the supervisory Defendants allowed spanish inmates and corrupt correctional officers to contaminate his food tray with blood, semen, urine, and chemicals. These allegations are so fantastic or incredible as to be factually frivolous. Moreover, with respect to the sixth, thirteenth, and fourteenth causes of action, Plaintiff has failed to allege a tangible connection between the acts of any of the Defendants named in those causes of action and the injuries suffered by Plaintiff. Accordingly, Plaintiff's fourth, sixth, thirteenth, fourteenth, and twenty-first causes of action are dismissed **without prejudice.**

*10 Plaintiff also alleges that he was unable to have his blood tested on January 23, 2005 because Defendants Meyers and Toomey destroyed the paper instructing

Slip Copy, 2009 WL 815724 (N.D.N.Y.)
(Cite as: 2009 WL 815724 (N.D.N.Y.))

Plaintiff to fast before the test (eighth cause of action). Finally, Plaintiff alleges that on January 26, 2005, Defendant Vega destroyed the results from Plaintiff's stool sample to cover up the conspiracy by spanish inmates and officers (ninth cause of action). Plaintiff does not, however allege that any of these actions resulted in a delay in treatment which was life-threatening or that Plaintiff was ultimately denied medical treatment because of these acts. *See, e.g. Amaker v. Coombe,* No. 96 Civ. 1622, 2002 WL 523388, at *8 (S.D.N.Y. Mar. 29, 2002) ("delay in treatment does not automatically indicate a violation of a prisoner's Eighth Amendment rights, 'unless the delay reflects deliberate indifference to a serious risk of health or safety, to a life-threatening or fast-degenerating condition or to some other condition of extreme pain that might be alleviated through reasonably prompt treatment.' "). Moreover, Plaintiff's claims against Defendants Meyers, Toomey, and Vega when read in their entirety are, as all of Plaintiff's claims in this Complaint, factually frivolous. Plaintiff alleges that the actions of these Defendants were part of the massive conspiracy to deliberately infect Plaintiff with viruses and then deny him proof that he had such viruses or treatment for the viruses. Plaintiff's eighth and ninth causes of action are also **dismissed without prejudice.**

**b. Food contamination**

In the context of Eighth Amendment protections, prisoners are to be provided with "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) (citation omitted); *see also Lunney v. Brureton,* No. 04 Civ. 2438, 2005 WL 121720, at *6 (S.D.N.Y. Jan.21, 2005). Consequently, "[d]epriving an inmate of food or serving him contaminated food may constitute a violation of the Eighth Amendment." *Moncrieffe v. Witbeck,* No. 97-CV-253, 2000 WL 949457, at *6 (N.D.N.Y. June 29, 2000) (citing *Robles v. Coughlin,* 725 F.2d at 15). However, as with most of his medical claims, Plaintiff's allegations that his food was contaminated with blood (sealed in packaged ketchup); feces; urine; semen; and chemicals are so conclusory and fantastic as to rise to the level of factually frivolous. Accordingly, these allegations are dismissed **without prejudice.**

**c. Excessive force**

While the Eighth Amendment protects a prisoner against the excessive use of force, it "excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind ." *Branham v. Meachum,* 77 F.3d 626, 630 (2d Cir.1996) (quoting *Hudson v. McMillian,* 503 U.S. 1, 9-10, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (other quotations omitted)). A truly *de minimis* use of force will rarely suffice to state a constitutional claim. *Hudson,* 503 U.S. at 9-10, 112 S.Ct. at 1000 ("[Not] every malevolent touch by a prison guard gives rise to a federal cause of action."); *Johnson,* 481 F.2d at 1033 ("Not every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights").

**\*11** Plaintiff alleges that Defendants Portnoy and Correctional Officer Smith "put the black strap" on Plaintiff's hands when transporting him from sick call to his cell. Comp. at 27. The restraining of Plaintiff's hands with a black strap on one occasion during transport from sick call to his cell is a *diminimis* use of force at best and does not allege conduct which is "repugnant to the conscience of mankind." Plaintiff's excessive force claims against Portnoy and Correctional Officer Smith are **dismissed without prejudice.** [FN8]

> [FN8]. To the extent that Plaintiff claims to have suffered emotional and mental harm for the alleged use of force by Defendants Portnoy and Smith, Plaintiff fails to state a claim upon which relief may be granted. *See* 42 U.S.C. § 1997e(e) (No Federal civil action may be brought by a prisoner confined in a jail, prison or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury).

Plaintiff also alleges that once back at his cell, he held his hands out through the food slot to have the black strap removed and "all officers which [Plaintiff] didn't name in this law suit started pulling his hands and arms really hard trying to break them and [his] wrists also." Comp. at 27-28. Since Plaintiff has not named any of the officers

Slip Copy, 2009 WL 815724 (N.D.N.Y.)
(Cite as: 2009 WL 815724 (N.D.N.Y.))

responsible for this incident, this claim is also dismissed **without prejudice.**

Defendants' Motion to Dismiss Plaintiff's excessive force claims is granted and those claims (seventeenth and eighteenth causes of action) are dismissed **without prejudice.**

**2. Retaliation**

When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under § 1983 lies. *See Franco v. Kelly,* 854 F.2d 584, 588-90 (2d Cir.1988). Courts must approach claims of retaliation " 'with skepticism and particular care' because 'virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.' " *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (quoting *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), overruled on other grounds by *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)).

In order to survive a motion to dismiss a complaint, a plaintiff asserting a First Amendment retaliation claim must advance "non-conclusory" allegations establishing:

> (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech [or conduct] and the adverse action.

*Davis,* 320 F.3d at 352 (quoting *Dawes,* 239 F.3d at 492). "[A] complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone." *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983).

Plaintiff alleges that he was retaliated against for filing grievances and complaints (third, seventh, tenth, nineteenth, and twentieth causes of action). Since the filing of prison grievances is a constitutionally protected activity, Plaintiff meets the first prong of the retaliation test. *See Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996); *Franco,* 854 F.2d at 590.

**\*12** Plaintiff has not proffered non-conclusory allegations showing a causal connection between any of the alleged retaliatory conduct with any of Plaintiff's grievances. More importantly, the retaliatory conduct alleged-which includes intentionally infecting Plaintiff with viruses; contaminating his food with blood, urine, semen, and chemicals; and murdering his whole family-are so outrageous and unbelievable as be factually frivolous. Plaintiff's retaliation claims are **dismissed without prejudice** in their entirety.

**3. Denial of access to the courts**

Inmates have a First Amendment right to "petition the Government for a redress of grievances." This right, which is more informally referred to as a "right of access to the courts," requires States "to give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights." *Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), *modified on other grounds, Lewis v. Casey,* 518 U.S. 343, 350, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996); *see also Bourdon v. Loughren,* 386 F.3d 88, 92 (2d Cir.2004) (citations omitted). "However, this right is not 'an abstract, freestanding right to a law library or legal assistance' and cannot ground a Section 1983 claim without a showing of 'actual injury.' " *Collins v. Goord,* 438 F.Supp.2d 399, 415 (S.D.N.Y.2006) (quoting *Lewis,* 518 U.S. at 351). As a result, to state a claim for denial of access to the courts, a plaintiff must assert non-conclusory allegations demonstrating both (1) that the defendant acted deliberately and maliciously, and (2) that the plaintiff suffered an actual injury." *Lewis,* 518 U.S. at 353; *Renelique v. Duncan,* 03-CV1256, 2007 WL 1110913, at \*9 (N.D.N.Y. Apr.12, 2007) (Strom, J.) (same) (citing *Howard v. Leonardo,* 845 F.Supp. 943, 946 (N.D.N.Y.1994)).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 815724 (N.D.N.Y.)
(Cite as: 2009 WL 815724 (N.D.N.Y.))

Plaintiff alleges that Defendant Meyers denied Plaintiff access to the courts by destroying Plaintiffs' free legal postage mail, including Plaintiff's Article 78 motions (eleventh cause of action). Comp. at 19-20. Plaintiff does not allege any actual injury as a result of Defendant's alleged conduct. Plaintiff fails to state a claim for denial of access to the Courts, and therefore his eleventh cause of action is dismissed **without prejudice.** *See Lewis,* 518 U.S. at 351, 116 S.Ct. at 2180 (to state a constitutional claim for denial of access to the courts, a plaintiff must make a showing that he has suffered, or will imminently suffer, actual harm; that is, that he was "hindered [in] his efforts to pursue a legal claim"); *accord Morello v. James,* 810 F.2d 344, 347 (2d Cir.1987).

**4. Conspiracy claims under Sections 1983 and 1985**

To survive a motion to dismiss, a conspiracy claim under § 42 U.S .C.1983 must allege that: (1) an agreement existed between two or more state actors to act in concert to inflict an unconstitutional injury on plaintiff and (2) an overt act was committed in furtherance of that goal. *Ciambriello v. County of Nassau,* 292 F.3d 307, 324-25 (2d Cir.2002); *see also Concepcion v. City of New York,* No. 05 Civ. 8501, 2008 WL 2020363, at *5 (affirming the continued viability of the *Ciambriello* standards when analyzing a conspiracy claim *vis a vis* a motion to dismiss).[FN9] Vague and conclusory allegations that defendants have engaged in a conspiracy must be dismissed. *Ciambriello,* 292 F.3d at 325; *see also Sommer v. Dixon,* 709 F.2d 173, 175 (2d Cir.1983) ("A complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss."); *Brown v. City of Oneonta,* 106 F.3d 1125, 1133 (2d Cir.1997) (complaints containing only conclusory, vague or general allegations of a conspiracy to deprive a person of constitutional rights do not state a claim for relief). Moreover, a Section 1983 conspiracy claim must not only allege a conspiracy, but also the "actual deprivation of constitutional rights." *Romer v. Morgenthau,* 119 F.Supp.2d 346, 363-64 (S.D.N.Y.2000) (citing *Malsh v. Austin,* 901 F.Supp. 757, 765 (S.D.N.Y.1995). "Thus, if a plaintiff cannot sufficiently allege a violation of his rights, it follows that he cannot sustain a claim of conspiracy to violate those rights." *See id.*

FN9. The *Concepcion* Court stated that "in accord with Supreme Court precedent as well as the overwhelming weight of authority in this Circuit, this Court applies the *Ciambrello* standard in evaluating the sufficiency of the conspiracy claim ... under the Rule 12(b)(6) standard. In this regard ... the Court notes that it does not construe the decision in *Ciambrello* as imposing a 'heightened pleading requirement [ ]' for civil rights conspiracy claims ... nor a requirement that plaintiff must plead 'specific facts' to support his claim.... Rather, it reads *Ciambrello* as informing this Court's understanding of the type of factual allegations that are minimally sufficient to state a 'plausible' conspiracy claim under § 1983." *Concepcion,* 2008 WL 2020363, at * 5.

*13 Plaintiff alleges in conclusory fashion that all of the Defendants were involved in a massive conspiracy against Plaintiff. Plaintiff does not assert any facts giving rise to a conspiracy, but instead makes vague and shocking statements about a massive conspiracy involving Defendants, spanish inmates, and corrupt officers. Plaintiff has not alleged, except in conclusory fashion, that any meeting of the minds occurred between any of the Defendants. The Complaint does not contain any allegations to support a "plausible" conspiracy claim involving any of the Defendants. "[A]lthough a plaintiff does not need to provide detailed factual allegations, the allegations in the complaint must be 'enough to raise a right to relief above the speculative level.' " *Flores v. Levy,* No. 07-CV-3753, 2008 WL 4394681, at *9 (E.D.N.Y. Sep. 23, 2008) (citing *Bell Atlantic Corp.,* 127 S.Ct. at 1965).

Plaintiff also asserts conspiracy claims under 42 U.S.C. § 1985(3). To state a claim under 42 U.S.C.1985(3) a plaintiff must allege:

" '(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of the citizens of the United States.' " *Fox v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 815724 (N.D.N.Y.)
(Cite as: 2009 WL 815724 (N.D.N.Y.))

*City of New York,* No. 03 Civ. 2268, 2004 WL 856299, at *9 (S.D.N.Y. Apr. 20, 2004) (quoting *Mian [v. Donaldson, Lufkin & Jenrette Sec. Corp.],* 7 F.3d [1085,] 1087-88 [ ( 2d Cir.1993) ] ).

*Mione v. McGrath,* 435 F.Supp.2d 266, 271-72 (S.D.N.Y.2006). Under § 1985(3), the language requiring intent to deprive of equal protection of the laws "means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirator's action." *Segreto v. Kirschner,* 977 F.Supp. 553, 565 (D.Conn.1997) (quoting *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971)).

However, "[a]s the Second Circuit has noted repeatedly, conspiracy claims are to be viewed with skepticism and must be supported by more than mere conclusory allegations." *Webb,* 340 F.3d at 110 ("In order to maintain an action under Section 1985, a plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end.") (internal quotation marks omitted). Plaintiff's conclusory allegations of a conspiracy against him fail to provide any factual basis to plausibly support a meeting of the minds between the Defendants or that Defendants entered into an agreement to violate Plaintiff's rights.

Finally, even if Plaintiff's allegations of conspiracy were found to be more than merely conclusory, Plaintiff's conspiracy claims are barred by the "intra-corpo rate conspiracy" doctrine, also sometimes referred to as the intraenterprise conspiracy doctrine. The "intracorporate conspiracy" doctrine provides that a corporation or public entity "generally cannot conspire with its employees or agents as all are considered a single entity." *Everson v. New York City Transit Auth.,* 216 F.Supp.2d 71, 76 (E.D.N.Y.2002) (citation omitted); *see also Orafan v. Goord,* 411 F.Supp.2d 153, 165 (N.D.N.Y.2006) (holding that the conspiracy claim failed because the alleged co-conspirators were all DOCS officials and employees acting within the scope of their employment) (internal citations and quotations omitted), vacated and remanded on other grounds by *Orafan v. Rashid,* 249 Fed. Appx. 217, 2007 WL 2875968 (2d Cir.2007). An exception exists if the individuals are motivated by personal

interests, separate and apart from the entity. *Orafan,* 411 F.Supp.2d at 165. To allege facts plausibly suggesting that defendants were pursuing personal interests, more is required than merely alleging defendants were motivated by personal bias. *See Peters v. City of New York,* 04-CV-9333, 2005 WL 387141, at *3 (S.D.N.Y. Feb.16, 2005) ("[P]ersonal bias is not the sort of individual interest that takes a defendant out of the intraenterprise conspiracy doctrine") (internal quotation marks and citation omitted); *accord, Johnson v. City of New York,* 01-CV-1860, 2004 WL 502929, at *5 (E.D.N.Y. Jan.12, 2004).

**\*14** In this case, all of the Defendants were DOCS employees during the period set forth in the Complaint and all were acting within the scope of their employment. Therefore, the intra-corporate conspiracy doctrine applies. Additionally, Plaintiff has not alleged facts to plausibly suggest that the exception to the intra-corporate conspiracy doctrine applies.

For all of the foregoing reasons, Plaintiff's conspiracy claims (the fifth and sixteenth causes of action) are **dismissed** in their entirety **without prejudice.**

**5. Due process**

To state a claim for violation of procedural due process, Plaintiff must allege first that he had a protected liberty interest and, second, if he had such an interest, that he was deprived of that interest without being afforded due process of law. *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997); *see generally Wolff v. McDonnell,* 418 U.S. 539, 557, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

Plaintiff alleges that Defendant Burge violated Plaintiff right to due process because he was involved in "massive conspiracy" to keep Plaintiff on mental health status and medicated in order to silence Plaintiff (fifth cause of action). Comp. at 15. This claim is dismissed as conclusory and for failure to state any sort of claim for denial of due process.

Plaintiff also alleges that Defendants Eagen, Bellamy, and

Slip Copy, 2009 WL 815724 (N.D.N.Y.)
(Cite as: 2009 WL 815724 (N.D.N.Y.))

Burge denied Plaintiff due process by having in place a "grievance program [that is] not fair and effective." (fifteenth cause of action). Comp. at 22-23. Inmates do not have a constitutional right to have grievances processed or to ensure that grievances are processed properly. *See e.g.* *Torres v. Mazzuca,* 246 F.Supp.2d 334, 342 (S.D.N.Y.2003) (prison grievance procedures do not confer any constitutionally protected right on an inmate). A violation of the inmate grievance procedures does *not* give rise to a claim under Section 1983. *Cancel v. Goord,* No. 00 Civ.2042, 2001 WL 303713, at *3 (S.D.N.Y. Mar. 29, 2001). Thus, Plaintiff's claims regarding the unfairness of the grievance process are dismissed.

Finally, Plaintiff alleges that he was subjected to an "atypical and significant hardship" during his SHU incarceration at Auburn in violation of his due process rights (twenty-second cause of action). Comp. at 31. Plaintiff has not however alleged that he received insufficient process prior to being confined in SHU nor does he indicate what Defendants, if any, were personally involved in the alleged denial of due process. Plaintiff fails to allege a plausible claim for denial of due process.

**6. Qualified Immunity**

Defendants raise the affirmative defense of qualified immunity. Dkt. No. 50-2, Memorandum of Law at 24-25. "Qualified immunity is an affirmative defense that shields government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Stephenson v. Doe,* 332 F.3d 68, 76 (2d Cir.2003) (quoting *McCardle v. Haddad,* 131 F.3d 43, 50 (2d Cir.1997) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).

***15** In determining whether qualified immunity applies, the court may first consider whether "the facts alleged show the [defendant's] conduct violated a constitutional right." *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001), modified by *Pearson v. Callahan,* ---U.S. ----, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (holding that although "the sequence set forth [in *Saucier*] is often appropriate, it should no longer be

regarded as mandatory"). If the plaintiff establishes that the violation of a constitutional right occurred, the court can examine "whether the right was clearly established ... in light of the specific context of the case, not as a broad general proposition." *Saucier,* 533 U.S. 194 at 201, 121 S.Ct. 2151, 150 L.Ed.2d 272. "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier,* 533 U.S. at 201, 121 S.Ct. at 2156. Because Plaintiff has not sufficiently alleged that any of the Defendants have violated his constitutional rights, "there is no necessity for further inquiries concerning qualified immunity."

**VI. Conclusion**

Plaintiff's recounting of the facts is conclusory at best and wholly fantastic. Plaintiff claims that he is the target of a "massive conspiracy" to infect him with three "life-time" viruses; contaminate his food; and destroy his mail. Plaintiff claims that spanish inmates have been putting "LA-BINE-YA" on Plaintiff's food tray, which he describes as "sealed ketchup with blood inside." Plaintiff also claims that spanish officers are giving out Plaintiff's personal information; Plaintiff is being kept at "mental health level one" and medicated to prevent him from litigating his actions in the courts; he has been deliberately infected with Hepatitis A, H. pylori, and herpes; and his food has been contaminated with feces, sperm, blood, urine, and chemicals. Additionally, Plaintiff alleges that as part of this conspiracy, his whole family has been murdered. Plaintiff claims that "[t]his is the biggest conspiracy in the history of the United States." Comp. at 26.

Even reading Plaintiff's Complaint in the most generous manner, the Court finds Plaintiff's allegations as a whole to be unbelievable. Moreover, Plaintiff's history of mental illness, as documented in the psychiatric evaluations attached as exhibits to Plaintiff's Complaint (*see* Comp., Exhibits at 8-15), further supports a finding that his allegations are the product of delusion. The Court finds that the Complaint is factually frivolous under the standards delineated in *Denton, Neitzke,* and *Livingston* (*see* Section V.C., *supra* ) and therefore dismisses the Complaint in its entirety.[FN10]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 815724 (N.D.N.Y.)
(Cite as: 2009 WL 815724 (N.D.N.Y.))

> FN10. Since the Complaint has been found to be factually frivolous, it "is exactly the sort of case that the PLRA now requires that a district court dismiss 'before docketing, if feasible' ... [since a]llowing these frivolous suits to proceed would subject the prospective defendants to the type of inconvenience and expense that concerned the Supreme Court in *Neitzke....*" *Jones v. City of New York,* Nos. Civ.A. 99-8281 and Civ.A. CV-00-370, 2000 WL 516889, at *3 (E.D.N.Y. Mar.15, 2000). Moreover, because the problem with Plaintiff's complaint is substantive, such that a better pleading will not cure it, leave to re-plead is denied as futile. *See Cuocco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000).

WHEREFORE, based on the findings above, it is hereby

ORDERED, that Defendants' Motion to Dismiss (Dkt. No. 50) is **GRANTED** and Plaintiff's claims and all Defendants are **dismissed in their entirety without prejudice;**[FN11] and it is further

> FN11. While Defendants Correctional Officer Smith, W. Robinson, and Nurse Smith have not been served or appeared, because all of Plaintiff's claims have been dismissed in their entirety, this action is dismissed as to the unserved Defendants as well.

**\*16** ORDERED that the Clerk shall serve a copy of this Memorandum-Decision and Order upon the parties in accordance with the Local Rules.

N.D.N.Y.,2009.
Brown v. Eagen
Slip Copy, 2009 WL 815724 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

**C**
Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Gabriel MIDALGO, Plaintiff,
v.
Sgt. BASS, Spinner, C.O. Streeter, John Doe,[FN1] Head
Medical Staff, C.O. Bennet,[FN2] Sgt. Trimm, C.O.
Bouyea, Defendants.

> FN1. Defendant John Doe has not been
> identified and therefore has not been served with
> the Amended Complaint or otherwise appeared
> in this action. *See* Dkt No 12.

> FN2. Plaintiff mistakenly spells Defendant
> Bennett's name as "Bennet." *See* Dkt. No. 23,
> Answer at n. 1. The Court will refer to this
> Defendant by the proper spelling.

No. 9:03-CV-1128 (NAM/RFT).

Sept. 26, 2006.

Gabriel Midalgo, Plaintiff, Pro Se.

Eliot Spitzer, Attorney General for the State of New York,
Senta B. Siuda, Esq., Assistant Attorney General,
Syracuse, NY, Attorney for Defendants.

**MEMORANDUM-DECISION AND ORDER**

NORMAN A. MORDUE, Chief U.S. District Judge.

**\*1** Presently before this Court is defendants' motion (Dkt.

No. 105) for summary judgment dismissing the complaint
in this civil rights action pursuant to 42 U.S.C. § 1983. In
his amended complaint (Dkt. No. 8), plaintiff, an inmate
in the custody of the New York State Department of
Correctional Services ("DOCS"), alleges deliberate
indifference towards his health and safety in violation of
the Eighth Amendment, interference with mail and access
to the law library in violation of the First Amendment,
inadequate visitation, and harassment.

Defendants' motion was referred to United States
Magistrate Judge Randolph F. Treece for a Report and
Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B)
and Local Rule 72.3(c). In a thorough Report and
Recommendation (Dkt. No. 110), Magistrate Judge Treece
recommends that the Court grant the motion for summary
judgment. Plaintiff objects (Dkt. No. 112). After the Court
extended time for plaintiff to file additional objections to
the Report-Recommendation (Dkt. No. 113), plaintiff filed
a second objection (Dkt. No. 114).

Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court conducts
a *de novo* review of those parts of a magistrate judge's
Report and Recommendation to which a party specifically
objects. Where only general objections are filed, the Court
reviews for clear error. *See Brown v. Peters,* 1997 WL
599355,*2-* 3 (N.D.N.Y.), *aff'd without op.,* 175 F.3d
1007 (2d Cir.1999). Failure to object to any portion of a
Report and Recommendation waives further judicial
review of the matters therein. *See Roldan v. Racette,* 984
F.2d 85, 89 (2d Cir.1993).

Plaintiff's objections include a variety of allegations. A
number of them revisit issues which are the subject of the
Report and Recommendation. They do not, however,
demonstrate the existence of material questions of fact
which would warrant denial of summary judgment. Other
allegations concern events allegedly occurring subsequent
to the filing of the amended complaint herein; these are
not properly the subject of this action. Upon thorough *de
novo* review, the Court accepts and adopts the Report and
Recommendation.

It is therefore

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

ORDERED that the Report and Recommendation (Dkt. No. 110) is accepted and adopted in its entirety; and it is further

ORDERED that defendants' motion for summary judgment (Dkt. No. 105) is granted and the action is dismissed.

IT IS SO ORDERED.
RANDOLPH F. TREECE, Magistrate Judge.

**REPORT-RECOMMENDATION and ORDER**

Pro se Plaintiff Gabriel Midalgo brings a civil action pursuant to 42 U.S.C. § 1983, alleging deliberate indifference towards his health and safety in violation of the Eighth Amendment, interference with mail and access to the law library in violation of the First Amendment, inadequate visitation, and harassment. Dkt. No. 8, Am. Compl. at ¶¶ 42-54. Defendants Bass, Sergeant at the Upstate Correctional Facility ("Upstate"), Correction Officer ("C.O.") Spinner, C.O. Streeter, C.O. Bennett, Trimm, Sergeant at Upstate, and C.O. Bouyea, bring this Motion for Summary Judgment. Dkt. No. 105. Plaintiff opposes the Motion. Dkt. No. 106. For the reasons to follow, it is recommended that the Motion for Summary Judgment be **granted.**

**I. FACTS**[FN3]

FN3. Plaintiff's response to the Motion for Summary Judgment fails to comport with the requirements of the Local Rules for the Northern District of New York. Plaintiff only submitted a Memorandum of Law and some Exhibits but did not provide a Statement of Material Facts as required. See N.D.N.Y.L.R. 7.1(a). Normally, if no Statement of Material Facts are filed, Defendants' Statement of Material Facts are deemed admitted. N.D.N.Y.L.R. 7.1(a)(3). This Court, nonetheless, will proceed to decide this Motion with the aid of Defendants' Statement of

Material Facts with accompanying Exhibits and Plaintiff's Verified Amended Complaint with Exhibits. Although no exhibits were attached to the Amended Complaint on the Docket Report, attachments were available with the Original Complaint and will hereby be incorporated into the Amended Complaint. See Dkt. Nos. 1 & 8.

**\*2** During the period of time of the alleged incidents, Plaintiff was incarcerated at the Upstate Correctional Facility. Dkt. No. 105, Defs.' 7.1 Statement at ¶ 3. In December 2002, an inmate was placed in Plaintiff's cell who Plaintiff alleges "was a paid informant." Am. Compl. at ¶ 16. Plaintiff further alleges that a wiretap was also placed in his cell during that time. Id. On February 4, 2003, Plaintiff wrote letters to the mail clerk and warden regarding his misplaced or delayed newspaper and magazine subscriptions and was told that they were handed out by correction officers. Id. at ¶ 23, Ex. C, Lt. to Warden, dated Feb. 4, 2003; Lt. to Mail Clerk, dated Feb. 4, 2003; Lt. from Nason to Midalgo, dated Feb. 10, 2003. Plaintiff believed his subscriptions had been misplaced or delayed since January 2003. Id. at ¶ 22. Plaintiff's complaints about his subscriptions were forwarded to the Deputy Superintendent of Programs. Id. at ¶ 23, Ex. C, Lt. from Girdich to Midalgo, dated Feb. 5, 2003. Several months later, Plaintiff alleged he still had not received his magazines and newspapers and thus canceled his subscriptions. Id. at ¶ 24, Ex. C, Lts. to F.H.M. & Maxim, dated Apr. 21, 2003. Then, on April 20, 2003, Plaintiff's family arrived for a visit but were delayed for several hours in seeing him. Id. at ¶ 25. Plaintiff also claims that on April 24, 2003, and from June to September 2003, he received rotten fruits and vegetables and spoiled milk at meal time on several occasions.[FN4] Id. at ¶¶ 26 & 28. On April 26, 2003, Plaintiff wrote a complaint where he grieved that an officer took an excessive amount of time to read his legal mail, he received rotten food, there was a delay in visitation with his family, magazine and newspapers were intercepted and either destroyed or misplaced, his cell was wiretapped, and the outgoing and incoming mail was being read. Id., Ex. A, Grievance, dated Apr. 26, 2003. Since Plaintiff received no response, he submitted a letter seeking an appeal to the Superintendent.[FN5] Id., Grievance Lt., dated May 27, 2003.

FN4. Plaintiff does not provide any specific dates as to when he received rotten or spoiled

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

food.

FN5. It is unknown to this Court whether a response from the Superintendent was received.

On June 21, 2003, Plaintiff filed a grievance concerning "continuous harassment" regarding Plaintiff's legal mail as well as complaints made about his food and recreation. Defs.' 7.1 Statement, Ex. A, Grievance, dated June 21, 2003, & Case History & Record, UST 16208-03. C.O. Streeter provided a memo based on Plaintiff's grievance stating that he did not provide Plaintiff with spoiled food and that the meal "is inspected and packed in the mess" and then it is inspected once again by him prior to going into Plaintiff's cell. *Id.,* Ex. A, Streeter Lt. to Sgt. King, dated July 20, 2003. Correction Officers Spinner and Trimm also submitted memos regarding the grievance and noted they did not refuse recreation time and the grievance may have been a result of a misbehavior report filed against Plaintiff. *Id.,* Ex. A, Spinner Lt. to Sgt. King, dated July 23, 2003, & Trimm Lt. to Sgt. King, dated July 29, 2003. Sergeant King then submitted a memo to Captain Bezio stating that after he spoke to Plaintiff, and after interviewing several corrections officers on the matter, he could find no evidence to support the allegations. *Id.,* Ex. A, Sgt. King Lt. to Captain Bezio, dated Aug. 1, 2003. Based on the above investigation, the Inmate Grievance Resolution Committee ("IGRC") recommended that the grievance complaint pass through to the Superintendent. *Id.,* Ex. A, Case History & Record on Grievance dated June 21, 2003. Thereafter, the Superintendent found that the complaint had been investigated and that there was "no evidence to support [the] complaint[.]" *Id.,* Ex. A, Superintendent's Appeal, dated Aug. 6, 2003. Plaintiff then appealed to the Central Office Review Committee ("CORC"). The CORC made several findings which included that the Superintendent's determination be upheld based on the same reasoning provided by the Superintendent and that there was no substantiation to the claim that Plaintiff was harassed nor was there sufficient evidence to conclude there was harassment and that performance of the employees' duties should not be construed as harassment.FN6 *Id.,* Ex. A, CORC Appeal, dated Oct. 1, 2003.

FN6. The CORC also stated that no grievances were received by the IGRC in April or May 2003, as Plaintiff has alleged he filed grievances during those months. Defs.' 7.1 Statement, Ex. A, CORC Appeal, dated Oct. 1, 2003; Am. Compl., Ex. A; *see also supra* p. 3.

**\*3** On June 27, 2003, a Fight Investigation Form was prepared by Sergeant Bass. Am. Compl., Ex. "Exhaustion of my Administrative Remedies ... [with fight investigation] ...," Fight Investigation Form, dated June 27, 2003. The form had a notation stating that Midalgo purportedly was defending himself in a fight he had with his cellmate because they had been in rival gangs. *Id.* The Sergeant's assessment was that it was a real fight and they were in rival gangs. *Id.* After the fight, Midalgo and his cellmate were placed in different cells. *Id.*

On July 1, 2003, Plaintiff sent Captain Bezio a letter stating that a known enemy had been placed in his cell and that his cell had been searched and that no contraband slip was received by Plaintiff.FN7 Defs.' 7.1 Statement, Ex. A, Pl.'s Lt., dated July 1, 2003. Captain Bezio responded stating that an investigation had been completed as to the issues Plaintiff had raised. *Id.,* Ex. A, DOCS Lt. from Captain Bezio, dated July 14, 2003. In Captain Bezio's letter, he noted that Sergeant Trimm interviewed Plaintiff about the missing materials but that Plaintiff did not provide any information. *Id.* Furthermore, the facility records were reviewed and it was found that there were no documented enemies of Plaintiff at the facility. *Id.*

FN7. It is unclear to this Court as to which cellmate Plaintiff referred to as a known enemy in the grievance.

On July 10, 2003, Plaintiff filed a grievance regarding bunking with an alleged known enemy, harassment, and other complaints. *Id .,* Ex. A, Grievance, dated July 10, 2003. C.O. Spinner submitted a memo to Sergeant Trimm stating that no legal material was removed from the cell and only items which were of excess were removed and logged, for which Plaintiff received a copy. *Id.,* Ex. A, Spinner Lt. to Sgt. Trimm, dated July 6, 2003. The Cell Search or Inspection Notice listed the items that were removed. *Id.,* Ex. A, Cell Search or Inspection Notice, dated June 27, 2003. Similarly, Sergeant Trimm sent a memo to Captain Bezio on July 6, 2003, stating that he

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

had interviewed Plaintiff and that Plaintiff could provide no information as to the law books removed or any legal work that was missing. *Id.,* Ex. A, Sgt. Trimm Lt. to Captain Bezio, dated July 6, 2003. In addition, Trimm stated that Midalgo was not in a cell with a known enemy. *Id.* The IGRC recommended that the grievance complaint filed pass through to the Superintendent. *Id.,* Ex. A, Case History & Record for Grievance dated July 10, 2003. The Superintendent found that after an investigation, there was no evidence to show that Plaintiff was placed in a cell with a known enemy and that inmates are bunked together based on "[a]n assessment of compatibility" and that there was no evidence to support any of the other complaints. *Id.,* Ex. A, Superintendent's Appeal, dated July 15, 2003. Plaintiff appealed to the CORC, which found the complaint to be without merit.[FN8] *Id.,* Ex. A, CORC Appeal, dated Aug. 20, 2003.

> [FN8.] Once again, the CORC noted that IGRC had not received grievances on April 26 or June 21, 2003, as Plaintiff has alleged he filed grievances on those dates. Am. Compl. at ¶ 27; Defs.' 7.1 Statement, Ex. A, CORC Appeal, dated Aug. 20, 2003.

On July 17, 2003, Plaintiff wrote to food services stating he was receiving spoiled food. Am. Compl., Ex. "Exhaustion of my Administrative Remedies Some Material Lost ...," Food Services Lt., dated July 17, 2003. On August 5, 2003, in a letter from Captain Racette to Plaintiff, Captain Racette stated that after conducting an investigation "a check with the messhall indicates that the trays were received in the proper condition" and that no other inmate had any problems with the trays. *Id.,* Ex. "Exhaustion of my Administrative Remedies Some Material Lost ...," Mem. from Captain Racette, dated Aug. 5, 2003.

*4 On July 28, 2003, Plaintiff received a letter stating two books he was requesting from the law library were not required to be provided by the facility's law library and that the other book he sought should be available and if it was missing, then a replacement would be ordered. *Id.,* Ex. D, Lt. from Litzenberger, dated July 28, 2003. On August 3, 2003, Plaintiff wrote a letter to Jean Botta stating that the library staff was refusing to provide him with a law book and that he had been told that two books

were not available at the facility.[FN9] *Id.,* Ex. D, Lt. to Botta, dated Aug. 3, 2003. Then, on August 4, 2003, Plaintiff submitted a letter to "D.S.G. Kiebert" stating he was receiving the wrong books and cases from the law library.[FN10] *Id.,* Ex. C, Lt., dated Aug. 4, 2003. He also noted that he did not receive a law book that was supposed to be available. *Id.* On August 5, 2003, Midalgo received a memo from Captain Racette stating that his complaints were investigated and that when Plaintiff was interviewed, he did not provide any further information, which resulted in a finding that the staff acted properly. *Id.,* Ex. "Exhaustion of my Administrative Remedies Some Material Lost ...," Mem. from Captain Racette, dated Aug. 5, 2003. On August 19, 2003, Plaintiff received a letter from the Law Library Supervisor, C.O. Bennett, stating one book requested was available but since it was in looseleaf and because Plaintiff was in SHU, he could request a photocopy of the materials. *Id.,* Ex. D., Lt. from Bennett, dated Aug. 19, 2003.

> [FN9.] Jean Botta is not named as Defendant in this action.

> [FN10.] "D.S.G. Kiebert" is also not named as a Defendant in this action.

## II. DISCUSSION

### A. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts submitted by the moving party. FED. R. CIV. P. 56(e); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) and *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)).

**\*5** When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994).

**B. Eleventh Amendment**

Plaintiff brings suit against Defendants Bass, Spinner, Streeter, Bennett, Trimm, and Bouyea in both their individual and official capacities. *See* Am. Compl. Plaintiff seeks injunctive relief as well as compensatory damages against these individuals in their individual and official capacities. *Id.* at Wherefore Clause.

The Eleventh Amendment states "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. The Eleventh Amendment bars a suit against the state in federal court unless the state consents to being sued or Congress legislatively overrides a state's immunity. *Huang v. Johnson,* 251 F.3d 65, 69 (2d Cir.2000). The state's immunity extends to state officials "act[ing] on behalf of the state" when the state is the "real, substantial party in interest." *Id.* at 69-70 (citing *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddie, Inc.,* 506 U.S. 139, 142-47 (1993) & quoting *Pennhurst State School and Hosp. v. Halderman,* 465 U.S. 89, 101-02 (1984)). Moreover, the Eleventh Amendment will bar recovery for money damages in a suit "against state officials in their official capacities." *Ford v. Reynolds,* 316 F.3d 351, 354 (2d Cir.2003).

Therefore, the Defendants cannot be sued in their official capacities in a claim for money damages. However, Midalgo may seek damages from them in their individual capacities. Furthermore, Plaintiff may sue the Defendants for injunctive relief in both their individual and official capacities because "official-capacity actions for prospective relief are not treated as actions against the State." *Cruz v. Gomez,* 202 F.3d 593, 595 n. 2 (2d Cir.2000) (quoting *Will v. Michigan Dep't of State Police,* 491 U .S. 58, 71 n. 10 (1989)).

**C. Exhaustion of Remedies**

Defendants claim that Plaintiff has failed to exhaust his administrative remedies as to the following claims: 1) medical care;[FN11] 2) mail tampering; 3) law library issues; and 4) family visitation. Dkt. No. 105, Defs.' Mem. of Law at p. 4.

FN11. As to Plaintiff's medical care claim, Plaintiff may have grieved his medical care issues. *See* Am. Compl., Ex. "Exhaustion of my Administrative Remedies Some Material Lost ...," Grievance, dated Aug. 13, 2003. However, since the Eighth Amendment medical indifference claim is against the John Doe

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

Defendant who was never identified nor appeared in this action, the issue will not be addressed further.

The Prisoner Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997(e)(a), states that "[n]o action shall be brought with respect to prison conditions under [section 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." This exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002); *see also Ziemba v. Wezner,* 366 F.3d 161, 163 (2d Cir.2004).

**\*6** The New York State Department of Corrections has created a three-step process to exhaust all administrative remedies available to inmates. *See Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004). First, the inmate must file a grievance complaint with the Grievance Clerk within fourteen (14) days of the incident. N.Y. COMP.CODES R. & REGS. tit. 7, § 701.7(a)(1). The complaint is then submitted to the IGRC to review the grievance. N.Y. COMP.CODES R. & REGS. tit. 7, § 701.7(a)(2)-(5). Second, the inmate may appeal the IGRC decision to the Superintendent. *See* N.Y. COMP.CODES R. & REGS. tit. 7, § 701.7(b). Third, if the inmate appeals the Superintendent's determination, the CORC is to make a final administrative determination. N.Y. COMP.CODES R. & REGS. tit. 7, § 701.7(c). Upon the completion of all three steps, an inmate may "seek relief pursuant to 42 U.S.C. § 1983." *Colon v. Harvey,* 344 F.Supp.2d 896, 897 (W.D.N.Y.2004) (citing *Neal v. Goord* 267 F.3d 116, 122 (2d Cir.2001) & *Santos v. Hauck,* 242 F.Supp.2d 257, 259 (W.D.N.Y.2003)). Moreover, "[e]ven if a prisoner receives no reply to a grievance or appeal, he is not excused from completing the appeals process. The rules provide that matters not decided within the prescribed time limits must be appealed to the next level of review." *Walters v. Carpenter,* 2004 WL 1403301, at *3 (S.D.N.Y. June 22, 2004) (citing N.Y. COMP. CODES R. & REGS. tit. 7, § 701.8 [FN12] & *Mendoza v. Goord,* 2002 WL 31654855, at *2 (S.D.N.Y. Nov. 21, 2002)).

FN12. N.Y. COMP.CODES R. & REGS. tit. 7,

§ 701.8 states: "[t]ime limit extensions may be requested at any level of review, but such extensions may be granted only with the written consent of the grievant. Absent such extension, matters not decided within the time limits may be appealed to the next step."

The Second Circuit has suggested a three-step inquiry when the inmate opposes a defendant's assertion that the inmate did not exhaust his remedies.

Depending on the inmate's explanation for the alleged failure to exhaust, the court must ask whether administrative remedies were in fact "available" to the prisoner. *Abney v. McGinnis,* 380 F.3d 663, 667-68 (2d. Cir.2004). The court should also inquire as to whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, *Johnson v. Testman,* 380 F.3d 691, 695 (2d. Cir.2004), or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense, *Ziemba v. Wezner,* 366 F.3d 161, 163 (2d Cir.2004). If the court finds that administrative remedies were available to the plaintiff, and that the defendants are not estopped and have not forfeited their non-exhaustion defense, but that the plaintiff nevertheless did not exhaust available remedies, the court should consider whether "special circumstances" have been plausibly alleged that justify "the prisoner's failure to comply with administrative procedural requirements." *Giano v. Goord,* 380 F.3d at 675 (citing *Berry v. Kerik,* 366 F.3d 85, 88 (2d Cir.2003); *Rodriguez* order).

*Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004); *see also Braham v. Clancy,* 425 F.3d 177, 181-82 (2d Cir.2005).

**\*7** Since failure to exhaust is an affirmative defense and defendants may be estopped from asserting the defense as "special circumstances may excuse a prisoner's failure to exhaust," the specific circumstances of each case must be examined. *Giano v. Goord,* 380 F.3d 670, 675 (2d Cir.2004) (citations omitted). Some special circumstances include, but are not limited to, occasions when prison

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

officials "inhibit an inmate's ability to utilize administrative grievance procedures," if the prisoner received a favorable disposition from his grievance but the time to appeal had expired and no relief was forthcoming, and all appeals were undertaken but prison officials did not respond within the required time period. *Id.* at 677. The effect of a plaintiff's justification as to why there was no exhaustion "is that, even though the administrative remedies are no longer available for reasons of timing or other procedural restrictions, such restrictions cannot serve to keep the plaintiff's suit from proceeding." *Id.* at 676. Additionally, "exhausted claims filed alongside unexhausted ones may proceed even though the unexhausted claims must be dismissed." *Id.* at 675.

Here, the Amended Complaint was filed on October 24, 2003. Dkt. No. 8. Any grievances filed subsequent to that date are untimely and irrelevant to the current action.[FN13] Therefore, only grievances filed prior to the date the Amended Complaint was filed will be considered.

> FN13. As Exhibits to their 7.1 Statement, Defendants include grievances filed by Plaintiff on April 27, 2004, and May 20, 2004, which clearly were submitted after the filing of the Amended Complaint.

Plaintiff's June 21st complaint grieved the issues of harassment, food, and recreation. *See* Defs.' 7.1 Statement, Ex. A, Grievance, dated June 21, 2003. Plaintiff's other complaint in July addressed the issues of a known enemy in his cell, harassment, and a cell search where items were taken. *Id.*, Ex. A., Grievance, dated July 10, 2003. Both of these grievances were appealed to the Superintendent and CORC, thus, they are exhausted.

As to Plaintiff's claims regarding the law library, outgoing/incoming mail, and visitation, Defendants assert such were not fully exhausted. Plaintiff states that he did exhaust all his remedies as shown by the Exhibits to his Amended Complaint. Dkt. No. 106, Pl.'s Mem. of Law at Point Two. Plaintiff claims that Defendant Spinner destroyed legal documents that showed he attempted to exhaust. *Id.* Midalgo also alleges that he "filed and appealed at least ten grievances" and that "more than half were ignored or intercepted" by Defendant Streeter. *Id.*

Plaintiff did provide a copy of his grievance on the law library, outgoing/incoming mail, and visitation issues, which was dated April 26, 2003; however, the CORC stated they never received any grievances from April 2003. Am. Compl., Ex. A, Grievance, dated Apr. 26, 2003; Defs.' 7.1 Statement, Ex. A, CORC Appeal, dated Oct. 1, 2003. Plaintiff also submitted a letter stating that since he received no response that he sought an appeal to the Superintendent. Am. Compl., Ex. A, Grievance Lt., dated May 27, 2003. No other appeals were instituted on that grievance. Nonetheless, even if the CORC stated they did not receive the grievance, Plaintiff attempted to fulfill the exhaustion requirement by seeking an appeal to the next level as required when he received no response. *See Walters v. Carpenter,* 2004 WL 1403301, at *3; N.Y. COMP.CODES R. & REGS . tit. 7, § 701.8.

**\*8** Since Defendants put forth the affirmative defense of failure to exhaust, this Court will make the three-step inquiry set forth by the Second Circuit. With the first inquiry, depending on the prisoner's explanation, the Court must decide whether the remedies were "available." " 'Available' means more than the mere presence of a grievance system but also that the system is functionally available to the prisoner." *Shaheen v. Hollins,* 2005 WL 2179400, at *3 (N.D.N.Y. Sept. 7, 2005) (citing *Hemphill v.. New York,* 380 F.3d at 686-87 ("[I]n some circumstances, the behavior of the defendants may render administrative remedies unavailable.")); *see also Abbas v. Senkowski,* 2005 WL 2179426, at *6 (S.D.N.Y. Sept. 9, 2005). The "proper test for determining whether ordinary grievance procedures are 'available' [is] whether 'a similarly situated individual of ordinary firmness [would] have deemed them available.' " *McCullough v. Burroughs,* 2005 WL 3164248, at *3 (E.D.N.Y. Nov. 29, 2005) (quoting *Hemphill v. New York,* 380 F.3d at 688). In addition, "threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system, or to external structures of authority such as state or federal courts." *McCullough,* 2005 WL 3164248, at *3 (quoting *Hemphill v. New York,* 380 F.3d at 688). Here, administrative remedies are available as a similarly situated inmate of ordinary firmness could deem the remedies available and because Plaintiff stated he did actually file the grievances, copies

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

of which were provided to the Court.

As remedies were "available," it must be determined if the Defendants' own actions estop them from raising the failure to exhaust affirmative defense. The Second Circuit has held that "prison officials' threats or other inhibiting conduct may estop defendants from asserting the affirmative defense of non-exhaustion." *Hemphill v. New York,* 380 F.3d at 688. Also, in making a determination based on the second inquiry, "[t]o establish equitable estoppel, the party claiming estoppel must show: (1) a misrepresentation by the opposing party; (2) reasonable reliance on that misrepresentation; and (3) detriment." *McCullough,* 2005 WL 3164248, at *4 (quoting *Lewis v. Washington,* 300 F.3d 829, 834 (7th Cir.2002)). In addition, "[w]hen asserting equitable estoppel against the government, one must also prove affirmative misconduct." *McCullough,* 2005 WL 3164248, at *4 (quoting *Lewis v. Washington,* 300 F.3d at 834). In this case, Plaintiff claims that Defendant Spinner destroyed legal documents showing he attempted to exhaust his administrative remedies and that "more than half [of the grievances] were ignored or intercepted" by Defendant Streeter. Pl.'s Mem. of Law at Point Two. Plaintiff's claim raises a matter of credibility but, for the purposes of this Motion, drawing all inferences in favor of Plaintiff, since Plaintiff set forth allegations of affirmative misconduct that could be considered "inhibiting," Defendants shall be deemed estopped from asserting the affirmative defense of failure to exhaust. Since we are considering Defendants actions as inhibiting, again for the purposes of this Motion, the claims will be deemed exhausted.

**D. Eighth Amendment Claims**

*9 Plaintiff alleges that Defendants Bass and Trimm were deliberately indifferent to his health and safety when they placed incompatible cellmates or known enemies in Plaintiff's cell. Am. Compl. at ¶ 42. Plaintiff also contends that Defendants Bouyea, Spinner, and Streeter served him spoiled food which caused him psychological harm. *Id.* at ¶ 54.

The Eighth Amendment to the U.S. Constitution prohibits cruel and unusual punishment. Prohibited punishment includes that which "involve[s] the unnecessary and

wanton infliction of pain." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Gregg v. Georgia,* 428 U.S. 153, 173 (1976)). To state a claim under § 1983, the inmate "must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice." *Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 620 (2d Cir.1996).

The Supreme Court has delineated a two-part test for deliberate indifference. First, the "depravation alleged must be, objectively, sufficiently serious," and "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer v. Brennan,* 511 U.S. 825, 834 (1994) (internal quotation marks and citations omitted). Second, the prison official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837; *see also Hayes v. New York City Dep't of Corr.,* 84 F.3d at 620.

The Eighth Amendment also imposes on prison officials "a duty ... to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan,* 511 U.S. at 833 (citation omitted). Nonetheless, prison officials may not be constitutionally liable for every injury an inmate suffers at the hands of other inmates. *Id.* at 834. A plaintiff may recovery for injuries received while in custody "if the injury resulted from the defendant prison official's purposeful subjection of the prisoner to a 'substantial risk of serious harm' or from the official's deliberate indifference to that risk." *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997) (quoting *Farmer v. Brennan,* 511 U.S. at 834). The Second Circuit has stated that "[t]he failure of custodial officers to employ reasonable measures to protect an inmate from violence by other prison residents has been considered cruel and unusual punishment." *Ayers v. Coughlin,* 780 F.2d 205, 209 (2d Cir.1985) (citing *United States v. Bailey,* 444 U.S. 394, 423 (1980)). However, "[a]n isolated omission to act by the state prison guard does not support a claim under section 1983 absent circumstances indicating an evil intent, or recklessness, or at least deliberate indifference to the consequences of his conduct for those under his control and dependent upon him." *Id.* (quoting *Williams v. Vincent,* 508 F.2d 541, 546 (2d Cir.1974)). Instead, "reckless disregard of plaintiff['s] right to be free from attacks by other inmates may be

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

shown by the existence of a pervasive risk of harm to inmates from other prisoners and a failure by prison officials to reasonably respond to that risk." *Knowles v. New York City Dep't of Corr.,* 904 F.Supp. 217, 221-22 (S.D.N.Y .1995) (citing *Rucco v. Howard,* 1993 WL 299296, at \*4 (S.D.N.Y. Aug. 4, 1993) & *Martin v. White,* 742 F.2d 469, 474 (8th Cir.1984)) (internal quotation marks omitted) (alteration in original). Furthermore, "an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference." *Sims v. Bowen,* 1998 WL 146409, at \*3 (N.D.N.Y. Mar. 23, 1998). Moreover, there is no constitutional right to the cellmate of a prisoner's choice even if a prisoner's not getting along with his cellmate. *Harris v. Greer,* 750 F.2d 617, 618 (7th Cir.1984).

**\*10** Here, Plaintiff claims a known enemy was placed in his cell. Midalgo states that he filed a grievance expressing his fear that he would be placed with a "known or made for hire enemy" and that on June 27, 2003, he was bunked with a known enemy and a fight broke out where Plaintiff suffered injuries to his face, eye, knees, and tricep. Am. Compl. at ¶¶ 27 & 31. However, Captain Bezio stated in a letter to Midalgo that "there [was] no evidence to indicate that [he] was placed in a cell with a known enemy. A review of facility records reveal[ed] that there [were] no documented enemies of [his] at [the] facility" and that if an inmate should be considered an enemy, Midalgo should contact the assigned Correction Counselor. Defs.' 7.1 Statement, Ex. A, DOCS Lt. from Captain Bezio, dated July 14, 2003. Defendant Trimm also conducted an investigation into the grievance and found that there was no evidence that there was a known enemy placed in Midalgo's cell. *Id.,* Ex. A, Sgt. Trimm Lt. to Captain Bezio, dated July 6, 2003. Even the Superintendent stated that inmates were bunked based on compatibility. *Id.,* Ex. A, Superintendent's Appeal, dated July 15, 2003.

When questioned about how Plaintiff knew there was a known enemy placed in his cell, Plaintiff stated that his "circumstantial evidence clearly proves that [he] was placed in the cell with a known enemy. The timing, the dates, [his] grievances, [his] appeals, the coincidences, everything[.]" Dkt. No. 105, Ex. A., Pl.'s Dep. at p. 63, lines 5-8. He also stated he told his correction counselor

he was in danger from "all gang members" but then stated that he did not tell his counselor anything of such nature since "there was no counselor for [him] to speak to" until after the incident occurred. *Id.* at pp. 63, lines 12-14, 64, lines 17-20, & 65, lines 17-23. Plaintiff further stated that the fights he had with his cellmate occurred because his cellmate made "homosexual advances" on him. *Id.* at p. 16, line 14. After that cellmate, Plaintiff had approximately twenty (20) more cellmates because "things weren't working out" and he was fighting with them as well over alleged homosexual advances. *Id.* at pp. 25, lines 11-14 & 30, lines 21-24, & 31, lines 1-11. Plaintiff stated he had "plenty of fights" with other cellmates. *Id.* at p. 31, lines 16-24.

Midalgo has failed to meet the Eighth Amendment standard of deliberate indifference. First, Midalgo must show that he was incarcerated under conditions that posed a substantial risk of serious harm. Plaintiff has stated he fought with many of his cellmates and was injured, especially with his first cellmate whom "Sergeant Bass thought was a rival gang member." Am. Compl., Ex. "Exhaustion of my Administrative Remedies ... [with fight investigation] ...," Fight Investigation Form, dated June. 27, 2003. However, Plaintiff has not shown that the injuries he received were based on the purposeful subjection of Midalgo to a substantial risk of serious harm or by deliberate indifference to the risk. Plaintiff's claims were investigated and found to be without merit as there were no known enemies in the facility. Furthermore, after Plaintiff's fight with his cellmate, they were separated and placed in different cells. *Id.* Moreover, Plaintiff, over time, had numerous cellmates because they were not compatible. Prison officials took appropriate measures to protect Midalgo after the fights by removing the other inmate from the cell. Therefore, Plaintiff has failed to prove that any depravation alleged was serious and that he was incarcerated under conditions that posed a substantial risk of harm.

**\*11** Even if Plaintiff could satisfy the first prong, Plaintiff clearly fails on the second prong. Midalgo has not shown that the Defendants knew of and disregarded an excessive risk to his health or safety. This is evidenced by the fact that he had nearly twenty other cellmates. He was not forced to bunk with another cellmate for an extended period of time. Even with his first cellmate, he only bunked with him for a month or so. Pl.'s Dep. at pp. 16,

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

lines 12-24, & 17, lines 1-3. Investigations were conducted into the matter and no evidence was found to support Plaintiff's claim that there was a known enemy placed in his cell. Plaintiff also admitted that many of his fights were because he thought other inmates were making homosexual advances towards him. *Id.* at pp. 30, lines 21-24, & 31, lines 1-11. Although there is a duty to protect placed on prison officials, the injuries were not a result of indifference on the part of the officials. Furthermore, Plaintiff did not inform the correction officials of his belief until a fight ensued. *Id.* at p. 65, lines 22-23. Plaintiff seemingly would prefer to choose his own cellmate, however inmates do not possess such a right, and the Superintendent noted that cellmates were chosen based on compatibility.

Plaintiff also claims that Defendants Spinner, Streeter, and Bouyea brought him spoiled or rotten food on several occasions and that from June to September 2003, Defendants Spinner and Streeter served Midalgo "moldy cheese, bread, spoiled milk and rotten fruits ." *Id.* at p. 14, lines 3-6; Am. Compl. at ¶ 28.

The Eighth Amendment places a duty upon prison officials to ensure that prisoners receive adequate food. *Farmer v. Brennan,* 511 U.S. at 832. In that context, prisoners are to be provided with "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) (citation omitted); *see also Lunney v. Brureton,* 2005 WL 121720, at *6 (S.D.N.Y. Jan. 21, 2005).

Here, C.O. Streeter stated that he did not provide Plaintiff with spoiled food and that meals are inspected and placed on the trays at the messhall and then are further inspected once again by him prior to Plaintiff receiving the food. Defs.' 7.1 Statement, Ex. A, Streeter Lt. to Sgt. King, dated July 20, 2003. The Superintendent found no evidence to support Plaintiff's claim on this issue. *Id., Ex.* A, Superintendent's Appeal, dated Aug. 6, 2003. Plaintiff admits that the officers do not prepare food trays and that they merely inspect them before they get to Plaintiff. Pl.'s Dep. at pp. 36, lines 19-24, & 37, lines 1-5. Midalgo also stated that while in the normal population, all the meals are sealed but in SHU some items are not sealed, however

some do remain sealed such as cheese and meat. *Id.* at p. 38, lines 2-14. Plaintiff further stated that he received expired milk from the correction officers and that Defendants Spinner and Streeter provided spoiled food during breakfast and lunch from June to September 2003. *Id.* at pp. 41, lines 23-24, 42, lines 1-13, 50, lines 16-24, & 51, lines 1-12. On October 10, 2003, Plaintiff received a memo from the Food Services Administrator stating that his kosher meal was prepared in accordance with the guidelines set by the Department of Correctional Services. Pl.'s Mem. of Law, Ex., Inter-Departmental Memo from Haug to Midalgo, dated Oct. 10, 2003. The memo also states that items such as milk and bread are prepackaged and the trays are checked and wrapped with cellophane before they are delivered to the inmates. *Id.* The Superintendent further stated that after an investigation was conducted with the Food Service Administrator, since the food is prepackaged, contact between an officer and the trays are limited. Pl.'s Mem. of Law, Ex. Superintendent's Appeal, dated Oct. 28, 2003. Midalgo states, however, that he had to beg other prisoners to sell him food so that he "wouldn't starve or get sick" and that as a result he received psychological harm which include "anxiety, nightmares about being poisoned, delusions and dizziness." *Id.* at p. 50; Am. Compl. at ¶ 54.

**\*12** Prison officials are required to provide nutritionally adequate meals that are served under conditions which do not present an immediate danger to the health and well being of an inmate. Here, Plaintiff received kosher meals for several years because the food was more healthy than regular food received by the inmates. Pl.'s Dep. at pp. 38, lines 15-24, & 39, lines 1-18. Upstate provided the kosher meals since Plaintiff made the request. *Id.* at p. 39, lines 1-18. Furthermore, Midalgo only stated he received psychological harm from the alleged incident. There was no immediate danger to his health or well being. Plaintiff did not starve nor was he denied meals. He also does not state he had weight loss or anything of the sort which would put his health in immediate danger. He stated that he purchased food from other inmates. Moreover, investigations were conducted into Plaintiff's spoiled and rotten food claims and the claims were found to be unsupported by any evidence as most items were prepackaged and wrapped in cellophane. Moreover, Plaintiff admits that the Defendants he seeks to hold liable had no control over the contents on his foodtrays.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

Therefore, it is recommended that the Motion for Summary Judgment on Plaintiff's Eighth Amendment claims be **granted**.

### E. First Amendment Claims

Plaintiff claims that Sergeant Trimm and "her C.O.s" were misplacing or destroying his magazine and newspaper subscriptions and that his outgoing mail/legal mail was read by Defendant Bouyea in order to "play mind games with [Plaintiff]." Am. Compl. at ¶¶ 22 & 46. Plaintiff further alleges that Defendant Bennett purposefully gave him the wrong books and cases and lost legal documents which resulted in frustrating Plaintiff's lawsuit and an inability to file a 440 motion pursuant to New York State's Criminal Procedure Law. *Id.* at ¶ 48.

"Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). In order to state a claim for lack of access to the courts by interference with legal mail, "an inmate must allege that a defendant's deliberate and malicious interference actually impeded his access to the court or prejudiced an existing action." *Cancel v. Goord,* 2001 WL 303713, at *4 (S.D.N.Y. Mar. 29, 2001) (citing *Lewis v. Casey,* 518 U.S. 343, 349 (1996)). However, "[a] delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." *Cancel v. Goord,* 2001 WL 303713, at *5 (citing *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995) & *Jones v. Smith,* 784 F.2d 149, 151-52 (2d Cir.1986)). But, if an adverse judgment to an "otherwise meritorious" motion resulted from defendants' delay, then a § 1983 claim is stated. *Id.*

A prisoner maintains the right to the flow of incoming and outgoing mail as protected by the First Amendment. *Davis v. Goord,* 320 F.3d at 351 (citing, *inter alia, Heimerle v. Attorney General,* 753 F.2d 10, 12-13 (2d Cir.1985)). Any "[r]estrictions on prisoners' mail are justified only if they 'further [ ] one or more of the substantial governmental interests of security, order, and rehabilitation ... [and] must be no greater than is necessary or essential to the protection of the particular governmental interest

involved.' " *Id.* (quoting *Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986)) (alterations in original). Therefore, "in balancing the competing interests implicated in restrictions on prison mail, courts have consistently afforded greater protection to legal mail than to non-legal mail, as well as greater protection to outgoing mail than to incoming mail." *Id.* (citing, *inter alia, Thornburgh v. Abbott,* 490 U.S. 401, 413 (1989)). Although an inmate has the right to be there when his legal mail is opened, an isolated event of tampering will be insufficient to allege a constitutional violation unless the inmate can show "that prison officials 'regularly and unjustifiably interfered with the incoming legal mail.' " *Id.* (quoting *Cancel v. Goord,* 2001 WL 303713, at *6); *see also Wolff v. McDonnell,* 418 U.S. 539, 574-76 (1974); *Morgan v. Montanye,* 516 F.2d 1367, 1371 (2d Cir.1975); *Gill v. Riddick,* 2005 WL 755745, at *15 (N.D.N.Y. Mar. 31, 2005).

**\*13** With regard to non-legal incoming mail, a prison's "regulations or practices affecting a prisoner's receipt of non-legal mail must 'be reasonably related to legitimate penological interests[.]' " *Cancel v. Goord,* 2001 WL 303713, at *6 (quoting *Thornburg v. Abbott,* 490 U.S. 401, 409 (1989)). "[P]rison security is a sufficiently important governmental interest to justify limitations on a prisoner's [F]irst [A]mendment rights." *Id.* (quoting *Gaines v. Lane,* 790 F.2d 1299, 1304 (7th Cir.1986)). In order to state a claim for interference with incoming non-legal mail, the inmate will have to show a pattern and practice of interference without the legitimate penological interest. *Id.*

With regard to Plaintiff's legal mail being read, Plaintiff states that C.O. Bouyea "mumble[d] something similar to what [Plaintiff] wrote in [his] legal mail under his breath." Am. Compl. at ¶ 26. Bouyea purportedly repeated "something verbatim to a letter" Midalgo had written to a legal organization and that there were similar occurrences on several occasions. Pl.'s Dep. at pp. 39, lines 19-24, & 40, lines1-6. Plaintiff claims that Bouyea whispered so that only Plaintiff could hear the statements. *Id.* at p. 40, lines 19-23. When Plaintiff was asked about the statement made in his Amended Complaint that "outgoing mail/legal mail was being read due to a fabricated penological interest" Midalgo stated that he believed his mail was read because he "agitated [the facility's] security interest and that ... gave them a reason to read [his] mail and things

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

[he] was writing in [his] mail." *Id.* at p. 83, lines 3-8. Another reason Plaintiff believed the mail was read was because the inmates who became his cellmates "would try to start a whole situation based on letters" that Plaintiff had written. *Id.* at p. 83, lines 9-12. Plaintiff had submitted a grievance about his legal mail and it was found to have no merit and that there was no evidence to support his complaint. Defs.' 7.1 Statement, Ex. A, Sgt. King Lt. to Captain Bezio, dated Aug. 1, 2003; Ex. A, Superintendent's Appeal, dated Aug. 6, 2003.

Here, Plaintiff has failed to show that there was interference with his legal mail. Plaintiff has not alleged any deliberate and malicious interference that actually impeded his access to the courts nor prejudiced an existing action. Plaintiff also provides no proof that his mail was read except that he states Defendant Bouyea was mumbling under his breath something similar to what had been written in Plaintiff's letters. Moreover, Midalgo has not shown that Bouyea opened and read his mail on a regular and unjustifiable basis.

Plaintiff further states he was not receiving his magazine and newspaper subscriptions and that Defendant Trimm "was aware that her C.O.s were purposefully misplacing [his] magazines and newspaper subscription" or providing them to other inmates. Am. Compl. at ¶ 22; Pl.'s Dep. at p. 34. Midalgo says he knew some of his magazines that were in the "rec room" were his because he saw his name on the label. Pl.'s Dep. at p. 34, lines 2-4. He also stated he wrote to the mail clerk to inquire about his mail, the mail clerk told him that magazines were given to the correction officers to be handed out, that they were not delivered to him. *Id.* at p. 34, lines 8-12. Then when Plaintiff spoke to Sergeant Trimm about the situation, she gave him "a devious smile and wrote something out on a pad and said she would look into it and she never did." *Id.* at p. 34, lines 16-19.

**\*14** In regards to the non-legal mail, Plaintiff does have a right to incoming, non-legal mail, although to a lesser extent than legal, outgoing mail. *See Davis v. Goord,* 320 F.3d at 351. Plaintiff would have to show a pattern and practice of interference without a penological interest or purpose. Midalgo makes the general claim that he did not receive his subscriptions for several months. In a letter to the Warden, Plaintiff provides the names of five different

magazines which were not delivered to him. Plaintiff only submitted two letters to the Court that were sent to two different magazine companies stating he needed to cancel his subscriptions due to his failure to receive the magazines. Am. Compl., Ex. C, Lt. to Warden, dated Feb. 4, 2003; Lts. to F.H.M. & Maxim, dated Apr. 21, 2003. Midalgo also states he received one issue per each subscription. Lts. to F.H.M. & Maxim, dated Apr. 21, 2003. Plaintiff states he received one issue of Maxim after it had gone through the procedure of media review. Pl.'s Dep. at pp. 34, lines 20-24, & 35, lines 4-12. Despite the letters, Plaintiff has not shown that there was a pattern and practice in not receiving his subscriptions. Plaintiff has not stated with any specificity which magazines he did not receive and, more importantly, for what time periods he did not receive them. *See* Am. Compl. at ¶¶ 22-24; Pl.'s Mem. of Law at Point Five. Plaintiff merely makes a generalization that from January 2003 until he cancelled his subscriptions, his magazines and newspapers were misplaced and that several months had passed without receiving any subscriptions. Am. Compl. at ¶¶ 23 -24. More to his detriment, Plaintiff does not state which officers misplaced or destroyed his magazines nor does he show that there was a practice of this by the Defendants.[FN14] Therefore, Plaintiff has failed to state a claim on his non-legal, incoming mail.

> FN14. The Court also notes that the Defendants fail to address whether or not there was a penological interest in the regulations or practices that may have affected Midalgo's receipt of non-legal mail. *See* Defs.' Mem. of Law.

In addition, "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Even if the Court were to draw all inferences in favor of Plaintiff that a pattern and practice has been established, Plaintiff has failed to allege the personal involvement of Defendant Trimm or any other Defendant. Furthermore, to the extent Plaintiff states that Defendant Trimm would be liable in a supervisory capacity, Plaintiff has failed to show what supervisory position Defendant Trimm holds as to the corrections officers who may have misplaced or destroyed his magazines.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

Plaintiff further makes the claim that he received the wrong books and cases from the law library or that he never received the books requested. *Id.* at ¶ 48. Midalgo also alleges that his legal documents simply were lost and he was unable to file court documents as a result. *Id.*

Under the First Amendment, "prisoners have a constitutional right of access to the courts." *Bounds v. Smith,* 430 U.S. 817, 821 (1977); *Bourdon v. Loughren,* 386 F.3d 88, 92 (2d Cir.2004). This right "requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds v. Smith,* 430 U.S. at 828; *Bourdon v. Loughren,* 386 F.3d at 92 (quoting *Bounds).* However, there is no "abstract, freestanding right to a law library or legal assistance, [and] an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense." *Lewis v. Casey,* 518 U.S. at 351. The Supreme Court held that in order to fulfill the actual injury requirement, derived from the constitutional doctrine of standing, on a law library claim where there is a lack of access to the courts, the inmate must be pursuing direct appeals from the conviction for which he or she was incarcerated, a *habeas corpus* petition, or a civil rights claim pursuant to § 1983 "to vindicate basic constitutional rights." *Lewis v. Casey,* 518 U.S. at 354.

**\*15** As to Plaintiff's law library claim, in regards to some of the books Midalgo sought, he received a letter stating that the law library was not required to carry two of the books he requested and that the other book should have been available and if it was missing, then a replacement would be ordered. Am. Compl., Ex. D, Lt. from Litzenberger, dated July 28, 2003. Then Plaintiff wrote two letters noting that the library staff was refusing to provide him with a law book, that he had been told that two books were not available at the facility, and that he was receiving the wrong books and cases from the law library. *Id.,* Exs. D, Lt. to Botta, dated Aug. 3, 2003 & Ex. C, Lt., dated Aug. 4, 2003. However, Plaintiff received a memo noting that an investigation had been completed and that the staff had acted properly. *Id.,* Ex. "Exhaustion of my Administrative Remedies Some Material Lost ...,"

Mem. from Captain Racette, dated Aug. 5, 2003. Midalgo also received a letter from C.O. Bennett whereby Plaintiff was told that one book he had requested was available but that because Plaintiff was in SHU and since the book was looseleaf, he could request a photocopy of the materials. *Id.,* Ex. D., Lt. from Bennett, dated Aug. 19, 2003. However, Plaintiff claims that the book was not in looseleaf and that Defendant Bennett had lied and then stated the book was missing after Plaintiff claimed that all he received was the index. Pl.'s Dep. at pp. 78, lines 14-24, & 79, lines 1-3. Plaintiff alleges that every book he requested from the law library was missing and that one book that he did receive had a section ripped out that Plaintiff needed. *Id.* at p. 85, lines 1-18. However, Plaintiff states that he would not say it was Defendant Bennett's fault but that it is his duty to oversee the law library. *Id.* at p. 86, lines 18-24.

Additionally, Plaintiff states that he was trying to find out how to copyright some of his poetry. *Id.* at p. 74, lines 22-23. Midalgo further acknowledges he was trying to file a N.Y. CRIM. PROC. LAW 440 motion because he claims he was wrongfully convicted and that he is still unable to file the motion because he received the wrong books and cases. *Id.* at pp. 74, line 24, & 75, lines 1-20. Plaintiff claims that he sent legal documents, which were exhibits Plaintiff wanted to attach to his 440 motion, to the law library to be copied, but that they were never returned even though the request was made. *Id.* at pp. 79, lines 16-24, & 80, lines 1-8. As a result, Plaintiff claims that this was another reason why he was unable to file the motion. *Id.* at p. 80, lines 1-5. Midalgo stated that he did not file the 440 motion prior to arriving at Upstate because he had been studying the process and procedures. *Id.* at p. 81, lines 18-21. Plaintiff alleges that if not Defendant Bennett, then either Defendants Streeter or Spinner lost his copies because "[t]hey colluded together" and conspired against Plaintiff. *Id.* at pp. 87, lines 10-24, & 88, lines 1-4. Midalgo avers that his claim could be proven by "circumstantial evidence," which would include his grievances and hearings. *Id.* at p. 88, lines 7-17.

**\*16** Here, Plaintiff does have a constitutional right to the access of the courts and, in turn, the right to an adequate law library or assistance from those trained in the law when preparing and filing legal documents. Plaintiff does not state a claim as to the availability of books he sought for the purposes of his copyright lawsuit. *See Lewis v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

*Casey,* 518 U.S. at 354. Plaintiff does state a claim in regards to the missing books and copies of exhibits to his 440 motion as he seeks to challenge his conviction, which would provide standing as it would be a direct appeal from the conviction for which he was incarcerated. *See id.*

However, the Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). In this case, as only Plaintiff's law library claim as to his 440 motion could proceed, Plaintiff has failed to allege any personal involvement on the part of any of the Defendants. Plaintiff states that Defendant Bennett was not at fault for the missing books. That statement belies the notion that there was any personal involvement. In addition, Plaintiff fails to state a claim for supervisory liability against Defendant Bennett for the missing books as Plaintiff does not state which Defendants Bennett was supervising. Furthermore, as to the missing copies of exhibits for the 440 motion, Plaintiff merely claims that Defendants Bennett, Streeter, and Spinner were involved because he believes there was a conspiracy. That allegation does not constitute personal involvement.

Therefore, it is recommended that the Motion for Summary Judgment be **granted** on the First Amendment claims.

### F. Inadequate Visitation

Plaintiff alleges that Defendant Trimm delayed his visit with his mother for several hours causing him emotional distress. Am. Compl. at ¶ 50.

"Although inmates do not relinquish their constitutional rights when imprisoned, implicit with incarceration is the fact that confinement imposes a limitation on privileges and rights." *Henry v. Coughlin,* 940 F.Supp. 639, 642 (S.D.N.Y.1996) (citing, *inter alia, Sandin v. Conner,* 515 U.S. 472, 485 (1995)). Restrictions that are placed upon an inmate's constitutional rights "may be upheld as long as they are 'reasonably related to legitimate penological

interests.' " *Hernandez v. McGinnis,* 272 F.Supp.2d 223, 226 (W.D.N.Y.2003) (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). However, family visitations for inmates only constitute a privilege and not a right. *See Block v. Rutherford,* 468 U.S. 576, 589 (1984); *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 125-26 (1977) (holding that one of the more obvious constitutional rights curtailed by confinement is the right to freely associate with those outside the penal institution); *see also Lynott v. Henderson,* 610 F.2d 340, 342 (5th Cir.1980) (stating that "[c]onvicted prisoners have no absolute constitutional right to visitation"); *Oxendine v. Williams,* 509 F.2d 1405, 1407 (4th Cir.1975) (holding that a "[prisoner] has no constitutional right to physical contact with his family"); *Hernandez v. McGinnis,* 272 F.Supp.2d at 227.

*17 Here, Plaintiff does not claim that he was denied visitation nor has he stated that visitation was delayed at any other time than the one time alleged. He merely states that a visit with his mother and brother was delayed by a few hours. Am. Compl. at ¶ 25. As there is no constitutional right to visitation and because of the fact that Plaintiff did actually receive visitation that same day, Plaintiff has failed to state a claim.

Therefore, it is recommended that the Motion for Summary Judgment be **granted** as to the visitation claim.

### G. Harassment

Plaintiff claims that Defendants Trimm and Bass harassed him by placing a wiretap in his cell as well as confidential informants and/or hired help in order to cause him physical and psychological harm.[FN15] Am. Compl. at ¶ 52.

FN15. Although Plaintiff does not specify what aspect of the Constitution was violated, though Plaintiff does insert a short sentence saying Defendants were deliberately indifferent, this Court will analyze the wiretap claim pursuant to the Fourth Amendment. *See* Am. Compl. at ¶ 52.

In terms of the wiretap, the claim would turn on whether

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

a plaintiff had a legitimate expectation of privacy with respect to his conversations. To assess the expectation, "the person asserting a privacy interest must demonstrate a subjective expectation of privacy." *George v. Carusone,* 849 F.Supp. 159, 165 (D.Conn.1994) (citing *California v. Greenwood,* 486 U.S. 35, 39 (1988)) (further citations omitted). Then "that person's subjective expectation must be one that society accepts as reasonable." *Id.* (citing *California v. Greenwood,* 486 U.S. at 39) (further citations omitted). The Second Circuit has held that "a convict has no expectation of privacy in his prison cell" because "society is not prepared to recognize as legitimate any subjective expectation of privacy that a [prisoner] might have in his prison cell[.]" *Willis v. Artuz,* 301 F.3d 65, 66, & 69 (2d Cir.2002) (citing *Hudson v. Palmer,* 468 U.S. 517, 526 (1984)).

Here, besides alleging that a wiretap was placed in his cell, Plaintiff does not provide a shred of evidence that there was actually a wiretap placed within his cell. Plaintiff sets forth certain circumstances, which to him seem like too much of a coincidence that a wiretap had to have been placed in his cell. Pl.'s Mem. of Law at Point Eight. Plaintiff merely states that he **thought** there was a wiretap because his cellmate attempted to talk about illegal activity and that his neighbor was trying to get Midalgo to bring back drugs. Pl.'s Dep. at p. 15, lines 13-17. He also stated the lights would flicker and that some of the officers would talk about the same things Midalgo and his cellmate had discussed. *Id.* at p. 15, lines 18-24. Even though Plaintiff does not have an expectation of privacy in his cell, Plaintiff fails to allege any facts that are not general or conclusory as to state any claim in regards to the alleged wiretap.

With regard to his claim of a confidential informant or hired help being placed in his cell to harass him, Plaintiff states that he believes his cellmate was a confidential informant because Officer Bouyea, Officer Streeter, and others gave the cellmate extra food trays, magazines, and books. Pl.'s Dep. at pp. 17, lines 4-12 & 29, lines 4-10. Other than supposition, Plaintiff has not provided any proof or evidence that his cellmate was a confidential informant. Midalgo's claims are merely conclusory and unsupported by any facts. Furthermore, the Superintendent stated that inmates are placed together based on compatibility. Defs.' 7.1 Statement, Ex. A, Superintendent's Appeal, dated July 15, 2003. Plaintiff has

not stated any type of claim available and moreover, Plaintiff would not have any choice in who was placed within his cell as inmates do not a have a constitutional right to the cellmate of their choice. *Harris v. Greer,* 750 F.2d 617, 618 (7th Cir.1984).

**\*18** Therefore, it is recommended that the Motion for Summary Judgment be **granted** on his claim.

### H. John Doe Defendant

As noted previously, Defendant John Doe has not been identified or appeared in this action. *See* Dkt No 12. FED.R.CIV.P. 4(m) states that "[i]f service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, then the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time[.]" Furthermore, pursuant to the Local Rules for the Northern District of New York, "service of process [is required] upon all defendants within sixty (60) days of the filing of the complaint." N.D.N.Y.L.R. 4.1. Plaintiff's time for service on John Doe has expired, per both the Local Rules and the Federal Rules, as the date of the filing of the Amended Complaint was October 24, 2003. *See* Dkt. No. 8. Since Plaintiff has failed to properly identify this Defendant, such claims should be dismissed.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that the Motion for Summary Judgment (Dkt. No. 105) be **GRANTED;** and it is further

**RECOMMENDED,** that all claims against the John Doe Defendant be **DISMISSED** due to Plaintiff's failure to timely identify and serve such Defendant; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten
(10) days within which to file written objections to the
foregoing report. Such objections shall be filed with the
Clerk of the Court. *FAILURE TO OBJECT TO THIS
REPORT WITHIN TEN (10) DAYS WILL PRECLUDE
APPELLATE REVIEW.* Roldan v. Racette, 984 F.2d 85,
89 (2d Cir.1993) (citing Small v. Sec'y of Health and
Human Servs., 892 F.2d 15 (2d Cir.1989)); *see also* 28
U.S.C. § 636(b)(1); FED.R.CIV.P. 72, 6(a), & 6(e).

N.D.N.Y.,2006.
Midalgo v. Bass
Not Reported in F.Supp.2d, 2006 WL 2795332
(N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

**C**

United States District Court,
E.D. New York.
Anthony PRICE, Plaintiff,
v.
Sheriff Edward REILLY, Kim Edwards, RN III, Perry
Intal, Mary Sullivan, RN, Dr. Benjamin Okonta, MD,
and Nassau University Medical Center, Defendants.
**No. 07-CV-2634 (JFB)(ARL).**

March 8, 2010.

**Background:** Pro se inmate, who suffered from end stage renal disease requiring dialysis, filed § 1983 action against sheriff, nurse practitioner, physician, and medical center, alleging violations of the Eighth Amendment for defendants' failure to provide adequate medical care. Defendants moved for summary judgment.

**Holdings:** The District Court, Joseph F. Bianco, J., held that:

(1) there was no evidence that administrative remedy was available to inmate;

(2) prison medical staff's modification of inmate's medication dosage did not constitute deliberate indifference to his medical needs;

(3) prison's failure to provide food with inmate's medication was not sufficiently serious to satisfy objective prong of test for deliberate indifference to serious medical needs;

(4) medical staff did not act with culpable intent to consciously disregard inmate's serious medical needs;

(5) genuine issue of material fact as to whether prison medical staff was aware of, and consciously disregarded inmate's request for a kidney transplant test precluded summary judgment;

(6) genuine issue of material fact as to whether inmate's shoulder pain was a serious medical condition precluded summary judgment;

(7) sheriff was not liable under § 1983; but

(8) genuine issues of material fact precluded summary judgment on § 1983 liability of registered nurse and doctor.

Motion granted in part and denied in part.

West Headnotes

**[1] Federal Civil Procedure 170A** 🔑 **2547.1**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)3 Proceedings
                170Ak2547 Hearing and Determination
                    170Ak2547.1 k. In general. Most Cited Cases
Generally, plaintiffs' failure to respond or contest facts set forth by defendants in their statement of facts, submitted in support of summary judgment, constitutes admission of those facts, and facts are accepted as undisputed under local rule. U.S.Dist.Ct.Rules S.D.N.Y., Civil Rule 56.1.

**[2] Federal Civil Procedure 170A** 🔑 **25**

170A Federal Civil Procedure
    170AI In General
        170AI(B) Rules of Court in General
            170AI(B)1 In General
                170Ak25 k. Local rules of District Courts. Most Cited Cases
District court has broad discretion to determine whether to overlook a party's failure to comply with local court rules.

**[3] Federal Civil Procedure 170A** 🔑 **2547.1**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)3 Proceedings
                170Ak2547 Hearing and Determination
                    170Ak2547.1 k. In general. Most Cited

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

Cases

District court, when analyzing motion for summary judgment by sheriff and medical personnel in inmate's pro se action alleging cruel and unusual punishment, would treat as admitted only those facts in defendants' statement of facts that were supported by admissible evidence and not controverted by other admissible evidence in the record, given that inmate was acting pro se, he failed to file and serve a response to defendant's statement, but he had identified arguments and factual assertions in statement with which he disagreed. U.S.C.A. Const.Amend. 8; U.S.Dist.Ct.Rules S.D.N.Y., Civil Rule 56.1.

[4] Federal Civil Procedure 170A ⬿ 657.5(1)

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(A) Pleadings in General
            170Ak654 Construction
                170Ak657.5 Pro Se or Lay Pleadings
                    170Ak657.5(1) k. In general. Most Cited Cases

Court must construe pro se complaint broadly, and interpret it to raise the strongest arguments that it suggests.

[5] Attorney and Client 45 ⬿ 62

45 Attorney and Client
    45II Retainer and Authority
        45k62 k. Rights of litigants to act in person or by attorney. Most Cited Cases

Federal Civil Procedure 170A ⬿ 657.5(1)

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(A) Pleadings in General
            170Ak654 Construction
                170Ak657.5 Pro Se or Lay Pleadings
                    170Ak657.5(1) k. In general. Most Cited Cases

Federal Civil Procedure 170A ⬿ 2546

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)3 Proceedings
                170Ak2542 Evidence
                    170Ak2546 k. Weight and sufficiency.
Most Cited Cases

Though pro se litigant's pleadings and other submissions are afforded wide latitude, pro se party's conclusory assertions, completely unsupported by evidence, are not sufficient to defeat motion for summary judgment.

[6] Civil Rights 78 ⬿ 1304

78 Civil Rights
    78III Federal Remedies in General
        78k1304 k. Nature and elements of civil actions.
Most Cited Cases

To prevail on a claim under § 1983, a plaintiff must show: (1) deprivation of any rights, privileges, or immunities secured by the Constitution and its laws, (2) by a person acting under the color of state law. 42 U.S.C.A. § 1983.

[7] Prisons 310 ⬿ 317

310 Prisons
    310II Prisoners and Inmates
        310II(H) Proceedings
            310k316 Exhaustion of Other Remedies
                310k317 k. In general. Most Cited Cases

In order to determine if prisoner exhausted his administrative remedies prior to commencement of lawsuit, as required by PLRA, court must first establish from a legally sufficient source that an administrative remedy is applicable, and that the particular complaint does not fall within an exception. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

[8] Prisons 310 ⬿ 313

310 Prisons

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

310II Prisoners and Inmates
   310II(H) Proceedings
      310k307 Actions and Litigation
        310k313 k. Trial. Most Cited Cases
Whether administrative remedy was available to prisoner
in a particular prison or prison system, and whether such
remedy was applicable to grievance underlying prisoner's
suit, for purpose of PLRA's exhaustion requirement, are
not questions of fact; rather, such issues either are, or
inevitably contain, questions of law. Prison Litigation
Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

[9] Civil Rights 78 🖘 1319

78 Civil Rights
   78III Federal Remedies in General
      78k1314 Adequacy, Availability, and Exhaustion
of State or Local Remedies
      78k1319 k. Criminal law enforcement; prisons.
Most Cited Cases
Sheriff and prison medical staff provided no evidence that
an administrative remedy was available to inmate who
suffered from end state renal disease, and who sought, but
did not receive, medical testing to determine if he was a
candidate for kidney transplant, and thus inmate's § 1983
action alleging violations of Eighth Amendment would not
be dismissed for his failure to exhaust administrative
remedies under PLRA; defendants failed to establish
procedural framework for grievance resolution at the
prison or the availability of any administrative remedies
for prisoner's situation. U.S.C.A. Const.Amend. 8; Prison
Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. §
1997e(a).

[10] Sentencing and Punishment 350H 🖘 1533

350H Sentencing and Punishment
   350HVII Cruel and Unusual Punishment in General
      350HVII(H) Conditions of Confinement
        350Hk1533 k. Deliberate indifference in
general. Most Cited Cases
Test for determining whether prison official's actions or
omissions rise to level of "deliberate indifference" in
violation of the Eighth Amendment, as will allow recovery
by prisoner in federal civil rights action, is twofold: first,
prisoner must demonstrate that he is incarcerated under

conditions posing substantial risk of serious harm, and
second, prisoner must demonstrate that defendant prison
officials possessed sufficient culpable intent. U.S.C.A.
Const.Amend. 8; 42 U.S.C.A. § 1983.

[11] Sentencing and Punishment 350H 🖘 1533

350H Sentencing and Punishment
   350HVII Cruel and Unusual Punishment in General
      350HVII(H) Conditions of Confinement
        350Hk1533 k. Deliberate indifference in
general. Most Cited Cases
Second prong of test for determining whether prison
officials acted with deliberate indifference to rights of
prisoners in violation of the Eighth Amendment, that of
"culpable intent," in turn involves two-tier inquiry;
specifically, prison official has sufficient culpable intent
if he has knowledge that inmate faces substantial risk of
serious harm and he disregards that risk by failing to take
reasonable measures to abate harm. U.S.C.A.
Const.Amend. 8.

[12] Sentencing and Punishment 350H 🖘 1546

350H Sentencing and Punishment
   350HVII Cruel and Unusual Punishment in General
      350HVII(H) Conditions of Confinement
        350Hk1546 k. Medical care and treatment. Most
Cited Cases
Mere fact that an inmate's underlying disease is a "serious
medical condition" does not mean that prison staff's
allegedly incorrect treatment of that condition
automatically poses an "objectively serious health risk," in
violation of Eighth Amendment. U.S.C.A. Const.Amend.
8.

[13] Prisons 310 🖘 192

310 Prisons
   310II Prisoners and Inmates
      310II(D) Health and Medical Care
        310k191 Particular Conditions and Treatments
          310k192 k. In general. Most Cited Cases

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

**Sentencing and Punishment 350H** 🔑 **1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1546 k. Medical care and treatment. Most Cited Cases

Even though inmate's end stage renal disease requiring dialysis was serious medical condition, prison medical staff did not act with deliberate indifference to inmate's medical needs in violation of his Eighth Amendment rights by modifying his medication dosage, since reduction in medication levels posed no objectively serious health risk to inmate; only injury inmate suffered was an increase in phosphorous levels, which was correctable, and a slight rash. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[14] Prisons 310** 🔑 **192**

310 Prisons
    310II Prisoners and Inmates
        310II(D) Health and Medical Care
            310k191 Particular Conditions and Treatments
                310k192 k. In general. Most Cited Cases

**Sentencing and Punishment 350H** 🔑 **1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1546 k. Medical care and treatment. Most Cited Cases

Even though inmate's prescriptions indicated that his medications for renal disease were to be taken with meals, prison officials' failure to provide food with the medication was not sufficiently serious to satisfy objective prong of test for deliberate indifference to inmate's serious medical needs, in violation of Eighth Amendment; inmate did not suffer any harm from taking medicine without food. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[15] Sentencing and Punishment 350H** 🔑 **1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1546 k. Medical care and treatment. Most Cited Cases

An inmate's mere disagreement with prison officials' prescribed medication dosage is insufficient as a matter of law to establish officials' "deliberate indifference" to his medical needs, in violation of the Eighth Amendment. U.S.C.A. Const.Amend. 8.

**[16] Prisons 310** 🔑 **192**

310 Prisons
    310II Prisoners and Inmates
        310II(D) Health and Medical Care
            310k191 Particular Conditions and Treatments
                310k192 k. In general. Most Cited Cases

**Sentencing and Punishment 350H** 🔑 **1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1546 k. Medical care and treatment. Most Cited Cases

Even though inmate disagreed with medical treatment he received at prison, medical staff did not act with culpable intent to consciously disregard inmate's serious medical needs, in violation of his Eighth Amendment rights, by adjusting the dosage levels of his prescription medication for renal disease; dosage inmate received adequately treated his condition, he suffered no injury from modification of dosage other than increased phosphorous levels, and officials changed dosage to correct those levels. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[17] Federal Civil Procedure 170A** 🔑 **2491.5**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2491.5 k. Civil rights cases in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

general. Most Cited Cases
Genuine issue of material fact as to whether prison
medical staff was aware of, and consciously disregarded
inmate's request for a kidney transplant test, precluded
summary judgment in inmate's § 1983 action alleging
officials' deliberate indifference to his medical needs, in
violation of Eighth Amendment. U.S.C.A. Const.Amend.
8; 42 U.S.C.A. § 1983.

**[18]** Sentencing and Punishment 350H ☞ 1546

350H Sentencing and Punishment
   350HVII Cruel and Unusual Punishment in General
      350HVII(H) Conditions of Confinement
         350Hk1546 k. Medical care and treatment. Most
Cited Cases
An inmate's chronic pain can constitute a "serious medical
condition" for purposes of claim of deliberate indifference
to a serious medical need under the Eighth Amendment.
U.S.C.A. Const.Amend. 8;.

**[19]** Federal Civil Procedure 170A ☞ 2491.5

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)2 Particular Cases
            170Ak2491.5 k. Civil rights cases in
general. Most Cited Cases
Genuine issue of material fact as to whether inmate's
shoulder pain was a serious medical condition, and
whether prison medical staff acted with deliberate
indifference by failing to prescribe pain medication or take
x-rays, despite inmate's ongoing complaints, precluded
summary judgment, in inmate's § 1983 Eighth Amendment
claims against medical staff. U.S.C.A. Const.Amend. 8; 42
U.S.C.A. § 1983.

**[20]** Civil Rights 78 ☞ 1355

78 Civil Rights
   78III Federal Remedies in General
      78k1353 Liability of Public Officials
         78k1355 k. Vicarious liability and respondeat

superior in general; supervisory liability in general. Most
Cited Cases
Supervisor liability in § 1983 action can be shown in one
or more of the following ways: (1) actual direct
participation in the constitutional violation, (2) failure to
remedy a wrong after being informed through a report or
appeal, (3) creation of a policy or custom that sanctioned
conduct amounting to a constitutional violation, or
allowing such a policy or custom to continue, (4) grossly
negligent supervision of subordinates who committed a
violation, or (5) failure to act on information indicating
that unconstitutional acts were occurring. 42 U.S.C.A. §
1983.

**[21]** Civil Rights 78 ☞ 1358

78 Civil Rights
   78III Federal Remedies in General
      78k1353 Liability of Public Officials
         78k1358 k. Criminal law enforcement; prisons.
Most Cited Cases
Sheriff was not liable under § 1983 for alleged deliberate
indifference to medical needs of inmate related to inmate's
end stage renal disease or chronic shoulder pain; there was
no showing that sheriff was personally involved in denying
medical treatment to inmate, or that there was a custom or
policy at prison of allowing alleged constitutional
violations. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. §
1983.

**[22]** Federal Civil Procedure 170A ☞ 2491.5

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)2 Particular Cases
            170Ak2491.5 k. Civil rights cases in
general. Most Cited Cases
Genuine issue of material fact as to whether registered
nurse on prison medical staff was personally involved in
prison's alleged failure to arrange for inmate's kidney
transplant test precluded summary judgment in inmate's §
1983 action alleging officials' deliberate indifference to his
medical needs, in violation of Eighth Amendment.
U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

**[23] Civil Rights 78** 🗝 **1358**

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials
            78k1358 k. Criminal law enforcement; prisons.
Most Cited Cases
If prison doctor denies medical treatment to an inmate, that doctor is "personally involved" in alleged constitutional violation for purposes of § 1983 liability. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[24] Federal Civil Procedure 170A** 🗝 **2491.5**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2491.5 k. Civil rights cases in general. Most Cited Cases
Genuine issue of material fact as to whether doctor denied medical treatment to inmate suffering from end stage renal disease, precluded summary judgment in inmate's § 1983 action alleging prison officials' deliberate indifference to his medical needs, in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.
*347 Anthony Price, pro se.

Edward J. Troy, Law Office of Edward J. Troy, Greenlawn, NY, for the Defendants.

**\*348 MEMORANDUM AND ORDER**

JOSEPH F. BIANCO, District Judge:

Pro se plaintiff Anthony Price (hereinafter "Price" or "plaintiff") alleges, pursuant to 42 U.S.C. § 1983, that Sheriff Edward Reilly, Kim Edwards, RN, Perry Intal, Mary Sullivan, RN, Dr. Benjamin Okonta, and Nassau University Medical Center (hereinafter "defendants") violated his Eighth Amendment rights by acting with deliberate indifference to his serious medical needs while plaintiff was incarcerated at the Nassau County Correctional Center (hereinafter "NCCC"). Specifically, plaintiff alleges that defendants: (1) prescribed an incorrect dosage of medication for his renal disease; (2) failed to get him tested for a kidney transplant list; and (3) failed to adequately treat him for shoulder pain. Defendants have moved for summary judgment on all of plaintiffs' claims. For the reasons set forth below, defendants' motion is granted in part and denied in part. Specifically, defendants' motion is granted with respect to plaintiff's claim regarding the dosage of his prescription medication and with respect to all of plaintiff's claims against Sheriff Reilly. Defendants' motion is denied in all other respects.

**I. FACTS**

[1][2][3] The Court has taken the facts set forth below from the parties' depositions, affidavits, and exhibits, and from the defendants' Rule 56.1 statement of facts.[FN1] They are not findings of fact by the Court, but rather are assumed to be true for the purposes of deciding this motion. Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party-here, the plaintiff. See Capobianco v. City of New York, 422 F.3d 47, 50 n. 1 (2d Cir.2005). Unless otherwise noted, where a party's 56.1 statement or deposition is cited, that fact is undisputed or the opposing party has pointed to no evidence in the record to contradict it.

FN1. The Court notes that plaintiff failed to file and serve a response to defendants' Local Rule 56.1 Statement of Facts in violation of Local Civil Rule 56.1. Generally, a "plaintiff['s] failure to respond or contest the facts set forth by the defendants in their Rule 56.1 statement as being undisputed constitutes an admission of those facts, and those facts are accepted as being undisputed." Jessamy v. City of New Rochelle, 292 F.Supp.2d 498, 504 (S.D.N.Y.2003) (quoting NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd., 262 F.Supp.2d 134, 139 (S.D.N.Y.2003)). However, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir.2001) (citations omitted); see

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

*also* *Giliani v. GNOC Corp.,* No. 04 Civ.
2935(ILG), 2006 WL 1120602, at *2 (E.D.N.Y.
Apr. 26, 2006)* (exercising court's discretion to
overlook the parties' failure to submit statements
pursuant to Local Civil Rule 56.1). In his
opposition papers, plaintiff identifies defendants'
arguments and factual assertions with which he
disagrees. In the exercise of its broad discretion,
and given plaintiff's *pro se* status, the Court will
deem admitted only those facts in defendants'
Rule 56.1 statement that are supported by
admissible evidence and not controverted by
other admissible evidence in the record. *See*
*Jessamy,* 292 F.Supp.2d at 504-05. Furthermore,
the Court has carefully reviewed all of the
parties' submissions, including plaintiff's
deposition, to determine if plaintiff has any
evidence to support his claims.

A. Arrival at NCCC and Medication

Plaintiff was incarcerated in the Nassau County
Correctional Center from January 7, 2007 to December
11, 2007. (Price Dep. at 6, 35.) Plaintiff has end stage
renal disease and has been on dialysis since 2004 related
to kidney failure. (*Id.* at 10; Defs.' 56.1 ¶ 2.) Plaintiff takes
two daily medications, Renagel and PhosLo, for this
condition. (Price Dep. at 10.) Before arriving **349** at the
NCCC,[FN2] plaintiff was taking two 800 milligram pills of
Renagel three times a day and two 667 milligram pills of
PhosLo three times a day. (*Id.* at 12-13.)

   FN2. Plaintiff was incarcerated at the Elmira
   correctional facility in 2005 and 2006. (Price
   Dep. at 7-8.)

When plaintiff arrived at the NCCC, he was interviewed
by Perry Intal, a nurse practitioner in the medical intake
department. (*Id.* at 21-22.) Plaintiff told Intal about his
medical history, including that he was a dialysis patient
and that he took medications. (*Id.* at 22.) Plaintiff was
given a prescription for one 800 milligram pill of Renagel
two times a day and one 667 milligram pill of PhosLo two
times a day. (*Id.* at 23-24.) Two or three weeks later,
plaintiff went to dialysis treatment and a blood test
revealed high phosphorous levels. (*Id.* at 25-26.) As a

result, plaintiff was given an increased dosage of
medication. (*Id.* at 25-27.) Thereafter, plaintiff's
phosphorous levels decreased and about one month later
(*id.* at 30-31), his dosage was decreased to one 800
milligram pill of Renagel three times a day and two 667
milligram pills of PhosLo three times a day. (*Id.* at 31-33.)
This was the dosage plaintiff received for the rest of his
incarceration at the NCCC.[FN3] (*Id.* at 32-33.) Plaintiff
believed that the dosage he was receiving was "wrong"
and that it was "hurting" him. (*Id.* at 59-60.) However, the
more plaintiff complained about the dosage hurting him,
"the more it seemed like the people got aggravated." (*Id.*
at 60.) In addition, plaintiff's prescriptions for Renagel and
PhosLo indicate that the medications were to be taken with
meals. (*See* Defs.' Ex. E.) Plaintiff alleges, however, that
the medications were sometimes given to him without
food or at times that interfered with his meals. (Price Dep.
at 23, 60.)

   FN3. Plaintiff testified that, at the time of his
   deposition, he was receiving two 800 milligram
   pills of Renagel three times a day and two 667
   milligram pills of PhosLo three times a day at the
   Fishkill correctional facility. (Price Dep. at
   11-12.)

Besides receiving medication, plaintiff also received
dialysis treatment three times a week at the Nassau
University Medical Center. (*Id.* at 30.) On some
occasions, plaintiff refused dialysis treatment because he
"was feeling good" and "wanted to take a break" from
treatment. (*Id.* at 56.) Plaintiff's regular medical treatment
at the hospital also included a blood test every 30 days.
(*Id.* at 27-28, 30.)

B. Kidney Transplant Request

In February or March 2007, plaintiff spoke with a social
worker named "Susan" about getting tested for a kidney
transplant. (*Id.* at 76.) A test was required before an
inmate could be placed on a waiting list for kidney
transplants. (*Id.* at 80-81.) Only two hospitals in the area
dealt with such matters: Stony Brook and a hospital in
Westchester County. (*Id.* at 75-76.) Susan tried to contact
Dr. Benjamin Okonta (hereinafter "Okonta") at Nassau
University Medical Center in or about February or March

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

2007 (*id.* at 76-77), but Susan told plaintiff that Okonta did not get back to her.[FN4] (*Id.* at 65-66, 74-78.) Susan also submitted a letter to Okonta in July 2007, stating: "As per our conversation on 7/27/07, I am re-submitting for your review my request [for] your medical services on behalf of our renal dialysis pt., Anthony Price." (*Id.* at 77-78; Defs.' Ex. K.) Plaintiff never received a response from Okonta. (Price Dep. at 82.)

> FN4. Plaintiff never interacted with Okonta except through Susan, the social worker. (Price Dep. at 73-74.)

Susan also submitted a letter to Nurse Mary Sullivan (hereinafter "Sullivan"), the **\*350** day supervisor at the NCCC medical center, stating: "As per our telephone conversation, I am submitting in writing Anthony Price's request for referral and evaluation to a kidney transplant center ... Stonybrook Univ. Medical Ctr." (Def.'s Ex. K.) At some point in time, plaintiff was called down to the NCCC medical center and was told by Sullivan that defendants knew about plaintiff's request to get on the kidney transplant list but that they had "other priorities right now." (Price Dep. at 70.) Plaintiff believed Sullivan was referring to his other health issues. (*Id.* at 70.) Plaintiff did not ask when he would be tested for the kidney transplant list. (*Id.* at 71.)

On September 25, 2007, plaintiff filed a formal grievance regarding his request to be tested for the kidney transplant list.[FN5] (*Id.* at 85.) Plaintiff stated on his grievance form that he had "been waiting to take the test I need to take to get on the kidney transplant list" and that his social worker had told him that she had forwarded the paperwork to the jail, but could not get a response. (Defs.' Ex. F.) Plaintiff requested that he be "given the test to see if I'm a candidate for possibly a kidney transplant." (*Id.*) By interdepartmental memorandum dated September 27, 2007, the Inmate Grievance Coordinator informed plaintiff that the medical grievance "is being discussed with and turned over to the Health Services Administrator. The medical unit will evaluate you. A Grievance Unit Investigator will contact you at a later date to conduct an evaluation of your status and to closeout the paperwork." (*Id.*) In another memo dated October 5, 2007, defendant Kim Edwards,[FN6] informed plaintiff:

> FN5. This was the only formal medical grievance filed by plaintiff. (Price Dep. at 85.)

> FN6. Edwards never wrote medical orders for plaintiff or examined plaintiff. (Price Dep. at 61.) Plaintiff had no interaction with Edwards except her written response to plaintiff's grievance. (*Id.* at 67.)

The social worker can only inform you of treatment options that are available for your medical problem. If you are in need of a "test", documentation must be provided by the attending physician that is responsible for your renal treatment.

(*Id.*) Plaintiff interpreted this response from Edwards to mean that the matter was now in the hands of the medical department, and so he did not further proceed with the grievance and "did not feel it was necessary." (Pl.'s Opp. at 3.)[FN7] Therefore, plaintiff "signed off on the grievance," saying that he had "read it and accepted it." (Price Dep. at 88.)

> FN7. Although plaintiff does not offer this explanation in his deposition, the Court construes the *pro se* plaintiff's sworn "verified rebuttal" to defendants' motion for summary judgment as an evidentiary submission. *See Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d Cir.2004) ("[A] verified pleading, to the extent that it makes allegations on the basis of the plaintiff's personal knowledge, and not merely on information and belief, has the effect of an affidavit and may be relied on to oppose summary judgment."); *see also Hailey v. N.Y. City Transit Auth.,* 136 Fed.Appx. 406, 407-08 (2d Cir.2005) ("The rule favoring liberal construction of *pro se* submissions is especially applicable to civil rights claims.").

Plaintiff did not get the requested test during the remainder of his incarceration at the NCCC. (*Id.* at 90.) Defendants have submitted evidence that they made efforts to get plaintiff tested and, in fact, scheduled plaintiff for a test at Stony Brook University Hospital on November 29, 2007, but that the test had to be cancelled due to "unforeseen circumstances"; the test was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

re-scheduled for January 10, 2008. (Defs.' Ex. G, Reschke Aff. ¶¶ 6-7.) Plaintiff was not informed about any scheduled test (Pl.'s Opp. at 2), and he was **351** transferred to a different facility in December 2007. (Price Dep. at 35; Reschke Aff. ¶ 7.)

### C. Shoulder Pain

Plaintiff began complaining about shoulder pain to the medical department at the NCCC on January 17, 2007, stating that his right shoulder was "extremely hurting." (Price Dep. at 36; Defs.' Ex. E, Sick Call Request, Jan. 17, 2007.) Plaintiff had received treatment for shoulder pain in the past, including a shot of Cortisone while at the Elmira facility (Price Dep. at 38, 53-54; Defs.' Ex. E, Sick Call Request, Apr. 14, 2007.) After the January 17 complaint, plaintiff was seen a couple of days later and given medication to rub on his shoulder. (Price Dep. at 41.) The medication did not help with the discomfort, and so plaintiff complained again later in January. (*Id.* at 42-43.) Although defendants gave plaintiff Motrin and Naprosyn for the pain, no x-rays were taken for several months. (*Id.* at 44, 55; Defs.' Ex. H, Edwards Aff. ¶ 4.) The pain medication continued to be ineffective, and plaintiff continued to complain. (*See, e.g., id.* at 45, 51.) For instance, in June 2007, plaintiff complained that his right shoulder "hurts really bad." (Def.'s Ex. E, Sick Call Request, June 12, 2007.) Plaintiff never refused medication for his shoulder. (Price Dep. at 56.) When plaintiff eventually was given x-rays, in April and November 2007 (Edwards Aff. ¶ 4), plaintiff was told that nothing was wrong with his shoulder.[FN8] (Price Dep. at 44; *see also* Defs.' Ex. J, Discharge Summary, November 2007 ("Although no definite evidence of venous thrombosis is seen with Rt. upper extremity, short segment acute thrombosis cannot be reliably excluded, Ultrasound might provide additional information....").) Plaintiff states that, with respect to his right shoulder, he currently wears a brace for carpal tunnel syndrome, has a separated shoulder, and takes shots for the pain. (Pl.'s Opp. at 4.)

FN8. Plaintiff testified that he stopped complaining about his shoulder at some point because he was frustrated that defendants were not helping. (Price Dep. at 54-55.) There is evidence that plaintiff complained about his shoulder at least as late as June 2007, and again

complained in November 2007, which resulted in the taking of additional x-rays. (*See* Def.'s Ex. E, Sick Call Request, June 21, 2007; Defs.' Ex. J.)

### II. PROCEDURAL HISTORY

On June 28, 2007, plaintiff filed the initial complaint in this action. Plaintiff filed an amended complaint on August 20, 2007 alleging, pursuant to Section 1983, that defendants Sheriff Edward Reilly, Kim Edwards, Perry Intal, and Nassau University Medical Center violated his Eighth Amendment rights with respect to his medication dosage, kidney transplant request, and shoulder pain. On November 14, 2007, plaintiff filed another complaint in a separate action (No. 07-CV-4841) making substantially the same allegations and expanding on his allegations regarding the kidney transplant request. This complaint named Mary Sullivan and Dr. Benjamin Okonta, as well as the Nassau University Medical Center, as defendants. By Order dated July 11, 2008, the Court consolidated both actions (Nos. 07-CV2634 and 07-CV-4841) because the allegations in the two actions were "factually intertwined."

Defendants moved for summary judgment on May 29, 2009.[FN9] Plaintiff submitted**352** an opposition to the motion on August 3 and August 11, 2009. [FN10] Defendants replied on August 20, 2009. Plaintiff submitted a surreply on October 6, 2009. This matter is fully submitted.

FN9. Pursuant to Local Rule 56.1, defendants also served plaintiff with the requisite notice for *pro se* litigants opposing summary judgment motions. *See Irby v. N.Y. City Transit Auth.,* 262 F.3d 412, 414 (2d Cir.2001) ("And we remind the district courts of this circuit, as well as summary judgment movants, of the necessity that pro se litigants have actual notice, provided in an accessible manner, of the consequences of the pro se litigant's failure to comply with the requirements of Rule 56.").

FN10. Plaintiff submitted his two identical oppositions and a sur-reply to the instant motion not only in this action, but also in the now-consolidated action (No. 07-CV-4841). The

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

Court has considered all of plaintiff's submissions in both actions in deciding the instant motion.

### III. STANDARD OF REVIEW

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); Reiseck v. Universal Commc'ns of Miami, Inc., 591 F.3d 101, 104 (2d Cir.2010). The moving party bears the burden of showing that he or she is entitled to summary judgment. See Huminski v. Corsones, 396 F.3d 53, 69 (2d Cir.2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 122 (2d Cir.2004); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party " 'must do more than simply show that there is some metaphysical doubt as to the material facts .... [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.* ' " Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir.2002) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (emphasis in original)). As the Supreme Court stated in Anderson, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50, 106 S.Ct. 2505 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. Id. at 247-48, 106 S.Ct. 2505 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth " 'concrete particulars' " showing that a trial is needed.

R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 77 (2d Cir.1984) (quoting SEC v. Research Automation Corp., 585 F.2d 31, 33 (2d Cir.1978)). Accordingly, it is insufficient for a party opposing summary judgment " 'merely to assert a conclusion without supplying supporting arguments or facts.' " BellSouth Telecomms., Inc. v. W.R. Grace & Co., 77 F.3d 603, 615 (2d Cir.1996) (quoting Research Automation Corp., 585 F.2d at 33).

[4][5] Where the plaintiff is proceeding *pro se,* the Court must "construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggest[s]." Weixel v. Bd. of Educ. of the City of N.Y., 287 F.3d 138, 145-46 (2d Cir.2002) (alterations in original) (quoting Cruz v. Gomez, 202 F.3d 593, 597 (2d Cir.2000)). Though a *pro se* litigant's pleadings and other submissions are afforded wide latitude, a *pro se* party's conclusory assertions, completely unsupported **353 by evidence, are not sufficient to defeat a motion for summary judgment. Shah v. Kuwait Airways Corp., 653 F.Supp.2d 499, 502 (S.D.N.Y.2009) ("Even a *pro se* party, however, 'may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that its version of the events is not wholly fanciful.' " (quoting Auguste v. N.Y. Presbyterian Med. Ctr., 593 F.Supp.2d 659, 663 (S.D.N.Y.2009))).

### IV. DISCUSSION

[6] To prevail on a claim under Section 1983, a plaintiff must show: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and its laws; (2) by a person acting under the color of state law. 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." Sykes v. James, 13 F.3d 515, 519 (2d Cir.1993).

There is no dispute for purposes of this motion that defendants were acting under color of state law. The question presented, therefore, is whether defendants' alleged conduct deprived plaintiff of his Eighth Amendment rights. Plaintiff alleges that his Eighth Amendment rights were violated when defendants: (1) prescribed him an incorrect dosage of medication for his renal disease; (2) failed to get him tested for the kidney

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

transplant list; and (3) failed to adequately treat him for his shoulder pain. For the reasons set forth below, after drawing all reasonable inferences from the facts in favor of plaintiff, the Court concludes that defendants are entitled to summary judgment on plaintiff's claim regarding the dosage of his medication and on all of plaintiff's claims against Sheriff Reilly. Defendants' motion for summary judgment is denied in all other respects.

### A. Exhaustion

As a threshold matter, defendants argue that plaintiff is barred from raising any Eighth Amendment claim with respect to his kidney transplant request because plaintiff has not exhausted his administrative remedies.[FN11] For the reasons set forth below, the Court disagrees and cannot conclude from this record that plaintiff failed to exhaust his administrative remedies.

> FN11. Defendants raise exhaustion only with respect to plaintiff's kidney transplant request, and so the Court does not consider exhaustion with respect to plaintiff's other claims.

### 1. Legal Standard

The Prison Litigation Reform Act of 1995 ("PLRA") states that "[n]o action shall be brought with respect to prison conditions under 42 U.S.C. § 1983, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "The PLRA exhaustion requirement 'applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' Prisoners must utilize the state's grievance procedures, regardless of whether the relief sought is offered through those procedures." Espinal v. Goord, 558 F.3d 119, 124 (2d Cir.2009) (quoting Porter v. Nussle, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." Woodford v. Ngo, 548 U.S. 81, 90, 126 S.Ct. 2378, 165 L.Ed.2d 368

(2006). Therefore, the exhaustion inquiry requires a court to "look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures." *354 Espinal, 558 F.3d at 124 (citing Jones v. Bock, 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) and Woodford, 548 U.S. at 88-90, 126 S.Ct. 2378).

Prior to Woodford, 548 U.S. 81, 126 S.Ct. 2378 (2006), the Second Circuit "recognized some nuances in the exhaustion requirement: (1) administrative remedies that are ostensibly 'available' may be unavailable as a practical matter, for instance, if the inmate has already obtained a favorable result in administrative proceedings but has no means of enforcing that result; (2) similarly, if prison officials inhibit the inmate's ability to seek administrative review, that behavior may equitably estop them from raising an exhaustion defense; (3) imperfect exhaustion may be justified in special circumstances, for instance if the inmate complied with his reasonable interpretation of unclear administrative regulations, or if the inmate reasonably believed he could raise a grievance in disciplinary proceedings and gave prison officials sufficient information to investigate the grievance." Reynoso v. Swezey, 238 Fed.Appx. 660, 662 (2d Cir.2007) (internal citations omitted); see also Davis v. New York, 311 Fed.Appx. 397, 399 (2d Cir.2009) (citing Hemphill v. New York, 380 F.3d 680, 686, 691 (2d Cir.2004)). However, the Second Circuit has not decided whether the above-discussed considerations apply post- Woodford. See, e.g., Reynoso, 238 Fed.Appx. at 662 ("Because we agree with the district court that [plaintiff] cannot prevail on any of these grounds, we have no occasion to decide whether Woodford has bearing on them."); Ruggiero v. County of Orange, 467 F.3d 170, 176 (2d Cir.2006) ("We need not determine what effect Woodford has on our case law in this area, however, because [plaintiff] could not have prevailed even under our pre- Woodford case law.").

As the Supreme Court has held, exhaustion is an affirmative defense: "We conclude that failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints." Jones v. Bock, 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); see also Key v. Toussaint, 660 F.Supp.2d 518, 523 (S.D.N.Y.2009) ("Failure to exhaust remedies under the PLRA is an affirmative defense, and thus the defendants have the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

burden of proving that [plaintiff's] retaliation claim has not been exhausted." (citations omitted)).

### 2. Application

Defendants argue that plaintiff did not appeal the resolution of his grievance request, i.e., the memo from Edwards dated October 5, 2007, stating that: "If you are in need of a 'test', documentation must be provided by the attending physician that is responsible for your renal treatment." (Defs.' Ex. F.) Therefore, defendants argue, plaintiff has failed to exhaust his administrative remedies under the PLRA. (Defs.' Br. at 25.) Plaintiff argues in response that he did not believe any further action on his grievance was "necessary" because the matter was put into the hands of the medical department. (Pl.'s Opp. at 3.) For the reasons discussed below, the Court concludes that, on this record, defendants have not met their burden of proving that plaintiff failed to exhaust his administrative remedies.

[7][8][9] As discussed above, the PLRA requires exhaustion only with respect to "such administrative remedies as are available." *See* 42 U.S.C. § 1997e(a). Therefore, in order to determine whether plaintiff exhausted his administrative remedies, the Court "must first establish from a legally sufficient source that an administrative remedy is applicable and that the particular complaint does not fall within an exception. Courts should be careful to look at the applicable set of grievance procedures,*355 whether city, state or federal." *Mojias v. Johnson,* 351 F.3d 606, 610 (2d Cir.2003); *see also Espinal,* 558 F.3d at 124 (holding that, when considering exhaustion, courts must "look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures" (citations omitted)). "Whether an administrative remedy was available to a prisoner in a particular prison or prison system, and whether such remedy was applicable to the grievance underlying the prisoner's suit, are not questions of fact. They are, or inevitably contain, questions of law." *See Snider v. Melindez,* 199 F.3d 108, 113-14 (2d Cir.1999). However, "the existence of the procedure may be a matter of fact." *Id.* at 114.

On the record before the Court on this motion, the Court

is unable to establish from any legally sufficient source that an administrative remedy was available to plaintiff. Defendants have made no submissions to the Court regarding the applicable grievance procedures at the NCCC. *See, e.g., Abney v. County of Nassau,* 237 F.Supp.2d 278, 281 (E.D.N.Y.2002) (noting that the "Inmate Handbook" for the Nassau County Correctional Facility procedure was "annexed to Defendants' moving papers"). Specifically, defendants have not submitted any evidence, by affidavit or otherwise, that NCCC procedures offer a remedy to address the particular situation in this case.[FN12] Therefore, the Court cannot conclude from this record that plaintiff had an available administrative remedy that he failed to exhaust.

FN12. The Court notes that the October 5, 2007 memo from Edwards is unclear as to which party bore the responsibility of obtaining plaintiff's medical records. (Defs.' Ex. F.) Edwards explains in an affidavit that she advised plaintiff that "it would be necessary for his doctors to provide the selected facility with his records before a request for testing would be considered." (Edwards Aff. ¶ 2.) It is unclear whether plaintiff had access to these records or whether the prison would need to obtain them. Thus, there appears to be a factual question as to the implementation of this grievance resolution. A similar situation arose in *Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004), in which the Second Circuit held that where a prisoner achieved favorable results in several grievance proceedings but alleged that prison officials failed to implement those decisions, that prisoner was without an administrative remedy and therefore had exhausted his claim for purposes of the PLRA. *See id.* at 667-68, 669 ("Where, as here, prison regulations do not provide a viable mechanism for appealing implementation failures, prisoners in [plaintiff's] situation have fully exhausted their available remedies."). The Court recognizes that *Abney,* 380 F.3d 663, was decided before *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), and that, as discussed above, the Second Circuit has not decided whether the various nuances to the exhaustion requirement apply post- *Woodford.* However, the Court need not decide the applicability of any such nuances to the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

exhaustion requirement because, as discussed above, defendants have failed to establish the procedural framework for grievance resolution at the NCCC and the availability of *any* administrative remedies.

Although there may be administrative remedies for such a situation under the New York Department of Corrections regulations, *see* 7 N.Y. Comp.Codes R. & Regs. tit. 7, § 701.5(c)(4) ("If a decision is not implemented within 45 days, the grievant may appeal to CORC citing lack of implementation as a mitigating circumstance."), it does not follow that the same procedure applies at the NCCC. *See, e.g., Abney v. County of Nassau,* 237 F.Supp.2d at 283 ("The flaw in Defendants' argument, however, is that the cases relied upon were all decided under the New York State administrative procedure-none were decided in the context of the procedure relied upon-the Nassau County Inmate Handbook procedure.").

B. Plaintiff's Claims of Deliberate Indifference

1. Legal Standard

"[D]eliberate indifference to serious medical needs of prisoners constitutes the *356 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment" and therefore "states a cause of action under § 1983." *Estelle v. Gamble,* 429 U.S. 97, 104-05, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). As the Second Circuit has explained,

[t]he Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody. Moreover, under 42 U.S.C. § 1983, prison officials are liable for harm incurred by an inmate if the officials acted with "deliberate indifference" to the safety of the inmate. However, to state a cognizable section 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice.

*Hayes v. N.Y. City Dep't of Corr.,* 84 F.3d 614, 620 (2d Cir.1996) (citations omitted). Within this framework, "[d]eliberate indifference to a prisoner's serious medical needs constitutes cruel and unusual punishment, in violation of the Eighth Amendment, as made applicable to the states through the Fourteenth Amendment." *Bellotto v. County of Orange,* 248 Fed.Appx. 232, 236 (2d Cir.2007). Thus, according to the Second Circuit,

[d]efendants may be held liable under § 1983 if they ... exhibited deliberate indifference to a known injury, a known risk, or a specific duty, and their failure to perform the duty or act to ameliorate the risk or injury was a proximate cause of plaintiff's deprivation of rights under the Constitution. Deliberate indifference is found in the Eighth Amendment context when a prison supervisor knows of and disregards an excessive risk to inmate health or safety .... Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause.

*Ortiz v. Goord,* 276 Fed.Appx. 97, 98 (2d Cir.2008) (citations and quotation marks omitted); *see also Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000) ("Deliberate indifference will exist when an official 'knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.' ") (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)); *Curry v. Kerik,* 163 F.Supp.2d 232, 237 (S.D.N.Y.2001) (" '[A]n official acts with the requisite deliberate indifference when that official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' ") (quoting *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (internal quotation marks omitted)).

[10][11] In particular, the Second Circuit has set forth a two-part test for determining whether a prison official's actions or omissions rise to the level of deliberate indifference:

The test for deliberate indifference is twofold. First, the plaintiff must demonstrate that he is incarcerated under conditions posing a substantial risk of serious harm.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

Second, the plaintiff must demonstrate that the defendant prison officials possessed sufficient culpable intent. The second prong of the deliberate indifference test, culpable intent, in turn, involves a two-tier inquiry. Specifically, a prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm.

**\*357** *Hayes,* 84 F.3d at 620 (internal citation omitted); *see also* *Phelps v. Kapnolas,* 308 F.3d 180, 185-86 (2d Cir.2002) (setting forth two-part deliberate indifference test).

In *Salahuddin v. Goord,* the Second Circuit set forth in detail the objective and subjective elements of a medical indifference claim. 467 F.3d 263 (2d Cir.2006). In particular, with respect to the first, objective element, the Second Circuit explained:

The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious. Only deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation. Determining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable care. Thus, prison officials who act reasonably [in response to an inmate-health risk] cannot be found liable under the Cruel and Unusual Punishments Clause, and, conversely, failing to take reasonable measures in response to a medical condition can lead to liability.

Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner. For example, if the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is

sufficiently serious. Factors relevant to the seriousness of a medical condition include whether a reasonable doctor or patient would find [it] important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain. In cases where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower. For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone. Thus, although we sometimes speak of a serious medical condition as the basis for an Eighth Amendment claim, such a condition is only one factor in determining whether a deprivation of adequate medical care is sufficiently grave to establish constitutional liability.

467 F.3d at 279-80 (citations and quotation marks omitted); *see also* *Jones v. Westchester County Dep't of Corr. Medical Dep't,* 557 F.Supp.2d 408, 413-14 (S.D.N.Y.2008).

With respect to the second, subjective component, the Second Circuit further explained:

The second requirement for an Eighth Amendment violation is subjective: the charged official must act with a sufficiently culpable state of mind. In medical-treatment cases not arising from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health. Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law. This mental state requires that the charged official act or fail to act while actually aware **\*358** of a substantial risk that serious inmate harm will result. Although less blameworthy than harmful action taken intentionally and knowingly, action taken with reckless indifference is no less actionable. The reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result. Rather, proof of awareness of a substantial risk of the harm suffices. But recklessness

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

entails more than mere negligence; the risk of harm must be substantial and the official's actions more than merely negligent.

*Salahuddin,* 467 F.3d at 280 (citations and quotation marks omitted); *see also Jones,* 557 F.Supp.2d at 414. The Supreme Court has stressed that

in the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.

*Estelle v. Gamble,* 429 U.S. 97, 105-06, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (internal citations omitted); *see also Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) ("A showing of medical malpractice is therefore insufficient to support an Eighth Amendment claim unless the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces a conscious disregard of a substantial risk of serious harm." (internal quotations omitted)); *Harrison v. Barkley,* 219 F.3d 132, 139 (2d Cir.2000) (a medical practitioner who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not evince the culpability necessary for deliberate indifference).

2. Application

Plaintiff alleges that defendants violated his Eighth Amendment rights by: (1) prescribing an incorrect dosage of his renal disease medication; (2) failing to have him tested for the kidney transplant list; and (3) failing to properly treat his shoulder pain. The Court considers each claim in turn and, for the reasons discussed below, concludes that defendants are entitled to summary

judgment on plaintiff's claim regarding his medication dosage and on all of plaintiff's claims against Sheriff Reilly. Defendants' motion is denied in all other respects.

a. Medication Dosage

Defendants concede that plaintiff's kidney condition is serious (Defs.' Br. at 21), but argue that the dosage of Renagel and PhosLo prescribed for plaintiff did not result in any injury. Defendants also argue that, even if the dosage was incorrect, it was at most "an error in medical judgment." Finally, defendants argue that plaintiff cannot show deliberate indifference because defendants continually tested plaintiff and twice changed the dosage of his medication depending on his phosphorous levels. (Defs.' Br. at 22.) For the reasons set forth below, the Court agrees and concludes that no rational jury could find that defendants acted with deliberate indifference with respect to the prescription*359 of medication for plaintiff's renal disease.

i. Objective Prong

[12][13][14] Plaintiff has failed to present any evidence that the allegedly incorrect medication dosage posed an objectively serious risk to plaintiff's health. As a threshold matter, the mere fact that plaintiff's underlying renal disease is a serious medical condition does not mean that the allegedly incorrect treatment for that condition poses an objectively serious health risk. *See Smith v. Carpenter,* 316 F.3d 178, 186-87 (2d Cir.2003) ("As we noted in *Chance* [v. Armstrong, 143 F.3d 698 (2d Cir.1998) ], it's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes."). Furthermore, plaintiff has failed to produce any evidence that his medication dosage at the NCCC caused him any objectively serious harm. Instead, plaintiff testified merely that the prescribed dosage was "wrong" and was "hurting" him.[FN13] (Price Dep. at 60.) Plaintiff's belief that the medication dosage was incorrect is insufficient to establish the objective prong of the deliberate indifference test.[FN14] *See Fox v. Fischer,* 242 Fed.Appx. 759, 760 (2d Cir.2007) ("[T]he fact that [plaintiff] was provided Claritin as a substitute for Allegra

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

fails to establish deliberate indifference to a serious medical need, because there is no allegation that the change in medication caused harm, if any, sufficiently serious to establish the objective prong of a deliberate indifference claim...."); *Reyes v. Gardener,* 93 Fed.Appx. 283, 285 (2d Cir.2004) ( "[Plaintiff] has offered no evidence ... showing that the prescribed medication regimen deviated from reasonable medical practice for the treatment of his condition."). Although there is evidence that plaintiff's phosphorous levels increased when he was prescribed a lesser dosage of medication upon arriving at the NCCC (*see* Price Dep. *360 at 23-26), that is not by itself enough to support a finding of an objectively serious condition.[FN15] *See Smith,* 316 F.3d at 188-89 ("Although [plaintiff] suffered from an admittedly serious underlying condition, he presented no evidence that the two alleged episodes of missed medication resulted in permanent or on-going harm to his health, nor did he present any evidence explaining why the absence of actual physical injury was not a relevant factor in assessing the severity of his medical need.") (affirming denial of motion for new trial). Thus, plaintiff's medication dosage claim must fail because he cannot show that the complained-of dosage posed an objectively serious health risk.[FN16]

FN13. Plaintiff does not distinguish between the initial dosage he received at the NCCC and the later dosages he received, instead arguing generally that all of the dosages he received at the NCCC were incorrect.

FN14. Plaintiff's conclusory testimony that the dosage was "hurting" him also is insufficient to establish the objective prong of the deliberate indifference test. To the extent plaintiff claims that the medication caused him pain, there is no evidence in the record that plaintiff suffered from chronic pain or, indeed, any other objectively serious symptoms in connection with the medication dosage. Although not mentioned in plaintiff's deposition or in his opposition to the instant motion, plaintiff alleges in his amended complaint that the lesser dosage put him at risk of "itching" and "breaking of bones." (Amended Complaint, No. 07-CV-2634, at 4.) There is evidence that plaintiff suffered from a rash and/or itching while at the NCCC and that plaintiff was told at one point that he had

eczema. (*See* Price Dep. at 45-51.) However, there is no evidence to connect those symptoms with the medication dosage for his renal disease. (*See, e.g., id.* at 46 ("Q. Did anyone ever tell you what was causing a rash? A. I kept going to the–I had went to the dermatologist at Bellevue. To me, the doctor had an attitude like it ain't nothing wrong; like it was acne or something.").) Furthermore, there is no evidence that the rash and/or itching was an objectively serious condition. *See Lewal v. Wiley,* 29 Fed.Appx. 26, 29 (2d Cir.2002) (affirming summary judgment and holding that plaintiff's alleged "persistent rash" was not a "serious medical condition"); *see also Benitez v. Ham,* No. 04-CV-1159, 2009 WL 3486379, at *11 (N.D.N.Y. Oct. 21, 2009) ("[T]he evidence shows that Plaintiff suffered from a severe body itch. While this condition was undoubtedly unpleasant, it simply does not rise to the level of an Eighth Amendment violation."). In any event, even if plaintiff did suffer from an objectively serious condition because of the medication dosage, he cannot prove that defendants acted with a subjectively culpable state of mind, as discussed *infra.*

FN15. In any event, as discussed *infra,* defendants adjusted plaintiff's dosage in response to the increase in phosphorous levels, and there is no evidence from which a rational jury could conclude that defendants acted with deliberate indifference in prescribing plaintiff's medication.

FN16. Although he does not raise it in any of his pleadings or in his opposition to the instant motion, plaintiff testified at his deposition that he had to take the medication with meals but that sometimes he was given the medication without food or at times that interfered with his meals. (Price Dep. at 23, 60; Defs.' Ex. E.) The record is unclear as to how often this occurred. The Court assumes, as it must on this motion for summary judgment, that on some occasions plaintiff was given his medications not at meal times or at times that interfered with meals. However, plaintiff points to no evidence whatsoever of any harm caused by defendants' alleged conduct in this regard, and, therefore, no

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

rational jury could find that the provision of medication without food on some occasions was objectively serious. *See Gillard v. Kuykendall,* 295 Fed.Appx. 102, 103 (8th Cir.2008) (affirming summary judgment for defendants where defendants, on some occasions, "were late in giving [plaintiff] his medications and did not always administer them with meals as [plaintiff] apparently desired" where there was no evidence of any adverse consequences). Thus, any deliberate indifference claim based on these allegations would fail as well.

### ii. Subjective Prong

[15][16] Plaintiff's claim with respect to his medication dosage also fails because plaintiff cannot show that defendants acted with subjectively culpable intent, i.e., that they were aware of, and consciously disregarded, plaintiff's serious medical needs. Plaintiff's claim is based on his assertion that the prescribed dosage was "wrong." However, mere disagreement with a prescribed medication dosage is insufficient as a matter of law to establish the subjective prong of deliberate indifference. *See Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998) ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."); *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001) ("[D]isagreements over medications ... are not adequate grounds for a Section 1983 claim. Those issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment." (citing *Estelle,* 429 U.S. at 107, 97 S.Ct. 285)); *see also, e.g., Fuller v. Ranney,* No. 06-CV-0033, 2010 WL 597952, at *11 (W.D.N.Y. Feb. 17, 2010) ("Plaintiff's claim amounts to nothing more than a disagreement with the prescribed treatment he received and his insistence that he be prescribed certain medications. Without more, plaintiff's disagreement with the treatment he received does not rise to the level of a constitutional violation of his Eighth Amendment rights."); *Covington v. Westchester County Dep't of Corr.,* No. 06 Civ. 5369, 2010 WL 572125, at *6 (S.D.N.Y. Jan. 25, 2010) ("[Plaintiff's] claims that Defendants failed **361 to change or increase his medication and counseling

sessions amount to negligence claims at most, which is insufficient."); *Hamm v. Hatcher,* No. 05-CV-503, 2009 WL 1322357, at *8 (S.D.N.Y. May 5, 2009) ("Plaintiff's unfulfilled demand for a larger dosage of [the medication] represents a mere disagreement over the course of Plaintiff's treatment and is inconsistent with deliberate indifference ....").

The fact that defendants adjusted the dosage of plaintiff's medication in response to plaintiff's phosphorous levels (*see* Price Dep. at 25-27) is also inconsistent with deliberate indifference. *See Bellotto v. County of Orange,* 248 Fed.Appx. 232, 237 (2d Cir.2007) ("The record also shows that mental health professionals responded to [plaintiff's] concerns about his medications and adjusted his prescription as they believed necessary.") (affirming summary judgment for defendants); *see also Jolly v. Knudsen,* 205 F.3d 1094, 1097 (8th Cir.2000) ("[Defendant's] actions in this case cannot reasonably be said to reflect deliberate indifference. The only relevant evidence in the record indicates that [defendant's] actions were aimed at correcting perceived difficulties in [plaintiff's] dosage levels [in response to blood tests]."); *Fuller,* 2010 WL 597952, at *11 ("Moreover, a subsequent decision to prescribe plaintiff a certain medication does not indicate that the medication should have been prescribed earlier.").[FN17] Thus, there is no evidence in the record sufficient for a rational jury to find that defendants acted with deliberate indifference regarding the prescription dosage of plaintiff's renal disease medication.

FN17. To the extent plaintiff also argues that that defendants acted with deliberate indifference because he has received different prescriptions at different facilities, the Court rejects that argument as well. *See, e.g., Cole v. Goord,* No. 04 Civ. 8906, 2009 WL 1181295, at *8 n. 9 (S.D.N.Y. Apr. 30, 2009) ("[Plaintiff's] reliance upon the fact that subsequent medical providers have provided him with a different course of medication or treatment ... does nothing to establish that [defendant] violated [plaintiff's] Eighth Amendment rights. Physicians can and do differ as to their determination of the appropriate treatment for a particular patient; that difference in opinion does not satisfy the requirements for a constitutional claim of deliberate indifference."

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

(citing *Estelle,* 429 U.S. at 97, 97 S.Ct. 285)).

In sum, based on the undisputed facts and drawing all reasonable inferences in plaintiff's favor, no rational jury could find that defendants were aware of, and consciously disregarded, plaintiff's objectively serious health needs regarding his medication dosage. Accordingly, defendants' motion for summary judgment is granted with respect to this claim.

b. Kidney Transplant

[17] Defendants also argue that plaintiff cannot proceed with his deliberate indifference claim regarding his request to be tested for a kidney transplant. Defendants do not dispute the objective seriousness of plaintiff's underlying condition or the requested transplant, and instead argue only that defendants lacked subjective culpability. Specifically, defendants argue that they made reasonable efforts to get plaintiff tested. (Defs.' Br. at 23.) However, construing the facts in the light most favorable to plaintiff, a rational jury could find that defendants were aware of, and consciously disregarded, plaintiff's serious medical needs.

Plaintiff began requesting a kidney transplant test as early as February or March 2007 and still had not received one by the time he left the NCCC in December 2007. (*See* Price Dep. at 76-77, 90.) Requests were sent on plaintiff's behalf to Dr. Okonta at the Nassau University Medical Center and to Nurse Mary Sullivan at the NCCC medical department. (*See* Defs.' Ex. K.) The record indicates that plaintiff received no response from Okonta. (*See* Price Dep. at 82.) When plaintiff asked Sullivan about the test, Sullivan told him that defendants had "other priorities right now." (Price Dep. at 70.) Even after plaintiff filed a formal grievance in September 2007, he still did not receive the requested test. (*See* Defs.' Ex. F.) On these facts, where there was a delay of at least nine months in arranging a kidney transplant test for plaintiff despite plaintiff's repeated requests, and where defendants do not dispute the necessity of the test, a rational jury could find that defendants acted with deliberate indifference to plaintiff's serious medical needs. *See Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000) (holding summary judgment inappropriate where there

was evidence that, *inter alia,* plaintiff was delayed dental treatment for a cavity for one year); *Hathaway v. Coughlin,* 841 F.2d 48, 50-51 (2d Cir.1988) ("[Plaintiff's] affidavit in opposition to [defendants'] motion for summary judgment alleged that a delay of over two years in arranging surgery ... amounted to deliberate indifference to his serious medical needs. We believe this is a sufficient allegation to survive a motion for summary judgment under *Archer* [*v. Dutcher,* 733 F.2d 14 (2d Cir.1984) ] because it raises a factual dispute ...."); *see also Lloyd v. Lee,* 570 F.Supp.2d 556, 569 (S.D.N.Y.2008) ("A reasonable jury could infer deliberate indifference from the failure of the doctors to take further steps to see that [plaintiff] was given an MRI. The argument that the doctors here did not take [plaintiff's] condition seriously is plausible, given the length of the delays. Nine months went by after the MRI was first requested before the MRI was actually taken.").

Defendants point to evidence in the record that they were, in fact, attempting to get plaintiff tested throughout the time in question, but were unsuccessful in their efforts. (*See* Defs.' Br. at 23; Reschke Aff. ¶ 3.) However, defendants' proffered explanation for the delay, i.e., the difficulty of finding a hospital because of transportation and security concerns, raises questions of fact and does not, as a matter of law, absolve them of liability. *See Johnson v. Bowers,* 884 F.2d 1053, 1056 (8th Cir.1989) ("It is no excuse for [defendants] to urge that the responsibility for delay in surgery rests with [the hospital]."); *Williams v. Scully,* 552 F.Supp. 431, 432 (S.D.N.Y.1982) (denying summary judgment where plaintiff "was unable to obtain treatment ... for five and one half months, during which time he suffered considerable pain" despite defendants' "explanations for the inadequacy of [the prison's] dental program"), *cited approvingly in Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000). Thus, whether defendants' efforts were reasonable over the nine month period at issue is a question of fact for the jury.

In sum, on this record, drawing all reasonable inferences in plaintiff's favor, the Court concludes that a rational jury could find that defendants acted with deliberate indifference regarding plaintiff's request for a kidney transplant test. Accordingly, defendants' motion for summary judgment on this claim is denied.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

c. Shoulder

Defendants argue that summary judgment is warranted on the claim relating to the alleged shoulder injury because plaintiff's complained-of shoulder pain was not objectively serious and plaintiff has failed to show subjectively culpable intent by defendants. For the reasons set forth below, the Court disagrees and concludes that a rational jury could find that defendants acted with deliberate indifference **363** regarding plaintiff's shoulder pain. Thus, summary judgment on this claim is denied.

i. Objective Prong

[18][19] Defendants argue that plaintiff cannot satisfy the objective element of the deliberate indifference test regarding his shoulder because plaintiff alleges only that he had pain in his shoulder and not that he had "a condition of urgency, one that might produce death, deterioration or extreme pain." (Defs.' Br. at 22.) However, plaintiff did complain to the medical department that his right shoulder was "extremely hurting." (Defs.' Ex. E, Sick Call Request, Jan. 17, 2007.) Furthermore, plaintiff states that he now has a separated shoulder and wears a brace for carpal tunnel syndrome. (Pl.'s Opp. at 4.) In any event, chronic pain can be a serious medical condition. *See* Brock v. Wright, 315 F.3d 158, 163 (2d Cir.2003) ("We will no more tolerate prison officials' deliberate indifference to the chronic pain of an inmate than we would a sentence that required the inmate to submit to such pain. We do not, therefore, require an inmate to demonstrate that he or she experiences pain that is at the limit of human ability to bear, nor do we require a showing that his or her condition will degenerate into a life-threatening one."); Hathaway v. Coughlin, 37 F.3d 63, 67 (2d Cir.1994); *see also* Sereika v. Patel, 411 F.Supp.2d 397, 406 (S.D.N.Y.2006) ( "[Plaintiff's] allegation that he experienced severe pain as a result of the alleged delay in treatment, together with his allegation that the alleged delay in treatment resulted in reduced mobility in his arm and shoulder, raise issues of fact as to whether his shoulder injury constitutes a sufficiently serious medical condition to satisfy the objective prong of the deliberate indifference standard.") (denying summary judgment). Thus, the Court cannot conclude at the summary judgment stage that plaintiff did not suffer from a serious medical condition.

ii. Subjective Prong

Defendants also argue that plaintiff cannot meet the subjective prong of the deliberate indifference test because plaintiff was seen repeatedly by the medical department and was given pain medication. (Defs.' Br. at 22.) Defendants also point to the fact that when x-rays were ultimately taken, they were negative.[FN18] However, construing the facts most favorably to plaintiff, a rational jury could find that defendants were aware of, and consciously disregarded, plaintiff's serious medical needs. Plaintiff repeatedly complained to defendants over a period of several months, beginning in January 2007, about the pain in his shoulder (*see* Defs.' Ex. E), and further complained that the pain medication he was being given was ineffective.[FN19] (*See, e.g.,* Price Dep. at 45, 51.) In June 2007, for instance, plaintiff was still complaining that his right shoulder "hurts really bad," and that he had been "complaining of that for months." (Def.'s Ex. E, Sick Call Requests, June 12 and June 17, 2007.) Thus, it is uncontroverted that defendants were aware of plaintiff's alleged chronic shoulder pain.

FN18. The November 2007 x-ray records indicate that "short segment acute thrombosis cannot be reliably excluded, Ultrasound might provide additional information ...." (*See* Defs.' Ex. J, Discharge Summary, November 2007.) Defendants point to no evidence in the record that they followed up on that x-ray report.

FN19. Plaintiff also informed defendants that he had been given a Cortisone shot for his shoulder at his previous place of incarceration. (*See* Price Dep. at 38, 53-54; Defs.' Ex. E, Sick Call Request, Apr. 14, 2007.)

Despite plaintiff's complaints, however, plaintiff was not given an x-ray exam for several months (Price Dep. at 44; Def.'s **364** Ex. J), and was not given any pain medication besides Motrin and Naprosyn. (Price Dep. at 55.) Although defendants argue that the treatment for plaintiff's shoulder pain was reasonable under the circumstances, there are factual questions in this case that preclude

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

summary judgment. *See Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998) ("Whether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case.") (reversing grant of motion to dismiss). Drawing all reasonable inferences from the facts in favor of plaintiff, a rational jury could find that defendants acted with deliberate indifference by not changing plaintiff's pain medication despite his continued complaints that it was ineffective, by failing to take x-rays for several months, and by failing to follow-up on a November 2007 x-ray report indicating that further tests might be needed (*see* Defs.' Ex. J, Discharge Summary, November 2007). *See Brock,* 315 F.3d at 167 ("It is not controverted that [defendant] was aware that [plaintiff] was suffering some pain from his scar. The defendants sought to cast doubt on the truthfulness of [plaintiff's] claims about the extent of the pain he was suffering and, also, to put into question DOCS' awareness of [plaintiff's] condition. But at most, defendants' arguments and evidence to these effects raise issues for a jury and do not justify summary judgment for them."); *Hathaway,* 37 F.3d at 68-69 (holding that, *inter alia,* two-year delay in surgery despite plaintiff's repeated complaints of pain could support finding of deliberate indifference). The fact that defendants offered some treatment in response to plaintiff's complaints does not as a matter of law establish that they had no subjectively culpable intent. *See Archer v. Dutcher,* 733 F.2d 14, 16 (2d Cir.1984) ("[Plaintiff] received extensive medical attention, and the records maintained by the prison officials and hospital do substantiate the conclusion that [defendants] provided [plaintiff] with comprehensive, if not doting, health care. Nonetheless, [plaintiff's] affidavit in opposition to the motion for summary judgment does raise material factual disputes, irrespective of their likely resolution.... [Plaintiff's] assertions do raise material factual issues. After all, if defendants did decide to delay emergency medical-aid-even for 'only' five hours-in order to make [plaintiff] suffer, surely a claim would be stated under *Estelle.*"). Specifically, given the factual disputes in this case, the Court cannot conclude as a matter of law that defendants did not act with deliberate indifference when they allegedly declined to change their treatment for plaintiff's shoulder pain despite repeated complaints over several months that the pain persisted. *See, e.g., Lloyd,* 570 F.Supp.2d at 569 ("[T]he amended complaint plausibly alleges that doctors knew that [plaintiff] was experiencing extreme pain and loss of mobility, knew that the course of treatment they prescribed was ineffective, and declined to do anything to attempt to improve

[plaintiff's] situation besides re-submitting MRI request forms.... Had the doctors followed up on numerous requests for an MRI, the injury would have been discovered earlier, and some of the serious pain and discomfort that [plaintiff] experienced for more than a year could have been averted."). Thus, there are factual disputes that prevent summary judgment on defendants' subjective intent.

In sum, on this record, drawing all reasonable inferences from the facts in favor of plaintiff, a rational jury could find that defendants acted with deliberate indifference to plaintiff's shoulder pain. Accordingly, defendants' motion for summary judgment on this claim is denied.

**\*365** C. Individual Defendants

Defendants also move for summary judgment specifically with respect to plaintiff's claims against three of the individual defendants: Sheriff Edward Reilly (hereinafter "Reilly"), Edwards, and Okonta. For the reasons set forth below, the Court grants defendants' motion with respect to Reilly, and denies it with respect to Edwards and Okonta.

1. Legal Standard

[20] "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under Section 1983." *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (citation and quotation marks omitted). In other words, "supervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on respondeat superior." *Id.* Supervisor liability can be shown in one or more of the following ways: "(1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring." *Id.* at 145 (citation omitted).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

### 2. Application

[21] Although plaintiff alleges in the complaint that Reilly was aware of plaintiff's condition and failed to assist,[FN20] there is no mention whatsoever of Reilly in plaintiff's deposition or in any of the parties' evidentiary submissions. Because there is no evidence in the record that Reilly was personally involved in any of the alleged constitutional violations or that there was a custom or policy of allowing such constitutional violations (and that Reilly allowed such custom or policy to continue), no rational jury could find Reilly liable for any of plaintiff's deliberate indifference claims. *See Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) ("[M]ere linkage in the prison chain of command is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim."); *see also Mastroianni v. Reilly,* 602 F.Supp.2d 425, 438-39 (E.D.N.Y.2009) ("[T]he plaintiff cannot establish that Sheriff Reilly was grossly negligent in failing to supervise subordinates because the medical care of inmates at the NCCC was delegated to the Nassau Health Care Corporation and plaintiff provides no evidence that Reilly was otherwise personally involved in his treatment."). Therefore, defendants' motion for summary judgment with respect to plaintiff's claims against Sheriff Reilly is granted.

> FN20. Plaintiff actually refers in the complaint to "Sheriff Edwards," but the Court determines, liberally construing the complaint, that this allegation refers to Sheriff Reilly.

[22] With respect to plaintiff's claims against Edwards and Okonta, however, there are disputed issues of fact that preclude summary judgment. Defendants argue that Edwards was not personally involved in the alleged constitutional violations because she did not treat plaintiff and merely responded to his grievance request. (Defs.' Br. at 24-25.) However, plaintiff testified that, although Edwards never physically treated him, she "takes care of appointments and makes sure you get to certain specialists" and that "she was in a position to make sure that I get the adequate care that I needed." (Price Dep. at 61-62.) Plaintiff also testified that he submitted a grievance request to **366 Edwards in order to be tested for the kidney transplant list, but that Edwards failed to get him on the list. (Price Dep. at 62-63.) Drawing all

reasonable inferences in favor of plaintiff, a rational jury could find that Edwards was personally involved in the alleged constitutional violations because she was in a position to get plaintiff tested for the kidney transplant list and failed to do so. *See McKenna v. Wright,* 386 F.3d 432, 437-38 (2d Cir.2004) ("Although it is questionable whether an adjudicator's rejection of an administrative grievance would make him liable for the conduct complained of, [defendant] was properly retained in the lawsuit at this stage, not simply because he rejected the grievance, but because he is alleged, as Deputy Superintendent for Administration at [the prison], to have been responsible for the prison's medical program." (citation omitted)). Thus, plaintiff has presented sufficient evidence of Edwards's personal involvement in the alleged constitutional violations to raise a genuine issue of material fact as to whether Edwards is liable for the alleged Eighth Amendment violations.

[23][24] Defendants also argue that Okonta was not personally involved in the alleged constitutional violations because he did not actually treat plaintiff. (Defs.' Br. at 24-25.) This argument misses the mark. It is plaintiff's allegation that Okonta violated plaintiff's constitutional rights precisely by not treating him. Plaintiff has presented evidence that he received no response from Okonta regarding his requests to be tested for the kidney transplant list. Where a prison doctor denies medical treatment to an inmate, that doctor is personally involved in the alleged constitutional violation. *See McKenna,* 386 F.3d at 437 (finding "personal involvement" where medical defendants were alleged to have participated in the denial of treatment); *see also Chambers v. Wright,* No. 05 Civ. 9915, 2007 WL 4462181, at *3 (S.D.N.Y. Dec. 19, 2007) ("Prison doctors who have denied medical treatment to an inmate are 'personally involved' for the purposes of jurisdiction under § 1983." (citing *McKenna,* 386 F.3d at 437)). Although defendants argue that they were in fact making efforts to get plaintiff tested (Defs.' Br. at 25), the reasonableness of those efforts, as discussed above, is a factual question inappropriate for resolution on summary judgment.

In sum, defendants' motion for summary judgment on plaintiff's claims against Reilly is granted. Defendants' motion with respect to Edwards and Okonta is denied.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

### V. CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part defendants' motion for summary judgment. Specifically, the Court grants defendants' motion with respect to plaintiff's claim regarding the dosage of his renal disease medication and with respect to all of plaintiff's claims against Sheriff Reilly. Defendants' motion is denied in all other respects. The parties to this action shall participate in a telephone conference on Monday, April 5, 2010 at 3:30 p.m. At that time, counsel for defendants shall initiate the call and, with all parties on the line, contact Chambers at (631) 712-5670.

SO ORDERED.

E.D.N.Y.,2010.
Price v. Reilly
697 F.Supp.2d 344

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

**C**   Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Jerome WALDO, Plaintiff,
v.
Glenn S. GOORD, Acting Commissioner of New York
State Department of Correctional Services; Peter J.
Lacy, Superintendent at Bare Hill Corr. Facility;
Wendell Babbie, Acting Superintendent at Altona Corr.
Facility; and John Doe, Corrections Officer at Bare Hill
Corr. Facility, Defendants.
**No. 97-CV-1385 LEK DRH.**

Oct. 1, 1998.

Jerome Waldo, Plaintiff, pro se, Mohawk Correctional
Facility, Rome, for Plaintiff.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Albany, Eric D. Handelman, Esq., Asst.
Attorney General, for Defendants.

DECISION AND ORDER

KAHN, District J.

**\*1** This matter comes before the Court following a
Report-Recommendation filed on August 21, 1998 by the
Honorable David R. Homer, Magistrate Judge, pursuant to
28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern
District of New York.

No objections to the Report-Recommendation have been
raised. Furthermore, after examining the record, the Court
has determined that the Report-Recommendation is not
clearly erroneous. *See* Fed.R.Civ.P. 72(b), Advisory

Committee Notes. Accordingly, the Court adopts the
Report-Recommendation for the reasons stated therein.

Accordingly, it is

ORDERED that the Report-Recommendation is
APPROVED and ADOPTED; and it is further

ORDERED that the motion to dismiss by defendants is
GRANTED; and it is further

ORDERED that the complaint is dismissed without
prejudice as to the unserved John Doe defendant pursuant
to Fed.R.Civ.P. 4(m), and the action is therefore dismissed
in its entirety; and it is further

ORDERED that the Clerk serve a copy of this order on all
parties by regular mail.

IT IS SO ORDERED.
HOMER, Magistrate J.

REPORT-RECOMMENDATION AND ORDER [FN1]

FN1. This matter was referred to the undersigned
pursuant to 28 U.S.C. § 636(b) and
N.D.N.Y.L.R. 72.3(c).

The plaintiff, an inmate in the New York Department of
Correctional Services ("DOCS"), brought this pro se
action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that
while incarcerated in Bare Hill Correctional Facility
("Bare Hill") and Altona Correctional Facility ("Altona"),
defendants violated his rights under the Eighth and
Fourteenth Amendments.[FN2] In particular, plaintiff alleges
that prison officials maintained overcrowded facilities
resulting in physical and emotional injury to the plaintiff

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

and failed to provide adequate medical treatment for his injuries and drug problem. Plaintiff seeks declaratory relief and monetary damages. Presently pending is defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b). Docket No. 18. For the reasons which follow, it is recommended that the motion be granted in its entirety.

FN2. The allegations as to Bare Hill are made against defendants Goord, Lacy, and Doe. Allegations as to Altona are made against Goord and Babbie.

I. Background

Plaintiff alleges that on August 21, 1997 at Bare Hill, while he and two other inmates were playing cards, an argument ensued, and one of the two assaulted him. Compl., ¶ 17. Plaintiff received medical treatment for facial injuries at the prison infirmary and at Malone County Hospital. Id. at ¶¶ 18-19. On September 11, 1997, plaintiff was transferred to Altona and went to Plattsburgh Hospital for x-rays several days later. Id. at ¶ 21.

Plaintiff's complaint asserts that the overcrowded conditions at Bare Hill created a tense environment which increased the likelihood of violence and caused the physical assault on him by another inmate. Id. at ¶¶ 10-11. Additionally, plaintiff contends that similar conditions at Altona caused him mental distress and that he received constitutionally deficient medical treatment for his injuries. Id. at ¶¶ 21-22. The complaint alleges that Altona's lack of a drug treatment program and a dentist or specialist to treat his facial injuries constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments. Id. at ¶¶ 22, 27-28.

II. Motion to Dismiss

*2 When considering a Rule 12(b) motion, a court must assume the truth of all factual allegations in the complaint and draw all reasonable inferences from those facts in favor of the plaintiff. Leeds v. Meltz, 85 F.3d 51, 53 (2d Cir.1996). The complaint may be dismissed only when "it

appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Staron v. McDonald's Corp., 51 F.3d 353, 355 (2d Cir.1995) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). This standard receives especially careful application in cases such as this where a pro se plaintiff claims violations of his civil rights. Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir.), cert. denied, 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994).

III. Discussion

A. Conditions of Confinement

Defendants assert that plaintiff fails to state a claim regarding the conditions of confinement at Bare Hill and Altona. For conditions of confinement to amount to cruel and unusual punishment, a two-prong test must be met. First, plaintiff must show a sufficiently serious deprivation. Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing Wilson v. Seiter, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); Rhodes v. Chapman, 452 U.S. 347, 348 (1981)(denial of the "minimal civilized measure of life's necessities"). Second, plaintiff must show that the prison official involved was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that the official drew the inference. Farmer, 511 U.S. at 837.

1. Bare Hill

In his Bare Hill claim, plaintiff alleges that the overcrowded and understaffed conditions in the dormitory-style housing "resulted in an increase in tension, mental anguish and frustration among prisoners, and dangerously increased the potential for violence." Compl.,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

¶ 11. Plaintiff asserts that these conditions violated his constitutional right to be free from cruel and unusual punishment and led to the attack on him by another prisoner. The Supreme Court has held that double-celling to manage prison overcrowding is not a per se violation of the Eighth Amendment. *Rhodes,* 452 U.S. at 347-48. The Third Circuit has recognized, though, that double-celling paired with other adverse circumstances can create a totality of conditions amounting to cruel and unusual punishment. *Nami v. Fauver,* 82 F.3d 63, 67 (3d Cir.1996). While plaintiff here does not specify double-celling as the source of his complaint, the concerns he raises are similar. Plaintiff alleges that overcrowding led to an increase in tension and danger which violated his rights. Plaintiff does not claim, however, that he was deprived of any basic needs such as food or clothing, nor does he assert any injury beyond the fear and tension allegedly engendered by the overcrowding. Further, a previous lawsuit by this plaintiff raised a similar complaint, that double-celling and fear of assault amounted to cruel and unusual punishment, which was rejected as insufficient by the court. *Bolton v. Goord,* 992 F.Supp. 604, 627 (S.D.N.Y.1998). The court there found that the fear created by the double-celling was not "an objectively serious enough injury to support a claim for damages." *Id.* (citing *Doe v. Welborn,* 110 F.3d 520, 524 (7th Cir.1997)).

**\*3** As in his prior complaint, plaintiff's limited allegations of overcrowding and fear, without more, are insufficient. *Compare* *Ingalls v. Florio,* 968 F.Supp. 193, 198 (D.N.J.1997) (Eighth Amendment overcrowding claim stated when five or six inmates are held in cell designed for one, inmates are required to sleep on floor, food is infested, and there is insufficient toilet paper) *and* *Zolnowski v. County of Erie,* 944 F.Supp. 1096, 1113 (W.D.N.Y.1996) (Eighth Amendment claim stated when overcrowding caused inmates to sleep on mattresses on floor, eat meals while sitting on floor, and endure vomit on the floor and toilets) *with* *Harris v. Murray,* 761 F.Supp. 409, 415 (E.D.Va.1990) (No Eighth Amendment claim when plaintiff makes only a generalized claim of overcrowding unaccompanied by any specific claim concerning the adverse effects of overcrowding). Thus, although overcrowding could create conditions which might state a violation of the Eighth Amendment, plaintiff has not alleged sufficient facts to support such a finding here. Plaintiff's conditions of confinement claim as to Bare

Hill should be dismissed.

2. Altona

Plaintiff also asserts a similar conditions of confinement claim regarding Altona. For the reasons discussed above, plaintiff's claim that he suffered anxiety and fear of other inmates in the overcrowded facility (Compl., ¶¶ 21-22) is insufficient to establish a serious injury or harm.

Plaintiff's second claim regarding Altona relates to the alleged inadequacies of the medical treatment he received. The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The two-pronged *Farmer* standard applies in medical treatment cases as well. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998). Therefore, plaintiff must allege facts which would support a finding that he suffered a sufficiently serious deprivation of his rights and that the prison officials acted with deliberate indifference to his medical needs. *Farmer,* 511 U.S. at 834.

Plaintiff alleges that the medical treatment available at Altona was insufficient to address the injuries sustained in the altercation at Bare Hill. Specifically, plaintiff cites the lack of a dentist or specialist to treat his facial injuries as an unconstitutional deprivation. Plaintiff claims that the injuries continue to cause extreme pain, nosebleeds, and swelling. Compl., ¶¶ 22 & 26. For the purposes of the Rule 12(b) motion, plaintiff's allegations of extreme pain suffice for a sufficiently serious deprivation. *See* *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Plaintiff does not, however, allege facts sufficient to support a claim of deliberate indifference by the named defendants. To satisfy this element, plaintiff must demonstrate that prison officials had knowledge of facts from which an inference could be drawn that a "substantial risk of serious harm" to the plaintiff existed and that the officials actually drew the inference. *Farmer,* 511 U.S. at 837. Plaintiff's complaint does not support, even when liberally construed, any such conclusion. Plaintiff offers

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

no evidence that the Altona Superintendent or DOCS Commissioner had any actual knowledge of his medical condition or that he made any attempts to notify them of his special needs. Where the plaintiff has not even alleged knowledge of his medical needs by the defendants, no reasonable jury could conclude that the defendants were deliberately indifferent to those needs. *See Amos v. Maryland Dep't of Public Safety and Corr. Services,* 126 F.3d 589, 610-11 (4th Cir.1997), *vacated on other grounds,*524 U.S. 935, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998).

*4 Plaintiff's second complaint about Altona is that it offers "no type of state drug treatment program for the plaintiff." Compl., ¶ 22. Constitutionally required medical treatment encompasses drug addiction therapy. *Fiallo v. de Batista,* 666 F.2d 729, 731 (1st Cir.1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 760-61 (3d Cir.1979). As in the *Fiallo* case, however, plaintiff falls short of stating an Eighth Amendment claim as he "clearly does not allege deprivation of essential treatment or indifference to serious need, only that he has not received the type of treatment which he desires." *Id.* at 731. Further, plaintiff alleges no harm or injury attributable to the charged deprivation. Plaintiff has not articulated his reasons for desiring drug treatment or how he was harmed by the alleged deprivation of this service. *See Guidry v. Jefferson County Detention Ctr.,* 868 F.Supp. 189, 192 (E.D.Tex.1994) (to state a section 1983 claim, plaintiff must allege that some injury has been suffered).

For these reasons, plaintiff's Altona claims should be dismissed.

B. Failure to Protect

Defendants further assert that plaintiff has not established that any of the named defendants failed to protect the plaintiff from the attack by the other inmate at Bare Hill. Prison officials have a duty "to act reasonably to ensure a safe environment for a prisoner *when they are aware that* there is a significant risk of serious injury to that prisoner." *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) (emphasis added); *see also Villante v. Dep't of Corr. of City of N.Y.,* 786 F.2d 516, 519 (2d

Cir.1986). This duty is not absolute, however, as "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability." *Farmer,* 511 U.S. at 834. To establish this liability, *Farmer's* familiar two-prong standard must be satisfied.

As in the medical indifference claim discussed above, plaintiff's allegations of broken bones and severe pain from the complained of assault suffice to establish a "sufficiently serious" deprivation. *Id.* Plaintiff's claim fails, however, to raise the possibility that he will be able to prove deliberate indifference to any threat of harm to him by the Bare Hill Superintendent or the DOCS Commissioner. Again, plaintiff must allege facts which establish that these officials were aware of circumstances from which the inference could be drawn that the plaintiff was at risk of serious harm and that they actually inferred this. *Farmer,* 511 U.S. at 838.

To advance his claim, plaintiff alleges an increase in "unusual incidents, prisoner misbehaviors, and violence" (Compl., ¶ 12) and concludes that defendants' continued policy of overcrowding created the conditions which led to his injuries. Compl., ¶ 10. The thrust of plaintiff's claim seems to suggest that the defendants' awareness of the problems of overcrowding led to knowledge of a generalized risk to the prison population, thus establishing a legally culpable state of mind as to plaintiff's injuries. Plaintiff has not offered any evidence, however, to support the existence of any personal risk to himself about which the defendants could have known. According to his own complaint, plaintiff first encountered his assailant only minutes before the altercation occurred. Compl., ¶ 17. It is clear that the named defendants could not have known of a substantial risk to the plaintiff's safety if the plaintiff himself had no reason to believe he was in danger. *See Sims v. Bowen,* No. 96-CV-656, 1998 WL 146409, at *3 (N.D.N.Y. Mar.23, 1998)(Pooler, J.)("I conclude that an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference"); *Strano v. City of New York,* No. 97-CIV-0387, 1998 WL 338097, at *3-4 (S.D.N.Y. June 24, 1998) (when plaintiff acknowledged attack was "out of the blue" and no prior incidents had occurred to put defendants on notice of threat or danger, defendants could not be held aware of any substantial risk

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

of harm to the plaintiff). Defendants' motion on this ground should, therefore, be granted.

**IV. Failure to Complete Service**

**\*5** The complaint names four defendants, including one "John Doe" Correctional Officer at Bare Hill. Defendants acknowledge that service has been completed as to the three named defendants. Docket Nos. 12 & 13. The "John Doe" defendant has not been served with process or otherwise identified and it is unlikely that service on him will be completed in the near future. *See* Docket No. 6 (United States Marshal unable to complete service on "John Doe"). Since over nine months have passed since the complaint was filed (Docket No. 1) and summonses were last issued (Docket entry Oct. 21, 1997), the complaint as to the unserved defendant should be dismissed without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D .N.Y.L.R. 4.1(b).

**V. Conclusion**

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion to dismiss be GRANTED in all respects; and

IT IS FURTHER RECOMMENDED that the complaint be dismissed without prejudice as to the unserved John Doe defendant pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b); and it is

ORDERED that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v.*

*Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1998.
Waldo v. Goord
Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 5620908 (N.D.N.Y.)

(Cite as: 2010 WL 5620908 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Edward KALWASINSKI, Plaintiff,
v.
Terri MAXYMILLIAN, Michael Hogan, Donald
Sawyer, Defendants.
No. 9:09-CV-0214 (DNH/GHL).

Dec. 23, 2010.

Edward Kalwasinski, Marcy, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Dean J. Higgins, Esq., of Counsel, Albany,
NY, for Defendants.

### *REPORT-RECOMMENDATION and ORDER*

GEORGE H. LOWE, United States Magistrate Judge.

**\*1** This *pro se* **prisoner** civil rights action,
commenced pursuant to 42 U.S.C. § 1983, has been
referred to me for Report and Recommendation by the
Honorable David N. Hurd, United States District Judge,
pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).
Plaintiff Edward Kalwasinski alleges that Defendants
violated his right to exercise his religion at the Central
New York Psychiatric Center ("CNYPC"). Currently
pending before the Court are cross-motions for summary
judgment pursuant to Federal Rule of Civil Procedure 56.
(Dkt. Nos. 33 and 37.) For the reasons that follow, I
recommend that Defendants' motion be granted in part and
denied in part and that Plaintiff's motion be denied.

### I. FACTUAL AND PROCEDURAL SUMMARY

On June 13, 2007, Plaintiff was civilly committed to
CNYPC pursuant to Article 10 of New York's Mental
Hygiene Law. (Dkt. No. 1 at 3 ¶¶ 1-2.) Plaintiff informed
"administrators" FN1 that he was a Muslim and needed to
participate in all of the activities required by his faith,
including prayer, meals, and ceremonies. *Id.* at 3-4 ¶ 3.

FN1. The complaint does not identify these
"administrators" by name.

Plaintiff alleges that Defendants Terri Maxymillian
(the director of the Sex Offender Treatment Program at
CNYPC), Michael Hogan (the commissioner of the New
York Office of Mental Health), and Donald Sawyer (the
executive director of CNYPC) violated his constitutional
rights by (1) not allowing Al-Jumu'ah prayer on Fridays;
(2) forcing Plaintiff to eat food from bowls and with
plastic silverware contaminated with pork from prior
meals eaten by non-Muslims; (3) denying Plaintiff sacred
foods during holidays; (4) forcing Plaintiff to eat fish on
Fridays "as the church of Catholics require[s]"; and (5)
forcing Plaintiff to attend Sex Offender Treatment
Program ("SOTP") classes on Fridays. *Id.* at 4-5 ¶¶ 4-7.FN2

FN2. Plaintiff's motion for summary judgment
focuses entirely on the Al Jumu'ah issue.
(Dkt.Nos.33-1, 33-2.) Defendants, too, focus
largely on the Al Jumu'ah issue.

### II. APPLICABLE LEGAL STANDARDS

#### A. Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary
judgment is warranted if "the pleadings, the discovery and
disclosure materials on file, and any affidavits show that
there is no genuine issue as to any material fact and that
the movant is entitled to judgment as a matter of law."
Fed.R.Civ.P. 56(c)(2). The party moving for summary
judgment bears the initial burden of showing, through the
production of admissible evidence, that no genuine issue
of material fact exists. Only after the moving party has met
this burden is the nonmoving party required to produce
evidence demonstrating that genuine issues of material
fact exist. *Salahuddin v. Goord,* 467 F.3d 263, 272-73 (2d
Cir.2006). The nonmoving party must do more than "rest
upon the mere allegations ... of the [plaintiff's] pleading"
or "simply show that there is some metaphysical doubt as
to the material facts." *Matsushita Elec. Indus. Co. v.*

Slip Copy, 2010 WL 5620908 (N.D.N.Y.)

(Cite as: 2010 WL 5620908 (N.D.N.Y.))

*Zenith Radio Corp.,* 475 U.S. 574, 585-86 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material [FN3] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008).

> FN3. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson,* 477 U.S. at 248.

**B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim**

*2 To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnie Gen. Transatlantique,* 405 F.2d 270, 273 (2d Cir.1968) (citations omitted); *accord, Katz v. Molic,* 128 F .R.D. 35, 37-38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Accordingly, it is appropriate to summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

A defendant may move to **dismiss** a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,*

129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U .S. 544, 570 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense ... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not shown-that the pleader is entitled to relief." *Id.* at 1950 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). However, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

**III. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**A. Religion Claims**

*1. Applicable Standard*

Depending on the circumstances, different standards apply to claims that state actors have violated an individual's right to freely exercise religion. Generally, in order to satisfy the Free Exercise Clause of the First Amendment, government actions that substantially burden a religious practice must be justified by a compelling government interest. *Sherbert v. Verner,* 374 U.S. 398 (1963). However, due to the unique concerns of the prison setting, **prisoners'** First Amendment free exercise rights must be balanced against the interests of prison officials engaged in the complex duties of administering the penal system. *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003). Thus, a prison regulation or individualized decision to deny a **prisoner** the ability to engage in a religious exercise "is judged under a reasonableness test

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5620908 (N.D.N.Y.)

(Cite as: 2010 WL 5620908 (N.D.N.Y.))

less restrictive than that ordinarily applied [to burdens on fundamental rights]: a regulation that burdens a [ **prisoner's**] protected right passes constitutional muster if it is reasonably related to legitimate penological interests." *Salahuddin v. Goord,* 467 F.3d 263, 274 (2d Cir.2006) (quoting *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349 (1987) (punctuation omitted).

**\*3** The Second Circuit has not decided which standard applies to individuals, like Plaintiff, who are civilly committed to locked psychiatric facilities that share characteristics with penal institutions. District courts in the Second Circuit are split on the issue. *Compare Carney v. Hogan,* No. 9:08-CV-1251 (DNH/ATB), 2010 U.S. Dist. LEXIS 59439, at *8, 2010 WL 2519121, at *3 (N.D.N.Y. Mar. 30, 2010) (applying substantial burden/compelling interest test to CNYPC patient's free exercise claim) *and Pratt v. Hogan,* 631 F.Supp.2d 192, 198 (N.D.N.Y.2009) (same) (Hurd, J.), *with Lombardo v. Holanchock,* No. 07 Civ. 8674, 2008 U.S. Dist. LEXIS 48753, at *16-17, 2008 WL 2543573, at *6 (S.D.N.Y. June 25, 2008) (applying legitimate penological purpose test to Mid-Hudson Psychiatric Center patient's free exercise claim) *and Abdul-Matiyn v. Pataki,* No. 9:06-CV-1503, 2008 U.S. Dist. LEXIS 118430, at *32, 2008 WL 974409, at *12 (N.D.N.Y. Apr. 8, 2008) (applying legitimate penological purpose test to CNYPC patient's free exercise claim) (Hurd, J.). [FN4] In an abundance of caution, I will consider Plaintiff's claims in the context of each standard. [FN5]

> FN4. The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

> FN5. Defendants' position is that the legitimate penological interest test should apply because "Plaintiff has made reference to **prisoner** litigation in his complaint and has not suggested that the analysis for a free exercise claim by an involuntarily committed individual is different from the analysis applied to **prisoners'** free exercise claims." (Dkt. No. 37-8 at 3, citation to complaint omitted.)

Plaintiff's religious rights are also protected by the

Religious Land Use and Institutionalized Persons Act. ("RLUIPA").[FN6] RLUIPA, like the Free Exercise Clause as applied to non-**prisoners**, applies a compelling governmental interest test. Specifically, RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution [FN7] ... unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." [FN8] 42 U.S.C. § 2000cc-1(a).

> FN6. Although Plaintiff's complaint does not explicitly claim that Defendants are liable under RLUIPA, I am required to construe the complaint liberally, interpreting it to raise the strongest possible arguments that it suggests. *Chavis v. Chappius,* 618 F.3d 162 (2d Cir.2010). Moreover, Plaintiff refers to RLUIPA in his motion for summary judgment. (Dkt. No. 33-2 at 5.) Defendants do not address RLUIPA.

> FN7. An "institution" is any facility or institution that is "owned, operated, or managed by, or provides services on behalf of any State" and is, *inter alia,* "for persons who are mentally ill, disabled, or retarded, or chronically ill or handicapped" or "a jail, prison, or other correctional facility." 42 U.S.C. § 1997(1) (2010).

> FN8. Although neither the Supreme Court nor the Second Circuit has yet decided the issue, the consensus of opinion among district courts in the Second Circuit is that RLUIPA does not authorize suits for money damages. *See Pugh v. Goord,* 571 F.Supp.2d 477, 506-09 (S.D.N.Y.2008). That issue is currently pending before the Supreme Court in *Sossamon v. Texas* (No. 08-1438, argued Nov. 2, 2010). That issue does not affect the analysis here because Plaintiff requests both money damages and injunctive relief. (Dkt. No. 1 at 7-9.)

2. *Al Jumu'ah Service*

Slip Copy, 2010 WL 5620908 (N.D.N.Y.)

(Cite as: 2010 WL 5620908 (N.D.N.Y.))

Plaintiff alleges that Defendants violated his religious rights by failing to hold proper Al Jumu'ah services. (Dkt. No. 1 at 4 ¶ 4(a).) Defendants move for summary judgment of this claim, arguing that the unavailability of proper Al Jumu'ah services was caused by legitimate penological interests. (Dkt. No. 37-8 at 5.)

a. *Facts*

"Al Jumu'ah is an important service for Muslims. Unlike other Muslim daily prayers, it is not a prayer that can be worshiped individually. It is a congregate prayer performed every Friday after the sun reaches its zenith and before the Asr, or afternoon prayer.... There is no alternative means of attending Jumu'ah. Attendance at the congregational prayer is obligatory on all men in the Muslim religion." (Najeeullah Decl., Dkt. No. 37-5 ¶¶ 10-11.) Plaintiff alleges that CNYPC stopped offering Al Jumu'ah services in August 2008. (Dkt. No. 33-1 ¶ 1.)

At CNYPC, a Muslim prayer service or study class[FN9] is offered on Fridays from 9:30-10:30 a.m. (Defs.' Ex. 1, Dkt. No. 37-4 at 2.) Imam Malik Najeeullah presides. (Dkt. No. 37-5 ¶ 7.) Plaintiff's official schedule at CNYPC includes this event. (Defs.' Ex. 9, Dkt. No. 37-4 at 45.) Defendants state that "CNYPC was under the mistaken belief that the Al Jumu'ah prayer could be worshiped individually and that the regularly scheduled worship time for Muslims at 9:30 a.m. on Fridays was available to satisfy the desire of resident Muslims to worship the prayer." (Dziadyk Decl., Dkt. No. 37-6 ¶ 12.)

> FN9. At various times, CNYPC officials, including Defendants, have referred to this event as a "prayer service." (Dkt. No. 33-2 at 18; Dkt. No. 37-4 at 32, 40.) Imam Najeeullah, who presides over the event, refers to it as a "class." (Dkt. No. 33-2 at 16; Dkt. No. 37-5 ¶ 7.)

*4 On January 22, 2009, Plaintiff sent a complaint to Defendant Maxmillian objecting to the lack of Al Jumu'ah services. (Pl.'s Ex. C, Dkt. No. 33-2 at 11 ¶ 1.) Defendant Maxmillian responded, stating that "CNYPC ... offers Muslim prayer services on Friday mornings that are led by Imam Najeeullah. Those services have not been changed nor has [Plaintiff] been denied the ability to attend." (Defs.' Ex. 7, Dkt. No. 37-4 at 40.)

On February 20, 2009, Plaintiff filed this action. (Dkt. No. 1.)

On March 18, 2009, Plaintiff sent a complaint to Defendant Sawyer in which he objected to the lack of Al Jumu'ah services. (Pl.'s Ex. G, Dkt. No. 33-2 at 17.) Defendant Sawyer responded that "Muslim services are offered on Fridays at 9:30 a.m. This time was set to meet both the needs of the residents and the Imam's schedule. The Imam has informed us that formal services do not need to happen at noon as residents can participate individually and from any location at that time."[FN10] *Id.* at 18.

> FN10. In response to interrogatories, Defendant Sawyer identified "the Imam" who had "informed" him on these matters as Imam Abdullah Muhammad. (Pl.'s Ex. G, Dkt. no. 33-2 at 19.) Imam Abdullah Mohammad is the Muslim Chaplain at Mohawk Correctional Facility. (Pl.'s Ex. B, Dkt. No. 33-2 at 8.)

On March 27, 2009, Imam Najeeullah issued a memorandum titled "Jumu'ah Prayer or the Friday Worship Service for Muslim[s]." (Pl.'s Ex. A, Dkt. No. 33-2 at 7.) It is not clear to whom the memorandum was directed, but the document states that Elaine Dziadyk (the supervisor of rehabilitation services) and S. Montrose (a social worker supervisor) received copies. *Id.* Imam Najeeullah explained that Al Jumu'ah should occur at approximately 1:15 p.m. during daylight savings time, that the prayer was "obligatory for all Muslims," and that the Friday morning Muslim study class at CNYPC was "not a Jumu'ah worship service." *Id.* Imam Najeeullah stated that his schedule did not allow him to facilitate a Friday Al Jumu'ah prayer service at CNYPC, but that "[t]here should always be a qualified Imam available to facilitate this service if it is allowed." *Id.*

On May 1, 2009, John Culkin, the Director of the Bureau of Sex Offender Evaluation and Treatment, responded to an April 7, 2009, letter from Plaintiff. (Pl.'s Ex. D, Dkt. No. 33-2 at 15; Defs.' Ex. 8, Dkt. No. 37-4 at 42.) Mr. Culkin stated that "[p]er staff at Central New York Psychiatric Center, the facility offers Muslim prayer

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5620908 (N.D.N.Y.)

(Cite as: 2010 WL 5620908 (N.D.N.Y.))

services at 9:30 am on Friday mornings. These services have not changed nor have you been denied the right to attend them as currently scheduled. The Imam has additionally informed [CNYPC] staff that formal services do not need to occur at noon as residents can participate individually and from any location at that time." *Id.*

On May 19, 2009, Mental Hygiene Legal Services wrote to Mr. Culkin, enclosing a copy of a letter from Imam Najeeullah. (Pl.'s Ex. E, Dkt. No. 33-2 at 16.) Mental Hygiene Legal Services noted that Imam Najeeullah's letter stated "that the Jumu'ah worship service is 'obligatory for all Muslims,' just as 'Sunday worship service is for all Christians' " and that "the 'study classes' he does host on Thursdays and Fridays are 'not a Jumu'ah worship service.' " *Id.*

**\*5** On October 23, 2009, Defendants Sawyer and Maxymillian responded to Plaintiff's interrogatories. (Dkt. No. 37-4 at 52-66.) In those responses, Defendants reiterated their answers to Plaintiff's grievances and stated that Imam Abdullah Muhammad had informed them that congregate prayer was not necessary for Al Jumu'ah. *Id.*

On January 13, 2010, Imam Abdullah Muhammad wrote to Deputy Attorney General Dean J. Higgins, counsel for Defendants in this action. (Pl.'s Ex. B, Dkt. No. 33-2 at 8.) He stated that he was writing to "clarify a gross misunderstanding" that Al Jumu'ah "can be performed individually." *Id.* He explained that "[a]ttendance at the congregational prayer is obligatory on all men ... So, it is impossible for me to advise anyone that Jumu'ah prayer can be performed individually. What I did say, and it may be the source of the misunderstanding, is that the [five] daily prayers can be performed individually under circumstances such as those found in jails, prisons, and other institutions." *Id.*

At some point, officials at CNYPC came to understand that "Al Jumu'ah is a congregate prayer that can[ ]not be worshiped individually." (Dziadyk Decl., Dkt. No. 37-6 ¶¶ 13.) Thereafter, the facility "commenced a search for a Muslim Imam to conduct the service." *Id.* ¶ 14. CNYPC officials asked Imam Najeeullah to preside at the service. *Id.* ¶ 15. Imam Najeeullah is employed part-time by both the New York Department of

Correctional Services ("DOCS") at Marcy Correctional Facility and the Department of Mental Health at CNYPC. (Najeeullah Decl., Dkt. No. 37-5 ¶¶ 2-3.) Imam Najeeullah attempted to get permission from DOCS to conduct a service at CNYPC, but his request was denied because it would conflict with his schedule of services at Marcy. *Id.* ¶ 12.

Imam Najeeullah has worked with CNYPC officials "to identify an eligible Imam who would be able to conduct services at the Center," but no such individual has been found. (Dkt. No. 37-5 ¶ 13.) At one point, an individual was "identified ..., but it was determined that he was not eligible" because of "issues in his background." *Id.* ¶ 14; Dkt. No. 37-6 ¶ 18. Defendants do not identify what these "issues" were or why they rendered the individual unsuitable. Defendants state that the search is ongoing. (Dkt. No. 37-5 ¶ 16; Dkt. No. 37-6 ¶ 19.)

On February 4, 2010, Stephen C. Clark, the principal attorney for the Mental Hygiene Legal Service for the Fourth Judicial Department, wrote to Plaintiff. (Pl.'s Ex. C, Dkt. No. 33-2 at 9-10.) Mr. Clark reported that he had met with members of the CNYPC staff, including Defendants Sawyer and Maxymillian, to discuss the lack of Al Jumu'ah services at CNYPC. *Id.* at 9. Defendant Sawyer stated that CNYPC was "actively attempting" to find someone and "insured that he would continue to work to bring this matter to a quick resolution." *Id.* Mr. Clark inquired whether Plaintiff would be interested in being trained to lead Al Jumu'ah services because Defendant Sawyer "seemed to indicate that the hospital would be willing to entertain getting appropriate training for someone currently there [ ] to run such services." *Id.*

b. *Analysis*

**\*6** Under the legitimate penological interest test, a **prisoner** "must show at the threshold that the disputed conduct substantially burdens [FN11] his sincerely held religious beliefs." *Salahuddin,* 467 F.3d at 274-75 (citing *Ford,* 352 F.3d at 591). Defendants do not dispute that Plaintiff's religious beliefs are sincerely held or that the lack of Al Jumu'ah services burdened those beliefs. Indeed, for the purposes of the pending motions, Defendants concede that Al Jumu'ah "is a central religious

Slip Copy, 2010 WL 5620908 (N.D.N.Y.)

(Cite as: 2010 WL 5620908 (N.D.N.Y.))

service of the Muslim faith" and that "[t]here is no alternative to the Al Jumu'ah worship." (Dkt. No. 37-8 at 5.) Therefore, I find that Plaintiff holds a sincere religious belief that has been substantially burdened. The issue, then, is whether Defendants have established as a matter of law that this burden was caused by a legitimate or compelling governmental interest.

> FN11. Although the Second Circuit has applied the "substantial burden" test in its most recent prison free exercise cases, it has done so while explicitly refusing to adopt or endorse the test. "The *Ford* court noted that the Circuits apparently are split over whether **prisoners** must show a substantial burden on their religious exercise in order to maintain free exercise claims. Nevertheless, the *Ford* court held that since the plaintiff had not challenged the application of the substantial burden requirement, the court would proceed as if the requirement applied. Likewise, the *Salahuddin* court noted that '[r]esolution of this appeal does not require us to address Salahuddin's argument that a **prisoner's** First Amendment free-exercise claim is not governed by the 'substantial burden' threshold requirement,' because defendants 'never proceed to argue that we should find any particular burdened religious practice to be peripheral or tangential to [plaintiff's] religion.' The court then proceeded as if the substantial burden requirement applied." *Pugh v. Goord,* 571 F.Supp.2d 477, 497 n. 10 (S.D.N.Y.2008) (citations and some punctuation omitted).

Under the deferential legitimate penological interest test, once a plaintiff establishes that his or her sincerely held religious belief has been substantially burdened," [t]he defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct; the burden remains with the **prisoner** to show that these articulated concerns were irrational." *Salahuddin,* 467 F.3d at 275 (quoting *Ford,* 352 F.3d at 595) (punctuation omitted). Although the defendants' burden is "relatively limited," the legitimate penological interest advanced must have been the *actual* reason for the defendants' actions. "Post hoc justifications with no record support will not suffice." *Salahuddin,* 467

F.3d at 276-77.

Here, Defendants rely on a post hoc justification. Defendants state that they

> are not opposed to permitting Plaintiff's participation in the congregate Al Jumu'ah; however ... there is currently no Imam available to conduct the service ... [T]he Imam and the CNYPC staff are addressing this issue and have instituted a search for a person to conduct the service. Once an Imam is identified, the service will be instituted and Plaintiff will be permitted to attend.

(Dkt. No. 37-8 at 5.) This was not the reason that Defendants initially gave for not offering the Al Jumu'ah service. Rather, Defendants initially responded to Plaintiff's complaints by stating that they believed that the Friday morning session offered by Imam Najeeullah was sufficient and that no congregate Al Jumu'ah service was required.[FN12] Defendants admit in their motion papers that this belief was "mistaken." (Dkt. No. 37-6 ¶ 12.) Defendants persisted in this "mistaken belief" for at least seventeen months, from the time that they ceased offering Al Jumu'ah services in approximately August 2008 until January 2010, when Imam Muhammad wrote to defense counsel to correct Defendants' "gross misunderstanding." (Dkt. No. 37-4 at 40; Dkt. No. 33-2 at 8.) Indeed, individuals associated with CNYPC continued to assert their belief that Al Jumu'ah was not required for several months after Plaintiff filed this action. (Dkt. No. 37-4 at 42.) Thus, the initial denial of Al Jumu'ah was due not to the lack of an Imam as Defendants now contend, but rather to a misunderstanding of the religious significance of Al Jumu'ah. It was not until after Imam Muhammad corrected this misunderstanding that Defendants began to search for an Imam who could preside at Al Jumu'ah.

> FN12. I note that such a justification would not, if asserted in the pending motion, be legally sufficient to entitle Defendants to summary judgment. *Ford,* 352 F.3d at 597-98. Even if this justification were legally sufficient, it would not be factually supported here. As Imam Muhammad indicated in his letter to defense counsel, he never intended for Defendants to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5620908 (N.D.N.Y.)

(Cite as: 2010 WL 5620908 (N.D.N.Y.))

believe that congregate Al Jumu'ah prayer is merely optional for Muslims.

**\*7** Even if Defendants' justification were not post hoc, it would be insufficient to support a finding, as a matter of law, that the denial of Al Jumu'ah was motivated by a legitimate penological interest. As another judge in this District has observed, the legitimate penological interest inquiry "is particularly fact-lad[ ]en and often ill-suited for resolution on [a] motion for summary judgment ..." *Jackson v. Boucaud,* No. 9:08-CV-1373 (TJM/DEP), 2009 U.S. Dist. LEXIS 125893, at \*26, 2009 WL 6066799, at \*7 (N.D.N.Y. Dec. 31, 2009).[FN13] Here, Defendants simply have not provided the Court with enough information to analyze the issue. Defendants do not provide any details at all about why the search for an Imam has been unsuccessful, other than to state that one potential Imam was not eligible because of unspecified "issues in his background." (Dkt. No. 37-6 ¶ 18.)

> FN13. The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

Defendants' justification, and the lack of detail they provide about it, is similar to that asserted in a recent case from the District of Connecticut. *Vega v. Lantz,* No. 304CV1215DFM, 2009 U .S. Dist. LEXIS 88550, 2009 WL 3157586 (D.Con. Sept. 25, 2009).[FN14] In *Vega,* a state **prisoner** claimed his free exercise and RLUIPA rights were violated because the facility routinely cancelled Al Jumu'ah. *Vega,* 2009 WL 315786, at \*1. The defendants conceded that Al Jumu'ah had been frequently cancelled over a four-year period, but argued that cancellation was necessary "when there is no chaplain available or in case of a security lockdown." *Id.* at \*11. The court denied the defendants' motion for summary judgment because the defendants "provide[d] no explanation for the frequent cancellation of Jumah, or of the insufficient and unequal staffing that allegedly underlies it." *Id.* Thus, the court found, the defendants had failed "to carry their burden of showing that the frequent cancellation of Jumah is either rationally related to a legitimate penological interest ... or in furtherance of a compelling governmental interest." *Id.*

> FN14. The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

Therefore, I recommend that the Court deny Defendants' motion for summary judgment dismissing Plaintiff's claim regarding the Al Jumu'ah service.

**3.** *Bowls and Utensils*

Plaintiff alleges that Defendants violated his religious rights by "forcing Plaintiff to eat food from bowls contaminated with pork from prior meals eat [en] by non-Muslims." (Dkt. No. 1 at 4 ¶ 4(b).) Defendants move for summary judgment dismissing this claim, arguing that Plaintiff's religious beliefs have not been burdened. (Dkt. No. 37-8 at 6.) Defendants are correct.

Imam Najeeullah declares that there is "no prohibition" on eating from a bowl or using a utensil previously used by a non-Muslim to eat pork "so long as they have been washed and sanitized ..." (Dkt. No. 37-5 ¶¶ 18-19.) Valerie Fasteson, the Director of Nutritional Services for CNYPC, declares that plates, bowls, and utensils are "thoroughly washed and sanitized" before they are reused. (Dkt. No. 37-7 ¶ 6.) CNYPC residents can also request disposable plates and tableware that would be used only once and then discarded. *Id.* ¶ 7. Plaintiff has not made such a request. *Id.*

**\*8** In opposition to Defendants' motion for summary judgment, Plaintiff admits that "all bowls and utensils are washed and sanitized after use and before re-use and such washing is consistent with the tenets of the Muslim faith." (Dkt. No. 37-1 ¶ 20; Dkt. No. 40 ¶ 9.)

Therefore, Plaintiff has not raised a triable issue of fact that his sincerely held religious beliefs have been burdened and I recommend that the Court dismiss Plaintiff's claim regarding the contamination of bowls and utensils.

**4.** *Food Issues*

Plaintiff alleges that his religion requires him to eat Halal foods and that Defendants violated his constitutional

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5620908 (N.D.N.Y.)

(Cite as: 2010 WL 5620908 (N.D.N.Y.))

rights by forcing him "to eat meals issued for Christian and Catholic religions, e.g.: Friday Muslims must eat fish as the church of Catholics require." (Dkt. No. 1 at 5 ¶ 5.) It is not entirely clear whether Plaintiff objects to the lack of a Halal menu or to the fact that fish is served on Fridays. Defendants argue that serving fish on Fridays does not burden Plaintiff's religious beliefs and that they are not constitutionally required to provide an entirely Halal menu. (Dkt. No. 37-8 at 5-6.)

a. *Fish on Friday*

Imam Najeeullah declares that "[f]ish is an acceptable food for a Muslim diet and the service of fish would violate no tenet of our faith." (Dkt. No. 37-5 ¶ 21.) Plaintiff admits in his reply papers that fish is a permissible food under Islamic law. (Dkt. No. 40 ¶ 8.) Therefore, Plaintiff has not raised a triable issue of fact that his sincerely held religious beliefs were burdened by the fact that fish was served on Fridays at CNYPC and I recommend that the Court grant Defendants' motion for summary judgment with respect to the claim that CNYPC's practice of serving fish on Fridays violated Plaintiff's rights under the Free Exercise Clause or RLUIPA.[FN15]

> [FN15.] Plaintiff may also be asserting an Establishment Clause claim regarding the service of fish on Fridays. Any such claim would be subject to dismissal for failure to state a claim. *See Travillion v. Leon,* 248 Fed. App'x 353, 355-56 (3d Cir.2007) (affirming trial court's 12(b)(6) dismissal of claim that jail's service of vegetarian menu during Lent violated Protestant **inmate's** rights under the Establishment Clause).

b. *Halal Foods*

Plaintiff may also be claiming that Defendants violated his free exercise and RLUIPA rights because CNYPC does not offer a Halal menu. (Dkt. No. 1 at 5 ¶ 5.) Defendants move for summary judgment of this claim. (Dkt. No. 37-8 at 5-6.)

The Second Circuit has "clearly established that a **prisoner** has a right to a diet consistent with his or her religious scruples." *Ford,* 352 F.3d at 597. However, "[a]ll that is required for a prison diet not to burden an **inmate's** free exercise of religion is the provision of a diet sufficient

to sustain the **prisoner's** good health without violating [his religion's] dietary laws." *Muhammad v. Warithu-Deen Umar,* 98 F.Supp.2d 337, 344 (W.D.N.Y.2000) (citing *Abdul-Malik v. Goord,* No. 07 Civ. 4584, 1997 U.S. Dist. LEXIS 2047, 1997 WL 83402, at *6 (S.D.N.Y. Feb. 27, 1997)).[FN16]

> [FN16.] The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

Defendants assert that meals at CNYPC "do not violate any tenets of the Muslim faith." (Dkt. No. 37-1 ¶ 19.) For this proposition, Defendants cite the declarations of Valerie Fasteson and Imam Najeeullah. *Id.* Neither of the declarations cited by Defendants show that CNYPC meals do not violate Muslim dietary laws. Ms. Fasteson declares that "[a]lthough the dietary service does not serve a strictly Halal diet, we do serve meals that are not violative of Muslim tenets. We do serve an alternative diet that, upon information and belief and based on the declaration of Imam Najeeullah ..., does accommodate the Muslim faith. This would include an option that would insure a pork free diet." (Dkt. No. 37-7 ¶ 5.) Imam Najeeullah's declaration does not state that CNYPC's alternative diet accommodates the Muslim faith. Rather, Imam Najeeullah merely states that fish in an acceptable food for a Muslim diet and that "the Halal diet is important to a Muslim's faith ... I will work with CNYPC staff to try and find ways to make a Halal diet possible." (Dkt. No. 37-5 ¶¶ 21-22.) These vague declarations stand in stark contrast to the evidence presented in a case cited by Defendants, *Majid v. Fischer,* No. 07 Civ. 4584, 2009 U.S. Dist. LEXIS 71616 (S.D.N.Y. Jul. 31, 2009).[FN17] There, the defendants provided the court with a report from an Imam explicitly stating that the pork-free menu offered by DOCS was "adequate and sufficient for Muslims under Islamic law and does not require Muslims to choose between violating their religious practice or starving." *Majid,* Dkt. No. 37-10 at 8.

> [FN17.] Defendants served a copy of this unpublished decision on Plaintiff with their summary judgment papers. (Dkt. No. 37-10.)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5620908 (N.D.N.Y.)

(Cite as: 2010 WL 5620908 (N.D.N.Y.))

**\*9** Moreover, Defendants have not provided the Court with enough evidence to establish as a matter of law that CNYPC provides a pork-free diet that is sufficient to sustain Plaintiff's good health. Indeed, the only reference in the record to the nutritional quality of the alternative menu is one sentence in the Inpatient Operations Manual stating that CNYPC's pork-free diet "meets 100 percent of the RDA." (Defs.' Ex. 3, Dkt. No. 37-4 at 24.) Defendants do not note this fact in their memorandum of law or ask the Court to draw any conclusions from it.

Additionally, Defendants have not provided any evidence regarding the legitimate penological or compelling interests supporting the menu at CNYPC. Although Defendants cite cases upholding DOCS' menu in the face of First Amendment and RLUIPA challenges by Muslim **inmates**, Defendants have not provided the Court with any evidence that CNYPC's menu is similar to DOCS' or that it is driven by similar penological interests. In contrast to the dearth of detail here, the defendants in *Majid* provided the court with a declaration describing in detail the number of **inmates** who needed to be fed in the DOCS system, the nutritional and religious factors that DOCS considered in formulating menus, the cost of providing a pork-free (but non-Halal) menu as compared with the regular menu, and the problems associated with obtaining Halal meats. Thus, I find that Defendants have not established, as a matter of law, that CNYPC provided Plaintiff with a diet sufficient to maintain his good health without violating Muslim dietary laws. Therefore, I recommend that the Court deny Defendants' motion for summary judgment dismissing this claim.

5. *Classes on Fridays and Denial of Sacred Foods on Holidays*

Defendant's motion for summary judgment does not address Plaintiff's claims that (1) being required to attend classes on Fridays violates his religious rights; or (2) Defendants violated Plaintiff's religious rights by denying him sacred foods on holidays. Therefore, I find that the claims should survive Defendants' motion for summary judgment.

**B. DUE PROCESS CLAIM**

Plaintiff claims that Defendants violated his Fifth and Fourteenth Amendment rights to due process. (Dkt. No. 1 at 7.) Regarding the due process issue, Plaintiff's complaint states only that "Plaintiff has not d[one] anything to lose his right[s] afforded by the" First Amendment. *Id.* Defendants argue that the complaint fails to state a due process claim. (Dkt. No. 37-8 at 6-7.) Defendants are correct. Plaintiff's due process claim simply duplicates his free exercise and RLUIPA claims. *See Velez v. Levy,* 401 F.3d 75, 94 (2d Cir.2005) ("[W]here a specific constitutional provision prohibits government action, plaintiffs seeking redress for that prohibited conduct in a **§ 1983** suit cannot make reference to the broad notion of substantive due process."). Therefore, I recommend that the Court grant Defendants' motion for summary judgment dismissing Plaintiff's due process claim.

**C. EIGHTH AMENDMENT CLAIM**

**\*10** Plaintiff claims that Defendants violated his Eighth Amendment rights. (Dkt. No. 1 at 8.) Defendants argue that the complaint fails to state an Eighth Amendment claim. (Dkt. No. 37-8 at 6-7.) Defendants are correct.

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishments. The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment. *Estelle v. Gamble,* 429 U.S. 97, 102-03 (1976). Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle,* 429 U.S. at 102. To satisfy the objective component of an Eighth Amendment claim, a **prisoner** must show that the defendant's "act or omission ... result[ed] in the denial of the minimal civilized measure of life's necessities." *Farmer,* 511 U.S. at 834. Therefore, "extreme deprivations are required to make out a conditions-of-confinement claim." *Hudson v. McMillian,* 503 U.S. 1, 9 (1992). To satisfy the subjective component, the defendant's behavior must be "wanton." *Whitley v. Albers,* 475 U.S. 312, 320 (1986). Where a **prisoner** claims that a defendant provided inadequate conditions of confinement, he must show that the defendant acted with "deliberate indifference." *Wilson v. Seiter,* 501 U.S. 294, 302-03 (1991). A prison official demonstrates deliberate

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5620908 (N.D.N.Y.)

(Cite as: 2010 WL 5620908 (N.D.N.Y.))

indifference to inhumane conditions of confinement where he "knows of and disregards an excessive risk to **inmate** health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837.

Here, Plaintiff has not raised a triable issue of fact that Defendants deprived him of the minimal civilized measure of life's necessities or that they knew of and disregarded an excessive risk to Plaintiff's health or safety. Therefore, I recommend that the Court grant Defendants' motion for summary judgment of Plaintiff's Eighth Amendment claim.

### D. PERSONAL INVOLVEMENT BY DEFENDANT HOGAN

Defendants argue that any claims against Defendant Hogan should be dismissed because Plaintiff has failed to allege that Defendant Hogan was personally involved in any constitutional violation. (Dkt. No. 37-8 at 7-8.) Defendants are correct.

Under Second Circuit precedent, " 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under **§ 1983**.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). In order to prevail on a *Bivens* cause of action against an individual, a plaintiff must show some tangible connection between the unlawful conduct and the defendant. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985). In other words, supervisory officials may not be held liable merely because they held a position of authority. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). Rather, supervisory personnel may be considered "personally involved" if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it

through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of **inmates** by failing to act on information indicating that the violation was occurring.[FN18] *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).

> [FN18.] In *Iqbal,* 129 S.Ct. at 1949, the Supreme Court ruled that where the underlying constitutional claim is a claim of intentional discrimination, a supervisory official's liability must be judged by the official's own purpose rather than the official's knowledge of subordinates' actions or policies. The Second Circuit has not yet issued a decision discussing *Iqbal*'s effect on the *Colon* categories. Several district courts in the Second Circuit have determined that *Iqbal* nullified some of the *Colon* categories. See *Sash v. United States,* 674 F.Supp.2d 531, 543-44 (S.D.N.Y.2009) (collecting cases). I will assume for the purposes of this motion that the *Colon* categories remain good law.

\*11 Here, the complaint does not mention Defendant Hogan at all other than in the caption and the list of parties. (Dkt. No. 1.) In response to interrogatories from Plaintiff, Defendant Sawyer stated that he could not recall Defendant Hogan making any inquiry about Plaintiff's March 18 complaint. (Dkt. No. 33-2 at 19.) Thus, the complaint fails to plausibly suggest, and the evidence fails to raise a triable issue, that Defendant Hogan was personally involved in any alleged constitutional violation. Therefore, I recommend that the Court dismiss Plaintiff's claims against Defendant Hogan.

### IV. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff's motion for summary judgment (Dkt. No. 33) focuses entirely on the lack of Al Jumu'ah services at CNYPC. I have discussed all of the evidence submitted by Plaintiff regarding this issue above, in Section III(A)(2). In analyzing Plaintiff's motion for summary judgment, I

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 9:09-cv-00977-GTS-DEP   Document 28   Filed 03/01/11   Page 305 of 405

Page 11

Slip Copy, 2010 WL 5620908 (N.D.N.Y.)

(Cite as: 2010 WL 5620908 (N.D.N.Y.))

must resolve all ambiguities and draw all reasonable inferences in Defendants' favor. *Major League Baseball Props., Inc., 542 F.3d at 309.* Although, as discussed above, Defendants have not provided the Court with sufficient evidence to support summary judgment in their favor on the Al Jumu'ah issue, they have provided sufficient evidence to raise a triable issue of fact. A reasonable juror could find that Defendants had a legitimate penological or a compelling interest for the decision not to hold Al Jumu'ah services at the proper time. Therefore, I recommend that the Court deny Plaintiff's motion for summary judgment.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 37) be *GRANTED IN PART AND DENIED IN PART.* I recommend that the Court grant Defendants' motion and dismiss the following claims: (1) the free exercise and RLUIPA claims regarding the use of bowls and utensils; (2) the free exercise and RLUIPA claims regarding CNYPC's practice of serving fish on Fridays; (3) any Establishment Clause claim regarding CNYPC's practice of serving fish on Fridays; (4) the due process claim; (5) the Eighth Amendment claim; and (6) all claims against Defendant Hogan; and it is further

**RECOMMENDED** that Plaintiff's motion for summary judgment (Dkt. No. 33) be *DENIED;* and it is further

**RECOMMENDED** that the following claims survive the pending motions: (1) the free exercise and RLUIPA claims regarding the lack of Al Jumu'ah services at CNYPC; (2) the free exercise and RLUIPA claims regarding the lack of a Halal menu at CNYPC; (3) the claim regarding CNYPC's requirement that Plaintiff attend classes on Fridays; and (4) the claim that Defendants denied Plaintiff sacred foods on holidays. The parties should be prepared, in further proceedings, to fully brief whether the legitimate Penological interest or the compelling government interest test should be applied to this case; and it is further

**ORDERED** that the Clerk provide Plaintiff with copies of *Carney v. Hogan,* No. 9:08-CV-1251

(DNH/ATB), 2010 U.S. Dist. LEXIS 59439, 2010 WL 2519121 (N.D.N.Y. Mar. 30, 2010); *Lombardo v. Holanchock,* No. 07 Civ. 8674, 2008 U.S. Dist. LEXIS 48753, 2008 WL 2543573 (S.D.N.Y. June 25, 2008); *Abdul-Matiyn v. Pataki,* No. 9:06-CV-1503, 2008 U.S. Dist. LEXIS 118430, 2008 WL 974409 (N.D.N.Y. Apr. 8, 2008); *Jackson v. Boucaud,* No. 9:08-CV-1373 (TJM/DEP), 2009 U.S. Dist. LEXIS 125893, 2009 WL 6066799 (N.D.N.Y. Dec. 31, 2009); *Vega v. Lantz,* No. 304CV1215DFM, 2009 U.S. Dist. LEXIS 88550, 2009 WL 3157586 (D.Con. Sept. 25, 2009); and *Abdul-Malik v.. Goord,* No. 07 Civ. 4584, 1997 U.S. Dist. LEXIS 2047, 1997 WL 83402 (S.D.N.Y. Feb. 27, 1997) in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

**\*12** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

N.D.N.Y.,2010.

Kalwasinski v. Maxymillian
Slip Copy, 2010 WL 5620908 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)

(Cite as: 2009 WL 3124424 (N.D.N.Y.))

C

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Mortimer EXCELL, Plaintiff,
v.
Robert K. WOODS, Supt., Upstate C.F.; N. Bezio, Dep.
Supt., Upstate C.F.; Glenn S. Goord, Comm'r, Docs;
Lucien J. LeClaire, Jr., Dep. Comm'r, Docs; Donnie
Wood, C.O., Upstate C.F.; Brian Lewis, C.O., Upstate
C.F.; Timothy Ramsdell, C.O., Upstate C.F.; John
Moore, Corr. Supervisor, Upstate C.F.; Kenneth
McLaughlin, Dir. of Ops., Inspector Gen.; D. Quinn,
Captain, Upstate C.F.; R.N. Maria Travers, Nurse,
Upstate C.F.; Gary Steinberg, C.O., Auburn C.F.; Dr.
Lester Wright, Assoc. Comm'r, Docs; Brad Smith, C.O.,
Auburn C.F.; Joseph Belliner, Dep. Supt., Auburn C.F.;
Jeffrey Clafflin, C.O., Auburn C.F.; John Burge, Supt.,
Auburn C.F.; Joseph Wolczyk, Hearing Officer, Auburn
C.F.; Donald Hess, C.O., Auburn C.F.; D. Selsky, Dir.
of Special Housing, Docs; Gordon Simons, C.O.,
Auburn C.F.; Brian Fischer; Comm'r, Docs; Richard
Roy, Inspector Gen.; Alan Croce, Chairman, Comm'n of
Corr., and Comm'r, Div. of Parole; Daniel Stewart,
Chairman, Comm'n, Comm'n of Corr.; Vernon Manley,
Comm'r, NYS Div. of Parole; Thomas Grant, Comm'r,
NYS Div. of Parole; John Capacci, NYS Div. of Parole;
Maria Tirone, Dep. Supt., Upstate C.F.; Ashley Allen,
Corr. Counselor, Upstate C.F.; Linda A. Hayes, KBSI,
Upstate C.F.; Patricia Salvage, Auburn C.F.; Raymond
Head, Lt., Auburn C.F.; James Anctil, Lt., Upstate C.F.;
R.N. Nancy Smith, Nurse Administrator, Upstate C.F.;
Labetz, Correctional Supervisor, Auburn C.F.; William
Devito, C.O., Auburn C.F.; J. Sourwine, C.O., Auburn
C.F.; Michael Bray, C.O., Auburn C.F.; Kevin Premo,
C.O., Upstate C.F.; Darrin Corrigeux, C.O., Upstate
C.F.; Sheila Sauve, C.O., Upstate C.F.; and M.
Mackdonal, C.O., Upstate C.F., Defendants.
No. 9:07-CV-0305 (GTS/GHL).

Sept. 29, 2009.
Mortimer Excell, Elmira, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Adele M. Taylor-Scott, Esq., Assistant

Attorney General, of Counsel, Albany, NY, for
Defendants.

**DECISION and ORDER**

Hon. GLENN T. SUDDABY, District Judge.

*1 Currently before the Court in this *pro se* **prisoner**
civil rights action filed by Mortimer Excell ("Plaintiff")
against forty-three employees of several New York State
departments and/or agencies ("Defendants") pursuant to
42 U.S.C. § 1983 are the following: (1) a motion, filed by
thirty-six of the Defendants, to dismiss part of Plaintiff's
Second Amended and Supplemental Complaint for failure
to state a claim pursuant to Fed.R.Civ.P. 12(b)(6); (2)
United States Magistrate Judge George H. Lowe's
Report-Recommendation recommending that the motion
be granted in part and denied in part; (3) Plaintiff's
Objections to those portions of the
Report-Recommendation recommending dismissal; and
(4) Plaintiff's fourth motion for the appointment of
counsel. (Dkt.Nos.67, 84, 87, 93.) For the reasons set forth
below, the Report-Recommendation is accepted and
adopted in its entirety; Defendants' motion is granted in
part and denied in part; Plaintiff's Second Amended and
Supplemental Complaint is dismissed in part, as detailed
in the "Ordered" Clauses of this Decision and Order; and
Plaintiff's fourth motion for the appointment of counsel is
denied.

**I. RELEVANT BACKGROUND**

**A. Plaintiff's Pleadings in This Action**

On March 23, 2007, Plaintiff filed his original
Complaint in this action pursuant to 42 U.S.C. § 1983,
asserting numerous claims arising out of his confinement
at Auburn and Upstate Correctional Facilities between
approximately August 9, 2005, and March 16, 2007 (the
date of the Complaint). (Dkt. No. 1, at 36.) On April 18,
2007, the Court required Plaintiff to file an Amended
Complaint. (Dkt. No. 6.) On May 17, 2007, Plaintiff filed
an Amended *and Supplemental* Complaint asserting
similar claims arising out of his confinement at Auburn
Correctional Facility between approximately May 5, 2005,
and May 14, 2007 (the date of the Amended and
Supplemental Complaint). (Dkt. No. 10.) On July 3, 2007,
with leave of the Court, Plaintiff filed a Second Amended

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)

(Cite as: 2009 WL 3124424 (N.D.N.Y.))

and Supplemental Complaint asserting similar claims arising out of his confinement at Auburn and Upstate Correctional Facilities between approximately June 17, 2005, and July 3, 2007 (the date of the Second Amended and Supplemental Complaint). (Dkt. No. 17.)

Generally, in his Second Amended and Supplemental Complaint, Plaintiff alleges that, on at least five separate occasions, between approximately June 17, 2005, and July 3, 2007, correctional officers at Auburn and Upstate Correctional Facilities harassed him based on his race and religion. (*See generally* Dkt. No. 17.) As a result, Plaintiff brings claims arising under First, Fourth, Eighth and Fourteenth Amendments, against forty-three employees of several New York State departments and/or agencies, listed in the caption of this Decision and Order. (*Id.*) In his Report-Recommendation, Magistrate Judge Lowe accurately and thoroughly recites the allegations, and prayer for relief, of Plaintiff's Second Amended and Supplemental Complaint. (*See* Report-Recommendation at Parts I.B. and I.C.) As a result, that recitation is incorporated by reference herein.

**B. Plaintiff's Related Action**

**\*2** In his Report-Recommendation, Magistrate Judge Lowe also accurately and thoroughly recites the allegations, claims and procedural posture of Plaintiff's Complaint in a previously filed action that is currently pending in this Court before the undersigned-*Excell v. Burge,* 05-CV1231-GTS-GJD (N.D.N.Y.). (*See* Report-Recommendation at Part I.A.) As a result, that recitation is incorporated by reference herein. The Court would note two additional facts regarding that action's procedural posture.

First, although this fact is not expressly stated in Magistrate Judge Lowe's Report-Recommendation, Senior United States District Judge Lawrence E. Kahn granted part of Defendants' motion for summary judgment in the action of *Excell v. Burge,* 05-CV-1231, on September 25, 2008, dismissing *with prejudice* all of Plaintiff's claims against Defendant Head, and Plaintiff's First Amendment free-exercise claim against Defendants Hess, Devito, Bray, and Sourwine. *See Excell v. Burge,* 05-CV-1231, 2008 WL 4426647 (N.D.N.Y. Sept. 25, 2008) (Kahn, J.). Then, after being assigned the case on October 2, 2008, the

undersigned denied Plaintiff's motion for reconsideration of Judge Kahn's decision and order on January 21, 2009. *See Excell v. Burge,* 05-CV-1231, 2008 WL 152585 (N.D.N.Y. Jan. 21, 2009) (Suddaby, J.)

Second, after Magistrate Judge Lowe issued his Report-Recommendation in this action, the undersigned scheduled trial in the action of *Excell v. Burge,* 05-CV-1231, for December 14, 2009, and appointed *pro bono* trial counsel for Plaintiff.

**C. Defendants' Motion to Dismiss**

On March 6, 2008, thirty-six of the forty-three Defendants in this action filed a motion to dismiss part of Plaintiff's Second Amended and Supplemental Complaint for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). (Dkt. No. 67.) [FN1] In his Report-Recommendation, Magistrate Judge Lowe accurately summarizes Defendants' arguments on their motion to dismiss. (*See* Report-Recommendation at Part I.D.) As a result, that summary is incorporated by reference herein.

> FN1. To the extent that the current motion is filed on behalf of Defendants who had already filed an Answer to Plaintiff's Second Amended and Supplemental Complaint (*see* Dkt. No. 66), that motion is properly brought under Fed.R.Civ.P. 12(c), which governs the entry of judgment on the pleadings. However, courts analyzing a motion filed under Rule 12(c) must apply the same standard as that applicable to a motion filed under Rule 12(b)(6). *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.), *cert. denied,* 513 U.S. 816 (1994); *Wynn v. Uhler,* 941 F.Supp. 28, 29 (N.D.N.Y.1996) (Pooler, J.).

After being granted two extensions of time by Magistrate Judge Lowe to file a response to the motion, Plaintiff filed a lengthy response on June 30, 2008, and July 7, 2008. (Dkt.Nos.74, 75.) More specifically, Plaintiff's response consisted of thirty pages of singled-spaced legal argument and affidavit testimony, as well as forty-nine pages of exhibits. (*Id.*) Liberally construed, the crux of Plaintiff's response is that Defendants' motion should be denied for three reasons: (1) his lengthy Second Amended and Supplemental Complaint

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)

(Cite as: 2009 WL 3124424 (N.D.N.Y.))

and his declaration in response to Defendants' motion provide sufficient factual allegations for purposes of Fed.R.Civ.P. 8(a); (2) his response exhibits and his declaration in response to Defendants' motion, demonstrate genuine issues of material fact for trial; and (3) Defendants have failed to comply with Plaintiff's discovery requests. (Id.)

**\*3** On March 12, 2009, Magistrate Judge Lowe issued a Report-Recommendation recommending that the motion be granted in part and denied in part. (Dkt. No. 84.) Familiarity with the specific recommendations and analysis therefor offered in Magistrate Judge Lowe's Report-Recommendation is assumed in this Decision and Order. (See Report-Recommendation at Part III.)

On March 27, 2009, Plaintiff filed his Objections to those portions of the Report-Recommendation recommending dismissal. (Dkt. No. 87.) [FN2] Liberally construed, the crux of Plaintiff's Objections argue that the undersigned should reject Magistrate Judge Lowe's Report-Recommendation for two reasons: (1) Plaintiff's lengthy Second Amended and Supplemental Complaint, his declaration in response to Defendants' motion, and his Objections to Magistrate Judge Lowe's Report-Recommendation provide sufficient factual allegations for purposes of Fed.R.Civ.P. 8(a); and (2) Plaintiff's response exhibits, his declaration in response to Defendants' motion, and his verified Objections to Magistrate Judge Lowe's Report-Recommendation demonstrate genuine issues of material fact for trial. (Id.)

FN2. The Court notes that, on March 20, 2009, Plaintiff filed a document entitled "Declaration," which was mistakenly docketed as an "Objection" to the Report-Recommendation. (Dkt. No. 85.) The Court concludes that the Declaration does not constitute an Objection to the Report-Recommendation, because it is dated February 26, 2009 (two weeks before the issuance of the Report-Recommendation), it does not reference the Report-Recommendation, and it constitutes evidence (which is immaterial on a motion to dismiss). (Id.) The Court notes also that, on March 25, 2009, Plaintiff filed a "Respon[se] to Opposition of Defendants [']

Memorandum Motion for Preliminary Injunctive Relief," which was incorrectly docketed as a "Supplemental Objection" to the Report-Recommendation. (Dkt. No. 86.) The Court concludes that this document does not constitute an Objection to the Report-Recommendation, because it is dated February 26, 2009 (two weeks before the issuance of the Report-Recommendation), it does not reference the Report-Recommendation but Plaintiff's then-pending motion for preliminary injunction. (Id.) As a result, the Clerk's Office is directed to re-docket Dkt. No. 85 as "Declaration in Support of Plaintiff's Motion for Counsel and/or Motion for Preliminary Injunction," to re-docket Dkt. No. 86 as "Reply to Response to Motion for Preliminary Injunction," and to re-docket Dkt. No. 87 as "Objection to Report-Recommendation."

**D. Plaintiff's Fourth Motion for Counsel**

On June 2, 2009, Plaintiff filed his fourth motion for the appointment of counsel. (Dkt. No. 93.) Plaintiff's first three such motions were filed on May 27, 2008, June 2, 2008, and March 4, 2009, and were denied on December 29, 2008, and April 7, 2009. (Dkt.Nos.71, 72, 80, 82, 88.)

**II. APPLICABLE LEGAL STANDARDS**

**A. Standard of Review of a Report-Recommendation**

When specific objections are made to a magistrate judge's report-recommendation, the Court makes a *"de novo"* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." See 28 U.S.C. § 636(b)(1)(C).[FN3] When only general objections are made to a magistrate judge's report-recommendation, the Court reviews the report-recommendation for clear error or manifest injustice. See Brown v. Peters, 95-CV-1641, 1997 WL 599355, at *2-3 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.) [collecting cases], aff'd without opinion, 175 F.3d 1007 (2d Cir.1999).[FN4] Similarly, when a party makes no objection to a portion of a report-recommendation, the Court reviews that portion for clear error or manifest injustice. See Batista v. Walker, 94-CV-2826, 1995 WL 453299, at *1 (S.D.N .Y. July 31, 1995) (Sotomayor, J.)

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)

(Cite as: 2009 WL 3124424 (N.D.N.Y.))

[citations omitted]; Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition [citations omitted]. After conducing the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C).

FN3. On de novo review, "[t]he judge may ... receive further evidence...." 28 U.S.C. § 636(b)(1)(C). However, a district court will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance. See, e.g., Paddington Partners v. Bouchard, 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters, 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate").

FN4. See also Vargas v. Keane, 93-CV-7852, 1994 WL 693885, at *1 (S.D.N.Y. Dec. 12, 1994) (Mukasey, J.) ("[Petitioner's] general objection [that a] Report ... [did not] redress the constitutional violations [experienced by petitioner] ... is a general plea that the Report not be adopted ... [and] cannot be treated as an objection within the meaning of 28 U.S.C. § 636."), aff'd, 86 F.3d 1273 (2d Cir.), cert. denied, 519 U.S. 895 (1996).

**B. Standard Governing a Motion to Dismiss for Failure to State a Claim**

Magistrate Judge Lowe thoroughly and correctly recited the legal standard governing a motion to dismiss for failure to state a claim, including the standard governing such motions to dismiss pleadings drafted by

pro se litigants. (See Report-Recommendation at Part II.) As a result, that standard is incorporated by reference herein.

**III. ANALYSIS**

**A. Defendants' Motion to Dismiss**

**\*4** As indicated above in Part I.C. of this Decision and Order, Plaintiff's Objections do not contain specific challenges to those portions of the Report-Recommendation recommending the partial denial of Defendants' motion to dismiss. Thus, the Court reviews those portions of the Report-Recommendation for only clear error. See, supra, Part II.A. of this Decision and Order. After carefully reviewing all of the papers in this action (including Plaintiff's Second Amended and Supplemental Complaint, and the referenced portions of Magistrate Judge Lowe's Report-Recommendation), the Court concludes that the referenced portions of the Report-Recommendation are well-reasoned and not clearly erroneous. As a result, the Court accepts and adopts these portions of the Report-Recommendation for the reasons stated therein.

With regard to the one portion of Magistrate Judge Lowe's Report-Recommendation to which Plaintiff's Objections do specifically challenge-i.e., Magistrate Judge Lowe's recommendation that Defendants' motion to dismiss be partially granted-a de novo review is appropriate. See, supra, Part II.A. of this Decision and Order. After carefully reviewing all of the papers in this action (including Plaintiff's Second Amended and Supplemental Complaint, the referenced portion of Magistrate Judge Lowe's Report-Recommendation, and Plaintiff's Objections), the Court concludes that the referenced portion of the Report-Recommendation is correct in all respects. Magistrate Judge Lowe employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. As a result, the Court also accepts and adopts this portion of the Report-Recommendation for the reasons stated therein. The Court would add only five points.

First, contrary to Plaintiff's reading of Magistrate Judge Lowe's Report-Recommendation, the vast majority of Magistrate Judge Lowe's recommendations were not premised on a failure by Plaintiff to allege sufficient facts

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)

(Cite as: 2009 WL 3124424 (N.D.N.Y.))

for purposes of Fed.R.Civ.P. 8(a). Rather, the vast majority of Magistrate Judge Lowe's recommendations were based on the fact that the claims in question, though factually detailed, were simply not cognizable under Fed.R.Civ.P. 12(b)(6). (*See* Report-Recommendation at Part II [describing the two grounds on which a defendant may move to dismiss for failure to state a claim].) [FN5] As a result, his argument that he provided a "short and plain statement of [his] claim," as required by Fed.R.Civ.P. 8(a), is almost entirely irrelevant.

> FN5. More specifically, the vast majority of Magistrate Judge Lowe's recommendations were based on the fact that the claims in question were not actionable under the following legal authorities: (1) the proscription against duplicitous and malicious prosecutions, pursuant to Fed.R.Civ.P. 11(b)(2), the first-in-time rule, and the Court's inherent power to manage its docket; (2) the principle of sovereign immunity under the Eleventh Amendment; (3) the doctrine of absolute immunity; (4) the requirement that supervisors be personally involved in constitutional violations under 42 U.S.C. § 1983; (5) the legal standard governing substantive and procedural due process claims arising from prison disciplinary hearings under the Fourteenth Amendment; (6) the legal standard governing access-to-courts claims arising under the First Amendment; (7) the legal standard governing free-exercise claims arising under the First Amendment; (8) the legal standard governing unreasonable-search claims under the Fourth Amendment; (9) the legal standard governing due process claims arising from the receipt of a false prison misbehavior report in prison under the Fourteenth Amendment; (10) the intra-corporate conspiracy doctrine; and (11) the legal standard governing claims of deliberate indifference to a serious medical need and inadequate prison conditions arising under the Eighth Amendment. (*See* Report-Recommendation at Part III.)

Second, contrary to Plaintiff's understanding of the legal standard governing motions to dismiss under Fed.R.Civ.P. 12(b) (6), extrinsic evidence cannot be considered by the Court when deciding such motions. *See* Fed.R.Civ.P. 12(d). Nor can matters outside the four corners of the pleadings be considered by the Court when deciding such motions, with a few exceptions. Here, the Court finds none of the exceptions are applicable. The exhibits and declarations on which Plaintiff relies in opposition to Defendants' motion were not exhibits to his lengthy Second Amended and Supplemental Complaint. (*See* Dkt. No. 17, Part 1.) Thus, they are not deemed part of that pleading pursuant to Fed.R.Civ.P. 10(c). Moreover, Plaintiff has already had three chances to amend his operative pleading in this action. As a result, he has no absolute right, under Fed.R.Civ.P. 15(a)(2), to constructively amend it through the Court's consideration of the materials in question. Finally, Plaintiff has not shown that the materials in question are sufficiently consistent with the allegations of his Second Amended and Supplemental Complaint. [FN6] As a result, it would not be appropriate for the Court to consider them out of an extension of special solicitude to Plaintiff. [FN7] For all these reasons, it is irrelevant (for purposes of the motion to dismiss currently pending before the Court) whether or not Plaintiff has submitted response exhibits, a declaration in response to Defendants' motion, and verified Objections to Magistrate Judge Lowe's Report-Recommendation, which demonstrate genuine issues of material fact for trial.

> FN6. The Court notes that, under the circumstances, considering the materials in question would result in piecemeal litigation, requiring Defendants, in their Answer or Amended Answer (*see* Dkt. No. 66), to admit or deny-at their peril-facts never plausibly alleged in Plaintiff's Second Amended and Supplemental Complaint.

> FN7. The Court notes that an additional reason it should not treat his Objections as effectively amending his Second Amended and Supplemental Complaint is that such a treatment would contravene the rule that a district court will ordinarily refuse to consider material that could have been, but was not, presented to the Magistrate Judge in the first instance. *See, supra,* note 3 of this Decision and Order.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)

(Cite as: 2009 WL 3124424 (N.D.N.Y.))

**\*5** Third, Plaintiff neglects to mention, in his Objections, that several of the dismissals recommended by Magistrate Judge Lowe are dismissals *with leave to amend.* Such a recommendation is extremely generous to Plaintiff, who has already had three chances to amend his operative pleading in this action, and who, on one occasion, took the opportunity to file a *supplemental* pleading without prior leave of the Court. (*Compare* Dkt. No. 15 *with* Dkt. No. 17.) *See* Fed.R.Civ.P. 15(d); Local Rule 7.1(a)(4). While the Court accepts Magistrate Judge Lowe's recommendation, *the Court cautions Plaintiff that, should his Third Amended and Supplemental Complaint allege any facts occurring after July 3, 2007 (the date of the Second Amended and Supplemental Complaint), those allegations will be sua sponte struck by the Court.*

Fourth, as stated above in Part I.B. of this Decision and Order, although this fact is not relied on in Magistrate Judge Lowe's Report-Recommendation, Judge Kahn granted part of Defendants' motion for summary judgment in the action of *Excell v. Burge,* 05-CV-1231, on September 25, 2008, dismissing *with prejudice* all of Plaintiff's claims against Defendant Head, and Plaintiff's First Amendment free-exercise claim against Defendants Hess, Devito, Bray, and Sourwine. *See Excell v. Burge,* 05-CV-1231, 2008 WL 4426647 (N.D.N.Y. Sept. 25, 2008) (Kahn, J.). As a result, Plaintiff's litigation of those claims in this action are precluded for the additional reason of res judicata, also known as claim preclusion.

Fifth, and finally, in addition to the intracorporate-conspiracy-doctrine cases cited by Magistrate Judge Lowe, the Court relies on the cases cited by the undersigned in *Murray v. Pataki,* 03-CV-1263, 2009 WL 981217, at \*4 & n. 11 (N.D.N.Y. Apr. 9, 2009) (Suddaby, J.).

**B. Plaintiff's Motion to Appoint Counsel**

Plaintiff's fourth motion for the appointment of counsel is denied for the same reasons that his third such motion was denied by Magistrate Judge Lowe on April 7, 2009. (Dkt. No. 88.) More specifically, after carefully reviewing the file in this action, the Court finds as follows: (1) it appears as though, to date, Plaintiff has been able to

effectively litigate this action; (2) it appears that the case does not present issues that are novel or more complex than those raised in most **prisoner** civil rights actions; (3) while it is possible that there will be conflicting evidence implicating the need for cross-examination at the time of the trial (as is the case in many actions brought under 42 U.S.C. § 1983 by *pro se* litigants), it is highly probable that this Court will appoint trial counsel at the final pretrial conference (should this case survive the filing of any further dispositive motions); and (4) the Court is unaware of any special reasons why appointment of counsel at this time would be more likely to lead to a just determination of this litigation.

**ACCORDINGLY,** it is

**\*6 ORDERED** that Magistrate Judge Lowe's Report-Recommendation (Dkt. No. 84) is *ACCEPTED* and *ADOPTED* in its entirety; and it is further

**ORDERED** that Defendants' motion to dismiss (Dkt. No. 67) is *GRANTED* **in part** and *DENIED* **in part;** and it is further

**ORDERED** that the following claims of Plaintiff's Second Amended and Supplemental Complaint (Dkt. No. 17) are *DISMISSED* without leave to amend:

(1) all claims against Defendants Devito, Head, Labetz, Simons, and Sourwine;

(2) the First Amendment religion claims alleged in ¶¶ 1-26 of the Second Amended and Supplemental Complaint against Defendant Hess;

(3) all claims against Defendant Burge;

(4) all claims against Defendants in their official capacities;

(5) all claims against Defendants Manley, Grant, and Capacci;

(6) the claim against Defendant Croce regarding his decision to deny Plaintiff parole;

(7) the claims against Defendants Goord, Burge,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)

(Cite as: 2009 WL 3124424 (N.D.N.Y.))

Fischer, Roy, McLaughlin, Croce, Stewart, LeClaire, Wright, and N. Smith alleging that they ignored complaints and grievances;

(8) the procedural due process claims against Defendants Salvage, Hayes, and Allen;

(9) the Fourth Amendment claim against Defendants Steinberg, B. Smith, and Claflin arising from their August 22, 2005, search of Plaintiff's cell;

(10) the conspiracy claims against Defendants Premo, D. Wood, and Corrigeux arising from the May 2006 drug tests;

(11) the conspiracy claim against Defendant Lewis arising from the June 17, 2006, request for a urine sample;

(12) the conspiracy claim against Defendants R. Woods and Anctil arising from Anctil's May 19, 2007, threats; and

(13) the claim that Defendant McDonald used "racial and discrimination and indecent and profane language"; and it is further

**ORDERED** that the following claims of Plaintiff's Second Amended and Supplemental Complaint (Dkt. No. 17) are *DISMISSED* with leave to amend:

(1) the claims against Defendants Goord, Fischer, Roy, McLaughlin, Croce, Stewart, LeClaire, Wright, and N. Smith alleging that they falsified documents in response to Plaintiff's grievances;

(2) the substantive due process and First Amendment access to the courts claims against Defendants Salvage, Hayes, and Allen;

(3) the due process claim against Defendants B. Smith and Claflin arising from the August 23, 2005, misbehavior report;

(4) the due process claim against Defendants Premo, D. Wood, and Corrigeux arising from the May 2006 drug tests;

(5) the due process claim against Defendant Lewis arising from the June 22, 2006, misbehavior report;

(6) the Eighth Amendment medical care claims against Defendants Moore and Travers arising from Plaintiff's discovery of glass in his food;

(7) the Eighth Amendment claims arising from Anctil's May 19, 2007, threats;

(8) the Eighth Amendment conditions of confinement claim against Defendant McDonald arising from the denial of food and spitting in Plaintiff's coffee; and

**\*7** (9) the Eighth Amendment medical care claim against Defendant McDonald arising from her interference with Plaintiff's medical interview; and it is further

**ORDERED** that the following claims of Plaintiff's Second Amended and Supplemental Complaint (Dkt. No. 17) hereby survive Defendants' motion to dismiss:

(1) the retaliation claim against Defendant Hess arising from the August 22, 2005, drug test;

(2) the retaliation claim against Defendant Bellinger arising from the August 22, 2005, drug test;

(3) the First Amendment claim against Defendants Steinberg, B. Smith, and Claflin arising from their August 22, 2005, search of Plaintiff's cell;

(4) the due process claim against Defendant Steinberg arising from the August 23, 2005, misbehavior report;

(5) the Fourth Amendment claim against Defendant Premo arising from the May 7, 2006, drug test; and

(6) the Eighth Amendment medical care claim against Defendant Travers arising from Plaintiff's May 2007 report of bloody bowel movements; and it is further

**ORDERED** that, within **THIRTY (30) DAYS** of the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)

(Cite as: 2009 WL 3124424 (N.D.N.Y.))

date of this Decision and Order, Plaintiff shall file, for the Court's review and acceptance, a **THIRD AMENDED AND SUPPLEMENTAL COMPLAINT,** in which he asserts the six claims described in the preceding paragraph, and in which he amends the nine claims that have been hereby dismissed with leave to amend; and it is further

**ORDERED** that, after Plaintiff's Third Amended and Supplemental Complaint, Defendants shall file an Answer (or an Amended Answer, if appropriate) in accordance with the Federal Rules of Civil Procedure; and it is further

**ORDERED** that Plaintiff's fourth motion for the appointment of counsel (Dkt. No. 93) is *DENIED;* and it is further

**ORDERED** that the Clerk's Office shall re-docket Dkt. No. 85 as "Declaration in Support of Plaintiff's Motion for Counsel and/or Motion for Preliminary Injunction," re-docket Dkt. No. 86 as "Reply to Response to Motion for Preliminary Injunction," and re-docket Dkt. No. 87 as "Objection to Report-Recommendation."

*Plaintiff is advised that, should his Third Amended and Supplemental Complaint fail to state a claim with regard to the nine claims that have been hereby dismissed with leave to amend, those claims will be sua sponte dismissed by the Court. Plaintiff is also advised that, should his Third Amended and Supplemental Complaint allege any facts occurring after July 3, 2007 (the date of the Second Amended and Supplemental Complaint), those allegations will be sua sponte struck by the Court.*

### REPORT-RECOMMENDATION

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* **prisoner** civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Glenn T. Suddaby, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Currently pending before the Court is a motion by some of the Defendants to dismiss for failure to state a claim pursuant to Federal Rules of Civil Procedure 12(b)(6). (Dkt. No. 67.) For the reasons that follow, I recommend that

Defendants' motion be granted in part and denied in part.

### I. BACKGROUND

#### A. Plaintiff's complaint in Case No. 9:05-CV-1231 (GTS/GJD)

**\*8** On September 28, 2005, Plaintiff Mortimer Excell filed a previous action in this Court. *Excell v. Burge,* No. 9:05-CV-1231 (GTS/GJD) (*"Burge"* ). The operative complaint in that case alleges that on five separate occasions, correctional officers at Auburn Correctional Facility harassed Plaintiff based on his race and religion. (*Burge* Dkt. No. 7.)

Specifically, the *Burge* complaint alleges that on June 17, 2005, officers G. Simons and Labetz taunted Plaintiff with religious and racial epithets, threw his religious headgear ("Tsalot-Kob") on the ground, and threatened to harm Plaintiff if he filed any grievances. (*Burge* Dkt. No. 7 at ¶¶ 1-8.) The officers then issued a misbehavior report charging Plaintiff with violating various disciplinary rules. *Id.* at ¶ 9. After a disciplinary hearing, Plaintiff was found guilty of the charges. *Id.* at ¶ 10. Plaintiff filed an administrative appeal with John W. Burge, the superintendent of the facility, which was denied. Plaintiff's written complaint to DOCS commissioner Glenn Goord was 'neglected.' *Id.* at ¶ 11.

On July 20, 2005, officer Hess removed Plaintiff from a religious studies class and informed him that he was not allowed to wear a colored Tsalot-Kob. When Plaintiff protested that DOCS directives allowed him to wear a colored Tsalot-Kobb, Hess summoned several officers, who returned Plaintiff to his cell and placed him on keeplock status. (*Burge* Dkt. No. 7 at ¶ 12.) Plaintiff subsequently received a misbehavior report charging him with "out of place." *Id.* at ¶ 13. Plaintiff was found not guilty after a disciplinary hearing, but did not receive a copy of the written disposition. *Id.* at ¶ 14.

On July 26, 2005, officer Simons approached Plaintiff in the mess hall, began calling him racially derogatory names, and ordered him to remove his Tsalot-Kob. *(Burge* Dkt. No. 7 at ¶ 15.) Simons and two other officers then removed Plaintiff from the mess hall, confiscated his Tsalot-Kob, and returned him to his cell on keeplock status. *Id.* at ¶ 16. Subsequently, Plaintiff received a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)

(Cite as: 2009 WL 3124424 (N.D.N.Y.))

misbehavior report charging him with violating various disciplinary rules. *Id.* at ¶ 17. After a disciplinary hearing, Plaintiff was found not guilty. *Id.* at ¶ 18.

On August 4, 2005, officer Devito removed Plaintiff from his religious class and demanded to know why he was wearing a colored Tsalot-Kob. (*Burge* Dkt. No. 7 at ¶ 20.) Devito threatened to kill Plaintiff if he filed any complaints against him. *Id.* He then went into the class and stated that the organization would not be allowed to continue to operate if Plaintiff remained in the organization. *Id.* Devito returned Plaintiff to his cell and placed him on keeplock status. *Id.* at ¶ 21. Devito subsequently issued Plaintiff a misbehavior report charging Plaintiff with refusing a direct order. *Id.* at ¶ 22. Plaintiff was found not guilty after a disciplinary hearing. *Id.* at ¶ 23. However, when he requested a written disposition, hearing officer Head told him to "get the fuck out [of] the hearing office [FN1]." *Id.*

> [FN1.] Because a motion to dismiss tests the face of a plaintiff's complaint, this Report-Recommendation includes many direct quotes from Plaintiff's complaint. Any grammatical errors or idiosyncratic turns of phrase are Plaintiff's, not the Court's.

**\*9** On August 9, 2005, officer Sourwine approached Plaintiff in the mess hall and ordered him to remove his colored Tsalot-Kob. (*Burge* Dkt. No. 7 at ¶ 24.) When Plaintiff showed Sourwine a copy of the DOCS directive allowing colored Tsalot-Kobs, Sourwine began calling Plaintiff racially derogatory names. *Id.* Officer Bray then approached Plaintiff, began calling Plaintiff racially derogatory names, said he did not "give a dam[n] fuck about ... the Directive," and ordered Plaintiff to leave the mess hall. *Id* . Bray returned Plaintiff to his cell and placed him on keeplock status. *Id.* Subsequently, Plaintiff received a misbehavior report charging him with violating various disciplinary rules. *Id* . at ¶ 25. At the disciplinary hearing on the charges, hearing officer Head would not allow Plaintiff to present a defense and ordered that Plaintiff be removed from the hearing room. *Id.* at ¶ 26. Plaintiff was found guilty of the charges. *Id.*

In addition to these five incidents, Plaintiff alleged

that he had filed a grievance against officer G. Steinberg for mail theft, sexual harassment, and threats. (*Burge* Dkt. No. 7 at ¶ 30.) However, Plaintiff did not name Steinberg as a defendant in the *Burge* action. Rather, he stated that he was simply 'notifying' the Court about the incident. *Id.* The Court did not interpret the *Burge* complaint as making any allegations against Steinberg. (*Burge* Dkt. No. 52 at 8.)

The *Burge* case has proceeded past the summary judgment stage. On summary judgment, the Court dismissed all claims against Head and the First Amendment religion claims against Hess, Devito, Bray, and Sourwine. Retaliation claims against those defendants remain pending.

**B. Plaintiff's complaint in this case**

On March 23, 2007, Plaintiff filed the case pending before the undersigned. The operative complaint is the amended complaint filed on July 9, 2007. (Dkt. No. 17) ("the complaint.") The first 27 paragraphs of the complaint's statement of facts repeat, nearly verbatim, the allegations of the *Burge* case. (Compare Dkt. No. 17 at ¶¶ 1-27 with *Burge* Dkt. No. 7 at ¶¶ 1-30.) In addition, the complaint includes allegations about the lack of response to Plaintiff's complaints and grievances, the denial of Plaintiff's parole, and ten other incidents of mistreatment by staff.

1. *Allegations against Defendants Hess, Bellinger, Steinberg, Smith, Claflin, Wolczyk, Salvage, Goord and Burge re: urine sample, cell search and falsified transcript*

On August 22, 2005, Plaintiff was removed from his cell and escorted to the medical unit to give a urine sample. (Dkt. No. 17 at ¶ 28.) This sample was required because of a report by Defendant Hess, whom Plaintiff had not seen for two or three weeks. *Id.* As Plaintiff was being escorted, Defendant Joseph Bellinger [FN2] told the escort officers to be sure that Plaintiff's urine test was positive. *Id.* Plaintiff asserts that Hess' report and Bellinger's comment were made in retaliation for Plaintiff submitting a grievance and for "beating" the July 20, 2005, misbehavior report. *Id.*

> [FN2.] The complaint refers to this defendant as "Joseph Bellnier." (Dkt. No. 17 at A-5.) I have

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)

(Cite as: 2009 WL 3124424 (N.D.N.Y.))

used the spelling provided in Defendants' motion to dismiss.

**\*10** While Plaintiff was giving the urine sample, Defendants Steinberg, B. Smith and Claflin searched his cell. (Dkt. No. 17 at ¶ 29.) When Plaintiff returned to his cell, his legal documents and belongings were on the floor and his three Tsalot-Kobs were in the toilet. *Id.* A cell search contraband receipt signed by Steinberg, B. Smith and Claflin stated that tobacco and marijuana had been found in the cell. *Id.*

On August 23, 2005, Plaintiff received a misbehavior report charging him with possession of a controlled substance. (Dkt. No. 17 at ¶ 30.) Plaintiff was found guilty after an August 25, 2005, disciplinary hearing conducted by Defendant Joseph Wolczyk at which Plaintiff was not allowed to present a defense. *Id.* He was sentenced to 12 months' SHU confinement, 12 months' loss of good time credits, and 12 months' loss of recreation, commissary, package and telephone privileges. *Id.*

On August 26, 2005, Plaintiff filed complaints with Defendants Goord and Burge. He did not receive a response. (Dkt. No. 17 at ¶ 32.)

Plaintiff appealed his disciplinary sentence through the prison appeals system and filed an Article 78 proceeding in state court. (Dkt. No. 17 at ¶ 33.) Plaintiff alleges that defendant stenographer Patricia Salvage "falsified the transcri[pt] of the Tier Three hearing ... in an effort to cover up staff misconduct ." *Id.*

I construe the complaint as asserting the following causes of action as a result of these events: (1) a retaliation claim against Defendants Hess and Bellinger; (2) a First Amendment religion claim, a Fourth Amendment claim, and substantive and procedural due process claims against Defendants Steinberg, B. Smith, and Claflin; (3) a procedural due process claim against Defendant Wolczyk [FN3]; and (4) a First Amendment access to the courts claim, a substantive due process claim, and a procedural due process claim against Defendant Salvage.

> FN3. Defendant Wolczyk has answered the complaint. (Dkt. No. 66.)

2. *Allegations against Defendants Premo, Wood, and Corrigeux re: falsified drug test*

On April 29, 2006, Plaintiff was moved into a cell with an **inmate** who had a long history of drug use. (Dkt. No. 17 at ¶ 38.) On May 7, 2006, Defendant Premo ordered Plaintiff to submit a urine specimen. Premo said "Albany" had requested the sample. (Dkt. No. 17 at ¶ 36.) On May 9, 2006, Plaintiff and his cell mate were both ordered to submit urine specimens. (Dkt. No. 17 at ¶ 37.) Plaintiff alleges that the reason for the second test was to use his cell mate's specimen "to give me a false positive." (Dkt. No. 17 at ¶ 38.)

On May 12, 2006, Defendant Wood issued misbehavior reports charging Plaintiff and his cell mate with use of controlled substances. Plaintiff alleges that Defendant Wood drafted the report in a way that ensured that Plaintiff's cell mate would have his misbehavior report dismissed as a reward for helping to set up Plaintiff. (Dkt. No. 17 at ¶ 39.) Defendant N. Bezio conducted a disciplinary hearing on May 25, 2006. (Dkt. No. 17 at ¶ 40.) As part of his defense, Plaintiff requested a copy of the urinalysis test. Plaintiff alleges that Defendants Premo and Corrigeux falsified the document to make it appear that Corrigeux, rather than "Albany," had requested the test. *Id.* Plaintiff was found guilty and sentenced to six months' SHU confinement, six months' lost good time, and six months' lost package, commissary, recreation, and telephone privileges. *Id.*

**\*11** I construe the complaint as asserting the following causes of action as a result of these events: (1) a Fourth Amendment claim, a conspiracy claim, and a due process claim against Defendant Premo; and (2) due process and conspiracy claims against Defendants Wood and Corrigeux.

3. *Allegations against Defendants Lewis, Moore, Ramsdell and Woods re: drug test*

On June 17, 2006, Defendant B. Lewis ordered Plaintiff to submit a urine specimen. (Dkt. No. 17 at ¶ 41.) Plaintiff, citing a three-hour time limit to submit specimens, said he would submit the specimen when he finished eating. *Id.* Defendant Lewis said to another

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)

(Cite as: 2009 WL 3124424 (N.D.N.Y.))

officer "Fuck him ... we will just put down [that] he [is] refusing to submit his urine specimen." *Id.* No one returned to take Plaintiff's specimen. *Id.* Plaintiff complained verbally to the building supervisor, Defendant Moore, and filed a written complaint with Defendant R. Woods. *Id.*

On June 22, 2006, Defendant Lewis issued a misbehavior report charging Plaintiff with refusing a direct order. (Dkt. No. 17 at ¶¶ 42, 45.) On July 10, 2006, Defendant T. Ramsdell and another officer escorted Plaintiff to a disciplinary hearing. (Dkt. No. 17 at ¶ 45.) When Plaintiff protested, Defendant Ramsdell and another officer told Plaintiff that "if he do[es] not stop his jail house lawyer shit and plead guilty they will issue[ ] the Plaintiff [another] false misbehavior report." *Id.* When Plaintiff refused and began to present a defense, Defendant Ramsdell and the other officer ordered the hearing officer to stop the hearing tape. *Id.* They threatened Plaintiff with bodily harm, escorted him back to his cell, and ordered him to assume the frisk position. *Id.* While Plaintiff was positioned against the wall, the officers put all of his personal items on the floor, including his Bible [FN4] and removed Plaintiff's pillow and toilet paper. *Id.* Plaintiff immediately verbally complained to the housing supervisor. (Dkt. No. 17 at ¶ 46.)

FN4. Plaintiff does not claim that Defendant Ramsdell violated his First Amendment rights. (Dkt. No. 17 at 56.)

On July 11, 2006, Plaintiff filed a "complaint to Defendant Woods and a grievance against Defendant Ramsdell" regarding the July 10 hearing room incident. (Dkt. No. 17 at ¶ 48.) Plaintiff alleged that Ramsdell acted in retaliation for a grievance Plaintiff filed against N. Bezio on July 9, 2006. *Id.*

On July 12, 2006, Plaintiff received a copy of a not guilty disposition from the July 10 hearing. (Dkt. No. 17 at ¶ 47.)

I construe the complaint as asserting the following causes of action as a result of these events: (1) a substantive due process claim, a procedural due process claim, and a conspiracy claim against Defendant Lewis; and (2) an Eighth Amendment claim, a substantive due

process claim, and a procedural due process claim against Defendant Ramsdell [FN5].

FN5. Defendant Ramsdell has answered the complaint. (Dkt. No. 66.)

*4. Allegations against Defendants Moore and Travers re: glass in food*

On June 29, 2006, Plaintiff found glass in his food. (Dkt. No. 17 at ¶ 43.) Plaintiff reported this to the housing unit supervisor, Defendant Moore. *Id.* Plaintiff requested medical care and a new food tray, but Moore refused. *Id.*

**\*12** On June 30, 2006, Defendants Moore and Nurse Travers gave Plaintiff a form to fill out to request medical care. (Dkt. No. 17 at ¶ 44.) Travers, without examining Plaintiff, told him there was nothing wrong with him. *Id.*

I construe the complaint as asserting Eighth Amendment medical care claims against Defendants Moore and Travers as a result of these events.

*5. Allegations against Defendants Bezio, LeClair, Ramsdell, and Sauve re: excessive force*

As mentioned above, on July 9, 2006, Plaintiff filed a grievance complaint against Defendant N. Bezio. (Dkt. No. 17 at ¶ 45.) On July 12, 2006, Plaintiff received a misbehavior report. (Dkt. No. 17 at ¶ 47.)

On July 21, 2006, Defendant Bezio commenced a disciplinary hearing. (Dkt. No. 17 at ¶ 49.) He denied Plaintiff's requests for the video of the July 10 hearing and copies of the July 11 complaint letters and grievance. *Id.*

On July 24, 2006, Plaintiff filed a complaint against Defendant Bezio with Defendant LeClaire. (Dkt. No. 17 at ¶ 50.) Plaintiff requested that Bezio be removed as his hearing officer. *Id.*

On July 27, 2006, Defendants Ramsdell and Sheila Sauve and five other officers arrived at Plaintiff's cell to escort him to a disciplinary hearing. (Dkt. No. 17 at ¶ 51.) Ramsdell ordered Plaintiff to turn his back to the cell door and put his hands behind his back and through the slot in the door. *Id.* Plaintiff complied, and Sauve applied mechanical restraints. *Id.* Plaintiff told Defendants that the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)

(Cite as: 2009 WL 3124424 (N.D.N.Y.))

restraints were too tight. *Id* . Ramsdell pat frisked Plaintiff "in a very hostile and sexual assault manner that offended Plaintiff['s] manhood and offend[ed] his dignity." *Id*. When Plaintiff arrived at the hearing room, Defendant Bezio told him to stop resisting. *Id*. Ramsdell and Sauve then pushed Plaintiff into the wall and tried to break Plaintiff's right index finger. *Id*. Defendant Bezio and five other officers pushed Plaintiff's face into the wall until it "burst open" and bled. *Id*. Plaintiff's wrists were also bleeding. *Id*. Plaintiff was escorted back to his cell and his legal documents were not returned. *Id*. Plaintiff did not receive medical care despite filing numerous complaints. (Dkt. No. 17 at ¶¶ 51, 58.)

Bezio found Plaintiff guilty of all charges and sentenced him to six months' SHU confinement, three months' loss of good time, and six months' loss of recreation, commissary, packages, and telephone privileges. (Dkt. No. 17 at ¶ 51.)

Plaintiff alleges that Defendant Linda A. Hayes, the stenographer for the hearing, falsely certified that her transcript was accurate. (Dkt. No. 17 at ¶ 77 [FN6].)

> FN6. Plaintiff alleges that Defendant Hayes also "knowingly and willfully ma[d]e a false official report" on another occasion, but it is not clear from the complaint to which disciplinary hearing Plaintiff is referring. (Dkt. No. 17 at ¶ 79.)

I construe the complaint as asserting the following causes of action as a result of these events: (1) Eighth Amendment, substantive due process, and procedural due process claims against Defendant Bezio [FN7]; (2) Eighth Amendment claims against Defendants Ramsdell [FN8] and Sauve [FN9]; and (3) First Amendment access to the court, substantive due process, and procedural due process claims against Defendant Hayes.

> FN7. Defendant Bezio has answered the complaint. (Dkt. No. 66.)

> FN8. As noted above, Defendant Ramsdell has answered the complaint. (Dkt. No. 66.)

> FN9. Defendant Sauve has answered the

complaint. (Dkt. No. 66.)

*6. Allegations against Defendants Ramsdell, Bezio, Allen, Goord and Selsky re: false misbehavior report and transcription*

**\*13** On July 28, 2006, Defendant Ramsdell and officer Comstock issued misbehavior reports charging Plaintiff with refusing a direct order, violating lock in/lock out procedures, violent conduct, interference with employees, and harassment. (Dkt. No. 17 at ¶ 52.) Officer Comstock's report "said he had only written [it] because he was ordered to do so by Defendant Bezio." *Id*. The disciplinary hearing on the charges was conducted on several dates in August 2006. (Dkt. No. 17 at ¶ 53.) The hearing officer, Defendant D. Quinn, denied Plaintiff's requests to present evidence. *Id*. Plaintiff did not immediately receive a disposition document or any determination of guilt. *Id*

On October 15, 2006, Plaintiff filed a grievance with Defendant Goord. (Dkt. No. 17 at ¶ 54.) In response, Defendant Selsky sent Plaintiff a copy of a disposition from an August 29 hearing. *Id*. Plaintiff had been found guilty and sentenced to three months' SHU confinement, three months' loss of good time, and three months' loss of recreation, commissary, packages and telephone privileges. *Id*. Plaintiff alleges that Defendant Ashley Allen, the stenographer for the August 29 hearing, falsely certified that her transcript was accurate. (Dkt. No. 17 at ¶ 78.)

I construe the complaint as asserting the following causes of action as a result of these events: (1) substantive due process, procedural due process, and conspiracy claims against Defendants Ramsdell and Bezio [FN10]; (2) a procedural due process claim against Defendant Quinn [FN11]; and (3) First Amendment access to the courts, substantive due process, and procedural due process claims against Defendant Allen.

> FN10. As noted above, Defendants Ramsdell and Bezio have answered the complaint. (Dkt. No. 66.)

> FN11. Defendant Quinn has answered the complaint. (Dkt. No. 66.)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)

(Cite as: 2009 WL 3124424 (N.D.N.Y.))

*7. Allegations against Defendant Travers re: bloody bowel movements*

On May 8, 2007, Plaintiff filed a sick call request regarding stomach pain, heart pain, and blood in his bowel movements. (Dkt. No. 17 at ¶ 65.) On May 9, 2007, a nurse gave Plaintiff three stool sample test cards. *Id.* On May 11, 2007, Plaintiff returned the three stool sample cards to Defendant Travers. (Dkt. No. 17 at ¶ 65.) On May 12, 13, and 14, 2007, Plaintiff filed sick call requests regarding heart pain and bloody bowel movements. *Id.* When Plaintiff asked Travers about the stool sample cards, she said that Plaintiff would soon see a nurse-practitioner because the samples had blood in them. *Id.* Travers would not give Plaintiff any pain killers. *Id.* Plaintiff filed "numerous" complaints against Nurse Travers and had blood in his bowel movements for nine months but never received care. (Dkt. No. 17 at ¶¶ 58, 65.)

I construe the complaint as asserting an Eighth Amendment medical care claim against Defendant Travers as a result of these events. I note that Defendants have explicitly declined to move to dismiss this cause of action. (Dkt. No. 67-4 at 21, 22 n. 4.)

*8. Allegations against Defendants McDonald, Woods and Fisher re: spitting in coffee cup, interfering with medical interview, and profane language*

**\*14** On May 9, 2007, Plaintiff filed a grievance against Defendant Michele McDonald [FN12] for spitting in his coffee cup, interfering with a medical interview and using racial and profane language. (Dkt. No. 17 at ¶ 62.) I construe the complaint as asserting Eighth Amendment medical care and conditions of confinement claims against Defendant McDonald.

> FN12. The complaint refers to this defendant as "Macdonal." (Dkt. No. 17 at ¶ 62.) I have used the spelling provided in Defendants' motion to dismiss.

*9. Allegations against Defendants Woods, Anctil and Tirone re: laughing at Plaintiff's report of pain and the misbehavior report alleging threats by Plaintiff*

On May 17, 2007, Defendant Woods walked by Plaintiff's cell. (Dkt. No. 17 at ¶ 66.) Plaintiff complained about his heart and stomach pains and the blood in his bowel movements. *Id.* Woods laughed in Plaintiff's face and walked away. *Id.* That same day, Plaintiff filed a complaint with Woods, stating that he was receiving cruel and unusual punishment and that "he would not just sit and be physically assaulted ... he will start to fight back to protect hi [m]self and he will not let these defendants kill him and he do not try to take one of them with him and he will feel better to die fighting for his justice." *Id.* On May 21, 2007, Defendant Anctil issued a misbehavior report charging Plaintiff with violent conduct and threats [FN13] (Dkt. No. 17 at ¶ 68.) Defendant Tirone presided over the disciplinary hearing on June 7, 2007. (Dkt. No. 17 at ¶ 69.) Plaintiff protested that the hearing was untimely. He asked to see a copy of any extension. Tirone denied that request and Plaintiff's requests to present documentary evidence and witnesses. *Id.* Tirone found Plaintiff guilty and sentenced him to nine months' SHU confinement and nine months' loss of recreation, packages, telephone and commissary privileges. *Id.*

> FN13. To the extent that this allegation raises any due process claim against Defendant Anctil on the basis that Defendant Anctil issued a false misbehavior report, I dismiss that claim *sua sponte* pursuant to 28 U.S.C. § 1915(e)(2)(B) for two reasons. First, it is clear from the face of the complaint that Plaintiff did, in fact, make threats. Thus, the report was not false. Second, as discussed at length below, even if the report were false, "a prison **inmate** has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997).

I construe the complaint as asserting the following causes of action as a result of these events: (1) Eighth Amendment medical care and substantive due process claims against Defendant Woods; and (2) a procedural due process claim against Defendant Tirone.[FN14]

> FN14. Defendant Tirone has answered the complaint. (Dkt. No. 66.)

*10. Allegations against Defendants Woods and Anctil regarding threats of physical force*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)

(Cite as: 2009 WL 3124424 (N.D.N.Y.))

On May 19, 2007, Woods sent Defendant Anctil to escort "Plaintiff to a hearing room and intimidation of threats of promise to use physical force." (Dkt. No. 17 at ¶ 67.) The complaint does not describe this event in any more detail. I liberally construe the complaint as asserting the following causes of action as a result of this event: (1) Eighth Amendment and conspiracy claims against Defendant Anctil; and (2) substantive due process and conspiracy claims against Defendant Woods.

**C. Plaintiff's prayer for relief**

Plaintiff requests (1) a declaration that Defendants violated his rights under the First, Eighth and Fourteenth Amendments; (2) "compensatory damages from each one of the defendants in their individual capacity and in their official capacity" of $14 million; (3) "punitive damages from each defendant in their individual capacity and official capacity in the amount of $20 million"; (4) a permanent injunction preventing Defendants "from depriving the Plaintiff of his programs he need for parole release, and the right to adequate medical care and the right to receive his adequate rehabilitation adjustment programs and all his good time that was stolen from the Plaintiff ... and to stop deny Plaintiff his outside correspondence with acts of mail theft and stop physical assault ... and put things in his food to harm him and stop using false misbehavior reports to keep Plaintiff's false confinement and stop putting mentally ill **inmates** in the same cell with Plaintiff or other **inmate** like Charles Ramball because his child mother is his woman." (Dkt. No. 17 at A-60 [FN15].)

> FN15. Page numbers refer to the handwritten page numbers in the upper right-hand corner of the complaint.

**D. Summary of Grounds in Support of Defendants' Motion**

**\*15** Defendants move to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. No 67.) Defendants argue that (1) the causes of action against Defendants Burge, Devito, Head, Hess, Labetz, Simmons and Sourwine arising out of the events of June 17-August 18, 2005, should be severed and dismissed because they are duplicative of the *Burge*

action; (2) the claims against supervisory personnel in their official capacities are barred by the Eleventh Amendment; (3) Defendants Manley, Grant, Capacci and Croce have absolute immunity barring the claims regarding the denials of parole; (4) the complaint insufficiently alleges personal involvement by Defendants Goord, Fischer, Roy, McLaughlin, Croce, Stewart, LeClaire, Wright and N. Smith; (5) the complaint does not state a cause of action against stenographers Linda Hayes, Patricia Salvage and Ashley Allen; and (6) the complaint fails to state a cause of action against Defendants Steinberg, Smith, Clafin, Corrigeux, Lewis, Premo, Bellinger, Hess, Moore, Anctil or Travers. (Dkt. No. 67-4.)

**II. LEGAL STANDARD GOVERNING MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM**

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Federal Rule of Civil Procedure 8(a)(2); [FN16] or (2) a challenge to the legal cognizability of the claim.[FN17]

> FN16. *See* 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") [citations omitted]; *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

> FN17. *See* *Swierkiewicz v. Sorema N.A.,* 534

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)

(Cite as: 2009 WL 3124424 (N.D.N.Y.))

U.S. 506, 514 (2002) ( "These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon*, 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas*, 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") [citation omitted]; *Kittay v. Kornstein*, 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12 [b][6]'s requirement of stating a cognizable claim and Rule 8[a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ("Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") [citation omitted]; *Util. Metal Research & Generac Power Sys.*, 02-CV-6205, 2004 U.S. Dist. LEXIS 23314, at *4-5 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.*, 331 F.Supp.2d 91, 101-102 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.*, 01-CV-4430, 2002 U.S. Dist. LEXIS 1658, at *6-7 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12[b] [6] motion-one aimed at the sufficiency of the pleadings under Rule 8 [a], and the other aimed at the legal sufficiency of the claims).

Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. By requiring this "showing," Rule 8(a)(2) requires that the pleading contain a short and plain statement that

"give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." [FN18] The main purpose of this rule is to "facilitate a proper decision on the merits." [FN19] A complaint that fails to comply with this rule "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [FN20]

FN18. *Dura Pharm., Inc. v. Broudo*, 125 S.Ct. 1627, 1634 (2005) (holding that the complaint failed to meet this test) [citation omitted; emphasis added]; *see also Swierkiewicz*, 534 U.S. at 512 [citation omitted]; *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 168 (1993) [citation omitted].

FN19. *Swierkiewicz*, 534 U.S. at 514 (quoting *Conley*, 355 U.S. at 48); *see also Simmons v. Abruzzo*, 49 F.3d 83, 86 (2d Cir.1995) ("Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") [citation omitted]; *Salahuddin v. Cuomo*, 861 F .2d 40, 42 (2d Cir.1988) ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") [citations omitted].

FN20. *Gonzales v. Wing*, 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd*, 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion); *accord, Hudson v. Artuz*, 95-CV-4768, 1998 WL 832708, at *2 (S.D.N.Y. Nov. 30, 1998), *Flores v. Bessereau*, 98-CV-0293, 1998 WL 315087, at *1 (N.D.N.Y. June 8, 1998) (Pooler, J .). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint*

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)

(Cite as: 2009 WL 3124424 (N.D.N.Y.))

Technol., LLC v. Smartlens Corp., 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of Gronager v. Gilmore Sec. & Co., 104 F.3d 355 [2d Cir.1996] ).

The Supreme Court has long characterized this pleading requirement under Rule 8(a)(2) as "simplified" and "liberal," and has repeatedly rejected judicially established pleading requirements that exceed this liberal requirement.[FN21] However, it is well established that even this liberal notice pleading standard "has its limits."[FN22] As a result, several Supreme Court and Second Circuit decisions exist, holding that a pleading has failed to meet this liberal notice pleading standard.[FN23]

> FN21. See, e.g., Swierkiewicz, 534 U.S. at 513-514 (noting that "Rule 8(a)(2)'s simplified pleading standard applies to all civil actions, with limited exceptions [including] averments of fraud or mistake.").

> FN22. 2 Moore's Federal Practice § 12.34[1][b] at 12-61 (3d ed.2003).

> FN23. See, e.g., Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 1964-1974 (2007) (pleading did not meet Rule 8[a] [2]'s liberal requirement); accord, Dura Pharm., 125 S.Ct. at 1634-1635, Christopher v. Harbury, 536 U.S. 403, 416-422 (2002), Freedom Holdings, Inc. v. Spitzer, 357 F.3d 205, 234-235 (2d Cir.2004), Gmurzynska v. Hutton, 355 F.3d 206, 208-209 (2d Cir.2004). Several unpublished decisions exist from the Second Circuit affirming the Rule 8(a)(2) dismissal of a complaint after Swierkiewicz. See, e.g., Salvador v. Adirondack Park Agency of the State of N.Y., No. 01-7539, 2002 WL 741835, at *5 (2d Cir. Apr. 26, 2002) (affirming pre-Swierkiewicz decision from Northern District of New York interpreting Rule 8[a][2] ). Although these decisions are not themselves precedential authority, see Rules of the U.S. Court of Appeals for the Second Circuit, § 0.23, they appear to acknowledge the continued precedential effect, after Swierkiewicz,

of certain cases from within the Second Circuit interpreting Rule 8(a)(2). See Khan v. Ashcroft, 352 F.3d 521, 525 (2d Cir.2003) (relying on summary affirmances because "they clearly acknowledge the continued precedential effect" of Domond v. INS, 244 F.3d 81 [2d Cir.2001], after that case was "implicitly overruled by the Supreme Court" in INS v. St. Cyr, 533 U.S. 289 [2001] ).

Most notably, in the recent decision of Bell Atlantic Corporation v. Twombly, the Supreme Court, in reversing an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1, "retire[d]" the famous statement by the Court in Conley v. Gibson, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 127 S.Ct. 1955, 1968-69 [FN24] (2007).[FN25] Rather than turning on the conceivability of an actionable claim, the Court clarified, the Rule 8 "fair notice" standard turns on the plausibility of an actionable claim. Id. at 1965-74.

> FN24. All citations to the Bell Atlantic decision will be to the S.Ct. cite rather than the U.S. cite because page numbers are not available for the U.S. version.

> FN25. The Court in Bell Atlantic further explained: "The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint.... Conley, then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." Bell Atlantic, 127 S.Ct. at 1969.

*16 More specifically, the Court reasoned that, by requiring that a pleading "show[ ] that the pleader is entitled to relief," Rule 8(a)(2) requires that the pleading give the defendant "fair notice" of (1) the nature of the

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)

(Cite as: 2009 WL 3124424 (N.D.N.Y.))

claim and (2) the "grounds" on which the claim rests. *Id.* at 1965, n. 3 [citation omitted]. While this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id* . [citations omitted]. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.* at 1965 [citations omitted]. What this means, on a practical level, is that there must be "plausible grounds to infer [actionable conduct]," or, in other words, "enough fact to raise a reasonable expectation that discovery will reveal evidence of [actionable conduct]." *Id* .

As have other Circuits, the Second Circuit has repeatedly recognized that the clarified plausibility standard that was articulated by the Supreme Court in *Bell Atlantic* governs *all* claims, not merely antitrust claims brought under 15 U.S.C. § 1 (as were the claims in *Bell Atlantic* ).[FN26] The Second Circuit has also recognized that this *plausibility* standard governs claims brought even by *pro se* litigants (although the plausibility of those claims is be assessed generously, in light of the special solicitude normally afforded *pro se* litigants).[FN27]

FN26. *See, e.g., Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (in civil rights action, stating that "To survive a motion to **dismiss**, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.' ") [citation omitted]; *Goldstein v. Pataki,* 07-CV-2537, 2008 U.S.App. LEXIS 2241, at *14 (2d Cir. Feb. 1, 2008) (in civil rights action, stating that *"Twombly* requires ... that the complaint's '[f]actual allegations be enough to raise a right to relief above the speculative level ....'") [internal citation omitted]; *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98, n. 2 (2d Cir.2007) ( "We have declined to read Twombly's flexible 'plausibility standard' as relating only to antitrust cases.") [citation omitted]; *Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) (in **prisoner** civil rights action, stating, "[W]e believe the [Supreme] Court [in *Bell Atlantic Corp. v. Twombly* ] is ... requiring

a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." ) [emphasis in original].

FN27. *See, e.g., Jacobs v. Mostow,* 281 F. App'x 85, 87 (2d Cir. March 27, 2008) (in pro se action, stating, "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.' ") [citation omitted] (summary order, cited in accordance with Local Rule 32.1[c][1] ); *Boykin v. KeyCorp.,* 521 F.3d 202, 215-16 (2d Cir.2008) (finding that borrower's *pro se* complaint sufficiently presented a *"plausible* claim of disparate treatment," under Fair Housing Act, to give lenders fair notice of her discrimination claim based on lenders' denial of her home equity loan application) [emphasis added].

It should be emphasized that Rule 8's plausibly standard, explained in *Bell Atlantic,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which the Court stated, "Specific facts are not necessary" to successfully state a claim under Fed.R.Civ.P. 8(a)(2). *Erickson v. Pardus,* 127 S.Ct. 2197, 2200 (2007) [citation omitted]. That statement was merely an abbreviation of the often-repeated point of law-first offered in *Conley* and repeated in *Bell Atlantic*-that a pleading need not "set out in detail the facts upon which [the claim is based]" in order to successfully state a claim. *Bell Atlantic,* 127 S.Ct. 1965, n. 3 (citing *Conley v. Gibson,* 355 U.S. 41, 47 [1957] ). That statement in no way meant that all pleadings may achieve the requirement of giving a defendant "fair notice" of the nature of the claim and the "grounds" on which the claim rests without ever having to allege any facts whatsoever. [FN28] There must still be enough facts alleged to raise a right to relief above the speculative level to a plausible level, so that the defendant may know what the claims are and the grounds on which they rest (in order to shape a defense).

FN28. For example, in *Erickson,* a district court had dismissed a *pro se* **prisoner's** civil rights

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)

(Cite as: 2009 WL 3124424 (N.D.N.Y.))

complaint because, although the complaint was otherwise factually specific as to how the **prisoner's** hepatis C medication had been wrongfully terminated by prison officials for a period of approximately 18 months, the complaint (according to the district court) failed to allege facts plausibly suggesting that the termination caused the **prisoner** "substantial harm." 127 S.Ct. at 2199. The Supreme Court vacated and remanded the case because (1) under Fed.R.Civ.P. 8 and *Bell Atlantic,* all that is required is "a short and plain statement of the claim" sufficient to "give the defendant fair notice" of the claim and "the grounds upon which it rests," and (2) the plaintiff had alleged that the termination of his hepatitis C medication for 18 months was "endangering [his] life" and that he was "still in need of treatment for [the] disease." *Id.* at 2200. While *Erickson* does not elaborate much further on its rationale, a careful reading of the decision (and the dissent by Justice Thomas) reveals a point that is perhaps so obvious that it did not need mentioning in the short decision: a claim of deliberate indifference to a serious medical need under the Eighth Amendment involves two elements, i.e., the existence of a sufficiently serious medical need possessed by the plaintiff, and the existence of a deliberately indifferent mental state possessed by prison officials with regard to that sufficiently serious medical need. The *Erickson* decision had to do with only the first element, not the second element. *Id.* at 2199-2200. In particular, the decision was merely recognizing that an allegation by a plaintiff that, during the relevant time period, he suffered from hepatis C is, in and of itself, a factual allegation plausibly suggesting that he possessed a sufficiently serious medical need; the plaintiff need not *also* allege that he suffered an independent and "substantial injury" as a result of the termination of his hepatis C medication. *Id.* This point of law is hardly a novel one. For example, numerous decisions, from district courts within the Second Circuit alone, have found that suffering from hepatitis C constitutes having a serious medical need for

purposes of the Eighth Amendment. *See, e .g., Rose v. Alvees,* 01-CV-0648, 2004 WL 2026481, at *6 (W.D.N.Y. Sept. 9, 2004); *Verley v. Goord,* 02-CV-1182, 2004 WL 526740, at *10 n. 11 (S.D.N.Y. Jan. 23, 2004); *Johnson v. Wright,* 234 F.Supp.2d 352, 360 (S.D.N.Y.2002); *McKenna v. Wright,* 01-CV-6571, 2002 WL 338375, at *6 (S.D.N.Y. March 4, 2002); *Carbonell v. Goord,* 99-CV-3208, 2000 WL 760751, at *9 (S.D.N.Y. June 13, 2000).

Having said all of that, it should also be emphasized that, "[i]n reviewing a complaint for dismissal under Fed.R.Civ.P. 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." [FN29] "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.* "[FN30] In other words, while all pleadings are to be construed liberally under Rule 8(e), *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality.

FN29. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) [citation omitted]; *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

FN30. *Hernandez,* 18 F.3d at 136 [citation omitted]; *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) [citations omitted]; *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) [citation omitted].

**\*17** For example, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint.[FN31] Moreover, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest."[FN32] Furthermore, when addressing a *pro se* complaint, *generally* a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)

(Cite as: 2009 WL 3124424 (N.D.N.Y.))

any indication that a valid claim might be stated." [FN33] Of course, an opportunity to amend is not required where the plaintiff has already amended his complaint. [FN34] In addition, an opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." [FN35]

> **FN31.** "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* 96-CV-7544, 1997 WL 714878, at *1, n. 2 (S.D.N.Y. Nov. 17, 1997) (citing, *inter alia, Gil v. Mooney,* 824 F.2d 192, 195 [2d Cir.1987] [considering plaintiff's response affidavit on motion to dismiss] ). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.'" *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) [citations omitted], *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). This authority is premised, not only on case law, but on Rule 15 of the Federal Rules of Civil Procedure, which permits a plaintiff, as a matter of right, to amend his complaint once at any time before the service of a responsive pleading-which a motion to dismiss is not. *See Washington v. James,* 782 F.2d 1134, 1138-39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss) [citations omitted].

> **FN32.** *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) [internal quotation and citation omitted].

> **FN33.** *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) [internal quotation and citation

omitted]; *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

> **FN34.** *Yang v. New York City Trans. Auth.,* 01-CV-3933, 2002 WL 31399119, at *2 (E.D.N.Y. Oct. 24, 2002) (denying leave to amend where plaintiff had already amended complaint once); *Advanced Marine Tech. v. Burnham Sec., Inc.,* 16 F.Supp.2d 375, 384 (S.D.N.Y.1998) (denying leave to amend where plaintiff had already amended complaint once).

> **FN35.** *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) [citation omitted]; *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) [citation omitted]; *see, e.g., See Rhodes v. Hoy,* 05-CV-0836, 2007 WL 1343649, at *3, 7 (N.D.N.Y. May 5, 2007) (Scullin, J., adopting Report-Recommendation of Peebles, M.J.) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the error in his complaint-the fact that plaintiff enjoyed no constitutional right of access to DOCS' established grievance process-was substantive and not formal in nature, rendering repleading futile); *Thabault v. Sorrell,* 07-CV-0166, 2008 WL 3582743, at *2 (D.Vt. Aug. 13, 2008) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the errors in his complaint-lack of subject-matter jurisdiction and lack of standing-were substantive and not formal in nature, rendering repleading futile) [citations omitted]; *see, e.g., Hylton v. All Island Cob Co.,* 05-CV-2355, 2005 WL 1541049, at *2 (E.D.N.Y. June 29, 2005) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the errors in his complaint-which included the fact that plaintiff alleged no violation of either the Constitution or

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)

(Cite as: 2009 WL 3124424 (N.D.N.Y.))

laws of the United States, but only negligence-were substantive and not formal in nature, rendering repleading futile); *Sundwall v. Leuba,* 00-CV-1309, 2001 WL 58834, at *11 (D.Conn. Jan. 23, 2001) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the error in his complaint-the fact that the defendants were protected from liability by Eleventh Amendment immunity-was substantive and not formal in nature, rendering repleading futile).

However, while this special leniency may somewhat loosen the procedural rules governing the form of pleadings (as the Second Circuit very recently observed), [FN36] it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Rules 8, 10 and 12. [FN37] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Rules 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow. [FN38] Stated more plainly, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." [FN39]

FN36. *Sealed Plaintiff v. Sealed Defendant # 1,* No. 06-1590, 2008 WL 3294864, at *5 (2d Cir. Aug. 12, 2008) ("[The obligation to construe the pleadings of *pro se* litigants liberally] entails, at the very least, a permissive application of the rules governing the form of pleadings.") [internal quotation marks and citation omitted]; *see also Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ("[R]easonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training ... should not be impaired by harsh application of technical rules.") [citation omitted].

FN37. *See Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set forth in *Haines v. Kerner,* 404 U.S. 519 [1972], did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P. 8] ); *accord, Shoemaker v. State of Cal.,* 101 F.3d 108 (2d

Cir.1996) (citing *Prezzi v. Schelter,* 469 F.2d 691) [unpublished disposition cited only to acknowledge the continued precedential effect of *Prezzi v. Schelter,* 469 F.2d 691, within the Second Circuit]; *accord, Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995).

FN38. *See McNeil v. U.S.,* 508 U.S. 106, 113 (1993) ("While we have insisted that the pleadings prepared by **prisoners** who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *cf. Phillips v. Girdich,* 408 F.3d 124, 128, 130 (2d Cir.2005) (acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ]or prejudice the adverse party").

FN39. *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980).

### III. ANALYSIS

### A. Allegations in Paragraphs 1-27 of the Amended Complaint

Defendants argue that any claims arising from the allegations in Paragraphs 1-27 of the complaint should be dismissed because they are duplicative of the allegations in the *Burge* case. (Dkt. No. 67-4 at 10-11.) With the exception of Paragraph 27, Defendants are correct.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)

(Cite as: 2009 WL 3124424 (N.D.N.Y.))

As a general rule, "[w]here there are two competing lawsuits, the first suit should have priority." *First City Nat'l Bank & Trust Co. v. Simmons,* 878 F.2d 76, 79 (2d Cir.1989) (quoting *Motion Picture Lab. Technicians Loc. 780 v. McGregor & Werner, Inc.,* 804 F.2d 16, 19 (2d Cir.1986)) (alteration in original). This rule "embodies considerations of judicial administration and conservation of resources" by avoiding duplicative litigation ... *Id.* at 80. We have recognized only two exceptions to the first-filed rule: (1) where the "balance of convenience" favors the second-filed action, see, e.g., *Motion Picture Lab. Technicians Loc. 780,* 804 F.2d at 19; *Remington Prods. Corp. v. Am. Aerovap, Inc.,* 192 F.2d 872, 873 (2d Cir.1951), and (2) where "special circumstances" warrant giving priority to the second suit, see, e.g., *First City Nat'l Bank,* 878 F.2d at 79.

**\*18** *Employers Ins. of Wausau v. Fox Entertainment Group, Inc.,* 522 F.3d 271, 275 (2d Cir.2008). Claims are duplicative if they arise from the same nucleus of fact. *See Alden Corp. v. Eazypower Corp.,* 294 F.Supp.2d 233, 235 (D.Conn.2003).

Here, the claims in Paragraphs 1-26 of the operative complaint (Dkt. No. 17) are duplicative of Plaintiff's claims in Case No. 9:05-CV-1231 GTS/GJB because they allege precisely the same facts. Neither the balance of convenience nor any special circumstance warrants giving priority to this suit. Rather, giving priority to this suit would undermine the judicial resources that have already been devoted to the *Burge* action, which has proceeded past the summary judgment stage. Therefore, I recommend that the Court dismiss the claims set forth in Paragraphs 1-26 of the operative complaint without leave to amend.

Paragraph 27, however, does not arise from the same nucleus of fact as a pending claim in the *Burge* case. Although Plaintiff alleged in that action that he had filed a grievance against officer Steinberg for mail theft, sexual harassment, and threats (*Burge* Dkt. No. 7 at ¶ 30), Plaintiff did not name Steinberg as a defendant and the Court did not construe the complaint as raising a claim against Steinberg. (*Burge* Dkt. No. 52 at 8.) Here, on the other hand, Plaintiff named Steinberg as a defendant (Dkt. No. 17 at A-7) and alleged that Steinberg violated his First

Amendment rights. (Dkt. No. 17 at 56.) Therefore, I recommend that Defendants' motion to dismiss the allegations in Paragraph 27 be denied.

**B. Eleventh Amendment**

Plaintiff requests damages from Defendants "in their individual capacity and in their official capacity." (Dkt. No. 17 at A-60.) Defendants argue that Plaintiff's claims against the supervisory Defendants in their official capacities are barred by the Eleventh Amendment. (Dkt. No. 67-4 at 11-12.) Defendants are more than correct: Plaintiff's claims against *all* of the Defendants in their official capacities are barred by the Eleventh Amendment [FN40].

> [FN40]. The Court has the authority to dismiss the claims against the non-supervisory Defendants in their official capacities pursuant to 28 U.S.C. § 1915(e)(2)(B) and Federal Rule of Civil Procedure 12(h)(3).

The Eleventh Amendment has long been construed as barring a citizen from bringing a suit against his or her own state in federal court, under the fundamental principle of "sovereign immunity." *See* U.S. Const. amend XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."); *Hans v. Louisiana,* 134 U.S. 1, 10-21 (1890); *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 267 (1997); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100 (1984). State immunity extends not only to the states, but to state agencies and to state officers who act on behalf of the state. *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf,* 506 U.S. 139, 142-47 (1993); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 101-06 (1984).

**\*19** The Eleventh Amendment bars suits against state officials acting in their official capacities.[FN41] All DOCS employees, not merely supervisors, are state officials for the purposes of the Eleventh Amendment. *See e.g. Davis v. New York,* 316 F.3d 93, 101 (2d Cir.2002); *Tolliver v. N.Y. State Correctional Officers,* No. 99 CIV 9555, 2000 WL 1154311, at \*2 (S.D.N.Y. Aug. 14, 2000) ("All of the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)

(Cite as: 2009 WL 3124424 (N.D.N.Y.))

defendants in this case are state officials because they are employees of the New York State Department of Correctional Services."). Where it has been successfully demonstrated that a defendant is entitled to sovereign immunity under the Eleventh Amendment, the federal court lacks subject matter jurisdiction over the case, and "the case must be stricken from the docket." *McGinty v. State of New York,* 251 F.3d 84, 100 (2d Cir.2001) (citation omitted); *see also* Fed.R.Civ.P. 12(h)(3). Here, the face of the complaint alleges that each Defendant has an official position with DOCS or the Division of Parole. (Dkt. No. 17 at ¶ 3.) Therefore, any claims against the Defendants in their officials capacities are barred by the Eleventh Amendment. Accordingly, I recommend that the Court dismiss those claims without leave to amend.

> FN41. *See Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993) ("The immunity to which a state's official may be entitled in a **§ 1983** action depends initially on the capacity in which he is sued. To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."); *Severino v. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993) ( "[I]t is clear that the Eleventh Amendment does not permit suit [under **Section 1983**] for money damages against state officials in their official capacities."); *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) ("The eleventh amendment bars recovery against an employee who is sued in his official capacity, but does not protect him from personal liability if he is sued in his 'individual' or 'personal' capacity."); *see also Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71 (1989) ( "Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.... As such, it is no different from a suit against the State itself.... We hold that neither a State nor its officials acting in their official capacities are 'persons' under **§ 1983**."); *Kentucky v. Graham,* 473 U.S. 159, 165-66

(1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity."); *see also Holloway v. Selsky,* 05-CV-0501, 2007 WL 433375, at *4 (N.D.N.Y. Feb. 6, 2007) (Sharpe, J.) [citing cases].

**C. Absolute Immunity for Parole Decisions**

Plaintiff alleges that he was wrongfully denied parole twice. At Plaintiff's first parole hearing on November 8, 2005, the parole record stated that Plaintiff had pleaded guilty to three crimes. (Dkt. No. 17 at ¶ 71.) Plaintiff informed the commissioners-Defendants Vernon J. Manley, Thomas Grant, and John C. Capacci-that he had not pleaded guilty and that one of the charges had been dismissed on appeal. *Id.* Plaintiff told the commissioners that DOCS officials had imposed "numerous false disciplinary sanctions" and denied Plaintiff his programming and that Plaintiff's life was in danger if he remained in prison. (Dkt. No. 17 at ¶ 72.) Plaintiff's parole was denied. *Id.*

On November 14, 2006, Plaintiff appeared for his second parole hearing. (Dkt. No. 17 at ¶ 75.) One of the commissioners was Defendant Croce. *Id.* Plaintiff provided documentation to the commissioners that the underlying charges against him were the result of a false police report and that DOCS officials had repeatedly brought false disciplinary charges against him and denied him access to the law library. *Id.* Parole was denied. (Dkt. No. 17 at ¶ 76.)

Plaintiff claims that Defendants Manley, Grant, and Capacci violated his rights by considering false documents when denying him parole. (Dkt. No. 17 at ¶¶ 71-74 and pp. 58-59.) He claims, further, that Defendant Croce violated his rights by serving as a parole commissioner at a time when he was "knowingly and willfully" disregarding Plaintiff's complaints about his treatment. (Dkt. No. 17 at ¶¶ 75-76 and pp. 58-59.)

Defendants Manley, Grant, Capacci, and Croce argue that they are absolutely immune from liability for damages regarding their decisions to deny parole. (Dkt. No. 67-4 at

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)

(Cite as: 2009 WL 3124424 (N.D.N.Y.))

12-13.) Defendants are correct.

**\*20** State actors are entitled to some degree of immunity from liability for damages for their official acts. Most actors receive qualified immunity, but a limited number are entitled to absolute immunity. *Scotto v. Almenas,* 143 F.3d 105, 110 (2d Cir.1998). Parole board officials are "absolutely immune from liability for damages when [deciding] to grant, deny, or revoke parole because this task is functionally comparable to that of a judge." *Scotto,* 143 F.3d at 111 (internal citations and punctuation omitted). A parole hearing officer is entitled to absolute immunity even if he acted erroneously or maliciously. *Montero v. Travis,* 171 F.3d 757, 761 (2d Cir.1999). *See also Farid v. Bouey,* 554 F.Supp.2d 301, 317-18 (N.D.N.Y.2008). Moreover, injunctive relief against parole board officials is not available unless the plaintiff demonstrates that the officials violated a federal decree or that declaratory relief is not available.[FN42] *Id.* at 318.

> FN42. Plaintiff requests injunctive relief, but it is not clear from the complaint whether or not Plaintiff is requesting injunctive relief against Defendants Manley, Grant, Capacci, and Croce. (Dkt. No. 17 at A-60.) Defendants did not address the issue of immunity from claims for injunctive relief. I raise this issue *sua sponte* pursuant to 28 U.S.C. § 1915(e)(2)(B).

Here, Plaintiff's claims against Defendants Manley, Grant, Capacci, and Croce are premised on their decision to deny him parole. These Defendants are absolutely immune. Moreover, because Plaintiff has not alleged that these Defendants violated a federal decree or that declaratory relief is unavailable, Plaintiff has not stated a claim for injunctive relief against these Defendants. Thus, I recommend that all claims against Defendants Manley, Grant, and Capacci be dismissed and that the claims arising from the denial of parole against Defendant Croce be dismissed without leave to amend.

**D. Personal Involvement**

Defendants argue that the complaint insufficiently alleges that Defendants Goord, Fischer, Roy, McLaughlin,

Croce, Stewart, LeClaire, Wright, and N. Smith were personally involved in any alleged constitutional violation. (Dkt. No. 67-4 at 13-15.)

The allegations against these defendants focus on their handling of Plaintiff's grievances and complaints. Plaintiff alleges both that these Defendants acted passively by "knowingly and willfully disregarding Plaintiff's complaints" (Dkt. No. 17 at ¶¶ 32, 34, 55, 59, 60-62, 64, 70) and that they actively interfered with his grievances and complaints by falsifying documents and "causing the filing of false misbehavior reports." (Dkt. No. 17 at ¶¶ 44, 57-59.)

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 [2d Cir.1991] ).[FN43] In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the alleged unlawful conduct and the defendant.[FN44] If the defendant is a supervisory official, such as a DOCS Commissioner or Deputy Commissioner, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct.[FN45] In other words, supervisory officials may not be held liable merely because they held a position of authority.[FN46] Rather, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of **inmates** by failing to act on information indicating that the violation was occurring.[FN47]

> FN43. *Accord, McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087 (1978); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

> FN44. *Bass v. Jackson,* 790 F.2d 260, 263 (2d

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)

(Cite as: 2009 WL 3124424 (N.D.N.Y.))

Cir.1986).

FN45. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

FN46. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

FN47. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright,* 21 F.3d at 501 (adding fifth prong); *Williams v. Smith,* 781 F.2d 319, 323-324 (2d Cir.1986) (setting forth four prongs).

**\*21** A **prisoner's** allegation that a supervisory official failed to respond to a grievance is insufficient to establish that the official "failed to remedy that violation after learning of it through a report or appeal" or "exhibited deliberate indifference ... by failing to act on information indicating that the violation was occurring." *Rivera v. Goord,* 119 F.Supp.2d 327, 344-45 (S.D.N.Y.2000). *See also Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997) ("The law is clear that allegations that an official ignored a **prisoner's** letter are insufficient to establish liability."). District Court decisions in this Circuit have established that:

where a supervisory official like the Commissioner of Corrections or a prison Superintendent receives letters or similar complaints from an **inmate** and does not personally respond, the supervisor is not personally involved and hence not liable. On the other hand, where a supervisor receives an **inmate** grievance or other complaint and responds to it, the supervisor may be liable ... At first glance, these holdings might seem counter-intuitive, as giving supervisors an incentive to inaction in order to avoid personal liability. However, it must be noted that the Commissioner and individual prison Superintendents receive innumerable letters and other forms of **inmate** complaints and delegate subordinates to handle them. Thus, if mere receipt of a letter or similar complaint were enough, without more, to constitute personal involvement, it would result in liability merely for being a supervisor, which is contrary

to the black-letter law that **§ 1983** does not impose *respondeat superior* liability.

*Walker v. Pataro,* No. 99 CIV. 4607, 2002 WL 664040, at \*12-13 (S.D.N.Y. Apr. 23, 2002) (internal citations omitted) (collecting and analyzing decisions) FN48.

FN48. The undersigned will provide a copy of the *Walker v. Pataro* decision to Plaintiff in light of the Second Circuit's recent decision in *Lebron v. Sanders,* 557 F.3d 76, 2009 WL 399215 (2d Cir. Feb. 19, 2009).

Here, as discussed above, Plaintiff alleges both that the supervisory Defendants ignored his complaints and that they took action by falsifying documents. I recommend that the claims that Defendants merely ignored complaints be dismissed without leave to amend. Regarding Plaintiff's claims that the supervisory Defendants falsified documents in response to grievances, I find those allegations conclusory. The complaint does not include any facts supporting those allegations, relying instead on legal conclusions masquerading as factual conclusions. Such conclusory allegations do not state a claim. *Rolon v. Henneman,* 517 F.3d 140, 148-49 (2d Cir.2008). I therefore recommend that these claims be dismissed with leave to amend.

**E. Stenographers**

Plaintiff has named stenographers Patricia Salvage, Linda A. Hayes, and Ashley Allen as defendants. (Dkt. No. 17 at ¶¶ 33, 77-79.) In their motion to dismiss, Defendants assert that Plaintiff "does not allege that defendant stenographers altered or erred in transcribing exactly what took place at the hearings. Rather, it appears that plaintiff is alleging that they violated his rights by memorializing the purported falsity of the underlying allegations and the alleged wrongdoing of the hearing officers." (Dkt. No. 67-4 at 15.) Contrary to Defendants' assertion, the complaint does allege that the stenographers altered the transcripts. For example, Plaintiff alleges that Defendant Salvage "falsified the transcribed (*sic* ) of the Tier Three Hearing Transcript ... to contempt [an] Article 78 Procedure." (Dkt. No. 17 at ¶ 33.) He alleges that Defendant Hayes' transcript of the July 27, 2006,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)

(Cite as: 2009 WL 3124424 (N.D.N.Y.))

disciplinary hearing "is all a falsification ... in a effort to cover-up staff misconduct and this transcribed (*sic* ) .... is false information" that will "prevent the Acting Supreme Court Justice of Franklin County Court to performing a lawful duty with this falsification of the records of her transcribed information that is false." (Dkt. No. 17 at ¶ 77.) He alleges that Defendant Allen prepared a "false transcribed document in a effort to cover-up staff misconduct ... to obstruct ... the Supreme Court Justice in their function with Plaintiff Article 78 proceeding ... to prevent the court from performing a lawful duty with the true and accurate transcribed documents of this Tier Three Hearing." (Dkt. No. 17 at ¶ 78.) It appears to the undersigned that Plaintiff is, indeed, alleging that the stenographers falsified transcripts and that they did so to prevent a New York state court from reviewing Plaintiff's disciplinary sentences in Article 78 proceedings.

**\*22** Construed accordingly, the complaint appears to allege that the stenographers violated Plaintiff's procedural and substantive due process rights and his right of access to the courts. Defendants argue that Plaintiff has failed to state a claim against the stenographers. (Dkt. No. 67-4 at 15-16.) Defendants are correct.

### 1. Procedural Due Process

The Supreme Court has held that in the context of a prison disciplinary hearing, procedural due process requires that (1) the **inmate** receive advance written notice of the disciplinary charges; (2) the **inmate** be allowed to call witnesses and present documentary evidence; and (3) the fact finder prepare a written statement describing the evidence relied upon and the reasons for the determination. *Wolff v. McDonnell,* 418 U.S. 539, 563-67 (1974). A transcript of the disciplinary hearing is not constitutionally required. *Dixon v. Goord,* 224 F.Supp.2d 739, 744-45 (S.D.N.Y.2002). Courts have repeatedly held that the Fourteenth Amendment does not require any administrative review of disciplinary convictions [FN49] Moreover, courts have repeatedly held that, where such administrative review is conducted, the Fourteenth Amendment does not require the review of (much less the existence of) a tape recording or transcript of the disciplinary hearing [FN50] Even where a party claims that a transcript was deliberately tampered with, there is no procedural due process violation if the state provides

adequate post-deprivation remedies. *Curro v. Watson,* 884 F.Supp. 708, 717-19 (E.D.N.Y.1995) ( **prisoner** who alleged that court reporters deliberately altered the transcript of his criminal trial did not state procedural due process claim because New York provides a procedure for challenging inaccuracies in trial transcripts). In New York, a **prisoner** who disputes the accuracy of the transcript of a disciplinary hearing may raise that issue in an Article 78 proceeding. N.Y. C.P.L.R. § 7804(d) (McKinney 1994).

FN49. *See, e.g., Wolff v. McDonnell,* 418 U.S. 539, 563-570 (1974) (not listing right to appeal among due process requirements of disciplinary hearing), *accord, Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004); *Amato v. Ward,* 41 N.Y.2d 469, 473, 393 N.Y.S.2d 934, 937 (N.Y.1977) ("This type of administrative review [of prison disciplinary hearings pursuant to New York State regulations] is not required by the Federal Constitution.") (*citing Wolff v. McDonnell), accord, Giovanni v. Lynn,* 48 F.3d 908, 911 n. 7 (5th Cir.1995) ("Nor, indeed, is provision for appeal, following an [otherwise] adequate [disciplinary] hearing, required under the more stringent standards of *Wolff v. McDonnell* ....").

FN50. *See, e.g., Dixon v. Goord,* 224 F.Supp.2d 739, 744 (S.D.N.Y.2002) ("According to *Wolff,* the only written or audio record of a disciplinary hearing that must be maintained to comply with minimal due process standards is a written statement describing the evidence relied upon and the reason for the determination.... The Court therefore agrees with Defendants that any alleged defect in the tape would not rise to the level of a constitutional violation."); *Cherry v. Selsky,* 99-CV-4636, 2000 U.S. Dist. LEXIS 9451, at \*15-16 (S.D.N.Y. July 7, 2000) ("This allegation [that defendant failed to review the audio tape recording of the disciplinary hearing, prior to affirming the decision of the hearing officer], without more, is insufficient to state a claim for violation of a liberty interest."); *Afrika v. Selsky,* 750 F.Supp. 595, 600, 602 (S.D.N.Y.1990) (granting defendant's motion for summary judgment because, among other reasons, plaintiff had no liberty interest in the review of an audio

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)

(Cite as: 2009 WL 3124424 (N.D.N.Y.))

tape of his disciplinary hearing as part of his administrative appeal, stating that "because both the hearing and review reached the minimal standards, [defendant] did not violate [plaintiff's] liberty interest in not being confined without due process"); *Brito v. Coughlin,* No. 88-CV-8064, 1989 WL 241718, at *2 (S.D.N.Y. July 31, 1989) ("[The due process clause] does not require, however, that a transcript be made or given to an **inmate** after a disciplinary hearing.").

Thus, because Plaintiff was not constitutionally entitled to a transcript and because he could have challenged any deficiencies in the transcripts in his Article 78 proceeding, he has not stated a claim. I therefore recommend that the Court dismiss Plaintiff's procedural due process claims against the stenographers without leave to amend.

2. *Substantive Due Process/Access to Courts*

Construed liberally, Plaintiff's complaint raises substantive due process and First Amendment access to the courts claims against the defendant stenographers. I will analyze these claims together. The substantive component of the Due Process Clause "bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." *Zinernon v. Burch,* 494 U.S. 113, 125 (1990) (internal quotations marks and citation omitted). "Substantive due process protects individuals against government action that is arbitrary, ... conscience-shocking, ... or oppressive in a constitutional sense, ... but not against constitutional action that is incorrect or ill-advised." *Lowrance v. Achtyl,* 20 F.3d 529, 537 (2d Cir.1994) (internal quotations marks and citations omitted).

**\*23** The first step in a substantive due process analysis is to identify the precise constitutional right at stake. *Lowrance,* 20 F.3d at 537 (citing *Collins v. City of Harker Heights,* 503 U.S. 115, 123-25 (1992)). "Substantive due process embraces an individual's right of access to the courts." *Curro,* 884 F.Supp. at 719. **Prisoners'** right to access to the courts includes proceedings to "attack their sentences, directly or collaterally, and ... to challenge the conditions of their

confinement." *Lewis v. Casey,* 518 U.S. 343, 355 (1996). "[A]n Article 78 petition that challenges an **inmate's** ... SHU confinement is an action for which access to the courts is constitutionally guaranteed .... [because it] relates directly to the conditions of confinement." *Collins v. Goord,* 438 F.Supp.2d 399, 417 (S.D.N .Y.2006). Plaintiff claims that the defendant stenographers thwarted his efforts to pursue Article 78 proceedings by providing false transcriptions. (Dkt. No. 17 at ¶¶ 33, 77, 78.) Thus, the constitutional right at stake is the right of access to the courts.

In order to state a claim for denial of access to the courts, Plaintiff must allege that the stenographers "hindered his efforts to pursue a legal claim." *Collins,* 438 F.Supp.2d at 416 (citing *Lewis,* 518 U.S. at 351). Similarly, in order to state a cause of action for substantive due process, a plaintiff must allege that he suffered "some tangible harm." *Curro,* 884 F.Supp. at 720. *See also Collins,* 438 F.Supp.2d at 415-16 (plaintiff alleging violation of right to access to the courts must allege an "actual injury."). Plaintiff has not alleged any tangible harm. Plaintiff does not allege that he was not successful in his Article 78 proceedings. Even if he was unsuccessful in those proceedings, he does not allege that any such failure stemmed from the transcriptions. *Compare Collins,* 438 F.Supp.2d at 417 ( **prisoner** adequately alleged tangible harm where he alleged that his Article 78 proceeding was dismissed when prison officials failed to provide him with necessary copies of documents). Therefore, Plaintiff has not stated a substantive due process or First Amendment access to the courts claim against Defendants Salvage, Hayes, or Allen and I recommend that these claims be dismissed with leave to amend [FN51]

> FN51. Defendants also argue that any claim against the stenographers is barred by the doctrine of qualified immunity. (Dkt. No. 67-4 at 15-16.) In light of my finding that Plaintiff has not stated a claim, I have not addressed this argument.

**F. Failure to state a cause of action against Defendants Steinberg, B. Smith, Clafin, Corrigeux, Lewis, Premo, Bellinger, Hess, Moore, Travers, Anctil, or McDonald**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)

(Cite as: 2009 WL 3124424 (N.D.N.Y.))

Defendants argue that Plaintiff has failed to state a claim against Defendants Steinberg, B. Smith, Clafin, Corrigeux, Lewis, Premo, Bellinger, Hess, Moore, Travers, Anctil, or McDonald. (Dkt. No. 67-4 at 16-23.)
1. *Bellinger and Hess*

Defendants argue that Plaintiff has failed to state a claim against Defendants Bellinger and Hess. (Dkt. No. 67-4 at 16-17.) I disagree.

Regarding Defendants Bellinger and Hess, the surviving paragraphs of the complaint allege that on August 22, 2005, Plaintiff was removed from his cell and escorted to the medical unit to give a urine sample. (Dkt. No. 17 at ¶ 28.) This sample was required because of a report by Defendant Hess. *Id.* Plaintiff had not seen Hess for two or three weeks prior to August 22. *Id.* As Plaintiff was being escorted, Defendant Bellinger told the escort officers to be sure that Plaintiff's urine test was positive. *Id.* Plaintiff asserts that Hess' report and Bellinger's comment were made in retaliation for Plaintiff submitting a grievance and for "beating" a July 20, 2005, misbehavior report. *Id.*

**\*24** Defendants argue that Plaintiff has failed to state a retaliation claim against Defendant Hess because (1) Plaintiff was not, in fact, deterred from filing grievances, writing letters of complaint, or filing lawsuits; and (2) the allegations regarding a possible retaliatory motive are implausible [FN52]. (Dkt. No. 67-4 at 16-17.)

FN52. Defendants also argue, cursorily and without citation to authority, that these claims should have been raised in an amended complaint in the *Burge* case.

In order to state a cause of action for retaliation, a plaintiff must plead facts plausibly suggesting that (1) the speech or conduct at issue was protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action. *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (citing *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001)).

Defendants argue that Plaintiff has not properly alleged that Hess took adverse action because the "complaint makes it clear that [Plaintiff] was not deterred, in any way from filing grievances, writing letters of complaint, o[r] filing new actions in the federal District Courts for relief of his alleged grievances." (Dkt. No. 67-4 at 17.) Defendants essentially argue that this Court should apply a *subjective* test: was Plaintiff actually deterred? However, the Second Circuit defines " 'adverse action' *objectively,* as retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir.2004) (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003), *superceded by* 320 F.3d 346, 2003 WL 360053 (2d Cir. Feb. 10, 2003) (emphasis in original). The Second Circuit has "made clear that this objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." *Gill,* 389 F.3d at 381. The issue of whether the facts "demonstrate that [a defendant's actions] would deter a reasonable **inmate** from pursuing grievances" should not be determined at the motion to dismiss stage. Rather, a **prisoner** plaintiff should be allowed "the opportunity to develop [those] facts." *Davis,* 320 F.3d at 354 (citing *Morales v. Mackalm,* 278 F.3d 126, 131 (2d Cir.2002) (abrogated on other grounds by *Porter v. Nussle,* 534 U.S. 516 (2002))). Therefore, dismissal is not appropriate on this ground at this stage in the litigation.

Defendants argue that Plaintiff cannot establish a causal connection between Plaintiff's defense of the disciplinary charge and Hess' actions because Plaintiff "admits that he had not seen defendant for two or three weeks" before the urine test. (Dkt. No. 67-4 at 16.) The Second Circuit has "not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal connection between the exercise of a federal constitutional right and an allegedly retaliatory action." *Gorman-Bakos v. Cornell Coop. Extension,* 252 F.3d 545, 554 (2d Cir.2001). The Second Circuit has, however, found that lapses of time far longer than two or three weeks are sufficient to support a cause of action for retaliation. *Espinal v. Goord,* 554 F.3d 216, 228 (2d Cir.2009) (the "passage of only six months between the dismissal of Espinal's lawsuit and an allegedly retaliatory beating by officers ... is sufficient to support an inference of a causal connection"); *Gorman-Bakos,* 252

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)

(Cite as: 2009 WL 3124424 (N.D.N.Y.))

F.3d at 555 (lapse of five months between protected activity and retaliation may show a causal connection); Grant v. Bethlehem Steel Corp., 622 F.2d 43, 45-46 (2d Cir.1980) (lapse of eight months between an EEOC complaint and retaliatory act indicated a causal connection). As explained above, Rule 8 requires a plaintiff to provide "plausible grounds to infer [actionable conduct]," or, in other words, "enough fact to raise a reasonable expectation that discovery will reveal evidence of [actionable conduct]." Bell Atlantic, 127 S.Ct. at 1965. Plaintiff alleges that Hess wrongfully interfered with his right to wear a colored Tsalot-Kob, that Hess issued a false misbehavior report after that incident, and that Plaintiff was found not guilty of the disciplinary charges. (Dkt. No. 17 at ¶¶ 12-14.) It is not implausible that, based on these events, Hess would have the motive to retaliate. Moreover, the "two or three" weeks that Plaintiff alleges had passed since he last saw Defendant Hess appear to be the two or three weeks between the time Plaintiff was found not guilty of the disciplinary charges on July 23, 2005 (Dkt. No. 17 at ¶ 14), and the encounter on August 22. These facts plausibly suggest that Defendant Hess took his first opportunity to retaliate.[FN53] Accordingly, Plaintiff has stated a claim for retaliation against Defendant Hess and I recommend that Defendants' motion to dismiss this claim be denied.

> FN53. By finding that such an allegation is "plausible," I express no opinion on whether this allegation can be established by evidence and/or survive a more stringent inquiry.

**\*25** Defendants argue that Plaintiff has not stated a retaliation claim against Defendant Bellinger because "insulting, disrespectful, or sarcastic comments are considered *de minimus,* and are not actionable." (Dkt. No. 67-4 at 17.) Defendants are correct that insulting comments generally do not rise to an actionable level. Davis, 320 F.3d at 353. If Defendant Bellinger were simply a correctional officer who had made the comment to other officers, the undersigned would be inclined to agree that the claim should be dismissed. However, the complaint alleges that Defendant Bellinger was the Deputy Superintendent of Auburn Correctional Facility. (Dkt. No. 17 at A-5.) As such, the complaint construed liberally alleges that the Deputy Superintendent of the facility

ordered subordinate officers to falsify the results of a drug test. This is more than a mere insulting comment. Accordingly, I recommend that Defendants' motion to dismiss the retaliation claim against Defendant Bellinger be denied.

*2. Steinberg, B. Smith, and Clafin*

Defendants argue that Plaintiff has failed to state a cause of action against Defendants Steinberg, B. Smith, or Claflin. (Dkt. No. 67-4 at 17-18.) I find that Defendants are partially correct.

Regarding Defendants Steinberg, B. Smith and Claflin, Plaintiff alleges that while he was giving the urine sample ordered by Hess, Defendants Steinberg, Smith and Claflin searched his cell. (Dkt. No. 17 at ¶ 29.) When Plaintiff returned to his cell, his legal documents and belongings were on the floor and his three Tsalot-Kobs were in the toilet. *Id.* A cell search contraband receipt signed by Steinberg, Smith and Claflin stated that tobacco and marijuana had been found in the cell. *Id.* On August 23, 2005, Plaintiff received a misbehavior report charging him with possession of a controlled substance. (Dkt. No. 17 at ¶ 30.) Plaintiff was found guilty and sentenced to 12 months' SHU confinement, 12 months' loss of good time credits, and 12 months' loss of recreation, commissary, package and telephone privileges. *Id.*

Construed liberally, the complaint alleges that these Defendants violated Plaintiff's First, Fourth and Fourteenth Amendment rights. Defendants have not moved to dismiss Plaintiff's allegation that these Defendants violated his First Amendment rights by throwing his religious headgear in the toilet. I find that Plaintiff's First Amendment claim is sufficient to withstand a *sua sponte* review pursuant to 28 U.S.C. § 1915(e)(2)(B). In *Farid v. Smith,* 850 F.2d 917, 926 (2d Cir.1988), the Second Circuit held that to assess a free exercise claim, the court must determine "(1) whether the practice asserted is religious in the person's scheme of beliefs and whether the belief is sincerely held; (2) whether the challenged practice of prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers some legitimate penological interest." The complaint sufficiently alleges, for the purposes of *sua sponte* review,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 29

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)

(Cite as: 2009 WL 3124424 (N.D.N.Y.))

that the wearing of the Tsalot-Kob is a part of Plaintiff's sincerely held Rastafarian beliefs, that throwing Plaintiff's Tsalot-Kobs in the toilet infringed that belief, and that there was no legitimate penological reason for throwing the Tsalot-Kobs in the toilet. Therefore, I recommend that Defendants be directed to answer this claim.

**\*26** Defendants argue that Plaintiff has failed to state a cause of action against Defendants B. Smith, Steinberg, and Claflin because (1) **prisoners** have no Fourth Amendment right of protection against unreasonable searches; and (2) **prisoners** have no constitutional right to be free from being falsely accused. (Dkt. No. 67-4 at 17-18 .) Defendants are correct, with the exception of the false accusation claim against Defendant Steinberg.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons ... against unreasonable searches ... shall not be violated." U.S. Const. amend IV. "What is reasonable, of course, depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 619 (1989) [internal quotation marks and citation omitted]. "Thus, the permissibility of a particular practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests ." Skinner, 489 U.S. at 619 [internal quotation marks and citations omitted]. In so doing, "[c]ourts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." Bell v. Wolfish, 441 U.S. 520, 559 (1979) [citations omitted], accord, Covino v. Patrissi, 967 F.2d 73, 77 (2d Cir.1992). The Fourth Amendment's proscription against unreasonable searches does not apply at all within the confines of a prison cell. Hudson v. Palmer 468 U.S. 517, 526 (1984); see also Tinsley v. Greene, 95-CV-1765, 1997 WL 160124, at \*7 (N .D.N.Y. March 31, 1997) (Pooler, J., adopting Report-Recommendation of Homer, M.J.) ("Searches of prison cells, even arbitrary searches, implicate no protected constitutional rights."). Therefore, Plaintiff has not stated a Fourth Amendment claim against Defendants Steinberg, B. Smith or Claflin and I recommend that this claim be dismissed without leave to amend.

Plaintiff has not stated a Fourteenth Amendment due process claim against Defendants Smith or Claflin. "[A] prison **inmate** has no general constitutional right to be free from being falsely accused in a misbehavior report." Boddie v. Schnieder, 105 F.3d 857, 862 (2d Cir.1997) (citing Freeman v. Rideout, 808 F.2d 949, 951 [2d Cir.1986] ); accord, Pittman v. Forte, 01-CV-0100, 2002 WL 31309183, \*5 (N.D.N.Y. July 11, 2002) (Sharpe, M.J.). In addition, "[t]he filing of a false report does not, of itself, implicate the guard who filed it in constitutional violations which occur at a subsequent disciplinary hearing.[FN54]" Williams v. Smith, 781 F.2d 319, 324 (2d Cir.1986). The only way that false accusations contained in a misbehavior report can rise to the level of a constitutional violation is when there has been more, such as "retaliation against the **prisoner** for exercising a constitutional right." Boddie, 105 F.3d at 862. The complaint does not allege that Smith or Claflin acted in retaliation. Read extremely broadly, however, it does suggest that Steinberg had a retaliatory motive beaues it states that four days prior to the search, Plaintiff filed a grievance against Steinberg. (Dkt. No. 17 at ¶ 27.) Therefore, I recommend that the due process claims be dismissed as to Defendants Smith and Claflin with leave to amend but that Defendants' motion to dismiss the false accusation claim against Defendant Steinberg be denied.

> FN54. Plaintiff alleges that he was not allowed to present a defense at the disciplinary hearing. (Dkt. No. 17 at ¶ 30.)

### 3. Corriguez, Premo, and D. Wood

**\*27** The complaint alleges that on April 29, 2006, Plaintiff has been moved into a cell with an **inmate** who had a long history of drug use. (Dkt. No. 17 at ¶ 3 8.) On May 7, 2006, Defendant Premo ordered Plaintiff to submit a random urine specimen. Premo said "Albany" had made the request. (Dkt. No. 17 at ¶ 36.) On May 9, 2006, Plaintiff and his cell mate were both ordered by a non-defendant correctional officer to submit a random urine specimen. (Dkt. No. 17 at ¶ 37.) Plaintiff alleges that the reason for the second test was to use his cell mate's specimen "to give me a false positive of cocaine and cannabinoid." (Dkt. No. 17 at ¶ 38.)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)

(Cite as: 2009 WL 3124424 (N.D.N.Y.))

On May 12, 2006, Defendant Wood issued misbehavior reports charging Plaintiff and his cell mate with use of controlled substances. Plaintiff alleges that Defendant Wood listed the date that he took the specimens as May 11 rather than May 9 so that Plaintiff's cell mate would have his misbehavior report dismissed as a reward for helping to set up Plaintiff. (Dkt. No. 17 at ¶ 39.) As part of his defense at the ensuing disciplinary hearing, Plaintiff requested a copy of the urinalysis test. Plaintiff alleges that Defendants Premo and Corrigeux falsified the document to make it appear that Corrigeux, rather than "Albany," had requested the test. (Dkt. No. 17 at ¶ 40.) Plaintiff was found guilty and sentenced to six months' SHU confinement, six months' lost good time, and six months' lost package, commissary, recreation, and telephone privileges. *Id.*

I have construed the complaint as asserting (1) a Fourth Amendment claim, a due process claim, and a conspiracy claim against Defendant Premo; and (2) due process and conspiracy claims against Defendants D. Wood and Corrigeux.

Defendants have not moved to dismiss the Fourth Amendment claim against Defendant Premo. I find that the claim is sufficient to withstand initial review pursuant to 28 U.S.C. § 1915(e)(2)(B). Urinalysis testing constitutes a search subject to the Fourth Amendment. *See Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 614 (1989); *Harris v. Keane,* 962 F.Supp. 397, 407 (S.D.N.Y.1997). However, if the intrusion into one's privacy is found to be minimal, the expectation of privacy is minimal, and there is a governmental reason advanced supporting a search, then the search will not violate one's Fourth Amendment rights. It is equally well-established that a **prisoner's** right to be free from unreasonable searches is diminished once he or she steps through the prison door. *Harris,* 962 F.Supp. at 407. Pursuant to New York Regulations, as long as the testing is not done with an intent to harass, a corrections officer may order an **inmate** to submit to urine testing "[w]hen correctional staff has reason to believe the **inmate** has used drugs ..., when correctional staff receives information from a source that the **inmate** is currently under the influence of or has recently used ... drugs ..., [or] as part of a computer-generated program for random testing of all

**inmates** [or those] **inmates** who have been found guilty of drug ... related misconduct in the previous two-year period." N.Y. Comp.Codes R. & Regs. tit. 7, § 1020.4(a)(1), (4), (7), (8); *see also Rodriguez v. Coughlin,* 795 F.Supp. 609 (W.D.N.Y.1992) (holding that two random drug tests within a twelve-month period, both producing negative results, did not constitute a constitutional violation). Here, the complaint alleges that Defendant Premo told Plaintiff that the May 7, 2006, drug test was a "random request made by Albany," but that at the disciplinary hearing Premo and Corrigeux represented that Corrigeux had requested the test. (Dkt. No. 17 at ¶¶ 36, 39.) These facts raise a sufficient inference of an intent to harass to survive initial review. The undersigned expresses no opinion about whether the evidence will support these facts or whether this allegation can withstand a more stringent inquiry.

**\*28** Defendants argue that the due process and conspiracy claims against Defendants Corrigeux, Premo, and D. Wood must be dismissed because (1) **prisoners** have no right to be free from being falsely or wrongly accused of conduct that may result in the deprivation of a protected liberty interest; and (2) under the intracorporate conspiracy doctrine, DOCS officials are legally incapable of conspiring together. (Dkt. No. 67-4 at 19-20.) Defendants are correct.

As discussed above, "a prison **inmate** has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Freeman v. Rideout,* 808 F.2d 949, 951 [2d Cir.1986] ); *accord, Pittman v. Forte,* 01-CV-0100, 2002 WL 31309183, \*5 (N.D.N.Y. July 11, 2002) (Sharpe, M.J.). In addition, "[t]he filing of a false report does not, of itself, implicate the guard who filed it in constitutional violations which occur at a subsequent disciplinary hearing [FN55]." *Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986). The only way that false accusations contained in a misbehavior report can rise to the level of a constitutional violation is when there has been more, such as "retaliation against the **prisoner** for exercising a constitutional right." *Boddie,* 105 F.3d at 862; *accord, Murray v. Pataki,* 03-CV-1263, 2007 U.S. Dist. LEXIS 26959, at \*26 (N.D.N.Y. March 5, 2007) (Treece, M.J.) [citations omitted].

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)

(Cite as: 2009 WL 3124424 (N.D.N.Y.))

FN55. The hearing was conducted by Defendant Bezio, but the complaint does not allege any facts suggesting that Defendant Bezio conducted the hearing improperly.

None of the facts alleged in the complaint plausibly suggest that Defendants Premo, Corrigeux, or D. Wood acted in retaliation for Plaintiff's exercise of a constitutional right. Therefore, I recommend that all claims against these officers regarding the filing of false reports be dismissed with leave to amend.

The complaint alleges that Defendants are all DOCS employees. (Dkt. No. 17 at 1-A9.) The intra-agency conspiracy doctrine precludes conspiracy claims "against officers, agents, or employees of a single corporate entity." *Farid v. Bouey,* 554 F.Supp.2d 301, 324 (N.D.N.Y.2008) (granting summary judgment where **prisoner** claimed conspiracy between Board of Parole and various BOP commissioners to deprive him of his civil rights). "The intra-corporate conspiracy doctrine provides that with exceptions not now presented, an entity cannot conspire with one or more of its employees, acting within the scope of employment, and thus a conspiracy claim conceptually will not lie in such circumstances." *Id.* (citing *Everson v. New York City Transit Auth.,* 216 F.Supp.2d 71, 75-76 (E.D.N.Y.2002)). Therefore, I recommend that all conspiracy charges be dismissed without leave to amend.

### 4. *Lewis*

On June 17, 2006, Defendant B. Lewis ordered Plaintiff to submit a urine specimen. (Dkt. No. 17 at ¶ 41.) Plaintiff, citing a three-hour time limit to submit specimens, said he would submit the specimen when he finished eating. *Id.* Defendant Lewis then said to another officer "Fuck him ... we will just put down [that] he [is] refusing to submit his urine specimen." *Id.* No one returned to take Plaintiff's specimen. *Id.* On June 22, 2006, Plaintiff received a misbehavior report charging him with refusing a direct order. (Dkt. No. 17 at ¶ 42.) I have construed the complaint as asserting a due process claim and a conspiracy claim against Defendant Lewis.

**\*29** Defendants move to dismiss the claims against

Lewis on the same grounds as asserted regarding Defendants Corrigeux, Premo and Wood. (Dkt. No. 67-4 at 18, 20.) As with those Defendants, the complaint fails to state a due process claim against Defendant Lewis because Plaintiff has not alleged any facts plausibly suggesting that Lewis acted with a retaliatory motive. Therefore, I recommend that this claim be dismissed with leave to amend. Moreover, the complaint fails to state a claim for conspiracy because Lewis and the other officer are both DOCS employees. Therefore, I recommend that this claim be dismissed without leave to amend.

### 5. *Moore*

The complaint alleges that on June 29, 2006, Plaintiff found glass in his food. (Dkt. No. 17 at ¶ 43.) Plaintiff reported this to the housing unit supervisor, Defendant Moore. *Id.* Plaintiff requested medical care and a new food tray, but Moore refused. *Id.* I have construed the complaint as asserting an Eighth Amendment medical care claim against Defendant Moore.

Defendants argue that Plaintiff has not stated an Eighth Amendment claim against Defendant Moore because Plaintiff "did not know whether or not he swallowed glass, and he alleges no subjective facts from which to infer that he was in 'serious medical need' on June 29 or June 30, 2006 ... and thus, that Sergeant Moore ... knew of, and disregarded, an excessive risk to his health or safety." (Dkt. No. 67-4 at 21.)

To prevail on an Eighth Amendment claim of inadequate medical care, a plaintiff must show two things: (1) that the plaintiff had a *sufficiently serious* medical need; and (2) that the defendant was *deliberately indifferent* to that serious medical need. *Estelle v. Gamble,* 429 U.S. 97, 104 (1976); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). To be sufficiently serious for purposes of the Constitution, a medical condition must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) [citations omitted], *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996), *cert. denied,* 513 U.S. 1154 (1995); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

Here, Plaintiff has not sufficiently alleged that Moore

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)

(Cite as: 2009 WL 3124424 (N.D.N.Y.))

was deliberately indifferent to a serious medical need. Plaintiff has not alleged that he had a serious medical need. He alleges that while eating his food he felt a piece of glass in his mouth. He removed the glass, inspected his food, and found three more pieces of glass. (Dkt. No. 17 at ¶ 43.) He does not allege that he swallowed glass or that he was cut by the piece of glass that he placed in his mouth. Rather, he merely alleges that "he did not know if any of the glass went down his belly." *Id.* While his fear that he *may* have swallowed glass is understandable, that fear, without more, is insufficient to constitute a serious medical need for Eighth Amendment purposes because fear, in and of itself, will not produce death, degeneration, or extreme pain. Given the lack of a serious medical need, the complaint does not allege facts plausibly suggesting that Moore was deliberately indifferent. Moreover, there is no allegation that Moore placed the glass in Plaintiff's food. *Cf. Robles v. Coughlin,* 725 F.2d 12 (2d Cir.1983) (allegation that defendants contaminated **prisoners'** food with glass sufficiently stated an Eighth Amendment claim to withstand initial review). Therefore, I recommend that the Eighth Amendment medical care claim against Defendant Moore be dismissed with leave to amend.

6. *Travers*

**\*30** Plaintiff complains that Defendant Travers denied him medical care on two occasions: (1) on June 30, 2006, after he discovered glass in his food (Dkt. No. 17 at ¶ 44); and (2) in May 2007, when Plaintiff reported bloody bowel movements. (Dkt. No. 17 at ¶ 58, 65.) Explicitly declining to move to dismiss the claims arising from the May 2007 incident (Dkt. No. 67-4 at 22, n. 1), Defendants move to dismiss Plaintiff's Eighth Amendment claim regarding the June 30 glass incident. (Dkt. No. 67-4 at 21.)

Regarding that incident, the complaint alleges that on June 30, 2006, Nurse Travers gave Plaintiff a form to fill out to request medical care. (Dkt. No. 17 at ¶ 44.) Travers, without examining Plaintiff, told him there was nothing wrong with him. *Id.*

Defendants argue that Plaintiff has failed to state an Eighth Amendment claim against Nurse Travers because (1) Plaintiff has not alleged a serious medical need; (2) **prisoners** do not have a right to the treatment of their

choice, and an **inmate's** disagreement over proper treatment does not create a constitutional claim; and (3) an allegation of medical negligence does not raise a constitutional claim. (Dkt. No. 67-4 at 21-22.)

As discussed above with regard to Defendant Moore, Plaintiff has not alleged that he suffered a serious medical need after discovering glass in his food. Therefore, I recommend that the Eighth Amendment claim against Defendant Travers arising from the events described in ¶ 44 of the complaint be dismissed with leave to amend.

7. *Anctil*

The complaint alleges that on May 19, 2007, Woods sent Defendant J. Anctil to escort "Plaintiff to a hearing room and intimidation of threats of promise to use physical force." (Dkt. No. 17 at ¶ 67.) Although this allegation is extremely unclear, I have construed the complaint as alleging that Defendant Anctil violated Plaintiff's Eighth Amendment rights and conspired with Defendant Woods.

Defendants move to dismiss Plaintiff's claims against Defendant Anctil. Defendants argue that verbal harassment, abuse and threats do not amount to violations of constitutional rights. (Dkt. No. 67-4 at 22.) Defendants are correct. "It is well established that mere threatening language and gestures of a custodial officer do not ... amount to constitutional violations." *Alnutt v. Cleary,* 913 F.Supp. 160, 165 (W.D.N.Y.1996) (punctuation omitted). The complaint alleges that Anctil used "intimidation" and "threats" and "promises" of physical force, not that Anctil actually harmed Plaintiff. Therefore, the complaint fails to state an Eighth Amendment claim against Defendant Anctil and I recommend that the claim be dismissed with leave to amend.

Further, as discussed above, it is legally impossible for DOCS employees to be found liable for conspiring together. Woods and Anctil are both DOCS employees. Therefore, the complaint fails to state a conspiracy claim against Defendant Anctil and I recommend that the claim be dismissed without leave to amend.

8. *McDonald*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)

(Cite as: 2009 WL 3124424 (N.D.N.Y.))

**\*31** The complaint alleges that on April 30, 2007, Plaintiff filed a complaint with Defendant Woods stating that Defendant McDonald had used racially abusive language to Plaintiff and denied him his food tray. (Dkt. No. 17 at ¶ 63.) On May 9, 2007, Plaintiff filed a grievance against Defendant McDonald for spitting in his coffee cup, interfering with a medical interview, and using racial and profane language. (Dkt. No. 17 at ¶ 62.) I have construed the complaint as alleging that Defendant McDonald violated Plaintiff's Eighth Amendment medical care and conditions of confinement rights.

In the Second Circuit, a **prisoner's** allegation that prison officials served unsanitary, spoiled or contaminated food is sufficient to state an Eighth Amendment claim, so long as he or she alleges that he or she suffered a "distinct and palpable injury". *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983); *Harris v. Ashlaw,* No. 9:07-CV-0358, 2007 WL 4324106, at \* 5 (N.D.N.Y. Dec. 5, 2007). Here, Plaintiff has not alleged that he suffered any injury as a result of being denied food or drinking the allegedly contaminated coffee. Therefore, Plaintiff has failed to state an Eighth Amendment claim against Defendant McDonald arising from this incident and I recommend that the claim be dismissed with leave to amend [FN56].

FN56. Defendants cite two unpublished Northern District of New York cases for the proposition that "Plaintiff's conclusory allegation ... that [McDonald] spit into his coffee cup is insufficient to state a constitutional ... claim." (Dkt. No. 67-4 at 23.) Neither of the cases cited by Defendants found that a **prisoner's** allegation that a correctional officer spit into his food failed to state an Eighth Amendment claim. Rather, both of those cases were decided on summary judgment and the Court dismissed the claims because the **prisoner** failed to *substantiate* them with evidence. *Chavis v. Kienert,* No. 9:03-CV-0039, 2005 U.S. Dist. LEXIS 41920, at \*65-66 (N.D.N.Y. Sept. 30, 2005); *Zimmerman v. Seyfert,* No. 9:03-CV-1389, 2007 U.S. Dist. LEXIS 52388, at \*80-81 (N.D.N.Y. July 19, 2007). Defendants provided copies of the decisions to Plaintiff in accordance with Local Rule 7.1(a)(1). The undersigned will provide a copy of the *Harris v. Ashlaw* opinion to Plaintiff

in light of the Second Circuit's recent decision in *Lebron v. Sanders,* 557 F.3d 76, 2009 WL 399215 (2d Cir. Feb. 19, 2009).

Plaintiff's bare allegation that McDonald interfered with a medical interview is insufficient to state an Eighth Amendment medical care claim. As discussed above, a plaintiff asserting such a claim must allege that he or she suffered from a serious medical condition. Plaintiff has made no such allegation. It is not even clear from the complaint with what type of medical interview McDonald allegedly interfered. Therefore, I recommend that the Eighth Amendment medical care claim against Defendant McDonald be dismissed with leave to amend.

Regarding Plaintiff's claim that McDonald used "racial and discrimination and indecent profane language," as noted above, "[i]t is well established that mere threatening language and gestures of a custodial officer do not ... amount to constitutional violations." *Alnutt v. Cleary,* 913 F.Supp. 160, 165 (W.D.N.Y.1996) (punctuation omitted). Therefore, I recommend that this claim be dismissed without leave to amend.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion to dismiss for failure to state a claim (Dkt. No. 67) be *GRANTED IN PART AND DENIED IN PART;*

**RECOMMENDED** that the following claims be dismissed without leave to amend: (1) all claims against Defendants Devito, Head, Labetz, Simons, and Sourwine; (2) the First Amendment religion claims alleged in ¶ 1-26 of the complaint against Defendant Hess, because they are duplicative of the claims in Case No. 9:05-CV-1231(GTS/GJD); (3) all claims against Defendant Burge; (4) all claims against Defendants in their official capacities; (5) all claims against Defendants Manley, Grant, and Capacci; (6) the claim against Defendant Croce regarding his decision to deny Plaintiff parole; (7) the claims against Defendants Goord, Burge, Fischer, Roy, McLaughlin, Croce, Stewart, LeClaire, Wright, and N. Smith alleging that they ignored complaints and grievances; (8) the procedural due process claims against Defendants Salvage, Hayes, and Allen; (9)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)

(Cite as: 2009 WL 3124424 (N.D.N.Y.))

the Fourth Amendment claim against Defendants Steinberg, B. Smith, and Claflin arising from their August 22, 2005, search of Plaintiff's cell; (10) the conspiracy claims against Defendants Premo, D. Wood, and Corrigeux arising from the May 2006 drug tests; (11) the conspiracy claim against Defendant Lewis arising from the June 17, 2006, request for a urine sample; (12) the conspiracy claim against Defendants R. Woods and Anctil arising from Anctil's May 19, 2007, threats; and (13) the claim that Defendant McDonald used "racial and discrimination and indecent and profane language."

**\*32 RECOMMENDED** that the following claims be dismissed with leave to amend: (1) the claims against Defendants Goord, Fischer, Roy, McLaughlin, Croce, Stewart, LeClaire, Wright, and N. Smith alleging that they falsified documents in response to Plaintiff's grievances; (2) the substantive due process and First Amendment access to the courts claims against Defendants Salvage, Hayes, and Allen; (3) the due process claim against Defendants B. Smith and Claflin arising from the August 23, 2005, misbehavior report; (4) the due process claim against Defendants Premo, D. Wood, and Corrigeux arising from the May 2006 drug tests; (5) the due process claim against Defendant Lewis arising from the June 22, 2006, misbehavior report; (6) the Eighth Amendment medical care claims against Defendants Moore and Travers arising from Plaintiff's discovery of glass in his food; (7) the Eighth Amendment claims arising from Anctil's May 19, 2007, threats; (8) the Eighth Amendment conditions of confinement claim against Defendant McDonald arising from the denial of food and spitting in Plaintiff's coffee; and (9) the Eighth Amendment medical care claim against Defendant McDonald arising from her interference with Plaintiff's medical interview.

**RECOMMENDED** that Defendants be directed to answer the following claims: (1) the retaliation claim against Defendant Hess arising from the August 22, 2005, drug test; (2) the retaliation claim against Defendant Bellinger arising from the August 22, 2005, drug test; (3) the First Amendment claim against Defendants Steinberg, B. Smith, and Claflin arising from their August 22, 2005, search of Plaintiff's cell; (4) the due process claim against Defendant Steinberg arising from the August 23, 2005, misbehavior report; (5) the Fourth Amendment claim

against Defendant Premo arising from the May 7, 2006, drug test; and (6) the Eighth Amendment medical care claim against Defendant Travers arising from Plaintiff's May 2007 report of bloody bowel movements.

**ANY OBJECTIONS to this Report-Recommendation must be filed with the Clerk of this Court within TEN (10) WORKING DAYS, PLUS THREE (3) CALENDAR DAYS from the date of this Report-Recommendation (unless the third calendar day is a legal holiday, in which case add a fourth calendar day).** *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); N.D.N.Y. L.R. 72.1(c); Fed.R.Civ.P. 6(a)(2), (d).

**BE ADVISED that the District Court, on** *de novo* **review, will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance.** FN57

FN57. *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40 n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *Alexander v. Evans,* 88-CV-5309, 1993 WL 427409, at \*18 n. 8 (S.D.N.Y. Sept. 30, 1993) (declining to consider affidavit of expert witness that was not before magistrate) [citation omitted]; *see also Murr v. U.S.,* 200 F.3d 895, 902, n. 1 (6th Cir.2000) ("Petitioner's failure to raise this claim before the magistrate constitutes waiver."); *Marshall v. Chater,* 75 F.3d 1421, 1426 (10th Cir.1996) ("Issues raised for the first time in objections to the magistrate judge's recommendations are deemed waived.") [citations omitted]; *Cupit v. Whitley,* 28 F.3d

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)

(Cite as: 2009 WL 3124424 (N.D.N.Y.))

532, 535 (5th Cir.1994) ("By waiting until after the magistrate judge had issued its findings and recommendations [to raise its procedural default argument] ... Respondent has waived procedural default ... objection [ ].") [citations omitted]; *Greenhow v. Sec'y of Health & Human Servs.,* 863 F.2d 633, 638-39 (9th Cir.1988) ("[A]llowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their strategy and present a different theory to the district court would frustrate the purpose of the Magistrates Act."), *overruled on other grounds by U.S. v. Hardesty,* 977 F.2d 1347 (9th Cir.1992); *Patterson-Leitch Co. Inc. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990-91 (1st Cir.1988) ("[A]n unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate.") [citation omitted].

**BE ALSO ADVISED that the failure to file timely objections to this Report-Recommendation will PRECLUDE LATER APPELLATE REVIEW of any Order of judgment that will be entered.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of H.H.S.,* 892 F.2d 15 [2d Cir.1989] ).

N.D.N.Y.,2009.

Excell v. Woods
Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2002 WL 31458240 (S.D.N.Y.), 24 NDLR P 284

(Cite as: 2002 WL 31458240 (S.D.N.Y.))

United States District Court,

S.D. New York.
Reginald PETTY, Plaintiff,
v.
Glenn S. GOORD, Commissioner of New York State Department of Correction Services, et al. Defendants.
No. 00 Civ.803 (MBM).

Nov. 4, 2002.

Reginald Petty, Clinton Correctional Facility, Dannemora, NY, Plaintiff pro se.

Eliot L. Spitzer, Attorney General of the State of New York, Edward Rodriguez, Assistant Attorney General, New York, NY, for Defendants.

OPINION AND ORDER

MUKASEY, J.

*1 Plaintiff Reginald Petty, an inmate at the Clinton Correctional Facility, filed this § 1983 action *pro se* against defendants Glenn S. Goord, Commissioner of the New York State Department of Correctional Services; Jane Doe # 1, Facility Nurse at Green Haven Correctional Facility; John Doe # 1, Facility Nurse at Green Haven Correctional Facility; Harry Mamis, Facility Doctor at Green Haven Correctional Facility; Amora, Corrections Officer at Green Haven Correctional Facility ("C.O.Amora"); Wilk, Corrections Sergeant at Green Haven Correctional Facility ("Sgt.Wilk"); John Doe # 2, Facility Specialist at Green Haven Correctional Facility; and John Doe # 3, Medical Director at Green Haven Correctional Facility. Petty claims that defendants, by disclosing his HIV status, violated his constitutional right to privacy. Petty claims also that these disclosures violated his Eighth Amendment right to be free from cruel and unusual punishment and that the disclosures violated New York state law.[FN1]

FN1. Unlike the privacy claim, which is fully pleaded by Petty, the Eighth Amendment and state law claims are difficult to discern from the Complaint. (*See* Compl. § V(iii) (averring, in conclusory fashion, that Petty seeks damages from each defendant for "cruel and unusual" punishment); Compl. § V(viii) (requesting "statutory damages" for violations of the plaintiff's rights under the "Confidentiality Statute")). However, because *pro se* litigants should be given every opportunity to demonstrate the validity of their claims, Petty's Eighth Amendment and state law claims will be addressed.

Defendants move to dismiss the complaint on the grounds that plaintiff failed to exhaust all Department of Correctional Services ("DOCS") administrative remedies, that defendants are entitled to qualified immunity, that the action is barred by the physical-injury requirement of 42 U.S.C. § 1997(e), and that the court lacks jurisdiction over this case under the Eleventh Amendment of the United States Constitution. Additionally, defendants move to dismiss all claims against Commissioner Goord and John Doe # 3 on the ground that these defendants lacked sufficient personal involvement in the disclosures to be sued in this § 1983 action. Finally, defendants move to dismiss Petty's Eighth Amendment claim for failure to state a claim and Petty's state law claim under New York Corrections Law § 24. For the reasons set forth below, defendants' motion is granted, and the complaint is dismissed.

I.

In considering a motion to dismiss, a district court generally " 'must limit itself to facts stated in the complaint' ' or attached documents. *Newman & Schwartz v. Asplundh Tree Expert Co.,* 102 F.3d 660, 662 (2d Cir.1996) (*quoting Kramer v. Time Warner, Inc.,* 937 F.2d 767, 773 (2d Cir.1991)). However, because plaintiff appears *pro se* and "a *pro se* litigant should be afforded every reasonable opportunity to demonstrate that he has a valid claim," *Satchell v. Dilworth,* 745 F.2d 781, 785 (2d Cir.1984), the following relevant facts, taken to be true for

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31458240 (S.D.N.Y.), 24 NDLR P 284

(Cite as: 2002 WL 31458240 (S.D.N.Y.))

purposes of the present motion, are drawn from both the complaint and plaintiff's affidavit in opposition to defendants' motion to dismiss ("Pl.'s Opp'n").[FN2]

> FN2. Although a court may not look beyond the pleadings when reviewing a motion to dismiss, Fed.R.Civ.P. 10(c) authorizes the court to consider any exhibits mentioned in and attached to the pleadings. See Fed.R.Civ.P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."). Here, Petty has attached his ambulatory health record on February 16, 1995, a laboratory report dated March 27, 1996 stating that Petty is HIV-positive, his September 19, 1996 grievance, and a form signed by Petty acknowledging the Bureau of Prisons' authority to open and read Petty's correspondence and to endorse checks and other negotiable instruments on his behalf. These exhibits will be treated as part of Petty's pleadings for the purposes of this motion.

On or about August 27, 1992, while confined in the Auburn Correctional Facility, Petty took an HIV antibody test, the result of which was negative. (Pl.'s Opp'n ¶ 5) On July 18, 1994, while confined at the Sing Sing Correctional Facility, Petty became sick and took several blood tests, none of which led to a diagnosis. (Id. ¶ 6) However, upon being transferred to the Green Haven Correctional Facility on February 8, 1996, Petty was informed by a physician's assistant that the blood tests taken at Sing Sing appeared abnormal. (Id. ¶ 7) Based on additional blood tests, Petty was diagnosed as HIV positive. (Id. ¶¶ 7-8) Petty then agreed to take medications that the physician's assistant recommended. (Id. ¶ 9)

**\*2** On September 11, 1996, Petty was transferred to the Special Housing Unit at Green Haven ("SHU") pending the outcome of a disciplinary action against him. (Id. ¶ 10) That day, in front of security staff, facility nurse Jane Doe # 1 interviewed Petty regarding his HIV status and medications. (Compl.¶ 1) On September 12, Petty, suffering from severe stomach, back, and head pains as well as a mild nose bleed, passed out on the floor of his cell. Upon regaining consciousness, Petty heard one of the guards asking why Petty was so sick. In response, Jane

Doe # 1 told the guard that Petty was HIV-positive. (Id. at ¶ 2) The same day, Petty was taken to the facility clinic for examination, where facility nurse John Doe # 1 noticed Petty's HIV-positive status. After the examination, while Petty was being handcuffed to a stretcher to be taken to an outside hospital, John Doe # 1 informed the transportation officers and emergency medical technicians that Petty was HIV-positive and would not give them any problems. (Id. ¶ 3)

On September 13, 1996, facility doctor Harry Mamis came to Petty's cell after Petty requested medical attention. Petty told the doctor that he had not been able to eat and had lost weight. After reviewing the medications in Petty's cell, Mamis asked Petty if he was HIV-positive. When Petty requested that Mamis lower his voice so that other inmates would not hear about Petty's medical condition, Mamis told Petty that he would be seen by a specialist. (Id. ¶ 4)

On September 18, 1996, corrections officers Amora and Wilk escorted Petty to the facility clinic, where he was examined by facility specialist John Doe # 2. During the examination, John Doe # 2 questioned Petty about his HIV status in the presence of C.O. Amora and Sgt. Wilk. (Id. ¶ 5) Following the examination, C.O. Amora and Sgt. Wilk escorted Petty back to his cell. While in the elevator, the two officers questioned Petty about his HIV status and, after leaving the elevator at the Special Housing Unit, joined with other officers in degrading jokes about Petty's condition. (Id.)

The next day, Petty filed an administrative grievance concerning the disclosure of his HIV status by prison staff. (Id. ¶ 6) The text of the grievance states:

On the dates of 9-11-96; 9-12-96; and 9-18-96; Medical Staff had disclosed confidential information from within my Medical Records to security and other non medical staff at this facility, and to a EMT unit without my consent. Thus, violating my Confidentiality and Privacy Rights under State and Federal Law. I've been questioned by security staff about said information which they should not have access to, nor should they have been informed of such information due to Patient & Physician Confidentiality and Privacy Act under N.Y. Public Health

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31458240 (S.D.N.Y.), 24 NDLR P 284

(Cite as: 2002 WL 31458240 (S.D.N.Y.))

Law. While being within the SHU this information is being disclosed to nonmedical staff which should not be. I am being harassed + called all kinds of names and I'm starting to bug out.

**\*3** (Pl.'s Opp'n, Ex. C)

On September 20, Petty sent a separate complaint to the facility's medical director, John Doe # 3, and to Glenn Goord, Commissioner of the New York State Department of Correctional Services. In this complaint, Petty explained that he had become depressed and suicidal as a result of the breaches of confidentiality and harassment by corrections officers and medical staff. (Compl.¶ 7)

On September 29, 1996, a corrections officer came to Petty's cell and informed him that he would be transferred to the Federal Bureau of Prisons' Metropolitan Correctional Center in New York City ("MCC"). Petty was then confined in MCC until October 11, 1996, when he was brought back to Green Haven and placed in the general population. (Pl.'s Opp'n ¶¶ 17-18) On or about October 13, 1996, three corrections officers rushed into Petty's cell, knocked him to the ground, and handcuffed him. While the corrections officers subdued Petty, a fourth officer, who was standing outside Petty's cell along with a sergeant, informed the other officers that Petty had AIDS and therefore precautions should be taken to avoid cutting him with the handcuffs. (Id. ¶ 19) Petty was then escorted back to SHU to be confined until the still-pending disciplinary action against him was resolved. (Id.)

During his confinement in SHU, Petty was harassed by corrections officers about his HIV status, and he tried to commit suicide several times. (Id. ¶ 20) On or about October 22, 1996, Petty was placed in the Central New York Psychiatric Center. (Id. ¶¶ 20-21) Upon Petty's return to Green Haven on or about December 31, 1996, the harassment by corrections officers resumed, and Petty was once again hospitalized on January 10, 1997. (Id. ¶ 22) Finally, on or about January 28, 1997, Petty was transferred to the Wende Correctional Facility. (Id. ¶ 23)

II.

Defendants contend that Petty's constitutional claims

should be dismissed for failure to exhaust available administrative remedies. I agree. 42 U.S.C. § 1997e(a) provides that:

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available have been exhausted.

42 U.S.C. § 1997e(a) (2000). Section 1997e(a) "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002). Thus, Petty's claims can proceed only if he has exhausted administrative remedies before suing defendants in federal court. Because Petty failed to follow up his initial grievance with an appeal, he did not exhaust available remedies.

N.Y. Comp.Codes R. & Regs., tit. 7, § 701.7 outlines the Inmate Grievance Program under which New York prison inmates may file grievances. First, the inmate must file a complaint with the Inmate Grievance Resolution Committee ("IGRC") within 14 days of an alleged incident. N.Y. Comp.Codes R. & Regs., tit. 7, § 701.7(a). The IGRC must then act on the complaint within seven working days by resolving the problem informally or by holding a hearing. Id. After receiving an adverse response from the IGRC, the inmate may appeal to the Superintendent of the facility within four days. Id. § 701.7(b). If he receives an adverse response from the Superintendent as well, the inmate may appeal to the Central Office Review Committee ("CORC"). Id. § 701.7(c). Crucially, if the IGRC does not respond to an initial grievance within the mandated time period, the statute provides that the inmate is entitled to appeal to the Superintendent. See 7 N.Y.C.R.R. § 701.8 ("[M]atters not decided within the time limits may be appealed to the next step.").

**\*4** As a threshold matter, allegations in the complaint that were not mentioned in Petty's September 19 grievance are barred by section 1997e(a). See Williams v. Muller, No. 98 Civ. 5204, 2000 U.S. Dist. LEXIS 5286, at \*8 (S.D.N.Y. Apr. 25, 2000) (refusing to allow a prisoner to bring a § 1983 action based upon those allegations in the

Not Reported in F.Supp.2d, 2002 WL 31458240 (S.D.N.Y.), 24 NDLR P 284

(Cite as: 2002 WL 31458240 (S.D.N.Y.))

complaint that were not raised in the administrative process). Because the grievance was filed on September 19, Petty cannot bring this § 1983 suit based upon any actions by medical personnel or corrections officers after that date. Moreover, because the grievance does not refer to the allegation that Doctor Mamis disclosed Petty's HIV status on September 13, that allegation also is not justiciable here.

On the other hand, the allegations regarding the acts of prison staff on September 11, September 12, and September 18 were mentioned in the initial grievance. Contrary to defendants' assertion, the grievance mentions C.O. Amora's and Sgt. Wilk's alleged harassment of Petty on September 18. (Pl.'s Opp'n, Ex. C "[W]hile being in the SHU this information is being disclosed to nonmedical staff which should not be [and] I am being harassed and called all kinds of names.")). Although the description of the officers' alleged behavior could be more detailed, it is consistent with the allegations in the complaint.

Nevertheless, Petty has not met the exhaustion requirement of section 1997e(a), because he did not go beyond the initial grievance filed on September 19. Petty asserts that he did not file an appeal because he never received a response to his initial complaint. However, N.Y. Comp.Codes R. & Regs., tit. 7, § 701.8 specifically allows an inmate to file an appeal when the grievance committee does not respond to a complaint in a timely manner. Petty therefore had the opportunity to appeal to the Superintendant of Green Haven but failed to do so. See McNair v. Jones, No. 01 Civ. 3253, 2002 U.S. Dist. LEXIS 17409, at *30 n. 5 (S.D.N.Y. Sept. 18, 2002) (finding that the plaintiff had not exhausted administrative remedies under N.Y. Comp.Codes R. & Regs., tit. 7, § 701 where he received no response to his grievance but had not appealed); But see John v. N.Y.C. Dep't of Corrs., 183 F.Supp.2d 619, 625 (S.D.N.Y.2002) (finding that the plaintiff exhausted administrative remedies under N.Y. Comp.Codes R. & Regs., tit. 7, § 701 where he filed a grievance and received no response because "there was no [adverse] decision to appeal"); Cf. Powe v. Ennis, 177 F.3d 393, 394 (5th Cir.1999) (per curiam) (applying Texas law) ("A prisoner's administrative remedies are deemed exhausted when a valid grievance has been filed and the state's time for responding thereto has expired.").

The statute states that "such administrative remedies as are available" must be exhausted. 42 U.S.C. § 1997e(a) (2000). By its plain language, the provision bars Petty's action, because an appeal to the Superintendant was available to Petty. Among other reasons, Congress enacted § 1997e(a) to give prison officials an opportunity to take corrective actions that might obviate the need for litigation and to assure that adjudication by federal courts would be facilitated by an administrative record that clarifies the contours of a controversy. See Porter, 534 U.S. at 524-25; Booth v. Churner, 532 U.S. 731, 737 (2001). Allowing an inmate to opt out of New York's grievance scheme without filing even one appeal and before receiving any response from prison authorities would undermine these goals. New York's legislature, recognizing that some grievances will not be answered within seven days, gave prisoners the right to bring their grievances to the attention of the Superintendent even in the absence of an adverse response from the IGRC. See N.Y. Comp.Codes R. & Regs., tit. 7, § 701.8. It is unreasonable to read these regulations as providing that a federal action is the next and only recourse when the prison fails to respond to an initial grievance. Because Petty failed to exhaust available remedies, his § 1983 action cannot go forward.

III.

*5 Petty's privacy claim must be dismissed also on an alternative ground-namely, that defendants are entitled to qualified immunity for their actions. The doctrine of qualified immunity "shields government officials from liability for damages on account of their performance of discretionary official functions 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " Rodriguez v. Phillips, 66 F.3d 470, 475 (2d Cir.1995) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). To determine whether a particular right is "clearly established" at the time of an alleged constitutional violation, the court considers three related factors: "whether the right was defined with reasonable specificity; whether the decisional law of the Supreme Court and the applicable circuit court supports its existence; and whether, under preexisting law, a defendant official would have reasonably understood that his acts

Not Reported in F.Supp.2d, 2002 WL 31458240 (S.D.N.Y.), 24 NDLR P 284

(Cite as: 2002 WL 31458240 (S.D.N.Y.))

were unlawful." *Rodriguez,* 66 F.3d at 476.

In *Powell v. Schriver,* 175 F.3d 107 (2d Cir.1999), our Court of Appeals held that, as of December 31, 1991, an inmate's right to maintain the confidentiality of his HIV-positive status was not clearly established. In *Powell,* two corrections officers were escorting the plaintiff to the prison's medical facility when, in the presence of staff and inmates, one officer gratuitously announced to the other that the plaintiff was HIV-positive and had undergone a sex-change operation. *Id.* at 109. Building on its decision in *Doe v. City of New York,* 15 F.3d 264 (2d Cir.1994), which held that HIV-positive individuals possess a constitutional right to privacy regarding their condition, the Second Circuit in *Powell* concluded that prison officials can impinge on an inmate's right to maintain the confidentiality of an undisclosed medical condition only to the extent the disclosures are "reasonably related to legitimate penological interests." *Powell,* 175 F.3d at 112.

Despite extending the constitutional right to privacy recognized in *Doe* to prison inmates, the Second Circuit in *Powell* granted qualified immunity to the officer who had revealed that plaintiff's HIV status. *Id.* at 113-14. In granting immunity, the Court emphasized that, as of December 31, 1991, other circuit courts had not even agreed on the principle that would later be recognized in *Doe*-namely that *outside* the prison context, an individual has a right to maintain the confidentiality of his medical history. *Id.* at 114. The Court noted also that no pre-1992 appellate case extended the right of confidentiality to the prison environment. *Id.*

In light of the Second Circuit's decision in *Powell,* the qualified immunity analysis in this case turns on whether an inmate's right to maintain the confidentiality of his HIV status became clearly established between December 31, 1991, the date on which the disclosure at issue in *Powell* took place, and September 1996, when defendants disclosed Petty's HIV status. In *Doe,* which was decided on January 28, 1994, the Second Circuit held that "[i]ndividuals who are infected with the HIV virus clearly possess a constitutional right to privacy regarding their condition." *Doe,* 15 F.3d at 267. However, as *Powell* itself emphasized, the plaintiff in *Doe* was not a prison inmate. *See Powell,* 175 F.3d at 113-14 (noting that *Doe* did not

extend the right to privacy to prison inmates). District courts in this Circuit, following *Powell,* have concluded that *Doe* did not clearly establish an inmate's right to privacy about his condition. *See Gill v. Defrank,* No. 98 Civ. 7851, 2000 U.S. Dist. LEXIS 9122, at *6 (S.D.N.Y. June 30, 2000) (granting qualified immunity to prison staff who disclosed an inmate's HIV status in May 1997); *Leon v. Johnson,* 96 F.Supp.2d 244, 253 (W.D.N.Y.2000) (granting qualified immunity to prison staff who disclosed an inmate's HIV status in 1996 and 1997).

**\*6** Petty rightly points out that before September 1996, several district courts in this Circuit had held that inmates are constitutionally protected from the unwarranted disclosure of their HIV status. *E.g. Nolley v. County of Erie,* 776 F.Supp. 715, 731 (W.D.N.Y.1991); *Rodriguez v. Coughlin,* No. 87 Civ. 1577, 1989 U.S. Dist. LEXIS 15898, at *10 (W.D.N.Y. Jun. 2, 1989); *Doe v. Coughlin,* 697 F.Supp. 1234, 1237-38 (N.D.N.Y.1988). However, these cases pre-date the disclosure at issue in *Powell,* which, according to the *Powell* Court, did not violate a clearly established right. Further, even without *Powell,* the district court decisions cited by Petty cannot themselves "clearly establish" a disputed constitutional right. *See Quinones v. Howard,* 948 F.Supp. 251, 254 (W.D.N.Y.1996) ("District court decisions, by themselves, do not 'clearly establish' the disputed constitutional issue." (quoting *Hawkins v. Steingut,* 829 F.2d 317, 321 (2d Cir.1987)). Finally, before *Powell* was decided, not all district courts had agreed on the existence and scope of an inmate's right to preserve the confidentiality of his HIV status. *Compare Nolley,* 776 F.Supp. at 731 (concluding that inmates are constitutionally protected from the unwarranted disclosure of their HIV status), *and Rodriguez,* 1989 U.S. Dist. LEXIS at *10 (same), *with Baez v. Rapping,* 680 F.Supp. 112, 115 (S.D.N.Y.1988) (finding no constitutional violation where a prison doctor warned the staff at a prison to avoid contact with the bodily fluids of the plaintiff), *and Cordero v. Coughlin,* 607 F.Supp. 9, 10-11 (S.D.N.Y.1984) (finding no constitutional violation where HIV-positive inmates were segregated from the general prison population). If district courts are unable to agree on the existence and scope of a right, that right cannot be "clearly established." *Richardson v. Selsky,* 5 F.3d 616, 623 (2d Cir.1993).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31458240 (S.D.N.Y.), 24 NDLR P 284

(Cite as: 2002 WL 31458240 (S.D.N.Y.))

Because the disclosures regarding Petty's HIV status were made before *Powell* was decided, defendants are entitled to qualified immunity for every breach of privacy claim in the complaint arising from an allegation of unlawful disclosure. This conclusion requires little analysis with regard to the allegations that prison officials told one another about Petty's status in the context of their official duties. To the extent that an inmate's privacy right was recognized at all before September 1996, the right protected prison inmates from unnecessary disclosures to their peers, not disclosures to prison staff during the ordinary course of prison business. *See Rodriguez,* 1989 U.S. Dist. LEXIS, at *10-11 ("Such right precluded New York's corrections officers from disclosing *to other inmates* that he suffers from AIDS." (emphasis added)).

However, the allegation that on September 18, 1996, Sgt. Wilk and C.O. Amora taunted Petty about his HIV status in the Special Housing Unit presents a closer question. (*See* Compl. ¶ 14; Pl.'s Opp'n ¶ 14) In the one case in this district decided before *Powell* in which a corrections officer was not granted qualified immunity for disclosing an inmate's HIV status, *Colon v. Arrabito,* No. 91 Civ. 7146, 1998 U.S. Dist. LEXIS 8484 (S.D.N.Y. Jun. 9, 1998), the plaintiff alleged that a corrections officer snatched her HIV medication from her hand and held it up for others in the prison to see. Rejecting the defendant's plea for qualified immunity, the court found that the inmate had a clearly established right to privacy under the Second Circuit's decision in *Doe* and that the officer could not have reasonably believed that taunting an inmate about his medical condition was lawful. *See id.* at *14 ("The law does not sanction behavior such as 'waving' the plaintiff's medication and pulling it out of her reach 'several times' after beckoning her to retrieve it, 'all the while laughing.' There is no security reason justifying such behavior.").

**\*7** Although the Court's reasoning in *Arrabito* is compelling in the setting of a gratuitous disclosure of a prisoner's medical status, *Arrabito* cannot be reconciled with *Powell,* which, in contrast to *Arrabito,* found that *Doe* did not "clearly establish" a prisoner's right to maintain the confidentiality of his medical records. *See Powell,* 175 F.3d at 113 ("This Court's controlling precedent on the right to maintain the confidentiality of medical information issued in 1994 ... did not address the

applicability of that right to prison inmates."). *Powell* itself, moreover, dealt with a gratuitous disclosure of an inmate's HIV status, *id.* at 112, and yet the Court indicated that *Doe* would not preclude qualified immunity even if it had been decided before the gratuitous disclosure, *id.* at 113. Ultimately, no meaningful distinction can be drawn between the gratuitous disclosure in *Powell,* for which the *Powell* Court granted the defendants in that case qualified immunity, and the alleged behavior of Sgt. Wilk and C.O. Amora on September 18, 1996. Thus, defendants are entitled to qualified immunity for every breach of privacy claim arising from the alleged disclosure of Petty's HIV status, including the disclosure in SHU on September 18.

IV.

Petty's Eighth Amendment claim, like his privacy claim, would have to be dismissed even if Petty had exhausted all available remedies. In order to maintain an Eighth Amendment claim on the ground that a defendant's actions constituted deliberate indifference to a substantial risk of harm by other inmates, a prisoner must make two showings. First, the prisoner must show that, in objective terms, the constitutional violation was "sufficiently serious such that [it] denied [him] the minimal civilized measure of life's necessities." *Dawes v. Walker,* 239 F.3d 489, 493-94 (2d Cir.2001) (internal quotation marks omitted). Second, "because 'only the unnecessary and wanton infliction of pain implicates the Eighth Amendment,' the prisoner must assert facts indicating that the responsible prison official had 'a sufficiently culpable state of mind' amounting to at least deliberate indifference." *Id.* (quoting *Farmer v. Brennan,* 511 U.S. 825, 834 (1994)).

Petty has failed to allege facts sufficient to support the objective component of this inquiry. In *Dawes,* the inmate plaintiff alleged that two corrections officers called him an "informant" and a "rat." The Second Circuit held that that allegation, even if assumed to be true, could not support an inference that the plaintiff faced a serious threat of harm. The *Dawes* Court stressed that in the absence of any factual allegations of physical violence or threats of physical violence, the plaintiff "failed to make the requisite showing required to support the objective element of his Eighth Amendment claim." *See Dawes,* 239 F.3d at 494. Correspondingly, here, Petty does not allege that he was attacked by other inmates or threatened in any

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31458240 (S.D.N.Y.), 24 NDLR P 284

(Cite as: 2002 WL 31458240 (S.D.N.Y.))

way with physical violence as a result of defendants' disclosures of his HIV status.[FN3] Although the gratuitous disclosure of an inmate's HIV status can constitute an Eighth Amendment violation where the disclosure "place[s][an] inmate in harm's way," *Powell, 175 F.3d at 115, Dawes* bars the prosecution of an Eighth Amendment claim under the present circumstances.

> FN3. Plaintiff's allegation that corrections officers knocked him to the ground on October 13, 1996 does not suffice, because plaintiff does not allege that these officers knew about or were motivated by plaintiff's HIV status. Indeed, plaintiff states that the officers were subsequently told not to handcuff Petty because he had AIDS. (Compl.¶ 19)

## V.

**\*8** The claims against Medical Director John Doe # 3 and Commissioner Goord are barred on yet another ground: These defendants were not personally involved in the alleged violations of Petty's constitutional rights. The personal involvement of a supervisory defendant may be shown by presenting evidence of one of the following: (1) the defendant participated directly in the alleged constitutional violation; (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong; (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom; (4) the defendant was grossly negligent in supervising subordinates who committed wrongful acts; or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. *Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir.1995).*

Petty alleges that he sent a complaint to both Medical Director John Doe # 3 and Commissioner Goord detailing the breaches of confidentiality by prison staff and the resulting harassment. (*See* Compl. ¶ 7) However, courts in this Circuit, applying the principles laid out in *Colon,* have agreed that receiving a letter from an inmate does not constitute sufficient personal involvement to generate supervisory liability. *See Sealey v. Giltner, 116 F.3d 47, 51 (2d Cir.1997)* (dismissing prisoner suit against DOCS

Commissioner Coughlin because his personal involvement in the events at issue consisted of receiving two letters from the plaintiff); *Garvin v. Goord, 212 F.Supp.2d 123, 126 (S.D.N.Y.2002)* (finding that Goord could not be held liable just because an inmate mailed letters to his office); *Woods v. Goord,* No. 01 Civ. 3255, 2002 U.S. Dist. LEXIS 7157, at \*24 (S.D.N.Y. Apr. 24, 2002) ("Receipt of letters or grievances ... is insufficient to impute personal involvement."); *Walker v. Pataro,* No. 99 Civ. 4607, 2002 U.S. Dist. LEXIS 7067, at \*42 (S.D.N.Y. Apr. 23, 2002) ("[W]here a supervisory official like the Commissioner of Corrections or a prison Superintendant receives letters or similar complaints from an inmate and does not personally respond, the supervisor is not personally involved and hence not liable."); *Richardson v. Hillman, 201 F.Supp.2d 222, 231 (S.D.N.Y.2002)* (dismissing claim against prison inspector who did not respond to plaintiff's letters); *Salahuddin v. Mead,* No. 95 Civ. 8581, 2000 U.S. Dist. LEXIS 3932, at \*12-13 (S.D.N.Y. Mar. 30, 2000) ("The receipt of letters alone ... does not constitute sufficient personal involvement to generate supervisory liability").

## VI.

Petty's constitutional claims also must be dismissed in part to the extent that Petty requests compensatory damages. Section 803(d)(e) of the Prisoner Litigation Reform Act ("PLRA"), codified at *42 U.S.C. § 1997e(e),* provides that "[n]o Federal civil action may be brought by a prisoner confined in jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." *42 U.S.C. § 1997e(e) (2000).* The cases that have addressed the issue have agreed that *§ 1997e(e)* bars prisoner suits for compensatory damages resulting from the mental and emotional injury associated with the disclosure of an inmate's HIV status. *See Davis v. Dist. of Columbia, 158 F.3d 1342, 1348 (D.C.Cir.1998)* (declining to grant compensatory damages in suit against prison officials who disclosed the plaintiff's HIV status); *Leon, 96 F.Supp.2d at 250-51* (same). These cases are consistent with *Thompson v. Carter, 284 F.3d 411 (2d Cir.2002),* in which the Second Circuit held that *42 U.S.C. § 1997e(e),* contrary to the view of the Ninth Circuit,[FN4] applies with full force to constitutional torts. *Id.* at 417.

> FN4. For the Ninth Circuit's view, see *Canell v.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31458240 (S.D.N.Y.), 24 NDLR P 284

(Cite as: 2002 WL 31458240 (S.D.N.Y.))

*Lightner,* 143 F .3d 1210, 1213 (9th Cir.1998) ("The deprivation of First Amendment rights entitles a plaintiff to judicial relief wholly aside from any physical injury he can show, or any mental or emotional injury he may have incurred."). Other circuits have not followed *Canell. See Searles v. Van Webber,* 251 F.3d 869, 876 (10th Cir.2001) ("The underlying violation ... should not be divorced from the resulting injury, such as 'mental or emotional injury,' thus avoiding the clear mandate of § 1997e(e)."); *Herman v. Holiday,* 238 F.3d 660, 665 (5th Cir.2001) (using section 1997e(e) to bar an Eighth Amendment claim); *Cassidy v. Ind. Dep't of Corr.,* 199 F.3d 374, 376 (7th Cir.2000) (applying section 1997e(e) to constitutional torts).

*\*9* In *Thompson* the Second Circuit concluded also that § 1997e(e) does not limit the availability of punitive damages for mental or emotional injury, thus avoiding a challenge to the constitutionality of the section. *Id.* at 418-19. Although other circuits have been sharply divided over the question of whether the statute permits punitive and nominal damages, *compare Davis,* 158 F.3d at 1348 (holding that § 1997e(e) draws no distinction between compensatory and punitive damages and therefore bars both) *with Allah v. Al-Hafeez,* 226 F.3d 247, 251 (3d Cir.2000) (concluding that § 1997e(e) does not bar claims for punitive damages), this court is bound by the Second Circuit's decision in *Thompson.* Because Petty has alleged no physical injury resulting from defendants' actions, Petty's plea for compensatory damages is barred under *Thompson.*[FN5]

> FN5. Petty offers an alternative basis for allowing the claim to proceed notwithstanding § 1997e(e). According to Petty, the provision does not apply to the case at bar because, unlike the plaintiffs in *Davis* and *Leon,* he suffered a "prior physical injury" when he contracted the HIV virus at Sing-Sing. (*See* Pl.'s Opp'n ¶ 25) However, Petty has drawn no connection between the "prior physical injury" and defendants' alleged unlawful actions. Without any allegation that a defendant in this action

caused him physical harm, Petty may not recover compensatory damages.

VII.

Finally, Petty claims that disclosure of his HIV status violates state law. In *Baker v. Coughlin,* 77 F.3d 12 (2d Cir.1996), the Second Circuit held that a state prisoner's pendent state law claims against prison officers for intentional tort, negligence, and medical malpractice are barred by Correction Law § 24, which provides that "[a]ny claim for damages arising out of any act done ... in the discharge of the duties of any officer or employee of the [DOCS] shall be brought and maintained in the court of claims as a claim against the state." *Id.* at 14 (*quoting* N.Y. Correct. Law § 24). The court held that section 24, "by its plain terms, precludes the assertion of claims against corrections officers in any court, including the federal courts." *Id.* at 15. To the extent that Petty's state law claims are brought against defendants in their individual capacities, the claims are barred by section 24.

VIII.

To the extent that Petty's claims are brought against defendants in their official capacities, the claims are barred by the Eleventh Amendment of the United States Constitution. *See Huang v. Johnson,* 251 F.3d 65, 70 (2d Cir.2001). However, contrary to defendants' assertion, plaintiff's complaint as a whole is not barred by the Eleventh Amendment.

The Eleventh Amendment provides that "the Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. An unconsenting state is immune from suits in federal court brought even by its own citizens. *See Edelman v. Jordan,* 415 U.S. 651, 662-63 (1974). Moreover, because such immunity extends to state agencies and officers who act on behalf of the state, *see P.R. Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 144-47 (1993), where the state is the real party in interest, the Eleventh Amendment bars suits against state officials. *See Huang,* 251 F.3d at 69-70 (citing *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 101-02 (1984).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31458240 (S.D.N.Y.), 24 NDLR P 284

(Cite as: 2002 WL 31458240 (S.D.N.Y.))

**\*10** Here, Petty has sued the defendants both in their official and individual capacities. (*Compl.,* § V(viii) (asking that "each defendant be held liable in their Individual and Official Capacity")). To the extent that Petty has sued defendants in their official capacities, the state is the real party in interest, and Petty's claims are barred. *See Huang,* 251 F.3d at 70. However, the Eleventh Amendment does not apply insofar as defendants are sued in their individual capacities. *See id.* (noting that the state does not become the real party in interest simply because it will bear the cost of a judgment against the individual defendants); *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) (finding that the defendant could be sued in his individual capacity for carrying out policies promulgated by the state of New York); *Gomez v. Kaplan,* No. 94 Civ. 3292, 2000 U.S. Dist. LEXIS 14239, at *42 (S.D.N.Y. Sept. 29, 2000) ("[T]he Eleventh Amendment does not provide any immunity to Defendants insofar as they are sued in their individual capacities."). The Eleventh Amendment, therefore, offers an alternative ground to dismiss the complaint, and the state law claim in particular, to the extent that Petty sues defendants in their official capacities.

For the reasons stated above, defendants' motion is granted, and the complaint is dismissed. Petty's constitutional claims against all defendants are dismissed under 42 U.S.C. § 1997e(a). Alternatively, Petty's privacy claim is dismissed under the doctrine of qualified immunity and Petty's Eighth Amendment claim is dismissed for failure to state a claim. Petty's pendent state law claim is dismissed under Correction Law § 24 to the extent that it is brought against defendants in their individual capacities and under the Eleventh Amendment to the extent that it is brought against defendants in their official capacities. Finally, Petty's claims against Commissioner Goord and John Doe # 3 are dismissed also for lack of personal involvement, and his demand for compensatory damages is stricken under 42 U.S.C. § 1997e(e).

S.D.N.Y.,2002.

Petty v. Goord
Not Reported in F.Supp.2d, 2002 WL 31458240 (S.D.N.Y.), 24 NDLR P 284
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2002 WL 1392164 (S.D.N.Y.), 24 NDLR P 61

(Cite as: 2002 WL 1392164 (S.D.N.Y.))

**H**

United States District Court, S.D. New York.

Abdul SHARIFF, Mark Bartley, Jamal Stephenson, David Gobern, Lewis Purcell, Sam Johnson, Terence Stevens, Stephen Gowins, and Abdul Suluk, Plaintiffs,
v.
Philip COOMBE, Commissioner of New York State Docs; Glen Goord, Acting Commissioner; Christopher Artuz, Superintendent of Green Haven Corr. Facility; Gail Haponic, Acting Deputy of Admin. of Green Haven; Roger Maines, Supervisor of Green Haven; M. Muller, Maintenance Supervisor of Green Haven, individually and in their official capacities, and the State of New York, Defendants.
No. 96 Civ. 3001(BSJ).

June 26, 2002.
*Memorandum & Order*

JONES, J.

## I. INTRODUCTION

**\*1** Plaintiffs, nine disabled prisoners who depend on wheelchairs for mobility, bring this action against the State of New York and six individuals employed by the New York State Department of Correctional Services ("DOCS") in an administrative capacity. Those six individuals, who are sued both in their individual and in their official capacities, are two former DOCS Commissioners and four administrators at Green Haven Correctional Facility ("Green Haven"), including the Superintendent, the former Plant Superintendent, a Deputy Superintendent, and a Maintenance Supervisor. Plaintiffs seek both injunctive and monetary relief for conditions affecting disabled inmates at Green Haven. The gravamen of the Fourth Amended Complaint [FN1] is that the conditions at Green Haven amount to unlawful discrimination against disabled inmates. These conditions allegedly violate (1) Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.;* (2) Title V of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794 *et seq.;* (3) Section 70 of the New

York State Correction Law; and (4) the Eighth and Fourteenth Amendments of the Constitution pursuant to 42 U.S.C. § 1983.

> FN1. Unless otherwise noted, references to the "Fourth Amended Complaint" refer to Plaintiffs' most recent Complaint, the Fourth Amended Complaint dated September 29, 1998.

Defendants move for summary judgment on several grounds pursuant to Federal Rule of Civil Procedure 56. Due to changes in the legal standards applicable to Plaintiffs' claims and the facts relevant to the issues of injunctive relief, exhaustion, and prior adjudication, the court must reserve decision on some issues at this time. In such circumstances, the court has identified issues for additional briefing by the parties in a second round of dispositive motions. Indeed, the complexity of those and other issues applicable to Plaintiffs' remaining claims may require a hearing for proper resolution. For the reasons stated below, Defendants' Motion for Summary Judgment is GRANTED in part and DENIED in part without prejudice to renew.

## II. CLAIMS FOR INJUNCTIVE RELIEF

Any Plaintiff who is no longer incarcerated at Green Haven is barred from asserting a claim for injunctive relief regarding conditions at Green Haven. *See Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996) ("It is settled in this Circuit that a transfer from a prison facility moots an action for injunctive relief against the transferring facility.") (citing cases). Plaintiffs Bartley, Gobern, Johnson, Purcell, Stevens, and Suluk are no longer incarcerated at Green Haven. Therefore, the court dismisses with prejudice all claims for injunctive relief brought by those six Plaintiffs.

Plaintiffs are not entitled to injunctive relief for those claims that are now moot because they have been addressed by prison officials. *See Prins v. Coughlin,* 76 F.3d 504, 506; *see also Farmer v. Brennan,* 511 U.S. 825, 846 (1994). Plaintiffs' injunctive claims as to the A & B yard have been rendered moot because Defendants have "repaired and repaved" this yard. (*See, e.g.,* Pls.' Mem. of

Not Reported in F.Supp.2d, 2002 WL 1392164 (S.D.N.Y.), 24 NDLR P 61

(Cite as: 2002 WL 1392164 (S.D.N.Y.))

Law in Opp'n to Defs.' Mot. for Summ. J. at 11.) Accordingly, all Plaintiffs, but particularly Plaintiffs Shariff and Stephenson, are precluded from seeking injunctive relief as to the conditions of the A & B yard that have been repaired, and the court dismisses those claims with prejudice.

**\*2** In light of the changes in both Plaintiffs' circumstances and the conditions at Green Haven that have occurred since this motion was filed, the court has been unable to address Plaintiffs' remaining claims for injunctive relief. For example, when this motion was filed, numerous repairs and renovations were scheduled for Green Haven. (*See* Turbin Aff. Ex. E.) If any such repairs were, in fact, conducted, Plaintiffs' claims for injunctive relief concerning those repairs would also be mooted. The court directs the parties to address these issues, as well as other changes in the facts of this case that may affect the viability of Plaintiff's claims for injunctive relief, in the additional briefing ordered by the court.

### III. CLAIMS FOR MONETARY RELIEF

#### A. CLAIMS UNDER 42 U.S.C. § 1983

Absent express statutory abrogation or consent by a state to suit, the Eleventh Amendment bars suits brought in federal court against a state by citizens of another state or the state's own citizens. *See Kimel v. Florida Bd. of Regents,* 528 U.S. 62, 72-73 (2000); *Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 54 (1996). Section 1983 does not abrogate a state's immunity, *Quern v.. Jordan,* 440 U.S. 332, 343-45 (1979), and New York has not consented to suit in federal court, *Trotman v. Palisades Interstate Park Comm'n,* 557 F.2d 35, 38-40 (2d Cir.1977). State employees sued in their official capacities are also immune from suits for monetary damages under the Eleventh Amendment in cases where the state is the real party in interest. *See Al- Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989). Moreover, "[s]tates[ ] and state officers, if sued in their official capacities for retrospective relief ... are not 'persons' subject to suit under § 1983." *K & A Radiologic Tech. Services, Inc. v. Commissioner of Dep't of Health,* 189 F.3d 273, 278 (2d Cir.1999). Therefore, the court dismisses Plaintiffs' claims for monetary relief pursuant to § 1983 against the State of New York and the other six

Defendants in their official capacities.

#### B. THE ADA AND THE REHABILITATION ACT [FN2]

> [FN2]. The ADA, which was adopted in 1992 and covers individuals and entities that do not receive federal funds, is broader in scope than the Rehabilitation Act, which was adopted in 1973 and is limited to programs receiving financial assistance from the federal government. *See Kilcullen v. New York State Dep't of Labor,* 205 F.3d 77, 79 n. 1 (2d Cir.2000).

Neither Title II of the ADA nor Section 504 of the Rehabilitation Act provides for suits against state officials in their individual capacities. *Garcia v. S.U.N.Y. Health Sci. Ctr. of Brooklyn,* 280 F.3d 98, 107 (2d Cir.2001) (collecting cases). Therefore, the court dismisses with prejudice Plaintiffs' claims under the ADA and the Rehabilitation Act against the six individual Defendants in their individual capacities.

The legal standards applicable to Plaintiffs' claims under the ADA and the Rehabilitation Act against the State of New York and the other six Defendants in their official capacities have changed during the pendency of this motion. The changes in the law render much of Defendants' briefing on these claims inapplicable. The court directs the parties to brief Plaintiffs' remaining claims under the ADA and the Rehabilitation Act in light of the standards set forth in *Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn,* 280 F.3d 98 (2d Cir.2001). *See also Harris v. New York State Dep't of Health,* No. 01 Civ. 3343, 2002 WL 726659, at \*27-\*31 (S.D .N.Y. Apr. 24, 2002) (applying the standards set forth in *Garcia* ).

#### C. STATE LAW CLAIMS

**\*3** Plaintiffs raise state law claims alleging that Defendants have failed to fulfill their duties under Section 70 of the New York State Correction Law. The court dismisses Plaintiffs' claims under Section 70 against the State of New York and the six other defendants in both their personal and their official capacities for lack of subject matter jurisdiction pursuant to New York State Correction Law Section 24 and the Eleventh Amendment. *See Baker v. Coughlin,* 77 F.3d 12, 14-15 (2d Cir.1996).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 1392164 (S.D.N.Y.), 24 NDLR P 61

(Cite as: 2002 WL 1392164 (S.D.N.Y.))

## IV. OTHER ARGUMENTS CONCERNING PLAINTIFFS' REMAINING CLAIMS

### A. EXHAUSTION OF ADMINISTRATIVE REMEDIES

In their Motion for Summary Judgment, Defendants argue that Plaintiffs' claims must be dismissed for failure to exhaust administrative remedies. Under 42 U.S.C. § 1997e(a), as amended by the Prison Litigation Reform Act of 1996 ("PLRA") on April 26, 1996, no action brought by a prisoner pertaining to prison conditions may be brought until all available administrative remedies are exhausted. *Porter v. Nussle,* 122 S.Ct. 983, 988 (2002); *see* 42 U.S.C. § 1997e(a) (Supp.2000) (as amended by PLRA § 803). While the mandatory exhaustion requirement of the PLRA does not apply retroactively, any claim filed after April 26, 1996, must be exhausted administratively before it may be raised in federal court. *See Salahuddin v. Mead,* 174 F.3d, 272, 275 (2d Cir.1999); *Blissett v. Casey,* 969 F.Supp. 118, 125 (N.D.N.Y.1997).

The court denies without prejudice to renew that portion of Defendants' motion seeking dismissal of Plaintiffs' claims for failure to exhaust administrative remedies. The court reserves final decision on the issues raised by Defendants' arguments relating to exhaustion for three reasons. First, the issue of exhaustion was briefed insufficiently by the parties to permit the court to rule. Specifically, the court requires a detailed, plaintiff-by-plaintiff analysis of the exhaustion requirements applicable to each claim and the actions taken by each Plaintiff. Second, the court recognizes that Plaintiffs may have pursued additional administrative remedies during the pendency of this motion. Third, changes in the law since briefing was submitted on this motion have clarified the exhaustion requirements applicable to each Plaintiff's claims. Depending on the exhaustion requirements applicable to each claim and the actions taken by individual Plaintiffs to pursue administrative relief, the court may lack jurisdiction over some of Plaintiffs' remaining claims. The court notes the following as guidance for the parties in fashioning future arguments:

Plaintiff Shariff's initial *pro se* Complaint was filed on February 27, 1996; therefore, the claims he alleged therein are not subject to mandatory exhaustion. Nevertheless, the court retains discretion and may require exhaustion with respect to the pre-PLRA claims raised by Plaintiff Shariff under certain circumstances. *See* 42 U.S.C. § 1997e(a) (1994) (amended 1996). The court expressly leaves open the questions of whether the court should, in its discretion, require exhaustion as to Plaintiff Shariff's claims and whether Plaintiff Shariff did, in fact, pursue administrative remedies with respect to the claims raised in this case.[FN3]

> FN3. Additionally, the parties have not addressed the question of whether any claims raised by Shariff in amendments to the initial Complaint filed after April 26, 1996, should be subject to the mandatory exhaustion requirements of the PLRA. The court reserves decision as to that issue.

**\*4** The other eight Plaintiffs first included their claims as part of the multiple amended complaints filed in this case after the exhaustion provisions were amended in 1996. Thus, it seems likely to the court that those eight Plaintiffs are required to have exhausted their claims prior to filing them in federal court. *Cf. Farber v. Wards Co., Inc.,* 825 F.2d 684, 689 (2d Cir.1987) (noting that "Rule 15(c) governs the 'relation back' of amended pleadings only for the purpose of the statute of limitations"). "Rule 15(c) does not exist merely to keep the door open for any tardy plaintiff.... Rather, Rule 15(c) stands as a remedial device for adding or substituting a party who 'but for a mistake concerning the identity of the proper party' would have been named originally." *Morin v. Trupin,* 778 F.Supp. 711, 735 (S.D.N.Y.1991). Thus, the decision by the other eight Plaintiffs, who raise many claims distinct from those initially filed by Plaintiff Shariff in his *pro se* Complaint, to file their claims as part of this case rather than filing their own lawsuits is unlikely to have obviated the PLRA's mandatory exhaustion requirement with respect to their claims. Since this issue has not been addressed in the light of current case law, the court reserves decision on this issue as well.

### B. PRIOR ADJUDICATION

When briefing was submitted on this motion, some of Plaintiffs' claims already had been adjudicated or were

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 1392164 (S.D.N.Y.), 24 NDLR P 61

(Cite as: 2002 WL 1392164 (S.D.N.Y.))

pending in other fora. (Defs.' Reply Mem. for Summ. J., Table C.) Defendants argue for dismissal of Plaintiffs' claims on the basis of such prior adjudication, which may preclude Plaintiffs from raising those claims in this court. *See Harris v. New York State Dep't of Health,* No. 01 Civ. 3343, 2002 WL 726659 (S.D.N.Y. Apr. 24, 2002) (discussing interaction between preclusion rules and abstention doctrines). Once again, the court has not been provided with enough detail of the claims raised by Plaintiffs in other proceedings to determine whether preclusion rules, abstention doctrines, or principles concerning double recoveries would bar any of the claims raised in the Fourth Amended Complaint, and Defendants have not addressed those topics substantively in their briefing on this motion. Thus, the court denies without prejudice to renew Defendants' motion to dismiss Plaintiffs' claims as a result of prior adjudication.

### C. PRIOR PHYSICAL INJURY REQUIREMENT

Pursuant to 42 U.S.C. § 1997e(e), "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." Claims by prisoners brought pursuant to § 1983 for emotional damages unrelated to any physical injuries are subject to dismissal. *See, e.g., Dawes v. Walker,* 239 F.3d 489, 494 (2d Cir.2001) (finding failure to make an objective showing of actual injury necessary to state an Eighth Amendment claim based on prison conditions); *Siglar v. Hightower,* 112 F.3d 191, 193-94 (5th Cir.1997) (finding bruised ear an insufficient physical injury to overcome bar of § 1997e(e)); *Zehner v. Trigg,* 952 F.Supp. 1318, 1322-23 (S.D.Ind.) (dismissing claim based on prisoners' exposure to asbestos), *aff'd* 133 F.3d 459, 461 (7th Cir.1997); *Brazeau v. Travis,* No. 96 CV 783, 1996 WL 391701, at *1 (N.D.N.Y. July 9, 1996) (holding that claim for emotional damages caused by delay in receipt of parole hearing transcript was barred by § 1997e(e)).

**\*5** The absence of a physical injury does not constitute a total bar to claims by prisoners under § 1983, since application of § 1997e(e) does not bar claims for nominal damages, punitive damages, or declaratory or injunctive relief. *Wagnoon v. Gatson,* 00 Civ. 3722 and 99 Civ. 5872, 2001 U.S. Dist. LEXIS 8417, at *12-*13 (June 25, 2001). Nevertheless, Plaintiffs' claims for

compensatory damages relating to non-physical accidents, particularly those raised by Plaintiffs Gobern, Johnson, and Purcell, may not meet the physical injury requirement of the PLRA. The court expressly leaves open the question of whether any Plaintiff can meet the prior physical injury requirement, which has been inadequately briefed on a plaintiff-by-plaintiff basis. Indeed, Defendant raises this issue only briefly in the context of argument presented as to the standard applicable to claims of a deprivation of rights under the Eighth Amendment. (*See* Defs.' Mem. of Law in Supp. of Mot. for Summ. J. at 30-31.)

### V. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED in part and DENIED in part without prejudice to renew. The following claims raised in the Fourth Amended Complaint are dismissed with prejudice: claims by Plaintiffs Bartley, Gobern, Johnson, Purcell, Stevens, and Suluk for injunctive relief; all claims for injunctive relief as to the conditions of the A & B yard that have been repaired; all claims against the State of New York and the other six Defendants in their official capacities for monetary relief pursuant to § 1983; all claims against the six individual Defendants in their individual capacities pursuant to the ADA and the Rehabilitation Act; and all claims against all Defendants under Section 70 of the New York State Correction Law. The remainder of Defendants' Motion for Summary Judgment is denied without prejudice to renew.

The court directs the parties to appear before the court for a conference at 3:00 p.m. on Tuesday, July 2, 2002, prepared to discuss Plaintiffs' remaining claims and current conditions at Green Haven. If Defendants choose to submit additional briefing, such briefing must be submitted as a renewed motion for summary judgment filed within thirty days of the date of this Memorandum and Order.

SO ORDERED:

S.D.N.Y.,2002.

Shariff v. Coombe
Not Reported in F.Supp.2d, 2002 WL 1392164 (S.D.N.Y.), 24 NDLR P 61

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 1392164 (S.D.N.Y.), 24 NDLR P 61

(Cite as: 2002 WL 1392164 (S.D.N.Y.))

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2003 WL 22211500 (S.D.N.Y.)

(Cite as: 2003 WL 22211500 (S.D.N.Y.))

C

Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.
Robert ARROYO, Plaintiff,
v.
THE CITY OF NEW YORK, N.Y.C. Department of
Correction, Hospital Administrator, C-73, St. Barnabas
Hospital Administrator, Dr. "John" Mohammad, First
name being fictitious, real name being unknown, Dr.
Harjinger Bhatti, Dr. Jude Aririguzo, Dr. "John"
August, First name being fictitious, real name being
unknown, Dr. Jean Valcourt, Dr. "John Doe", Full name
being fictitious, real name being unknown, Dr. Sung
Kim, Dr. Ye Hum Kim, the New York City Health and
Hospitals Corporation, St. Barnabus Hospital, St.
Barnabus Correctional Health Systems, Inc., the New
York City Correctional Health Services, the New York
City Department of Health, Defendants.
No. 99 Civ.1458(JSM).

Sept. 25, 2003.

Inmate brought a § 1983 suit, alleging that violation
of his Eighth Amendment right to be free from cruel and
unusual punishment in connection with an eight-month
delay of allegedly necessary surgery for an inguinal
hernia. On a defense motion for summary judgment, the
District Court, Martin, J., held that: (1) inmate failed to
exhaust his administrative remedies, and (2) in any event,
the alleged delay did not amount to cruel and unusual
punishment.

Motion granted.

West Headnotes

[1] Civil Rights 78 ☜    1311

78 Civil Rights

78III Federal Remedies in General

78k1306 Availability, Adequacy, Exclusivity, and
Exhaustion of Other Remedies
78k1311 k. Criminal Law Enforcement; Prisons.
Most Cited Cases
Inmate, in failing to renew his grievance or otherwise
seek to use an extensive inmate grievance resolution
program in place at correctional facility, did not exhaust
his administrative remedies, as required by the Prison
Litigation Reform Act (PLRA), thus barring his § 1983
suit alleging cruel and unusual punishment in connection
with an eight-month delay of allegedly necessary surgery
for an inguinal hernia; even if he initially thought that he
had been promised prompt surgery after his informal
grievance review, shortly thereafter he obviously knew
that surgery had not been performed, or even scheduled,
and he presented no explanation as to why he did not at
least inquire as to why surgery that he allegedly thought he
had been promised had not been forthcoming. 42 U.S.C.A.
§ 1983; Civil Rights of Institutionalized Persons Act, §
7(a), as amended, 42 U.S.C.A. § 1997e(a).

[2] Prisons 310 ☜    192

310 Prisons

310II Prisoners and Inmates
310II(D) Health and Medical Care
310k191 Particular Conditions and Treatments
310k192 k. In General. Most Cited Cases
(Formerly 310k17(2))
Sentencing and Punishment 350H ☜    1546

350H Sentencing and Punishment

350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1546 k. Medical Care and Treatment.
Most Cited Cases
Alleged eight-month delay of allegedly necessary
surgery for an inmate's inguinal hernia did not amount to
cruel and unusual punishment under the Eighth
Amendment; the hernia was not a serious enough
condition to satisfy the objective prong of the test, and as

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22211500 (S.D.N.Y.)

(Cite as: 2003 WL 22211500 (S.D.N.Y.))

to the subjective prong, all that the inmate alleged was negligence. U.S.C.A. Const. Amend. 8.

OPINION & ORDER

MARTIN, J.

**\*1** Plaintiff Robert Arroyo brings this action pursuant to 42 U.S.C. § 1983, alleging that Defendants violated his Eighth Amendment right to be free from cruel and unusual punishments by delaying for eight months allegedly necessary surgery for an inguinal hernia. Defendants have moved for summary judgment on various grounds, including Plaintiff's failure to exhaust administrative remedies, the failure to proffer evidence of deliberate indifference to Plaintiff's serious medical needs, the lack of personal involvement by the individual Defendants, qualified immunity, the failure to plead an unconstitutional pattern or practice by the municipal Defendants, the fact that the Department of Corrections and Correctional Health Services are agencies that may not be sued, and, to the extent that Plaintiff implies that he may have claims under state law, the failure to file a notice of claim.

*Failure to Exhaust Administrative Remedies*

[1] The Prison Litigation Reform Act, 42 U.S.C. § 1997e(a) provides that a prisoner may not bring an action pursuant to 42 U.S.C. § 1983 or any other Federal law until he has exhausted any available administrative remedies. In this case, Plaintiff failed to pursue his administrative remedies, and for that reason alone, this action must be dismissed.

In October 1998, Plaintiff filed a grievance stating that he had been denied surgery for a hernia that caused him great pain and suffering. His complaint was heard in a first level informal proceeding, in which it was proposed that it be resolved as follows:

"On 10/26/98 the IGRC contacted the Clinic Manger. Grievant will be called down to have an examination. Action requested is accepted."

Plaintiff accepted this resolution, and was further examined in the clinic at Riker's Island. When that examination resulted only in further non-surgical interventions, and he was not scheduled promptly for surgery, he did not renew his grievance or otherwise seek

to use the extensive five step inmate grievance resolution program that is in place at Riker's Island. His failure to do so precludes this action, despite his claim that it would have been irrational for him to appeal what he perceived to be a favorable result. Even if Plaintiff though that he had been promised prompt surgery after his informal grievance review, shortly thereafter he obviously knew that surgery had not been performed, or even scheduled. He presents no explanation as to why he did not at least inquire as to why surgery that he allegedly thought he had been promised had not been forthcoming.

*Denial of Medical Care*

[2] Even if Plaintiff had exhausted his administrative remedies, he has not sufficiently stated a claim for violation of the Eighth Amendment. In order to state a claim for an unconstitutional denial of medical care, a plaintiff must prove "deliberate indifference" to his serious medical needs. Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). The deliberate indifference standard has both an objective and a subjective component. First, the alleged condition must be objectively "sufficiently serious." Such seriousness has been defined as "a condition of urgency, one that may produce death, degeneration, or extreme pain." Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir.1994), cert. denied, 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). Subjective complaints of pain are not sufficient to satisfy this standard. *Espinal v. Coughlin*, 98 Civ. 2579 (RPP), 2002 U.S. Dist. LEXIS 20, \*9 (S.D.N.Y. Jan. 2, 2002); *Chatin v. Artuz*, No. 95 Civ. 7994(KTD), 1999 U.S. Dist. LEXIS 11918, \*11 (S .D.N.Y. Aug. 4, 1999), *aff'd,* 2002 U.S.App. LEXIS 86 (2002) ("[Plaintiff's] alleged problems in his right foot may indeed be very real. His pain is not, however, of the type contemplated for satisfaction of the objective standard." (citing Liscio v. Warren, 901 F.2d 274, 277 (2d Cir.1990)). Second, the Defendant must:

**\*2** know of and disregard an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Hathaway v. Coughlin, 37 F.3d at 66 (2d Cir.1994)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22211500 (S.D.N.Y.)

(Cite as: 2003 WL 22211500 (S.D.N.Y.))

(quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 1979, 128 L.Ed.2d 811 (1994)).

Charges that amount only to allegations of malpractice, and mere disagreements with respect to the quality of medical care do not state an Eighth Amendment claim. *Estelle v. Gamble,* 429 U.S. at 105-06, 97 S. Ct at 292 ("Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). *See also Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998); *Espinal v. Coughlin,* 2002 U.S. Dist. LEXIS 20, *10; *Brown v. McElroy,* 160 F.Supp.2d 699, 705-06 (S.D.N.Y.2001); *Culp v. Koenigsmann,* 99 Civ. 9557(AJP), 2000 U.S. Dist. LEXIS 10168, *32 (S.D.N.Y. July 19, 2000). Accordingly, a delay in treatment does not violate the Eighth Amendment unless it involves an act or a failure to act that evinces "a conscious disregard of a substantial risk of serious harm." *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998)); *Espinal v. Coughlin,* 2002 U.S. Dist. LEXIS 20, *9 ("The Second Circuit has 'reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment, ignored a 'life-threatening and fast-degenerating' condition for three days, or delayed major surgery for over two years.").

Application of the deliberate indifference standard to the facts of this case makes clear that summary judgment must be granted in favor of the Defendants. First, Plaintiff's inguinal hernia was not objectively a "serious" enough condition to satisfy the objective prong of the test. In *Gonzalez v. Greifinger,* No. 95 Civ. 7932(RWS), 1997 U.S. Dist LEXIS 18677, *7 (S.D.N.Y. Nov. 22, 1997), the Court found that an 11 month delay in surgically repairing the plaintiff's umbilical hernia, followed by surgery that resulted in complications, failed to satisfy the constitutional serious medical need standard.

Other courts have found objectively insufficient claims relating to a toothache, *Tyler v. Rapone,* 603 F.Supp. 268, 271-72 (E.D.Pa.1985), a broken finger, *Rodriguez v. Joyce,* 693 F.Supp. 1250, 1252-53 (D.Me.1988), and pain in the knee, *Espinal v. Coughlin,*

2002 U.S. LEXIS 20, *9. *See also Abdul-Akbar v. Dept. of Corrections,* 910 F.Supp. 986, 1006 (D.Del.1995), *aff'd,* 111 F.3d 125 (3rd Cir.), *cert. denied,* 522 U.S. 852, 118 S.Ct. 144, 139 L.Ed.2d 91 (1997) ("It is questionable whether a hernia is a 'serious medical need.' ").

In this case, Plaintiff's condition was not "one of urgency that may produce death, degeneration, or extreme pain," and was far less serious than the types of conditions that have been found to constitute "serious medical needs." Plaintiff has not alleged, let alone presented evidence to show, that his condition was, at any point, "fast degenerating" or "life threatening," or that Defendants delayed necessary medical treatment in order to punish him.

**\*3** Secondly, with respect to the subjective prong, all that Plaintiff has alleged is negligence. There is no evidence that Plaintiff ever was denied medical treatment. To the contrary, he testified that he was promptly taken to the clinic whenever he asked to be, and it is clear that he was seen in the clinic at Riker's Island more than 30 times during the eight month period at issue here.[FN1] Also, there is ample evidence in the record of attempts to ameliorate Plaintiff's condition without surgery. The hernia, which Plaintiff first noticed 1993, and which was repeatedly diagnosed as a reducible hernia, was reduced at least twice. He was prescribed pain medication, a scrotal support, various trusses, ice packs, elevation, and a surgical consultation was requested. Ultimately, in January 1999, the hernia was surgically repaired at Kings County Medical Center. These interventions were consistent with the diagnosis made and treatment prescribed at Beth Israel Hospital one month before Plaintiff was incarcerated. There too he was diagnosed with an "easily reducible RIH [right inguinal hernia]," and told to purchase a scrotal support, or truss, for comfort. At that time, he also was given an appointment for a surgical consultation, which he did not attend. [FN2]

> FN1. In addition to treatment for the hernia, Plaintiff was treated for a number of other conditions while incarcerated at Riker's Island. He received medical attention for drug dependency, mental health issues, dyspepsia, heartburn, and ingrown toe nails, and was

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22211500 (S.D.N.Y.)

(Cite as: 2003 WL 22211500 (S.D.N.Y.))

prescribed eyeglasses at the Riker's Island clinic. Thus, there is absolutely no evidence his medical needs were ignored by Defendants.

FN2. Plaintiff's alleged urgent need and desire for surgery is further undercut by his refusal to undergo prescribed surgery for a left inguinal hernia, which was diagnosed and scheduled at the time of the surgical repair of the right inguinal hernia.

Moreover, Plaintiff has not alleged that the hernia became worse,[FN3] or that his general condition deteriorated as a result of the alleged delay in surgery. The evidence also is that, unlike in *Gonzalez v. Greifinger,* 1997 U.S. Dist. LEXIS 18677, the surgery ultimately was performed successfully and without complications.

FN3. His allegation is that the hernia was, at all times, the size of a softball.

Finally, Defendants have presented evidence that attempting to treat a hernia conservatively prior to performing surgery constitutes reasonable medical practice. Plaintiff, on the other hand, did not present any medical opinion testimony to support his argument that it was unreasonable to first attempt to treat his hernia non-surgically, and to resort to surgery only after such methods had failed. *See Culp v. Koenigsmann,* 2000 U.S. Dist. LEXIS 10168, *11. Accordingly, Plaintiff has failed to meet his burden of proof in opposition to Defendants' motion for summary judgment. *Celotex v. Catrett,* 477 U.S. 317, 323-24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Cifarelli v. Village of Babylon,* 25 C.C.P.A. 785, 93 F.2d 47, 51 (2d Cir.1996) ("[M]ere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment."); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995).

It also appears that Plaintiff has not alleged that the municipal Defendants engaged in a pattern or practice of indifference to prisoners' medical needs, as required by *Monell v. Department of Social Services of the City of New York,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037-38, 56 L.Ed.2d 611 (1978); *Batista v. Rodriguez,* 702 F.2d 393,

397 (2d Cir.1983). Nor has Plaintiff alleged any direct participation by Dr. Ye Hum Kim. However, in light of the foregoing, there is no need to address either these issues or the Defendants' claims of qualified immunity. Furthermore, having dismissed all of Plaintiff's federal claims, the Court also will dismiss whatever state law claims he intended to assert pursuant to this Court's supplemental jurisdiction. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

*Conclusion*

**\*4** For the foregoing reasons, Defendants' motion for summary judgment is granted and the Second Amended Complaint is dismissed.

SO ORDERED.

S.D.N.Y.,2003.

Arroyo v. City of New York
Not Reported in F.Supp.2d, 2003 WL 22211500 (S.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 2922805 (N.D.N.Y.)

(Cite as: 2009 WL 2922805 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
David STEPHENSON, Plaintiff,
v.
ALBANY COUNTY POLICYMAKERS, et al.,
Defendants.
Civ. No. 6:09-CV-326 (LEK/RFT).

Aug. 14, 2009.
David Stephenson, Marcy, NY, pro se.

*REPORT-RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate
Judge.

   *1 The Clerk has sent to the Court a civil rights
Complaint (Dkt. No. 1), Motion to Proceed *In Forma
Pauperis* (IFP) (Dkt. No. 2), Motion for Joinder of Claims
(Dkt. No. 3), and a Motion to Appoint Counsel and
Conduct Discovery (Dkt. No. 6), filed by *pro se* Plaintiff
David Stephenson, who is currently incarcerated at Marcy
Correctional Facility.[FN1] In his *pro se* Complaint,
Stephenson alleges civil rights violations based upon, *inter
alia,* malicious prosecution, abuse of process, conspiracy,
fraud, invasion of privacy, and attorney malpractice. For
a more complete statement of Plaintiff's claims, reference
is made to the Complaint.

> FN1. In 2006, Stephenson filed a civil rights
> action in this Court, pursuant to 42 U.S.C. §
> 1983, *Stephenson v. Herrick,* Civ. No.
> 1:06-CV-1466 (GLS/DRH), which was
> dismissed by the Court, *sua sponte,* for failure to
> state a claim upon which relief could be granted.
> Stephenson's Petition for a Writ of *Habeas
> Corpus,* pursuant to 28 U.S.C. § 2254, is also
> pending in this Court, *Stephenson v.
> Superintendent,* Civ. No. 9:08-CV-1243
> (LEK/RFT).

**I. DISCUSSION**

   **A. Application to Proceed *In Forma Pauperis***
   Plaintiff has submitted an *In Forma Pauperis*
Application. The Prison Litigation Reform Act (PLRA),
codified in part at 28 U.S.C. § 1915(b), provides that an
inmate who seeks *in forma pauperis* status is required to
pay over a period of time the full amount of the filing fee
provided for in 28 U.S.C. § 1914(a), which is currently
$350.00 for most civil actions. After reviewing Plaintiff's
Application, we find that he may properly proceed *in
forma pauperis.*

   **B. Allegations Contained in the Complaint**
   Section 1915(e) of Title 28 of the United States Code
directs that, when a plaintiff seeks to proceed *in forma
pauperis,* "the court shall dismiss the case at any time if
the court determines that ... the action or appeal (i) is
frivolous or malicious; (ii) fails to state a claim on which
relief may be granted; or (iii) seeks monetary relief against
a defendant who is immune from such relief." 28 U.S.C.
§ 1915(e)(2)(B). Thus, it is a court's responsibility to
determine that a plaintiff may properly maintain his
complaint before permitting him to proceed further with
his action.

   Moreover, under 28 U.S.C. § 1915A, a court must, as
soon as practicable, *sua sponte* review "a complaint in a
civil action in which a prisoner seeks redress from a
governmental entity or officer or employees of a
governmental agency" and must "identify cognizable
claims or dismiss the complaint, or any portion of the
complaint, if the complaint (1) is frivolous, malicious, or
fails to state a claim upon which relief may be granted; or
(2) seeks monetary relief from a defendant who is immune
from such relief." 28 U.S.C. §§ 1915A(a) & (b); *see also
Carr v. Dvorin,* 171 F.3d 115, 116 (2d Cir.1999) (*per
curiam* ).

   Plaintiff brings this action pursuant to 42 U.S.C. §
1983, which "establishes a cause of action for 'the
deprivation of any rights, privileges, or immunities
secured by the Constitution and laws' of the United
States." *German v. Fed. Home Loan Mortgage Corp.,*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2922805 (N.D.N.Y.)

(Cite as: 2009 WL 2922805 (N.D.N.Y.))

885 F.Supp. 537, 573 (S.D.N.Y.1995) (quoting *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 508 (1990) & 42 U.S.C. § 1983)); *see also Myers v. Wollowitz,* 1995 WL 236245, at *2 (N.D.N.Y. Apr. 10, 1995) (stating that " § 1983 is the vehicle by which individuals may seek redress for alleged violations of their constitutional rights"). In this action, Plaintiff seeks to hold Defendants liable for various alleged constitutional violations, including, but not limited to:

**\*2** • conspiracy claims against all Defendants;

• claims for malicious prosecution and abuse of process against Defendants Mark Haskins, New York State Bureau of Narcotics, P. David Soares, Albany County District Attorney, and Christopher Baynes, Albany County Assistant District Attorney;

• claims of "undue influence and fraud" against Defendants Haskins, Albany County Task Force, and Albany County Prosecutors;

• claims of "common law fraud" and attorney malpractice against Defendant F. Stanton Ackerman, his court appointed attorney;

• invasion of privacy claims against Defendants Haskins, Andrew Zostant, Town of Colonie Police Detective, Steven Heider, Town of Colonie Police Superintendent, and other members of the Albany County Task Force for interfering with Plaintiff's expectation of privacy and private communications without probable cause; and

• what appears to be a *Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658, 691 (1978), claim against Albany County for various policies and customs.

*See generally* Compl.

The initial impediment to Plaintiff's pursuit of this action is aptly summarized in Plaintiff's Complaint: "The Plaintiff has a pending Federal Habeas Corpus Petition in the Northern District of New York Federal Court, Case No. 9:08-CV-1243. **This 1983 action and complaint is intended to supplement that Petition, as these claims**

for money damages are relevant to the same set of facts." Compl. at ¶ 17 (emphasis added). Indeed, as Plaintiff overtly admits, this entire § 1983 action (including state claims for malpractice and fraud) relates to events leading up to and including his guilty plea and sentence in Albany County Court in 2006.[FN2] The Supreme Court has held that

> FN2. A similar *fait accompli* vanquished Stephenson's prior attempt to sue various individuals in this Court, *Stephenson v. Herrick, et al.,* Civ. No. 1:06-CV-1466 (GLS/DRH). Upon information and belief, the core events giving rise to Stephenson's prior § 1983 action are the same events giving rise to the current action. That prior civil rights action was dismissed in light of *Heck v. Humphrey,* 512 U.S. 477 (1994). *See Stephenson v. Herrick, et al.,* Civ. No. 1:06-CV-1466, Dkt. No. 9, Decision and Order, dated Mar. 8, 2007.

in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983.

*Heck v. Humphrey,* 512 U.S. 477, 486-87 (1994).

Plaintiff's claims in this action are barred because he has failed to show that his conviction or sentence has been overturned. *See Duamutef v. Morris,* 956 F.Supp. 1112, 1115-18 (S.D.N.Y.1997) (dismissing § 1983 claims of malicious prosecution, false arrest, perjury, retaliation, and civil rights conspiracy under *Heck* where the plaintiff's underlying conviction had not been overturned). Because all of Plaintiff's claims relate to events that gave rise to Plaintiff's conviction and the sentence he is currently serving, many of which are currently interposed in his pending *Habeas Corpus* Petition, [FN3] this action is barred

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2922805 (N.D.N.Y.)

(Cite as: 2009 WL 2922805 (N.D.N.Y.))

under *Heck* and we recommend dismissal pursuant to 28 U.S.C. § 1915(e)(2)(B)(i) and (ii) as it lacks an arguable basis in law. We note that this recommendation is limited to all § 1983 claims asserted by Plaintiff. Plaintiff has also inserted some state law claims sounding in fraud and attorney malpractice. It is not clear whether Plaintiff intended to assert these claims in support of his § 1983 claims, or if he intended them to stand on their own, thereby invoking the Court's pendent jurisdiction to entertain state law claims. To the extent they are part and parcel of the § 1983 claims, then they too suffer the same infirmity and are barred by *Heck.* To the extent, however, that they are purely state law claims, in light of this Court's recommendation of dismissal of the federal claims, we would recommend the Court not exercise pendent jurisdiction of such state law claims, pursuant to 28 U.S.C. § 1367, which authorizes a federal court to decline to exercise supplemental jurisdiction over a state claim if all of the claims over which the court had original jurisdiction were dismissed. 28 U.S.C. § 1367(c)(3).

> FN3. Stephenson raises the following grounds, *inter alia,* in support of his *Habeas* Petition:
>
> 1) he was denied equal protection and due process in state court when he was denied, *inter alia,* a grand jury and was subjected to an insufficient accusatory process and was victim of an illegal search and seizure;
>
> 2) he was a victim of selective prosecution and "Mode of Proceedings error"; and
>
> 3) his guilty plea was unknowing and unintelligent due to ineffective assistance of counsel.
>
> *Stephenson v. Superintendent,* Civ. No. 9:08-CV-1243 (LEK/RFT), Dkt. No. 1, Pet.

### C. Other Pending Motions

**\*3** Presently pending in this matter are Plaintiff's Motions for Joinder of Claims, Appointment of Counsel, and to Conduct Discovery. In light of the Court's recommendation of full dismissal, we find it unnecessary

at this juncture to adjudicate such claims. Should the District Judge assigned to this matter accept this recommendation, such Motions would be automatically terminated upon the closing of this case. If, however, the recommendation is not accepted, the Clerk shall forward this file to the undersigned for consideration of these Motions.

**WHEREFORE,** it is hereby

**ORDERED,** that Plaintiff's *In Forma Pauperis* Application (Dkt. No. 2) is **granted;** and it is further

**RECOMMENDED,** that pursuant to the Court's review under 28 U.S.C. § 1915 and § 1915A, Plaintiff's entire Complaint be should be **dismissed** as barred by *Heck v. Humphrey,* 512 U.S. 477, 486-87 (1994), and the Court should decline to exercise pendent jurisdiction over any purported state claims pursuant to 28 U.S.C. § 1367(c)(3); and it is further

**ORDERED,** that in the event the District Court does not adopt the above recommendation, the entire file be returned to the undersigned for consideration of Plaintiff's other Motions (Dkt. Nos. 3 & 6); and it is further

**ORDERED,** that the Clerk serve a copy of this Report-Recommendation and Order on Plaintiff by regular mail.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

### DECISION AND ORDER

LAWRENCE E. KAHN, District Judge.

This matter comes before the Court following a Report-Recommendation filed on August 14, 2009 by the Honorable Randolph F. Treece, United States Magistrate Judge, pursuant to 28 U .S.C. § 636(b) and L.R. 72.3 of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2922805 (N.D.N.Y.)

(Cite as: 2009 WL 2922805 (N.D.N.Y.))

the Northern District of New York. Report-Rec. (Dkt. No. 7). After ten days from the service thereof, the Clerk has sent the entire file to the undersigned, including the objections by Plaintiff David Stephenson, which were filed on August 24, 2009. Objections (Dkt. No. 8).

It is the duty of this Court to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.* This Court has considered the objections and has undertaken a de novo review of the record and has determined that the Report-Recommendation should be approved for the reasons stated therein.

*4 Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No. 7) is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it is further

**ORDERED,** that pursuant to the Court's review under 28 U.S.C. § 1915 and § 1915A, Plaintiff's entire Complaint is **DISMISSED WITHOUT PREJUDICE,** pending the outcome of Plaintiff's pending habeas petition; and accordingly all other pending Motions in this case (Dkt. Nos. 3 and 6) should be **DENIED** and **DISMISSED;** and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

N.D.N.Y.,2009.

Stephenson v. Albany County Policymakers
Slip Copy, 2009 WL 2922805 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 3909694 (N.D.N.Y.)

(Cite as: 2010 WL 3909694 (N.D.N.Y.))

**c**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Dwayne JOY, Plaintiff,
v.
State of NEW YORK; Brian Fischer, individually and
as Commissioner of the New York State Department of
Correctional Services; County of Onondaga; and Agents
of the County of Onondaga, Defendants.
No. 5:09-CV-841 (FJS/ATB).

Sept. 30, 2010.
West Codenotes

Recognized as Unconstitutional McKinney's Correction
Law § 24
Carroll & Carroll Lawyers, P.C., Woodruff Lee Carroll,
Esq., of Counsel, Syracuse, NY, for Plaintiff.
Office of the New York State Attorney General, Kelly L.
Munkwitz, AAG, of Counsel, Albany, NY, for Defendant
New York State and Defendant Brian Fischer.

Onondaga County Law Department, Karen Ann Bleskoski,
Esq., of Counsel, Syracuse, NY.

**MEMORANDUM-DECISION AND ORDER**

SCULLIN, Senior District Judge.
**I. INTRODUCTION**
    *1 On July 23, 2009, Plaintiff filed this action under
42 U.S.C. § 1983 alleging violations of his civil rights
resulting from the administrative imposition of
post-release supervision and his subsequent arrest for
violating the terms of his supervision. In addition to these
federal Constitutional claims, Plaintiff alleges violations
of section 8-B of the Court of Claims Act. false
imprisonment, *prima facie* tort, and New York State
constitutional violations.
    Currently before the Court is Defendant New York
State's and Defendant Brian Fischer's ("State Defendants")

motion to dismiss and Defendant Onondaga County's and
Defendants Agents of Onondaga County's ("County
Defendants") motion for a more definite statement.

**II. BACKGROUND**[FN1]

    FN1. Unless noted otherwise, the parties do not
    dispute the facts.

    Plaintiff was convicted of Burglary and Grand
Larceny, for which he served a determinate New York
State prison term of seven years. At the conclusion of his
sentence, Plaintiff was placed on post-release supervision.
The New York State sentencing court did not impose a
period of supervised release at the time of judgment.
Pursuant to New York Penal Law § 70.45(1), the
Department of Correctional Services ("DOCS")
"administratively imposed" post-release supervision,
which was mandated as part of every determinate
sentence.

    While on post-release supervision, Plaintiff violated
the terms of his release *on* three separate occasions and
was subsequently returned to custody. Plaintiff was
released from custody after a successful New York State
habeas corpus proceeding. Plaintiff now brings this civil
rights action seeking recompense for the allegedly illegal
imposition of post-release supervision and the periods of
incarceration resulting from his violations of the terms of
his illegally-imposed post-release supervision.

**III. DISCUSSION**

**A. State Defendants' motion to dismiss**
*1. Standard of review for a Rule 12(b)(6) motion*

    A motion to dismiss a complaint, brought pursuant to
Rule 12(b) (6) of the Federal Rules of Civil Procedure,
calls upon a court to gauge the legal sufficiency of the
non-movant's pleading, using as a backdrop a pleading
standard which is particularly unexacting in its
requirements. See *Patane v. Clark,* 508 F.3d 106, 111-12
(2d Cir.2007). In considering a pleading's legal

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3909694 (N.D.N.Y.)

(Cite as: 2010 WL 3909694 (N.D.N.Y.))

sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) (citation omitted). This presumption of truth, however, does not extend to legal conclusions. *See Ashcroft v. Iqbal,* --- U.S. ----, ---- - ----, 129 S.Ct. 1937, 1949-50, 173 L.Ed.2d 868 (2009). Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleading, the court may consider documents that are "integral" to that pleading, even if they are neither physically attached to, nor incorporated by reference into, the pleading. *See Mangiafico v. Blumenthal,* 471 F.3d 391, 398 (2d Cir.2006) (quoting *Chambers v. Time Warner, Inc. .,* 282 F.3d 147, 152-53 (2d Cir.2002)).

**\*2** To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," *see* Fed.R.Civ.P. 8(a) (2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief[,]' " *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 557, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quotation omitted). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *see id.* at 555 (citation omitted), and present claims that are "plausible on [their] face," *id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 129 S.Ct. at 1949 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief." ' " *Id* . (quoting [ *Twombly,* 550 U.S.] at 557, 127 S.Ct. 1955, 167 L.Ed.2d 929).

**2. Plaintiffs claims against Defendant State of New York and Defendant Fischer in his official capacity**

The Eleventh Amendment to the United States Constitution bars federal courts from exercising subject matter jurisdiction over claims against states absent their consent to such a suit or an express statutory waiver of immunity. *See Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 90-100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). It is well-settled that states are not "persons" under section 1983 and, therefore, that statute does not abrogate a state's Eleventh Amendment

immunity. *See Will v. Mich. Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). Moreover, this immunity extends to state agencies and state officials sued in their official capacities. *See Mancuso v. N.Y. State Thruway Auth.,* 86 F.3d 289, 292 (2d Cir.1996) (quotation omitted).

In the present matter, although Plaintiff does not oppose the State Defendants' motion to dismiss Defendant New York State on Eleventh Amendment immunity grounds, he does oppose the dismissal of Defendant Fischer in his official capacity. This argument has no merit because the case law is well-established that Plaintiff cannot sue Defendant Fischer in his official capacity.

Accordingly, the Court grants the State Defendants' motion to dismiss Defendant New York State and Defendant Fischer in his official capacity.

**3. Plaintiffs section 1983 claims against Defendant Fischer in his individual capacity**

Section 1983 imposes liability for "conduct which 'subjects, or causes to be subjected' the complainant to a deprivation of a right secured by the Constitution and laws." *Rizzo v. Goode,* 423 U.S. 362, 370-71, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976) (quoting 42 U.S.C. § 1983). Not only must the conduct deprive the plaintiff of rights and privileges secured by the Constitution, but the actions or omissions attributable to each defendant must be the proximate cause of the injuries and consequent damages that the plaintiff sustained. *See Brown v. Coughlin,* 758 F.Supp. 876, 881 (S.D.N.Y.1991) (citing *Martinez v. California,* 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481, *reh. denied,* 445 U.S. 920, 100 S.Ct. 1285, 63 L.Ed. 606 (1980)). As such, for a plaintiff to recover in a section 1983 action, he must establish a causal connection between the acts or omissions of each defendant and any injury or damages he suffered as a result of those acts or omissions. *See id.* (citing *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619. 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979)) (other citation omitted).

**a. Personal involvement**

**\*3** Personal involvement in the alleged constitutional violation is a prerequisite to finding a supervisory official liable under section 1983. *See Colon v. Coughlin,* 58 F.3d

Slip Copy, 2010 WL 3909694 (N.D.N.Y.)

(Cite as: 2010 WL 3909694 (N.D.N.Y.))

865, 873 (2d Cir.1995) (quotations omitted). A supervisory official is personally involved in the violation of a plaintiff's constitutional rights if he (1) directly participates in the infraction; (2) fails to remedy the wrong after learning of the violation; (3) creates, or allows to continue, an unconstitutional practice; or (4) is grossly negligent in the management of subordinates who caused the violation. *See Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)).

Here, Plaintiff has not sufficiently alleged that Defendant Fischer was personally involved in the alleged violation of his rights. The only allegation in Plaintiff's complaint that could be considered to allege Defendant Fischer's personal involvement states that

[s]aid actions were a policy of the State of New York and the Department of Corrections and said agents of the State of New York:

(a) after learning of the violation through a report or appeal[,] defendants failed to remedy the wrong:

(b) they created the policy or custom under which the unconstitutional practices occurred, or allowed such policy [or] custom to continue;

(c) defendants were grossly negligent in managing subordinates who caused the unlawful condition or event.

(d) opposed the lawful release of the Defendant [sic] until they commenced a habeas corpus proceeding

(e) acted recklessly and intentionally in disregard of the Plaintiffs Constitutional rights in allowing and pursuing the aforesaid as a policy of the State of New York.

*See* Complaint at ¶ 17.

These allegations, although clearly demonstrating Plaintiffs counsel's understanding of the prerequisites to establishing personal involvement, are insufficient to survive a motion to dismiss. In *Iqbal,* the plaintiff's complaint alleged that the defendants " 'knew of,

condoned and willfully and maliciously agreed to subject [him]' to harsh conditions of confinement 'as a matter of policy, solely on account of [his] religion, race and/or national origin and for no legitimate penological interest.' " *Iqbal,* 129 S.Ct. at 1951 (quotation omitted). Dismissing the complaint. the Supreme Court held that such bare allegations "amount to nothing more than a 'formulaic recitation of the elements[.]' " *Id.*

In the present matter, Plaintiff has not satisfactorily alleged that Defendant Fischer was personally involved in the conduct concerning the revocation of Plaintiff s post-release supervision. First, Plaintiff does not allege that Defendant Fischer knew that Plaintiff had been arrested for a post-release supervision violation. Second, there is no allegation that Defendant Fischer was involved in the parole revocation hearing that ultimately led to Plaintiff's incarceration. Although Plaintiff could argue that the parole board violated his constitutional rights by incarcerating him for violating conditions of his post-release supervision which a sentencing judge did not impose, parole boards are absolutely immune from liability for their decisions. *See King v. Simpson,* 189 F.3d 284, 287 (2d Cir.1999) (quotation and other citation omitted). Third, Plaintiff does not allege that DOCS or DOCS personnel had the authority to release Plaintiff once he was incarcerated.

**\*4** As such, the Court grants the State Defendants' motion to dismiss the claims against Defendant Fischer for lack of personal involvement.[FN2]

> FN2. Alternatively, the Court grants the State Defendants' motion to dismiss the claims against Defendant Fischer on the ground that he is entitled to qualified immunity.
>
> On August 6, 1988, the New York state legislature enacted "Jenna's Law," a statute that ended indeterminate sentences for criminal defendants convicted of violent felonies. *See* N.Y. Penal Law § 70.02. Jenna's Law also imposed a schedule of mandatory terms of post-release parole supervision for certain violent felony offenders. *See id.* at § 70.45(1).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3909694 (N.D.N.Y.)

(Cite as: 2010 WL 3909694 (N.D.N.Y.))

Due to the mandatory nature of the post-release supervision that Jenna's Law created. New York state courts often neglected to declare on the record what the defendant's post-release supervision obligations would be. In such cases, DOCS would administratively impose the postrelease supervision on the defendant so that his sentence would comply with the law. as was the case here.

For several years, New York state courts routinely upheld the administrative imposition of this mandatory post-release supervision. *See, e.g., Deal v. Goord,* 8 A.D.3d 769, 769-70, 778 N.Y.S.2d 319 (3d Dep't 2004) (citing *People v. Lindsey,* 302 A.D.2d 128, 129, 755 N.Y.S.2d 118 (3d Dep't 2003), *lv. denied* 100 N.Y.2d 583, 764 N.Y.S.2d 394, 796 N.E.2d 486 (2003)) (other citations omitted). On June 9, 2006, however, the Second Circuit held that DOCS' administrative imposition of post-release supervision violated the Constitution's Due Process Clause. *See Earley v. Murray,* 451 F.3d 71 (2d Cir.2006), *reh'g denied,* 462 F.3d 147 (2d Cir.2006), *cert. denied,* 551 U.S. 1159, 127 S.Ct. 3014, 168 L.Ed.2d 752 (2007).

After the Second Circuit's decision in *Earley,* the New York state courts continued to rule that post-release supervision was an automatic part of a sentence subject to Jenna's Law and noted that, because DOCS was "only enforcing, not imposing, a part of petitioner's sentence which was automatically included by statute, they have not performed any judicial function. making prohibition an unavailable remedy." *Garner v. N.Y.S. Dep't of Corr. Servs.,* 39 A.D.3d 1019, 1019 (3d Dep't 2007) (citation omitted); *see also People v. Thomas,* 35 A.D.3d 192, 193-94, 826 N.Y.S.2d 36 (1st Dep't 2006) (citation omitted). Even though *Earley* was decided on June 9, 2006. it was not until April 29, 2008, that the New York State Court of Appeals held that the New York

Criminal Procedure Law did not permit the administrative imposition of post-release supervision. *See Garner v. N.Y.S. Dep't of Corr. Servs.,* 10 N.Y.3d 358, 363, 859 N.Y.S.2d 590, 889 N.E.2d 467 (2008); *People v. Sparber,* 10 N.Y.3d 457, 460-61, 859 N.Y.S.2d 582, 889 N.E.2d 459 (2008) (citation omitted). After the New York Court of Appeals' decisions, on June 30, 2008, the New York legislature passed N.Y. Corrections Law § 601-d, creating a procedure by which individuals who had post-release supervision administratively imposed could be re-sentenced so that their sentences would comply with Jenna's Law. This law, for the first time, imposed on Defendant Fischer and DOCS an obligation to, and provided a means by which DOCS could, petition the state sentencing court to correct an improperly imposed sentence to include post-release supervision. *See* N.Y. Corr. Law § 601-d.

Considering the state courts' confusion over the law, it cannot be said that, during the relevant time period, any right that Plaintiff may have had was a clearly established one of which a reasonable person would have known. Plaintiff was released from prison and placed on his administratively-imposed post-release supervision on June 28, 2006. Thereafter. Plaintiff was released from his term of incarceration from his post-release supervision violations on May 27, 2008. *See* Affidavit of Woodruff Lee Carroll dated November 2, 2008 ("Carroll Aff."), at ¶ 5. As the case law makes clear, the implications of *Earley* and the impact that it would have on prisoners in Plaintiff's position was a source of great confusion. As such, Defendant Fischer is entitled to qualified immunity. *See Rodriguez v. Fischer,* No. 08-CV-4662. 2010 WL 438421, *6 (E.D.N.Y. Feb.3, 2010) (applying qualified immunity defense to DOCS officers who incarcerated the plaintiff for violations of an administratively-imposed post-release supervision because New York courts

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3909694 (N.D.N.Y.)

(Cite as: 2010 WL 3909694 (N.D.N.Y.))

continued to uphold the practice even after *Earley* was decided, allowing the defendants to rely on a presumptively-valid state statute (citations omitted)); *see also Ruffins v. Dep't of Corr. Servs.,* 701 F.Supp.2d 385, 408 (E.D.N.Y.2010) (same).

**4. Plaintiffs state-law claims against Defendant Fischer**

In addition to Plaintiffs federal claims, he asserts several New York state-law claims, including (1) unjust conviction and imprisonment pursuant to section 8-b of the New York State Court of Claims Act; (2) false imprisonment; (3) *prima facie* tort; and (4) New York State constitutional violations. *See* Complaint at 3–6. Defendant Fischer claims that section 24 of the New York State Correction Law bars these state-law claims.

Section 24 of the New York State Correction Law provides as follows:

1. No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department, in his personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the duties of any officer or employee of the department shall be brought and maintained in the court of claims as a claim against the state.

N.Y.Corr. Law § 24.

Essentially, this statute precludes inmates from bringing civil suits against "corrections officers in their personal capacities" in state courts. *See Cepeda v. Coughlin,* 128 A.D.2d 995, 997, 513 N.Y.S.2d 528 (3d Dep't 1987). "In applying pendent jurisdiction, federal courts are bound to apply state substantive law to the state claim." *Baker v. Coughlin,* 77 F.3d 12, 15 (2d Cir.1996) (citations omitted). "If a state would not recognize a plaintiffs right to bring a state claim in state court, a federal court exercising pendent jurisdiction ... must

follow the state'sjurisdictional determination and not allow that claim to be appended to a federal law claim in federal court." *Id.* (citation omitted).

In 2009, the United States Supreme Court held that section 24, to the extent that it relegates to the New York State Court of Claims civil rights actions brought pursuant to 42 U.S.C. § 1983, is inconsistent with the Supremacy Clause and is, therefore, unconstitutional. *See Haywood v. Drown,* --- U.S. ----, 129 S.Ct. 2108, 173 L.Ed.2d 920 (2009). The *Haywood* Court held that New York State, having created courts of general jurisdiction that routinely hear section 1983 actions against all types of state actors, "is not at liberty to shut the courthouse door to federal claims that it considers at odds with its local policy." *Id.* at 2117 (footnote omitted).

Although the *Haywood* decision found section 24 to be in violation of the Supremacy Clause, it did so only with respect to claims brought under section 1983-a federal statute. *See id.* at 2117-18. After *Haywood,* the courts of this district have unanimously held that the *Haywood* decision does not affect the question of the district court's jurisdiction to hear pendent state-law claims against DOCS officials. *See, e.g., Crump v. Ekpe,* No. 9:07-CV-1331, 2010 WL 502762, *18 (N.D.N.Y. Feb. 8, 2010) (quoting *May v. Donneli,* 9:06-cv-437, 2009 WL 3049613, at *5 (N.D.N.Y. Sept.18, 2009) (Sharpe, J. & Treece, M.J.); *see also Tafari v. McCarthy,* No. 9:07-CV-654, ---F.Supp.2d ----, 2010 WL 2044705, *51 (N.D.N.Y. May 24, 2010) (citations omitted).

**\*5** Since Plaintiffs allegations against Defendant Fischer clearly fall within the scope of his duties as Commissioner of DOCS, the Court finds that it does not have jurisdiction to hear these pendent state-law claims and, therefore, grants the State Defendants motion to dismiss these claims. *See May,* 2009 WL 3049613, *5 (citations omitted).

**B. County Defendants' motion for a more definite statement**

Pursuant to Rule 12(e) of the Federal Rules of Civil Procedure, the County Defendants move for a more definite statement of the complaint. *See* Dkt. No. 10-1 at 1. First, the County Defendants claim that it is impossible

Slip Copy, 2010 WL 3909694 (N.D.N.Y.)

(Cite as: 2010 WL 3909694 (N.D.N.Y.))

to determine whether any or all of Plaintiff's claims are time barred because Plaintiff fails to allege any dates on which the alleged violations occurred. *See id.* at 2. Second, they assert that they cannot determine who or what agency allegedly placed Plaintiff on post-release supervision, the term of Plaintiff's sentence upon which he bases his allegations of illegal post-release supervision, and which agency allegedly imprisoned him after he violated the terms of his post-release supervision. *See id* The County Defendants assert that it is impossible to tell what role, if any, they played in the alleged violations. *See id.* In response, Plaintiff does not appear to oppose the County Defendants' motion but asserts that the documents/information are in Defendants' control and that, therefore, he cannot "particularize accurately without them." *See* Dkt. No. 13 at 1.

It is unclear how Plaintiff can hold the County Defendants liable for any of the alleged constitutional and statutory violations. The only allegation in the complaint that directly relates to the County Defendants states that "[s]aid Onondaga County repeated[ly] placed the plaintiff on post sentence supervision and continued to enforce said post sentence supervision long alter they knew or ought to have known that they were prohibited from doing so under federal law." *See* Complaint at ¶ 18.

Section 70.45 of the New York State Penal Law states that the "board of parole shall establish and impose conditions of post-release supervision" for persons sentenced to determinate prison sentences. *See* N.Y. Penal Law § 70.45(3). Moreover, section 500-c of the New York State Correction Law provides that the county officer responsible for administering the county's correctional facilities "shall not be held personally liable for receiving or detaining any person under and in accordance with a commitment issued by a judicial officer; nor shall he. without lawful authority, let any such person out of jail." N.Y. Corr. Law § 500-c(4). Further, the law states that, "[n]otwithstanding any other provision of law, in the county of Onondaga all of the provisions of this section shall equally apply in any case where the sheriff is holding a person under arrest, for arraignment, prior to commitment, as if such person had been judicially committed to the custody of the sheriff and such person may be held in the Onondaga county jail." *Id.* § at 501-c(6).

**\*6** First, the State, not the County, is responsible for the imposition and enforcement of postrelease supervision. Further, to the extent that Plaintiff may allege that the County Defendants violated his rights by incarcerating him pursuant to a State Parole detainer, section 501-c renders the County immune from any liability. Moreover, Plaintiffs counsel has admitted that he believes that the County is not a proper party to this action. *See* Reply Affidavit of Karen A. Bleskoski sworn to November 4, 2009 ("Bleskoski Aff."), at Exhibit "D." Finally, as in *Iqbal.* Plaintiffs complaint against the County Defendants is nothing more than a mere "formulaic recitation" of the required elements. *See Iqbal,* 129 S.Ct. at 1951. Plaintiff provides nothing more than mere conclusory allegations and, significantly, omits what county agency or individual was involved in his alleged constitutional violations, when they allegedly violated his rights, and how it was that the County Defendants placed him on post-release supervision when such supervision is statutorily delegated to the State.

Accordingly, the Court denies the County Defendants' motion for a more definite statement as moot and, *sua sponte,* dismisses the action against the County Defendants as merit less.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that the State Defendants' motion to dismiss is **GRANTED;** and the Court further

**ORDERS** that all claims against the County Defendants are **DISMISSED** *sua sponte;* and the Court further

**ORDERS** that the County Defendants' motion for a more definite statement is **DENIED** as moot; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case.

**IT IS SO ORDERED.**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3909694 (N.D.N.Y.)

(Cite as: 2010 WL 3909694 (N.D.N.Y.))

N.D.N.Y.,2010.

Joy v. New York
Slip Copy, 2010 WL 3909694 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)

(Cite as: 2010 WL 502762 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,

N.D. New York.
Robert CRUMP, Plaintiff,
v.
Ekpe D. EKPE, et al., Defendants.
No. 9:07-CV-1331 (LEK/DEP).

Feb. 8, 2010.
Robert Crump, Middletown, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, Susan C. Von Reusner, Esq., Asst. Attorney General, of Counsel, Albany, NY, for Defendants.

### DECISION AND ORDER

LAWRENCE E. KAHN, District Judge.
*1 This matter comes before the Court following a Report-Recommendation filed on January 19, 2010, by the Honorable David E. Peebles, United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern District of New York. Report-Rec. (Dkt. No. 30).

Within ten days, excluding weekends and holidays, after a party has been served with a copy of a Magistrate Judge's Report-Recommendation, the party "may serve and file specific, written objections to the proposed findings and recommendations," FED. R. CIV. P. 72(b), in compliance with L.R. 72.1. No objections have been raised in the allotted time with respect to Judge Peebles' Report-Recommendation. Furthermore, after examining the record, the Court has determined that the Report-Recommendation is not subject to attack for plain error or manifest injustice.

Accordingly, it is hereby

ORDERED, that the Report-Recommendation (Dkt. No. 30) is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it is further

ORDERED, that Defendants' Motion for summary judgment (Dkt. No. 28) be **GRANTED,** and that Plaintiffs complaint in this action be **DISMISSED** in all respects; and it is further

ORDERED, that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

### REPORT AND RECOMMENDATION

DAVID E. PEEBLES, United States Magistrate Judge.
Plaintiff Robert Crump, a prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983 complaining of the deprivation of his civil rights arising out of events that occurred while he was imprisoned, additionally asserting various pendent state common law claims and asking that the court exercise supplemental jurisdiction over those causes of action. Plaintiff's complaint, which is comprehensive, comprised of one hundred and fifty six paragraphs and including thirty separate causes of action, centers upon a series of events including two separate, brief periods of disciplinary special housing unit ("SHU") confinement and what he characterizes as ongoing harassment on the part of various corrections officers. Plaintiff's complaint seeks recovery of compensatory and punitive damages totaling $86.4 million.

Currently pending before the court is a motion brought by the defendants for summary judgment dismissing the plaintiff's complaint. In their motion, defendants argue that plaintiff's claims should be dismissed for a variety of reasons, including procedurally based upon plaintiff's failure to exhaust his administrative remedies with respect to certain claims, and substantively because he has failed to state viable due process and retaliation claims, adding that his damage claims are

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)

(Cite as: 2010 WL 502762 (N.D.N.Y.))

barred by the Eleventh Amendment as well as New York Correction Law § 24 and the doctrine of qualified immunity. Having carefully considered the record now before the court, I recommend that defendants' motion, which plaintiff has not opposed, be granted, and that his complaint be dismissed in its entirety.

I. *BACKGROUND*[FN1]

> FN1. In light of the procedural posture of the case the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003). It should be noted, however, that many if not most of plaintiff's allegations are sharply contested by the defendants.

**\*2** At the times relevant to the complaint, plaintiff was a prison inmate entrusted to the custody of the New York State Department of Correctional Services ("DOCS") and was designated to Riverview Correctional Facility ("Riverview"), located in Ogdensburg, New York.[FN2] *See* Complaint (Dkt. No. 1) ¶ 33. Plaintiff's complaint arises out of two separate incidents that occurred while he was confined to Riverview, the first resulting in his confinement for three days in the facility SHU and the second leading to thirty days of keeplock confinement which, he claims, evolved in retaliation for his having filed a grievance complaining about the procedure for inmate assignments to messhall duty.[FN3,FN4]

> FN2. Plaintiff was released on parole on January 11, 2008. *See* Dkt. No. 5; *see also,* Reusner Aff. Exh. B (Dkt. No. 28-10).

> FN3. A Special Housing unit is defined by regulations promulgated by the DOCS as "single- or double-occupancy cells grouped so as to provide separation from the general population [which] may be used to house inmates confined to such units pursuant to Part 301 ...." 7 N.Y.C.R.R. § 300.2(b). Inmates may be admitted to SHU for various reasons, not limited to disciplinary action. 7 N.Y.C.R.R. § 301.1 Inmates in SHU are not completely restricted.

*Husbands v. McClellan,* 990 F.Supp. 214, 217 (W.D.N.Y.1998); *see also* 7 N.Y.C.R.R. pt. 304. They are allowed two showers per week and one hour of outdoor exercise per day. *Id.* They are entitled to unlimited legal visits and one non-legal visit per week. *Id.* SHU inmates have access to counselors and sick call. *Id.* Additionally, they can participate in cell study programs and can receive books from the library. *Id.*

> FN4. Keeplock is a form of confinement restricting an inmate to his or her cell, separating the inmate from others, and depriving him or her of participation in normal prison activities. *Gittens v. LeFevre,* 891 F.2d 38, 39 (2d Cir.1989); *Warburton v. Goord,* 14 F.Supp.2d 289, 293 (W.D.N.Y.1998) (citing *Gittens* ); *Tinsley v. Greene,* No. 95-CV-1765, 1997 WL 160124, at *2 n. 2 (N.D.N.Y. Mar. 31, 1997) (Pooler, D.J. & Homer, M.J.) (citing, *inter alia, Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995)). Inmate conditions while keeplocked are substantially the same as in the general population. *Lee v. Coughlin,* 26 F.Supp.2d 615, 628 (S.D.N.Y.1998). While on keeplock confinement an inmate is confined to his or her general population cell for twenty-three hours a day, with one hour for exercise. *Id.* Keeplocked inmates can leave their cells for showers, visits, medical exams, and counseling, and can have cell study, books, and periodicals, *Id.* The primary difference between keeplock and the general population confinement conditions is that keeplocked inmates do not leave their cells for out-of-cell programs, and are usually allowed less time out of their cells on the weekends. *Id.* Keeplock is a less severe penalty than SHU; for example keeplocked inmates have access to their personal property, while SHU inmates do not. *Grant v. Riley,* No. 89 CIV. 0359, 1996 WL 727441, at *1 n. 1 (S.D.N.Y. Dec.17, 1996). In addition, keeplocked inmates are afforded more liberal visitation rights. *Id.*

According to the plaintiff, the genesis of his

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)

(Cite as: 2010 WL 502762 (N.D.N.Y.))

difficulties was a handwritten grievance filed with the Riverview Inmate Grievance Resolution Committee ("IGRC") on February 13, 2006. Complaint (Dkt. No. 1) ¶ 20. Labeling his grievance as "Inmates In Messhall w/o Medical Screening," Crump complained that inmates were being assigned to messhall program jobs without adequate physical examination or testing for communicable diseases, and that there were one or more inmates with hepatitis C working in the messhall. *Id.* Exhs. B & C; *see also* Affirmation of Susan C. von Reusner ("Reusner Aff.") (Dkt. No. 28-8) Exh. C (Dkt.28-11) p. 3. The IGRC subsequently investigated Crump's grievance, which was stamped received on February 13, 2006 and assigned grievance number RV-8195-06, and prepared a report noting that all inmates are screened upon arrival at Riverview, there is no requirement that inmates assigned to the messhall undergo any medical testing, "[b]oth HIV and hepatitis C are blood born/body fluid carried diseases", and universal precautions are to be used by all who work in those areas. *Id.* at p. 5. Notwithstanding these observations, the IGRC agreed that every inmate assigned to the messhall program should be medically cleared at the time of assignment. *Id.* at p. 4; *see also* Complaint (Dkt. No. 1) Exh. A.

On February 28, 2006, upon review of the IGRC's recommendation, defendant Ekpe D. Ekpe, the superintendent at Riverview, denied Crump's grievance, finding that existing medical review procedures conducted upon an inmate's arrival at the facility and the sick-call process provide sufficient medical screening of inmates assigned to work in the messhall. Reusner Aff. Exh. C (Dkt. No. 28-11) p. 1. Plaintiff does not allege that he appealed the superintendent's determination, and it thus appears that he took no further action regarding this grievance.

Plaintiff maintains that on the morning of March 2, 2006, in retaliation for filing that grievance, Superintendent Ekpe and defendant Sergeant Reneiri appeared at the "F-1" Housing Unit, where plaintiff was then designated, called plaintiff to the officer's observatory station, and demanded that plaintiff follow them to the messhall and identify any inmate working there who was infected with HIV or hepatitis C. Complaint (Dkt. No. 1) ¶¶ 37-38. When plaintiff refused to comply and attempted

to explain his grievance, the superintendent became angry, began yelling at plaintiff and berating him, and commanded that Sergeant Reneiri and Corrections Officer ("C.O.") Wilkens "get him out of here." *Id.* at ¶¶ 39-41.

**\*3** Plaintiff was taken to the facility SHU, where he was processed and strip searched, and confined for a period of seventy-two hours. Complaint (Dkt. No. 1) ¶¶ 42-47, 52; *see also* Declaration of Ekpe D. Ekpe ("Ekpe Decl.") (Dkt. No. 28-5) ¶ 8. Plaintiff asserts that while in the SHU he was interviewed by a facility supervisor, who told Crump that he had been sent to SHU "in order to make sure that he was not 'starting trouble in their jail' ". Complaint (Dkt. No. 1) ¶ 51. Defendants maintain that plaintiff's confinement to SHU was spawned by the superintendent's concern for safety and order at the facility pending an investigation of allegations that Crump was spreading rumors among the inmates that workers in the messhall were contagious and that the food they prepared was poisoned, contaminated, and otherwise unsafe to eat. Ekpe Decl. (Dkt. No. 28-5) ¶ 8. Although plaintiff asserts that his assignment to SHU was retaliatory, he admittedly did not grieve his three-day SHU confinement. Declaration of Kristina Monnet ("Monnet Decl.") (Dkt.28-6) ¶ 8; *see also* Crump Deposition Transcript ("Crump Tr.") (Dkt. No. 28-24) pp. 13, 15, 24, 91-93.

When released from SHU confinement three days later, plaintiff collected the personal belongings that had been taken from him upon his transfer into the unit and discovered that a property inventory form, No. 1-64, had not been completed when they were confiscated. Complaint (Dkt. No. 1) ¶ 52. When he returned to the F-1 unit and the cubicle to which he had previously been assigned and unpacked his personal property, Crump found that many of his belongings were missing, damaged, or destroyed. *Id.* ¶¶ 52-54.

Following his release from SHU confinement, Crump claims to have suffered harassment and threats from unnamed corrections officers who were encouraging plaintiff to file a grievance or civil complaint against Superintendent Ekpe because Ekpe "had no right to do what he did" to Crump. Crump Tr. (Dkt. No. 28-24) pp. 12-15, 18, 24; *see also* Complaint (Dkt. No. 1) ¶¶ 58-59. According to plaintiff, the superintendent is the only

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)

(Cite as: 2010 WL 502762 (N.D.N.Y.))

"black African-American" at Riverview, and his subordinate corrections officers are trying to get him out of that facility so that they can control it. Crump Tr. (Dkt. No. 28-24) pp. 12-15. Because Crump was trying to maintain good behavior so that he would be released from the prison, he did not file a grievance or complaint against Ekpe. *Id.* As a result, plaintiff was subjected to continued harassment by corrections officers at the facility. *Id.*

On March 11, 2006 Crump was involved in an incident in which inmates were "horse playing" in the bathroom. Complaint (Dkt. No. 1) ¶¶ 60-63; *see also* Crump Tr. (Dkt. No. 28-24) pp. 23-24. According to prison officials, while standing near the entrance to the bathroom plaintiff shouted out a warning to the inmates inside that a corrections officer was approaching. Reusner Aff. Exh. G (Dkt. No. 28-15). When defendant Sears, who responded to the incident, ordered Crump to produce his identification, he became loud and belligerent, arguing that he had not done anything. *Id.* After he disobeyed several orders to return to his cube, C.O. Sears placed plaintiff on "full bed status" and completed a misbehavior report citing Crump for three misconduct charges, including verbal interference, creating a disturbance, and disobeying a direct order. *Id.*

*\*4* A Tier II disciplinary hearing was conducted by defendant Lieutenant McNally on March 15, 2006 to address the charges contained in the misbehavior report.[FN5] *See* Reusner Aff. Ex. H (Dkt. No. 28-16). At the commencement of the hearing Crump was advised of and stated that he understood the charges against him, and he pleaded guilty to refusing a direct order, but denied having created a disturbance or having interfered with a corrections employee. *Id.* at pp. 1-2. During the hearing plaintiff testified and was permitted to call two inmate witnesses, both of whom testified that Crump had been standing outside of the bathroom watching television at the time of the horseplaying incident but did not shout out that a corrections officer was coming. *See generally id.* At the close of the hearing, plaintiff stated that he had no procedural objections to the conduct of the hearing. *See* Reusner Aff. Ex. H (Dkt. No. 28-16) at p. 7. Based upon the misbehavior report written by Corrections Officer Sears and his finding that the inmate witnesses lacked credibility, defendant McNally found the plaintiff guilty of

all three charges and imposed a penalty of thirty days of keeplock confinement, with a concomitant loss of package, commissary and telephone privileges.[FN6] *Id.* Plaintiff appealed the disciplinary finding, and the superintendent affirmed Lieutenant McNally's determination on March 27, 2006. Reusner Aff. Exh. J. (Dkt. No. 28-18).

FN5. The DOCS conducts three types of inmate disciplinary hearings. Tier I hearings address the least serious infractions and can result in minor punishments, such as the loss of recreation privileges. Tier II hearings involve more serious infractions and can result in penalties which include confinement for a period of time in the SHU. Tier III hearings concern the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *See Hynes v. Squillace*, 143 F.3d 653, 655 (2d Cir.), *cert. denied*, 525 U.S. 907, 119 S.Ct. 246, 142 L.Ed.2d 202 (1998).

FN6. The record is not entirely clear as to whether plaintiff was confined to SHU or keeplock for that thirty-day period. Plaintiff alleges in his complaint and testified at his deposition that he served the time in the facility SHU. Complaint (Dkt. No. 1) ¶ 66; *see also* Crump Tr. (Dkt. No. 28-24) pp. 25-26. The transcript of the disciplinary hearing, Dkt. No. 28-16, and disciplinary record, Dkt. No. 28-17, in contrast, reflect that plaintiff was confined to keeplock. In their statement of undisputed facts, filed in accordance with Local Rule 7.1(a)(3), submitted in support of their motion, defendants assert that plaintiff was sentenced to thirty days of keeplock confinement. Dkt. No. 28-2 at ¶ 28. Since it appears plaintiff was assigned to a cubicle while at Riverview, *see* Complaint (Dkt. No. 1) ¶ 53, rather than a cell, an arrangement which would more easily lend itself to a keeplock confinement, and drawing all inferences in plaintiff's favor, I have assumed that plaintiff served his thirty day keeplock confinement at the facility SHU.

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)

(Cite as: 2010 WL 502762 (N.D.N.Y.))

While in keeplock, plaintiff sent a letter to Superintendent Epke, stamped received on March 22, 2006, complaining of unspecified threats and fear of reprisals from unidentified corrections officers. Reusner Aff. Ex. K. (Dkt. No. 28-19) Sergeant Willett, who is not a named defendant, was assigned to investigate plaintiff's complaint to the superintendent. Complaint (Dkt. No. 1) ¶ 74. As part of his investigation, Sergeant Willett prepared a report of his interview of the plaintiff, dated April 5, 2006. Reusner Aff. Exh. L (Dkt. No. 28-20). In it, Sergeant Willet reported that Crump indicated he felt the need for "protection from the superintendent because the superintendent runs the place and all the correction officers are now head hunting him for every rule violation they can get." *Id.* Plaintiff denies making this statement, but claims that Willet changed plaintiff's story and insisted that Crump's complaints were not with the corrections officers, but with the superintendent for putting him in SHU confinement without reason. Complaint (Dkt. No. 1) ¶ 74. By memorandum dated April 19, 2006, Captain Kanaly advised plaintiff that his complaint of threats had been investigated, and it was determined that there was no threat to Crump's safety at Riverview. Reusner Aff. Exh. L (Dkt. No. 28-20) at p. 2 (unnumbered).

The following day plaintiff filed another grievance, this time identified by him as "Code 1-Forced Into Messhall." Reusner Aff. Exh. M (Dkt. No. 28-21). Plaintiff's grievance, designated as number RV-8291-06, complained of his mandatory assignment to messhall duty, unspecified harassment and threats, loss of personal property, and that he was "being targeted for tickets and being found guilty ... when another inmate has claimed in great respect and honesty that I Crump didn't do that charge but that he did it." *Id.* In response to that grievance Superintendent Ekpe 1) advised Crump to follow appropriate claims procedures with regard to alleged, missing items; 2) advised that it appeared there were no longer any disciplinary actions pending; 3) stated that effective May 8, 2006 plaintiff would be programed as a Phase II Program Aid and A-2 Porter; and 4) noted that a sergeant had been assigned to conduct an investigation regarding plaintiff's complaint, and that based upon the investigation it was determined that no further action was necessary and that plaintiff's complaints had been adequately addressed. Reusner Aff. Exh. N (Dkt. No.

28-22). On plaintiff's appeal to the DOCS Central Office Review Committee ("CORC"), by decision dated July 5, 2006 the CORC upheld the superintendent's determination, noting that Crump was then assigned as a program aide in the mornings and a porter in the evening, and also advising Crump that his disciplinary sanction could be appealed in accordance with the DOCS regulations as set forth in 7 N.Y.C.R.R. Part 5. *Id.* Exh. O (Dkt. No. 28-23).

## II. *PROCEDURAL HISTORY*

**\*5** Plaintiff commenced this action on December 21, 2007. Dkt. No. 1. Named as defendants in plaintiff's complaint are Epke D. Epke, the superintendent of Riverview; Deputy Superintendent Hessel; Lieutenant McNally; Sergeant Reneiri; three John Doe corrections officers; and Corrections Officer Sears. *Id.* While plaintiff's claims appear to center upon his first grievance and the retaliation that he allegedly suffered as a direct result of its filing, his complaint includes thirty separate causes of action including for violations of his rights under the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, alleging claims of retaliation, deprivation of liberty and property without due process, and cruel and unusual punishment, all relating to his confinement to SHU and keeplock. Additionally, plaintiff alleges common law claims of negligence as well as violations of the New York Correction Law and the DOCS regulations.

On April 3, 2009, following the completion of pretrial discovery in the case, defendants filed a motion for the entry of summary judgment dismissing plaintiff's claims as a matter of law. Dkt. No. 28. In their motion, defendants argue that plaintiff's claims should be dismissed on the grounds that 1) he failed to exhaust his administrative remedies with respect to claims relating to his seventy-two hour confinement in SHU; 2) he has failed to state viable due process and retaliation claims; and 3) recovery is barred by the Eleventh Amendment as well as New York Correction Law § 24 and the doctrine of qualified immunity.[FN7] Despite passage of the deadline for doing so, plaintiff has failed to submit papers in opposition to defendants' motion, which is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. §

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)

(Cite as: 2010 WL 502762 (N.D.N.Y.))

636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

> FN7. Defendants also correctly assert that the claims against the unnamed John Doe defendants must be dismissed as a result of plaintiff's failure to identify and timely serve these defendants. Rule 4(m) of the Federal Rules of Civil Procedure authorizes dismissal where a summons and complaint is not served within 120 days after filing of the complaint, absent a showing of good cause. Fed.R.Civ.P. 4(m); *Shuster v. Nassau Cty.,* No. 96 Civ. 3635, 1999 WL 9847, at *1 (S.D.N.Y. Jan.11, 1999) (Rule 4(m) authorizes dismissal where no service within 120 days after filing of the complaint); *Romand v. Zimmerman,* 881 F.Supp. 806, 809 (N.D.N.Y.1995) (McAvoy, C.J.) (120-day period for service of a summons and complaint by a plaintiff under Fed.R.Civ.P. 4(m) applies to *pro se* plaintiffs as well as those represented by counsel); *see also, e.g., Michelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 709 F.Supp. 1279, 1282 (S.D.N.Y.1989) (citation omitted) (court lacks jurisdiction until defendants properly served with summons and complaint). Inasmuch as plaintiff has failed to identify and take steps to obtain jurisdiction over the John Doe defendants, I recommend dismissal of his claims against them.

III. *DISCUSSION*

A. *Plaintiff's Failure to Oppose Defendants' Motion*

Before turning to the merits of plaintiff's claims, a threshold issue to be addressed is the legal significance, if any, of his failure to oppose defendants' summary judgment motion, and specifically whether that failure automatically entitles defendants to summary judgment dismissing plaintiff's complaint.

This court's rules provide that

[w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested

therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.

N.D.N.Y.L.R. 7.1(b)(3). Undeniably, *pro se* plaintiffs are entitled to some measure of forbearance when defending against summary judgment motions. *See Jemzura v. Public Serv. Comm'n,* 961 F.Supp. 406, 415 (N.D.N.Y.1997) (McAvoy, C.J.). The deference owed to *pro se* litigants, however, does not extend to relieving them of the consequences of Local Rule 7.1(b)(3). *Robinson v. Delgado,* No. 96-CV-169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J. & Hurd, M.J.); *Cotto v. Senkowski,* No. 95-CV-1733, 1997 WL 665551, at *1 (N.D.N.Y. Oct. 23, 1997) (Pooler, J. & Hurd, M.J.); *Wilmer v. Torian,* 980 F.Supp. 106, 106-07 (N.D.N.Y.1997) (Pooler, J. & Hurd, M.J.). Accordingly, absent a showing of good cause defendants' unopposed summary judgment motion should be granted, if determined to be facially meritorious. *See Allen v. Comprehensive Analytical Group, Inc.,* 140 F.Supp.2d 229, 231-32 (N.D.N.Y.2000) (Scullin, C.J.); *Leach v. Dufrain,* 103 F.Supp.2d 542, 545-46 (N.D.N.Y.2000) (Kahn, J.).

**\*6** It should also be noted that the plaintiff's failure to properly oppose defendants' summary judgment motion is not without further consequences. By failing to submit papers in opposition to their motion, plaintiff has left the facts set forth in defendants' Local Rule 7.1(a)(3) Statements unchallenged, thus permitting the court to deem facts set forth in the defendants' statement of material facts not in dispute to have been admitted based upon his failure to properly respond to that statement.[FN8] *See Elgamil v. Syracuse Univ.,* No. 99-CV-611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corrs.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1(a) (3)).[FN9]

> FN8. Local Rule 7.1(a)(3) provides that *"[t]he Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."*

*See* N.D.N.Y.L.R. 7.1(a)(3) (emphasis in original).

FN9. Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

Based upon plaintiff failure to oppose defendants' motion I recommend that the court review the motion for facial sufficiency, accepting defendants' assertions of facts as set forth in their Local Rule 7.1(a)(3) Statement as uncontroverted, and that the motion be granted if determined to be facially meritorious.

B. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see* *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also* *Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

A party seeking summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *but see* *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

***7** When deciding a summary judgment motion a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See* *Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507-08 (2d Cir.2002) (citation omitted); *see also* *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

C. *Exhaustion of Remedies*

As a threshold, procedural basis for dismissal of his claims related to this incident, in their motion defendants contend that plaintiff's failure to file and pursue to completion, a grievance against Superintendent Ekpe, Sergeant Reneiri, and Deputy Hessel relating to his SHU confinement for seventy-two hours before filing suit, precludes him from asserting any claims arising out of that incident.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see* *Woodford v. Ngo,* 548 U.S. 81, 84, 126 S.Ct. 2378, 2382, 165 L.Ed.2d 368 (2006); *Hargrove v.*

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)

(Cite as: 2010 WL 502762 (N.D.N.Y.))

*Riley,* No. CV-04-4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan.31, 2007). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 992, 152 L.Ed.2d 12 (2002) (citation omitted).

The failure of a prisoner to satisfy the PLRA's exhaustion requirement is not jurisdictional, but instead gives rise to a defense which must affirmatively be raised by a defendant in response to an inmate suit. *Jones v. Block,* 549 U.S. 199, 212, 127 S.Ct. 910, 919, 166 L.Ed.2d 798 (2007). In the event a defendant named in such an action establishes that the inmate plaintiff failed properly to exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal. *See Pettus v. McCoy,* No. 04-CV-0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 548 U.S. at 94-95, 126 S.Ct. at 2387-88 (holding that the PLRA requires "proper exhaustion" of available remedies). "Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95, 126 S.Ct. at 2388; *see also Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007) (citing *Woodford* ).[FN10]

> FN10. While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "in a substantive sense", an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his or her available administrative remedies within the appropriate grievance protocol in order to satisfy the PLRA. *Macias,* 495 F.3d at 43 (quoting *Johnson v. Testman,* 380 F.3d 691, 697-98 (2d Cir.2004)) (emphasis omitted).

*8 New York prison inmates are subject to an Inmate Grievance Program ("IGP") established by the DOCS and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* No. 96 CV 5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb.20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2d Cir.2003) and *Snider v. Melindez,* 199 F.3d 108, 112-13 (2d Cir.1999)). The IGP

consists of a three-step review process. First, a written grievance is submitted to the IGRC within twenty-one days of the incident.[FN11] 7 N.Y.C.R.R. § 701.5(a). The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance. 7 N.Y.C.R.R. §§ 701.4(b), 701.5(b). If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision. 7 N.Y.C.R.R. § 701.5(c). The third level of the process affords the inmate the right to appeal the superintendent's ruling to the CORC, which makes the final administrative decision. 7 N.Y.C.R.R. § 701.5(d). Ordinarily, absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in a federal court. *Reyes v. Punzal,* 206 F.Supp.2d 431, 432 (W.D.N.Y.2002) (citing, *inter alia, Sulton v. Greiner,* No. 00 Civ. 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec.11, 2000)).

> FN11. The IGP supervisor may waive the grievance timeliness requirement due to "mitigating circumstances." 7 N.Y.C.R.R. § 701.6(g)(1)(i)(a)-(b).

While plaintiff has alleged in his complaint that he filed a grievance in March of 2006 regarding his later keeplock confinement and that he has fully exhausted his administrative remedies with respect to the claims now raised, *see* Complaint (Dkt. No. 1) ¶¶ 19, 24, the record discloses that although clearly familiar with the IGP, he did not file any grievance related to his confinement in SHU, which began on March 2, 2006. Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 28-2) ¶ 14. The record establishes that plaintiff filed only two grievances relevant to this action. The first, number RV-8195-06 and dated February 13, 2006, is the grievance complaining of the medical screening procedure for assigning inmates to messhall duty, a grievance which plaintiff claims spawned his three-day confinement to SHU. Reusner Aff. Exh. C (Dkt. No. 28-11). The second grievance, number RV-8291-06 and dated April 20, 2006, raises a variety of complaints but lacks any reference to the superintendent's order on March 2, 2006 that he be taken to the SHU for a seventy-two hour period to allow for investigation of the allegation that he was spreading dangerous rumors, the

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)

(Cite as: 2010 WL 502762 (N.D.N.Y.))

procedures which followed for escorting and admitting plaintiff into the SHU, or the conditions within the SHU during that seventy-two hour period. Reusner Aff. Exh. M (Dkt. No. 28-21). Indeed, during his deposition plaintiff admitted that he never made any complaint regarding this confinement, explaining that at the time he was trying to get out of Riverview. Crump Tr. (Dkt. No. 28-24) pp. 15, 93.

*9 Accordingly, while plaintiff's claims related to his later, Tier II disciplinary proceeding were properly exhausted, all those relating to and/or arising out of his three-day confinement to SHU are subject to dismissal for failure to exhaust available administrative remedies.[FN12]

FN12. Twenty-one of plaintiff's thirty causes of action, including claims against Epke, Reneiri, Hessel and two John Does, relate to the March 2 through 5, 2006 SHU confinement. Additionally, in that section of the complaint identified by plaintiff as "legal claim" he alleges violation of the Fourth Amendment right to be free from illegal searches and seizures. Complaint (Dkt. No. 1) ¶ 149. The only allegations in the complaint relating to search and seizure are those asserting that when taken to SHU on March 2, 2006 plaintiff was subjected to a strip search and a visual body cavity search and that his personal property was taken at the time of his admission to SHU. See id. at ¶ 46. Accordingly, to the extent that this alleged constitutional violation relates to this search and/or confiscation of his personal property occurring at the time of his admission to SHU on March 2, 2006, it should be dismissed in light of plaintiff's failure to exhaust his administrative remedies with respect to that claim.

D. Retaliation

As was previously noted, in his complaint Crump alleges that his constitutional rights under the First Amendment were violated when, after he pursued his grievance regarding the medical screening procedures for assigning inmates to work in the messhall, he was subjected to harassment and threats, and disciplinary charges were lodged against him. Noting the ease with which such claims can be incanted by a prison inmate, defendants seek dismissal of this cause of action as legally deficient as a matter of law.

When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies. See Franco v. Kelly, 854 F.2d 584, 588-90 (2d Cir.1988). As the Second Circuit has repeatedly cautioned, however, such claims are easily recited and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach such claims "with skepticism and particular care." Dawes v. Walker, 239 F.3d 489, 491 (2d Cir.2001), overruled on other grounds, sub. nom Swierkiewicz v. Sorema N.A., 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (citing Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir.1983)); Davis v. Goord, 320 F.3d 346, 352 (2d Cir.2003).

In order to state a prima facie claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action-in other words, that the protected conduct was a substantial or motivating factor in the prison officials' decision to take action against the plaintiff. Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); Dillon v. Morano, 497 F.3d 247, 251 (2d Cir.2007); Dawes, 239 F.3d at 492. If the plaintiff carries this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." Mount Healthy, 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. Graham v. Henderson, 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

Analysis of retaliation claims thus requires careful

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)

(Cite as: 2010 WL 502762 (N.D.N.Y.))

consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two. When such claims, which are exceedingly case specific, are alleged in only conclusory fashion and are not supported by evidence establishing the requisite nexus between any protected activity and the adverse action complained of, a defendant is entitled to summary judgment dismissing a plaintiff's retaliation claims. *Flaherty,* 713 F.2d at 13.

1. *Confinement to SHU from March 2 Through 5, 2006*

**\*10** Plaintiff first asserts that Epke's order on March 2, 2006 to subject Crump to SHU confinement was motivated by the filing of his first grievance. The only factual allegation against Sergeant Reneiri in this regard is that following Epke's order, he handcuffed and escorted plaintiff to SHU.

It is well recognized that the filing of a grievance is protected conduct, and can thus satisfy the first prong of a retaliation claim. *Graham,* 89 F.3d at 80. Plaintiff has therefore sufficiently alleged that he engaged in constitutionally protected conduct. Additionally, after the filing of his grievance plaintiff was undeniably subjected to adverse action, in the form of confinement to SHU, and he has therefore also established the adverse action element of his retaliation claim. *See Gill v. Pidlypchak,* 389 F.3d 379, 384 (2d Cir.2004).

Plaintiff's claim fails, however, because he has failed to provide anything but conclusory allegations that the grievance was a substantial or motivating factor behind Epke's actions. To the contrary, Superintendent Epke explains that following his denial of plaintiff's grievance on February 28, 2006, there were allegations that plaintiff was spreading rumors among the other inmates that the workers in the messhall were contagious and that the food they prepared was poisoned, contaminated, and otherwise unsafe to eat. Epke Decl. (Dkt. No. 28-5) ¶ 8. Legitimately concerned that if those reports proved true plaintiff's unchecked rumors would disturb the prison environment by discouraging inmates from eating in the messhall, Superintendent Epke determined that is was necessary that plaintiff be removed from the general population while the allegations against him could be investigated. *Id.* Accordingly, plaintiff was held in SHU for only

seventy-two hours and thereafter released to his previous housing unit and cubicle. Based upon these facts, no reasonable factfinder could conclude that plaintiff's grievance was the motivating factor for his placement in SHU.

With respect to plaintiff's claim against Sergeant Reneiri for his involvement, plaintiff has failed to allege any facts suggesting that he did anything but comply with a direct order issued by the superintendent which, even plaintiff acknowledged, defendant Reneiri was required to do. Crump. Tr. (Dkt. No. 28-25) p. 64. Accordingly, there is nothing but a conclusory allegation that Sergeant Reneiri acted in retaliation, to support plaintiff's retaliation claim against him, and no basis exists for a finding that his actions were taken for any other reason than a direct order from his superintendent.

As noted by defendants, the Second Circuit "ha[s] established a 'presumption that a prison official's acts to maintain order are done for a proper purpose.' " *Hynes v. Squillace,* 143 F.3d at 657 (quoting *Rivera v. Senkowski,* 62 F.3d 80,86 (2d Cir.1995)). Accordingly, even if plaintiff had established that the filing of his first grievance was a motivating factor in the superintendent's decision to send him to SHU, the court further finds the defendants have established that in light of plaintiff's alleged dissemination of rumors, the same action would have been taken regardless of the filing of that grievance in order to allow for an investigation and maintain order in the facility. For these reasons, I conclude that defendants are entitled to summary judgment on this portion of plaintiff's retaliation claims.

2. *False Misbehavior Report*

**\*11** Plaintiff's retaliation claims against C.O. Sears and Lieutenant McNally are premised upon issuance of the March 11, 2006 misbehavior report and the subsequent disciplinary hearing. As defendants point out, plaintiff's theory in this regard is inconsistent, if not contradictory. Plaintiff appears to allege that defendant Sears' actions were in retaliation for *not* filing a grievance or civil complaint against the superintendent for sending Crump to the SHU. *See* Complaint (Dkt. No. 1) ¶¶ 59-64, 141; *see also* Crump Tr. (Dkt. No. 28-24) pp. 102-104. With

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)

(Cite as: 2010 WL 502762 (N.D.N.Y.))

regard to defendant McNally, plaintiff alleges in his complaint that he imposed disciplinary sanctions based upon Sears' false misbehavior report, in retaliation for Crump's filing of the first grievance (*see id.* at ¶ 145), but later testified at his deposition that "Lieutenant McNally and Sears are the ones that retaliated against me for not filing the grievance, a complaint [against Epke]" (Crump Tr. (Dkt. No. 28-24) p. 104). Putting aside these contradictions, and assuming without deciding that plaintiff has alleged that he engaged in constitutionally protected conduct giving rise the alleged retaliation by defendants Sears and McNally, his claims are subject to dismissal because he has failed to allege, let alone adduce, any facts supporting an inference of a retaliatory motive.

In cases involving allegations of retaliation based on the filing of allegedly false misbehavior reports, "[t]he difficulty lies in establishing a retaliatory motive." *Barclay v. New York,* 477 F.Supp.2d 546, 558 (N.D.N.Y.2007). Mere conclusory allegations of such retaliatory motivation will not suffice to survive a summary judgment motion; to establish retaliatory animus, which ordinarily must be shown circumstantially since direct evidence of such motivation is typically lacking, a plaintiff may cite such factors as "temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *Id.* (citations omitted); *see also Rivera v. Goord,* 119 F.Supp.2d 327, 339 (S.D.N.Y.2000).

The only evidence offered by the plaintiff which could potentially support the finding of a nexus between the protected activity alleged in his complaint and the subsequent misbehavior report is the inference that might be drawn by the timing of his first grievance filed on February 13, 2006 and the misbehavior report issued in March 11, 2006. It is true such an inference, flowing from a closeness in proximity between protected activity and the issuance of a misbehavior report, can sometimes suffice to defeat a summary judgment motion seeking dismissal of a retaliation claim. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (citing *Flaherty,* 713 F.2d at 14). In many circumstances, however, this alone is insufficient to avoid summary judgment. *Williams v. Goord,* 111 F.Supp.2d 280, 290 (S.D.N.Y.2000) (citing *Ayers v. Stewart,* 1996 WL 346049, at *1 (2d Cir.1999)); *see also Ethier v. City of Cohoes,* No. 1:02 Civ. 1584,

2006 WL 1007780, *7 (N.D.N.Y. April 18, 2006).

**\*12** In this instance, temporal proximity is the only fact that might give rise to a determination by a reasonable factfinder that the misbehavior report was issued in retaliation for protected activity. Although Crump denies shouting a warning to the inmates "horseplaying" in the bathroom, he admits being in the area of the bathroom door, that he did not immediately produce his identification when requested by C.O. Sears, and that he protested when ordered to do so, denying any wrongdoing. Indeed, the disciplinary hearing conducted by Lieutenant McNally plaintiff pleaded guilty to one of the three charges against him, again admitting his presence in the vicinity of the disturbance, and that he did not immediately comply with defendant Sears' order but tried to provide an explanation. Defendant McNally stated that his determination of guilt was based on the report issued by defendant Sears and his finding that plaintiff's inmate witnesses lacked credibility, and it was made in the context of plaintiff's admissions. Plaintiff does not allege any facts, and there is no evidence in the record, that either C.O. Sears or Lieutenant McNally was even aware of his messhall medical procedures grievance, let alone motivated by that grievance to take adverse action against the plaintiff. Additionally, plaintiff has provided no evidence regarding his prior disciplinary history. Given the totality of these circumstances, no reasonable factfinder could conclude that the misbehavior report and resulting findings of guilt after the Tier II disciplinary hearing were prompted by retaliatory animus. I therefore recommend dismissal of this remaining portion of plaintiff's retaliation claim.

E. *Harassment*

Though not specifically addressed by defendants in their motion, plaintiff's complaint also generally asserts that he was harassed by defendants; no specific factual allegations are provided, and plaintiff's complaint, though including a great deal of detail on other matters, is vague as to the identity of those corrections workers who are alleged to have participated in the harassment. *See, e.g.,* Complaint (Dkt. No. 1) ¶¶ 58-59. According to plaintiff the harassment consisted of being pulled aside to isolated areas and prodded by corrections officers to file a civil

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)

(Cite as: 2010 WL 502762 (N.D.N.Y.))

complaint against superintendent Epke, targeted for random searches, assigned to the messhall (an apparently less desirable position than he had as a program aide), and called out by corrections officers by name. Crump Tr. (Dkt. No. 28-24) pp. 14, 32, 34, 51 and 73. Liberally construed, plaintiff's allegations of harassment are, at best, an attempt to state a violation of his Eighth Amendment right to be free from cruel and unusual punishment. His complaint, however, fails to allege any conduct that would warrant Eighth Amendment protection.

42 U.S.C. § 1983 is not designed to rectify harassment or verbal abuse. See Purcell v. Coughlin, 790 F.2d 263, 265 (2d Cir.1986); Gill v. Hoadley, 261 F.Supp.2d 113, 129 (N.D.N.Y.2003); Aziz Zarif Shabazz v. Pico, 994 F.Supp. 460, 474 (S.D.N.Y.1998); Alnutt v. Cleary, 913 F.Supp. 160, 165-66 (W.D.N.Y.1996) (citations omitted). Thus, mere allegations of verbal abuse do not rise to the level of a constitutional violation, and are not cognizable under 42 U.S.C. § 1983. See Moncrieffe v. Witbeck, No. 97-CV-253, 2000 WL 949457, at *3 (N.D.N.Y. June 29, 2000) (Mordue, J.) (allegations that corrections officer laughed at inmate not actionable under section 1983) (citation omitted); Carpio v. Walker, No. Civ.A.95CV1502, 1997 WL 642543, at *6 (N.D.N.Y. Oct.15, 1997) (Pooler, J. & DiBianco, M.J.) ("[v]erbal harassment alone, unaccompanied by any injury, no matter how inappropriate, unprofessional, or reprehensible it might seem, does not rise to the level of an Eighth Amendment violation").

*13 There are no allegations that plaintiff suffered from the infliction of any physical injury or pain as a result of defendants' harassing conduct. Plaintiff testified at his deposition that no physical force was used against him. Crump Tr. (Dkt. No. 28-25) at p. 42-43. When asked to identify physical injuries sustained as a result of the alleged harassment by prison workers, plaintiff testified at his deposition that he was "freezing for two days [in SHU], starving, they put me in a cold cell so you get proportional rationale meals." Id. at p. 105. The record is clear that plaintiff does not claim to have suffered any physical injury as a result of the alleged harassment. Plaintiff has therefore failed to meet the threshold requirement for an Eighth Amendment violation of showing the "unnecessary and wanton infliction of pain" by prison officials. Whitley v. Albers, 475 U.S. 312, 319,

196 S.Ct. 1078, 1084, 89 L.Ed.2d 251, ---- (1986). Consequently, I find plaintiff has failed to establish any facts that would support an Eighth Amendment violation.

F. Due Process

Another component of plaintiff's complaint focuses upon his contention that his right to procedural due process was abridged in connection with his three-day SHU confinement and his later disciplinary hearing. In their motion, defendants assert that plaintiff's claim fails at the outset, in light of his inability to prove the deprivation of a protected liberty interest.

To successfully state a claim under 42 U.S.C. § 1983 for the denial of procedural due process arising out of a disciplinary hearing, a plaintiff must show that he or she 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient procedural safeguards. See Tellier v. Fields, 280 F.3d 69, 79-80 (2d Cir.2000) (citations omitted); Hynes, 143 F.3d at 658; Bedoya v. Coughlin, 91 F.3d 349, 351-52 (2d Cir.1996).

1. Liberty Interest

Addressing first plaintiff's seventy-two hour confinement in SHU, restrictive confinement for administrative reasons generally does not implicate a constitutionally protected liberty interest. Jones v. Artuz, No. 93 Civ. 8784, 1994 WL 721362, at *2 (S.D.N.Y.1994) (citing Russell v. Coughlin, 910 F.2d 75, 77 (2d Cir.1990)). Notwithstanding this general rule, a state may by regulation create a constitutionally protected liberty interest if the language employed is unmistakably mandatory. McMillan v. Scully, No. 85 Civ. 7280, 1986 WL 7543, at *3 (S.D.N.Y. June 30, 1986) (citing Hewitt v. Helms, 459 U.S. 460, 471, 103 S.Ct. 864, 871, 74 L.Ed.2d 675(1972), overruled in part by, Sandin v. Conner, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418) (1985)).

Here, the record reveals plaintiff was confined to SHU for seventy-two hours for administrative reasons in order to maintain order in the facility while the allegation that he was spreading rumors was investigated.[FN13] Under the applicable DOCS regulations when an inmate is assigned involuntarily to SHU for administrative reasons,

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)

(Cite as: 2010 WL 502762 (N.D.N.Y.))

a hearing must be conducted within fourteen days of the inmate's admission. 7 N.Y.C.R.R. § 301.4(a). Plaintiff was released from SHU in considerably less than fourteen days, before the expiration of the period within which a hearing to determine the propriety of the segregation was even required. Under these circumstances, the controlling regulation does create a protected liberty interest, and his seventy-two hour confinement cannot support a procedural due process claim. See *Malik v. Miller,* 679 F.Supp. 268, 269 (W.D.N.Y.1988) (summary judgment granted dismissing procedural due process claim arising out of administrative confinement for five days pending a disciplinary hearing).

> FN13. "Administrative segregation admission results from a determination by the facility that the inmates' presence in general population would pose a threat to the safety and security of the facility." 7 N.Y.C.R.R. § 301.4(b).

**\*14** Turning to the plaintiff's disciplinary confinement in keeplock, the Second Circuit has interpreted the Supreme Court's decision in *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), to mean that "a prisoner's restricted confinement within a prison does not give rise to a liberty interest, warranting procedural due process protection, unless the conditions 'impose[ ] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Sealey,* 197 F.3d at 583 (quoting *Sandin,* 515 U.S. at 484, 115 S.Ct. 2293, 132 L.Ed.2d 418). Atypicality in a *Sandin* inquiry is normally a question of law.[FN14] *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir.2000); *Sealey,* 197 F.3d at 585. When determining whether a plaintiff possesses a liberty interest, district courts must examine the specific circumstances of confinement, including analysis of both the length and conditions of confinement. See *Sealey,* 197 F.3d at 586; *Arce v. Walker,* 139 F.3d 329, 335-36 (2d Cir.1998); *Brooks v. DiFasi,* 112 F.3d 46, 48-49 (2d Cir.1997); *see also Williams v. Goord,* 111 F.Supp.2d 280, 289 (S.D.N.Y.2000) (citations omitted) (SHU confinement in New York generally does not impose atypical and significant hardship because it remains within the normal range of prison custody).

> FN14. In cases where there is factual dispute

concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those disputes to a jury for resolution. *Colon,* 215 F.3d at 230-31; *Sealey,* 197 F.3d at 585.

While not the only factor to be considered, the duration of a disciplinary confinement remains significant under *Sandin.*[FN15] *Colon,* 215 F.3d at 231. Specifically, while under certain circumstances confinement of less than 101 days could be shown to meet the atypicality standard under *Sandin* (*see id.* at 232 n. 5), the Second Circuit generally takes the position that SHU confinement under ordinary conditions of more than 305 days rises to the level of atypicality, whereas normal SHU confinement of 101 days or less does not. *Id.* at 231-32 (305 days of SHU confinement constitutes an atypical and sufficient departure).[FN16]

> FN15. Segregation for a period of thirty days was found by the Supreme Court in *Sandin* not to impose a significant hardship on an inmate. 515 U.S. at 485-86, 115 S.Ct. at 2301. In explaining its reasoning, the Court found that the disciplinary confinement failed to present "a dramatic departure from the basic conditions" of an inmate's normal sentence. *Id.*

> FN16. In fact, in *Colon* a Second Circuit panel split markedly on whether or not adoption of a 180-day "bright line" test for examining SHU confinement would be appropriate and helpful in resolving these types of cases. 215 F.3d at 232-34 (Newman, C.J.), 235-37 (Walker, C.J. and Sack, C.J., concurring in part).

Plaintiff's thirty-day keeplock confinement, without more, is patently insufficient to state a protectable liberty interest. *Rodriguez v. McGinnis,* 1 F.Supp.2d 244, 248 (S.D.N.Y.1998) ("[T]he decisions of the Second Circuit are unanimous that keeplock ... confinement of 30 days or less in New York prisons is not 'atypical or significant hardship' under *Sandin.*" ) (quoting *Williams v. Keane,* No. 95 Civ. 0379(JGX)(AJP), 1997 WL 527677, at \*6 (S.D.N.Y. Aug. 25, 1997)).[FN17] Accordingly, the court finds that dismissal on this basis alone is appropriate.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)

(Cite as: 2010 WL 502762 (N.D.N.Y.))

FN17. To the extent that plaintiff alleges a liberty interest in his assignment as a program aide relative to his apparent objection to having been temporarily assigned to the messhall after his disciplinary confinement, his claim must fail. It is well recognized that inmates do not have a protected interest to participate in prison programs. *Thompson v. LaClair,* No. 9:08-CV-37, 2008 WL 191212 at *4 (N.D.N.Y. Jan.22, 2008) (Scullin, S.J.) (citing *Boothe v. Hammock,* 605 F.2d 661, 664 (2d Cir.1979)).

2. *Procedural Protections*

Even assuming that plaintiff were able to prove the deprivation of a cognizable liberty interest, his procedural due process claim would nonetheless fail because, based on the record now before the court, it is clear he was afforded ample due process. The procedural protections to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are both modest and well-established, the contours of the required protections having been articulated in *Wolff v. McDonnell,* 418 U.S. 539, 563-67, 94 S.Ct. 2963, 2978-80, 41 L.Ed.2d 935 (1974). Under *Wolff,* the constitutionally mandated due process requirements include 1) written notice of the charges; 2) the opportunity to appear at a disciplinary hearing and present witnesses and evidence, subject to legitimate safety and penological concerns; 3) a written statement by the hearing officer explaining his or her decision and the reasons for the action being taken; and 4) in some circumstances, the right to assistance in preparing a defense. *Wolff,* 418 U.S. at 564-70, 94 S.Ct. at 2978-83. In order to pass muster under the Fourteenth Amendment, a hearing officer's disciplinary determination must garner the support of at least "some evidence". FN18 *Superintendent v. Hill,* 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985).

FN18. The "some evidence" standard under *Hill* has been described as considerably tolerant. *See Friedl v. City of New York,* 210 F.3d 79, 85 (2d Cir.2000). To be sure, the Fourteenth Amendment requires that at least some "reliable evidence" be contained in the record supporting the hearing officer's determination. *Sira v.*

*Morton,* 380 F.3d 57, 69 (2d Cir.2004) (*quoting, inter alia, Luna v. Pico,* 356 F.3d 356, 488 (2d Cir.2004)). Based upon the court's review of the hearing transcript, and in particular plaintiff's admissions during the hearing, I conclude that no reasonable factfinder could determine that the hearing officer's conclusion was not based upon "some evidence".

**\*15** The record establishes that plaintiff received a copy of the misbehavior report setting forth the charges against him in advance of the hearing. Reusner Aff. Exh. H (Dkt. No. 28-16) p. 1. A disciplinary hearing was conducted, and was recorded. *See generally id.* At the commencement of the hearing the plaintiff confirmed that he was aware of and understood the charges against him. Plaintiff was permitted to give an oral statement, as well as to offer testimony from his own witnesses. *See generally id.* At the close of the hearing, when asked if he had any objections to the procedure followed, plaintiff responded that he did not. *Id.* at 7. In addition, after announcing his disposition the hearing officer advised plaintiff of his right of appeal. Reusner Aff. Exh. H (Dkt. No. 28-16) p. 8. Plaintiff later sought review by the superintendent, and the hearing officer's determination was upheld on appeal. Reusner Aff. Exh. J (Dkt. No. 28-18). The hearing officer's finding of guilt on two of the charges was based upon admissions made by plaintiff during the hearing as well as the misbehavior report. As to the third charge, plaintiff pleaded guilty. The hearing officer's determination was therefore supported by some evidence, thereby meeting the minimum requirements of the Fourteenth Amendment. The procedures that were provided to plaintiff thus were adequate to afford plaintiff the minimal process to which he was entitled.

Plaintiff also asserts that when presiding over his Tier II disciplinary proceeding, Lieutenant McNally was not impartial. To be sure, bias on the part of a disciplinary hearing officer can support a claim of procedural due process deprivation under the Fourteenth Amendment. *Davidson v. Capuano,* No. 78 Civ. 5724, 1988 WL 68189, at *8 (S.D.N.Y. June 16, 1988) (citing *McCann v. Coughlin,* 698 F.2d 112, 122 (2d Cir.1983)). Here again, the inquiry focuses on whether plaintiff was afforded basic due process. *See Wright v. Conway,* 584 F.Supp.2d 604,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)

(Cite as: 2010 WL 502762 (N.D.N.Y.))

609 (W.D.N.Y.2009).

Plaintiff has alleged no facts that would lead a reasonable factfinder to conclude that Lieutenant McNally was biased in conducting the hearing. There is no allegation of any special relationship between C.O. Sears, the author of the misbehavior report, and McNally, and, as previously noted, there is no evidence that defendant McNally was even aware of plaintiff's initial grievance. To the contrary, for the reasons explained above, the undisputed evidence shows that Lieutenant McNally fairly conducted the hearing, and that plaintiff was provided more than sufficient due process with respect to the disciplinary proceeding.

To the extent that plaintiff's claim of McNally's bias implicates an insufficient basis for his finding, I have already concluded that the evidence of plaintiff's guilt more than meets the some evidence standard. "[A] plaintiff armed with nothing more than conclusory allegations of bias and prejudgment should not be able to defeat a well-supported motion for summary judgment." *Francis v. Coughlin,* 891 F.2d 43, 37 (2d Cir.1989). Accordingly, plaintiff's bare allegations, without evidentiary support, are insufficient to establish a claim of hearing officer bias sufficient to withstand defendants' motion for summary judgment.[FN19] *Id.*

> FN19. In his complaint, plaintiff generally alleges in the section entitled "legal claim" that he seeks redress for violation of his Sixth Amendment rights, among other things. That constitutional amendment provides the right to a fair trial in all criminal prosecutions. *See* U.S. CONST. AMEND. VII. Presumably, plaintiff asserts the Sixth Amendment in relation to his disciplinary hearing. However, "prison disciplinary hearings are not treated as 'criminal' for the purposes of the Sixth Amendment." *Sash v. Zenk,* 439 F.3d 61, 63 (2d Cir.), *cert. denied,* 549 U.S. 920, 127 S.Ct. 277, 166 L.Ed.2d 212, S.Ct. 277 (2006); *see also Wolff,* 418 U.S. at 570, 94 S.Ct. at 2981-82. As a result, plaintiff's Sixth Amendment claim should be dismissed.

**\*16** In light of the lack of evidence in the record

demonstrating that plaintiff's procedural due process rights were violated during the course of his disciplinary hearing, I recommend dismissal of these claims.[FN20]

> FN20. Any procedural due process claim premised upon the claimed loss of his personal property while in SHU is also subject to dismissal. The alleged destruction or loss of plaintiff's personal property will not support a claim redressable under § 1983 if "adequate state post-deprivation remedies are available." *Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). The Second Circuit has held New York's post-deprivations remedies adequate to preclude a prisoner's due process claim for lost personal property. *Love v. Coughlin,* 714 F.2d 207, 208-09 (2d Cir.1983).

G. *Claims Against Deputy Superintendent Hessel*

Although not specifically addressed by defendants, there is a separate and independent basis for dismissal of plaintiff's claims against Deputy Superintendent Hessel. The only allegations in the complaint against Hessel are found in plaintiff's twenty-fifth cause of action, alleging deprivation of liberty without due process of law in relation to plaintiff's seventy-two hour confinement in SHU. Complaint (Dkt. No. 1) ¶ 137. The complaint otherwise lacks factual allegations detailing Hessel's involvement in this occurrence, and it therefore appears that the claim is premised solely upon Hessel's role as deputy superintendent.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). A supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor; there is no *respondeat superior*

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)

(Cite as: 2010 WL 502762 (N.D.N.Y.))

liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. Vague and conclusory allegations that a supervisor has failed to train or properly monitor the actions of subordinate employees will not suffice to establish the requisite personal involvement and support a finding of liability. *Pettus v. Morgenthau,* 554 F.3d 293, 300 (2d Cir.2009) ("To the extent that [a] complaint attempts to assert a failure-to-supervise claim ... [that claim is insufficient where] it lacks any hint that [the supervisor] acted with deliberate indifference to the possibility that his subordinates would violate [plaintiff's] constitutional rights.").

Culpability on the part of a supervisory official for a civil rights violation can, however, be established in one of several ways, including when that individual 1) has directly participated in the challenged conduct; 2) after learning of the violation through a report or appeal, has failed to remedy the wrong; 3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) was grossly negligent in managing the subordinates who caused the unlawful event; or 5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty,* 490 F.3d 143, 152-53 (2d Cir.2007), *rev'd on other grounds, sub nom., Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 2931(2009); *see also, Richardson,* 347 F.3d at 435; *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.3d 319, 323-24 (2d Cir.1986).

**\*17** During his deposition plaintiff clarified that he seeks to hold defendant Hessel liable for his confinement in SHU because "he's the deputy of the jail [,and] he has full knowledge ...." Crump. Tr. (Dkt. No. 28-24) p. 45; *see also, id.* at pp. 100-101. Plaintiff acknowledges that Hessel never spoke to him, and did not order that he be placed in the SHU. Crump. Tr. (Dkt. No. 28-24) p. 101. "[M]ere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." *Richardson,* 347 F.3d at 435 (citations omitted). Accordingly, plaintiff's claims against Deputy Superintendent Hessel should be dismissed. *see, e.g., Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987) (dismissal appropriate where plaintiff does no more than allege that defendant was in charge of prison); *Ayers v. Coughlin,*

780 F.2d 205, 210 (2d Cir.1985) (same).

H. *Violation of State Law*

In addition to setting forth constitutional claims, plaintiff's complaint asserts that his SHU confinement violated New York Correction Law §§ 112, 137(5) and 138(4) and various regulations of the DOCS.[FN21] To the extent that plaintiff attempts to state a claim under 42 U.S.C. § 1983 for the alleged violation of these provisions, such a claim fails as a matter of law.

> FN21. New York Correction Law § 112 generally relates to the duties of the commissioner of the DOCS relating to correctional facilities. *See* N.Y. Correct. Law § 112. In general, section 137(5) prohibits degrading treatment of inmates. *See id.* at § 137(5). Section 138(4) provides that "[i]nmates shall not be disciplined for making written or oral statements, demands, or requests involving a change of institutional conditions, policies, rules, regulations, or laws affecting an institution." *See id.* at § 138(4). Plaintiff also generally alleges violation of 7 N.Y.C.R.R. "Sections 250-300 et. seg." Complaint (Dkt. No. 1) ¶ 98.

To state a valid claim under section 1983, "a plaintiff must allege that (1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." *Snider v. Dylag,* 188 F.3d 51, 53 (2d Cir.1999) (citing *Dwares v. City of New York,* 985 F.2d 94, 98 (2d Cir.1993)). "A violation of a state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. § 1983." *Cusamano v. Sobek,* 604 F.Supp.2d 416, 482 (N.D.N.Y.2009) (Suddaby, J.) (collecting cases). "Furthermore, the violation of a DOCS Directive, alone, is not even a violation of a New York State Law or regulation (much less of 42 U.S.C. § 1983)." *Cabassa v. Gummerson,* 01-CV-1039, 2008 WL 4416411, at \*6 n. 24 (N.D.N.Y. Sept.24, 2008) (Hurd, J.) (internal quotation marks and citation omitted). This is so because the DOCS directives merely provide a system which the DOCS Commissioner has established to assist him or her

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)

(Cite as: 2010 WL 502762 (N.D.N.Y.))

in exercising discretion, which he or she retains despite any violation of those directives. *Id.*

Plaintiff's claims relating to state laws and regulations should, therefore, be dismissed.

*J. Immunity*

Lastly, in support of their motion defendants assert that plaintiff's claims against them are barred by the immunity provided under the Eleventh Amendment as well as the doctrine of qualified immunity, and that his state law claims are precluded by New York Correction Law § 24.

*1. Eleventh Amendment*

The Eleventh Amendment protects a state against suits brought in federal court by citizens of that state, regardless of the nature of the relief sought. *Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 3057-58, 57 L.Ed.2d 1114 (1978). This absolute immunity which states enjoy under the Eleventh Amendment extends both to state agencies, and in favor of state officials sued for damages in their official capacities when the essence of the claim involved seeks recovery from the state as the real party in interest.[FN22] *Richards v. State of New York Appellate Division, Second Dep't,* 597 F.Supp. 689, 691 (E.D.N.Y.1984), *aff'd* 767 F.2d 998 (2d Cir.1985) (citing *Pugh* and *Cory v. White,* 457 U.S. 85, 89-91, 102 S.Ct. 2325, 2328-29, 72 L.Ed.2d 694 (1982)). To the extent that a state official is sued for damages in his or her official capacity, the official is entitled to invoke the Eleventh Amendment immunity belonging to the state.[FN23] *Kentucky v. Graham,* 473 U.S. 159, 169, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985); *Hafer v. Melo,* 502 U.S. 21, 26, 112 S.Ct. 358, 361, 116 L.Ed.2d 301 (1991).

FN22. In a broader sense, this portion of defendants' motion implicates the sovereign immunity enjoyed by the State. In *Northern Ins. Co. of New York v. Chatham County* the Supreme Court reaffirmed that the sovereign immunity enjoyed by the states is deeply rooted, having been recognized in this country even prior to ratification of the Constitution, and is neither dependent upon nor defined by the Eleventh Amendment. 547 U.S. 189,193, 126 S.Ct. 1689,

1693, 164 L.Ed.2d 367,---- (2006).

FN23. By contrast, the Eleventh Amendment does not establish a barrier against suits seeking to impose individual or personal liability on state officials under section 1983. *See Hafer,* 502 U.S. at 30-31, 112 S.Ct. at 364-65.

**\*18** It is unclear whether plaintiffs' claims are alleged against defendants in their individual or official capacities, or both. To the extent that plaintiff asserts his claims against defendants in their official capacities, plaintiff's damage claims are in reality claims against the State of New York, thus exemplifying those against which the Eleventh Amendment protects. As a result, they are subject to dismissal. *Daisernia v. State of New York,* 582 F.Supp. 792, 798-99 (N.D.N.Y.1984) (McCurn, J.). I therefore recommend that this portion of defendants' motion be granted, and plaintiff's damage claim against the defendants in their capacities as state officials be dismissed

*2. New York Correction Law § 24*

By statute, New York invests state employees, including correctional workers, with immunity from suits requiring them to personally answer state law claims for damages based on activities falling within the scope of the statute, providing that

1. [n]o civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of [the Department of Correctional Services], in his personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties of any officer or employee of [the Department of Correctional Services] shall be brought and maintained in the court of claims as a claim against the state.

N.Y. Correct. Law § 24; *see also Ierardi v. Sysco,*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)

(Cite as: 2010 WL 502762 (N.D.N.Y.))

119 F.3d 183, 186-87 (2d Cir.1997).[FN24] Section 24 thus precludes claims against corrections officers brought against them in any court in their personal capacities arising out of the discharge of their duties. *Baker v. Coughlin,* 77 F.3d 12, 14-15 (2d Cir.1996). In *Haywood v. Drown,* --- U.S. ----, 129 S.Ct. 2108, 173 L.Ed.2d 920 (2009), the Supreme Court recently held this provision unconstitutional to the extent it precludes inmates from pursuing § 1983 actions. In the wake of *Haywood,* one court in this district has observed that "[a] claim brought pursuant to state law does not implicate the Supremacy Clause, and therefore, the *Haywood* decision does not affect the question of whether this Court has proper jurisdiction to hear [a] pendent state law claim." *May v. Donneli,* 9:06-cv-437, 2009 WL 3049613, at * 5 (N.D.N.Y. Sept.18, 2009) (Sharpe, J. & Treece, M.J.). In that case, because the acts of the corrections officers, which were alleged to have violated New York Correction Law § 610, clearly fell within the scope of their employment, the court found that it lacked jurisdiction to hear such pendent state law claims. *See id.*

> FN24. To be sure, the immunity afforded under section 24 is by no means absolute; actions taken by corrections workers occurring during the course of their employment but wholly outside of their scope of employment, for example, lack the protection of that section. The circumstances presented in *Ierardi,* for example, involving a claim of sexual harassment made by a special education teacher employed by the DOCS against a corrections officer assigned to the same facility, serves aptly to illustrate the type of situation in which section 24 would not afford protection. *Ierardi,* 119 F.3d at 188-89.

In this case plaintiff's pendent state law claims, alleging violations of the New York Correction Law and the DOCS regulations, as well as common law negligence, indisputably arise from actions taken by the defendants in their roles as corrections employees, including the determinations to administratively confine plaintiff to SHU, to issue a misbehavior report, the conduct of the disciplinary hearing, and the determination that plaintiff was guilty of the charges alleged. While they may allege constitutional deprivations and actions exceeding the

scope of a corrections officer's authority, these types of claims have consistently been treated as giving rise to immunity from suit for pendent state law claims against corrections officers in their individual capacities, whether in state or federal court. *See, e.g. Baker,* 77 F.3d at 15-16; *Parker v. Fogg,* No. 85-CV-177, 1994 WL 49696, at *9 (N.D.N.Y. Feb.17, 1994) (McCurn, S.J.). *Cepeda v. Coughlin,* 128 A.D.2d 995, 996-97, 513 N.Y.S.2d 528, 530 (3d Dep't 1987) (holding Correction Law section 24 applicable to actions against corrections officers for allegedly using excessive force when returning inmates to their cells during a disturbance), *lv. denied,* 70 N.Y.2d 602, 518 N.Y.S.2d 1024, 512 N.E.2d 550 (1987). For this reason, I find that plaintiff's state law claims are precluded by section 24, and recommend that they be dismissed.[FN25,FN26]

> FN25. In any event, even if I were to conclude that those state law claims were not precluded, I would recommend that the court not exercise pendent jurisdiction of such claims, "pursuant to 28 U.S.C. § 1367, which authorizes a federal court to decline supplemental jurisdiction over a state claim if all of the claims over which the court had original jurisdiction were dismissed." *Stephenson v. Albany County Policymakers,* Civ. No. 6:09-CV-326, 2009 WL 2922805, at *2 (N.D.N.Y. Aug.14, 2009) (Kahn, J. & Treece, M.J.) (citing 28 U.S.C. § 1367(c)(3)).

> FN26. In light of the foregoing, I have declined to address defendants' assertion of qualified immunity as further grounds for dismissal of the complaint.

IV. *SUMMARY AND RECOMMENDATION*

**\*19** At the heart of plaintiff's complaint is the claim that he was retaliated against for filing a grievance complaining that inmates assigned to work in the messhall did not receive adequate advance medical screening. Out of this arises thirty causes of action alleging violations of various constitutional provisions as well as New York State Correction Law, the DOCS regulations and common law tort claims. Having failed to exhaust his administrative remedies regarding his seventy-two hour SHU

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)

(Cite as: 2010 WL 502762 (N.D.N.Y.))

confinement, I recommend that all of plaintiff's claims relating to that event be dismissed on this procedural basis. With respect to his claims of retaliation and those relating to alleged violations of his right to due process, I have concluded that no reasonable factfinder could determine that plaintiff's constitutional rights were violated and therefore recommend dismissal of these claims on the merits. Additionally, plaintiff has not alleged personal involvement on the part of defendant Hessel, thus failing to provide a basis for a finding of liability against him. To the extent that Crump has named defendants in their official capacities, I recommend dismissal based upon the sovereign immunity afforded by the Eleventh Amendment. Finally, because violations of state law and regulations do not state a claim under section 1983, and in any event, plaintiff's claims are precluded by New York Correction Law § 24, I recommend dismissal of all of plaintiff's claims that are premised upon violation of state law. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 28) be GRANTED, and that plaintiff's complaint in this action be DISMISSED in all respects.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; Roldan v. Racette, 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules.

N.D.N.Y.,2010.

Crump v. Ekpe
Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 3049613 (N.D.N.Y.)

(Cite as: 2009 WL 3049613 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.

Charles MAY, Plaintiff,
v.
Superintendent DONNELI; Donaldson, Grievance
Coordinator; Dep. Stern; Imam Ahmed; Officer
Matthew; Deacon Bashaw; and James Jones,
Administration Sergeant, Defendants.
Civil Action No. 9:06-cv-437 (GLS/RFT).

Sept. 18, 2009.
West KeySummary**Civil Rights 78** 🔑 **1463**

78 Civil Rights

    78III Federal Remedies in General
        78k1458 Monetary Relief in General
            78k1463 k. Mental Suffering, Emotional
Distress, Humiliation, or Embarrassment. Most Cited
Cases

A prisoner who did not suffer a physical injury was
not entitled to compensatory damages for mental or
emotional suffering for his § 1983 claim under the
Religious Land Use and Institutionalized Persons Act
(PLRA). The prisoner's alleged loss of weight and possible
increase in blood pressure was insufficient to constitute a
physical injury under the PLRA. The prisoner alleged that
his First Amendment rights were violated when he was
denied the opportunity to eat blessed food for seven days
with his fellow Nation of Islam members during the Holy
Month of Ramadan. Prison Litigation Reform Act of 1995,
§ 101(e), 42 U.S.C.A. § 1997e(e).
Charles May, Ray Brook, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of
New York, David L. Cochran, Assistant Attorney General,
of Counsel, Albany, NY, for the Defendants.

***ORDER***

GARY L. SHARPE, District Judge.

   **\*1** The above-captioned matter comes to this court
following a Report-Recommendation by Magistrate Judge
Randolph F. Treece, duly filed August 25, 2009.
Following ten days from the service thereof, the Clerk has
sent the file, including any and all objections filed by the
parties herein.

   No objections having been filed, and the court having
reviewed the Magistrate Judge's Report-Recommendation
for clear error, it is hereby

   ORDERED, that the Report-Recommendation of
Magistrate Judge Randolph Treece filed August 25, 2009
is ACCEPTED in its entirety for the reasons state therein,
and it is further

   ORDERED, that the defendants' motion for partial
summary judgment (Docket No. 57) is GRANTED in part
and DENIED in part, and it is further

   ORDERED, that the Clerk of the court serve a copy
of this order upon the parties in accordance with this
court's local rules.

   IT IS SO ORDERED.

***REPORT-RECOMMENDATION AND ORDER***

RANDOLPH F. TREECE, United States Magistrate
Judge.

   *Pro se* Plaintiff Charles May brings this civil rights
action, pursuant to 42 U.S.C. § 1983, alleging that his
First Amendment rights were violated when he was denied
the opportunity to eat blessed food for seven days with his
fellow Nation of Islam members during the Holy Month of
Ramadan. Dkt. No. 51, Am. Compl. at ¶ 1. In addition,
Plaintiff asserts claims under the Religious Land Use and
Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §
2000cc-1, and New York State Corrections Law § 610. *Id.*
at ¶ 37. Defendants move for Partial Summary Judgment,
to which Plaintiff filed a Response in Opposition. Dkt.
Nos. 57-58. Defendants contend that Plaintiff is (1) barred

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3049613 (N.D.N.Y.)

(Cite as: 2009 WL 3049613 (N.D.N.Y.))

from bringing an action for mental or emotional injury under 42 U.S.C. § 1983 because he failed to allege the required showing of physical injury pursuant to 42 U.S.C. § 1997e(e); and (2) estopped from bringing a pendent state law claim pursuant to N.Y. CORR. LAWW § 24. Dkt. No. 57-5, Defs.' Mem. of Law at pp. 2-4. For the reasons that follow, it is recommended that the Defendants' Motion be **GRANTED in part** and **DENIED in part**.

## I. BACKGROUND

The following material facts are not, for purposes of this Motion, in dispute. Plaintiff alleges that in August 2005, approximately one month prior to the Islamic celebration of Ramadan, he was signed up as a member of the Nation of Islam in order to allow him to participate in Ramadan related activities. Dkt. No. 58, Pl.'s 7.1 Statement at p. 2. According to Plaintiff, during the Holy Month of Ramadan, Muslims are unable to eat during mess hall hours because they are required to fast during that time; the fast is then broken at night by eating blessed food. Am. Compl. at ¶ 16.[FN1] On October 5, 2005, Plaintiff fasted and then ate blessed food with his fellow Nation of Islam members. *Id.* at ¶ 13. Plaintiff alleges that on October 6, 2005, he was informed by Defendant Sergeant Jones, in the presence of Defendant Corrections Officer ("C.O.") Mathew, that the administration had him listed as a Sunni Muslim and he would therefore have to eat with them until the administration straightened things out. *Id.* Though Plaintiff was willing to eat with the Sunni Muslims temporarily, he alleges that when he attempted to enter the Masjid [FN2] on October 6th, he was denied access by C.O. Mathew because he was not on the list. *Id.* at ¶ 35. Plaintiff alleges that Defendant Sergeant Jones maliciously failed to put him on the Sunni Muslim list. *Id.* at ¶ 34. Ultimately, Plaintiff was unable to eat with either Muslim sect for seven days until October 13, 2005, when he was permitted to eat with the Sunni Muslims. *Id.* at ¶ 19. During those seven days, Plaintiff observed the fasting strictures of Ramadan, but was unable to properly break his fast, thus resulting in a seven day fast. After informing Defendant Superintendent Donneli of the matter, Plaintiff was immediately placed with the Nation of Islam on October 18, 2005. *Id.* at ¶ 20.

FN1. Though Plaintiff submitted a "Material Fact" statement in accordance with N.D.N.Y.L.R. 7.1 (Dkt. No. 57), his statement is

presented in an argumentative manner and does not clearly lay out all of his factual allegations. Therefore, the Court relies primarily on Plaintiff's Amended Complaint to discern his factual allegations.

FN2. A Masjid is a Muslim place of worship, commonly referred to in English as a Mosque.

**\*2** Though Plaintiff refrained from eating for seven days, he alleges no physical injury other than that he "lost a few pounds," was feeling lightheaded because of a possible increase in blood pressure, and suffered mental and emotional distress. Dkt. No. 58, Pl.'s Resp. in Opp'n to Defs.' Mot. (hereinafter "Pl.'s Resp.") at p. 2. In fact, Plaintiff stated candidly during his deposition that he did not suffer any physical injury. Dkt. No. 57-4, David L. Cochran, Esq., Affirm., dated Oct. 15, 2008, Ex. A, Pl.'s Dep., dated Jan. 22, 2008 (hereinafter "Pl.'s Dep.") at p. 2.

Plaintiff alleges a second violation of his constitutional right to freely exercise his religion when Defendants denied him the opportunity to have family visits during the Muslim festival of Eid-Ul-Adha. Am. Compl. at ¶ 22.

As a result of the aforementioned factual allegations Plaintiff claims he suffered emotional, mental, and physical distress, and seeks both compensatory and punitive damages for his alleged injuries. *Id.* at ¶¶ 22, 25 & 26.

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In order for an issue of material fact to exist, it must relate to a disputed matter that "might affect the outcome of the suit," and the evidence is such that a "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

On a motion for summary judgment, the moving party

Slip Copy, 2009 WL 3049613 (N.D.N.Y.)

(Cite as: 2009 WL 3049613 (N.D.N.Y.))

bears the initial burden to demonstrate that there is no genuine issue as to any material fact, and therefore, they are entitled to a judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its burden, the non-moving party must go beyond the pleadings and allege specific facts that present a genuine issue for trial. FED. R. CIV. P. 56(e). To that end, the non-movant cannot rest on "mere allegations or denials." *Id.*

When evaluating a motion for summary judgment, the court will draw all inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Moreover, when a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (cited in *Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995)). Nevertheless, a party's "bald assertion," unsupported by evidence, is insufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

**B. Physical Injury Requirement**

**\*3** The Prison Litigation Reform Act of 1995 ("PLRA"), codified in part at 42 U.S.C. § 1997e(e), states that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." The purpose of this physical injury requirement is to discourage frivolous suits commenced by inmates. *See Cox v. Malone,* 199 F.Supp.2d 135, 139-140 (S.D.N.Y.2002) ("Section 1997e(e) [ ... ] is a *substantive* limitation on the type of actions that can be brought by prisoners. Its purpose is to weed out frivolous claims where only emotional injuries are alleged.") (emphasis in original). The Second Circuit Court of Appeals has held that the PLRA applies to alleged constitutional violations brought under 42 U.S.C. § 1983. *Thompson v. Carter,* 284 F.3d 411, 416 (2d Cir.2002).

In this case, the only physical injury that Plaintiff states he suffered was a loss of a few pounds and a

possible increase in blood pressure. Pl.'s Resp. at p. 2. Furthermore, Plaintiff did not allege these injuries in his Amended Complaint, but rather, only after Defendants raised the PLRA defense in their Motion for Partial Summary Judgment. Prior to Defendants' Motion, Plaintiff stated at his deposition that he did not suffer any physical injury. Pl.'s Dep. at p. 2. Even assuming, *arguendo,* that Plaintiff had properly alleged a physical injury in his Amended Complaint, his allegations do not constitute physical injury for purposes of the PLRA.

Section 1997e(e) provides no definition of "physical injury." *Liner v. Goord,* 196 F.3d 132, 135 (2d Cir.1999). However, courts have held that in order to constitute a physical injury under 1997e(e), an injury must be more than *de minimis,* but need not be significant. *Id.* (citing *Siglar v. Hightower,* 112 F.3d 191, 193 (5th Cir.1997)); *Warren v. Westchester County Jail,* 106 F.Supp.2d 559, 570 (S.D.N.Y.2000) (citing *Siglar* ).

The issue is therefore whether Plaintiff's loss of a few pounds amounts to more than a *de minimis* injury for purposes of the PLRA. In short, it appears this question is answered in the negative. Loss of weight is generally not considered to be a physical injury for purposes of the PLRA, especially the loss of only a few pounds. *See Dawes v. Walker,* 1998 WL 59454, at \*1 n. 1 (N.D.N.Y. Feb.9, 1998) ("It appears unlikely that lost weight is a physical injury within the meaning of Section 1997e(e)."); *see also Porter v. Coombe,* 1999 WL 587896, at \*8 (S.D.N.Y. Aug.4, 1999) (plaintiff's loss of twenty-five pounds did not constitute a physical injury); *accord Pearson v. Welborn,* 471 F.3d 732, 744 (7th Cir.2006) (plaintiff's loss of fifty pounds did not constitute a physical injury). Similarly, Plaintiff's alleged increase in blood pressure does not amount to physical injury. *See Jones v. H.H.C. Inc.,* 2003 WL 1960045, at \*5 (S.D.N.Y. Apr.8, 2003); *accord Davis v. District of Columbia,* 158 F.3d 1342, 1349 (D.C.Cir.1998) (articulating that § 1997e(e) precludes reliance on somatic manifestations of emotional distress). Thus, Plaintiff has not alleged a sufficient physical injury pursuant to the PLRA.

**\*4** Although Plaintiff has not met his burden on the physical injury requirement of the PLRA, his failure to do so is not completely dispositive of his underlying

Slip Copy, 2009 WL 3049613 (N.D.N.Y.)

(Cite as: 2009 WL 3049613 (N.D.N.Y.))

constitutional claim. "The failure of prisoners to plead or establish a compensable actual injury in a § 1983 constitutional tort claim [ ... ] only precludes the recovery of compensatory damages, but does not lead to the dismissal of the underlying claim." *Dawes v. Walker*, 239 F.3d 489, 496 (2d Cir.2001). Plaintiff may still be entitled to injunctive or declaratory relief for a violation of his constitutional rights. *Thompson v. Carter*, 284 F.3d 411, 416-418 (2d Cir.2002). A plaintiff is not required to show physical injury in order to recover nominal damages, punitive damages, or declaratory relief. *Gill v. Hoadley*, 2007 WL 1341468, at *4 (N.D.N.Y. May 4, 2007). In fact, it is error for courts not to award nominal damages in § 1983 actions when a constitutional violation has been established. *See Robinson v. Cattaraugus*, 147 F.3d 153, 162 (2d Cir.1998).

In the instant case, Plaintiff has requested punitive damages. Am. Compl. at ¶ 26. Defendants do not challenge the merits of Plaintiff's underlying constitutional claim, therefore that issue is not before this Court. Due to Plaintiff's inability to demonstrate a physical injury under 1997e(e), compensatory damages for mental or emotional suffering are barred for his § 1983 claim, but it remains to be decided if Plaintiff is entitled to nominal damages, punitive damages, or declaratory relief.

**C. Plaintiff's Pendent State Law Claim**

Plaintiff also brings a pendent state law claim pursuant to N.Y. CORR. LAWW § 610, which guarantees inmates "the free exercise and enjoyment of religious profession and worship" while incarcerated. Am. Compl. at ¶ 37. A federal court exercising pendent jurisdiction must apply state law. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1996). "Thus, if state law does not recognize a plaintiff's right to bring an action in state court, a federal court, exercising pendent jurisdiction, sitting as a state court, must follow the state law limitation on jurisdiction." *Livingston v. Griffin*, 2007 WL 2437433, at *2 (N.D.N.Y. Aug.22, 2007) (citing *Baker v. Coughlin*, 77 F.3d 12, 15 (2d Cir.1996)).

Defendants argue that this claim is barred by N.Y. CORR. LAWW § 24, which reads:

1. No civil action shall be brought in any court of the

state, except by the attorney general on behalf of the state, against any officer or employee of the department, in his personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties of any officer or employee of the department shall be brought and maintained in the court of claims as a claim against the state.

**5** Thus, § 24 precludes "the assertion of claims against corrections officers [in their personal capacities] in any court, including the federal courts," by designating the New York State Court of Claims as the only available venue to bring a claim for damages arising out the acts committed by corrections officers within the scope of their employment. *Baker v. Coughlin*, 77 F.3d at 14-15. And, because the Court of Claims is a court of limited jurisdiction, hearing only claims against New York State and no other individual or entity, § 24 amounts to a grant of immunity for corrections officers sued in their personal capacities for claims arising out of the discharge of their duties. N.Y. CT. CLMS. LAW § 9.

After the parties submitted their respective briefs on this Motion, the Supreme Court held in *Haywood v. Drown*, --- U.S. ----, 129 S.Ct. 2108, 173 L.Ed.2d 920 (2009) that § 24, when used to relegate to the Court of Claims civil rights actions brought pursuant to 42 U.S.C. § 1983, is inconsistent with the Supremacy Clause, U.S. Const. Art. VI, cl. 2, and therefore, unconstitutional. The *Haywood* Court held that New York State, having created courts of general jurisdiction that routinely hear § 1983 actions against all types of state actors, "is not at liberty to shut the courthouse door to federal claims [against corrections officers] that it considers at odds with its local policy." *Id.* at 2117. The Supreme Court found such selective treatment of § 1983 claims brought against corrections officers to be "contrary to Congress' judgment that *all* persons who violate federal rights while acting under color of state law shall be held liable for damages," and therefore, in violation of the Supremacy Clause. *Id.* at

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3049613 (N.D.N.Y.)

(Cite as: 2009 WL 3049613 (N.D.N.Y.))

2115 (emphasis in original).

In this case, Plaintiff has brought a state law claim pursuant to N.Y. CORR. LAWW § 610. Although the *Haywood* decision found § 24 to be in violation of the Supremacy Clause, it did so only with respect to claims brought under § 1983, a federal statute. A claim brought pursuant to a state law does not implicate the Supremacy Clause, and therefore, the *Haywood* decision does not affect the question of whether this Court has proper jurisdiction to hear this pendent state law claim.

Even after *Haywood,* a New York state court (other than the Court of Claims) would not have jurisdiction to hear Plaintiff's pendent claim pursuant to § 24 because Plaintiff has alleged acts that clearly fall within the scope of the Defendants' employment duties as corrections officers. Therefore, this Court does not have jurisdiction to hear this pendent state law claim brought pursuant to N.Y. CORR. LAWW § 610, and it is recommended that such claim be **dismissed.** *Baker v. Coughlin,* 77 F.3d at 14-16; *see also, e.g., Cancel v. Mazzuca,* 205 F.Supp.2d 128, 139 (S.D.N.Y.2002) (dismissing plaintiff's pendent state law claims pursuant to § 24).

### III. CONCLUSION

For the reasons stated therein, it is hereby
**\*6 RECOMMENDED,** that the Defendants' Motion for Partial Summary Judgment (Dkt. No. 57) be **GRANTED in part and DENIED in part;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.* Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs. .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

N.D.N.Y.,2009.

May v. Donneli
Slip Copy, 2009 WL 3049613 (N.D.N.Y.)
END OF DOCUMENT



Not Reported in F.Supp., 1994 WL 49696 (N.D.N.Y.)

(Cite as: 1994 WL 49696 (N.D.N.Y.))

C

Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Maurice PARKER, Plaintiff,
v.
Superintendent Walter FOGG, Correction Officers
Dennis Schoonmaker, Ernest Benevento & Correction
Sergeant Longtin, Defendants.
No. 85-CV-177.

Feb. 17, 1994.

James M. Kerrigan, Ithaca, NY, for plaintiff.

Robert Abrams, Atty. Gen. for the State of New York,
Albany, NY (David B. Roberts, Asst. Atty. Gen., of
counsel), for defendants.

MEMORANDUM-DECISION AND ORDER

McCURN, Senior District Judge.

**\*1** While incarcerated plaintiff *pro se,* Maurice
Parker, filed the present lawsuit.[FN1] This civil rights action,
brought pursuant to 42 U.S.C. § 1983, is predicated upon
allegations that plaintiff's Eighth and Fourteenth
Amendment rights under the United States Constitution
were violated, as well as his rights under Article I, §§ 5
and 6 of the New York State Constitution,[FN2] during an
altercation which took place on October 12, 1983, at
Coxsackie Correctional Facility ("Coxsackie" or "the
facility"), a maximum security prison. Besides those
alleged constitutional deprivations, plaintiff asserts three
pendent state law claims: (1) intentional infliction of
emotional distress, (2) assault and battery, and (3)
violations of New York Corrections Law § 137(5) [FN3] and
7 N.Y.C.R.R. §§ 250.2(g) and 251.2.[FN4] In his complaint
plaintiff seeks a declaratory judgment "that defendants
have violated [his] constitutional rights as protected by the
Eighth and Fourteenth Amendments to the United States
Constitution;...." Complaint at 5. He also seeks
compensatory damages of $250,000 and punitive damages
of $250,000, as well as reasonable costs and expenses,

including attorney's fees. *Id.*

Named as defendants in the complaint are Walter
Fogg, the Superintendent at Coxsackie at the time of the
alleged incident,[FN5] Correction Officers ("C.O.") Dennis
Schoonmaker and Ernest J. Benevento, and Sergeant
James Longtin.[FN6] On January 18 and 19, 1994 this matter
was tried before the court without a jury. In accordance
with Fed.R.Civ.P. 52(a), following constitutes the court's
findings of fact and conclusions of law in this regard.

*I. FINDINGS OF FACT*

To fully appreciate the relatively brief encounter
between plaintiff Parker and the defendants on the evening
of October 12, 1983, it is necessary to briefly examine the
background against which that incident occurred. There is
evidence in the record, in the form of "Inmate
Misbehavior Reports," showing that plaintiff had been
verbally harassing C.O. Judy Wood prior to October 12,
1983. *See* Defendants' exhs. E and F. Even though
plaintiff did not remember the incidents described in those
reports, he did remember having some differences with
C.O. Wood. Defendants suggest that those differences
arose out of the fact that C.O. Wood is a woman and at the
time was a "Block Officer," which apparently was quite
rare in the early 1980's. Plaintiff disagrees explaining that
his differences with Wood occurred because she accused
him of being a ringleader or instigator, provoking others
to engage in disturbances. In any event, it is against this
history of animosity between plaintiff Parker and Wood
(which most surely did exist, for whatever reason) that the
incident which is the subject of this litigation occurred.

Plaintiff's version of the events of October 12, 1983
is as follows. That evening he was keeplocked [FN7] in his
cell. When the other inmates returned from evening
recreation there were problems with the "lock in" [FN8]
because the inmates thought that the C.O.s were bringing
the inmates back to the cells ten minutes early. Plaintiff
testified that the inmates were behaving in a raucous
manner, with continued screaming even after being locked
in for the night. During this time plaintiff claims to have
been writing letters.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 49696 (N.D.N.Y.)

(Cite as: 1994 WL 49696 (N.D.N.Y.))

**\*2** Then, between 9:15 and 9:40 p.m., the door to plaintiff's cell was opened and he saw the defendants standing there. Plaintiff states that at that time he was wearing pajamas with no pockets and his slippers. When he tried to put on his boots, Schoonmaker, whom plaintiff believes had a baton, ordered him not to. In response to plaintiff's inquiry as to what was going on, Schoonmaker told him to, "Shut up," in no uncertain terms. Upon leaving the cell, plaintiff testified that he was not pat frisked, but that he was only escorted by the defendants to the center room. Apparently that room is so called because it is located between two sets of cell blocks. *See* Defendants' exh. A.

As they proceeded down the corridor, plaintiff admits to talking loudly and continuing to question defendants as to where he was being taken. He did that because he was the only one not locked in and he wanted his fellow inmates to know that he was being taken away by the defendants. Plaintiff was then placed in the corner of the center room, making it difficult for him to be seen or heard by other inmates in the surrounding cells. *See* Defendants' exh. A. At this time plaintiff's hands were behind his back, as they had been since he left the cell, and pressed against the wall. C.O.s Benevento and Schoonmaker flanked plaintiff, and by plaintiff's estimation Sergeant Longtin was behind the C.O.s, about two and a half feet from plaintiff.

Plaintiff further testified that it was only about three seconds from the time he was placed in the corner until Schoonmaker first hit him-either with an open right hand or a fist, plaintiff is not sure which. Prior to being struck, plaintiff testified that Schoonmaker was basically telling him that he had a big mouth and that he was a troublemaker. Trying to avoid getting hit, the plaintiff ducked. Plaintiff then claims that after that initial strike by Schoonmaker, both Benevento and Schoonmaker beat him up a little. Schoonmaker then hit plaintiff a second time with a right fist to plaintiff's temple, causing plaintiff's head to hit the wall and he began to bleed. Plaintiff testified that he was ducking and trying to protect himself after Schoonmaker struck him the first time. In fact, the plaintiff went so far as to demonstrate for the court the crouching position he assumed, with his hands covering his face, when the altercation started. Thus, because by his

own admission plaintiff was protecting his face and head and in so doing obstructing his own vision, the court simply cannot credit plaintiff's testimony that C.O. Benevento struck or kicked plaintiff. Perhaps plaintiff was kicked or hit by more than one of the defendants, but the fact remains that he could not reasonably testify to that because at that point, he could not see what was happening.

In any event, after this plaintiff claims that Benevento subdued him with a stick and no more punches were thrown. Plaintiff also claims that he was kicked in the groin, but again there is no credible testimony as to which defendant, if any, engaged in that conduct. Moreover, the medical records do not corroborate plaintiff's statement that he sustained injuries to the groin area as a result of this incident.

**\*3** The medical report contained in the "Unusual Incident Report" reveals that plaintiff sustained a cut measuring approximately 1 and 1/8 inches long on the outer area of his right eyebrow. Defendants' exh. B and H at 5. The facility nurse applied butterfly bandages. *Id.* The next day plaintiff was seen by a doctor who administered sutures. Defendants' exh. H at 5. Plaintiff received somewhere between four and six sutures.[FN9] The sutures were removed eleven days later. Defendants' exh. H. Photos of plaintiff taken eight days after the incident show that his right eye was still quite swollen, with significant bruising around it. Defendants' exh. I and plaintiff's exhs. 3A and 3B.[FN10] To this day, plaintiff still has a small scar (about one and a half inches long) above his right eyebrow, visible from approximately five feet away.

In addition to the scar, plaintiff claims that in the months after the incident he had a lot of headaches and vision problems, as well as pain in the groin area. Even today plaintiff claims that he continues to suffer from headaches, although he could not testify to the frequency of the same. Significantly, however, there is no mention in any of plaintiff's medical records, which are a part of the trial record, of headaches or vision problems. If plaintiff had, as he testified, a number of headaches in the two weeks immediately following the incident, surely that would be noted in his medical records from that time.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 49696 (N.D.N.Y.)

(Cite as: 1994 WL 49696 (N.D.N.Y.))

Likewise, even though plaintiff claimed at trial that he also sustained injury to his groin area, there is no mention of that in either the medical portion of the "Unusual Incident Report" or in his medical records for the date of the incident, or the visits immediately following that. In fact, there is no mention in the medical records of any such problem until nearly six weeks after the incident. Defendants' exh. H. In addition, when plaintiff again saw the doctor on November 28, 1983, he mentioned that problems with "bloody ejaculate" were intermittent for the past two months "and also 1 yr. [year] ago." *Id.* Following treatment for prostate difficulties, by plaintiff's own admission, this problem subsided. Thus, insofar as plaintiff's injuries are concerned, the court finds that plaintiff did sustain a laceration to the area above his right eyebrow, which required sutures and resulted in a small permanent scar.

The court will not attribute plaintiff's other complaints of headaches, vision problems and pain and discomfort in the groin area to this incident, however, because those problems are not substantiated in plaintiff's medical records during the weeks immediately following the incident. Furthermore, the fact that headaches can be so easily feigned is another reason for not attributing that particular symptom to the October 12, 1983 incident, especially where these supposed headaches are not mentioned anywhere in plaintiff's medical records.

Not surprisingly, defendants' version of events is at odds with that offered by plaintiff. The defendants claim that earlier in the evening of October 12, 1983, plaintiff had again been verbally harassing C.O. Wood. Sergeant Longtin claims that he first became aware of this when he received a call from C.O. Wood at approximately 7:50 p.m. In response to that call, Sergeant Longtin testified that he went to plaintiff's cell to work out the problem by talking with plaintiff. According to Longtin he and plaintiff agreed to "forgive and forget" the whole matter. Sometime later, while he was making his rounds in another part of the facility, Longtin received a second call from C.O. Wood, again complaining about plaintiff Parker. This time she advised Longtin that the keeplocked inmates, including Parker, were creating a disturbance. Wood also expressed concern that plaintiff had indicated that when the nurse and another C.O. made their usual

nightly rounds at 10:00 p.m., the inmates, led by plaintiff, planned to "break on" them, or, in other words, create a disturbance. Defendants' exh. G. Longtin advised Wood that he would be up shortly after finishing his rounds.

**\*4** The Sergeant did not come alone, though, as he had earlier. This time he was accompanied by defendants, Benevento and Schoonmaker. Sergeant Longtin testified that Schoonmaker was called to accompany him because that was part of his job. At the time, Schoonmaker had the official sounding title of "Evening Shift Assembly Desk Escort Officer," which in Schoonmaker's own words meant that he was a "gopher," or as Longtin described it, a "go-getter." Longtin testified that he did not know why Benevento was also called upon to accompany the Sergeant, but he hypothesized that perhaps Benevento was working overtime that night. The Sergeant further testified that it was customary for one Sergeant to be accompanied by two Corrections Officers in a situation such as this, where they anticipated moving an inmate, as they did Parker.

When the three defendants arrived at plaintiff's cell, prior to giving the signal for the door to be opened, Sergeant Longtin testified that he informed plaintiff that he was being taken to the center room so that they could talk to him. Schoonmaker then ordered plaintiff Parker to put on his pants and plaintiff did that. After exiting the cell, Schoonmaker pat frisked plaintiff and he found contraband-namely a blade from a Bic brand razor measuring approximately 1 1/2 inches by 3/8 inches. Defendants' exh. D and D1. Despite finding that contraband, the three defendants proceeded to escort plaintiff to the center room. Later that night, Schoonmaker wrote up an Inmate Misbehavior Report pertaining to both the contraband and the altercation; but no action was taken with respect to the contraband at the time it was found. Defendants' exh. D.

Upon entering the center room, plaintiff was ordered to stand in the corner and he did that. At that point, while directly in front of the plaintiff, Sergeant Longtin claims that he began talking to him, again questioning plaintiff about the alleged harassment and his supposed plan to instigate a disturbance on the block later that evening. Before he could finish, plaintiff began yelling.

Not Reported in F.Supp., 1994 WL 49696 (N.D.N.Y.)

(Cite as: 1994 WL 49696 (N.D.N.Y.))

Schoonmaker told the plaintiff to stop yelling and to show a little more respect for the Sergeant, or words to that effect. According to the defendants, that prompted plaintiff to respond by removing his hands from his pockets, where he had been instructed to keep them, and to swing at Schoonmaker with a closed fist. Schoonmaker claims that in self-defense he responded by striking plaintiff on the left side of his head, causing plaintiff's head to hit the wall. Schoonmaker and Benevento then turned the plaintiff around, and both applied "bar hammer locks" to plaintiff's arms. Defendants' exh. B. Longtin issued handcuffs to Schoonmaker who handcuffed the plaintiff. After being escorted to the infirmary, plaintiff was seen by a facility nurse and then placed in another cell area.

Ascertaining exactly what happened on the evening of October 12, 1983 at Coxsackie is not easy because, admittedly, there are discrepancies, in varying degrees of significance, in the testimony of each of the witnesses, all of whom are parties to this action.[FN11] In addition to the discrepancies, the court's task of deciding the "facts" of this case is made even more difficult because it appears that all of the witnesses embellished their testimony to some extent. Difficulty in ascertaining where the "truth" lies here is also compounded by the fact that this incident occurred over ten years ago; and thus, understandably, the independent recollection of each party was significantly impaired. Nevertheless, after considering all of the evidence, and after having the opportunity to judge the credibility of the witnesses, the court concludes that plaintiff's version of events more closely resembles what happened between plaintiff and defendants on the evening of October 12, 1983 than does the defendants' version, and the matter will be decided based predominately upon that view of events.

**\*5** There are two primary reasons that the court is willing, for the most part, to accept plaintiff's version of events. First, the court is greatly troubled by the fact that once contraband was found on the plaintiff, the defendants did not proceed to immediately write him up or focus upon that undisputed violation of prison policy. It is incredible to the court that after finding that contraband on the plaintiff, who according to the Sergeant, had already been reprimanded earlier that same evening for verbal assaults, the defendants' agenda remained to take plaintiff down the hall and talk to him about Wood's claim that he planned to instigate another disturbance later that night. Given the sequence of events, the court finds it perplexing that once the contraband was found, the defendants did not simply remove plaintiff from his cell block, especially when they were supposedly concerned about him causing a disturbance there later on that night. If that remained defendants' concern, it seems only logical that once they found the contraband, in combination with plaintiff's earlier difficulties with C.O. Wood and her fear about the possibility of plaintiff instigating another cell block disturbance, the defendants would have taken immediate action to segregate plaintiff. Or, at the very least, they would have taken some action more severe then just taking plaintiff down the hall to discuss matters with him. After all, as defendants themselves emphasized at trial, Coxsackie is a maximum security prison and plaintiff had a history of behavior problems, including problems with C.O. Wood-the very same C.O. who complained about him the night of October 12, 1983. Had defendants segregated plaintiff, any fear about his causing another disturbance would have been alleviated.

The court finds the defendants' description of what happened on the night of October 12, 1983 suspect for a second reason. As all the parties testified, although not in precisely this way, plaintiff, a 19 year old, 160 pound unarmed inmate, and familiar with prison mores having already served part of his sentence, was surrounded and literally cornered, by three guards whose combined weight was, conservatively, 500 pounds. Regardless of whether or not the defendants had batons,[FN12] it is implausible to the court that in this situation plaintiff would have "thrown the first punch," [FN13] "in an effort to 'get in his licks,' " [FN14] as the defendants steadfastly maintain. It is far more likely, in the court's opinion, that defendants were agitated by plaintiff Parker's ongoing insolence, as documented in the Inmate Misbehavior Reports of C.O. Woods, and which apparently continued earlier that evening. And thus they, or at least defendant Schoonmaker, made the decision to take some action beyond just talking to the plaintiff.

II. CONCLUSIONS OF LAW

*A. Eighth Amendment-Excessive Force*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 49696 (N.D.N.Y.)

(Cite as: 1994 WL 49696 (N.D.N.Y.))

Given the proliferation of inmate instituted lawsuits over the years, [FN15] it is not surprising that the law is fairly well circumscribed, with respect to Eighth Amendment excessive force claims. Recently, Chief Judge McAvoy of this District had occasion to set forth the legal principles governing such claims. *See Richardson v. VanDusen,* 833 F.Supp. 146 (N.D.N.Y.1993); *see also Boyd v. Selmver,* 842 F.Supp. 52, 55-56 (N.D.N.Y.1994). Set forth in those decisions is a thorough and accurate recitation of the relevant legal principles, which closely follows that set forth by other courts in this Circuit when faced with Eighth Amendment excessive force claims. [FN16] Consequently, the court sees no need to restate what has already been so well put by a number of courts; instead the court will quote liberally from Judge McAvoy's recent published decision in *Richardson.*

**\*6** The Eighth Amendment protects prisoners from "cruel and unusual punishment." *See Wilson v. Seiter,* 501 U.S. 294, ----, 111 S.Ct. 2321, 2323, 115 L.Ed.2d 271 (1991); *Estelle v. Gamble,* 429 U.S. 97, 102-05, 97 S.Ct. 285, 290-91, 50 L.Ed.2d 251 (1976). However, it is "the unnecessary and wanton infliction of pain", *Estelle v. Gamble,* 429 U.S. at 103, 97 S.Ct. at 290, and not simply the "ordinary lack of due care for the prisoner's interests or safety" *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986), which the Eighth Amendment prohibits.

To prevail in this civil rights action grounded in the Eighth Amendment, the plaintiff must show that the defendants used such excessive force to subdue him that the force could fairly be characterized as the "unnecessary and wanton infliction of pain." *See Hendricks v. Coughlin,* 942 F.2d 109, 113 (2nd Cir.1991). What is necessary to establish an "unnecessary and wanton infliction of pain" varies according to the nature of the constitutional violation. *Whitley v. Albers,* 475 U.S. at 320, 106 S.Ct. at 1084. "Wantonness does not have a fixed meaning but must be determined with 'due regard for differences in the kind of conduct against which an Eighth Amendment objection is lodged.' " *Wilson v. Seiter,* 501 U.S. at ----, 111 S.Ct. at 2326 (1991) (quoting *Whitley v. Albers,* 475 U.S. at 320, 106 S.Ct. at 1084). In this manner, the court must consider the "wantonness" element within the

context of the situation in which the underlying force occurred. *Id.* What may amount to the "unreasonable and wanton infliction of pain" is determined by the constraints facing the state official. As the *Whitley* court stated:

Where a prison security measure is undertaken to resolve a disturbance, such as occurred in this case, that indisputably poses significant risks to the safety of inmates and prison staff, we think the question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm."

*Id.* at 321-322, 106 S.Ct. at 1085 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied sub nom. John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)).

The Supreme Court has recently re-affirmed use of the *Whitley* test in situations such as the one now before the court. *See Hudson v. McMillian,* 503 U.S. 1, 112 S.Ct. 995, 999, 117 L.Ed.2d 156 (1992). In *Hudson,* the Court stated that "whenever prison officials stand accused of using excessive force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in *Whitley:* whether the force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.*

**\*7** Applying the *Whitley/Hudson* test, the Second Circuit recently stated:

To determine whether the defendants acted maliciously, a jury should consider the following factors: the extent of the plaintiff's injuries; the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response. Id. (citing *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085). If an evaluation of these factors leads the jury to conclude that the defendants acted maliciously, wantonness has been established. And an Eighth Amendment violation has occurred. If, on the other hand, reflection upon these

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 49696 (N.D.N.Y.)

(Cite as: 1994 WL 49696 (N.D.N.Y.))

factors leads the jury to find that the defendants acted in a good-faith effort to maintain and restore discipline, no constitutional violation has occurred because the subjective component of the claim has not been satisfied.

*Romano v. Howarth,* 998 F.2d 101 (2d Cir.1993).

*Id.* at 151-52.

*1. Defendant Schoonmaker*

Convinced that defendant Schoonmaker delivered the first blow, the court must now consider whether, under the circumstances, that conduct amounted to a deprivation of plaintiff Parker's constitutional rights such that liability should be imposed under section 1983. When the facts of this case are analyzed in light of the *Romano* factors, the court is compelled to conclude that Schoonmaker's unprovoked attack on plaintiff, albeit brief, renders him liable under section 1983. Although plaintiff's injuries were not extensive, that does not militate against a finding of excessive force violative of the Eighth Amendment. *See Hudson,* 112 S.Ct. at 1000 (use of excessive physical force against an inmate may constitute cruel and unusual punishment even though the inmate does not suffer serious injury). In addition, crediting plaintiff's testimony that Schoonmaker struck him first, there is absolutely nothing in the record demonstrating that Schoonmaker needed to apply force when plaintiff, a 19 year old, 160 pound unarmed inmate, was in a corner virtually surrounded by three prison guards who together substantially outweighed him. Again, accepting plaintiff's version of events, as just explained, Schoonmaker could not reasonably perceive plaintiff as a threat to Schoonmaker's well being. Lastly, Schoonmaker made no effort to temper his response to plaintiff's supposed disrespect; after verbally attacking plaintiff, Schoonmaker just hauled off and struck him. Based on all of the foregoing, the court finds that the force applied by defendant Schoonmaker was not done "in a good faith effort to maintain or restore discipline[,]" but rather was done "maliciously and sadistically to cause harm." *See id.* at 999. Consequently, plaintiff has shown to the court's satisfaction that Dennis Schoonmaker violated plaintiff's Eighth Amendment right to be free from cruel and unusual punishments.

*2. Defendant Longtin*

**\*8** The legal analysis set forth above, and particularly those factors enumerated in *Romano,* are not necessarily applicable with respect to the other two defendants however. More specifically, as to Sergeant Longtin, because the court does not credit plaintiff's testimony that he was attacked by any defendant other than Schoonmaker, obviously Longtin cannot be held liable on the same basis as Schoonmaker-as a direct participant in the attack. At the time of the incident, along with the other Sergeant on duty during that shift, by his own admission Sergeant Longtin was the second highest ranking prison official on duty then. (The highest ranking on duty official was a Lieutenant.) As such, Sergeant Longtin stands in a different position legally from that of the other two defendants. And because of that status, the fact that Longtin himself did not actually strike the plaintiff, does not necessarily extricate him from a finding of liability under § 1983.

A defendant's liability for a constitutional deprivation under 42 U.S.C. § 1983 may arise in several different ways, as the Second Circuit has recognized.

The defendant may have directly participated in the infraction. A supervisory official, after learning of the violation through a report or appeal, may have failed to remedy the wrong. A supervisory official may be liable because he or she created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue. Lastly, a supervisory official may be personally liable if he or she was grossly negligent in managing subordinates who caused the unlawful condition or event.

*Moffitt v. Town of Brookfield,* 950 F.2d 880, 886 (2d Cir.1991) (quoting *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)) (citations omitted)); *see also Van Pelt v. Finn,* No. 92 Civ. 2977, 1993 U.S.Dist. LEXIS 15951, at * 19 (S.D.N.Y. filed Nov. 12, 1993) (same); and *Garrido v. Coughlin,* 716 F.Supp. 98, 100 (S.D.N.Y.1989) (quoting *Duchesne v. Sugarman,* 566 F.2d 817, 830 (2d Cir.1977)) ("Supervisory officials cannot be held liable under § 1983 solely for the acts of others; 'there must be some showing of personal responsibility.' "). In the present case there is simply no proof that Longtin participated in striking plaintiff; that he

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 49696 (N.D.N.Y.)

(Cite as: 1994 WL 49696 (N.D.N.Y.))

created a policy or custom under which this attack was allowed to take place; or that he allowed a policy or custom of unprovoked attacks on inmates to continue. Thus, of the types of personal involvement just described, the only category into which Sergeant Longtin could possibly be placed would be as a supervisor who was grossly negligent in managing a subordinate-C.O. Schoonmaker.

Sergeant Longtin cannot be found liable on that basis, however, because this was a single incident which happened in a matter of seconds. Therefore, even though he was acting in a supervisory capacity at the time plaintiff's constitutional rights were violated, Sergeant Longtin still cannot be held liable because he is no different than any other non-supervisory prison official who does not act because there is no reasonable opportunity to intercede. As defense counsel correctly pointed out, this case is no different than *O'Neill v. Krzeminski,* 839 F.2d 8 (2d Cir.1988), where the Court held that there was "insufficient evidence to permit a jury reasonably to conclude that [an officer's] failure to intercede was a proximate cause of the beating [,]" where "the three blows were struck in such rapid succession that [the officer] had no realistic opportunity to a prevent them." *Id.* at 11. Just as in *O'Neill,* the blows by Schoonmaker were over and done with so quickly here that Sergeant Longtin "had no realistic opportunity to attempt to prevent them." *Id. see also Gaudreault v. Municipality of Salem, Mass.,* 923 F.2d 203, 207 n. 3 (1st Cir.1990), *cert. denied,* 500 U.S. 956, 111 S.Ct. 2266, 114 L.Ed.2d 718 1991) (no "realistic opportunity" for a police officer to prevent an attack in a police station booking room where it was over in a matter of seconds). Thus, while generally a corrections officer such as Longtin bears "an affirmative duty to intercede on behalf of a citizen whose constitutional rights are being violated in his presence by other officers [,]" Sergeant Longtin was excused from that duty because there was no "realistic opportunity" to prevent this attack which was over in a matter of seconds. *See id.*

*3. Defendant Benevento*

**\*9** Similarly, there is no basis for finding liability under section 1983 as against C.O. Benevento. Not only

was C.O. Benevento not in a supervisory position at the time of the incident, but just like Sergeant Longtin, he too did not have a reasonable opportunity to intercede. Therefore the legal analysis set forth above with respect to Sergeant Longtin applies with equal force to C.O. Benevento. Thus there is no basis for a finding that defendant Benevento violated plaintiff's rights under the Eighth Amendment.

*B. Fourteenth Amendment-Due Process*

Given the complete lack of proof at trial on any due process claim other than one based upon Schoonmaker's unprovoked attacked on plaintiff Parker,[FN17] the court assumes that plaintiff has abandoned all other aspects of this claim. In other words, the court finds that defendant Schoonmaker is also liable under § 1983 for violating plaintiff's due process rights when Schoonmaker struck plaintiff in the head, but the other two defendants are not liable in any way for violating plaintiff's due process rights.

*C. Pendent State Law Claims*

Before turning to a consideration of plaintiff's pendent state law claims, the court notes that although this case has been pending for nearly nine years, it was not until defendants' opening statement at trial that a statute of limitations defense was raised. Having failed to assert that affirmative defense in their answer, however, the defendants are deemed to have waived it. *See Litton Indus. v. Lehman Bros. Kuhn Loeb Inc.,* 967 F.2d 742, 752 (2d Cir.1992). In light of that waiver, the court need not address the defendants' untimely statute of limitations argument.

During their opening statement, defendants raised a second procedural point with respect to plaintiff's pendent claims and that is that those claims are barred by § 24 of the New York State Corrections Law. That statute expressly states, in relevant part:

1. No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department [of corrections], in his personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 49696 (N.D.N.Y.)

(Cite as: 1994 WL 49696 (N.D.N.Y.))

2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties of any officer or employee of the department shall be brought and maintained in the court of claims as a claim against the state.

N.Y.Correc.Law §§ 24(1) and 24(2) (McKinney 1987) (emphasis added). Relying upon that statute, defendants argue that because a state court would lack jurisdiction thereunder to decide plaintiff's pendent state claims, then so too would this court lack jurisdiction over those claims.[FN18] Case law construing section 24 is not plentiful. The few federal cases discussing that statute do make clear, though, that "a New York State inmate is foreclosed in New York State court- ...-from a private damage action against prison employees in their personal capacity for damages arising out of acts or failures to act taken within the scope of employment and in the discharge of duty." *Selby v. Ribeiro,* No. 78 Civ. 1281-CSH, slip op. at 3 (S.D.N.Y. Jan. 9, 1980) (citing *Rav v. Fritz,* 468 F.2d 586, 587 n. 2 (2d Cir.1972)) (emphasis added); *see also Boyd, supra,* slip op. at *13-*14; and *Brown v. Coughlin,* 758 F.Supp. 876, 886 (S.D.N.Y.1991). Thus, the court agrees that § 24 bars plaintiff's pendent tort claims.[FN19]

*D. Damages*

**\*10** Having determined that defendant Schoonmaker is liable to plaintiff for violating his Eighth and Fourteenth Amendment rights, the only remaining question for the court is the amount of damages to be awarded. In that regard, the court notes its disagreement with defendants that plaintiff Parker should only be entitled to recover nominal damages. An award of nominal damages is proper "[a]bsent a showing of causation and actual injury." *Miner v. City of Glens Falls,* 999 F.2d 655, 660 (2d Cir.1993) (emphasis added) (citing, *inter alia, Carey v. Piphus,* 435 U.S. 247, 263, 266-67, 98 S.Ct. 1042, 1052, 1054, 55 L.Ed.2d 252 (1978)). As fully set forth herein, the plaintiff has made the requisite showing of causation and actual injury, at least with respect to the injury he sustained to his head. Thus, something more than a nominal damage award is mandated here.

After reviewing the medical records, listening to all of

the testimony, and having an opportunity to observe the permanent scar near plaintiff's right eyebrow, which although not disfiguring, does remain visible today-some nine years later, the court is convinced that plaintiff is entitled to damages totalling $2,500.00. An award of that amount will, in the court's opinion, adequately compensate plaintiff for the actual injury he sustained, as well as for his pain and suffering.

An award of punitive damages is not, however, justified on the present record. In *Smith v. Wade,* 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983), the Supreme Court set forth the standard for assessing punitive damages in § 1983 actions. The Court held that punitive damages may be awarded "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Id.* at 56, 103 S.Ct. at 1640. The *Smith* Court further "observed that though entitlement to compensatory damages is automatic upon a finding that the plaintiff's rights have been violated, an award of punitive damages is discretionary, reflecting a 'moral judgment,' and that the threshold of proof need not be different." *Vasbinder v. Ambach,* 926 F.2d 1333, 1342 (2d Cir.1991) (quoting *Smith,* 461 U.S. at 52, 52-55, 103 S.Ct. at 1638, 1638-40). The Supreme Court has also explained that the purpose of punitive damages "is to punish the defendant for his willful or malicious conduct and to deter others from similar behavior." *Memphis Community School District v. Stachura,* 477 U.S. 299, 306 n. 9, 106 S.Ct. 2537, 2542 n. 9, 91 L.Ed.2d 249 (1986); *see also In re Air Disaster at Lockerbie, Scotland,* 928 F.2d 1267, 1272 (2d Cir.), *cert. denied,* 502 U.S. 920, 112 S.Ct. 331, 116 L.Ed.2d 272 (1991) (reviewing history of punitive damages).

Keeping these general principles in mind, the court cannot find that punitive damages are warranted based upon the record before it. There is simply nothing in the record showing that defendant Schoonmaker acted recklessly or with "callous indifference" to plaintiff Parker's rights. Although defendant Schoonmaker violated plaintiff's constitutional rights, in the court's view his conduct was not sufficiently egregious to justify an award of punitive damages.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 49696 (N.D.N.Y.)

(Cite as: 1994 WL 49696 (N.D.N.Y.))

*E. Attorney's Fees*

  **\*11** In light of the foregoing, plaintiff's counsel has thirty (30) days from the date of entry of this memorandum-decision and order in which to file his application for attorney's fees. Counsel is reminded that such application must be submitted in a form consistent with the requirements for the same in this Circuit. Defendant Schoonmaker will then have fifteen (15) days in which to file any objections thereto. If no objections are filed by the end of that time, the court will award attorney's fees in the full amount sought by plaintiff's counsel. Having said all this, the court strongly urges both counsel to resolve the attorney's fees matter without further court intervention. If that is not possible, however, the above time frame applies.

*III. CONCLUSION*

  For the violation of his Eighth and Fourteenth Amendment rights, plaintiff Maurice Parker is awarded compensatory damages of $2,500.00 against defendant Dennis Schoonmaker. Plaintiff Parker is also entitled to a declaratory judgment that defendant Dennis Schoonmaker violated his Eighth and Fourteenth Amendment as fully explained herein. Plaintiff Parker is not, however, entitled to recover on any other aspect of this action.

  Accordingly, the Clerk of the Court is directed to enter judgment on behalf of the plaintiff in the total amount of $2,500.00 as against defendant Dennis Schoonmaker. The Clerk of the Court is further directed to enter judgment dismissing the plaintiff's claims as against defendants Ernest Benevento and James Longtin, and dismissing plaintiff's state law claims as against all defendants.

  IT IS SO ORDERED.

  FN1. Although plaintiff initially proceeded *pro se,* by order dated July 19, 1989 Magistrate Judge Gustave DiBianco appointed attorney David Damico to represent the plaintiff. Docket Entry # 24. When Mr. Damico asked to be relieved as counsel because it was a hardship for him to travel to the prison where plaintiff was incarcerated, the Magistrate Judge granted that request. Docket Entry # 26. He then appointed

attorney James Kerrigan to represent plaintiff on a *pro bono* basis. Docket Entry # 27. The court acknowledges its gratitude to Mr. Kerrigan's for his willingness to accept this *pro bono* assignment.

  FN2. As does the Eighth Amendment of the United States Constitution, section 5 of the New York State Constitution contains a prohibition against "cruel and unusual punishments," and presumably it is that provision upon which plaintiff is relying, although the same is not specified in his complaint. *See* N.Y. Const. art. I, § 5 (McKinney 1982). Section 6 of the State Constitution is likewise similar to the Fourteenth Amendment of the United States Constitution in that in contains, *inter alia,* a due process clause. *See* N.Y. Const. art. I, § 6 (McKinney 1982). And once again, although not indicated in his complaint, it is apparently that provision of section 6 upon which plaintiff relies in this action.

  FN3. Although not identified in his complaint, plaintiff is apparently relying upon the first part of this statute, which states:

  No inmate in the care or custody of the department [of corrections] shall be subjected to degrading treatment, and no officer or other employee of the department shall inflict any blows whatever upon any inmate, unless in self defense, or to suppress a revolt or insurrection.

N.Y.Correct. § 137(5) (McKinney 1987). This statute is not as one-sided as a reading of the just quoted passage might suggest. Section 137(5) goes on to provide:

  When any inmate, or group of inmates, shall offer violence to any person, or do or attempt to do any injury to property, or attempt to escape, or resist or disobey any lawful direction, the officers and employees shall use all suitable means to defend themselves, to maintain order, to enforce observation of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 49696 (N.D.N.Y.)

(Cite as: 1994 WL 49696 (N.D.N.Y.))

discipline, to secure the persons of the offenders and to prevent any such attempt or escape.

Id.

FN4. Section 250.2(g) of the New York Code of Rules and Regulations plainly states: "Corporal punishment is absolutely forbidden for any purpose and under all circumstances." 7 N.Y.C.R.R. § 250.2(g). Section 251-1.2 of the Code, contained in the section entitled "Initial Actions in Cases of Inmate Misbehavior," basically describes the circumstances under which it may be appropriate for physical force to be used in connection with an inmate who has misbehaved.

FN5. Just prior to trial, plaintiff moved to voluntarily discontinue this action as against Superintendent Fogg, and the court granted that motion. Docket Entry # 41.

FN6. The court observes that the complaint is silent as to which capacity-individual or official-the defendants are being sued. This is not an uncommon deficiency in a case such as this. Oliver Schools, Inc. v. Foley, 930 F.2d 248, 252 (2d Cir.1991) (quoting Kentucky v. Graham, 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 3106 n. 14, 87 L.Ed.2d 114 (1985) (quoting in turn Brandon v. Holt, 469 U.S. 464, 469, 105 S.Ct. 873, 876, 88 L.Ed.2d 878 (1985)) (" 'In many cases,' a complaint against public officials 'will not clearly specify whether officials are sued personally, in their official capacity, or both,' and only" [t]he course of proceedings' ... will indicate the nature of the liability imposed.' "). Furthermore, in part because the defendants never filed any motions in this case, the issue of the capacity in which the defendants are being sued was never fully explored. The court will assume, however, that plaintiff Parker is suing the defendants in both their individual and official capacities.

It is true that in their answer defendants asserted a qualified immunity defense, which applies, if at all, only insofar as they are being sued in their personal or individual capacities. See Ying Jing Gan v. City of New York, 996 F.2d 522, 529-530 (2d Cir.1993). Presumably if defendants believed that they were also being sued in their official capacity, they would have included an Eleventh Amendment immunity defense in their answer. See id. at 529 (citations omitted) ("To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."). Nonetheless, given the following comment by the Second Circuit, except as explained below, the court will not presume, as defendants seemingly did, that they are being sued only in their personal capacities.

[A] plaintiff who has not clearly identified in her complaint the capacity in which the defendant is sued should not have the complaint automatically construed as focusing on one capacity to the exclusion of the other. By the same token, a party who is unclear in argument as to the capacity in which the defendant can be pursued should not lightly be deemed to have withdrawn a claim that was expressly stated. When the party's defense of her stated claim bespeaks a doctrinal confusion, the court should not presume that there has been abandonment but should instead give her the opportunity either to abandon the claim or to pursue it with a corrected understanding as to what proof will be required to establish it.

Frank v. Relin, 1 F.3d 1317, 1326 (2d Cir.1993).

Having given plaintiff some leeway on this pleading issue, consistent with the relevant case law, the court will not read plaintiff's

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 49696 (N.D.N.Y.)

(Cite as: 1994 WL 49696 (N.D.N.Y.))

complaint as asserting a claim for monetary damages against the defendants in their official capacities, however, because such claim obviously would be barred by the Eleventh Amendment. *Gan,* 996 F.2d at 529. Thus, the court will construe plaintiff's complaint as seeking monetary damages against defendants in their personal or individual capacities only. The court will construe the complaint as seeking declaratory relief against defendants in both their personal and official capacities, however. (It is undisputed that a claim for declaratory relief is not barred by the Eleventh Amendment. *See Berman Enterprises, Inc. v. Jorling,* 3 F.3d 602, 606 (2d Cir.1993)).

FN7. Keeplock is a means of administrative confinement. As plaintiff explains it, an inmate is keeplocked in his cell because of certain misbehavior. While keeplocked, an inmate must spend nearly the entire day in the cell, including taking meals there.

FN8. Sergeant Longtin testified that at 10:00 p.m. all the inmates are locked in their cells for the night and a head count is taken.

FN9. Plaintiff testified that he received six sutures, and the medical records are ambiguous. The one entry pertaining to the number of sutures appears to read four, but it is followed by and entry which is illegible. Defendants' exh. H at 5. This discrepancy, if it even exists, in the court's view, is inconsequential.

FN10. The court takes umbrage at the suggestion by plaintiff that the original photographs were "hidden away in the court's files for years [,]" implying an element of deceit on the part of the court or defense counsel. First of all, those photographs were provided by Prisoner's Legal Services of New York, which was at least nominally representing plaintiff at the time. *See* Docket Entry # 46 (Court Exhibit # 1). Second, the court file in this action is a matter of public record. Therefore, at any time prior to the trial

plaintiff's counsel was free to review it. Indeed, the court would be surprised to learn if that was not done shortly after the appointment of plaintiff's current counsel. Thus, any suggestion that either the court or defense counsel were secreting these photographs is patently absurd.

FN11. In defendants' post-trial submission, they suggest that the plaintiff's testimony is inherently suspect because, among other reasons, he is a party to this action. While that may be true, obviously the same can also be said of the defendants, and thus the court is not willing to discredit the testimony of any witness here simply because he is a party to this action.

As an additional basis for challenging plaintiff's testimony, defendants assert that he should be disbelieved simply because he is a convicted felon. The court declines to accept that view. Automatically discounting the testimony of a plaintiff-inmate would mean that he or she would never prevail in a case such as this. Certainly the Supreme Court did not intend such a harsh result when it stated, "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley,* 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987). An obvious and dangerous ramification of the view suggested by defendants is that plaintiff-inmates would be deprived of all their constitutional rights solely by virtue of their status as inmates. Such a cynical view flies in the face of the Supreme Court's clear pronouncement in *Turner.*

FN12. The testimony conflicts on this point.

FN13. Letter of David B. Roberts to Court (Jan. 24, 1994) at 1.

FN14. *Id.* at 3.

FN15. *See* Report of the Federal Courts Study Committee-Part II, April 2, 1990 at 49; *see also*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 49696 (N.D.N.Y.)

(Cite as: 1994 WL 49696 (N.D.N.Y.))

N.Y.Correc.Law § 137, Practice Commentary thereto at 137 ("Claims that unnecessary force was used against inmates by corrections officers have formed the basis for numerous lawsuits alleging a violation of the 8th Amendment."). In this District alone, inmate instituted cases, with the vast majority being brought under 42 U.S.C. § 1983, represented 34.3% of the total civil caseload for 1993. *See* Northern District of New York, 1993 Annual Report, *Pro Se* Staff Attorney's Office.

FN16. *See, e.g., Candelaria v. Coughlin,* 787 F.Supp. 368, 374 (S.D.N.Y.), *aff'd without published opinion,* 979 F.2d 845 (2d Cir.1992); *Gabai v. Jacoby,* 800 F.Supp. 1149, 1154-55 (S.D.N.Y.1992) (Grubin, Mag. J.), *Report-Recommendation Adopted in its Entirety,* No. 91 Civ. 2605 (S.D.N.Y. Sept. 9, 1992).

FN17. Besides forming the basis for an Eighth Amendment violation, an unprovoked attack such as the one which occurred in this case may also be the basis for a violation of an inmate's due process rights. *See Wilson v. White,* 656 F.Supp. 877, 879 (S.D.N.Y.1987) ("An attack on a prison inmate ... which is not part of an attempt to maintain or restore discipline violates the inmate's due process right to be free from unprovoked attack."); and *Vargas v. Correa,* 416 F.Supp. 266, 268-69 (S.D.N.Y.1976) (court held that an unprovoked assault upon an inmate constituted a violation of his due process rights).

FN18. Defendants also failed to raise this defense in their answer. Nevertheless, defendants are not deemed to have waived it because, as Fed.R.Civ.P. 12(h)(3) plainly states, "Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." Fed.R.Civ.P. 12(h)(3) (emphasis added); *see also Tongkook America, Inc. v. Shipton Sportswear Company,* 14 F.3d 781, 783 (2d Cir. Jan. 26, 1994) (citations omitted) ("The fact that [defendant] did not raise the defense of lack of

subject-matter jurisdiction in its answer is not determinative, since subject-matter jurisdiction cannot be waived and the issue can be raised at any time in the course of the litigation.").

FN19. One thing is clear from the complaint and that is that plaintiff is seeking only monetary damages with respect to the pendent tort claims. His claim for declaratory relief is, as mentioned earlier, limited to the claims arising out of the alleged constitutional deprivations. *See supra* at 3.

N.D.N.Y.,1994.

Parker v. Fogg
Not Reported in F.Supp., 1994 WL 49696 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.